## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN ACADEMY OF PEDIATRICS,
345 Park Boulevard
Itasca, IL 60143,

*Plaintiff*,

v.

FEDERAL TRADE COMMISSION; ANDREW
N. FERGUSON, in his official capacity as Chair
of the Federal Trade Commission; MARK R.
MEADOR, in his official capacity as
Commissioner of the Federal Trade Commission,
600 Pennsylvania Avenue NW
Washington, DC 20580,

*Defendants*.

Case No. _____

**COMPLAINT**

**(Rule 57 Speedy Hearing Request)**

## INTRODUCTION

1.     The American Academy of Pediatrics ("AAP") is a non-partisan 501(c)(3) non-profit organization founded in 1930 with the mission of advancing the health of all infants, children, adolescents, and young adults.  For nearly a century, AAP has served as the leading national voice in pediatric medicine and public discourse concerning the health and well-being of young people.  Consistent with its mission, AAP has highlighted repeatedly the importance of support for transgender and gender-diverse ("TGD") youth, including, as appropriate, the provision of gender-affirming care ("GAC") through individualized care plans developed in consultation with providers, families, and patients.  GAC refers to a range of steps designed to support TGD youth, not a specific medical treatment or intervention.  AAP's speech includes a

policy statement published in 2018 (the "2018 Policy Statement") titled "Ensuring Comprehensive

Care and Support for Transgender and Gender-Diverse Children and Adolescents."[1]

2.    The Trump Administration has repeatedly expressed animus toward speech like

AAP's, including through, *inter alia*, Executive Orders issued by the President, such as President

Trump's January 20, 2025 Executive Order declaring that the United States "recognize[s] two

sexes, male and female" and "these sexes are not changeable,"[2] and President Trump's January 28,

2025 Executive Order directing executive branch agencies to "end" what he described as the

"chemical and surgical mutilation" of children.[3]

3.    Federal Trade Commission ("FTC") Chairman Andrew Ferguson has made clear he

shares the Administration's animus toward such speech.  In December 2024, while campaigning

for the position of FTC Chairman, then-Commissioner Ferguson promised to use his position, if

appointed, to "[f]ight back against the trans agenda" and "[i]nvestigate" those who "pushed gender

confusion."[4]  President Trump elevated then-Commissioner Ferguson to FTC Chairman on

January 20, 2025—the same day he declared the United States government would only recognize

"two sexes."[5]

4.    In the most recent demonstration of the Trump Administration's and Chairman

Ferguson's animus, the FTC targeted AAP with a Civil Investigative Demand ("CID") on January

---

[1] AAP Policy Statement, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, (Oct. 1, 2018) https://perma.cc/34FM-3E4X ("2018 Policy Statement").

[2] *See* Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

[3] *See* Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025).

[4] *See* Punchbowl News, *As Chair, FTC Commissioner Touts He'd Pull Back on AI and Fight Trans Care* (Dec. 6, 2024), https://perma.cc/P6NL-FZFG.

[5] *See* Press Release, FTC, Andrew N. Ferguson Takes Over as FTC Chairman (Jan. 22, 2025), https://perma.cc/ZSN6-RNAC.

15, 2026.[6]  The CID demands a sweeping array of information about AAP's protected speech, including:  (1) all statements AAP has made about "Pediatric Gender Dysphoria Treatment" ("PGDT"),[7] including to whom those statements were made, when and how they were made, and why they were made; (2) the identity of any person or entity who evaluated the science supporting AAP's statements; (3) AAP's deliberative process for developing its clinical guidance on GAC and information about every individual or entity that participated in that process; (4) AAP's communications with other organizations as well as any other institution or individual about the development of clinical guidance on GAC; (5) information about AAP's educational programs related to "PGDT"; (6) AAP's financial information; and (7) any testimony, advocacy or other information AAP has provided to legislatures or regulators about "PGDT" as well as information about its participation in lawsuits and submission of amicus briefs.  *See* Ex. 1 (CID), Specifications A.5–13, B.1–11.

5.    The subject matter and scope of the CID's demands demonstrate a clear motive to punish AAP for its 2018 Policy Statement and its stated support of social affirmation and appropriate medical interventions to support TGD youth.

6.    The CID's improper motive is further evidenced by the FTC's disregard for the limitations of its statutory authority to investigate conduct relevant to potential violations of the FTC Act.  The FTC Act prohibits "persons, partnerships, or corporations" from engaging in unfair or deceptive acts or practices "in or affecting commerce."  15 U.S.C. § 45(a)(1)–(2).  But AAP is a non-profit organization that advocates on behalf of young people and publishes medical and

---

[6] The CID issued to AAP is attached as Exhibit 1.

[7] The CID defines PGDT as any "medical intervention which, according to [AAP], purports to treat gender dysphoric or gender diverse minors . . . ."  Ex. 1 (CID), Definition D-7.

scientific guidance to inform the clinical judgment of pediatricians. It is not a "person, partnership, or corporation" and its guidance about GAC is not "in or affecting commerce."

7.    The issuance of the CID is intended to intimidate AAP from speaking about the state of scientific research on GAC because the Trump Administration and the FTC do not agree with it. Unable to prevail in the marketplace of ideas, the FTC has resorted to burdening AAP with an intrusive and expensive investigation that is unconstitutional and outside the scope of the FTC's statutory authority.

8.    Using the threat of investigation or prosecution against an organization in order to silence speech the government does not like is retaliation, prohibited by the First Amendment to the U.S. Constitution. Moreover, issuing an overbroad subpoena as a tool to compel disclosures in such a retaliatory action violates the Fourth Amendment. The FTC's CID is also an attack on AAP for its protected speech, issued because the Trump Administration disagrees with the viewpoints AAP expresses. Such a CID cannot proceed consistent with the U.S. Constitution's core protections against retaliation, viewpoint discrimination, and unreasonable search.

9.    Absent this Court's intervention, the FTC's unlawful actions will continue to cause AAP real and immediate harm because of the unreasonable burdens those actions have imposed on AAP's First Amendment-protected activities, including its right to free speech and association. Without relief, AAP faces a choice: continue to speak and engage on the issue of GAC and risk further targeting by the FTC or accede to the FTC's improper request for information that the FTC has no legitimate basis to demand. But the Constitution safeguards individuals and organizations from being forced to make this type of impossible choice.

## JURISDICTION AND VENUE

10.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1331.  AAP's claims arise under the First and Fourth Amendments to the U.S. Constitution.

11.     This Court has authority to enter a declaratory judgment and to provide preliminary and permanent relief, as well as other relief, under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the All Writs Act, 28 U.S.C. § 1651, Federal Rules of Civil Procedure 57 and 65, and the Court's inherent equitable powers.

12.     Subject-matter jurisdiction exists under Article III because AAP has suffered—and will continue to suffer—injuries-in-fact.  There is a sufficient causal connection between AAP's injuries and Defendants' pursuit of this investigation; a favorable decision by this Court granting AAP relief will redress those injuries.

13.     This dispute is ripe because AAP's rights have already been violated, and AAP will suffer further imminent invasions of those rights in the absence of relief from this Court.  AAP is justifiably concerned about the retaliatory effect of the CID and the associated investigation, both of which have caused it associational, financial, and other harms.

