# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN ACADEMY OF PEDIATRICS,<br><br>*Plaintiff*,<br><br>v.<br><br>FEDERAL TRADE COMMISSION; ANDREW N. FERGUSON, in his official capacity as Chair of the Federal Trade Commission; MARK R. MEADOR, in his official capacity as Commissioner of the Federal Trade Commission,<br><br>*Defendants*. | Case No. 1:26-cv-00508-CRC |

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

BACKGROUND ................................................................................................... 5

I.    AAP Engages in Core First Amendment Activities on Matters of Public Concern. ............. 5

II.   The FTC Is Carrying Out the Trump Administration's Well-Established Directive to End GAC Through Retaliation Against Organizations like AAP. ............................................. 6

III.  The FTC Issued a Sweeping CID Targeting AAP's Speech and Associations Immediately After This Court Found Likely Executive Branch Retaliation Against AAP for That Same Speech. ............................................................................................................... 9

IV.   The FTC's CID and Investigation Have Harmed, and Will Continue to Harm, AAP. ........ 13

ARGUMENT ....................................................................................................... 14

I.    AAP Is Likely to Succeed on the Merits of Its Claims. ................................................ 15

      A.    AAP Is Likely to Establish that the FTC's CID Violates the First Amendment's Prohibition on Retaliation for Engaging in Protected Activity. ................................ 15

            1.    AAP has engaged in protected First Amendment activities. ..................... 16

            2.    The FTC's CID has been, and will continue to be, sufficient to deter AAP's protected activities. ....................................................................... 19

            3.    The FTC's retaliatory actions are causally linked to AAP's constitutionally protected activities. ........................................................ 21

      B.    AAP Is Likely to Establish that the CID Is Overbroad in Violation of the First and Fourth Amendments. ...................................................................................... 27

            1.    The CID is overbroad because it lacks scrupulous exactitude. ................ 28

            2.    The CID is overbroad because the FTC lacks jurisdiction. .................... 30

            3.    The FTC has not demonstrated a compelling interest that justifies the CID. .................................................................................................... 36

II.   AAP Has Suffered and Will Continue to Suffer Irreparable Harm Absent Immediate Relief. ................................................................................................................... 37

III.  The Equities and the Public Interest Favor Granting Preliminary Relief. ...................... 41

CONCLUSION .................................................................................................... 43

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. District of Columbia*,
   285 F. Supp. 3d 381 (D.D.C. 2018) ...................................................................15

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013) ...........................................................................................15

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
   121 F.4th 1314 (D.C. Cir. 2022) .......................................................................14

*Am. Acad. of Pediatrics v. Kennedy*,
   No. 1:25-cv-11916 (D. Mass. July 7, 2025) .....................................................19

*\*Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*,
   No. 25-cv-4505, 2026 WL 80796 (D.D.C. Jan. 11, 2026)............................. *passim*

*Am. Bar Ass'n v. U.S. Dep't of Justice*,
   783 F. Supp. 3d 236 (D.D.C. 2025) ...................................................24, 37, 41

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Fed. Election Comm'n*,
   333 F.3d 168 (D.C. Cir. 2003) ..........................................................................28

*Aref v. Lynch*,
   833 F.3d 242 (D.C. Cir. 2016) ....................................................................16, 20

*Bailey v. Fed. Bureau of Prisons*,
   No. 24-cv-01219, 2024 WL 3219207 (D.D.C. June 28, 2024)..........................37

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) .............................................................................................19

*BEG Invs., LLC v. Alberti*,
   144 F. Supp. 3d 16 (D.D.C. 2015) .....................................................................25

*Bolger v. Youngs Drug Prods. Corp.*,
   463 U.S. 60 (1983) .............................................................................................32

*Borough of Duryea v. Guarnieri*,
   564 U.S. 379 (2011) .....................................................................................16, 19

*C.G.B. v. Wolf*,
   464 F. Supp. 3d 174 (D.D.C. 2020) ...................................................................42

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
   404 U.S. 508 (1972)................................................................................19

*Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colls. & Schs.*,
   854 F.3d 683 (D.C. Cir 2017)..................................................................31

*Costa v. Bazron*,
   456 F. Supp. 3d 126 (D.D.C. 2020)..........................................................42

*Davis v. District of Columbia*,
   158 F.3d 1342 (D.C. Cir. 1998)...............................................................38

*DSE, Inc. v. United States*,
   169 F.3d 21 (D.C. Cir. 1999)...................................................................43

*\*Elrod v. Burns*,
   427 U.S. 347 (1976).................................................................................37

*Fed. Election Comm'n v. Machinists Non-Partisan Pol. League*,
   655 F.2d 380 (D.C. Cir. 1981)...........................................................30, 36

*First Choice Women's Res. Ctrs., Inc. v. Platkin*,
   (Dec. 2, 2025) (No. 24-781).....................................................................37

*Flores v. Bondi*,
   No. 1:25-6308 (9th Cir. Jan. 28, 2026).....................................................19

*Florida EB5 Investments, LLC v. Wolf*,
   443 F. Supp. 3d 7 (D.D.C. 2020)..............................................................14

*FTC v. Ken Roberts Co.*,
   276 F.3d 583 (D.C. Cir. 2001)..................................................................30

*Goodwin v. District of Columbia*,
   579 F. Supp. 3d 159 (D.D.C. 2022).....................................................22, 24

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
   515 U.S. 557 (1995).................................................................................18

*J.G.G. v. Trump*,
   786 F. Supp. 3d 37 (D.D.C. 2025)............................................................43

*Johnson v. District of Columbia*,
   726 F. Supp. 3d 8 (D.D.C. 2024)..............................................................22

*Karem v. Trump*,
   960 F.3d 656 (D.C. Cir. 2020)..................................................................38

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
    385 U.S. 589 (1967) ......................................................................................17

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*,
    567 U.S. 298 (2012) ......................................................................................27

*League of Women Voters of the U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) .........................................................................42

*Lewis v. Gov't of the Dist. of Columbia*,
    161 F. Supp. 3d 15 (D.D.C. 2015) ...............................................................22

*Lozman v. Riviera Beach*,
    585 U.S. 87 (2018) ........................................................................................19

*Marcus v. Search Warrant*,
    367 U.S. 717 (1961) ......................................................................................28

*Media Matters for Am. v. FTC*,
    805 F. Supp. 3d 105 (D.D.C. 2025) ...................................................... passim

*Media Matters for Am. v. FTC*,
    No. 25-5302, 2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) ....................21, 22

*Media Matters for Am. v. Paxton*,
    138 F.4th 563 (D.C. Cir. 2025) ............................................................ passim

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ......................................................................................18

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ......................................................................................17

*NAACP v. Alabama ex rel. Patterson*,
    357 U.S. 449 (1958) .................................................................................27, 36

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) ......................................................................................33

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018) ......................................................................................17

*Nat'l Rifle Assoc. of Am. v. Vullo*,
    602 U.S. 175 (2024) ......................................................................................19

*Nat'l Treasury Emps. Union v. United States*,
    927 F.2d 1253 (D.C. Cir. 1991) ...................................................................41

*Nken v. Holder*,
   556 U.S. 418 (2009) ..................................................................................41

*Okla. Press Publ'g Co. v. Walling*,
   327 U.S. 186 (1946) ..................................................................................28

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
   475 U.S. 1 (1986) .....................................................................................19

*Pebble Ltd. P'ship v. Env't Prot. Agency*,
   310 F.R.D. 575 (D. Alaska 2015) ..............................................................30

*Perry v. Schwarzenegger*,
   591 F.3d 1147 (9th Cir. 2010) ..................................................................28

*Playboy Enters., Inc. v. Meese*,
   639 F. Supp. 581 (D.D.C. 1986) ...............................................................20

*Pursuing America's Greatness v. Fed. Election Comm'n*,
   831 F.3d 500 (D.C. Cir. 2016) ..................................................................15

*\*In re R.J. Reynolds Tobacco Co.*,
   1988 WL 490114 (F.T.C. Mar. 4, 1988) ...........................................31, 32, 34

*In re Sealed Case (Admin. Subpoena)*,
   42 F.3d 1412 (D.C. Cir. 1994) ..................................................................31

*Singletary v. District of Columbia*,
   351 F.3d 519 (D.C. Cir. 2005) ..................................................................25

*Smith v. De Novo Legal, LLC*,
   905 F. Supp. 2d 99 (D.D.C. 2012) ............................................................22

*Snyder v. Phelps*,
   562 U.S. 443 (2011) ..................................................................................17

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ..................................................................................17

*Sweezy v. New Hampshire*,
   354 U.S. 234 (1957) ..................................................................................18

*Tao v. Freeh*,
   27 F.3d 635 (D.C. Cir. 1994) ....................................................................20

*Turner v. U.S. Agency for Glob. Media*,
   502 F. Supp. 3d 333 (D.D.C. 2020) ..........................................................42

*Underwager v. Salter,*
    22 F.3d 730 (7th Cir. 1994) ......................................................................18

*United States v. Jud. Watch Inc.,*
    371 F.3d 824 (D.C. Cir. 2004) ............................................................28, 30

*\*United States v. Morton Salt Co.,*
    338 U.S. 632 (1960) ................................................................................31

*United States v. Powell,*
    379 U.S. 48 (1964).............................................................................27, 36

*Washington v. Trump,*
    No. 25-1922 (9th Cir. Sept. 19, 2025) ...............................................6, 33

*Williams v. Johnson,*
    537 F. Supp. 2d 141 (D.D.C. 2008) ........................................................20

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)..............................................................................14, 41

*Wis. Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985)................................................................37

*Woodruff v. Peters,*
    482 F.3d 521 (D.C. Cir. 2007).................................................................25

*Xiaomi Corp. v. Dep't of Def.,*
    No. 21-cv-00280, 2021 WL 950144 (D.D.C. Mar. 12, 2021) ...............38

*\*Zurcher v. Stanford Daily,*
    436 U.S. 547 (1978).....................................................................27, 28, 31

## Constitutional Provisions

U.S. CONST. amend. I................................................................... *passim*

U.S. CONST. amend. IV ................................................................ *passim*

## Statutes

Federal Trade Commission Act, 15 U.S.C. § 41 et seq. ........................ *passim*

## Other Authorities

Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 30, 2025)...........................2, 6, 22, 23

Exec. Order No. 14187, 90 Fed. Reg. 8771 (Feb. 3, 2025) ...........................2, 7, 22, 23

Federal Rule of Civil Procedure 65 ........................................................................1, 43

Letter from Organizations Representing Health Care Clinicians, Public Health
      Professionals, Scientists, Patients, and Family Advocates to Congress (Jan. 9,
      2026) ...........................................................................................................................19

Local Civil Rule 65.1(c) .............................................................................................1

Pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule ("LCvR") 65.1(c), Plaintiff American Academy of Pediatrics ("AAP") respectfully moves for a preliminary injunction barring Defendants from (1) implementing or enforcing the January 15, 2026 Civil Investigative Demand (the "CID") served by the Federal Trade Commission ("FTC") on AAP and (2) taking further unlawful action interfering with or retaliating against AAP's exercise of its First Amendment rights.[1]

## INTRODUCTION

The American Academy of Pediatrics is a 501(c)(3) non-profit dedicated to improving the health of all young people and the leading national voice for pediatric medicine. *See* Declaration of M. Del Monte ("Del Monte Decl.") ¶ 3. AAP has been a leading advocate on high-profile health policy issues such as childhood vaccines and gender-affirming care ("GAC"). *Id.* ¶ 8; *see* Declaration of S. Grigsby ("Grigsby Decl."), Ex. 10. On January 15, 2026, the FTC issued AAP a sweeping Civil Investigative Demand ("CID"), which demanded a host of information regarding AAP's protected speech about GAC, including its scientific policy development process, communications with both members and outside experts, and advocacy in legal and political spheres. *See* ECF No. 1-1. This CID is the most recent demonstration of the animus held by the Trump Administration and the FTC toward speech like AAP's and toward AAP specifically.

