**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN ACADEMY OF PEDIATRICS,

             *Plaintiff*,

    v.

FEDERAL TRADE COMMISSION; ANDREW
N. FERGUSON, in his official capacity as Chair of
the Federal Trade Commission; MARK R.
MEADOR, in his official capacity as
Commissioner of the Federal Trade Commission,

             *Defendants*.

Case No. 1:26-cv-00508-CRC

**DECLARATION OF MARK DEL MONTE**

I, Mark Del Monte, declare as follows, pursuant to 28 U.S.C. § 1746:

1.      I am over the age of 18, competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I am the Chief Executive Officer of the American Academy of Pediatrics ("AAP").

3.      AAP is a 501(c)(3) nonprofit organization dedicated to educating clinicians, supporting research, and issuing evidence-based clinical guidance to inform pediatric medical practice. AAP's core mission is to attain and champion optimal physical, mental, and social health and wellbeing for all infants, children, adolescents, and young adults. AAP is composed of approximately 67,000 pediatric physicians, including primary care pediatricians, pediatric medical subspecialists, and pediatric surgical specialists. As a physician-led organization, AAP functions as a collective body of pediatric medical expertise. Its governance structure and publications reflect AAP's role as an authoritative medical organization addressing issues of pediatric health at the population and systems level.

1

4.      The free exchange of medical and policy ideas is critical to AAP's ability to carry out its core mission.

5.      As part of its mission, AAP issues a substantial body of policy statements, clinical practice guidelines, clinical reports, and technical reports addressing pediatric health and health care.  These materials are developed—and indeed, can only be developed—through candid dialogue and collaboration among committees of physicians and experts.  The materials are intended to define, guide, and improve pediatric health care, child health systems, and the health and well-being of infants, children, adolescents, and young adults.  Some practitioners might receive access to AAP guidance statements in connection with paid conferences, workshops, trainings, or compendia, but the guidance statements are—and always have been—free to the public, regardless of AAP membership status.  Likewise, AAP does not pay to advertise its guidance statements.

6.      In addition to issuing formal guidance, AAP staff and members speak on pediatric health issues frequently.  AAP hosts national conferences, plenary sessions, educational programming, and trainings.  To educate its members and the public, AAP produces blogs, podcasts, and social media posts.  AAP issues press statements and members conduct media interviews.  In significant court cases, AAP files amicus briefs in support of issues of critical pediatric health concerns.  Finally, AAP engages in advocacy and provides education and expertise to policymakers, Congress, and federal agencies, including through public comment on proposed rulemakings.  These expressive activities are core to AAP's goal of advancing pediatric health.

7.      AAP also issues publications reflecting recent scientific or medical research on pediatric health topics, including its flagship journal *Pediatrics*.  To curate these publications, AAP employees periodically review scientific and medical literature to identify articles for inclusion.

8.      As part of its mission, AAP speaks and advocates on the issue of gender-affirming care ("GAC") for young people diagnosed with gender dysphoria.  This work involves the same types of policy development, education, and expert collaboration that AAP undertakes on other pediatric health topics.  AAP's work on GAC requires expert participation and open deliberation, given the complexity of the medical issues involved.

9.      AAP's GAC work has been subject to increased scrutiny over the last year.  For example, on January 28, 2025, President Trump issued Executive Order No. 14187, targeting gender-affirming care as a "stain on our Nation's history" and directing various federal agencies to "end" its practice.  That followed an earlier Executive Order—No. 14168, issued on January 20, 2025—which declared that the government would recognize "two sexes, male and female" that are "not changeable" and referred to transgender identity as "gender ideology extremism" (together, with Executive Order No. 14187, the "Executive Orders").

10.     On January 16, 2026, AAP received a Civil Investigative Demand (the "CID") from the Federal Trade Commission (the "FTC").  The CID identifies the subject of the FTC's investigation as whether "[AAP] or any other Person . . . has made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of Pediatric Gender Dysphoria Treatment."  ECF No. 1-1.

11.     The FTC's issuance of the CID is not an isolated event.  Only a month before the FTC issued its CID to AAP, the Department of Health and Human Services ("HHS") abruptly and unexpectedly terminated seven grants awarded to AAP—each of which the agency had approved for continued funding just a few months prior, between April and September 2025.  Together, the seven awards made up nearly two-thirds of AAP's total federal award funding.  I know of no legal reason for HHS to terminate those awards.  Instead, it appears that HHS terminated the awards to

retaliate against AAP for making statements that disagreed with views expressed by the Trump administration, including AAP's public criticism of an HHS report seeking to discredit GAC.

12. AAP sued HHS to challenge the grant terminations in December 2025. Judge Beryl A. Howell granted a preliminary injunction against HHS to enjoin termination of the grant awards, based on the Court's finding that AAP was likely to succeed on the merits of a claim that HHS had retaliated against AAP for engaging in disfavored speech and petitioning activity in violation of AAP's First Amendment rights. *See AAP v. U.S. Dept. of Health and Human Services*, 2026 WL 80796 at *21 (D.D.C. Jan. 11, 2026).