14.     Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e)(1)(A) because the FTC has its principal place of business and individual Defendants perform their official duties in the District of Columbia.

## THE PARTIES

15.     Plaintiff American Academy of Pediatrics is a 501(c)(3) non-profit organization dedicated to improving the health of all children.  AAP's membership includes pediatricians, with members in every state in the country who currently provide direct care to infants, children, adolescents, and young adults in both hospital and outpatient settings.  Today, approximately

67,000 pediatricians are members of AAP and are committed to its mission of achieving the optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults.[8]  While its membership ranges across the country, AAP itself is incorporated under the laws of Illinois, headquartered in Itasca, Illinois, and operated exclusively for charitable and educational purposes under section 501(c)(3) of the Internal Revenue Code.  Grounding its work in science, AAP has advanced pediatric clinical expertise, provided high-quality education and policy guidance, fostered the development of scientific research in the field of pediatrics, and consistently advocated on behalf of all young people.

16.    Defendant FTC is an administrative agency of the United States that is headquartered in Washington, D.C.  Among other things, it is tasked with preventing unfair and deceptive acts or practices in or affecting commerce.  *See* 15 U.S.C. § 45(a)(2).

17.    Defendant Andrew N. Ferguson is the Chairman of the FTC and one of the two sitting Commissioners.  His business address is in Washington, D.C.  Chairman Ferguson is responsible for overseeing the FTC's activities, including investigations such as the one complained of herein.  He is being sued in his official capacity.

18.    Defendant Mark R. Meador is a Commissioner of the FTC.  His business address is in Washington, D.C.  Commissioner Meador is responsible for overseeing the FTC's activities, including investigations such as the one complained of herein.  He is being sued in his official capacity.

---

[8] *About the AAP*, Am. Acad. of Pediatrics, https://perma.cc/Z4MG-C7DL (last visited Feb. 16, 2026).

## FACTS

**I.    AAP Has a Long History of Advancing the Welfare of All Infants, Children, Adolescents, and Young Adults.**

**A.    AAP Was Founded to Advance the Health of All Young People.**

19.    AAP is a 501(c)(3) non-profit organization that was founded in 1930 with the mission of improving the health of all infants, children, adolescents, and young adults.[9]

20.    As set forth in its founding documents, AAP's fundamental purpose is to support research, education, ethics, and dignity in pediatric practice for the ultimate welfare of young people, and not "pecuniary profit."[10]  Two critical aspects of this mission are to "foster and stimulate interest in pediatrics and correlate all aspects of work for the welfare of children which properly comes within the scope of pediatrics [and] to promote publications and encourage contributions to medical and scientific literature pertaining to pediatrics."[11]

21.    For nearly a century, AAP has served as a leading national voice on pediatric medicine, clinical guidance, and health policy.  It has advanced pediatric clinical expertise, grounded its work in science, provided high-quality education and policy guidance, fostered the development of scientific research in the field of pediatrics, and consistently advocated on behalf of all infants, children, adolescents, and young adults.[12]

22.    For decades, the AAP has engaged in lawful, transparent, and well-established collaboration with agencies of the United States government to advance child health through the provision of independent medical expertise and programmatic implementation.    These

---

[9] *Articles of Incorporation*, Am. Acad. of Pediatrics, AAP Books, https://perma.cc/SW9V-DA4U (last visited Feb. 16, 2026).

[10] *Id.* at 3.

[11] *Id.*

[12] *About the AAP, supra* note 8.

collaborations have included cooperative agreements with components of the U.S. Department of Health and Human Services ("HHS"), under which AAP has developed and disseminated evidence-based pediatric preventive care guidelines. AAP has also collaborated with federal agencies like the Centers for Disease Control and Prevention by contributing pediatric expertise to advisory workgroups and public health initiatives, helping translate emerging science into practical guidance for clinicians. Together, these collaborations reflect a long-standing, good-faith partnership in which independent medical expertise and public institutions work side by side to promote the health and well-being of youth.

### B.    AAP Engages in Advocacy, Education, and Scientific Research to Advance the Health of Young People.

23.    AAP achieves its mission by advocating for policies that promote the health and well-being of infants, children, adolescents, and young adults, fostering research that advances the field of pediatrics, and educating the medical professionals who provide direct patient care.

24.    Consistent with this purpose, AAP does not sell medical products or services to patients or their families.

25.    Instead, for example, to expand access to health care in pediatric settings, AAP supports policies that ensure all youth have access to high-quality, age-appropriate, and affordable health insurance.[13]

26.    AAP has filed amicus briefs, submitted comments in rulemakings, and participated in public policy debates in support of its mission to support and improve the quality of, and access to, pediatric healthcare.

---

[13] *Advocacy,* Am. Acad. of Pediatrics, https://perma.cc/R9LS-7ESX (last visited Feb. 16, 2026).

27.     AAP also engages in a variety of activities to foster scientific and medical discourse, with the goal of advancing the field of pediatric medicine.  For example, AAP engages in original health services research intended to increase understanding of how the practice of pediatric medicine can improve care for youth and families on topics such as food allergies, mental health, obesity, and vaccinations.[14]  AAP research articles have been published in numerous peer-reviewed journals.[15]

28.     Since 1948, AAP has published the editorially independent, peer-reviewed, scientific journal *Pediatrics*, which includes original scientific research, clinical observations, and articles about a variety of topics that intersect with pediatrics, such as nutrition, psychology, education, and dentistry.  The mission of the journal is to "[e]ncompass the needs of the whole child in his or her physiologic, mental, emotional, and social structure."[16]

29.     AAP also provides a variety of educational resources to medical professionals so that they have access to the latest research in the field of pediatrics.  AAP offers courses and trainings on a variety of subject matters—from first aid to managing asthma—to ensure that pediatricians have the knowledge they need to provide their patients with evidence-based and scientifically-backed care.[17]  AAP hosts events, such as conferences, to enable professionals in the

---

[14] *Research,* Am. Acad. of Pediatrics, https://perma.cc/ZG4Z-VWYU (last visited Feb. 16, 2026).

[15] *Research Journal Articles,* Am. Acad. of Pediatrics, https://perma.cc/696K-ET43 (last visited Feb. 16, 2026).

[16] *Pediatrics Overview,* Am. Acad. of Pediatrics, https://perma.cc/9YM8-SN49 (last visited Feb. 16, 2026).

[17] *PediaLink & EQIPP Courses,* Am. Acad. of Pediatrics, https://perma.cc/4L4J-7D6X (last visited Feb. 16, 2026).

field of pediatrics to collaborate and openly exchange ideas about how to further advance the well-being of young people through their practice.[18]

30.     AAP promulgates medical guidance and policy statements on a variety of pediatric conditions to assist medical practitioners in providing evidence-backed care to their patients.  The subject matter of these policies covers a wide range of topics, from sleep apnea to pain management.[19]

31.     AAP policy statements are authored by panels of subject-matter experts who review the available scientific evidence.   The statements undergo rigorous, evidence-based, and nonpartisan review.[20]

32.     The authors of AAP policy statements are not compensated.

33.     AAP does not promote its policy statements through advertisements.

34.     AAP policy statements are made publicly available at no cost, regardless of membership status.

**C.     AAP's 2018 Policy Statement is Part of its Mission to Improve the Well-being of Transgender and Gender-Diverse Youth.**

35.     GAC is one of the many scientific and medical subjects on which AAP issues clinical guidance for medical professionals.  GAC refers to a continuum of care for individuals diagnosed with gender dysphoria, as supported by evidence-based medicine.