Since returning to office, President Trump and his Administration have undertaken a sustained campaign to delegitimize, restrict, and ultimately eliminate GAC, including by seeking to restrict speech about it and by targeting institutions and individuals that publicly support GAC. Through a series of Executive Orders and public statements, beginning in January 2025, the

---

[1] Pursuant to LCvR 7(m), Plaintiff's counsel conferred with Defendants' counsel about this motion, and Defendants' counsel stated that Defendants oppose the motion.

Administration characterized transgender identity as a form of "gender ideology extremism," denounced GAC as harmful and illegitimate, and directed federal agencies to end federal support for such care, which it described as a "stain on our Nation's history." *See* Exec. Order No. 14168 of Jan. 20, 2025, 90 Fed. Reg. 8615, 8615 (Jan. 30, 2025); Exec. Order No. 14187 of Jan. 28, 2025, 90 Fed. Reg. 8771, 8771 (Feb. 3, 2025). In the months that followed, senior Administration officials repeatedly singled out AAP by name, including by highlighting a description of its scientific guidance as "very low quality," *see* Grigsby Decl., Ex. 1, accusing it of professional misconduct and characterizing its advocacy on behalf of transgender and gender-diverse youth ("TGD") as morally corrupt, *see id.*, Ex. 2 (accusing AAP of "peddl[ing] the lie that chemical and surgical sex-rejecting procedures could be good for children" and "malpractice"). Then, in December 2025, the Department of Health and Human Services ("HHS") abruptly terminated seven of AAP's federal grants—an action this Court preliminarily enjoined on January 11, 2026, after finding that AAP was likely to succeed on its claim that the funding terminations were retaliatory and unsupported by any legitimate justification. *See Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-4505, 2026 WL 80796, at *1–2 (D.D.C. Jan. 11, 2026) ("*AAP*"). Four days later, on January 15, 2026, the FTC issued the CID at issue here.

FTC Chairman Andrew Ferguson has vowed to carry out President Trump's directive to eliminate GAC. Even before he became Chairman, then-Commissioner Ferguson campaigned for the job by pledging to "fight back against the trans agenda" and "investigate" those who "pushed gender confusion." Grigsby Decl., Exs. 3–4. Under Chairman Ferguson's leadership, the FTC has made clear its hostility to those who speak about GAC, including through public statements referring to GAC as "mutilation," *id.*, Ex. 5; a Commission-sponsored workshop focused on the "Dangers" of GAC, *id.*, Ex. 6; and a formal Request for Information that invoked the President's

January 28, 2025, Executive Order directing federal agencies to "end" support for GAC, *id.*, Ex. 7. Chairman Ferguson has even gone so far as to publicly confirm that the FTC was "investigating" supporters of GAC based on the findings of HHS—an agency that this Court has already determined likely retaliated against AAP for its protected speech on issues of public health. *Id.*, Ex. 8; *AAP*, 2026 WL 80796, at *1–2. Nearly 150 FTC staff members publicly warned that the FTC was exceeding its statutory mandate and acting out of hostility toward GAC rather than consumer protection concerns. Grigsby Decl., Ex. 9. Against this backdrop, the FTC's CID to AAP is not a neutral inquiry, but the next step in a coordinated campaign to punish AAP for its protected speech and to suppress viewpoints the Administration disfavors.

To prevent the FTC from continuing to violate AAP's constitutional rights, the Court should grant this Motion and preliminarily enjoin the FTC from taking further action implementing or enforcing the January 15, 2026 CID and from taking further unlawful action interfering with or retaliating against AAP's exercise of its First Amendment rights. As described below, AAP satisfies each element required for a preliminary injunction.

*First*, AAP is likely to succeed on the merits of each of its claims. AAP is likely to succeed on its First Amendment retaliation claim because multiple factors make clear that the FTC issued its CID in response to AAP's protected speech. The CID invasively demands information relating to AAP's protected rights to petition and speak, is part of a broader campaign targeting AAP for those activities, and risks chilling AAP's protected speech. Moreover, the lack of any sound justification for the CID further confirms that it was not issued for any legitimate investigative purpose. The FTC has no statutory authority to investigate AAP's non-commercial medical guidance or AAP's legal and political advocacy because such an inquiry has no relevance to potential violations of the Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.* ("FTC Act"),

strongly suggesting that the decision to issue a CID to AAP was not driven by a genuine concern about unlawful "marketing and advertising." *See* ECF No. 1-1 at 2.[2] Put simply, many factors support the inference that the FTC issued its CID to retaliate against AAP for exercising its constitutionally protected right to express its views on matters of significant public concern.

AAP is also likely to succeed on the merits of its claim that the FTC's CID exceeds the First and Fourth Amendment limitations on the FTC's investigatory powers. The CID demands essentially all documents and information related to AAP's work on GAC, including its scientific and educational statements about GAC, its deliberations and communications about GAC guidance, its legal advocacy, and the identities of everyone involved in formulating such guidance. *See generally* ECF No. 1-1. The CID's overbreadth thus threatens AAP's First Amendment-protected rights to speech, petition, and association, without any of the restraint the Fourth Amendment requires. In exceeding the bounds of the FTC's statutory authority, the CID fails to comport with the Fourth Amendment's requirement that agencies have legal authority for any search they undertake. Moreover, the FTC cannot show that the CID serves any compelling state interest, as required for searches seeking to compel disclosure of materials implicating First Amendment freedoms.

*Second*, the remaining preliminary injunction factors favor an injunction against the FTC's CID. The CID is irreparably harming AAP. Each day the CID remains in effect, it threatens to chill the protected speech and activities of AAP, its staff, its members, and the expert doctors and researchers with whom AAP collaborates. *See* Del Monte Decl. ¶¶ 14–28. Conversely, the CID does not benefit the FTC or the public. In fact, the public is put at risk when a medical organization

---

[2] All page references to docketed materials refer to the ECF-stamped page number unless otherwise specified.

like AAP faces retaliation for engaging in scientific discourse. Thus, the balance of the equities also favors granting the preliminary injunction.

The First and Fourth Amendments do not permit the FTC's conduct, and neither should this Court. The Court should grant AAP's Motion for Preliminary Injunction.

## BACKGROUND

### I.    AAP Engages in Core First Amendment Activities on Matters of Public Concern.

AAP is a nonprofit organization founded in 1930 with the mission of advancing the health and well-being of all infants, children, adolescents, and young adults. Since its founding, AAP has served as a leading national voice on pediatric medicine. Grounding its work in science, AAP has advanced pediatric clinical expertise, provided high-quality education and policy guidance, fostered pediatric research, and consistently advocated on behalf of all young people. Today, AAP's membership includes approximately 67,000 pediatricians across the United States. Importantly, however, AAP does not sell medical products or provide clinical services to patients. Grigsby Decl., Ex. 10. Instead, AAP advances pediatric health by educating clinicians, supporting research, and issuing evidence-based clinical guidance to inform pediatric practice.

Central to fulfillment of AAP's mission is AAP's publication of clinical guidance on a wide range of pediatric health topics. These clinical guidance documents—referred to as policy statements—are developed by panels of subject matter experts, synthesize medical evidence and scientific research for pediatric providers, and are vetted through peer review. *Id.*, Ex. 11. AAP's policy statements are made available for free to the public and are designed to support clinicians in providing individualized and evidence-based patient care. The policy statements do not promote particular products, providers, or services.

Gender-affirming care for youth diagnosed with gender dysphoria is one of many topics for which AAP has issued clinical guidance. In 2018, AAP published a policy statement entitled,

"Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents" ("Policy Statement"), which it reaffirmed in 2023. *Id.*, Ex. 12. The Policy Statement synthesizes scientific research on gender dysphoria and describes the role of pediatricians in "providing evidence-based information to assist youth and families in medical decision-making." *Id.* Like AAP's other policy statements, it does not direct patients or pediatricians to pursue particular treatments, therapies, or interventions. *Id.*

AAP's work related to GAC has also included educational programming for pediatricians, such as workshops or conferences, legal and political advocacy through amicus briefs and participation in rulemakings, and the exercise of its own right to petition the courts for redress from unconstitutional or unlawful government action. *Id.*, Exs. 12–13; Brief for Am. Acad. of Pediatrics et al. as *Amici Curiae* Supporting Appellees, *Washington v. Trump*, No. 25-1922 (9th Cir. Sept. 19, 2025); *AAP*, 2026 WL 80796, at *17. Regardless of the format, AAP's public communications on this topic are intended to support the field of pediatrics and consistently emphasize that care decisions are individualized and made in consultation with families and qualified clinicians.

## II. The FTC Is Carrying Out the Trump Administration's Well-Established Directive to End GAC Through Retaliation Against Organizations like AAP.

Since returning to office, President Trump and his Administration have launched a sustained nationwide public campaign to discredit and eliminate GAC. In January 2025, the President issued Executive Orders No. 14168 and 14187. The first referred to transgender identity as "gender ideology extremism" and declared that the government would recognize "two sexes, male and female" that are "not changeable." *See* Exec. Order No. 14168, 90 Fed. Reg. at 8615 ("Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women . . . . This is

wrong."). The second directed executive agencies to "end" GAC, referring to the practice as "chemical and surgical mutilation" and a "stain on our Nation's history." *See* Exec. Order No. 14187, 90 Fed. Reg. at 8771.

On January 20, 2025—the same day he declared the U.S. government would recognize only "two sexes, male and female"—President Trump elevated then-Commissioner Andrew Ferguson to Chairman of the FTC. Chairman Ferguson campaigned for this elevation by promising to "[f]ight back against the trans agenda" and "[i]nvestigate" those who "pushed gender confusion." Grigsby Decl., Ex. 3; *cf. Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 111–12 (D.D.C. 2025) (discussing Mr. Ferguson's statement that "it is 'really important that the FTC take investigative steps in the new administration under President Trump' because 'progressives' and others who are 'fighting "disinformation["]' were 'not going to give up just because of the election'") ("*Media Matters II*"); *id.* at 115 ("[W]hen Mr. Ferguson was only a candidate for the FTC Chairman position, he also stated that he had a 'track record of standing up to . . . the radical left'"). Upon assuming the role, Chairman Ferguson framed the FTC, historically understood to be an independent agency, as acting "under the President's leadership" and repeatedly referred to the agency as the "Trump-Vance FTC." Grigsby Decl., Exs. 15–16.