13. Given the Trump Administration's targeted regulatory and investigatory scrutiny, which AAP understands to be an attempt to silence its speech on GAC, engaging in collaborative discussions with other medical organizations and pediatric health experts regarding GAC has become significantly more difficult than for other topics.

14. This CID in particular targets those who speak about GAC, and, based on similar targeting in the past, AAP anticipates disruption of its ability to engage its members and expert doctors and researchers in its ordinary activities, including public discussions of GAC-related issues.

15. After AAP was targeted in the past for its work on GAC, some of its members and the experts with whom AAP collaborates expressed concerns about being associated with AAP and its events. In some instances, such individuals declined or withdrew from media interviews or participation in AAP workshops, panels, or educational sessions for fear of exposure and targeting.

16. Given these past occurrences, AAP reasonably believes that the FTC CID will lead some AAP members and collaborative partners to scale back their association with AAP, impeding AAP's ability to collaborate with those individuals. Because the CID discourages AAP's members

and partners from freely communicating and sharing ideas about this important topic, the CID has impacted and will impact AAP's overarching goal of advancing pediatric health.

17.    Because of the government's past actions against AAP and its speech regarding GAC, AAP has experienced significant disruptions and safety threats at its events. Individuals have infiltrated AAP's national meeting under false pretenses—sharing propaganda undermining GAC, and harassing meeting attendees. In some instances, AAP members and partners have been doxxed and harassed as a result of their involvement with AAP events, causing them to require additional security and bringing harm to their employers.

18.    Given this history, AAP reasonably believes that the FTC CID will result in new disruptions and safety threats at its events. AAP has already started to plan for these new disruptions and threats in light of the CID.

19.    The measures AAP must take to mitigate these safety concerns impose a concrete financial cost and operational burden on the organization that is attributable, at least in part, to the FTC CID.

20.    In response to past targeting of AAP's work on GAC, AAP was forced to significantly increase the security personnel for events, including hiring local police, to protect against disruption of sessions. This led to approximately $50,000 in increased costs that AAP bore just to continue its regular activities of convening experts to freely discuss issues of pediatric healthcare, which is essential to AAP's core mission.

21.    Due to the FTC's targeting of AAP through the CID, AAP plans to hire additional security personnel for any events that include sessions on topics reflecting the kind of speech that the FTC is targeting.

22.     AAP is also harmed by reduced attendance at AAP events due to potential attendees' fear of reprisal, reputational harm, and even threats to their personal safety.  This reduction in attendance has both financial impacts and impacts on the reach and effectiveness of the events.

23.     Because of past targeting of AAP's work on GAC, AAP was forced to carefully manage the logistics for events that involve sessions that relate to GAC, such as not publishing the location of events involving GAC until the day before an event, or, in some instances, only sharing the location with a limited set of attendees that AAP had to "vet" prior to attendance, incurring additional costs.  In some cases, AAP was forced to cancel entire sessions due to security concerns for AAP members.  Being forced to cancel an event under these circumstances cuts against AAP's core values of supporting free and open exchange of medical and policy ideas to ensure the highest quality of pediatric care.

24.     Due to the FTC's targeting of AAP through the CID, AAP plans to take similar steps in managing the logistics of its events, further alienating AAP from its partners and others engaging in the pediatric health space.

25.     Not only will the FTC's issuance of the CID likely impact participation in AAP events, but the CID has made any work involving GAC—including policy guidance discussion or writing, event planning, or collaboration with external partners and experts—more difficult to complete, as AAP staff have already expressed concern about potentially being drawn into the FTC's investigation. These risks have already resulted in complications, delays, and burdens on productivity.  AAP employees report increased levels of stress and concern as they carry out their regular activities because of the FTC's targeting of AAP.  There is a heightened sense of fear given

the broad categories of internal deliberative materials and associational information detailed therein.

26.     I am also aware that in the past, AAP employees received anonymous notes and threats in the mail based on their and AAP's work relating to GAC.  AAP employees questioned whether they are safe at AAP headquarters and have requested that AAP's offices be closed to visitors to restrict access to unauthorized guests and the public.  AAP reasonably anticipates that AAP staff will be subjected to similar threats in the future due to the FTC's targeting of AAP's work on GAC.

27.     The CID has materially harmed employee morale, including staff concerns about their physical safety, mental wellbeing, and sense of fulfillment at work.

28.     Despite the substantial cost and burdens the FTC's actions have imposed on our organization, AAP has not abandoned its goals of fostering public health policy discussion regarding GAC and advancing the quality and accessibility of specialized care for youth suffering from gender dysphoria.  AAP, however, fears that the FTC's CID will make it more difficult to speak publicly about GAC to ensure that youth with gender dysphoria and their families have access to the highest quality care.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: ___February 20, 2026___

_____
Mark Del Monte