36.     Gender dysphoria is a condition characterized by clinically significant distress or impairment in social, occupational, or other important areas of functioning due to a marked

---

[18] AAP Experience National Conference & Exhibition Home Page, https://perma.cc/38EW-G7TC (last visited Feb. 16, 2026).

[19] *Clinical Practice Guidelines,* Am. Acad. of Pediatrics, https://perma.cc/7LQP-XAXW (last visited Feb. 16, 2026).

[20] *Policy Statement Development Process,* Am. Acad. of Pediatrics, https://perma.cc/26Q5-SBH (last visited Feb. 16, 2026).

incongruence between the patient's gender identity (*i.e.*, the innate sense of oneself as being a particular gender) and sex assigned at birth.

37.    GAC does not refer to a single treatment or intervention.  Instead, GAC refers to a broad range of steps that may be used to affirm a patient's gender.  These steps can range from social acceptance and mental health care to medical treatments, such as hormone treatments and puberty blockers, and legal affirmation.  In very rare cases, GAC could also include gender-affirming surgeries, when determined to be developmentally and medically appropriate for an individual patient, in consultation with family and medical and mental health providers.  The continuum of care that makes up GAC is generally recognized by the scientific community as an appropriate treatment for people diagnosed with gender dysphoria, including minors, although the appropriateness of any particular intervention remains a highly individualized decision for each patient and family, supported by appropriate healthcare providers.

38.    Consistent with its mission of improving the well-being of all young people—and as it has done for a variety of pediatric conditions—AAP released the 2018 Policy Statement on the topic of GAC in 2018 entitled, "Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents."  The 2018 Policy Statement was published in the October 2018 issue of *Pediatrics*.

39.    At all times since its publication, this Policy Statement has been free to access online.  It remains available online with cost-free access today.[21]

40.    In announcing its 2018 Policy Statement, AAP explained:  "In recent years, 'gender identity' has increasingly been recognized as a complex concept that goes beyond traditional definitions of masculinity and femininity.  Society struggles to adapt to and appreciate the diverse

---

[21] *See* 2018 Policy Statement, *supra* note 1.

experiences of transgender and gender-diverse (TGD) individuals, which contributes to intolerance, discrimination and stigma.  In this context, TGD youths and their families increasingly present to pediatric providers for advocacy, care and referrals."[22]

41.     The announcement stated that AAP "stands against stigmatization and marginalization of TGD youths, and emphasizes the need for their acceptance as members of our families, communities and workforce."  And it explained that the 2018 Policy Statement outlines "the role of pediatricians in addressing the needs, challenges and resilience of TGD youths and their families."[23]

42.     Likewise, the Policy Statement explains that "[a]s youth who identify as TGD reflect on and evaluate their gender identity, various interventions may be considered to better align their gender expression with their underlying identity.  This process of reflection, acceptance, and, for some, intervention is known as 'gender affirmation.'"[24]

43.     The 2018 Policy Statement is, like all of AAP's work on GAC, grounded in science and does not make specific recommendations as to any particular intervention.  Nor does it promote specific pediatricians, clinics, therapies, drugs, or other products or services.

44.     For example, the 2018 Policy Statement addresses topics such as the estimated prevalence of gender dysphoria among youth, the research into mental health implications of gender dysphoria for youth, and the "gender-affirmative care model" by which pediatric providers

---

[22] Jason Rafferty, *Pediatricians Are Key in Supporting Transgender, Gender-Diverse Youths,* Am. Acad. of Pediatrics (Sept. 17, 2018), https://perma.cc/PZ7A-NHVS.

[23] *Id.*

[24] *See* 2018 Policy Statement, *supra* note 1.

"offer developmentally appropriate care that is oriented toward understanding and appreciating the youth's gender experience."[25]

45.     The 2018 Policy Statement also addresses topics such as the role of the pediatrician and the clinical setting in ensuring patients are comfortable and affirmed in their identity and research on the role of familial acceptance as well as safe schools and communities for TGD youth.[26] The 2018 Policy Statement makes clear that "[o]ne of the most important ways to promote high-quality health care for youth who identify as TGD and their families is increasing the knowledge base and clinical experience of pediatric providers in providing culturally competent care to such populations."[27]

46.     Throughout the 2018 Policy Statement, AAP emphasizes that all decisions about GAC should be made on a case-by-case basis, in consultation with families and providers.  For example, the 2018 Policy Statement states:  "The decision of whether and when to initiate gender-affirmative treatment is personal and involves careful consideration of risks, benefits, and other factors unique to each patient and family."[28]

47.     AAP plays no role in pricing, prescribing, or providing GAC treatment to patients.

48.     AAP Policy Statements are reviewed on a 5-year cycle.  After 5 years, a policy may be reaffirmed, revised, or retired.[29]

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Policy Statement Development Process, supra* note 20.

49.    In August 2023, AAP reviewed and reaffirmed the 2018 Policy Statement.[30]

50.    In its 2023 announcement reaffirming the 2018 Policy Statement, AAP also "authorized development of an expanded set of guidance for pediatricians based on a systematic review of the evidence."[31]

51.    AAP reiterated its mission is to "continue to 'ensure young people get the reproductive and gender-affirming care they need and are seen, heard and valued as they are'" as well as its opposition to "any laws or regulations that discriminate against transgender and gender-diverse individuals, or that interfere in the doctor-patient relationship."[32]

52.    In addition to the 2018 Policy Statement and its Reaffirmation, AAP educates medical professionals about the available research on GAC in other contexts.  For example, GAC was a topic at AAP's National Conference & Exhibition, held in Denver, Colorado between September 26 and 30, 2025.[33]

53.    Regardless of the medium, the content of AAP's speech has been consistent—it describes available scientific and medical research on GAC in order to inform the clinical judgment of pediatricians providing care to TGD youth and to support the availability of appropriate, supportive, and empathetic care for youth experiencing gender dysphoria.

---

[30] Alyson Sulaski Wyckoff, *AAP Reaffirms Gender-Affirming Care Policy, Authorizes Systematic Review of Evidence to Guide Update*, Am. Acad. of Pediatrics (Aug. 4, 2023), https://perma.cc/9XAA-LB3W.

[31] *Id.*

[32] *Id.*

[33] AAP Experience Denver 2025 Home Page, https://perma.cc/X7ZT-KA5B (last visited Feb. 16, 2026).

54.    AAP works to improve the health of TGD minors through other avenues.  For example, AAP advocates for access to appropriate GAC for TGD minors through amicus briefs and submission of comments in federal and state agency rulemakings.[34]

55.    As part of these efforts, AAP has often collaborated with other organizations and individuals that share its mission of improving the well-being of all young people, including through access to developmentally appropriate GAC.

## II.    The FTC Has Made Clear its Intent to Carry Out the Trump Administration's Well-Established Directive of Ending GAC Through Retaliation Against its Supporters.

### A.    The Trump Administration Has Taken Retaliatory Actions Against GAC and its Institutional Supporters, Including AAP.