Consistent with that direction, the FTC convened a workshop titled "The Dangers of 'Gender-Affirming Care' for Minors" in July 2025, presenting the event as part of the Trump Administration's broader effort to eliminate GAC. *Id.*, Ex. 6. Chairman Ferguson described the workshop as an effort to address what he called "wounds" inflicted by proponents of GAC and to advance the interests of "the parents and kids the Biden Administration chose to ignore." *Id.*,

Ex. 17 at 2.[3]

Nearly 150 FTC staff publicly objected to the workshop, expressing concern that "[t]he workshop's title, agenda, and the announcement's use of charged language suggest[ed] the Commission ha[d] already taken a position opposing gender-affirming care for minors." *Id.*, Ex. 9 at 1. Their objections were published anonymously, out of "credible fear of retaliation from the Trump-Vance FTC." *Id.* at 3. FTC Director of Public Affairs Joe Simonson publicly declared that FTC staff who opposed the workshop were "free to resign" and that "[n]o sane person could endorse the needless mutilation of children." *Id.*, Ex. 5.

The workshop did not discuss GAC in a neutral manner, nor did it focus on commercial activities of the type subject to FTC oversight. Instead, it exclusively featured individuals who oppose GAC, who attacked AAP and its non-commercial clinical guidance repeatedly throughout the workshop. Commissioner Mark R. Meador spoke; during his remarks, he voiced his hostility to GAC, stating that "for too long those in power have only given a voice to one side in this debate" and asserting that those supporting GAC are "the side that is perpetrating the very fraud that needs to be uncovered and stopped." *Id.*, Ex. 17 at 84. A panelist, Glenna Goldis, explicitly referenced medical associations including the AAP, stated that medical organizations should be pressured through government investigations and injunctions to force them to "change," and described the intended consequences of public investigations as loss of members and funding. *Id*. at 81; *cf. AAP*, 2026 WL 80796, at *17 (D.D.C. Jan. 11, 2026) (describing public rebuke of AAP by high-ranking official at HHS who threatened consequences for a lawsuit filed by AAP). Notably, Goldis was later hired into a senior litigation role within the FTC's Bureau of Consumer Protection with a

---

[3] Unless otherwise indicated, page references for exhibits attached to the Grigsby Declaration refer to the paginated number within the exhibit itself.

focus on investigations into GAC.  Grigsby Decl., Ex. 18.

After the workshop, the FTC issued a Request for Information regarding GAC for minors, asserting that "some medical organizations continue to advocate for GAC as the best standard of care, despite the apparent lack of a widespread medical consensus as to whether GAC is the correct course of action for gender dysphoric youth" and expressly invoking President Trump's Executive Order directing agencies to end the practice.  *Id.*, Ex. 7 at 2.

In November 2025, FTC leadership and senior staff also publicly linked the FTC's intention to investigate GAC with the actions of the HHS.  Chairman Ferguson, as well as his senior policy advisor, both posted about a recently published HHS report that sought to discredit AAP's 2018 Policy Statement.  Chairman Ferguson shared the report on X and stated, "[t]his report is exactly why the @FTC is investigating these practices."  Grigsby Decl., Ex. 8.  Chairman Ferguson's senior policy advisor, Jon Schweppe, quoted HHS Secretary Robert F. Kennedy, Jr. in his repost of the report, saying "@AmerAcadPeds peddled the lie that chemical and surgical sex-rejecting procedures could be good for children.  They betrayed their oath to first do no harm . . .  That is not medicine—it's malpractice."  *Id.*, Ex. 19.

**III.    The FTC Issued a Sweeping CID Targeting AAP's Speech and Associations Immediately After This Court Found Likely Executive Branch Retaliation Against AAP for That Same Speech.**

The HHS report was not the only action HHS took against AAP's protected speech, which a senior HHS advisor previously referred to as "demonic."  *Id.*, Ex. 20.  In December 2025, HHS terminated seven of AAP's federal grants.  *See AAP*, 2026 WL 80796, at *1–2 (granting preliminary injunction against grant termination and finding AAP likely to succeed on First Amendment retaliation claim).  This Court granted AAP's request to preliminarily enjoin those terminations, finding that AAP had demonstrated a likelihood of success on its claim that the terminations were unconstitutional retaliation for AAP's protected speech on matters of public

health, including GAC. *Id.* In so finding, the Court relied on the timing of the adverse actions, extensive hostile public statements by leadership, and the absence of a plausible legitimate explanation. *Id.*

Only four days later, on January 15, 2026, the FTC issued the CID to AAP. *See* ECF No. 1-1; *cf. AAP*, 2026 WL 80796, at *16 ("The timing of HHS's retaliatory act of terminating the seven grants has almost perfectly coincided with significant events in one area of AAP's First Amendment protected speech."). The CID asserts that the FTC's purpose is to determine whether AAP or "any other Person" made "false or unsubstantiated representations or engaged in unfair practices" connected to the "marketing and advertising of Pediatric Gender Dysphoria Treatment [("PGDT")]," [4] and whether FTC action to obtain monetary relief would be in the public interest. ECF No. 1-1 at 2, 5. But the CID indiscriminately demands a vast array of information about AAP's protected speech and associations going back five years—and up to a decade for certain requests— covering essentially all materials related to AAP's work on GAC. *See, e.g.*, *id.*, Specifications A.8, A.13, B.1–5. For example, the CID seeks a catalog of every statement AAP has made related to so-called "PGDT" (referred to as "Covered Statements" in the CID), including how and to whom the statements were made, when and where they were made, and why they were made. *Id.*, Specifications A.6–7, B.9. The CID also demands sweeping information about AAP's processes for developing clinical guidance on GAC, for example:

- "[from January 1, 2015 to present,] the process for developing and issuing the 2018 Policy Statement and 2023 Reaffirmation, including but not limited to every individual or entity that participated in development and issuance, and any funding sources";

- "[from January 1, 2015 to present,] identify each person, company, agency, or other entity with responsibility for developing, reviewing, or evaluating substantiation,

---

[4] The CID defines PGDT as any "medical intervention which, according to [AAP], purports to treat gender dysphoric or gender diverse minors . . . ." ECF No.1-1, Definition D-7.

scientific or otherwise, for each Covered Statement, including the qualifications of each such Person, and describe the functions performed by each";

- "regardless of time period, all Communications with Professional Medical Organizations related to the 2018 Policy Statement, 2023 Reaffirmation, and SOC 8"; and

- "regardless of time period, all Documents reflecting or constituting Communications with other organizations or institutions, or individuals regarding the development and publication of the 2018 Policy Statement, 2023 Reaffirmation, and SOC 8."

*Id.*, Specifications A.8, A.13, B.4, B.5; Grigsby Decl., Ex. 24.  The CID also demands information related to AAP's advocacy efforts related to GAC by requiring that AAP provide "[a]ll testimony, advocacy, or other information provided to any legislature or regulator related to PGDTs" and "all investigations and lawsuits involving You and either the Covered Statements or PGDTs, including any lawsuit in which you are amicus."  *Id.*, Specifications A.11, B.7.  The CID additionally demands information about AAP's educational efforts related to "PGDT," scientific research it has conducted or relied on related to "PGDT," and AAP's financial information.  *Id.*, Specifications A.5, A.9, B.1-.3, B.6, B.8, B.10–11.

The CID's demands directly target the core of AAP's protected activities—AAP's statements about the science supporting GAC, development of clinical guidance through collaboration with other organizations and persons, and advocacy to courts and legislatures about supporting transgender and gender-diverse youth with access to appropriate GAC.  No legitimate inquiry into "marketing and advertising" to "consumers," which the CID purports to investigate, would require these categories of information.  *Id.* at 5.

Further demonstrating its retaliatory motive, the CID exceeds the bounds of the FTC's jurisdiction and fails to comply with several of the statutory requirements of the FTC Act.  The FTC only has authority to issue a CID if it has "reason to believe that any person . . . may have any information, relevant to unfair or deceptive acts or practices in or affecting commerce."  15

11

U.S.C. § 57b-1(c)(1). And the FTC is limited to enforcing the FTC Act against "persons, partnerships, or corporations." 15 U.S.C. § 45(a)(1)–(2). Section 4 of the FTC Act defines "corporation" as an entity "organized to carry on business for its own profit or that of its members." *Id.* § 44.

The CID claims to be investigating whether AAP violated the FTC Act in connection with the "marketing and advertising" of PGDT. ECF No. 1-1 at 5. AAP, however, is a non-profit dedicated to advancing the health and well-being of young people, not a corporation organized to carry on business for profit capable of violating the FTC Act. Grigsby Decl., Ex. 21. The CID, moreover, demands information about AAP's protected medical and scientific speech that is not "in or affecting commerce." *See, e.g.*, ECF No. 1-1, Specifications A.5–8, A.11–13, B.1–9. The CID—by targeting the non-commercial speech of a non-profit medical organization—demands information that has no relevance to potential FTC Act violations and thus exceeds the bounds of the Commission's jurisdiction.

Additionally, a valid CID must be issued "pursuant to a Commission resolution." 15 U.S.C § 57b-1(i). But the two FTC resolutions attached to the CID fail to support the investigation's subject matter. ECF No. 1-1 at 17–18. The 2019 Resolution targets the "advertising, marketing, or sale" of medical products or services and the 2021 Resolution targets acts or practices related to goods or services marketed "to children under 18." *Id.* AAP does not engage in the advertising, marketing, or sale of medical products or services. And the CID's demands focus on activities that seek to educate clinicians, not commercial activities or practices that are marketed towards children under 18. *Id.* Moreover, both resolutions reiterate that investigations must be related to unfair or deceptive conduct that is "in or affecting commerce" in violation of the FTC Act, which can only be enforced against "persons, partnerships, or corporations." *Id.* But as set forth above,

12

the CID demands information about non-commercial medical and scientific guidance and purports to target AAP, a non-profit dedicated to the health of all infants, children, adolescents, and young adults.

Accordingly, multiple factors, including the CID's timing, substance, and alleged basis, all confirm that the CID was not issued pursuant to a legitimate investigative purpose, but rather to silence AAP's protected speech. *See, e.g.*, *Media Matters II*, 805 F. Supp. 3d at 112 ("[G]iven the comments by Chairman Ferguson and his colleagues about Media Matters, the timing of the CID, and evidence of pretext, Media Matters is likely to show that retaliatory animus was the but-for cause of the FTC's CID.").