56.    Since returning to office, President Trump and his Administration have undertaken a sustained campaign to delegitimize, restrict, and eliminate recognition of TGD people broadly and the gender affirmation model specifically.  This includes targeting anyone—whether medical institutions, scientists, doctors, or non-profits—that speaks out about the science that supports GAC.

57.    On January 20, 2025, the President issued Executive Order No. 14168, which frames transgender identity as "gender ideology extremism" and declares that "[i]t is the policy of the United States to recognize two sexes, male and female" and "[t]hese sexes are not changeable."[35]

---

[34] *See, e.g.*, Brief for American Academy of Pediatrics et al. as Amici Curiae Supporting Appellees, *State of Washington et al. v. Donald J. Trump et al.*, No. 25-1922 (9th Cir. Sept. 19, 2025); Susan J. Kressly, *AAP Opposes New HHS Rules Restricting Access to Care for Families,* Am. Acad. of Pediatrics (Dec 18. 2025), https://perma.cc/F3GP-5D2E; Meredith McNamara et al., *Combating Scientific Disinformation on Gender-Affirming Care*, 152 Pediatrics 1, 1 (Sep. 2023), https://perma.cc/39YY-GJSW.

[35] *See* Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

58.     On January 28, 2025, President Trump signed Executive Order No. 14187, titled "Protecting Children from Chemical and Surgical Mutilation."[36]  The Order asserts that "medical professionals are maiming and sterilizing a growing number of impressionable children" under what it calls the "radical and false claim" that a child's sex can be changed, and declares that this purported practice will be a "stain on our Nation's history" that "must end."[37]  The Order declares that it is the policy of the United States not to "fund, sponsor, promote, assist, or support" what it characterizes as the "so-called 'transition'" of children "from one sex to another," and to "rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures."[38]

59.     Since the issuance of these Executive Orders, the Trump Administration has repeatedly attacked AAP for its viewpoints about GAC.  As just one example, a senior advisor in the Trump HHS referred to AAP's work, including on behalf of TGD youth, as "demonic forces" on social media.[39]

---

[36] *See* Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025).

[37] *See id.*

[38] *See id.*

[39] Calley Means (@CalleyMeans), X (Apr. 20, 2025), https://perma.cc/EW4T-DE6P.



60.    In May 2025, HHS published a report titled "Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices," and in November 2025 issued a revised and expanded version of that report, which characterized AAP's Policy Statement on GAC as "very low quality" and "did not recommend [its guidance] for implementation."[40]

61.    In November 2025, HHS Secretary Robert F. Kennedy, Jr. publicly accused AAP and other medical organizations of having "peddled the lie that chemical and surgical sex-rejecting procedures could be good for children," declaring that such care "is not medicine—it's malpractice."[41]

---

[40] *See* U.S. Dep't of Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, 146 (Nov. 19, 2025), https://perma.cc/6W5N-GRYZ.

[41] *See* U.S. Dep't of Health & Hum. Servs., *HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures* (Nov. 19, 2025), https://perma.cc/E5JG-ZWMJ.

62.    The following month, HHS issued a Declaration again singling out AAP and other non-profits, asserting that their GAC guidance had "encouraged widespread clinician adoption" of what the Administration labeled "sex-rejecting procedures," while reiterating that such guidance is "very low quality and should not be implemented."[42]  The Declaration justified this action by asserting that "[t]he failure of professional organizations in the United States to protect children, and follow the principles of evidence-based medicine, highlights the need for this Declaration."[43]

63.    On December 16, 2025, the Trump Administration abruptly terminated seven of AAP's federal grants on the basis that the awards "no longer effectuate[] agency and [HHS] priorities."[44]  On December 24, 2025, AAP promptly filed suit against HHS, its component agencies, and their heads in their official capacities, alleging that the grant terminations were undertaken in retaliation for AAP's exercise of its First Amendment rights.[45]

64.    Just four days prior to the FTC's issuance of the CID, Judge Beryl A. Howell of this Court granted AAP's motion for a preliminary injunction to halt those funding terminations, finding that AAP had demonstrated a likelihood of success on its First Amendment retaliation claim against HHS.[46]  In reaching that conclusion, Judge Howell identified the "overlapping timeline," the "number and negativity of statements made by HHS leadership over the course of

---

[42] *See* U.S. Dep't of Health & Hum. Servs., *Declaration of the Secretary of the Department of Health and Human Services re: Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents* (Dec. 18, 2025), https://perma.cc/Q29Q-4EYJ.

[43] *See id.*

[44] *See Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-4505, 2026 WL 80796, at *1–*2 (D.D.C. Jan. 11, 2026) (granting preliminary injunction and finding AAP likely to succeed on First Amendment retaliation claim).

[45] *Id.*

[46] *See id.*

months, and the complete absence of a plausible legitimate alternative explanation" as central to her assessment of the government's motive for the funding terminations.[47]

### B. Federal Courts Have Repeatedly Rejected the Trump Administration's Use of Federal Investigations to Punish Activities and Speech Related to GAC.

65.    In September 2025, Judge Myong J. Joun of the United States District Court for the District of Massachusetts quashed a Department of Justice ("DOJ") subpoena issued to Boston Children's Hospital in connection with GAC, finding that the investigation served an "improper purpose" and was aimed at implementing the Trump Administration's policy of ending GAC rather than any legitimate law-enforcement objective.[48]    The court emphasized that the subpoena followed immediately after Executive Orders directing agencies to eliminate GAC nationwide and cited internal memoranda committing DOJ to use "all available resources" to achieve that goal.[49]

66.    Likewise, in October 2025, Judge Jamal N. Whitehead of the Western District of Washington rejected DOJ's asserted justification for a subpoena issued to QueerDoc in connection with its provision of certain GAC.[50]    Although DOJ claimed to be investigating potential fraud, the court determined that rationale was pretextual and concluded that the subpoena targeted QueerDoc "for what it does (provide gender affirming care) rather than how it does it (through any

---

[47] See id. at *21.

[48] See In re Administrative Subpoena No. 25-1431-019, 800 F. Supp. 3d 229, 236–39 (D. Mass. 2025).

[49] See id. at 232–33; see also id. at 239 ("The Administration has been explicit about its disapproval of the transgender community and its aim to end GAC. The subpoena reflects those goals, comprising overbroad requests for documents and information seemingly unrelated to investigating fraud or unlawful off-label promotion. It is abundantly clear that the true purpose of issuing the subpoena is to interfere with the Commonwealth of Massachusetts' right to protect GAC within its borders, to harass and intimidate BCH to stop providing such care, and to dissuade patients from seeking such care. For the above reasons, I find that the Government has failed to show proper purpose and, even if it had, that BCH has demonstrated that the subpoena was issued for an improper purpose, motivated only by bad faith.").