## IV.    The FTC's CID and Investigation Have Harmed, and Will Continue to Harm, AAP.

The CID's intrusive demands have compounded the harms already inflicted on AAP by the Trump Administration and the FTC's anti-GAC campaign and have also created new, concrete harms to AAP's constitutionally protected speech and associational activities. The CID has undermined AAP's ability to facilitate and engage in the open exchange of scientific information and medical discourse in furtherance of its mission to promote the health and well-being of young people. Del Monte Decl. ¶¶ 14–15. Due to the CID, AAP faces new threats to its collaboration with expert doctors and researchers, to holding public events safe from disruption and harassment, and to carrying on its important work of informing pediatric practice in the area of GAC. *Id.* ¶¶ 13, 16–18; *see also AAP*, 2026 WL 80796, at *2 ("In the realm of public health policy, where evidence-based research can make the difference between lives well-lived and chronic illness or even death, assuring such public access to information and debate is acutely important.").

The CID has caused AAP associational and reputational harm. Del Monte Decl. ¶¶ 15, 22; *see also AAP*, 2026 WL 80796, at *22–23 (AAP suffered reputational harm from HHS's retaliatory termination of grants). AAP reasonably fears—based on its experience being targeted in the past

for its work on GAC—that groups and key allies that previously worked closely with AAP will pull back on, or entirely cease, communications and engagement with AAP, fearful that AAP may be required to turn over their communications to the FTC. Del Monte Decl. ¶ 16. AAP employees, members, and collaborators have already expressed concerns about being publicly associated with AAP's work on topics implicated by the FTC's investigation. *Id.* ¶ 15. These concerns are understandable given the FTC's request for AAP's communications with third parties and the identities of every person or entity that developed, reviewed, or evaluated the scientific support for AAP's statements about "PGDT." ECF No. 1-1, Specifications A.8, A.13, B.4, B.5.

The FTC's investigation and statements about GAC have also impacted AAP's finances and operations. For example, in the past AAP has borne additional security costs in hosting forums for scientific and medical discussion of GAC, due to disruptions, harassment, and security threats. Del Monte Decl. ¶¶ 17, 20, 23. Due to this history and the FTC's targeting of its protected speech and activities, AAP is already planning for additional security at future events. *Id.* ¶¶ 18–19, 21, 24. AAP's staff is currently bearing the brunt of this unconstitutional conduct, operating in an environment of fear of retaliation by the FTC and finding it more difficult to do their important work. *Id.* ¶¶ 25–27.

## ARGUMENT

A plaintiff seeking a preliminary injunction must show: (1) likelihood of success on the merits; (2) likelihood of "suffer[ing] irreparable harm in the absence of preliminary relief;" (3) that "the balance of equities tips in [their] favor;" and (4) that "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1324 (D.C. Cir. 2022) (same). The final two factors "merge when plaintiff attempts to preliminarily enjoin a government action," *Florida EB5 Investments,*

14

*LLC v. Wolf*, 443 F. Supp. 3d 7, 13 (D.D.C. 2020), "because the government's interest *is* the public interest," *Pursuing America's Greatness v. Federal Election Commission*, 831 F.3d 500, 511 (D.C. Cir. 2016) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  As set forth below, AAP satisfies all four factors and is therefore entitled to preliminary injunctive relief.

## I.      AAP Is Likely to Succeed on the Merits of Its Claims.

AAP is likely to succeed on the merits of its claims that the FTC issued the CID in violation of the First Amendment, in retaliation for AAP's protected speech and petition, and that the CID violates First and Fourth Amendment constraints on the FTC's authority to conduct investigations. *See Adams v. District of Columbia*, 285 F. Supp. 3d 381, 390 (D.D.C. 2018) (explaining plaintiffs need only show a likelihood of success "on at least one count of [the] underlying Complaint").

### A.      AAP Is Likely to Establish that the FTC's CID Violates the First Amendment's Prohibition on Retaliation for Engaging in Protected Activity.

The FTC issued its CID to punish AAP for engaging in speech and petition disfavored by certain government officials.  That is a clear First Amendment violation.

The First Amendment guarantees the right to "freedom of speech" and "to petition the Government for a redress of grievances."  U.S. CONST. amend. I.  Critically, this "freedom of speech prohibits the government from telling people what they must say," because "[a]t the heart of the First Amendment lies the principle that each person should decide for [themselves] the ideas and beliefs deserving of expression, consideration, and adherence."  *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013).  "The First Amendment generally 'prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech,'" *Media Matters for America v. Paxton*, 138 F.4th 563, 570 (D.C. Cir. 2025) (quoting *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022)) ("*Media Matters I*"), and "[i]t should alarm all Americans when the Government retaliates against

15

individuals or organizations for engaging in constitutionally protected public debate," *Media Matters II*, 805 F. Supp. 3d at 111.

To prevail on a retaliation claim, a plaintiff "must show: (1) [it] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in [the plaintiff]'s position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against [the plaintiff]." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016); *see also AAP*, 2026 WL 80796, at *15–17 (same). AAP is likely to prove each of these elements. First, AAP engaged in speech and petition activities protected under the First Amendment. Second, the FTC's invasive and expansive CID and investigation would deter any organization of ordinary firmness from speaking again. Third, a clear but-for causal connection exists between the FTC's actions and AAP's protected First Amendment activity, based on the CID's part in a broader campaign of governmental hostility targeting AAP; the CID's timing; and the lack of legitimate purpose in issuing the CID.

This Court has already held that AAP demonstrated a likelihood of success on the merits of its First Amendment retaliation claim based on the actions of another federal agency that targeted AAP due to its work on GAC. *See AAP*, 2026 WL 80796, at *16. The Court should reach the same conclusion here.

### 1.    AAP has engaged in protected First Amendment activities.

In furtherance of its mission "to attain optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults," Grigsby Decl., Ex. 10, AAP exercises its First Amendment right to free speech (through publications and public outreach) and to petition (through litigation and advocacy). Both speech and petition are essential First Amendment rights. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011) ("[T]he right to

speak and the right to petition are 'cognate rights,'" "both . . . integral to the democratic process.'") (quoting *Thomas v. Collins,* 323 U.S. 516, 530 (1945)). "The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives, whereas the right to speak fosters the public exchange of ideas that is integral to deliberative democracy as well as to the whole realm of ideas and human affairs." *Id.*

> a) **The First Amendment protects AAP's publication of its Policy Statements.**

AAP's Policy Statements focus on matters of public concern, contribute to scientific debate, and present AAP's review of the scientific literature on a wide variety of pediatric topics.

AAP's speech concerns an indisputably important public issue—the health and well-being of young people. "The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled[.]" *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). That is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964)). And the First Amendment "makes for us" the choice "between the dangers of suppressing information[] and the dangers of its misuse if it is freely available." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578 (2011).

The Supreme Court has additionally recognized the particular "danger of content-based regulations 'in the fields of medicine and public health.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 756 (2018) (quoting *Sorrell*, 564 U.S. at 566); *accord Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) ("Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us . . . . That freedom is therefore a special concern of the First Amendment[.]"). AAP's Policy Statements are protected scientific debate, and "[s]cientific controversies must be settled by the methods of science rather

17

than by the methods of litigation." *Underwager v. Salter,* 22 F.3d 730, 736 (7th Cir. 1994); *see also Sweezy v. New Hampshire*, 354 U.S. 234, 262 (1957) (Frankfurter, J., concurring) ("For society's good—if understanding be an essential need of society—inquiries into [the natural sciences], speculations about them, stimulation in others of reflection upon them, must be left as unfettered as possible."); *cf. AAP*, 2026 WL 80796, at *2 ("When force and coercion replace reason in the marketplace of ideas, the public suffers by denial of access to high-quality information.").

AAP's expert review of and reliance on scientific sources to form recommendations is also protected because "presenting a curated and 'edited compilation of [third party] speech' is itself protected speech." *Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024) (quoting *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 570 (1995)).  When AAP cites and highlights scientific sources and research in its publications, it "is enough to invoke its right as a private speaker to shape its expression by speaking on one subject while remaining silent on another." *Hurley*, 515 U.S. at 574.

AAP has served as a leading national voice on pediatric medicine since its founding and has advanced pediatric clinical expertise.  AAP's Policy Statements—which are developed by panels of subject matter experts, grounded in scientific evidence, and vetted by peer review— synthesize medical evidence and scientific research to aid pediatric providers in providing individualized and informed patient care.  These Policy Statements are broadly available and are free to the public.  AAP's speech is unquestionably protected by the First Amendment and improperly targeted by the CID.  *See* ECF No. 1-1, Specifications A.5–8, A.12-13, B.1–9.

        **b)**        **AAP's petitioning of the government through litigation and advocacy is protected First Amendment activity.**

The Supreme Court has "recognized the right to petition as one of the most precious of the liberties safeguarded by the Bill of Rights . . . high in the hierarchy of First Amendment values."

*Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018) (internal quotation marks removed).  "[T]he right to petition extends to all departments of the Government," including "administrative agencies" and "courts."  *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).  The Supreme Court has expressly recognized "a lawsuit" as a form of "petition" within the meaning of the Petition Clause.  *Borough of Duryea*, 564 U.S. at 390.  AAP's protected petitioning activities include filing and defending lawsuits, *see, e.g.*, Complaint, *Am. Acad. of Pediatrics v. Kennedy*, No. 1:25-cv-11916 (D. Mass. July 7, 2025), ECF. No. 1; *AAP*, 2026 WL 80796 (D.D.C. Jan. 11, 2026); participating in litigation as amicus curiae, *see, e.g.*, Brief of *Amici Curae* the American Academy of Pediatrics, et al. in Support of Plaintiffs-Appellees and Urging Affirmance, *Flores v. Bondi*, No. 1:25-6308 (9th Cir. Jan. 28, 2026), ECF. No. 29-1; and testifying, advocating, or otherwise providing information to legislatures and regulatory bodies, *see, e.g.*, Letter from Organizations Representing Health Care Clinicians, Public Health Professionals, Scientists, Patients, and Family Advocates to Congress (Jan. 9, 2026) (https://perma.cc/KCP2-KRBX).  The CID impermissibly targets AAP for its conduct of this constitutionally protected petition activity. *See* ECF No. 1-1, Specifications A.11, B.7.

### 2.   The FTC's CID has been, and will continue to be, sufficient to deter AAP's protected activities.

Government officials may not "use the power of the State to punish or suppress disfavored expression," whether through legal action or regulation.  *See Nat'l Rifle Assoc. of Am. v. Vullo*, 602 U.S. 175, 188 (2024); *see also Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 20 (1986) ("[T]he State cannot advance some points of view by burdening the expression of others."); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64, 67 (1963) (explaining the First Amendment does not allow a State to "deliberately set about to achieve the suppression of publications deemed 'objectionable'" through actions meant "clearly to intimidate").

The FTC, through the CID, has taken "action sufficient to deter a person of ordinary firmness in [AAP's] position from speaking again." *Aref*, 833 F.3d at 258.  The bar for such action is not high because "even minor forms of retaliation can support a First Amendment claim, for they may have just as much of a chilling effect on speech as more drastic measures." *Williams v. Johnson*, 537 F. Supp. 2d 141, 149 (D.D.C. 2008) (quoting *Velikonja v. Mueller*, 315 F. Supp. 2d 66, 76 (D.D.C. 2004)); *see also Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994) (explaining that the First Amendment protects "from 'even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights'" (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75–76 n.8 (1990)).  And AAP does not have to cease its protected activity entirely in order to show the retaliation deters that activity.  To do so would "convert[] a legally objective test into a subjective one based on the actions of the most principled of actors." *AAP*, 2026 WL 80796, at *16.  Rather, the test is one of "ordinary firmness," *Media Matters I*, 138 F.4th at 584, "because, otherwise, it would basically strip constitutional rights away from the most principled speakers." *AAP*, 2026 WL 80796, at *16.