[50] See QueerDoc, PLLC v. U.S. Dept. of Just., No. 2:25-MC-00042-JNW, 2025 WL 3013568, at *7 (W.D. Wash. Oct. 27, 2025).

unlawful means)."[51]  Finding that DOJ issued the subpoena for an "improper purpose," the court

held that DOJ had deployed its investigatory powers "to achieve what the Administration cannot

accomplish through legislation: the elimination of medical care that Washington and other states

explicitly protect."[52]

### C.    The FTC Has Adopted the Trump Administration's Anti-GAC Agenda.

67.    FTC Chairman Ferguson has vowed to embrace the Trump Administration's efforts

to target organizations and individuals that support GAC.  Prior to his selection as FTC Chairman,

then-Commissioner Ferguson promoted his candidacy by pledging to "[f]ight back against the

trans agenda."[53]  He also promised to use the power of the FTC to "[i]nvestigate the doctors,

therapists, hospitals, and others" who "push[] gender confusion."[54]

68.    On January 20, 2025, President Trump elevated then-Commissioner Andrew

Ferguson to Chairman.[55]  Although the FTC has historically operated as an independent agency,

upon accepting his role, Chairman Ferguson promptly confirmed that the FTC would act "[u]nder

the President's leadership" and has repeatedly referred to the agency as "the Trump-Vance FTC."[56]

69.    Chairman Ferguson has endorsed an expansive theory of presidential control over

the Commission, asserting that the President "is vested with all of the executive power in our

---

[51] *See id.* at *6.

[52] *See id.* at *4; *see also id.* at *5 ("No clearer evidence of improper purpose could exist than the Government's own repeated declarations that it seeks to end the very practice it claims to be merely investigating.").

[53] *See* Punchbowl News, *As Chair, FTC Commissioner Touts He'd Pull Back on AI and Fight Trans Care* (Dec. 6, 2024), https://perma.cc/R2XQ-GXBD.

[54] *Id.*

[55] *See* Press Release, FTC, Andrew N. Ferguson Takes Over as FTC Chairman (Jan. 22, 2025), https://perma.cc/ZSN6-RNAC.

[56] *See id.*; Press Release, FTC, FTC Chairman Applauds Revocation of Biden-Harris Executive Order on Competition (Aug. 14, 2025), https://perma.cc/G9P8-5YDD.

government" and defending the President's removal of Democratic-appointed FTC Commissioners on that basis.[57]

70.    Under Chairman Ferguson's leadership, the FTC announced a workshop on the "dangers" of GAC for minors.  After this announcement, 149 FTC employees issued an anonymous formal Statement of Concern to members of Congress warning that the agency was exceeding its statutory mandate by "second-guess[ing] established medical standards widely accepted by experts in the field."[58]  The staff emphasized that evaluating clinical judgment and family decision making "is not the FTC's lane."[59]  They also raised concerns that the FTC "has already taken a position opposing [GAC] for minors."[60]  The staffers signed the letter anonymously because of "credible fear of retaliation from the Trump-Vance FTC."[61]

71.    In response to the Statement of Concern, FTC Director of Public Affairs Joe Simonson publicly declared that FTC staff who opposed the workshop were "free to resign" and that "[n]o sane person could endorse the needless mutilation of children."[62]

72.    On July 9, 2025, the FTC convened the workshop titled "The Dangers of 'Gender Affirming Care' for Minors."[63]  In announcing the workshop, the FTC confirmed that its purpose

---

[57] *See* Statement of Chairman Andrew N. Ferguson, FTC (Mar. 18, 2025), https://perma.cc/C9G9-WBCT.

[58] Statement of Concern by Federal Trade Commission Staff (July 2025), https://perma.cc/6R6G-KGXF.

[59] *See id.*

[60] *Id.*

[61] *Id.*

[62] Jody Godoy, *U.S. FTC Workshop Criticizing Medical Care for Transgender Youth Draws Staff Opposition*, Reuters (July 2, 2025), https://perma.cc/2NS2-XJX3.

[63] FTC, The Dangers of "Gender-Affirming Care" for Minors (July 9, 2025), https://perma.cc/9ZM2-HE6V.

was to "follow[] President Trump's executive order ending the federal government's previous support for" GAC for minors.[64]

73.    In his opening address, Chairman Ferguson framed the workshop as a means to address a political failure, asserting that the Biden Administration "didn't care about the parents and kids."[65]  He described the workshop as an effort to advance the interests of "the parents and kids the Biden Administration chose to ignore" and to "heal the wounds that proponents of [GAC] may have inflicted."[66]

74.    At the workshop, Commissioner Mark R. Meador also made clear his hostility to GAC.  He stated that "for too long those in power have only given a voice to one side in this debate," and asserted that this was "the side that is perpetrating the very fraud that needs to be uncovered and stopped."[67]

75.    One of the workshop's panelists, Glenna Goldis, explicitly named AAP in her remarks, baselessly asserting that medical associations like AAP had become "healthcare lobbying groups" and published guidance that was "not evidence-based" and "harmful."[68]  Ms. Goldis stated that AAP and other medical organizations should be pressured through government investigations and injunctions to "change."[69]  She asserted that public investigations would "expos[e] the medical associations to the public" and cause them to lose members and funding.[70]  The FTC recently hired

---

[64] *FTC Announces Workshop on Exploring Unfair or Deceptive Trade Practices in "Gender-Affirming" Care for Minors,* Fed. Trade Comm'n (June 9, 2025), https://perma.cc/T3MF-YQJA.

[65] Transcript of The Dangers of 'Gender-Affirming Care' for Minors, FTC, at 2 (July 9, 2025), https://perma.cc/B6TR-PMUY.

[66] *See id.*

[67] *Id.* at 84.

[68] *Id.* at 81–82.

[69] *Id.*

[70] *See id.*

Ms. Goldis to serve as a senior litigator in the Bureau of Consumer Protection, where she is expected to lead GAC investigations.[71]

76. On July 28, 2025, the FTC issued a Request for Information regarding GAC for minors, asserting that "some medical organizations continue to advocate for GAC as the best standard of care, despite the lack of a widespread medical consensus as to whether GAC is the correct course of action for gender dysphoric youth" and expressly invoking President Trump's Executive Order directing agencies to end the practice.[72]

77. On November 19, 2025, FTC Chairman Andrew Ferguson reposted on X a post by Jane Coleman regarding HHS's report "Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices."[73]  In so doing, Chairman Ferguson expressly linked the report to the FTC's investigative activity, stating:  "This report is exactly why the @FTC is investigating these practices.  Great work @RobertKennedyJr."[74]

---

[71] Theodore Bunker, *FTC Hires Attorney Fired for Transgender Care Views*, MSN (Feb. 5, 2026), https://perma.cc/T6QC-8PTZ.

[72] FTC, *Request for Public Comment Regarding "Gender-Affirming Care" for Minors* (July 28, 2025), https://perma.cc/ZVT9-RB37.

[73] Andrew N. Ferguson (@AFergusonFTC), X (Nov. 19, 2025), https://perma.cc/B9FH-FV9U.

[74] *See id.*



78.     That same day, Jon Schweppe, then a senior policy advisor in the Office of the Chairman of the FTC, reposted the HHS press release on X and quoted from the report—attributed to Secretary Kennedy—asserting that "'The American Medical Association and @AmerAcadPeds peddled the lie that chemical and surgical sex-rejecting procedures could be good for children. They betrayed their oath to first do no harm . . . That is not medicine—it's malpractice.' -@RobertKennedyJr."[75]

---

[75] Jon Schweppe (@JonSchweppe), X (Nov. 19, 2025), https://perma.cc/4JKQ-WSNY.