Here, the FTC has issued an expansive CID—enforceable through a petition in federal court—that invades AAP's protected speech and petition rights.  In terms of both its timing and the information sought, this CID is a continuation of actions taken against the AAP by the Trump Administration and its agencies in response to disagreement with AAP's speech and exercise of its petition rights.  Even when considered in isolation, the FTC's expansive CID would plainly "deter a person of ordinary firmness in [AAP's] position from speaking again." *Aref*, 833 F.3d at 258; *see also Playboy Enters., Inc. v. Meese*, 639 F. Supp. 581, 585 (D.D.C. 1986) (explaining the mere "threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation" suffices to deter protected speech); *Media Matters II*, 805 F. Supp. 3d at 130 ("A [person] of

20

ordinary firmness would be wary of speaking again if she had to reveal the materials requested by this fishing expedition of a CID.").  But when the FTC's conduct is placed in the context of the broader retaliation campaign against AAP and anyone who advocates for access to appropriate GAC, it is even clearer that such conduct would chill protected activity by a person of ordinary firmness.  S*ee AAP*, 2026 WL 80796, at *15.  The chilling effect of the CID is reinforced by the power federal law vests in the agency to punish AAP for noncompliance, including seeking judicial enforcement of the CID.  *See, e.g.*, 15 U.S.C. § 57b-1(e); *Media Matters II*, 805 F. Supp. 3d at 131 ("[T]he fact that the CID is enforceable in federal court . . . also bolsters the conclusion that someone of ordinary firmness would be deterred from speaking.").

Finally, while AAP remains steadfastly committed to advancing the health and well-being of young people, including by speaking out on issues of importance and publishing evidence-based clinical guidance, AAP is facing increased difficulty engaging with members and experts on issues of importance due to those individuals' fear of becoming subject to the FTC's unconstitutional investigation and suffering the FTC's retaliation in response to AAP's exercise of its First Amendment rights.  These difficulties chill AAP's speech on GAC and related issues.  Del Monte Decl. ¶ 16.

### 3.    The FTC's retaliatory actions are causally linked to AAP's constitutionally protected activities.

The CID can only be explained as retaliation for AAP's protected activities.  Because "direct evidence of an improper motive is usually difficult, if not impossible, to obtain," courts have recognized that "[c]ircumstantial evidence is equally as probative as direct evidence in proving illegitimate intent."  *Media Matters for Am. v. FTC*, No. 25-5302, 2025 WL 2988966, at *8 (D.C. Cir. Oct. 23, 2025) (quoting *Bailey v. Ramos*, 125 F.4th 667, 685 (5th Cir. 2025)) ("*Media Matters III*").  "[S]uch circumstantial evidence, including proximity in time between the protected

speech and government's adverse actions, the defendant's expression of hostility to the protected speech, and the absence of a proffered legitimate alternative explanation for the action can support a finding that protected speech caused the agency's response." *Id.* Broadly, courts need not suspend disbelief in analyzing causation—where context "suggests that there may be more to this story," courts may recognize a retaliatory motive. *Smith v. De Novo Legal, LLC*, 905 F. Supp. 2d 99, 104 (D.D.C. 2012).

Here, multiple factors justify the inference that the FTC opened its investigation into AAP and issued the CID in retaliation for AAP's protected activities. The Trump Administration, including its agencies and departments, has engaged in a broader "campaign" targeting the plaintiff. *E.g.*, *Lewis v. Gov't of the Dist. of Columbia*, 161 F. Supp. 3d 15, 29 (D.D.C. 2015) (plaintiff properly pleaded causation where, despite nine months between protected speech and termination, she had alleged a series of smaller, intervening instances of retaliatory conduct). The CID also came just four days after HHS' retaliatory action against AAP was enjoined. *E.g.*, *Johnson v. District of Columbia*, 726 F. Supp. 3d 8, 30 (D.D.C. 2024) (explaining that "close temporal proximity can provide circumstantial evidence of causation") (internal quotations omitted), *recons. denied*, No. CV 20-2944 (RC), 2024 WL 3858547 (D.D.C. Aug. 19, 2024). And the CID exceeds the boundaries of the FTC's authority to investigate potential violations of the FTC Act, demonstrating that the government's justification for its action is pretextual. *E.g.*, *Goodwin v. District of Columbia*, 579 F. Supp. 3d 159, 175 (D.D.C. 2022).

*First*, the CID is the most recent attack in the current Administration's ongoing campaign against AAP and GAC, which began on the first day of the Trump presidency. *See* Exec. Order No. 14168 of Jan. 20, 2025, 90 Fed. Reg. at 8615; Exec. Order No. 14187 of Jan. 28, 2025, 90 Fed. Reg. at 8771. President Trump's January 2025 Executive Orders referred to transgender identity

as "gender ideology extremism," Executive Order No. 14168, 90 Fed. Reg. at 8615, declared that the government would recognize "two sexes, male and female" that are "not changeable," *id.*, and directed executive agencies to "end" access to certain procedures encompassed within the continuum of potential GAC interventions, referring to them as "chemical and surgical mutilation," Executive Order No. 14187, 90 Fed. Reg. at 8771. The same day the first order was issued—and the same day he was inaugurated—President Trump elevated then-Commissioner Andrew Ferguson to Chairman. Grigsby Decl., Ex. 15. FTC Chairman Ferguson has shown hostility to GAC and those who support it since before this elevation, campaigning for the position of Chairman by promising to "[f]ight back against the trans agenda" and "[i]nvestigate" those who "pushed gender confusion." *Id.*, Ex. 4 at 1. Only a few months after taking this position, Chairman Ferguson convened a workshop on the "dangers" of GAC for minors and delivered the opening address at the workshop, describing it as an effort to "heal the wounds that proponents of [GAC] may have inflicted." *Id.*, Ex. 17 at 2. Nearly 150 FTC employees denounced the workshop in an anonymous, formal Statement of Concern to members of Congress, warning that the agency was exceeding its statutory mandate by "second-guess[ing] established medical standards widely accepted by experts in the field" and that the FTC had "already taken a position opposing [GAC] for minors." *Id.*, Ex. 9 at 1. Indeed, their objections were published anonymously, out of "credible fear of retaliation from the Trump-Vance FTC." *Id.* at 3. In response to the letter, FTC Director of Public Affairs Joe Simonson declared publicly that "[n]o sane person could endorse the needless mutilation of children." *Id.*, Ex. 5.

In parallel to the FTC's attacks, AAP has faced animus from other Trump agencies. A senior administration advisor at HHS referred to AAP's work on behalf of TGD youth as "demonic forces." *Id.*, Ex. 20. In November and December 2025, HHS Secretary Robert F. Kennedy, Jr.

and HHS itself issued statements accusing AAP and others of having "peddled the lie that chemical and surgical sex-rejecting procedures could be good for children," committing "malpractice," and issuing "very low quality" guidance." *Id.*, Exs. 1–2.  Chairman Ferguson publicly linked the FTC's investigation of GAC to the actions of HHS, when he reposted an X post about HHS's "Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices" report with the caption: "This report is exactly why the @FTC is investigating these practices. Great work @RobertKennedyJr." *Id.,* Ex. 8.  These statements and actions by the FTC and Chairman Ferguson demonstrate the illegitimate basis for Defendants' retaliatory actions against AAP for its First Amendment-protected activity.  When an agency fails to "address[] the evidence backing AAP's health policy recommendations" and "instead impugn[s] AAP's motivations, repeatedly accusing this organization of having conflicts of interest and, worse, attempting to harm children," it evinces hostility to AAP's protected activity.  *AAP*, 2026 WL 80796, at *18.

*Second*, the timing of the FTC's issuance of the CID is suspicious.  *See Am. Bar Ass'n v. U.S. Dep't of Justice*, 783 F. Supp. 3d 236, 246 (D.D.C. 2025) ("[T]he temporal proximity between the Blanche Memo and the termination of the ABA's grants is probative of Defendants' retaliatory motive."); *Goodwin*, 579 F. Supp. 3d at 175 ("The allegations averred in the amended complaint show . . . temporal proximity and support the reasonable inference that defendants lacked a non-retaliatory motive to detain plaintiffs," adequately stating causation for a First Amendment retaliation claim).  As discussed *supra*, Bkgd. Section II, in response to HHS' December 2025 termination of seven of AAP's federal grants, AAP sought and obtained a preliminary injunction from this Court through exercise of its protected petition rights.  On January 11, 2026, the Court found that "substantial and undisputed evidence from statements and other actions by HHS leadership and officials . . . demonstrate the likelihood of retaliatory motive for the grant

terminations at issue." *AAP*, 2026 WL 80796, at *2.  On January 15, 2026, the FTC issued the CID to AAP.

"There is . . . 'no hard-and-fast rule regarding the temporal proximity that must exist between protected activity and the adverse action.'" *BEG Invs., LLC v. Alberti*, 144 F. Supp. 3d 16, 22 (D.D.C. 2015) (citation omitted).  Still, the D.C. Circuit "has held on several occasions that a period of one month or shorter typically suffices to state a prima facie claim and raise a plausible inference of retaliation." *Id.* at 22–23 (collecting cases).  "[A] close temporal relationship may *alone* establish the required causal connection," *Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2005) (emphasis added), if "the two events are 'very close' in time," *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007) (quoting *Clark County School District v. Breeden*, 532 U.S. 268, 273–74 (2001)).  Here, the span of time at issue falls far below the range courts have deemed sufficient to support a plausible inference of retaliation.

*Third*, the lack of a plausible justification for the FTC's investigation into AAP, as well as the scope of the CID, suggest strongly that the investigation was opened and the CID issued for improper motives.  As described throughout AAP's Motion, *see supra* Bkgd. Section II, *infra* Section I.B.2, (a) the FTC's authority to issue CIDs is limited to when it has reason to believe any person has information "relevant to unfair or deceptive acts or practices in or affecting commerce"—but the CID demands information about AAP's First Amendment-protected speech and activities that are not "in or affecting commerce;" (b) the CID identifies AAP as the "Organization" that may have violated the FTC Act—but the FTC is limited to enforcing the FTC Act against "persons, partnerships, or corporations" and AAP is a non-profit dedicated to the well-being of young people, not a corporation that carries on business for its own profit or that of its

25

members; and (c) a CID must be issued "pursuant to a Commission resolution," under the FTC

Act, 15 U.S.C § 57b-1(i)—but this one was not.

*Fourth*, the scope of the CID also reveals the FTC's animus. *Cf. Media Matters II*, 805 F.