79.    Even as recently as February 10, 2026, the Director of the FTC Office of Public Affairs, Joe Simonson, reposted a Bloomberg article regarding AAP's Petition to Quash the FTC's CID, stating "[t]he partisan morons at Bloomberg believe investigating whether children had their breasts and genitalia improperly removed is 'an attack on transgender rights.'"[76]

---

[76] Joe Simonson (@SaysSimonson), X (Feb. 10, 2026, 1:34 PM), https://perma.cc/88KM-5Q67.



### III. The FTC Issues an Overbroad and Intrusive CID to Retaliate Against AAP's Speech on GAC.

80.    On January 15, 2026, the FTC issued the CID to AAP.  The CID claims to investigate whether "[AAP] or any other Person . . . have made, or assisted others in making false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of Pediatric Gender Dysphoria Treatment [("PGDT")] . . . which, according to the Organization, purports to treat gender dysphoric or gender diverse minors, to consumers in violation of Sections 5 and 12 of the FTC Act . . . and whether FTC action to obtain monetary relief would be in the public interest."  *See* Ex. 1 (CID) at 5.

81.    The FTC's investigation into AAP is not a neutral investigatory effort to identify potential violations of the FTC Act, but instead an abuse of the FTC's investigative tools to advance

a political objective the Administration has been unable to achieve through legislation—namely, the delegitimization and elimination of GAC and the science that supports it.

82.     The FTC's CID to AAP is the latest instance of public attacks by the Trump-Vance Administration on GAC.  It follows months of direct retaliation against AAP by HHS and the FTC's own public alignment with the Trump Administration's effort to discredit and eliminate GAC.

83.     The CID's overbroad demands are designed to intrude on AAP's First Amendment rights to speak and associate, and to intimidate AAP from continuing to discuss both the best ways for medical professionals to treat and support TGD youth and the science behind those recommendations.  Despite purporting to investigate unsubstantiated "marketing and advertising" representations, the CID makes sweeping demands for information about AAP's protected participation in scientific and medical discourse.

84.     For example, the CID demands a catalog of AAP's statements about "PGDT," including location, context, means of communication, purpose, and timing of dissemination; all documents related to the scientific support for those statements; materials reflecting AAP's deliberative processes for issuing clinical guidance about GAC and the identities of any individual or entity who participated in that process; the identities of each person or entity who developed or evaluated the scientific research supporting statements related to "PGDT"; all "communications" with professional medical organizations or other entities and individuals regarding certain GAC clinical guidance; information about AAP's political advocacy to legislatures or regulators about "PGDT" as well as its participation in lawsuits and submission of amicus briefs; AAP's financial information; information about AAP's educational efforts involving "PGDT"; and "all documents"

related to any partnership with certain medical entities or clinicians. *See* Ex. 1 (CID), Specifications A.5–13, B.1–11.

85.    No neutral inquiry into deceptive "marketing and advertising . . . to consumers" requires the information that the CID demands. First, many of the requests target AAP's protected medical and scientific speech about GAC that is offered to medical professionals for the purpose of informing clinical judgment, not "advertising" aimed at generating commercial demand by "consumers." The disconnect between the FTC's purported purpose in conducting the investigation and the nature of the CID's requests demonstrates its retaliatory nature.

86.    Second, many of the CID's requests target AAP's association with other individuals and organizations in the scientific and medical community. The demands for the identities of every person or entity involved in developing guidance about GAC and the communications exchanged between AAP and its associates are clearly designed to chill AAP's ability to engage in open scientific discussions about GAC with others.

87.    Third, several of the CID's requests target AAP's advocacy to legislatures, participation in lawsuits, and filing of amicus briefs. Such demands are clearly intended to silence AAP's right to speak out about health policy and advocate for a viewpoint with which the FTC disagrees.

88.    This unconstitutional intrusion is even more egregious in light of the disconnect between the CID's scope and the FTC's authority under the FTC Act.

89.    The FTC's authority to issue CIDs is limited to situations where it has "reason to believe that any person . . . may have any information, relevant to unfair or deceptive acts or practices in or affecting commerce . . . ." 15 U.S.C. § 57b-1(c)(1).

90.    The CID, however, seeks information about AAP's patently noncommercial and protected medical, scientific, and educational statements about GAC.  For example, the CID dedicates several requests to AAP's 2018 Policy Statement and its Reaffirmation, which are clinical guidance materials written by scientists that are offered for free to the public for the purpose of informing the clinical judgment of medical professionals.  *See* Ex. 1 (CID), Specifications A.8, B.4–5.  These documents do not "advertise" or "market" GAC, or any medical products or service to patients.  These materials are not "in or affecting commerce" and the CID thus demands information that has no relevance to potential violations of the FTC Act and exceeds the bounds of the FTC's jurisdiction.

91.    The FTC's authority is also limited to enforcing FTC Act violations against "persons, partnerships, or corporations."  15 U.S.C. § 45(a)(1)–(2).  Section 4 of the FTC Act defines "corporation" as an entity "organized to carry on business for its own profit or that of its members."  *Id.* § 44.  AAP was not organized for profit or for the purpose of enriching its members.  AAP's mission since its founding has been to "foster and stimulate interest in pediatrics and correlate all aspects of work for the welfare of children . . . [and] to promote publications and encourage contributions to medical and scientific literature pertaining to pediatrics . . . *none of which objects is for pecuniary profit.*"[77]  By investigating AAP as a possible violator of the FTC Act, the CID exceeds the bounds of the Commission's jurisdiction to seek information relevant to FTC Act violations.

92.    Furthermore, the CID fails to comply with the statutory requirement that a CID be "signed by a Commissioner acting pursuant to a Commission resolution."  15 U.S.C § 57b-1(i).

---

[77] *Articles of Incorporation*, Am. Acad. of Pediatrics, AAP Books, at 3, https://perma.cc/SW9V-DA4U (last visited Feb. 16, 2026) (emphasis added).

The two resolutions underlying the CID—the 2019 Resolution targeting the "advertising, marketing, or sale" of certain medical products or services and the 2021 Resolution targeting acts or practices related to goods or services marketed "to children under 18"—fail to support the investigation's subject matter, further evidencing its retaliatory nature.  *See* Ex. 1 (CID) at 17-18.  Both resolutions only authorize investigations into acts or practices "in or affecting commerce" in violation of the FTC Act, which can only be enforced against "persons, partnerships, or corporations."  *Id.*  AAP does not engage in acts or practices "in or affecting commerce" nor is it "a person, partnership, or corporation."  AAP also does not advertise, market, or sell medical products or services.  And the CID's demands focus on activities that fall outside commercial activities or practices that are marketed towards children under 18.  These resolutions do not support the CID, do not satisfy the statute, and thus evidence the retaliatory motive of the CID.

## IV.    The FTC's Actions Have Harmed, and Will Continue to Harm, AAP.

93.    The FTC's issuance of the CID has both exacerbated the harm already done to AAP as a result of the Trump Administration and FTC's retaliatory anti-GAC campaign and has caused new, concrete harms to AAP's constitutionally protected speech and associational activities.  The CID will continue to harm AAP absent judicial relief.

94.    AAP's core mission includes issuing evidence-based clinical guidance and participating in public discourse on pediatric health policy and issues.  AAP's speech—addressing matters of significant public concern—lies at the heart of the First Amendment.