Supp. 3d at 112 ("[T]he Court finds that the FTC's expansive CID is a retaliatory act."). The CID

goes far beyond simply asking about marketing and advertising practices, which it contends is the

subject of the investigation, and dives headfirst into AAP's protected activities by demanding an

abundance of information directly about AAP's petition, speech, and association. ECF No. 1-1 at

5. For example, the CID expressly demands information concerning AAP's petition rights,

including documents related to AAP's "legal advocacy or litigation," "lobbying services,"

information about "[a]ll investigations and lawsuits involving [AAP] . . . including any lawsuit in

which [AAP is] amicus," and "[a]ll testimony, advocacy, or other information provided to any

legislature or regulator related to PGDTs." ECF No. 1-1, Specifications A.3, A.11, B.7. The CID

also expressly demands information about AAP's protected scientific, medical, and educational

speech, including any "education and training" it provides to its members, "[e]ach training or

certification program" it offers, "[e]ach workshop, town hall or other formal or informal session,

and conference" it hosted "that relates to PGDT in any way." ECF No. 1-1, Specifications A.3–5,

B.6, B.8. These demands also include "descriptions of any pamphlets, posters, or other materials

concerning PGDT," information about "to whom those materials were disseminated, for what

purpose they were disseminated, and the dates when [AAP] disseminated the materials," as well

as "all Documents (including tests, reports, studies, scientific literature, and written opinions) upon

which [AAP has] relied" for support of its 2018 Policy Statement, and all of AAP's

communications with professional medical organizations and other organizations, institutions and

individuals about its GAC clinical guidance materials. ECF No. 1-1, Specifications A.6, B.1, B.4,

B.5.  The CID also aims itself squarely at AAP's associational rights, demanding that AAP identify individuals, including members, who worked on each "Covered Statement," as well as the Policy Statement and Reaffirmation.  *See* ECF No. 1-1, Specifications A.8, A.13.  But the First Amendment protects the right "to engage in association for the advancement of beliefs and ideas." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958); *see also Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 309 (2012).  These demands clearly seek to infringe on AAP's First Amendment rights and, in so doing, evince the FTC's animus.

For the reasons set forth above, the FTC's investigation and CID have no "legitimate purpose." *United States v. Powell*, 379 U.S. 48, 57–58 (1964).  Rather, the FTC has issued a CID that violates AAP's constitutional rights, even though AAP and its activities fall outside the FTC's jurisdiction.  All of the factors discussed above support the conclusion that the investigation was opened and the CID issued in order to retaliate against AAP for its protected activity.  *See also AAP*, 2026 WL 80796, at *17 (describing "the totality of the circumstantial evidence supporting a likely causal link").

### B.    AAP Is Likely to Establish that the CID Is Overbroad in Violation of the First and Fourth Amendments.

AAP is likely to establish that the FTC's intrusive CID violates First and Fourth Amendment constraints on its investigations.  The CID is overly broad in two ways.  First, the CID sweeps in expansive categories of information that relate to AAP's protected speech, legal advocacy, and association without any of the "scrupulous exactitude" required by the First and Fourth Amendments.  *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas*, 379 U.S. 476, 485 (1965)).  Second, the CID is overly broad in that it goes well beyond the bounds of the FTC's jurisdiction to investigate "persons, partnerships, or corporations" that conduct activities "in or affecting commerce," thereby running afoul of the Fourth Amendment's

27

requirement that an agency's demand for information fall within its legal authority.  *Contra. United States v. Jud. Watch Inc.*, 371 F.3d 824, 833 (D.C. Cir. 2004).  The FTC does not have a compelling state interest that supports the CID's vast intrusion into AAP's protected activity, particularly given its lack of jurisdiction over AAP's speech and AAP itself.

### 1.    The CID is overbroad because it lacks scrupulous exactitude.

The CID's assertion of investigative authority is too sweeping to be sustained.  The Fourth Amendment limits the scope of administrative subpoenas, which should be denied where the items demanded entail "too much indefiniteness or breadth."  *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946).  Likewise, the First Amendment provides AAP protection against disclosure of materials that would chill its constitutional rights.  *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010); *see also Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Fed. Election Comm'n*, 333 F.3d 168, 175 (D.C. Cir. 2003) ("The Supreme Court has long recognized that compelled disclosure of political affiliations and activities can impose just as substantial a burden on First Amendment rights as can direct regulation.").  Because these twin constitutional guarantees overlap, where "the materials sought to be seized" by an administrative subpoena even "*may* be protected by the First Amendment," the requirements of the Fourth Amendment are applied with "scrupulous exactitude."  *Zurcher*, 436 U.S. at 564 (citing *Stanford*, 379 U.S. at 485) (emphasis added).  This is so because "unrestricted power of search and seizure could also be an instrument for stifling liberty of expression."  *Marcus v. Search Warrant*, 367 U.S. 717, 729 (1961).

The CID does not reflect "scrupulous exactitude."  Rather, the CID, which is at least as broad as (if not broader than) a CID the D.C. Circuit recently called "sweeping," seeks documents covering a timeframe of more than five years—and even over ten years, for certain demands—and touches upon nearly every aspect of AAP's work related to GAC.  *See Media Matters I*, 138 F.4th at 581 (describing "harm" and "burdens" of comparable CID).  It asks for, among other things, a

catalog of AAP's statements about "PGDT," including location, context, means of communication, purpose, and timing of dissemination; "all documents" related to the science supporting those statements; materials reflecting AAP's deliberative processes for issuing clinical guidance about GAC and every person or entity who participated in that process; the identities of each person or entity who developed or evaluated the scientific research supporting AAP's statements about "PGDT"; all "communications" with professional medical organizations or other entities and individuals regarding GAC guidance; information about AAP's political advocacy to legislatures or regulators about GAC as well as its participation in lawsuits and submission of amicus briefs; information about AAP's educational programs related to "PGDT"; AAP's financial information; and "all documents" related to any partnership with certain medical entities or clinicians. *See* ECF No. 1-1, Specifications A.5-13; B.1–11.[5]  The CID also stretches key terms far past their logical definitions, for instance, defining "American Academy of Pediatrics" as encompassing all its "wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, members, employees, agents, consultants, and other persons working for or on behalf of the foregoing."[6]  ECF No. 1-1, Specification D.6; *see also id.*, D.4 (defining "Document" with similar breadth).

By delving into every aspect of AAP's speech and activities concerning GAC, these requests operate to chill AAP's speech (internal and external) on the subject, slow the development of related guidance, inhibit AAP's ability to coordinate with other stakeholders on these issues,

---

[5] Pursuant to FTC Staff's February 5, 2026 letter to AAP, specifications A.8, A.13, B.1-3 have an applicable time period of January 1, 2015 to present; specifications B.4-5 apply "regardless of time period."  Grigsby Decl., Ex. 24.

[6] As detailed in AAP's Petition to Quash the CID, FTC staff clarified that the reference to "members" in the definition of "Organization" referred to LLC members, not AAP's individual members.  Grigsby Decl., Ex. 27 at 66.

and threaten further scrutiny in response to AAP's GAC-focused legal and political advocacy.  *See*

*generally* ECF No. 11.  *In toto*, the CID demands nearly every piece of information related in any

way to AAP's position on GAC, spanning a timeframe of more than five years for most requests

and over ten years for others.  AAP raised these issues with the FTC after receiving the CID, but

FTC staff declined to narrow the CID in any meaningful way, refused to extend the deadline for

petitioning to quash the CID, and refused to continue discussing the CID's breadth unless AAP

agreed to begin producing responsive documents thirty days before the CID's return date.  Grigsby

Decl., Exs. 22–27.   The CID cannot be credibly described as "carefully tailored to avoid

unnecessary interference with protected activities," as it must be to adhere to the First Amendment.

*Pebble Ltd. P'ship v. Env't Prot. Agency*, 310 F.R.D. 575, 582 (D. Alaska 2015) (quashing

subpoena).

### 2.    The CID is overbroad because the FTC lacks jurisdiction.

The FTC's lack of authority to demand the information it seeks exacerbates the overbreadth

of the CID.  A federal agency's investigative demand violates the Fourth Amendment's prohibition

on unreasonable searches and seizures when the inquiry is not "within the authority of the agency."

*Jud. Watch*, 371 F.3d at 833 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1960)).

"[T]he Supreme Court has made it abundantly clear that courts should deny enforcement" of

agency subpoenas "where the inquiry is not one which the requesting agency is lawfully authorized

to make," in that it is not "within the authority of the agency."  *Fed. Election Comm'n v. Machinists*

*Non-Partisan Pol. League*, 655 F.2d 380, 385 (D.C. Cir. 1981) (citations omitted); *FTC v. Ken*

*Roberts Co.*, 276 F.3d 583, 586–87 (D.C. Cir. 2001) ("[A] court must assure itself that the subject

matter of the investigation is within the statutory jurisdiction of the subpoena-issuing agency.")

(citations omitted).  The FTC does not have jurisdiction to demand information about the non-

commercial speech of a non-profit dedicated to advancing the welfare of young people, because

30

the evidence it seeks has no relevance to a possible violation of the FTC Act. *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1418 (D.C. Cir. 1994) ("[I]n the absence of specific authority in its enabling statute, [an agency] cannot rely on its broad investigatory powers to pursue other wrongdoing, as yet unknown."). The FTC may issue a CID whenever it has "reason to believe that any person may . . . have any information, relevant to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title)." 15 U.S.C. § 57b-1(c)(1). But the CID here fails to meet that requirement because it seeks information that has no relevance to potential FTC Act violations and is thus outside the scope of the FTC's investigatory authority. *See Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 689–92 (D.C. Cir 2017) (affirming denial of petition to enforce CFPB CID as exceeding agency authority and noting that "review of a CID is governed by the *Morton Salt* analysis"). First, the CID targets non-commercial activities and statements, which the FTC Act does not authorize. Second, the CID identifies AAP as a potential FTC Act violator, even though it is not a "person, partnership, or corporation" that could violate the FTC Act. Third, the CID was not issued pursuant to an authorizing resolution, as the FTC Act requires. The CID thus fails to comport with Fourth Amendment restrictions on agency investigations, particularly when those restrictions are applied with the "scrupulous exactitude" required by the First Amendment. *Zurcher*, 436 U.S. at 564.

### a)    AAP's statements and activities are not "in or affecting commerce."

The FTC's authority is limited to acts or practices "in or affecting commerce." *See* 15 U.S.C. § 45(a)(1); *see also In re R.J. Reynolds Tobacco Co.*, 1988 WL 490114, at *2 (F.T.C. Mar. 4, 1988) ("[U]nless the . . . advertisement can be classified as commercial speech, it is not subject to the Commission's jurisdiction."). The CID, however, seeks information about AAP's

31

statements and activities that are plainly non-commercial and thus outside the scope of the FTC's jurisdiction.