95.    The CID has fundamentally disrupted the conditions under which AAP engages in protected expression.  By subjecting AAP's scientific and policy work to an intrusive and overbroad federal investigation, the FTC has imposed new risks and burdens that now weigh upon AAP's decisions about whether and how to speak about GAC.  These concerns have undermined AAP's ability to advance its mission and to facilitate the open exchange of scientific and medical

discourse. The First Amendment protects this speech activity, and the FTC's actions have burdened it.

96.    AAP's work is fundamentally collaborative: AAP engages medical experts in research and public discussion of pediatric health issues to advance healthcare for all infants, children, adolescents, and young adults. The issuance of the CID has prompted concerns expressed by AAP, employees, members, and collaborators about being publicly associated with AAP's work on topics implicated by the FTC's investigation. Since the FTC's campaign against GAC began, individuals who would otherwise participate in panels, author guidance, or serve in visible roles now fear that their communications or affiliations could expose them to government scrutiny or public targeting.

97.    Each day the CID remains in effect, AAP must operate under the shadow of an illegitimate federal investigation that imposes unreasonable burdens and expenses upon its speech, deters its members and collaborators from participating with AAP in the free exchange of ideas, and drains resources from its core mission. That AAP has continued to speak despite these burdens underscores the constitutional violation. Absent judicial relief, the FTC's actions will continue to distort AAP's speech environment, impair its associational rights, and unreasonably burden its protected activities in violation of the First Amendment.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the First Amendment – Retaliation for Protected Activity
### U.S. Const. amend. I

98.    All preceding paragraphs are incorporated and reasserted as if fully set forth here.

99.    The First Amendment guarantees a right to "freedom of speech" and "to petition the Government for a redress of grievances." U.S. Const. amend. I. The right to petition includes

the right "to appeal to courts and other forums established by the government." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011).

100.    Furthermore, "the First Amendment protects scientific expression and debate just as it protects political and artistic expression." *Bd. of Trs. of Leland Stanford Jr. Univ. v. Sullivan*, 773 F. Supp. 472, 474 (D.D.C. 1991); *see also Nat'l Institute of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 756 (2018) (recognizing the "danger of content-based regulations 'in the fields of medicine and public health'"); *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) ("Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us . . . .  That freedom is therefore a special concern of the First Amendment[.]").

101.    The government violates the First Amendment when it retaliates against someone for exercising their First Amendment rights.  *See, e.g.*, *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018) ("[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech."); *Smith v. Ark. State Highway Emp., Loc. 1315*, 441 U.S. 463, 465 (1979) (a person can "speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so").  "Reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right[s]." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (citation modified).  "[T]he law is settled" on this issue. *Gonzalez v. Trevino*, 602 U.S. 653, 662 (2004) (Alito, J., concurring) (quoting *Hartman*, 547 U.S. at 256).

102.    The First Amendment's prohibition of retaliatory actions applies to government investigative proceedings as well as enforcement proceedings. *See Media Matters for Am. v. Paxton*, 138 F.4th 563, 580 (D.C. Cir. 2025).

32

103.    The FTC's CID against AAP violates the First Amendment's prohibition on retaliation for engaging in protected First Amendment activity.

104.    AAP has engaged in protected, non-commercial speech, in the form of clinical guidance reflecting scientific research and evidence-based strategies regarding GAC that AAP publishes to help medical professionals support their patients and their families in making informed, individualized health decisions.

105.    As set forth in Sections II and III of this Complaint, the FTC initiated its investigation for the improper, illegitimate purpose of retaliating against AAP for engaging in speech that the FTC disfavors.  The FTC has shown—through, *inter alia*, public statements by Chairman Ferguson and Commission employees, its July 2025 workshop and comments made therein, and the issuance of a patently overbroad CID in excess of the FTC's jurisdiction—that it is not acting for a legitimate purpose.  Instead, it is acting in furtherance of the stated goal to "end" access to and support of evidence-based treatments for gender dysphoria that the Administration and the FTC disagree with.  It is doing so by targeting the medical and scientific organizations, like AAP, that speak out in favor of permitting physicians, families, and patients access to such evidence-based care.

106.    The FTC additionally initiated its investigation for the improper, illegitimate purpose of retaliating against AAP for engaging in protected petition of the Government, including by filing amicus briefs, submitting comments in rulemakings, and participating in lawsuits and public policy debates in support of AAP's mission to support and improve the quality of, and access to, pediatric health care, including GAC.  "Petitions to the courts and similar bodies can . . . address matters of great public import" and "facilitate the informed public participation that is a cornerstone of democratic society." *Guarnieri*, 564 U.S. at 397.  "[T]he right to petition extends

to all departments of the Government," including "administrative agencies" and "courts." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

107.    The retaliatory impetus for the CID is further evidenced by its scope.  The CID is "sweeping and burdensome" and "call[s] for sensitive materials," including information regarding AAP's policy-development process, the identities of all individuals and entities that evaluated the science underlying AAP's guidance, communications with other organizations and individuals, and financial records—all under the threat of enforcement.  *Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 129 (D.D.C. 2025).  This CID is designed to, and if able to be enforced would, deter a person of ordinary firmness from engaging further in protected medical and policy speech by imposing the burden and risk of intrusive discovery.  *Id.*

108.    Moreover, the CID lacks any legitimate purpose because it patently exceeds the bounds of the FTC's jurisdiction to seek information "relevant to unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 57b-1(c)(1).  The FTC's "[s]ubpoena enforcement power is not limitless," *FTC v. Ken Roberts Co.*, 276 F.3d 583, 586 (D.C. Cir. 2001), and the information sought by the CID has no relevance to potential FTC Act violations.  AAP's speech is not "in or affecting commerce" and the FTC has no plausible basis to investigate it.  *In re R.J. Reynolds Tobacco Co.*, No. 9206, 1988 WL 490114, at *2 (F.T.C. Mar. 4, 1988) ("[U]nless the . . . advertisement can be classified as commercial speech, it is not subject to the Commission's jurisdiction.").  Further, AAP is not a person, partnership, or corporation capable of violating the FTC Act.  15 U.S.C. § 45(a)(2).  AAP is a 501(c)(3) non-profit dedicated to advancing the health of infants, children, adolescents, and young adults.  AAP's activities do not "fall within the object of enhancing its members' profit."  *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 767 (1999) (citation omitted).

109.    Finally, the disconnect between the subject matter of the resolutions that purport to authorize the CID and the scope of the investigation further demonstrate the retaliatory purpose of the CID.  A valid CID must be "signed by a Commissioner acting pursuant to a Commission resolution."  15 U.S.C § 57b-1(i).  But the two resolutions underlying the CID—the 2019 Resolution targeting the "advertising, marketing, or sale" of certain medical products or services and the 2021 Resolution targeting acts or practices related to goods or services marketed "to children under 18"—fail to support the investigation's subject matter.  *See* Ex. 1 (CID) at 17-18. Both resolutions also only authorize investigations into acts or practices "in or affecting commerce" in violation of the FTC Act, which can only be enforced against "persons, partnerships, or corporations."  But AAP does not engage in acts or practices "in or affecting commerce" and is not a person, partnership, or corporation.  AAP also does not advertise, market, or sell medical products or services.  And the clear focus of the CID's demands is not related to commercial activities or practices that are marketed towards children under 18.