Commercial speech "propos[es] a commercial transaction." *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 64 (1983). Accordingly, the FTC looks to three factors to determine whether speech is commercial: (1) the speech's content, including whether it promotes demand for a product/service or refers to the attributes of a product/service, such as type, price, quality, or health effects; (2) the means used to publish the speech, including whether it is paid for; and (3) the speaker's commercial motivation. *See In re R.J. Reynolds Tobacco Co.*, 1988 WL 490114, at *3–5.

AAP's speech and activities satisfy none of these factors. The targeted speech is clinical guidance reflecting scientific research and evidence-based strategies regarding GAC. AAP publishes its guidance to help medical professionals support their patients and their families in making informed, individualized health decisions. Grigsby Decl., Exs. 11–12. The guidance emphasizes that decisions about GAC must be made on a case-by-case basis in consultation with family and a qualified medical professional. *Id.*, Ex. 12. It discusses potential health effects associated with GAC for the sole purpose of informing clinical judgment—not to shape consumer preferences or steer treatment choices. *Id.* The guidance does *not* recommend specific providers, nor does it direct, refer, or encourage patients to seek any particular GAC treatments, therapies, clinics or other services. *Id.* Nor does the guidance indicate that AAP plays any role in pricing, prescribing, or providing GAC treatment to patients. *Id.* In short, AAP's activities are far removed from any effort to generate commercial demand.

Moreover, AAP provides its GAC guidance, as well as other guidance on a variety of pediatric health conditions, to the public for free—regardless of membership status. Del Monte

Decl. ¶ 5.   Though some practitioners might receive access to AAP guidance statements in connection with paid conferences, workshops, trainings, or compendia, the guidance statements are—and always have been—free to the public.  *Id.*  AAP does not pay to advertise its GAC guidance.  *Id.*  AAP is a non-profit organization focused on improving young people's health and has no commercial motive in issuing clinical guidance.  Grigsby Decl., Ex. 21.

The same can be said for AAP's legal and political advocacy, including its amicus efforts and participation in rulemakings concerning GAC.  *See id.*, Exs. 13–14; Brief for Am. Acad. of Pediatrics et al. as *Amici Curiae* Supporting Appellees, *Washington v. Trump*, No. 25-1922 (9th Cir. Sept. 19, 2025).  No matter the format, AAP communicates publicly about GAC to support the field of pediatrics and emphasizes that all care decisions are individualized and should be made in consultation with families and qualified clinicians.  As discussed above, *supra* Section I.A.1, "expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'"  *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)).  The FTC cannot plausibly claim that AAP issued this GAC guidance to generate membership or sales where the guidance is freely available to the non-member public, accessing the guidance in no way impacts membership eligibility or dues, and AAP's GAC policy statement is one of many sets of clinical guidance AAP issues regarding a variety of pediatric health concerns.

The recent decision in *FTC v. Agora Financial, LLC* confirms that AAP's statements are non-commercial speech that falls outside the FTC's jurisdiction.  *See* 447 F. Supp. 3d 350 (D. Md. 2020).  In *Agora*, the FTC sued the sellers of a medical publication called "The Doctor's Guide" that provided recommendations on how to manage Type 2 diabetes.  *Id.* at 355–56.  The FTC conceded that it did not seek to regulate the book—only ads for the book—and the court agreed

that the book's content was non-commercial speech that "lies outside of the FTC's jurisdiction." *Id.* at 364; *see also id.* at 366 ("The FTC . . . [is] charged with protecting consumers from false or misleading advertising of products being sold, not from being exposed to novel or unproven medical ideas contained in health-related publications."). AAP's GAC guidance is directly analogous to the medical and scientific speech contained in a "The Doctor's Guide." *See supra* Bkgd. Section I. And in this case, AAP does not sell GAC or advertise its GAC guidance. *See* Del Monte Decl. ¶ 5. The FTC thus has no basis to assert jurisdiction over AAP's GAC guidance.[7]

> **b)**    **AAP is a non-profit—not a person, partnership, or corporation.**

In addition to improperly targeting AAP's non-commercial speech and activities for investigation, the CID identifies AAP as the "Organization" that may have violated the FTC Act. ECF No. 1-1 at 2. But the FTC Act only prohibits "persons, partnerships, or corporations" from engaging in unfair or deceptive acts or practices "in or affecting commerce." 15 U.S.C. § 45(a)(1)– (2). Section 4 of the Act limits "corporation" to an entity "organized to carry on business for its own profit or that of its members." *Id.* § 44. As noted above, *supra* Bkgd. Section I, AAP was not organized for profit or for the purpose of enriching its members. Rather, AAP's mission is, and has been since its founding, to "foster and stimulate interest in pediatrics and correlate all aspects of [the] work for the welfare of children . . . [and] to promote publications and encourage contributions to medical and scientific literature pertaining to pediatrics . . . *none of which objects is for pecuniary profit.*" *See* Grigsby Decl., Ex. 21 (emphasis added).

As the Supreme Court held in *California Dental Association v. FTC*, Section 4's definition of "corporation" reaches a non-profit membership association where its activities "plainly fall

---

[7] For the same reasons, AAP's speech cannot be considered "advertisements" under Section 12 of the FTC Act. *See In re R.J. Reynolds Tobacco Co.*, 1988 WL 490114, *6 (defining the FTC's understanding of "advertisement" as "a notice or announcement that is publicly published or broadcast and is paid-for").

within the object of enhancing its members' profit"—which AAP's do not.  *See* 526 U.S. 756, 767 (1999).  The trade association at issue in that case regulated advertising by dentists and provided preferential insurance and financing arrangements to its members through for-profit subsidiaries— all clearly commercial activity—and the Court determined that it qualified as a "corporation" under the FTC Act.  *Id.* at 760, 767–68.  But the Court noted that other organizations not focused on their members' bottom lines would fall outside the FTC's jurisdiction, even if the organization's work ultimately benefited its members.  "[A]n organization devoted solely to professional education may lie outside the FTC Act's jurisdictional reach, even though the quality of professional services ultimately affects the profits of those who deliver them."  *Id.* at 766.

The fact that the FTC lacks any basis to investigate AAP—a non-profit that is dedicated to advancing the well-being of children and fostering pediatric scientific research—further demonstrates the CID's overbreadth.

<blockquote>c)    <strong>The FTC's CID was not issued pursuant to an authorizing resolution.</strong></blockquote>

The FTC Act requires that a CID be issued "pursuant to a Commission resolution."  15 U.S.C § 57b-1(i).  The FTC claims that there are two resolutions that purport to authorize the CID.  The first, from 2019, is aimed at "advertising, marketing, or sale" of medical products or services, while the second, from 2021, focuses on acts or practices related to goods or services marketed "to children under 18."  ECF No. 1-1 at 18.  The 2019 resolution does not support the CID because AAP does not engage in advertising, marketing, or sale of medical products or services.  *See id.*  The 2021 resolution does not support the CID because the CID's focus is materials directed to clinicians, not goods or services marketed to children under 18.  *See id.* at 19.  Finally, both resolutions emphasize that investigations must be related to unfair or deceptive conduct that is "in or affecting commerce" in violation of the FTC Act, which can only be enforced against "persons,

partnerships, or corporations." *Id.* at 18–19.  But as set forth above, AAP is a non-profit dedicated to children's health, and its speech is neither "in" nor "affecting" commerce.  The disconnect between the resolutions that purport to authorize the CID, and the nature of the CID's requests, further demonstrate that the FTC has failed to act within its statutory authority, such that the CID violates the Fourth Amendment.

### 3. The FTC has not demonstrated a compelling interest that justifies the CID.

The FTC has also failed to identify a state interest of sufficient weight to justify its proposed intrusion on AAP's First Amendment-protected speech, legal advocacy, and association.  Before a state or federal body can compel disclosure of information that would trespass on First Amendment freedoms, a "subordinating interest of the State" must be identified, and it must be "compelling."  *NAACP*, 357 U.S. at 463 (citation omitted).  If an agency lacks statutory jurisdiction to conduct its proposed investigation, "then no compelling interest for the subpoenaed information can possibly exist."  *Machinists Non-Partisan Pol. League*, 655 F.2d at 389; *see also Powell*, 379 U.S. at 57 (noting that a proper government investigation must "be conducted pursuant to a legitimate purpose").  As discussed above, the FTC can point to no statutory basis for jurisdiction over either AAP or the information specifically demanded in the CID, so no compelling interest can "possibly exist" here.  *Machinists Non-Partisan Pol. League*, 655 F.2d at 389.

Even assuming, contrary to the text of the FTC's authorizing statute, the FTC did have a statutory basis for jurisdiction here, it still could not identify a sufficiently compelling state interest to justify the CID.  That is because, as discussed at length above, the FTC's motivation for targeting AAP for investigation and issuing the CID was not a proper investigative purpose, but to retaliate against AAP for its First Amendment-protected speech concerning GAC.  *See supra* Section I.A.

**II.     AAP Has Suffered and Will Continue to Suffer Irreparable Harm Absent Immediate Relief.**

The CID and the associated investigation have caused—and are causing AAP—ongoing irreparable harm.  AAP's injuries easily satisfy the requirements for emergency relief: irreparable harm that is "certain and great, . . . actual . . . not theoretical," and "of such *imminence* that there is a 'clear and present' need for equitable relief."  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 307 (D.D.C.), *aff'd*, 548 F.2d 977 (D.C. Cir. 1976)).

The FTC's CID has caused AAP "the loss of First Amendment freedoms," which, even if lost only for "minimal periods of time, unquestionably constitutes irreparable injury" for purposes issuing a preliminary injunction.  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Bailey v. Fed. Bureau of Prisons*, No. 24-cv-01219, 2024 WL 3219207, at *9 (D.D.C. June 28, 2024) (irreparable harm can be established by showing that "First Amendment freedoms are actually" or "imminently will be" lost); *see also* Tr. of Oral Arg. at 89, *First Choice Women's Res. Ctrs., Inc. v. Platkin*, (Dec. 2, 2025) (No. 24-781) ("[T]his is just kind of obvious that there's some kind of objective chill from a subpoena on speech." (Kavanaugh, J.)).  The chilling effect created by the CID threatens AAP's overarching goal of advancing pediatric health because it discourages AAP's members and partners from freely communicating and sharing ideas about this topic of public importance.  Del Monte Decl. ¶ 16.  *Cf. Am. Bar Ass'n*, 783 F. Supp. 3d at 247 ("Here . . . the First Amendment injury is concrete and ongoing.  The ABA regularly engages in protected expressive activity, and DOJ's termination of its grants directly punishes that activity.").  The CID has made any work involving GAC—including policy guidance discussion or writing, event planning, or collaboration with external partners and experts—more difficult to complete, as AAP staff have already expressed concern about potentially being drawn into the FTC's investigation.  Del Monte

Decl. ¶ 25.  Further, it is difficult to overstate the material impact the CID has had on AAP employee morale, including staff concerns about their physical safety, mental well-being, and sense of fulfillment at work.  *Id.* ¶ 27.  These risks have already resulted in complications, delays, and burdens on productivity—as AAP employees report increased levels of stress and concern in carrying out their regular activities because of the FTC's targeting of AAP—and a heightened sense of fear given the broad categories of internal deliberative materials and associational information detailed therein.  *Id.* ¶ 25.  These constitutional injuries, resulting from the retaliatory CID, create "a presumed availability of federal equitable relief."  *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) (citations omitted); *see Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) (noting even "a *prospective* violation of a constitutional right constitutes irreparable injury") (citation omitted) (emphasis added).