110.    The FTC's First Amendment violations have caused and will cause AAP ongoing irreparable harm.  AAP's freedom of speech and to petition the government, in court and otherwise, are being significantly impaired by the FTC's retaliatory action.

## COUNT II

### Violation of the First Amendment – Viewpoint Discrimination
### U.S. Const. amend. I

111.    The paragraphs above are incorporated and reasserted as if fully set forth here.

112.    "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society."  *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024).

113.    "The government" therefore "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 706 (2010) (Alito, J., dissenting) ("The proudest boast of our free speech jurisprudence is that we protect the freedom to express [even] the thought that we hate." (citation omitted)); *see also Communist Party v. Subversive Activities Control Bd.*, 367 U.S. 1, 137 (1961) (Black, J., dissenting) ("[T]he freedoms of speech, press, petition and assembly guaranteed by the First Amendment must be accorded to the ideas we hate or sooner or later they will be denied to the ideas we cherish.").

114.    The FTC's CID discriminates on the basis of viewpoint by targeting AAP for investigation based on disagreements with AAP's position on the scientific and medical support for and efficacy of GAC, as evidenced by the FTC's own public framing of GAC.

115.    The FTC's CID likewise discriminates on the basis of viewpoint by targeting AAP for investigation based on AAP's exercise of its right to association, which is protected by the First Amendment. *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 309 (2012). Freedom of association encompasses a right against compelled disclosure of one's affiliations. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958). The FTC's CID demands the identities of all individuals and entities involved in the development of GAC guidance, as well as deliberations about that guidance. *See* Ex. 1 (CID), Specifications A.8, A.13, B.4–5. There is a "reasonable probability" that disclosure of such information will subject AAP to "threats, harassment, or reprisals from either Government officials or private parties,'" *John Doe No. 1 v. Reed*, 561 U.S.

186, 200 (2010) (quoting *Buckley v. Valeo*, 424 U.S. 1, 74 (1976)), infringing on AAP's First Amendment freedom of association.

116.    There is no legitimate, much less compelling, state interest in punishing an organization for, or chilling it from, advancing views with which the government disagrees.

117.    Even if there were a compelling interest at stake, the CID is not narrowly tailored to advancing that interest because it demands far more information from AAP than necessary for the FTC's stated objective of investigating AAP's statements in connection with "the marketing and advertising" of "PGDT," including, for example, "all Communications" with other professional medical organizations and "all documents" reflecting communications with other organizations, institutions, or individuals related to the development of GAC guidance. *See* Ex. 1 (CID), Specifications B.4–5.

118.    The FTC's actions have caused and continue to cause AAP ongoing and irreparable harm, including by pressuring AAP to censor or alter its First Amendment-protected speech and association.

### COUNT III

### Violation of the First and Fourth Amendments – Improper Investigation
### U.S. Const. amend. I & IV

119.    The paragraphs above are incorporated and reasserted as if fully set forth here.

120.    The Constitution restrains the FTC's ability to conduct investigations in two ways. First, the Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). Separately, the First Amendment prohibits the government from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content." *Nat'l Inst. of Fam. & Life Advocs. v. James*, 160 F.4th 360, 373 (2d Cir. 2025). Where, as here, a subpoena seeks materials that implicate the First Amendment, the Fourth Amendment

demands "scrupulous exactitude" in defining the subpoena's scope. *Zurcher v. Stan. Daily*, 436 U.S. 547, 564 (1978) (citation omitted).

121.    The FTC's CID violates these constitutional restraints.  It is not a legitimate exercise of the FTC's investigatory authority.  Instead, it is an overbroad and unauthorized fishing expedition into AAP's protected speech, deliberations, and associational relationships undertaken to punish AAP for expressing a viewpoint the Trump Administration has deemed unfavorable and an attempt to silence AAP.  Because the government may not "use the power of the State to punish or suppress disfavored expression," the CID is an impermissible exercise of the FTC's investigative power. *See Vullo*, 602 U.S. at 188.

122.    The CID demands materials that reach the core of AAP's First Amendment-protected activities, including its speech on matters of public concern and its right to associate freely with other medical organizations and experts in the pediatric health space for the purpose of scientific exchange and professional consensus-building.  Here, the importance of AAP's ability to exercise its right to free association is only heightened by the FTC's animosity toward its speech and viewpoint. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647–48 (2000) (recognizing the right to associate as "crucial" in preventing the majority from imposing views on groups with "perhaps unpopular" ideas).

123.    The CID also violates the Fourth Amendment because its demands are not reasonably relevant to any lawful investigation and are grossly disproportionate to any conceivably legitimate enforcement interest. *See Ken Roberts Co.*, 276 F.3d at 586 (observing that the FTC's subpoena power "is not limitless"); *see also United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) (noting that compulsory process in a government investigation is only permissible where "the information sought is reasonably relevant").  Rather than narrowly targeting specific conduct,

the CID sweeps broadly across years of AAP's communications and associational activities, imposing substantial compliance costs while yielding no information within the FTC's lawful authority to pursue.

124.    The FTC's improper investigatory subpoena impairs AAP's Fourth Amendment rights to be free from unreasonable search, and the subpoena, which is overbroad and in excess of the FTC's jurisdiction, creates ongoing and irreparable harms to AAP's First Amendment-protected speech and association.

## PRAYER FOR RELIEF

WHEREFORE, AAP respectfully requests that the Court enter an order or judgment in favor of Plaintiff AAP and against Defendants as follows:

1.    Declare that Defendants' CID constitutes a First Amendment retaliatory action in violation of Plaintiff's rights under the First Amendment of the U.S. Constitution.

2.    Declare that Defendants' CID constitutes First Amendment viewpoint discrimination in violation of Plaintiff's rights under the First Amendment of the U.S. Constitution.

3.    Declare that Defendants' CID violates Plaintiff's rights under the First and Fourth Amendments of the U.S. Constitution.

4.    Preliminarily and permanently enjoin Defendants, their officers, agents, servants, and employees from initiating any action to interfere with or curtail Plaintiff's exercise of its constitutional rights, including by forcing Plaintiff to disclose information related to its 2018 Policy Statement or its 2023 Reaffirmation of the 2018 Policy Statement.

5.    Grant such other and further relief as this Court deems just and proper.

February 17, 2026                        Respectfully submitted,

                                         */s/ Stacey K. Grigsby*
                                         Stacey K. Grigsby (DDC Bar No. 491197)
                                         Laura Kim (D.C. Bar No. 473143)*
                                         Amber M. Charles (DDC Bar No. 1035226)
                                         Alexandra J. Widas (DDC Bar No. 1645372)
                                         Alexandra J. Remick (D.C. Bar No. 1737692)*
                                         COVINGTON & BURLING, LLP
                                         One CityCenter
                                         850 10th Street NW
                                         Washington DC, 20001
                                         sgrigsby@cov.com
                                         lkim@cov.com
                                         acharles@cov.com
                                         awidas@cov.com
                                         aremick@cov.com

                                         *Attorneys for Plaintiff the American Academy of
                                         Pediatrics*

                                         * Petition for Admission Pending