The FTC's CID has also caused AAP associational and reputational harm.  Because harm to "reputation or goodwill is not easily measurable in monetary terms," this Court "typically view[s it] as irreparable."  *Xiaomi Corp. v. Dep't of Def.*, No. 21-cv-00280, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021) (citation omitted).  After AAP was targeted in the past for its work on GAC, some of its members and the experts with whom AAP collaborates expressed concerns about being associated with AAP and its events, and some declined or withdrew from media interviews or participation in AAP workshops, panels, or educational sessions for fear of exposure and targeting.  Del Monte Decl. ¶ 15.  The reach and effectiveness of AAP's events have also been negatively impacted by reduced attendance due to potential attendees' fear of reprisal, reputational harm, and even threats to their personal safety.  *Id.* ¶ 22.  Given these past occurrences, AAP reasonably believes that the FTC CID will lead some AAP members and collaborative partners to scale back their association with AAP, impeding AAP's ability to collaborate with those

individuals. *Id.* ¶ 16. Such concerns are foreseeable, particularly as the CID demands AAP's communications with third parties. ECF No. 1-1, Specifications B.4–5. These are concrete and present harms resulting from the FTC's investigation. *See Media Matters I*, 138 F.4th at 581 (finding in the standing context that organization "reasonably alter[ing] behavior to avoid creating evidence or materials that it would be forced to turn over if the CID were enforced . . . [constituted] adverse effects [that we]re neither abstract nor contingent on a future government action"); *see also AAP*, 2026 WL 80796, at *22–23 (AAP was reputationally harmed by HHS retaliatory termination of grant funds).

Compounding the fear of exposure and targeting over involvement in GAC-related work, the CID has also led to increased fear for the physical safety of AAP affiliates and staff. Because of the government's past actions against AAP and its speech regarding GAC, AAP has experienced significant disruptions and safety threats at its events. Del Monte Decl. ¶ 17. Individuals have infiltrated AAP's national meeting under false pretenses, where they share propaganda undermining GAC and harass meeting attendees. AAP members and partners have also been doxxed and harassed as a result of their involvement with AAP events, causing them to require additional security and bringing harm to their employers. *Id.* In the past, AAP employees have received anonymous notes and threats in the mail based on their and AAP's work relating to GAC, have questioned whether they are safe at AAP headquarters, and have requested that AAP's offices be closed to visitors to restrict access to unauthorized guests and the public. *Id.* ¶ 26. AAP reasonably anticipates that AAP staff will be subjected to similar threats in the future due to the FTC's targeting of AAP's work on GAC. *Id.*

All of this has necessitated that AAP undertake additional security measures to protect both AAP's communications and virtual meetings concerning GAC and related in-person events,

imposing concrete financial costs and operational burdens on AAP.  In response to past targeting of AAP's work on GAC, AAP was forced to significantly increase the security personnel for events (including hiring local police) to protect against disruption of sessions, which led to approximately $50,000 in increased costs that AAP bore just to continue its regular activities of convening experts to freely discuss issues of pediatric healthcare—an essential part of AAP's core mission.  *Id.* ¶ 20. And because of past targeting of AAP's work on GAC, AAP has been forced to carefully manage the logistics for events that involve sessions that relate to GAC, such as not publishing the location of events involving GAC until the day before an event, or, in some instances, only sharing the location with a limited set of attendees that AAP had to "vet" prior to attendance, incurring additional costs.  *Id.* ¶ 23.  In other cases, AAP was forced to cancel entire sessions due to security concerns for AAP members—a consequence that cuts against AAP's core values of supporting free and open exchange of medical and policy ideas to ensure the highest quality of pediatric care.  *Id.*  Given prior events, AAP reasonably believes that the FTC CID will result in new disruptions and safety threats at its events.  *Id.* ¶ 18.  AAP has already started to plan for these new disruptions and threats in light of the CID; the measures AAP must take to mitigate these safety concerns impose concrete financial costs and operational burdens on the organization that are attributable, at least in part, to the CID.  *Id.* ¶¶ 18–19.  AAP is also financially impacted by reduced attendance at events when attendees fear reprisal, reputational harm, and threats to their personal safety.  *Id.* ¶ 22.  Due to the FTC's targeting of AAP through the CID, AAP plans to hire additional security personnel for any events that include sessions on topics reflecting the kind of speech that the FTC is targeting, and plans to take similar steps in managing the logistics of its events, further alienating AAP from its partners and others engaging in the pediatric health space. *Id.* ¶¶ 21, 24.

AAP has suffered substantial harms because of the FTC's CID.  As detailed above, AAP's "First Amendment interests are [both] threatened [and are] in fact being impaired" each day the CID remains in effect.  *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254–55 (D.C. Cir. 1991) (citation modified).  While AAP remains steadfastly committed to advancing the health and well-being of young people, including by speaking out on issues of importance and publishing evidence-based clinical guidance, AAP is facing increased difficulty engaging with members and experts on issues of importance due to those individuals' fear of becoming subject to FTC's unconstitutional investigation and suffering the FTC's retaliation in response to AAP's exercise of its First Amendment rights—both irreparable injuries.  *Media Matters I*, 138 F.4th at 585.  Absent emergency relief, AAP will continue to sustain such injuries, to the detriment of the organization, its members, and the medical field at large.

## III.  The Equities and the Public Interest Favor Granting Preliminary Relief.

The two final equitable factors—which "merge when the Government is the opposing party"—favor AAP.  *Nken*, 556 U.S. at 435.  The Court must balance the "competing claims of injury and . . . consider the effect on each party [and the public] of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)).  Here, these factors overwhelmingly favor relief.

To start, "[i]n First Amendment cases, the likelihood of success will often be the determinative factor."  *Media Matters I*, 138 F.4th at 584 (quoting *Green v. U.S. Dep't of Just.*, 54 F.4th 738, 745 (D.C. Cir. 2022)).  That is because "'there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional' government action."  *Id.* at 585 (quoting *Pursuing Am.'s Greatness*, 831 F.3d at 511); *see also Am. Bar Ass'n*, 783 F. Supp. 3d at 248 ("Given that the ABA has established a likelihood of success on the merits of a

41

constitutional claim, it has shown that the balance of the equities and public interest favor an injunction preventing the government from continuing to violate the Constitution."). Accordingly, AAP's strong likelihood of success on the merits itself establishes that the equities and public interest favor preliminary relief.

Next, the FTC has no discrete interest here because "[i]t is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quotation marks omitted). "[T]here is a substantial public interest 'in having governmental agencies abide by the . . . laws that govern their existence and operations.'" *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Because the FTC acts outside the law here, the public interest is served by granting AAP's request for an injunction.

The public's interest is further heightened where, as here, constitutional rights are at stake. The Constitution "is the ultimate expression of the public interest," so "government actions in contravention of the Constitution are always contrary to the public interest." *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020) (quotation marks omitted); *see also, e.g.*, *Costa v. Bazron*, 456 F. Supp. 3d 126, 137 (D.D.C. 2020) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."). The FTC has decoupled its interest from that of the public's because "an injunction against the perpetuation of unconstitutional government action axiomatically favors the public interest." *AAP*, 2026 WL 80796, at *23.

Lastly, as has been true throughout the government's sustained retaliation campaign, the public is at risk where a scientific organization like AAP is targeted. This Court noted previously that "the harm to the public whose health programs may become collateral damage to HHS's likely retaliatory acts against AAP, outweighs the harm suffered by HHS of having to disburse funds to

a disfavored speaker." *Id.* at *24. This case does not involve programs funded by government grants, but it does involve speech—specifically, the evidence-based information on GAC that AAP disseminates to the public to support practitioners and assist youth and families in medical decision-making. The retaliatory campaign the government has waged against AAP injures the public by jeopardizing AAP's willingness and ability to support youth, families, and the field of pediatrics. AAP has been the leading national voice on pediatric medicine since 1930, and it will continue to provide that critical voice—as long as the government is stopped from silencing it. The public has an unequivocal interest in not becoming collateral damage to the Administration's culture wars.

The strong public interest in ensuring that AAP can continue to contribute to public debate on the vital issue of young people's well-being unencumbered by political pressure requires entry of a preliminary injunction.

## CONCLUSION

For the reasons set forth above, AAP respectfully requests that the Court grant its Motion for Preliminary Injunction.[8]

February 20, 2026                                    Respectfully submitted,

                                                     By:  */s/ Stacey K. Grigsby*

                                                     Stacey K. Grigsby (DDC Bar No. 491197)
                                                     Laura Kim (D.C. Bar No. 473143)*
                                                     Amber M. Charles (DDC Bar No. 1035226)

---

[8] Because the entry of an injunction will not harm the Defendants, the security required by Fed. R. Civ. P. 65(c) should be set at $1. *See, e.g.*, *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) ("The language 'in such sum as the court deems proper' [in Rule 65(c)] has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond."); *J.G.G. v. Trump*, 786 F. Supp. 3d 37, 83 (D.D.C. 2025), *vacated and remanded on other grounds*, No. 25-5217, 2025 WL 2317650 (D.C. Cir. Aug. 8, 2025) ("In light of the circumstances and nature of this case, [the Court] finds that a nominal amount is proper and exercises its discretion to require Plaintiffs to collectively post $1.00.").

Alexandra J. Widas (DDC Bar No. 1645372)
Alexandra J. Remick (D.C. Bar No. 1737692)*
COVINGTON & BURLING, LLP
One CityCenter
850 10th Street NW
Washington DC, 20001
sgrigsby@cov.com
lkim@cov.com
acharles@cov.com
awidas@cov.com
aremick@cov.com

*Petition for Admission Pending*

**Attorneys for Plaintiff**

44

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2026, I filed the foregoing document with the Clerk of Court for the U.S. District Court for the District of Columbia using the court's CM/ECF system. I further certify that a copy of the foregoing document and all accompanying materials were deposited with the U.S. Postal Service for delivery to the below:

1.  Federal Trade Commission
    600 Pennsylvania Ave., NW
    Washington, DC 20580

2.  Andrew N. Ferguson
    600 Pennsylvania Ave., NW
    Washington, DC 20580

3.  Mark R. Meador
    600 Pennsylvania Ave., NW
    Washington, DC 20580

4.  Pamela Bondi
    Attorney General of the United States
    U.S. Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, DC 20530

5.  Civil Process Clerk
    U.S. Attorney's Office for the District of Columbia
    601 D Street, NW Washington, DC 20530

Also on February 20, 2026, copies of the foregoing document and all accompanying materials were additionally served via e-mail on counsel at the Federal Trade Commission and the U.S. Attorney's Office for the District of Columbia.


_/s/ Stacey K. Grigsby_

Stacey K. Grigsby

45