# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN ACADEMY OF PEDIATRICS,<br><br>*Plaintiff*,<br><br>v.<br><br>FEDERAL TRADE COMMISSION; ANDREW N. FERGUSON, in his official capacity as Chair of the Federal Trade Commission; MARK R. MEADOR, in his official capacity as Commissioner of the Federal Trade Commission,<br><br>*Defendants*. | Case No. 1:26-cv-00508-CRC |

## DECLARATION OF STACEY K. GRIGSBY IN SUPPORT OF PLAINTIFF'S <u>MOTION FOR PRELIMINARY INJUNCTION</u>

I, Stacey K. Grigsby, declare pursuant to 28 U.S.C. § 1746 that:

1.      I am an attorney with the law firm Covington & Burling LLP.  I represent Plaintiff American Academy of Pediatrics ("AAP") in this action.  I submit this declaration in support of Plaintiff's Motion for Preliminary Injunction.  If called upon to do so, I could and would competently testify as follows:

2.      Attached hereto as **Exhibit 1** is a true and correct copy of a Declaration from the Secretary of the U.S. Department of Health & Human Services ("HHS") regarding "Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents*"* (Dec. 18, 2025), available at https://www.hhs.gov/sites/default/files/declaration-pediatric-sex-rejecting-procedures.pdf (last accessed Feb. 20, 2025).

3.      Attached hereto as **Exhibit 2** is a true and correct copy of a Press Release from the HHS entitled "HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures" (Nov. 19, 2025), available at https://www.hhs.gov/press-room/hhs-releases-peer-reviewed-report-discrediting-pediatric-sex-rejecting-procedures.html  (last  accessed  Feb. 19, 2025).

4.      Attached hereto as **Exhibit 3** is a true and correct copy of a Punchbowl News article entitled "As Chair, FTC Commissioner Touts He'd Pull Back on AI and Fight Trans Care" (Dec. 6, 2024),  available  at  https://punchbowl.news/article/tech/ftc-commissioner-artificial-intelligence-trans-care/ (last accessed Feb. 19, 2025).

5.      Attached hereto as **Exhibit 4** is a true and correct copy of a document linked in the above Punchbowl News article, which the article characterizes as a "resume-style document" created  by  FTC  Commissioner  Andrew  Ferguson,  available  at  https://punchbowl.news/wp-content/uploads/FTC-Commissioner-Andrew-N-Ferguson-Overview.pdf (last accessed Feb. 19, 2025).

6.      Attached hereto as **Exhibit 5** is a true and correct copy of a Reuters article entitled "US FTC Workshop Criticizing Medical Care for Transgender Youth Draws Staff Opposition" (July 2, 2025), available at https://www.reuters.com/legal/litigation/us-ftc-workshop-criticizing-medical-care-transgender-youth-draws-staff-2025-07-02/ (last accessed Feb. 19, 2025).

7.      Attached hereto as **Exhibit 6** is a true and correct copy of a Press Release from the U.S. Federal Trade Commission ("FTC") entitled "FTC Announces Workshop on Exploring Unfair or Deceptive Trade Practices in "Gender-Affirming Care" for Minors" (June 9, 2025), available    at    https://www.ftc.gov/news-events/news/press-releases/2025/06/ftc-announces-workshop-exploring-unfair-or-deceptive-trade-practices-gender-affirming-care-minors    (last accessed Feb. 19, 2025).

8.      Attached hereto as **Exhibit 7** is a true and correct copy of a Request from the FTC entitled "Request for Public Comment Regarding 'Gender-Affirming Care' for Minors," available at  https://www.ftc.gov/system/files/ftc_gov/pdf/GAC-RFI-FINAL.pdf  (last  accessed  Feb. 19, 2025).

9. Attached hereto as **Exhibit 8** is a true and correct copy of a post on social-media website X by FTC Chairman Andrew Ferguson (@AFergusonFTC) from November 19, 2025 at 4:27 p.m., available at https://x.com/AFergusonFTC/status/1991257084285874536 (last accessed Feb. 19, 2026).

10. Attached hereto as **Exhibit 9** is a true and correct copy of the "Statement of Concern Dated July 2, 2025 from FTC Employees on the FTC's July 9 Workshop on Gender-Affirming Care," available at https://fingfx.thomsonreuters.com/gfx/legaldocs/akvexqzyopr/FTC%20staff%20statement.pdf (last accessed Feb. 19, 2026).

11. Attached hereto as **Exhibit 10** is a true and correct copy of the webpage entitled "About the AAP," as found on the AAP website, available at https://www.aap.org/en/about-the-aap/ (last accessed Feb. 19, 2026).

12. Attached hereto as **Exhibit 11** is a true and correct copy of the webpage entitled "Policy Statement Development Process" (Feb. 28, 2023), as found on the AAP website, available at https://www.aap.org/en/policy/policy-statement-development-process/ (last accessed Feb. 19, 2026).

13. Attached hereto as **Exhibit 12** is a true and correct copy of the AAP Policy Statement entitled "Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents" (October 1, 2018, reaffirmed August 2023), available at https://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf (last accessed Feb. 19, 2026).

14. Attached hereto as **Exhibit 13** is a true and correct copy of an AAP Press Release entitled "AAP Opposes New HHS Rules Restricting Access to Care for Families" (Dec. 18, 2025), available at https://www.aap.org/en/news-room/news-releases/aap/2025/aap-opposes-new-hhs-rules-restricting-access-to-care-for-families/ (last accessed Feb. 19, 2026).

15. Attached hereto as **Exhibit 14** is a true and correct copy of a case study published in AAP's peer-reviewed journal *Pediatrics* by Meredith McNamara, MD, MSc, et al., entitled "Combating Scientific Disinformation on Gender-Affirming Care" (Aug 22, 2023), available at https://publications.aap.org/pediatrics/article/152/3/e2022060943/193719/Combating-Scientific-Disinformation-on-Gender (last accessed Feb. 19, 2026).

16. Attached hereto as **Exhibit 15** is a true and correct copy of a Press Release from the FTC entitled "Andrew N. Ferguson Takes Over as FTC Chairman" (Jan. 22, 2025), available at https://www.ftc.gov/news-events/news/press-releases/2025/01/andrew-n-ferguson-takes-over-ftc-chairman (last accessed Feb. 19, 2026).

17. Attached hereto as **Exhibit 16** is a true and correct copy of a Press Release from the FTC entitled "FTC Chairman Applauds Revocation of Biden-Harris Executive Order on Competition" (Aug. 14, 2025), available at https://www.ftc.gov/news-events/news/press-releases/2025/08/ftc-chairman-applauds-revocation-biden-harris-executive-order-competition (last accessed Feb. 19, 2026).

18.     Attached hereto as **Exhibit 17** is a true and correct copy of a transcript from the FTC Workshop on "Exploring Unfair or Deceptive Trade Practices in 'Gender-Affirming Care' for Minors" held on July 9, 2025, including Chairman Ferguson's Address, available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-The-Dangers-of-Gender-Affirming-Care-for-Minors-Transcript.pdf (last accessed Feb. 19, 2026).

19.     Attached hereto as **Exhibit 18** is a true and correct copy of a Newsmax article entitled "FTC Hires Attorney Fired for Transgender Care Views" (Feb. 5, 2026), available at https://www.msn.com/en-us/news/politics/ftc-hires-attorney-fired-for-transgender-care-views/ar-AA1VLcxg (last accessed Feb. 19, 2026).

20.     Attached hereto as **Exhibit 19** is a true and correct copy of a post on social-media website X by Jon Schweppe (@JonSchweppe) from November 19, 2025 at 1:18 p.m., available at https://x.com/JonSchweppe/status/1991209540310737399 (last accessed Feb. 19, 2026).

21.     Attached hereto as **Exhibit 20** is a true and correct copy of a post on social-media website X by Calley Means (@calleymeans) from Apr. 20, 2025 at 3:01 p.m., available at x.com/calleymeans/status/1914031641217167844?s=46 (last accessed Feb. 19, 2026).

22.     Attached hereto as **Exhibit 21** is a true and correct copy of AAP's Articles of Incorporation, available at https://publications.aap.org/aapbooks/book/chapter-pdf/1596451/aap_9781610025232-articles_of.pdf (last accessed Feb. 19, 2026).

23.     Attached hereto as **Exhibit 22** is a true and correct copy of correspondence between AAP Counsel Laura Kim and FTC Staff Gregory Ashe from January 30, 2026 at 12:35 a.m. to January 31, 2026 at 11:25 a.m.

24.     Attached hereto as **Exhibit 23** is a true and correct copy of correspondence from AAP Counsel Laura Kim to FTC Staff Gregory Ashe, Annie Chiang, and Jonathan Cohen on February 4, 2026 at 11:12 p.m.

25.     Attached hereto as **Exhibit 24** is a true and correct copy of correspondence from FTC Staff Jonathan Cohen to AAP Counsel Laura Kim and Alexandra Remick on February 5, 2026 at 7:28 p.m., including the letter attached to said correspondence.

26.     Attached hereto as **Exhibit 25** is a true and correct copy of correspondence between AAP Counsel Alexandra Remick and FTC Staff Jonathan Cohen from February 5, 2026 at 7:28 p.m. to February 6, 2026 at 4:46 p.m., including the letter attached to said correspondence.

27.     Attached hereto as **Exhibit 26** is a true and correct copy of correspondence between AAP counsel Laura Kim and Alexandra Remick and FTC Staff Jonathan Cohen from February 5, 2026 at 7:28 p.m. to February 8, 2026 at 5:12 p.m.

28.     Attached hereto as **Exhibit 27** is a true and correct copy of AAP's Petition to Quash or Limit the FTC's CID and the accompanying exhibits filed on February 9, 2026, available at https://search.ftc.gov/system/files/ftc_gov/pdf/AAP-PTQ.pdf.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on February 20, 2026, in Washington D.C.

*/s/  Stacey K. Grigsby*
Stacey K. Grigsby (D.C. Bar No. 491197)

# EXHIBIT 1



**THE SECRETARY OF HEALTH AND HUMAN SERVICES**

**WASHINGTON, D.C. 20201**

# DECLARATION OF THE SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES

## RE: Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents

**Date:** December 18, 2025

**Declarant:** Robert F. Kennedy Jr., Secretary of U.S. Department of Health and Human Services

---

I, Robert F. Kennedy, Secretary of the U.S. Department of Health and Human Services (HHS), pursuant to my authority and responsibilities under federal law, and pursuant to 42 CFR § 1001.2, hereby declare as follows

## I. BACKGROUND AND AUTHORITY

### A. Rising Prevalence of Gender Dysphoria Diagnoses in Youth

In recent years, medical professionals have documented a substantial increase in gender dysphoria diagnoses among young people in the United States, with similar trends throughout Europe.[1] In response to this phenomenon and following the publication of the "Dutch Protocol," and subsequent endorsements by the World Professional Association for Transgender Health (WPATH) and the Endocrine Society (ES), the number of children and adolescents receiving medical interventions for gender dysphoria increased substantially.[2] These interventions, referred to in this Declaration as sex-rejecting procedures, include puberty-suppressing hormones, cross-sex hormones, and surgical procedures.

Research indicates that thousands of American children have undergone these sex-rejecting procedures.[3] Yet current medical evidence does not support a favorable risk/benefit profile for using these interventions to treat pediatric gender dysphoria. Moreover, existing clinical guidelines endorsing these procedures demonstrate significant variation in methodological rigor and quality.

To address these methodological concerns and evaluate the evidence for sex-rejecting procedures for children and adolescents, on May 1, 2025, HHS released a review of the evidence to identify best practices for treating pediatric gender dysphoria.[4] On November 19, 2025, HHS released the final, peer-reviewed report, *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* ("the HHS Report").[5] The HHS Report is a comprehensive review of the evidence and literature related to sex-rejecting procedures.

**B. Expansion of Medical Interventions for Gender Dysphoria**

Following the 2006 publication of what became known as the "Dutch Protocol" in *The European Journal of Endocrinology*, pediatric medical interventions for gender dysphoria increased substantially.[6] During the subsequent decade, growing numbers of children and adolescents diagnosed with gender dysphoria began receiving medical procedures advocated by organizations such as the WPATH and the ES.[7]

WPATH's Standards of Care Version 8 (SOC-8) specifically acknowledged this trend, attributing the development of a dedicated adolescent chapter partly to what it characterized as exponential increases in youth referrals.[8] While earlier health system studies documented referral rates below 0.1 percent, more recent surveys identifying "transgender" youth report prevalence ranging from 1.2 to 2.7 percent, with "gender diverse" identification reaching as high as 9 percent.[9] WPATH documentation also indicates that adolescent females seek these interventions at rates between two and seven times higher than adolescent males.[10]

WPATH guidelines recommend that providers conduct thorough biopsychosocial evaluations of adolescents seeking medical transition, incorporating input from mental health specialists, medical professionals, parents or guardians, except in circumstances where parental involvement might cause harm.[11]

**C. Scale of Pediatric Interventions in the United States**

The number of pediatric patients seeking sex-rejecting procedures can only be roughly estimated.  The decentralized and largely privatized nature of the American healthcare system has facilitated the proliferation of specialized gender clinics alongside numerous independent practitioners offering these services.[12] Conservative estimates from March 2023 identified 271 gender clinics operating across the United States, with approximately 70 rendered inactive due to state legislative restrictions.[13]

The treatment approach referenced in this declaration as sex-rejecting procedures—terminology that some refer to as "gender-affirming care"—encompasses several intervention types, when provided to minors: puberty-suppressing drugs that prevent the onset of puberty, cross-sex hormones that induce secondary sex characteristics of the opposite-sex, and surgical procedures, including breast removal and, less commonly, genital reconstruction. Thousands of American minors have undergone these interventions.[14]

Research published in 2023 estimated that from 2016 through 2020, approximately 3,700 adolescents in the U.S., aged 12 to 18 with gender dysphoria diagnoses underwent surgical interventions. This figure includes more than 3,200 youth who underwent breast or chest surgery and over 400 who had genital surgeries resulting in permanent reproductive organ alterations and compromised sexual function.[15] Separate research examining the period from 2017 to 2021 identified more than 120,000 children ages 6 through 17 diagnosed with gender dysphoria, with over 17,000 of these minors initiating either puberty blockers or hormonal therapy.[16] However, as discussed in the HHS Review, current medical evidence does not support a favorable risk/benefit profile for the use of chemical or surgical procedures in children to treat gender dysphoria.

**D. Legal Authority for This Declaration**

This declaration is issued pursuant to the authority vested in the HHS Secretary, and is informed by 42 CFR § 1001.2, which provides that "when the Department has declared a treatment modality not to be safe and effective, practitioners who employ such a treatment modality will be deemed not to meet professionally recognized standards of health care."  As such, this declaration supersedes

"Statewide or national standards of care, whether in writing or not, that professional peers of the individual or entity whose provision of care is an issue, recognize as applying to those peers practicing or providing care within a State." For reasons explained in this Declaration, standards of care recommended by certain medical organizations are unsupported by the weight of evidence and threaten the health and safety of children with gender dysphoria.

## II. COMPREHENSIVE REVIEW OF EVIDENCE

HHS issued a comprehensive evidence review and best practices assessment regarding pediatric gender dysphoria care on May 1, 2025.[17]  After the publication of this preliminary report, HHS also invited peer reviews from major medical associations, including the American Academy of Pediatrics (AAP), the American Psychiatric Association (APA), and the ES, as well as clinical experts and evidence-based medicine methodologists. While both the AAP and the ES declined to participate, HHS received reviews from the APA and seven invited peer reviewers for consideration. The report also engaged with two unsolicited reviews that were previously published in journals. In keeping with its commitment to radical transparency, HHS published all nine peer reviews alongside its detailed responses to each one,[18] as well as a final, revised report incorporating the feedback in November 2025.[19]

Employing an evidence-based medicine approach, the HHS Review identified substantial concerns regarding outcomes from specific medical interventions—namely puberty blockers, cross-sex hormones, and surgical procedures—intended to facilitate children's and adolescents' transition away from their sex. The Review documents significant risks from these procedures, including permanent harms such as infertility, while finding markedly insufficient evidence of therapeutic benefit. Crucially, the Review determined that existing evidence cannot support effectiveness claims for medical and surgical interventions in ameliorating mental health conditions or reducing gender dysphoria symptoms. As the Review states: "Analysis of the biological plausibility of harms is necessary and suggests that some short- and long-term harms are likely (in some cases expected) sequelae of treatment."[20] The evidence examined in the HHS Review demonstrates an unfavorable risk/benefit profile for medical and surgical interventions in children and adolescents with gender dysphoria diagnoses. While the HHS Review refrains from making specific clinical, policy, or legislative recommendations, it furnishes essential insights for policymakers charged with promoting health and safety, particularly for vulnerable populations such as children and adolescents.[21]

### A. HHS Review Methodology

The HHS Review conducted an "umbrella review" of existing systematic reviews, including those that informed European health authorities' policy decisions, to assess their methodological quality and the evidence regarding the benefits and harms of hormonal and surgical interventions for treating pediatric gender dysphoria. The review found that the overall quality of evidence concerning the effects of sex-rejecting procedures on psychological outcomes, quality of life, regret, or long-term health, is very low.

### B. Evidence Quality Regarding Therapeutic Benefits

The HHS Review also concluded that available evidence cannot support determinations regarding the effectiveness of medical and surgical interventions for mental health or alleviating gender dysphoria symptoms.

The Review states that pediatric medical transition evidence for benefit remains highly uncertain, while harm evidence demonstrates less uncertainty.[22] The evidence compilation indicates that medical and surgical interventions for children and adolescents diagnosed with gender dysphoria present an unfavorable risk-benefit profile.

## C. Evidence and Analysis of Treatment Harms

While acknowledging that systematic reviews provide limited direct evidence of harms from sex-rejecting procedures in minors, the HHS Review offers plausible rationales for why such evidence may have been inadequately sought, detected, or reported. Contributing factors include the relatively recent implementation of hormonal and surgical treatment, deficiencies in monitoring and reporting adverse effects within existing studies, and publication bias.

Despite the absence of robust evidence from large-scale population studies, the HHS Review identifies known and plausible harm risks from puberty blockers, cross-sex hormones, and surgeries based on human physiology and pharmacological agents used. The Review notes that short- and long-term adverse effects are likely, and include infertility and sterility, sexual dysfunction, impaired bone density development, adverse cognitive effects, cardiovascular and metabolic disease, psychiatric conditions, surgical complications, and regret.[23]

## D. International Shift Away from Pediatric Medical Transition

The HHS Review chronicles both the weak evidentiary basis and the growing international movement away from using puberty blockers, cross-sex hormones, and surgeries for treating gender dysphoria in minors, highlighting significant harm risks.[24] The Review provides methodologically rigorous assessment of evidence underlying surgical and endocrine interventions, including puberty suppression and cross-sex hormone use, while incorporating international practice evaluations such as the United Kingdom's Cass Review.

The Review documents mounting concerns regarding both the scarcity of reliable benefit evidence and the presence of significant harm risks associated with this care model, identifying psychotherapy as a non-invasive alternative approach.

## E. Ethical Analysis and Conclusions

The HHS Review invokes widely recognized medical ethics principles to conclude that "medical interventions pose unnecessary, disproportionate risks of harm, healthcare providers should refuse to offer them even when they are preferred, requested, or demanded by patients."[25] As the Review states, "in the domain of pediatrics, these norms limit the authority not only of patients (who in any case lack full decision-making capacity) but of parents as well."[26] The first obligation of the physician, under the Hippocratic Oath, originating in the fourth century BC, is to first do no harm, as the purpose of the practice of medicine is to heal. Sex-rejecting procedures introduce a unique set of iatrogenic harms for minors, which may include "surgeries to remove healthy and functioning organs."[27] The Review states: "To discharge their duties of nonmaleficence and beneficence, clinicians must ensure, insofar as reasonably possible, that any interventions they offer to patients have clinically favorable risk/benefit profiles relative to the set of available alternatives, which includes doing nothing."[28] As related previously in this Declaration, the risk-benefit profile of these procedures for children is extremely poor. "The best available evidence," it finds, is that pediatric sex-rejecting procedures "have not been shown to improve mental health outcomes." "At the same time," the Review notes, "there is increasing recognition of the risk and harms associated" with pediatric sex-rejecting procedures, including "possible outcomes, such as impaired cognitive function, greater susceptibility to hormone-sensitive cancers, cardiac disease, reduced bone density, sexual dysfunction, infection, and infertility [that] are objectively detrimental to health." The Review concludes that "[s]uch medical harms, or plausible risks thereof, should not be imposed on children or adolescents in the absence of a reasonable expectation of proportionate medical benefit."[29]

Though the HHS Review deliberately avoids making clinical, policy, or legislative recommendations, it supplies critical information that should guide policymakers in decisions promoting health and safety, especially for vulnerable populations such as minors.[30]

# III. INADEQUACY OF CLINICAL GUIDELINE FROM MEDICAL ORGANIZATIONS

I acknowledge that guidance from prominent U.S. medical professional organizations, including the American Medical Association (AMA), AAP, and APA, has characterized sex-rejecting procedures—termed by these organizations as "gender-affirming care"—as safe and effective.[31,32,33,34] These endorsements from medical societies have encouraged widespread clinician adoption of sex-rejecting procedures throughout the United States. The most influential sources of clinical guidance for treating pediatric gender dysphoria in the United States are the WPATH and the ES clinical practice guidelines and the AAP guidance document. However, a recent systematic review of international guideline quality by researchers at the University of York found that all three documents as very low quality and should not be implemented.[35]

As the HHS Review notes regarding the role of medical organizations in the treatment of pediatric gender medicine:

> U.S. medical associations played a key role in creating a perception that there is professional consensus in support of pediatric medical transition. This apparent consensus, however, is driven primarily by a small number of specialized committees, influenced by WPATH. It is not clear that the official views of these associations are shared by the wider medical community, or even by most of their members. There is evidence that some medical and mental health associations have suppressed dissent and stifled debate about this issue among their members.[36]

## A. Endocrine Society

The ES issued clinical practice guidelines in 2017 entitled "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons." As the HHS Review notes:

> In WPATH and ES guidelines, the principal goal of CSH administration is to induce physical characteristics typical of the opposite sex. When hormone levels rise beyond the typical reference range for a person's sex, they are considered supraphysiologic. ES guidelines suggest that the sex an individual identifies as—as opposed to their biological sex—should determine the target reference range for hormonal concentrations. Critics have argued that perceived identity does not alter physiological processes and that such a belief can result in inappropriate and potentially dangerous hormone dosing.[37]

The HHS Review states:

> The ES 2017 guideline, which used the GRADE [Grading of Recommendations Assessment, Development and Evaluation] framework, has been criticized for making strong recommendations for hormonal interventions in the setting of a weak evidence base. Notably, none of the systematic reviews that supported the ES guidelines were based on outcomes for children or adolescents. The ES recommendation to initiate puberty blockade using gonadotropin-releasing hormone agonists was derived by putting a higher value on achieving a "satisfactory physical appearance" while putting the lowest value on avoiding physical harms. The ES recommendation for the initiation of cross-sex hormones no earlier than age 16 was justified by placing a higher value on adolescent's purported ability to meaningfully consent to

cross-sex hormones (CSH) and placing a lower value on avoiding harm from potentially prolonged pubertal suppression.

## B. WPATH

As explained in Chapter 9 of HHS Review, the guidelines issued by the WPATH "have been rated among the lowest in quality and have not been recommended for implementation by systematic reviews (SRs) of guidelines."[38] As the HHS Review points out: "Despite their lack of trustworthiness, for more than a decade WPATH guidelines have served as the foundation of the healthcare infrastructure for gender dysphoric (GD) youth in the United States. The WPATH Standards of Care guidelines are embedded in nearly all aspects of healthcare including clinical education, delivery of care, and reimbursement decisions by private and public insurers." In 2022, WPATH issued guidelines entitled "Standards of Care for the Health of Transgender and Gender Diverse People, Version 8" (SOC-8). These guidelines relaxed eligibility criteria for children to access sex-rejecting procedures, and ultimately recommends that adolescents wishing to undergo sex-rejecting procedures receive them. Besides the problems identified in systematic reviews of international guidelines, during recommendation development, WPATH suppressed systematic evidence reviews, failed to appropriately manage conflicts of interest, and prioritized legal and political rather than clinical considerations.[39] The HHS Review states: "In the process of developing SOC-8, WPATH suppressed systematic reviews its leaders believed would undermine its favored treatment approach. SOC-8 developers also violated conflict of interest management requirements and eliminated nearly all recommended age minimums for medical and surgical interventions in response to political pressures."[40]  The HHS Review goes on to explain: "The recommendations are couched in cautious-sounding language, stating that GD should be "sustained over time," particularly before administering CSH. However, no clear standard is set; the only guidance offered is the vague and clinically meaningless phrase "several years, leaving critical decisions open to broad and subjective interpretation.""[41]

On the surface, WPATH SOC-8 might appear to recommend a cautious approach toward assessment. Mental health providers are to conduct a "comprehensive biopsychosocial assessment" prior to initiating medical interventions in order "to understand the adolescent's strengths, vulnerabilities, diagnostic profile, and unique needs to individualize their care." At the same time, however, WPATH recommends that clinicians use the International Classification of Diseases 11th Revision diagnosis of "Gender Incongruence of Adolescence and Adulthood," which, unlike the DSM-5 diagnosis of "Gender Dysphoria," requires only "marked and persistent incongruence between an individual's experienced gender and the assigned sex." Because SOC-8 defines transgender in a similar way ("people whose gender identities and/or gender expressions are not what is typically expected for the sex to which they were assigned at birth") and provides no meaningful distinction between this meaning of transgender and gender non-conformity, SOC-8 effectively recognizes transgender identification as a medical condition justifying medical interventions.[42]

The HHS Review also argues: "Although WPATH's guidelines do not necessarily discourage mental healthcare, they likewise do not require it as a precondition for PMT [pediatric medical transition]. Some guideline authors opposed even minimal requirements for mental health support, arguing that such provisions were analogous to "conversion therapy."35 SOC-8's only formal recommendation is for a "comprehensive biopsychosocial assessment," although WPATH emphasizes that its guideline is "flexible," thereby leaving room for considerable variation in clinical practice."[43]
A recent systematic review evaluating international guideline quality concluded that healthcare professionals should account for the inadequate quality and independence of available guidance when utilizing WPATH and Endocrine Society international guidelines in practice.[44]

## C. AMA and AAP

While the AMA and the AAP have not issued their own treatment guidelines, they support the ES and WPATH guidelines, as discussed previously in this proposed rule.  AAP issued a policy statement in 2018 supporting the use of puberty blockers, cross-sex hormones, and surgeries for minors.[45] In support of sex-rejecting surgeries, AAP stated that while "current protocols [(ES, WPATH)] typically reserve surgical interventions for adults, they are occasionally pursued during adolescence on a case-by-case basis, considering the necessity and benefit to the adolescent's overall health and often including multidisciplinary input from medical, mental health, and surgical providers as well as from the adolescent and family."  The AAP reaffirmed its policy statement in 2023, but also stated that it was conducting its own review of the evidence and guideline development---which still have not been released.[46]

Regarding the AAP policy statement, the HHS Review states:

> The AAP 2018 policy statement is not technically a CPG [clinical practice guideline] but has been widely cited in the U.S. as influential in establishing how pediatricians respond to children and adolescents with GD [gender dysphoria]. Because the document offers extensive clinical recommendations regarding every step of PMT—from social transition to PBs [puberty blockers], CSH [cross-sex hormones], and surgery—the York team assessed the trustworthiness of the AAP guidance using the same criteria they applied to CPGs. Using the AGREE II criteria, the AAP policy statement received the second-lowest average score among all international guidelines: 2 out of 7. As noted in Chapter 2, the AAP's policy statement's use of "gender diverse" casts a very wide net regarding which patients the organization considers eligible for medical intervention. The statement has been heavily criticized in peer-reviewed articles, which have pointed out that it is rife with referencing errors and inaccurate citations. Despite persistent advocacy among its members, who have petitioned the organization to release updated, evidence-based guidance for treating pediatric GD, the organization chose to reaffirm their policy statement in 2023.[47]

The Review comprehensively documents how SOC-8 development represented a significant departure from unbiased, evidence-driven clinical guideline development principles.[48]

The failure of professional organizations in the United States to protect children, and follow the principles of evidence-based medicine, highlights the need for this Declaration.

Global guidelines supporting care for children and adolescents experiencing gender dysphoria demonstrate variable methodological rigor and quality. The HHS Review's assessment reveals fundamental deficiencies in both the development processes and evidentiary foundations of the most frequently cited guidelines endorsing sex-rejecting procedures for minors.

## IV. INTERNATIONAL EVIDENCE REVIEWS AND CONSENSUS

The HHS Review's findings align with conclusions from multiple European nations that conducted independent, rigorous systematic evidence reviews. Sweden, Finland, and the United Kingdom each commissioned independent systematic evidence reviews through their public health authorities. All three nations concluded that medicalization[49] risks may exceed benefits for children and adolescents with gender dysphoria, subsequently implementing sharp restrictions on gender transition interventions for minors.[50,51,52,53,54,55] These three countries now recommend exploratory psychotherapy as initial treatment. Sweden and Finland reserve hormonal interventions exclusively for exceptional cases, recognizing their experimental nature.[56,57,58,59]

**A. United Kingdom's Cass Review**

The United Kingdom's Cass Review represents the most influential evaluation to date—a four-year independent assessment of pediatric gender medicine published in April 2024. The Cass Review findings precipitated closure of the United Kingdom's Gender Identity Development Service (GIDS), which the Care Quality Commission had rated "inadequate" in 2021.

The Cass Review recommended restructuring the care delivery model away from centralized "gender clinic" approaches toward more holistic frameworks emphasizing psychosocial support delivered through regional hubs. The Review's findings also led the United Kingdom to prohibit puberty blocker use outside clinical trial settings and substantially restrict cross-sex hormone access.[60]

Though cross-sex hormones remain officially available, the National Health Service (NHS) recently disclosed that since the Cass Review's publication, no minor has satisfied eligibility criteria for receiving cross-sex hormones under updated policies.[61] Note that the United Kingdom has never provided gender dysphoria-related surgery to minors through the NHS.[62]

**B. Sweden**

Sweden's National Board of Health and Welfare (NBHW) reviewed and revised its guidelines for minors under age 18 in 2022. The NBHW determined that risks from puberty-suppressing treatment using GnRH-analogues (injectable medications preventing ovarian and testicular hormone production) and hormonal treatment promoting opposite-sex characteristics likely exceed potential benefits.[63,64]

The NBHW specified that mental health support and exploratory psychological care should constitute first-line treatment. Hormonal interventions may serve as last-resort measures for select youth. Sweden has elected to restrict gender transition procedures for minors to research settings exclusively, limiting eligibility to early childhood-onset gender dysphoria cases.

**C. Finland**

Finland's Council for Choices in Health Care, the monitoring agency for national public health services, issued guidelines in 2020 calling for psychosocial support as primary treatment, hormone therapy only after careful case-by-case consideration, and no surgical treatment for minors.[65, 66] Finland has restricted gender transition procedure eligibility to minors with early childhood-onset gender dysphoria and without mental health comorbidities.

**D. Denmark**

Denmark experienced increased sex-rejecting procedure referrals from 97 individuals in 2016 to 352 in 2022, with biological females aged 11-18 constituting 70 percent.[67] Concerned about rising referrals and reports of treatment regret or attempts to reverse hormone-induced bodily changes, Denmark adopted an approach emphasizing assessment and psychosocial support for minors while postponing hormone therapy decisions, including puberty blockers and cross-sex hormones, particularly when gender incongruence has been brief or when questions exist regarding gender identity stability.[68]

**E. Norway**

Norway's Norwegian Commission for the Investigation of Health Care Services (UKOM), an independent state agency, issued 2023 recommendations regarding treatment for children and young people with gender incongruence.[69] Recommendations included classifying puberty blockers and surgical treatment for children as experimental, revising national guidelines based on systematic

knowledge synthesis, and establishing a national registry to enhance quality and reduce treatment variation. Norway's public health authority has indicated intentions to adjust current treatment guidelines in response to UKOM concerns.[70]

### F. Additional Countries

Italy,[71] Brazil,[72] and Australia[73] represent additional countries that have restricted or contemplated restricting various sex-rejecting procedures for minors.

### G. International Developments Summary

Growing international concern exists regarding hormonal and surgical interventions for pediatric gender dysphoria among countries conducting rigorous, independent, evidence-based evaluations. While certain medical associations have endorsed sex-rejecting procedures, the HHS Review emphasizes that these endorsements lack grounding in evidence-based medicine and often reflect suppression of opposing ideas.

## V. DECLARATION

Based on the comprehensive evidence review published by the Department of Health and Human Services, documented risks of significant harm, markedly weak evidence of benefit, unfavorable risk-benefit profiles, inadequate existing clinical guidelines, growing international consensus among countries conducting rigorous evidence reviews, and applicable medical ethics principles, I hereby declare:

**Sex-rejecting procedures for children and adolescents are neither safe nor effective as a treatment modality for gender dysphoria, gender incongruence, or other related disorders in minors, and therefore, fail to meet professional recognized standards of health care. For the purposes of this declaration, "sex-rejecting procedures" means pharmaceutical or surgical interventions, including puberty blockers, cross-sex hormones, and surgeries such as mastectomies, vaginoplasties, and other procedures, that attempt to align an individual's physical appearance or body with an asserted identity that differs from the individual's sex.**

This Declaration does not apply (1) To treatment of an individual with a medically verifiable disorder of sexual development; (2) For purposes other than attempting to align an individual's physical appearance or body with an asserted identity that differs from the individual's sex; or (3) To treat complications, including any infection, injury, disease, or disorder that has been caused by or exacerbated by the performance of a sex-rejecting procedure. 42 CFR § 1001.2 allows the Secretary to declare a "treatment modality *not* to be safe and effective," (emphasis added), and accordingly nothing in this declaration recommends a particular treatment for gender dysphoria or any other condition. However, the HHS Review points to psychotherapy (talk therapy) as a noninvasive alternative to sex-rejecting procedures. As Sweden's national health authority has recommended, "[p]sychosocial support that helps adolescents deal with natal puberty without medication needs to be the first option when choosing care measures."[74]

Under 42 U.S.C. § 1320a-7(b)(6)(B), the Secretary "may" exclude individuals or entities from participation in any Federal health care program if the Secretary determines the individual or entity has furnished or caused to be furnished items or services to patients of a quality which fails to meet professionally recognized standards of health care.  This declaration does not constitute a determination that any individual or entity should be excluded from participation in any Federal health care program.  Any such determination could only be made after a separate determination under 42 C.F.R. § 1001.701, which is subject to further administrative and judicial review under 42 C.F.R. §§ 1001.2007,

1005.21.  Before making any such determination, HHS will ensure compliance with applicable laws, regulations, court orders, and any required procedures.

This declaration rests upon the best available scientific evidence and aims to promote the health, safety, and well-being of children and adolescents, who constitute an especially vulnerable population deserving the highest standards of care.

---

**DECLARED** this 18th day of December, 2025.

---

*[signature]*

Robert F. Kennedy Jr.
Secretary
U.S. Department of Health and Human Services

---

[1] Stuart William Jarvis et al., "Epidemiology of gender dysphoria and gender incongruence in children and young people attending primary care practices in England: retrospective cohort study," *Archives of Disease in Childhood* 110 (2025): 612-621, doi:10.1136/archdischild-2024-327992; Christian J. Bachmann et al., "Gender identity disorders among young people in Germany: Prevalence and trends, 2013--2022. An analysis of nationwide routine insurance data," *Deutsches Ärzteblatt International* 121 (2024): 370-371, doi:10.3238/arztebl.m2024.0098.

[2] Henriette A. Delemarre-van de Waal and Peggy T. Cohen-Kettenis, "Clinical management of gender identity disorder in adolescents: A protocol on psychological and pediatric endocrinology aspects," European Journal of Endocrinology 155, Supp 1 (2006): S131-S137, https://doi.org/10.1530/eje.1.02231; E. Coleman et al., "Standards of Care for the Health of Transgender and Gender Diverse People, Version 8," International Journal of Transgender Health 23, Supp 1 (2022): S1-S258, https://doi.org/10.1080/26895269.2022.2100644; and Wylie C. Hembree et al., "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," The Journal of Clinical Endocrinology & Metabolism 102, no. 11 (2017): 3869–3903, https://doi.org/10.1210/jc.2017-01658.

[3] Wright J. D., Chen L., Suzuki Y, Matsuo K., Hershman D. L. (2023). National estimates of gender-affirming surgery in the US. JAMA Network Open,6(8), e2330348; Hughes L. D., Charlton B. M., Berzansky I., Corman J. D. (2025). Gender-affirming medications among transgender adolescents in the US, 2018–2022. JAMA Pediatrics, 179(3), 342–344.

[4] U.S. Department of Health and Human Services (HHS). *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices. (Pre–Peer Review)*. Washington, DC: HHS, May 2025. https://opa.hhs.gov/sites/default/files/2025-11/gender-dysphoria-report-pre-peer-review.pdf

[5] U.S. Department of Health and Human Services (HHS), *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices.* Washington, DC: HHS, November 2025.

[6] Henriette A. Delemarre-van de Waal and Peggy T. Cohen-Kettenis, "Clinical management of gender identity disorder in adolescents: A protocol on psychological and pediatric endocrinology aspects," *European Journal of Endocrinology* 155, Supp 1 (2006): S131-S137, https://doi.org/10.1530/eje.1.02231.

[7] E. Coleman et al., "Standards of Care for the Health of Transgender and Gender Diverse People, Version 8,"*International Journal of Transgender Health* 23, Supp 1 (2022): S1-S258, https://doi.org/10.1080/26895269.2022.2100644; Wylie C. Hembree et al., "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," *The Journal of Clinical Endocrinology & Metabolism* 102, no. 11 (2017): 3869--3903, https://doi.org/10.1210/jc.2017-01658.

[8] Jennifer Block, "US transgender health guidelines leave age of treatment initiation open to clinical judgment," *BMJ* 378 (2022), https://doi.org/10.1136/bmj.o2303.

[9] Ibid.

[10] Ibid.

[11] Block, "US transgender health guidelines leave age of treatment initiation open to clinical judgment."

[12] Stephen B. Levine et al., "Reconsidering informed consent for trans-identified children, adolescents, and young adults," *Journal of Sex & Marital Therapy* 48, no. 7 (2022): 706-727, doi:10.1080/0092623X.2022.2046221.

[13] Luca Borah et al., "State restrictions and geographic access to gender-affirming care for transgender youth," *JAMA* 330, no. 4 (2023): 375--378, doi:10.1001/jama.2023.11299.

[14] U.S. Department of Health and Human Services, "Treatment for Pediatric Gender Dysphoria Review of Evidence and Best Practices," (May 1, 2025; final version November 18, 2025), https://opa.hhs.gov/sites/default/files/2025-05/gender-dysphoria-report.pdf.

[15] Jason D. Wright et al., "National Estimates of Gender-Affirming Surgery in the US," *JAMA Network Open* 6, no. 8 (2023), doi:10.1001/jamanetworkopen.2023.30348.

[16] Robin Respaut and Chad Terhune, "Putting numbers on the rise in children seeking gender care," Reuters, October 6, 2022, https://www.reuters.com/investigates/special-report/usa-transyouth-data/.

[17] HHS, "Treatment for Pediatric Gender Dysphoria Review of Evidence and Best Practices"; see also https://www.hhs.gov/press-room/gender-dysphoria-report-release.html

[18] U.S. Department of Health and Human Services (HHS), Supplement to *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices.* Peer Reviews and Replies. Washington, DC: HHS, November 2025. https://opa.hhs.gov/sites/default/files/2025-11/gender-dysphoria-report-supplement.pdf.

[19] HHS "Treatment for Pediatric Gender Dysphoria Review of Evidence and Best Practices."

[20] HHS, "Treatment for Pediatric Gender Dysphoria Review of Evidence and Best Practices."

[21] Ibid.

[22] Ibid.

[23] Ibid, 10.

[24] Ibid.

[25] Ibid., 15.

[26] HHS Review pg. 225

[27] HHS Review pg. 128

[28] HHS Review pg. 226

[29] HHS Review pg. 227-228

[30] Ibid.

[31] Stacy Weiner, "States are banning gender-affirming care for minors. What does that mean for patients and providers?," *AAMCNews*, February 20, 2024, https://www.aamc.org/news/states-are-banning-gender-affirminghttps://www.aamc.org/news/states-are-banning-gender-affirming-care-minors-what-does-mean-patients-and-providerscare-minors-what-does-mean-patients-and-providers.

[32] "APA adopts groundbreaking policy supporting transgender, gender diverse, nonbinary individuals," American Psychological Association, released February 28, 2024, https://www.apa.org/news/press/releases/2024/02/policy-supporting-transgender-nonbinary.

[33] Alyson Sulaski Wyckoff, "AAP continues to support care of transgender youths as more states push restrictions," *AAP News*, January 6, 2022, https://publications.aap.org/aapnews/news/19021/AAP-continues-tosupport-care-of-transgender.

[34] "Criminalizing Gender Affirmative Care with Minors," American Psychological Association, accessed September 2, 2025, https://www.apa.org/topics/lgbtq/gender-affirmative-care.

[35] HHS Review pg. 141

[36] HHS Review pg. 15

[37] HHS Review. Pg. 124

[38] HHS Review, pg. 157

[39] Ibid.

[40] HHS Review, pg. 14

[41] HHS Review, Pg. 165

[42] HHS Review, pg. 194-195

[43] HHS Review, pg. 196.

[44] Taylor J, Hall R, Heathcote C, et al., "Clinical guidelines for children and adolescents experiencing gender dysphoria or incongruence: a systematic review of guideline quality (part 1)," *Archives of Disease in Childhood* 2024;109: s65-s72, https://pubmed.ncbi.nlm.nih.gov/38594049/.

[45] *Pediatrics* (2018) 142 (4): e20182162.

[46] Alyson Sulaski Wyckoff, "AAP reaffirms gender-affirming care policy, authorizes systematic review of evidence to guide update," *AAP News*, August 4, 2023, https://publications.aap.org/aapnews/news/25340/AAP-reaffirms-gender-affirming-care-policy.

[47] HHS Review pg. 148, 149

[48] HHS, "Treatment for Pediatric Gender Dysphoria Review of Evidence and Best Practices."

[49] "Medicalization," Cambridge Dictionary, accessed August 8, 2025,https://dictionary.cambridge.org/us/dictionary/english/medicalization.

[50] Jonas F. Ludvigsson et al., "A systematic review of hormone treatment for children with gender dysphoria and recommendations for research," *Acta Paediatrica* 112, no. 11 (2023): 2279-2292, https://doi.org/10.1111/apa.16791.

[51] National Institute for Health and Care Excellence (NICE), "Evidence Review: Gender Affirming Hormones for Children and Adolescents with Gender Dysphoria," (2020).

[52] National Institute for Health and Care Excellence (NICE), "Evidence Review: Gonadotrophin Releasing Hormone Analogues for Children and Adolescents with Gender Dysphoria," (2020).

[53] I. Pasternack et al., "Lääketieteelliset menetelmät sukupuolivariaatioihin liittyvän dysforian hoidossa: Systemaattinen katsaus [Medical approaches to treating gender dysphoria: A systematic review]," Summaryx Oy (2019).

[54] Jo Taylor et al., "Interventions to suppress puberty in adolescents experiencing gender dysphoria or incongruence: A systematic review," *Archives of Disease in Childhood* 109, Supp 2 (2024): s33-s47, doi:10.1136/archdischild-2023-326669.

[55] Jo Taylor et al., "Masculinising and feminising hormone interventions for adolescents experiencing gender dysphoria or incongruence: A systematic review," *Archives of Disease in Childhood* 109, Supp 2 (2024): s48s56, doi:10.1136/archdischild-2023-326670.

[56] "Children and young people's gender services: implementing the Cass Review recommendations," NHS England, last updated August 29, 2024, https://www.england.nhs.uk/long-read/children-and-young-peoplesgender-services-implementing-the-cass-review-recommendations/.

[57] "Care of children and adolescents with gender dysphoria-summary of national guidelines," The Swedish National Board of Health and Welfare (Socialstyrelsen), December 2022, https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2023-1-8330.pdf.

[58] The Swedish National Board of Health and Welfare (Socialstyrelsen), "Care of children and young people with gender Dysphoria - national knowledge support with recommendations for the profession and decision makers," (2022), https://www.socialstyrelsen.se/globalassets/sharepointdokument/artikelkatalog/kunskapsstod/2022-12-8302.pdf.

[59] One Year Since Finland Broke with WPATH 'Standards of Care'," Society for Evidence Based Gender Medicine, July 2, 2021, https://segm.org/Finland_deviates_from_WPATH_prioritizing_psychotherapy_no_surgery_for_minors.

[60] "Children and young people's gender services: implementing the Cass Review recommendations," NHS England, last updated August 29, 2024, https://www.england.nhs.uk/long-read/children-and-young-peoplesgender-services-implementing-the-cass-review-recommendations/.

[61] Spencer, B. (2025, April 2). NHS swaps gender drugs for 'holistic' care. The Sunday Times. https://web.archive.org/web/20250420045726/https://www.thetimes.com/uk/healthcare/article/nhs-swaps-gender-drugs-for-holistic-care-jxhm3b6vk

[62] Silver, C., Calvey, R., Martin, A., & Butterworth, J. (2025). Towards best-practice healthcare for transgender patients: Quality improvement in United Kingdom general practice. Healthcare, 13(4), 353.

[63] "Care of children and adolescents with gender dysphoria-summary of national guidelines."

[64] The Swedish National Board of Health and Welfare (Socialstyrelsen), "Care of children and young people with gender Dysphoria."

[65] "One Year Since Finland Broke with WPATH 'Standards of Care'," Society for Evidence Based Gender Medicine, July 2, 2021, https://segm.org/Finland_deviates_from_WPATH_prioritizing_psychotherapy_no_surgery_for_minors.

[66] Council for Choices in Healthcare in Finland, "Summary of a recommendation by COHERE Finland," June 16, 2020, https://palveluvalikoima.fi/documents/1237350/22895838/Summary+transgender.pdf/2cc3f0532e34-39ce-4e21-becd685b3044/Summary+transgender.pdf?t=1592318543000.

[67] Mette Vinther Hansen et al., "Sundhedsfaglige tilbud til børn og unge med kønsubehag [Healthcare services for children and adolescents with gender dysphoria]," *Ugeskrift for Laeger* (2023), https://ugeskriftet.dk/videnskab/sundhedsfaglige-tilbud-til-born-og-unge-med-konsubehag.

[68] Nanna Ravnborg et al., "Gender Incongruence in Danish Youth (GenDa): A Protocol for a RetrospectiveCohort Study of Danish Children and Adolescents Referred to a National Gender Identity Service," *Journal of Clinical Medicine* 13 (2024), https://doi.org/10.3390/jcm13226658.

[69] Norwegian Healthcare Investigation Board (Ukom), "Pasientsikkerhet for barn og unge medkjønnsinkongruens [Patient safety for children and adolescents with gender incongruence]," March 2023, https://ukom.no/rapporter/pasientsikkerhet-for-barn-og-unge-med-kjonnsinkongruens/sammendrag.

[70] Jennifer Block, "Norway's guidance on paediatric gender treatment is unsafe, says review," *BMJ* 380 (2023), doi:10.1136/bmj.p697.

[71] Alvise Armellini, "Italy moves to tighten controls on gender-affirming medical care for minors," *Reuters*, August 5, 2025, https://www.reuters.com/business/healthcare-pharmaceuticals/italy-moves-tighten-controlsgender-affirming-medical-care-minors-2025-08-05/.

[72] AFP, "Brazil prohibits hormone therapy for transgender minors," *MSN News*, April 20, 2025, https://www.msn.com/en-in/news/other/brazil-prohibits-hormone-therapy-for-transgender-minors/arAA1D66l7.

[73] Australian Associated Press, "Queensland halts prescription of puberty blockers and hormones for children with gender dysphoria," *The Guardian*, January 28, 2025, https://www.theguardian.com/australianews/2025/jan/28/queensland-halts-prescription-of-puberty-blockers-and-hormones-for-children-with-genderdysphoria

[74] HHS Review pg. 256

# EXHIBIT 2

 An official website of the United States government

**U.S. DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES**

Press Room </press-room/index.html>    T+  🖨  ⤳

Navigate to:

**FOR IMMEDIATE RELEASE**
**November 19, 2025**

**Contact: HHS Press Office**

202-690-6343
Submit a Request for
Comment

# HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures

**WASHINGTON, NOV. 19, 2025** — The U.S. Department of Health and Human Services (HHS) today published *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* <https://opa.hhs.gov/gender-dysphoria-report>, its peer-reviewed <https://opa.hhs.gov/gender-dysphoria-report-peer-reviews> study of the medical dangers posed to children from attempts to change their biological sex.

The report, released through the Office of the Assistant Secretary for Health, finds that the harms from sex-rejecting procedures — including puberty blockers, cross-sex hormones, and surgical operations — are significant, long term, and too often ignored or inadequately tracked. These conclusions confirm President Trump's Make

America Healthy Again Commission's findings that unnecessary procedures and long-term health risks such as infertility are the byproduct of the overmedicalization of children.

"The American Medical Association and the American Academy of Pediatrics peddled the lie that chemical and surgical sex rejecting procedures could be good for children," **said Health and Human Services Secretary Robert F. Kennedy, Jr.** "They betrayed their oath to first do no harm, and their so called 'gender affirming care' has inflicted lasting physical and psychological damage on vulnerable young people. That is not medicine — it's malpractice."

"This report marks a turning point for American medicine," said **National Institutes of Health Director Jay Bhattacharya, MD, PhD**. "The evidence in it meticulously documents the risks the profession has imposed on vulnerable children. At the NIH, we are committed to ensuring that science, not ideology, guides America's medical research."

"What are we going to tell the young people who can't have children because the medical profession stole that from them?" said **Assistant Secretary for Health Brian Christine, MD.** "Our report is an urgent wake up call to doctors and parents about the clear dangers of trying to turn girls into boys and vice versa."

Before submitting its report for peer review, HHS commissioned the most comprehensive study to date of the scientific evidence and clinical practices surrounding the treatment of children and adolescents for "gender dysphoria." The authors were drawn from disciplines and professional backgrounds spanning medicine, bioethics, psychology, and philosophy.

- **Evgenia Abbruzzese**, Society for Evidence Based Gender Medicine

- **Alex Byrne, PhD**, Massachusetts Institute of Technology

- **Farr Curlin, MD**, Duke University

- **Moti Gorin, PhD, MBE**, Colorado State University

- **Kristopher Kaliebe, MD, DFAACAP**, University of South Florida

- **Michael K. Laidlaw, MD**, Michael K. Laidlaw MD, Inc.

- **Kathleen McDeavitt, MD**, Baylor College of Medicine

- **Leor Sapir, PhD**, Manhattan Institute for Policy Research

- **Yuan Zhang, PhD**, Evidence Bridge

HHS invited the American Academy of Pediatrics and the Endocrine Society to contribute their evidence to this report. Both organizations declined to participate.

###

---

Note: All HHS press releases, fact sheets and other news materials are available in our Press Room </press-room/index.html>.
Like HHS on Facebook, follow HHS on X @HHSgov <https://x.com/hhsgov>, @SecKennedy <https://x.com/seckennedy>, and sign up for HHS Email Updates <https://cloud.connect.hhs.gov/subscriptioncenter>.
Last revised: November 19, 2025

## Submit a request for comment

For media inquiries, please submit a request for comment.

## Sign up to receive our press releases

### Sign Up

<https://cloud.connect.hhs.gov/news-sign-up>

# Related Press Releases

**FDA Launches Assessment of BHA, a Common Food Chemical Preservative** </press-room/fda-launches-assessment-bha-common-food-chemical-preservative.html>

FEBRUARY 10, 2026 │ PRESS RELEASE

**FDA Takes New Approach to "No Artificial Colors" Claims** </press-room/fda-takes-new-approach-no-artificial-colors-claims.html>

FEBRUARY 5, 2026 │ PRESS RELEASE

**Secretary Kennedy Announces $100 Million Investment in Great American Recovery** </press-room/secretary-kennedy-announces-100-million-investment-great-american-recovery.html>

FEBRUARY 2, 2026 │ PRESS RELEASE

Content created by Assistant Secretary for Public Affairs (ASPA)
Content last reviewed November 19, 2025

# **EXHIBIT 3**



December 06, 2024

# As chair, FTC commissioner touts he'd pull back on AI and fight trans care

**A Federal Trade Commission member** is lobbying President elect **Donald Trump** to make him the agency's chair by promising to "fight back against the trans agenda," deemphasize artificial intelligence initiatives and subordinate the independent agency to the will of the incoming president.

**In a resume-style** [document](#) obtained by Punchbowl News, **Andrew Ferguson** said he'd "end the FTC's attempt to become an AI regulator" and "prosecute collusion on DEI," while keeping the agency's focus trained on "Big Tech monopolies," particularly on censorship.

SKIP TO CONTENT

d as the front runner to replace Democratic Chair **Lina Khan.** Ferguson's eye for Trump's pet issues and a willingness to push conservative legal epublicans at government agencies have done previously.

**Take the trans issues,** for instance. Ferguson said he would:

> Investigate the doctors, therapists, hospitals, and others who deceptively pushed gender confusion, puberty blockers, hormone replacement, and sex-change surgeries on children and adults while failing to disclose strong evidence that such interventions are not helpful and carry enormous risks.

**Ferguson's idea** is to wield the FTC's history of policing quack health claims in service of the conservative backlash to transgender health care, especially for minors.

**Ditto the pledge** to "investigate and prosecute collusion on DEI, ESG, advertiser boycotts, etc." The agency has the power to look into cartels, though the Justice Department generally takes the lead on the issue.

**Some of Ferguson's ideas** would delight both the conservatives who want the FTC to get out of the way of mergers and acquisitions, as well as those who like Khan's history of targeting Big Tech firms. Trump has seemed to be in both camps at times.

**As chair,** Ferguson would "stop Lina Khan's war on mergers," the document says. But he'd also use the FTC to stop Big Tech firms "from using their market power to box out new entrants and stymie innovation."

**It's not immediately clear** when or if Ferguson sent his plea to Trump's transition team. The president elect, however, has been moving swiftly to name officials for his next administration, including the Federal Communications Commission's chair and the [head](#) of DOJ's antitrust division.

**The FTC** did not respond to requests for comment. In a statement, Trump transition spokeswoman **Karoline Leavitt** said Trump "has made brilliant decisions on who will serve in his second Administration at lightning pace."

**"Remaining decisions** will continue to be announced by him when they are made," Leavitt added.

**Answering to Trump.** Ferguson laid out his plan to align the FTC bureaucracy with Trump's desire for more power over government agencies and policy. The prospective chair would "terminate uncooperative bureaucrats" and take "on entrenched left-wing ideologues" who work at the agency.

**Ferguson also asserts:** "The Constitution requires that all federal employees, even the heads of so-called independent agencies, answer to the President."

**Supreme Court precedent** says that FTC commissioners are independent operators whom the president can't fire over policy differences. Although commissioners are often partisan figures, the agency treasures its independence. Conservatives howled about Khan's appearances with President **Joe Biden,** for instance.

**Conservative legal academics** have long tried to argue, though, that presidents can actually fire commissioners. They also claim Congress could not have given away power in the first place to an ~~...~~ into the three branches of government.

SKIP TO CONTENT

~~...~~on, who was a counsel to Senate Minority Leader **Mitch McConnell** as well as the Senate Judiciary Committee, also played up his previous work on behalf of Trump. Ferguson said he has "proven loyalty."

**Among his major accomplishments,** Ferguson lists his work during the confirmation hearings of Supreme Court Justices **Brett Kavanaugh** and **Amy Coney Barrett.**

**Ferguson also brags** that he was the "Senate staff architect of President Trump's two impeachment acquittals."

*- Ben Brody*

  

**TECH**



**PRESENTED BY ACS CAN**

Thank you Congress for prioritizing funding for cancer cures and a pathway to cancer innovation in Medicare.

**RELATED**

## Cotton, McConnell press FTC, DOJ on antitrust leaks

The senators point to twelve instances since 2023 when Bloomberg broke stories about antitrust authorities like the FTC and Justice Department preparing to take legal action against major players.

**VAULT • FINANCE + ECONOMY**

## FTC's Slaughter backs Khan for chair as tech eyes her for the role

**TECH**

## 'Out and out brawl': Khan supporters ready to fight to protect FTC chair

**TECH**

Editorial photos provided by Getty Images  Political ads courtesy of AdImpact

SKIP TO CONTENT



PRESENTED BY ACS CAN



Thank you Congress for prioritizing funding for cancer cures and a pathway to cancer innovation in Medicare.

---

**PUNCHBOWL NEWS**

Careers

Become a Sponsor

Terms of Service

Privacy Policy

**PRICING**

Pricing

Group Plans

Portal with Enbloc AI

Pricing and Payment Terms

**GET IN TOUCH**

Contact Us

Media Inquiries

Memberships

Advertising

**STAY CONNECTED**

Youtube

Facebook

Instagram

LinkedIn

X / Twitter

© 2026 Punchbowl News  All rights Reserved  Punchbowl News, Capitol Dome, Power People Politics, The Tally, Canvass, The Daily Punch are trademarks of AJ Press LLC

# EXHIBIT 4

# FTC Commissioner Andrew N. Ferguson for FTC Chairman

Commissioner Ferguson is the America First, pro-innovation choice for Chairman of the Federal Trade Commission. Ferguson has impeccable legal credentials, proven loyalty to President Donald Trump, and a track record of standing up to Big Tech Censorship, DEI-wokeism, and the anti-business, anti-innovation agenda of the radical left. President Trump can designate Ferguson as Chairman of the FTC on Day 1 of the Trump Administration – no Senate confirmation is needed for sitting FTC Commissioners to become Chairman, and his term does not expire until 2030.

## Major Accomplishments

- Sued the Biden Administration to halt its lawless environmental, immigration, and gun policies.
- Directed Virginia Attorney General's efforts to bring down the Department of Homeland Security's "Disinformation Board."
- Represented Virginia and numerous other States in a landmark antitrust suit against Google's ad-tech monopoly.
- Successfully fought to end the Biden FTC's anti-business policy of refusing to end merger investigations early and allow firms to close their deals as soon as the FTC finds no competitive harm ("early termination").
- Oversaw the effort to confirm President Trump's judicial nominations in the Senate, transforming the Supreme Court as well as the lower courts. Lead staffer for both the Kavanaugh and Barrett nominations.
- Senate staff architect of President Trump's two impeachment acquittals.

## Agenda for the FTC

### Reverse Lina Khan's Anti-Business Agenda

- Repeal burdensome regulations and provide businesses with the certainty they need. Businesses deserve to know what they can and can't do.
- Support strong American companies that can beat foreign competitors. Foster innovation that improves our quality of life and makes our country greater than ever before.
- Stop Lina Khan's war on mergers. Most mergers benefit Americans and promote the movement of the capital that fuels innovation. Focus FTC resources on the mergers that harm competition and hinder innovation, while permitting mergers that keep capital flowing to innovators.
- End the FTC's attempt to become an AI regulator.
- No more novel and legally dubious consumer protection cases. Demand honesty and fairness to consumers, but businesses should not fear that the FTC will punish them for honest conduct that offends the sensibilities of beltway bureaucrats.
- Stop abusing FTC enforcement authorities as a substitute for comprehensive federal privacy legislation.

### Hold Big Tech Accountable and Stop Censorship

- Focus antitrust enforcement against Big Tech monopolies, especially those companies engaged in unlawful censorship.
- Pursue structural and behavioral legal remedies under the antitrust laws and the FTC Act to make sure large platforms treat all Americans fairly and to prevent them from using their market power to box out new entrants and stymie innovation.

### Protect Freedom of Speech and Fight Wokeness

- Investigate and prosecute collusion on DEI, ESG, advertiser boycotts, etc.
- End Lina Khan's politically motivated investigations.
- Terminate all initiatives investigating so-called "disinformation," "hate speech" or AI "bias."
- End the FTC's attacks on online anonymity.
- Fight back against the trans agenda. Investigate the doctors, therapists, hospitals, and others who deceptively pushed gender confusion, puberty blockers, hormone replacement, and sex-change surgeries on children and adults while failing to disclose strong evidence that such interventions are not helpful and carry enormous risks.
- Stop pursuing cases under lawless disparate impact discrimination theories. Such cases are designed to force companies to adopt de facto quotas and affirmative action policies.

### Fight the Bureaucracy to Implement President Trump's Agenda

- The Constitution requires that all federal employees, even the heads of so-called independent agencies, answer to the President.
- Terminate uncooperative bureaucrats.
- Advance the President's agenda by taking on entrenched left-wing idealogues at the FTC who take their agenda from liberal journalists and activists. Only a strong, Trump-aligned Chairman can resist their influence.

## Biographical Highlights

- Solicitor General of Virginia
- Law Clerk to Supreme Court Justice Clarence Thomas. Also clerked on D.C. Circuit. B.A. & J.D. from the University of Virginia.
- Chief counsel for nominations to the Senate Judiciary Committee.
- Chief Counsel to Senate Majority Leader Mitch McConnell. Ferguson served as a strong voice that supported President Trump's agenda within McConnell's office.

## Excerpts from Ferguson's Statements on FTC Matters

Concurring and Dissenting Statement on the Social Media 6(b) Report (link):

» The Report says nothing about the **banning of politicians (including Donald Trump while he was serving as President of the United States)**, about the removal and demonetization of users who challenge the Silicon Valley political consensus, nor about one of **the most brazen acts of election interference in recent history: the coordinated suppression by social media companies of the Hunter Biden laptop story in the leadup to the 2020 presidential election.**

» We have seen what happens when social media companies prioritize their views—or the government's view—of "quality" over the preferences of their users. Over the past decade, these companies have enforced a restrictive censorship regime on Americans' online speech. **They have adopted Orwellian policies banning nebulous categories of content like "misinformation," "disinformation," and "hate speech"—categories that in practice mean only any content that challenges the Silicon Valley elite consensus on [any issue] where free thought is inconvenient to those in charge.**

» [Chair Khan's] Report also notes that many social media and video streaming companies have "inhouse experts, such as ethicists, social and political scientists, [and] policy experts" who are responsible for addressing "ethics, bias, inclusion, and fairness" in AI technology. [Khan's] Report suggests that this is a good thing and that the companies need more of them, preferably with binding authority over the rest of the company. **But the truth is that these AI safety groups, as they are often called, have proven to be little more than rebranded versions of the DEI bureaucracies that have infected America's businesses and colleges.**

» **Tacking on threats to the end of a report and calling them "recommendations" is not good government; it is bureaucratic bullying.**

Dissenting Statement In the Matter of Rytr LLC (link):

» The Commission's aggressive move into AI regulation is premature. … Doomsayers warn that AI will take our jobs, hopelessly blur the distinction between fact and fiction, and maybe even threaten the survival of human civilization. AI companies do not forcefully resist all these claims, given that predictions about the incredible potential for AI may be useful as these companies compete for investment dollars and engineering talent. But the Commission should not succumb to the panic or hype. Generative AI technology is impressive, but it is also nascent. Neither its naysayers nor its cheerleaders really understand its potential, or whether it represents substantial progress toward "artificial general intelligence" (AGI)—machine intelligence matching both the breadth and power of the human mind, the holy grail of AI research. **That ignorance is not a reason to plunge headlong with aggressive regulation. It is a reason to stay our hand.**

» As our country has always done, we should give this industry the space to realize its full potential—whatever that turns out to be. America is the greatest commercial power in the history of the world in no small part because of its tolerant attitude toward innovation and new industry. **There has never been a better place in the world to have a new idea than the United States. We should go to great lengths to ensure that remains the case.**

Dissenting and Concurring Statement In the Matter of H&R Block, Inc. (link):

» The election of the President is thus the key to constitutional self-government for the executive branch. If the President supervises and directs subordinate officers, then the people control them because the President answers directly to the people. But if the President does not control subordinate officers, then neither do the people. The administrative state would rule the roost, governing in favor of its own interests without regard to the people's needs. … The power to appoint is critical to setting the governing agenda. **The power to remove, and the obedience that the fear of removal instills, ensures the agenda's execution. The removal power is also the key to reforming the administrative state.** The President could hardly reform the government if he were stuck with the officers responsible for the problems he was trying to fix. And the removal power must extend beyond merely officers who openly disobey his orders. Subtle forms of disagreement and bureaucratic mischief can strangle policy reforms in their cradle. The President therefore must have the power to remove not just disobedient officers, but also those whom he concludes do not support his governing agenda.

# **EXHIBIT 5**

# US FTC workshop criticizing medical care for transgender youth draws staff opposition

By Jody Godoy

July 2, 20256:43 PM EDT - Updated July 2, 2025

Item 1 of 2 United States Federal Trade Commission logo and U.S. flag are seen in this illustration created on April 23, 2025. REUTERS/Dado Ruvic/Illustration/File Photo



[1/2]United States Federal Trade Commission logo and U.S. flag are seen in this illustration created on April 23, 2025. REUTERS/Dado Ruvic/Illustration/File Photo Purchase Licensing Rights, opens new tab



[2/2]Demonstrators attend a Transgender Day of Visibility rally on the National Mall in Washington, D.C., U.S., March 31, 2025. REUTERS/Evelyn Hockstein/File Photo Purchase Licensing Rights

Summary

- Group of FTC staff oppose workshop on transgender youth healthcare
- FTC's consumer protection authority does not cover doctor-patient relationship, staff say
- FTC spokesperson says staff who oppose workshop can quit

July 2 (Reuters) - Some staff members at the U.S. Federal Trade Commission have raised concerns about a planned workshop by the agency on what it calls the dangers of gender-affirming medical care for transgender youth, saying it oversteps the FTC's consumer-protection authority, according to a letter seen by Reuters.

The workshop "would chart new territory for the Commission by prying into confidential doctor-patient consultations," the group of staff wrote in an anonymous statement of concern, opens new tab sent to members of Congress.

"Simply put, in our judgment, this is not the FTC's lane," they said.

The workshop, opens new tab is part of a larger campaign to curtail trans rights during President Donald Trump's second term. Trump issued orders in his first days in office stating the U.S. government does not recognize gender identity apart from "an individual's immutable biological classification as either male or female" and cutting funding for gender-affirming care for youth. That policy faces a court challenge.

FTC Chairman Andrew Ferguson, a Republican who was appointed to the Commission by former President Joe Biden and named its chair by Trump in January, has sought to use the FTC's antitrust and consumer-protection authority to tackle conservative issues, such as perceived online censorship.

Gender transition treatments, often called gender-affirming care, can include puberty-blocking drugs, hormones and sometimes surgery. The American Academy of Pediatrics has said that gender-affirming care can improve mental health for minors with gender dysphoria, and the organization opposed policymakers interfering in the doctor-patient relationship. Conservative lawmakers in 25 states have passed laws restricting minors from receiving the treatments.

The FTC has broad consumer-protection authority to bring enforcement actions against unfair or deceptive business practices. In announcing the workshop, the FTC said that authority could apply if "medical professionals or others omitted warnings about the risks or made false or unsupported claims about the benefits and effectiveness of gender-affirming care for minors."



Meta CEO Mark Zuckerberg testified in court on Wednesday that the Facebook and Instagram operator does not allow kids under 13 on its platforms,

2

The theory would intrude on the doctor-patient relationship and risk politicizing the agency's work, the letter said. The letter called on Ferguson to cancel the event, or alternatively to open a 60-day public comment period for the commission to hear a broader range of views.

FTC spokesperson Joe Simonson said in a statement that "staff who oppose a workshop designed to better understand the concerns of tens of millions of parents, children, and medical professionals are free to resign."

"No sane person could endorse the needless mutilation of children. Every American should be troubled by the possibility that parents and their children were misled about the use of medical 'therapies' that may have caused serious harm," he said.

The staff letter also raised concerns that the workshop created a hostile work environment for the agency's LGBTQ employees, given the views expressed by some of the invited speakers.

"It is unacceptable to subject our LGBTQ+ colleagues—in their place of work—to individuals who deny their existence and disrespect their humanity," the staff wrote.

Staff who signed the letter did so anonymously for fear of retaliation, while some others opposed the effort out of concern that even an anonymous letter would trigger reprisals, according to sources familiar with the effort.

Biden urged the FTC in 2022 to use its consumer-protection authority to review whether "conversion therapy," intended to change a minor's sexual orientation or gender identity, could be considered an unfair or deceptive business practice. The FTC, then led by Lina Khan, did not take any public action.

3

# **EXHIBIT 6**



**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

For Release

# FTC Announces Workshop on Exploring Unfair or Deceptive Trade Practices in "Gender-Affirming Care" for Minors

The workshop will include presentations from doctors, specialists, medical ethicists, whistleblowers, detransitioners, and parents.

June 9, 2025

**Tags:** Consumer Protection | Commissioners | Health Care

Today the Federal Trade Commission announced it will host a workshop focusing on unfair or deceptive trade practices in "gender-affirming care" for minors. The workshop, called "The Dangers of 'Gender-Affirming Care' for Minors," will take place on July 9, 2025, in Washington, DC and will be streamed online. A link to watch the webcast will be posted the morning of the event to FTC.gov

The agenda for the workshop, which will be released prior to the event, will include doctors, medical ethicists, whistleblowers, detransitioners, and parents of detransitioners. These participants will share perspectives grounded in research, expertise, and personal experience.

The workshop is being convened following President Trump's executive order ending the federal government's previous support for "gender-affirming care" for minors. The order asserted that "medical professionals are maiming and sterilizing a growing number of impressionable children under the radical and false claim that adults can change a child's sex through a series of irreversible medical interventions."

Section 5 of the Federal Trade Commission Act gives the FTC broad authority to protect consumers from unfair or deceptive acts or practices. This authority could be implicated if there is evidence that

medical professionals or others omitted warnings about the risks or made false or unsupported claims about the benefits and effectiveness of gender-affirming care for minors.

The workshop will help the FTC to understand whether consumers are being or have been exposed to false or unsupported claims about "gender-affirming care" and to gauge the harms consumers may be experiencing.

For the safety of participants, in-person attendance at the event will be invitation only. Members of the public or press who wish to attend may emai  healthcareworkshop@ftc.gov to indicate interest.

The Federal Trade Commission works to promote competition and protect and educate consumers. The FTC will never demand money, make threats, tell you to transfer money, or promise you a prize. Learn more about consumer topics at consumer.ftc.gov, or report fraud, scams, and bad business practices at ReportFraud.ftc.gov. Follow the FTC on social media, read consumer alerts and the business blog, and sign up to get the latest FTC news and alerts.

## Contact Information

## Media Contact

Joe Simonson
Office of Public Affairs

# EXHIBIT 7

**Request for Public Comment Regarding "Gender-Affirming Care" for Minors**

The Federal Trade Commission (FTC) invites public comment to better understand how consumers may have been exposed to false or unsupported claims about "gender-affirming care" (GAC), especially as it relates to minors, and to gauge the harms consumers may be experiencing.

Proponents of GAC, including healthcare and medical institutions, have long touted the benefits of this type of care, including for minors. Over time, however, reporting by multiple news outlets,[1] personal accounts by parents and detransitioners,[2] disclosures by whistleblowers, independent reviews and studies,[3] and even information and communications from institutions promoting these practices[4] have revealed potential deceptive or unfair practices involved in this type of medical care.

On June 18, 2025, after considering a wide range of authoritative sources including lawyers, families, and medical professionals with years of expertise in this field, the Supreme Court in *Skrmetti v. United States* affirmed the constitutionality of Tennessee's Senate Bill 1, a law that prohibits GAC for minors.[5] According to the Court, there are now "fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments in [the] evolving field" of transgender medicine. Participants in these debates "raise sincere concerns; the implications for all are profound."[6] Although the purported benefits of providing GAC for minors are reduced suicidality and improved mental health, a growing chorus of experts now publicly contradict these claims.

There remains widespread concern about the harms of GAC for minors, which has caused government officials to act both in the United States and abroad. On January 28, 2025, President Trump signed an executive order ending the federal government's previous support for GAC for minors.[7] More than two dozen states have passed laws like Tennessee Senate Bill 1 that prohibit GAC for minors.[8] Other countries have taken similar action. The United Kingdom's National Health Service (NHS), for example, stopped providing puberty suppressing hormones, or puberty blockers, to children "because there is not enough evidence on their clinical safety and

---

[1] E.g., Helen Lewis, *The Liberal Misinformation Bubble About Youth Gender Medicine*, The Atlantic (June 29, 2025), https://www.theatlantic.com/ideas/archive/2025/06/transgender-youth-skrmetti/683350/.

[2] E.g., Prisha Mosley, *I Began "Gender Transition" At 16. I Was Lied To In A Terrible Way. Now I Am Seeking Justice*, IWF (Jul. 27, 2023), https://www.iwf.org/2023/07/27/i-began-gender-transition-at-16-i-was-lied-to-in-a-terrible-way-now-i-am-seeking-justice/; *How One Detransitioner Found Peace Outside of Medicalization*, iWFeatures (May 18, 2023), https://www.iwfeatures.com/documentary/how-one-detransitioner-found-peace-outside-of-medicalization/.

[3] *E.g.*, Dr. Hilary Cass, *Independent Review of Gender Identity Services for Children and Young People: Final Report* (Apr. 2024), https://cass.independent-review.uk/home/publications/final-report/.

[4] Azeen Ghorayshi, *U.S. Study on Puberty Blockers Goes Unpublished Because of Politics, Doctor Says*, N.Y. Times (Oct. 23, 2024), https://www.nytimes.com/2024/10/23/science/puberty-blockers-olson-kennedy.html.

[5] 605 U.S. ---, 145 S. Ct. 1816 (2025).

[6] *Id.* at 1837.

[7] Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025).

[8] Annette Choi, *27 states have passed laws restricting gender-affirming care for trans youth,* CNN (Apr. 30, 2025), https://www.cnn.com/politics/state-ban-gender-affirming-care-transgender-dg.

effectiveness."[9] And other European countries like Finland, Sweden, Norway, and Denmark have similarly restricted or banned various GAC procedures for minors.[10]

At the same time, some medical organizations continue to advocate for GAC as the best standard of care, despite the apparent lack of a widespread medical consensus as to whether GAC is the correct course of action for gender dysphoric youth. Many of these organizations rely on the World Professional Association of Transgender Health (WPATH), which continues to loosen its restrictions and standards regarding GAC for minors, despite increasing professional debate over gender transition protocols.[11]

Against this backdrop, the FTC seeks to evaluate whether consumers (in particular, minors) have been harmed by GAC and whether medical professionals or others may have violated Sections 5 and 12 of the FTC Act by failing to disclose material risks associated with GAC or making false or unsubstantiated claims about the benefits or effectiveness of GAC. As the agency that has been historically tasked as the federal government's guardian against deceptive health claims and has brought dozens of enforcement actions in this area, the FTC is uniquely positioned to investigate this potentially unlawful activity.

On July 9, the FTC held a workshop during which the Commission heard testimony from doctors, medical ethicists, whistleblowers, detransitioners, and parents of detransitioners. That testimony indicated that GAC practitioners may be actively deceiving consumers. The FTC now seeks input from the public, especially from those who have personal experience with GAC. The FTC encourages members of the public to comment on any issues or concerns that are relevant to the FTC's consideration of these topics, including by submitting any written data, advertisements, social media posts, disclosures, or empirical research. In particular, the FTC invites public comment on the following questions:

1. Have you or a family member ever visited a medical professional or other organization that recommended gender-affirming care ("GAC")? If so, describe your experience, including the following (if applicable):

   a. What led to their recommendation?
   b. What specific treatments did they recommend?
   c. Did the GAC practitioner describe the benefits or effectiveness of GAC?
   d. If you answered yes to 1.c, how did they describe the benefits or effectiveness?
   e. Did they provide to you any materials from what they claimed were authoritative sources that described the benefits or effectiveness of undergoing GAC?

---

[9] Treatment: Gender dysphoria, NHS (May 28, 2020), https://www.nhs.uk/conditions/gender-dysphoria/treatment/.

[10] Joshua P. Cohen, *Increasing Number Of European Nations Adopt A More Cautious Approach To Gender-Affirming Care Among Minors*, Forbes (June 6, 2023), https://www.forbes.com/sites/joshuacohen/2023/06/06/increasing-number-of-european-nations-adopt-a-more-cautious-approach-to-gender-affirming-care-among-minors/.

[11] Azeen Ghorayshi, *Biden Officials Push to Remove Age Limits for Trans Surgery*, Documents Show, N.Y. Times (June 25, 2024), https://www.nytimes.com/2024/06/25/health/transgender-minors-surgeries.html.

f.   Did they provide you with any materials from other sources describing the benefits or effectiveness of undergoing GAC?

g.   Did they describe the risks, side effects, or other harms that could come about because of undergoing GAC?

h.   If you answered yes to 1.g, how did they describe those risks, side effects, or other harms?

i.   Did they provide to you any materials from what they claimed were authoritative sources that described the risks, side effects, or other harms that could come about because of undergoing GAC?

j.   Did they provide you with any materials from other sources describing the risks, side effects, or other harms that could come about because of undergoing GAC?

k.   Did the GAC practitioner alert you to any professional or political controversy surrounding the existing debate on the science of GAC?

l.   Did the GAC practitioner inform you that some states have prohibited GAC for minors?

m.  Did the GAC practitioner attempt to persuade you or a family member to undergo GAC? Please be specific.

2. Have you or a family member ever undergone GAC? If so, describe your experience, including the following (if applicable):

a.   What specific treatments did you or your family member undergo?

b.   Have you or your family member experienced harms or adverse effects resulting from the GAC procedures?

c.   Have you or your family member experienced any benefits resulting from the GAC procedures?

d.   If you answered yes to 2.b, what harms or adverse effects did you or your family member experience resulting from the GAC procedures?

e.   If you answered yes to 2.b, was the risk of these harms or adverse effects explained or disclosed prior to undergoing GAC procedures?

f.   If you answered yes to 2.b and 2.c, did the harms or adverse effects resulting from the GAC procedures outweigh any benefits, or vice versa?

3. Are you aware of any practitioners, entities, or institutions providing GAC that have made false representations regarding the benefits or effectiveness of GAC? If so, describe, including the following:

a.   What practitioners, entities, or institutions?

b.   What were the false representations?

c.   How were the false representations made (e.g., in-person, conference, social media posts, websites)?

4. Are you aware of any individuals, entities, or institutions that have promoted, advertised, or otherwise made public representations about GAC procedures or GAC-related products? If so, describe, including the following:

   a. What entities, individuals, or institutions?
   b. What were the representations?
   c. Where did the representations appear (e.g., in-person, conferences, social media posts, websites)?
   d. Did any of the representations tout the effectiveness or benefits of GAC procedures or related products?
   e. Did any of the representations discuss the risks, side effects, or other harms of GAC procedures or related products?
   f. If any of these representations were made in social media posts made by influencers, did the posts indicate if there was any material connection between the influencer and any provider of GAC procedures or maker of any GAC-related product?

Comments must be received no later than **Friday, September 26, 2025 by 11:59pm ET**.

**Instructions for submitting:**

1. Go to the docket on regulations.gov

2. Click "Browse Documents"

3. Underneath the document containing the RFI questions, click comment (the blue button)

4. Fill out the form which requires:

   4.1. The comment text itself

   4.2. The comment category

5. You can submit as: an individual, an organization, or anonymous

   5.1. Optional: Attachments to aid your response. You can attach up to 20 files, but each file cannot exceed 10MB. Valid file types include: bmp, docx, gif, jpg, jpeg, pdf, png, pptx, rtf, sgml, tif, tiff, txt, wpd, xlsx, xml.

**Confidentiality:**

Because comments responsive to this RFI are likely to include sensitive health information protected from disclosure by 5 U.S.C. § 552 and 16 C.F.R. § 4.10(a)(4), such information will be redacted prior to posting unless you inform us in writing by stating in your comment, "I affirmatively consent to this comment being published without redaction of sensitive health information."

Please DO NOT include other forms of sensitive or confidential information in comments submitted through Regulations.gov including:

- social security numbers;
- dates of birth;
- driver's license numbers or other state identification numbers;
- financial account information;
- competitively sensitive information.

If you include such information in your comment, it will be redacted prior to publication.

Comments submitted through Regulations.gov will be posted on the Internet and made available to the public. Posted comments will include commenters' names and any other content that is not subject to the redactions described above. Comments submitted in response to this RFI could inform the FTC's enforcement priorities and future actions.

**If you want to submit a confidential, non-public comment for consideration, DO NOT submit through Regulations.gov.** Instead, please send the comment, along with a request for confidential treatment, to ElectronicFilings@ftc.gov or via mail to the attention of the Office of the Secretary. The communication should reference the Regulations.gov docket number, FTC-2025-0264. Per FTC Rule 4.9(c), "Persons submitting material to the Commission … may designate that material or portions of it confidential and request that it be withheld from the public record. All requests for confidential treatment shall be supported by a showing of justification in light of applicable statutes, rules, orders of the Commission or its administrative law judges, orders of the courts, or other relevant authority." 16 C.F.R. § 4.9(c). The FTC's Office of General Counsel (OGC) will review requests for confidential treatment. If OGC grants the request for confidential treatment in full, the comment will be available for consideration by FTC staff but will not be posted on Regulations.gov. If OGC denies the request for confidential treatment, it will notify the submitter and provide them with ten business days to withdraw the comment. If the submitter requests that the comment be withdrawn, the comment will not be posted on Regulations.gov or otherwise become public.

# EXHIBIT 8

 **Andrew Ferguson** ✓
@AFergusonFTC

⌀ ···

This report is exactly why the @FTC is investigating these practices. Great work @RobertKennedyJr.

---

 **Jane Coleman** ✓ @JaneBColeman · Nov 19, 2025

Today, the @HHSGov released its peer-reviewed report discrediting "gender-affirming care" –

"HHS invited the American Academy of Pediatrics and the Endocrine Society to contribute their evidence to this report. Both organizations declined to …

---

**U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES**
www.hhs.gov/news | 202-690-6343

**FOR IMMEDIATE RELEASE**

**HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures**

**WASHINGTON—NOVEMBER 19, 2025—**The U.S. Department of Health and Human Services (HHS) today published *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, its peer-reviewed study of the medical dangers posed to children from attempts to change their biological sex.

The report, released through the Office of the Assistant Secretary for Health, finds that the harms from sex-rejecting procedures — including puberty blockers, cross-sex hormones, and surgical operations — are significant, long term, and too often ignored or inadequately tracked. These conclusions confirm President Trump's Make America Healthy Again Commission's findings that unnecessary procedures and long-term health risks such as infertility are the byproduct of the overmedicalization of children.

"The American Medical Association and the American Academy of Pediatrics peddled the lie that chemical and surgical sex-rejecting procedures could be good for children," said **Health and Human Services Secretary Robert F. Kennedy, Jr.** "They betrayed their oath to first do no harm, and their so-called 'gender-affirming care' has inflicted lasting physical and psychological damage on vulnerable young people. That is not medicine — it's malpractice."

"This report marks a turning point for American medicine," said **National Institutes of Health Director Jay Bhattacharya, MD, PhD**. "The evidence in it meticulously documents the risks the profession has imposed on vulnerable children. At the NIH, we are committed to ensuring that science, not ideology, guides America's medical research."

"What are we going to tell the young people who can't have children because the medical profession stole that from them?" said **Assistant Secretary for Health Brian Christine, MD**. "Our report is an urgent wake up call to doctors and parents about the clear dangers of trying to turn girls into boys and vice-versa."

Before submitting its report for peer review, HHS commissioned the most comprehensive study to date of the scientific evidence and clinical practices surrounding the treatment of children and adolescents for "gender dysphoria." The authors were drawn from disciplines and professional backgrounds spanning medicine, bioethics, psychology, and philosophy.

- **Evgenia Abbruzzese**, Society for Evidence Based Gender Medicine
- **Alex Byrne, PhD**, Massachusetts Institute of Technology
- **Farr Curlin, MD**, Duke University
- **Moti Gorin, PhD, MBE**, Colorado State University
- **Kristopher Kaliebe, MD, DFAACAP**, University of South Florida

---

4:27 PM · Nov 19, 2025 · **24.3K** Views

# EXHIBIT 9

## Statement of Concern Dated July 2, 2025
## from FTC Employees on the
## FTC's July 9 Workshop on Gender-Affirming Care

*The following statement has been composed strictly on personal time and devices. None of the signatories purport to speak for the Federal Trade Commission, any individual Commissioner, or any other component of the agency. The signatories speak only in their personal capacities to blow the whistle about potential mismanagement, waste of funds, abuse of authority, creation of a hostile work environment, and threats to public health posed by the FTC's workshop.*

The signatories are concerned about the FTC's recent announcement that it will host a workshop called "The Dangers of 'Gender-Affirming Care' for Minors" on July 9, 2025. The workshop's title, agenda, and the announcement's use of charged language suggest the Commission has already taken a position opposing gender-affirming care for minors.

The press release states that the FTC's authority "could be implicated if there is evidence that medical professionals or others omitted warnings about the risks or made false or unsupported claims about the benefits and effectiveness of gender-affirming care for minors." This expansive oversight theory would chart new territory for the Commission by prying into confidential doctor-patient consultations.

Regulation of the practice of medicine falls under the jurisdiction of state licensing boards, not the FTC. To be sure, the FTC has challenged deceptive commercial speech promoting widely advertised health products. For example, the FTC has sued many companies for false online advertisements claiming that an over-the-counter drug will cause rapid weight loss. But the FTC has not historically intervened in the confidential, individualized advice given across a series of professional, consent-based appointments protected by the doctor-patient relationship. This is a critical distinction between past consumer protection law enforcement matters concerning health and what the Commission now appears ready to police.

The FTC's mandate is to address unfair or deceptive practices in interstate commerce—not to second-guess established medical standards widely accepted by experts in the field, based on their professional judgment,[1] or to overrule clinical and familial decision-making. Simply put, in our judgment, this is not the FTC's lane.

Straining the FTC's legal authority to intrude on the doctor-patient relationship is even more troubling when it relates to a politically charged topic, as it risks casting the FTC as a partisan actor. This can only diminish the credibility of the agency and its effectiveness as an unbiased law enforcer.

As the Chairman warned in his "Staying in Our Lane" speech last year, the use of consumer protection authority to "address general issues of political and social significance" outside of the FTC's lane "undermines the rule of law."[2]

---

[1] Medical professionals overwhelmingly support access to appropriate gender-affirming care for transgender people, including children. *See, e.g.,* Joanne LaFleur, et. al, *Gender-Affirming Medical Treatments for Pediatric Patients with Gender Dysphoria,* UNIV. OF UTAH COLL. OF PHARMACY (May 19, 2025) ("[A]fter having spent many months searching for, reading, and evaluating the available literature, it was impossible for us to avoid drawing some high-level conclusions. Namely, the consensus of the evidence supports that the treatments are effective in terms of mental health, psychosocial outcomes, and the induction of body changes consistent with the affirmed gender in pediatric [] patients. The evidence also supports that the treatments are safe in terms of changes to bone density, cardiovascular risk factors, metabolic changes, and cancer. . . . Based on the reviewed evidence included in this report, it is our expert opinion that policies to prevent access to and use of [gender-affirming hormonal therapy] for treatment of [gender dysphoria] in pediatric patients cannot be justified based on the quantity or quality of medical science findings or concerns about potential regret in the future, and that high-quality guidelines are available to guide qualified providers in treating pediatric patients who meet diagnostic criteria.").

[2] *Staying in Our Lane: Resisting the Temptation of Using Consumer Protection Law to Solve Other Problems,* Prepared Remarks of Commissioner Andrew N. Ferguson, International Consumer Protection and Enforcement Network ("ICPEN") Fall Conference (Sept. 27, 2024).

In addition to our concerns about how the July 9 workshop could stain the Commission's reputation and exceed its authority, we write to express that the workshop has created a hostile work environment for our trans colleagues and their allies. The Commission plans to welcome speakers to our workplace such as Erin Friday, who has consistently, publicly, and gleefully denigrated trans people,[3] and Miriam Grossman, who is known for promoting conversion therapy for gay and trans people. It is unacceptable to subject our LGBTQ+ colleagues—in their place of work—to individuals who deny their existence and disrespect their humanity.

The signatories respectfully call on the FTC to cancel the July 9 workshop, or at the very least, open a public docket to receive comments for a 60-day period to ensure the FTC hears from all relevant stakeholders on this issue.

This letter is signed anonymously because staff have credible fear of retaliation from the Trump-Vance FTC.

Sincerely,

149 FTC employees, with a total of 1,288 years of service to the FTC

---

[3] E.g., https://x.com/ErinFriday5490/status/1884858723459567678, https://x.com/ErinFriday5490/status/1909457939150360728, https://x.com/ErinFriday5490/status/1839499449225384422.

# EXHIBIT 10



American Academy
of Pediatrics

DEDICATED TO THE HEALTH OF ALL CHILDREN®

Donate

**About the AAP**

![American Academy of Pediatrics plaque on brick wall with two men]

# The American Academy of Pediatrics: Carrying the Mantle for 95 Years

The AAP celebrates its 95th year of providing pediatricians and families with steadfast support and guidance, every step of the way.

View Story

# Facts & History

The mission of the American Academy of Pediatrics is to attain optimal physical, mental, and social  health and well-being for all infants, children, adolescents and young adults. To accomplish this, AAP shall support the professional needs of its members.



## Strategic Plan

In order to articulate its full value to members and stakeholders, the AAP strategic plan focuses on how the Academy as an organization will remain strong, healthy and vibrant over a five-year time frame.



## AAP Equity and Inclusion Efforts

See the steps the AAP is taking in its commitment to serve as an equitable, diverse and inclusive organization.



## AAP History

The AAP was founded in 1930 by 35 pediatricians to serve as an independent forum to address children's health needs. At that time, the idea that children had unique developmental and health needs was new. Practices that are now standard preventive care (i.e. immunization, regular health exams) were only just

beginning to change the custom of treating children as "miniature adults".



Why Do I Give to the AAP?

# Funding

The AAP programs and activities are funded through a wide array of sources including membership dues, continuing medical education activities, publications, advertising, royalties, grants, corporate partnerships, and charitable contributions from employees and members.



# Financial Information

See our financial audits. Including
Audited Financials, A-133 Audit Report,
and Public 990.



## Moving Pediatrics Forward

Learn more about the amazing
achievements in pediatric medicine
and advocacy throughout the years.

# Leadership

Learn about the variety of leadership roles at the American Academy
of Pediatrics and information on our organizational governance.

### Board of Directors

The Academy is governed by a Board of Directors consisting of
thirteen members and the Executive Committee for a total of

seventeen members.

## Senior Leadership Team

The Senior Leadership Team of the AAP provides leadership and oversight to the various business and operational areas of the organization.

## Constitution and By-Laws

Read how the AAP is governed including specific scientific, social and educational objectives of the organization.

## Board of Directors Meeting Minutes

View recent minutes from the AAP Board of Directors meetings here.

# Advertising

## Advertise with the AAP

Learn how to advertise in AAP publications and journals, at the AAP National Conference & Exhibition and at the AAP Career Fair.

## AAP Mailing and Email List

The AAP has outsourced all marketing to mms, Inc. (Medical Marketing Services). Data may be used for email broadcasts and direct mail list rentals. Please note: The AAP reserves the right to approve all data uses.

## PedJobs

PedJobs offers the most targeted advertising for your pediatric job openings. Staff/In-House Physician Recruiters, practice employers and administrators, reach 67,000 board-certified members of the AAP, as well as subscribers to Pediatrics and AAP News.

## AAP Exhibits

The AAP offers many opportunities to present your products to our members.

# Learn More About Us

## Awards

The AAP recognizes professionals who make a difference in pediatrics.

# Employment and RFP Opportunities

## Career Center

Explore employment opportunities at the AAP, including information on benefits, job fairs, and more.

## RFP Opportunities

Learn about available RFP opportunities for providing goods and services to support the mission of the AAP. The AAP encourages responses from qualified small businesses, minority businesses and women's business enterprises.

# Contact Us

View our support center and our locations.

Contact Us

---

© Copyright 2026 American Academy of Pediatrics. All rights reserved.

# EXHIBIT 11



American Academy
of Pediatrics
DEDICATED TO THE HEALTH OF ALL CHILDREN®

Donate

## Policy Statement Development Process

The American Academy of Pediatrics publishes more than 60 policies each year on a broad range of topics that impact the health and wellbeing of infants, children, adolescents and young adults. Policy statements of the AAP are written by medical experts and reflect the latest evidence in the field. They are evidence driven, nonpartisan and rigorously reviewed. Collectively, they are an integral part of the Academy's identity, help guide practitioners in the care of children and are cited in research and referenced in media.

There are three phases to the development of AAP policy statements:

1. Drafting of an "intent" to write a policy. The intent is a document that describes the purpose, research base, list of authors and their areas of expertise and key topic areas of a proposed policy statement. This document is submitted to the AAP Board of Directors for consideration and approval.

2. Writing the policy statement and submitting to peer review. This process can take up to two years and includes an evidence review, collaborative writing among the group of expert authors and submission to multiple groups of peers for review. Feedback from peer reviewers is incorporated into the draft policy statement.

3. Executive review and approval. After a policy completes peer review, it is reviewed internally by senior leadership at AAP and voted upon by the AAP Board of Directors. If approved, it is published in **Pediatrics**, the official peer-reviewed journal of the AAP.

# Review Process

Policy statements are thoroughly vetted through several rounds of review, including:

- at least one round of peer review, where it is not uncommon to have 30-40 reviewers per policy statement.

- three rounds of executive review including AAP executive staff and senior leadership, the AAP Board of Directors and the Executive Committee of the Board of Directors.

All steps in this process are intended for a final policy statement that has been rigorously reviewed and is factual and with a strong scientific basis.

AAP clinical reports and technical reports follow the same process as above.

Policy statements, clinical reports, technical reports and clinical practice guidelines are reviewed on a 5-year cycle. After 5 years, a policy may be reaffirmed, revised or retired.

# Types of AAP Policy and Clinical Standards

- Policy Statements – statements that advocate, direct or detail a public health position of concern to the AAP.

- Technical Reports – reports that focus on a review of the literature and data analyses.

- Clinical Reports – reports that guide pediatricians in the clinical setting by addressing best practices and state-of-the-art medicine.

- **Clinical Practice Guidelines** - evidence-based clinical guidance that is based on a comprehensive literature review and data analyses with formal rules of evidence in support of each recommendation made.

# Additional Information

- **Browse all policy in Pediatrics**

- **Find recently featured policy and related supplemental resources**

- **Policy recommendations in easy to find A to Z patient care topic finder**

**Last Updated**    02/28/2023

**Source**    American Academy of Pediatrics

© Copyright 2026 American Academy of Pediatrics. All rights reserved.

© Copyright 2026 American Academy of Pediatrics. All rights reserved.

# EXHIBIT 12

POLICY STATEMENT Organizational Principles to Guide and Define the Child Health Care System and/or Improve the Health of all Children

American Academy of Pediatrics
DEDICATED TO THE HEALTH OF ALL CHILDREN™



**This Policy Statement was reaffirmed August 2023.**

# Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents

Jason Rafferty, MD, MPH, EdM, FAAP, COMMITTEE ON PSYCHOSOCIAL ASPECTS OF CHILD AND FAMILY HEALTH, COMMITTEE ON ADOLESCENCE, SECTION ON LESBIAN, GAY, BISEXUAL, AND TRANSGENDER HEALTH AND WELLNESS

## abstract



As a traditionally underserved population that faces numerous health disparities, youth who identify as transgender and gender diverse (TGD) and their families are increasingly presenting to pediatric providers for education, care, and referrals. The need for more formal training, standardized treatment, and research on safety and medical outcomes often leaves providers feeling ill equipped to support and care for patients that identify as TGD and families. In this policy statement, we review relevant concepts and challenges and provide suggestions for pediatric providers that are focused on promoting the health and positive development of youth that identify as TGD while eliminating discrimination and stigma.

## INTRODUCTION

In its dedication to the health of all children, the American Academy of Pediatrics (AAP) strives to improve health care access and eliminate disparities for children and teenagers who identify as lesbian, gay, bisexual, transgender, or questioning (LGBTQ) of their sexual or gender identity.[1,2] Despite some advances in public awareness and legal protections, youth who identify as LGBTQ continue to face disparities that stem from multiple sources, including inequitable laws and policies, societal discrimination, and a lack of access to quality health care, including mental health care. Such challenges are often more intense for youth who do not conform to social expectations and norms regarding gender. Pediatric providers are increasingly encountering such youth and their families, who seek medical advice and interventions, yet they may lack the formal training to care for youth that identify as transgender and gender diverse (TGD) and their families.[3]

This policy statement is focused specifically on children and youth that identify as TGD rather than the larger LGBTQ population, providing brief, relevant background on the basis of current available research

*Department of Pediatrics, Hasbro Children's Hospital, Providence, Rhode Island; Thundermist Health Centers, Providence, Rhode Island; and Department of Child Psychiatry, Emma Pendleton Bradley Hospital, East Providence, Rhode Island*

*Dr Rafferty conceptualized the statement, drafted the initial manuscript, reviewed and revised the manuscript, approved the final manuscript as submitted, and agrees to be accountable for all aspects of the work.*

*This document is copyrighted and is property of the American Academy of Pediatrics and its Board of Directors. All authors have filed conflict of interest statements with the American Academy of Pediatrics. Any conflicts have been resolved through a process approved by the Board of Directors. The American Academy of Pediatrics has neither solicited nor accepted any commercial involvement in the development of the content of this publication.*

*Policy statements from the American Academy of Pediatrics benefit from expertise and resources of liaisons and internal (AAP) and external reviewers. However, policy statements from the American Academy of Pediatrics may not reflect the views of the liaisons or the organizations or government agencies that they represent.*

*The guidance in this statement does not indicate an exclusive course of treatment or serve as a standard of medical care. Variations, taking into account individual circumstances, may be appropriate.*

*All policy statements from the American Academy of Pediatrics automatically expire 5 years after publication unless reaffirmed, revised, or retired at or before that time.*

**To cite:** Rafferty J, AAP COMMITTEE ON PSYCHOSOCIAL ASPECTS OF CHILD AND FAMILY HEALTH, AAP COMMITTEE ON ADOLESCENCE, AAP SECTION ON LESBIAN, GAY, BISEXUAL, AND TRANSGENDER HEALTH AND WELLNESS. Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents. *Pediatrics.* 2018;142(4): e20182162

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by guest

**TABLE 1** Relevant Terms and Definitions Related to Gender Care

| Term | Definition |
|---|---|
| Sex | An assignment that is made at birth, usually male or female, typically on the basis of external genital anatomy but sometimes on the basis of internal gonads, chromosomes, or hormone levels |
| Gender identity | A person's deep internal sense of being female, male, a combination of both, somewhere in between, or neither, resulting from a multifaceted interaction of biological traits, environmental factors, self-understanding, and cultural expectations |
| Gender expression | The external way a person expresses their gender, such as with clothing, hair, mannerisms, activities, or social roles |
| Gender perception | The way others interpret a person's gender expression |
| Gender diverse | A term that is used to describe people with gender behaviors, appearances, or identities that are incongruent with those culturally assigned to their birth sex; gender-diverse individuals may refer to themselves with many different terms, such as transgender, nonbinary, genderqueer,[7] gender fluid, gender creative, gender independent, or noncisgender. "Gender diverse" is used to acknowledge and include the vast diversity of gender identities that exists. It replaces the former term, "gender nonconforming," which has a negative and exclusionary connotation. |
| Transgender | A subset of gender-diverse youth whose gender identity does not match their assigned sex and generally remains persistent, consistent, and insistent over time; the term "transgender" also encompasses many other labels individuals may use to refer to themselves. |
| Cisgender | A term that is used to describe a person who identifies and expresses a gender that is consistent with the culturally defined norms of the sex they were assigned at birth |
| Agender | A term that is used to describe a person who does not identify as having a particular gender |
| Affirmed gender | When a person's true gender identity, or concern about their gender identity, is communicated to and validated from others as authentic |
| MTF; affirmed female; trans female | Terms that are used to describe individuals who were assigned male sex at birth but who have a gender identity and/or expression that is asserted to be more feminine |
| FTM; affirmed male; trans male | Terms that are used to describe individuals who were assigned female sex at birth but who have a gender identity and/or expression that is asserted to be more masculine |
| Gender dysphoria | A clinical symptom that is characterized by a sense of alienation to some or all of the physical characteristics or social roles of one's assigned gender; also, gender dysphoria is the psychiatric diagnosis in the *DSM-5*, which has focus on the distress that stems from the incongruence between one's expressed or experienced (affirmed) gender and the gender assigned at birth. |
| Gender identity disorder | A psychiatric diagnosis defined previously in the *DSM-IV* (changed to "gender dysphoria" in the *DSM-5*); the primary criteria include a strong, persistent cross-sex identification and significant distress and social impairment. This diagnosis is no longer appropriate for use and may lead to stigma, but the term may be found in older research. |
| Sexual orientation | A person's sexual identity in relation to the gender(s) to which they are attracted; sexual orientation and gender identity develop separately. |

This list is not intended to be all inclusive. The pronouns "they" and "their" are used intentionally to be inclusive rather than the binary pronouns "he" and "she" and "his" and "her." Adapted from Bonifacio HJ, Rosenthal SM. Gender variance and dysphoria in children and adolescents. *Pediatr Clin North Am.* 2015;62(4):1001–1016. Adapted from Vance SR Jr, Ehrensaft D, Rosenthal SM. Psychological and medical care of gender nonconforming youth. *Pediatrics.* 2014;134(6):1184–1192. DSM-5, *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition*; DSM-IV, *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition*; FTM, female to male; MTF, male to female.

and expert opinion from clinical and research leaders, which will serve as the basis for recommendations. It is not a comprehensive review of clinical approaches and nuances to pediatric care for children and youth that identify as TGD. Professional understanding of youth that identify as TGD is a rapidly evolving clinical field in which research on appropriate clinical management is limited by insufficient funding.[3,4]

## DEFINITIONS

To clarify recommendations and discussions in this policy statement, some definitions are provided. However, brief descriptions of human behavior or identities may not capture nuance in this evolving field.

"Sex," or "natal gender," is a label, generally "male" or "female," that is typically assigned at birth on the basis of genetic and anatomic characteristics, such as genital anatomy, chromosomes, and sex hormone levels. Meanwhile, "gender identity" is one's internal sense of who one is, which results from a multifaceted interaction of biological traits, developmental influences, and environmental conditions. It may be male, female, somewhere in between, a combination of both, or neither (ie, not conforming to a binary conceptualization of gender). Self-recognition of gender identity develops over time, much the same way as a child's physical body does. For some people, gender identity can be fluid, shifting in different contexts. "Gender expression" refers to the wide array of ways people display their gender through clothing, hair styles, mannerisms, or social roles. Exploring different ways of expressing gender is common for children and may challenge social expectations. The way others interpret this expression is referred to as "gender perception" (Table 1).[5,6]

These labels may or may not be congruent. The term "cisgender" is used if someone identifies and expresses a gender that is consistent with the culturally defined norms of the sex that was assigned at birth. "Gender diverse" is an umbrella term to describe an ever-evolving array of labels that people may apply when their gender identity, expression, or even perception does not conform

2

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by guest

to the norms and stereotypes others expect of their assigned sex. "Transgender" is usually reserved for a subset of such youth whose gender identity does not match their assigned sex and generally remains persistent, consistent, and insistent over time. These terms are not diagnoses; rather, they are personal and often dynamic ways of describing one's own gender experience.

Gender identity is not synonymous with "sexual orientation," which refers to a person's identity in relation to the gender(s) to which they are sexually and romantically attracted. Gender identity and sexual orientation are distinct but interrelated constructs.[8] Therefore, being transgender does not imply a sexual orientation, and people who identify as transgender still identify as straight, gay, bisexual, etc, on the basis of their attractions. (For more information, *The Gender Book*, found at www.thegenderbook.com, is a resource with illustrations that are used to highlight these core terms and concepts.)

## EPIDEMIOLOGY

In population-based surveys, questions related to gender identity are rarely asked, which makes it difficult to assess the size and characteristics of the population that is TGD. In the 2014 Behavioral Risk Factor Surveillance System of the Centers for Disease Control and Prevention, only 19 states elected to include optional questions on gender identity. Extrapolation from these data suggests that the US prevalence of adults who identify as transgender or "gender nonconforming" is 0.6% (1.4 million), ranging from 0.3% in North Dakota to 0.8% in Hawaii.[9] On the basis of these data, it has been estimated that 0.7% of youth ages 13 to 17 years (∼150 000) identify as transgender.[10] This number is much higher than previous estimates, which were

extrapolated from individual states or specialty clinics, and is likely an underestimate given the stigma regarding those who openly identify as transgender and the difficulty in defining "transgender" in a way that is inclusive of all gender-diverse identities.[11]

There have been no large-scale prevalence studies among children and adolescents, and there is no evidence that adult statistics reflect young children or adolescents. In the 2014 Behavioral Risk Factor Surveillance System, those 18 to 24 years of age were more likely than older age groups to identify as transgender (0.7%).[9] Children report being aware of gender incongruence at young ages. Children who later identify as TGD report first having recognized their gender as "different" at an average age of 8.5 years; however, they did not disclose such feelings until an average of 10 years later.[12]

## MENTAL HEALTH IMPLICATIONS

Adolescents and adults who identify as transgender have high rates of depression, anxiety, eating disorders, self-harm, and suicide.[13–20] Evidence suggests that an identity of TGD has an increased prevalence among individuals with autism spectrum disorder, but this association is not yet well understood.[21,22] In 1 retrospective cohort study of 180 trans youth and matched cisgender peers, 56 youth who identified as transgender reported previous suicidal ideation, and 31 reported a previous suicide attempt, compared with 20 and 11 among matched youth who identified as cisgender, respectively.[13] Some youth who identify as TGD also experience gender dysphoria, which is a specific diagnosis given to those who experience impairment in peer and/or family relationships, school performance, or other aspects of their life as a consequence of the

incongruence between their assigned sex and their gender identity.[23]

There is no evidence that risk for mental illness is inherently attributable to one's identity of TGD. Rather, it is believed to be multifactorial, stemming from an internal conflict between one's appearance and identity, limited availability of mental health services, low access to health care providers with expertise in caring for youth who identify as TGD, discrimination, stigma, and social rejection.[24] This was affirmed by the American Psychological Association in 2008[25] (with practice guidelines released in 2015[8]) and the American Psychiatric Association, which made the following statement in 2012:

*Being transgender or gender variant implies no impairment in judgment, stability, reliability, or general social or vocational capabilities; however, these individuals often experience discrimination due to a lack of civil rights protections for their gender identity or expression.… [Such] discrimination and lack of equal civil rights is damaging to the mental health of transgender and gender variant individuals.*[26]

Youth who identify as TGD often confront stigma and discrimination, which contribute to feelings of rejection and isolation that can adversely affect physical and emotional well-being. For example, many youth believe that they must hide their gender identity and expression to avoid bullying, harassment, or victimization. Youth who identify as TGD experience disproportionately high rates of homelessness, physical violence (at home and in the community), substance abuse, and high-risk sexual behaviors.[5,6,12,27–31] Among the 3 million HIV testing events that were reported in 2015, the highest percentages of new infections were among women who identified as transgender[32] and were also at particular risk for not knowing their HIV status.[30]

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by guest

## GENDER-AFFIRMATIVE CARE

In a gender-affirmative care model (GACM), pediatric providers offer developmentally appropriate care that is oriented toward understanding and appreciating the youth's gender experience. A strong, nonjudgmental partnership with youth and their families can facilitate exploration of complicated emotions and gender-diverse expressions while allowing questions and concerns to be raised in a supportive environment.[5] In a GACM, the following messages are conveyed:

- transgender identities and diverse gender expressions do not constitute a mental disorder;

- variations in gender identity and expression are normal aspects of human diversity, and binary definitions of gender do not always reflect emerging gender identities;

- gender identity evolves as an interplay of biology, development, socialization, and culture; and

- if a mental health issue exists, it most often stems from stigma and negative experiences rather than being intrinsic to the child.[27,33]

The GACM is best facilitated through the integration of medical, mental health, and social services, including specific resources and supports for parents and families.[24] Providers work together to destigmatize gender variance, promote the child's self-worth, facilitate access to care, educate families, and advocate for safer community spaces where children are free to develop and explore their gender.[5] A specialized gender-affirmative therapist, when available, may be an asset in helping children and their families build skills for dealing with gender-based stigma, address symptoms of anxiety or depression, and reinforce the child's overall resiliency.[34,35] There is a limited but growing body of evidence that suggests that using an integrated affirmative model results in young people having fewer mental health concerns whether they ultimately identify as transgender.[24,36,37]

In contrast, "conversion" or "reparative" treatment models are used to prevent children and adolescents from identifying as transgender or to dissuade them from exhibiting gender-diverse expressions. The Substance Abuse and Mental Health Services Administration has concluded that any therapeutic intervention with the goal of changing a youth's gender expression or identity is inappropriate.[33] Reparative approaches have been proven to be not only unsuccessful[38] but also deleterious and are considered outside the mainstream of traditional medical practice.[29,39–42] The AAP described reparative approaches as "unfair and deceptive."[43] At the time of this writing,* conversion therapy was banned by executive regulation in New York and by legislative statutes in 9 other states as well as the District of Columbia.[44]

Pediatric providers have an essential role in assessing gender concerns and providing evidence-based information to assist youth and families in medical decision-making. Not doing so can prolong or exacerbate gender dysphoria and contribute to abuse and stigmatization.[35] If a pediatric provider does not feel prepared to address gender concerns when they occur, then referral to a pediatric or mental health provider with more expertise is appropriate. There is little research on communication and efficacy with transfers in care for youth who identify as TGD, particularly from pediatric to adult providers.

## DEVELOPMENTAL CONSIDERATIONS

Acknowledging that the capacity for emerging abstract thinking in childhood is important to conceptualize and reflect on identity, gender-affirmation guidelines are being focused on individually tailored interventions on the basis of the physical and cognitive development of youth who identify as TGD.[45] Accordingly, research substantiates that children who are prepubertal and assert an identity of TGD know their gender as clearly and as consistently as their developmentally equivalent peers who identify as cisgender and benefit from the same level of social acceptance.[46] This developmental approach to gender affirmation is in contrast to the outdated approach in which a child's gender-diverse assertions are held as "possibly true" until an arbitrary age (often after pubertal onset) when they can be considered valid, an approach that authors of the literature have termed "watchful waiting." This outdated approach does not serve the child because critical support is withheld. Watchful waiting is based on binary notions of gender in which gender diversity and fluidity is pathologized; in watchful waiting, it is also assumed that notions of gender identity become fixed at a certain age. The approach is also influenced by a group of early studies with validity concerns, methodologic flaws, and limited follow-up on children who identified as TGD and, by adolescence, did not seek further treatment ("desisters").[45,47] More robust and current research suggests that, rather than focusing on who a child will become, valuing them for who they are, even at a young age, fosters secure attachment and resilience, not only for the child but also for the whole family.[5,45,48,49]

---

* For more information regarding state-specific laws, please contact the AAP Division of State Government Affairs at stgov@ aap.org.

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by guest

## MEDICAL MANAGEMENT

Pediatric primary care providers are in a unique position to routinely inquire about gender development in children and adolescents as part of recommended well-child visits[50] and to be a reliable source of validation, support, and reassurance. They are often the first provider to be aware that a child may not identify as cisgender or that there may be distress related to a gender-diverse identity. The best way to approach gender with patients is to inquire directly and nonjudgmentally about their experience and feelings before applying any labels.[27,51]

Many medical interventions can be offered to youth who identify as TGD and their families. The decision of whether and when to initiate gender-affirmative treatment is personal and involves careful consideration of risks, benefits, and other factors unique to each patient and family. Many protocols suggest that clinical assessment of youth who identify as TGD is ideally conducted on an ongoing basis in the setting of a collaborative, multidisciplinary approach, which, in addition to the patient and family, may include the pediatric provider, a mental health provider (preferably with expertise in caring for youth who identify as TGD ), social and legal supports, and a pediatric endocrinologist or adolescent-medicine gender specialist, if available.[6,28] There is no prescribed path, sequence, or end point. Providers can make every effort to be aware of the influence of their own biases. The medical options also vary depending on pubertal and developmental progression.

### Clinical Setting

In the past year, 1 in 4 adults who identified as transgender avoided a necessary doctor's visit because of fear of being mistreated.[31] All clinical office staff have a role in affirming a patient's gender identity. Making flyers available or displaying posters related to LGBTQ health issues, including information for children who identify as TGD and families, reveals inclusivity and awareness. Generally, patients who identify as TGD feel most comfortable when they have access to a gender-neutral restroom. Diversity training that encompasses sensitivity when caring for youth who identify as TGD and their families can be helpful in educating clinical and administrative staff. A patient-asserted name and pronouns are used by staff and are ideally reflected in the electronic medical record without creating duplicate charts.[52,53] The US Centers for Medicare and Medicaid Services and the National Coordinator for Health Information Technology require all electronic health record systems certified under the Meaningful Use incentive program to have the capacity to confidentially collect information on gender identity.[54,55] Explaining and maintaining confidentiality procedures promotes openness and trust, particularly with youth who identify as LGBTQ.[1] Maintaining a safe clinical space can provide at least 1 consistent, protective refuge for patients and families, allowing authentic gender expression and exploration that builds resiliency.

### Pubertal Suppression

Gonadotrophin-releasing hormones have been used to delay puberty since the 1980s for central precocious puberty.[56] These reversible treatments can also be used in adolescents who experience gender dysphoria to prevent development of secondary sex characteristics and provide time up until 16 years of age for the individual and the family to explore gender identity, access psychosocial supports, develop coping skills, and further define appropriate treatment goals. If pubertal suppression treatment is suspended, then endogenous puberty will resume.[20,57,58]

Often, pubertal suppression creates an opportunity to reduce distress that may occur with the development of secondary sexual characteristics and allow for gender-affirming care, including mental health support for the adolescent and the family. It reduces the need for later surgery because physical changes that are otherwise irreversible (protrusion of the Adam's apple, male pattern baldness, voice change, breast growth, etc) are prevented. The available data reveal that pubertal suppression in children who identify as TGD generally leads to improved psychological functioning in adolescence and young adulthood.[20,57–59]

Pubertal suppression is not without risks. Delaying puberty beyond one's peers can also be stressful and can lead to lower self-esteem and increased risk taking.[60] Some experts believe that genital underdevelopment may limit some potential reconstructive options.[61] Research on long-term risks, particularly in terms of bone metabolism[62] and fertility,[63] is currently limited and provides varied results.[57,64,65] Families often look to pediatric providers for help in considering whether pubertal suppression is indicated in the context of their child's overall well-being as gender diverse.

### Gender Affirmation

As youth who identify as TGD reflect on and evaluate their gender identity, various interventions may be considered to better align their gender expression with their underlying identity. This process of reflection, acceptance, and, for some, intervention is known as "gender affirmation." It was formerly referred to as "transitioning," but many view the process as an affirmation and acceptance of who they have always been rather than a transition

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf
by guest

**TABLE 2** The Process of Gender Affirmation May Include ≥1 of the Following Components

| Component | Definition | General Age Range[a] | Reversibility[a] |
|---|---|---|---|
| Social affirmation | Adopting gender-affirming hairstyles, clothing, name, gender pronouns, and restrooms and other facilities | Any | Reversible |
| Puberty blockers | Gonadotropin-releasing hormone analogues, such as leuprolide and histrelin | During puberty (Tanner stage 2–5)[b] | Reversible[c] |
| Cross-sex hormone therapy | Testosterone (for those who were assigned female at birth and are masculinizing); estrogen plus androgen inhibitor (for those who were assigned male at birth and are feminizing) | Early adolescence onward | Partially reversible (skin texture, muscle mass, and fat deposition); irreversible once developed (testosterone: Adam's apple protrusion, voice changes, and male pattern baldness; estrogen: breast development); unknown reversibility (effect on fertility) |
| Gender-affirming surgeries | "Top" surgery (to create a male-typical chest shape or enhance breasts); "bottom" surgery (surgery on genitals or reproductive organs); facial feminization and other procedures | Typically adults (adolescents on case-by-case basis[d]) | Not reversible |
| Legal affirmation | Changing gender and name recorded on birth certificate, school records, and other documents | Any | Reversible |

[a] Note that the provided age range and reversibility is based on the little data that are currently available.

[b] There is limited benefit to starting gonadotropin-releasing hormone after Tanner stage 5 for pubertal suppression. However, when cross-sex hormones are initiated with a gradually increasing schedule, the initial levels are often not high enough to suppress endogenous sex hormone secretion. Therefore, gonadotropin-releasing hormone may be continued in accordance with the Endocrine Society Guidelines.[68]

[c] The effect of sustained puberty suppression on fertility is unknown. Pubertal suppression can be, and often is indicated to be, followed by cross-sex hormone treatment. However, when cross-sex hormones are initiated without endogenous hormones, then fertility may be decreased.[68]

[d] Eligibility criteria for gender-affirmative surgical interventions among adolescents are not clearly defined between established protocols and practice. When applicable, eligibility is usually determined on a case-by-case basis with the adolescent and the family along with input from medical, mental health, and surgical providers.[68–71]

from 1 gender identity to another. Accordingly, some people who have gone through the process prefer to call themselves "affirmed females, males, etc" (or just "females, males, etc"), rather than using the prefix "trans-." Gender affirmation is also used to acknowledge that some individuals who identify as TGD may feel affirmed in their gender without pursuing medical or surgical interventions.[7,66]

Supportive involvement of parents and family is associated with better mental and physical health outcomes.[67] Gender affirmation among adolescents with gender dysphoria often reduces the emphasis on gender in their lives, allowing them to attend to other developmental tasks, such as academic success, relationship building, and future-oriented planning.[64] Most protocols for gender-affirming interventions incorporate World Professional Association of Transgender Health[35] and Endocrine Society[68] recommendations and include ≥1 of the following elements (Table 2):

1. Social Affirmation: This is a reversible intervention in which children and adolescents express partially or completely in their asserted gender identity by adapting hairstyle, clothing, pronouns, name, etc. Children who identify as transgender and socially affirm and are supported in their asserted gender show no increase in depression and only minimal (clinically insignificant) increases in anxiety compared with age-matched averages.[48] Social affirmation can be complicated given the wide range of social interactions children have (eg, extended families, peers, school, community, etc). There is little guidance on the best approach (eg, all at once, gradual, creating new social networks, or affirming within existing networks, etc). Pediatric providers can best support families by anticipating and discussing such complexity proactively, either in their own practice or through enlisting a qualified mental health provider.

2. Legal Affirmation: Elements of a social affirmation, such as a name and gender marker, become official on legal documents, such as birth certificates, passports, identification cards, school documents, etc. The processes for making these changes depend on state laws and may require specific documentation from pediatric providers.

3. Medical Affirmation: This is the process of using cross-sex hormones to allow adolescents who have initiated puberty to develop secondary sex characteristics of the opposite biological sex. Some changes are partially reversible if hormones are stopped, but others become

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by guest

irreversible once they are fully developed (Table 2).

4. Surgical Affirmation: Surgical approaches may be used to feminize or masculinize features, such as hair distribution, chest, or genitalia, and may include removal of internal organs, such as ovaries or the uterus (affecting fertility). These changes are irreversible. Although current protocols typically reserve surgical interventions for adults,[35,68] they are occasionally pursued during adolescence on a case-by-case basis, considering the necessity and benefit to the adolescent's overall health and often including multidisciplinary input from medical, mental health, and surgical providers as well as from the adolescent and family.[69–71]

For some youth who identify as TGD whose natal gender is female, menstruation, breakthrough bleeding, and dysmenorrhea can lead to significant distress before or during gender affirmation. The American College of Obstetrics and Gynecology suggests that, although limited data are available to outline management, menstruation can be managed without exogenous estrogens by using a progesterone-only pill, a medroxyprogesterone acetate shot, or a progesterone-containing intrauterine or implantable device.[72] If estrogen can be tolerated, oral contraceptives that contain both progesterone and estrogen are more effective at suppressing menses.[73] The Endocrine Society guidelines also suggest that gonadotrophin-releasing hormones can be used for menstrual suppression before the anticipated initiation of testosterone or in combination with testosterone for breakthrough bleeding (enables phenotypic masculinization at a lower dose than if testosterone is used alone).[68] Masculinizing hormones in natal female patients may lead to a cessation of menses, but unplanned pregnancies have been reported, which emphasizes the need for ongoing contraceptive counseling with youth who identify as TGD.[72]

## HEALTH DISPARITIES

In addition to societal challenges, youth who identify as TGD face several barriers within the health care system, especially regarding access to care. In 2015, a focus group of youth who identified as transgender in Seattle, Washington, revealed 4 problematic areas related to health care:

1. safety issues, including the lack of safe clinical environments and fear of discrimination by providers;

2. poor access to physical health services, including testing for sexually transmitted infections;

3. inadequate resources to address mental health concerns; and

4. lack of continuity with providers.[74]

This study reveals the obstacles many youth who identify as TGD face in accessing essential services, including the limited supply of appropriately trained medical and psychological providers, fertility options, and insurance coverage denials for gender-related treatments.[74]

Insurance denials for services related to the care of patients who identify as TGD are a significant barrier. Although the Office for Civil Rights of the US Department of Health and Human Services explicitly stated in 2012 that the nondiscrimination provision in the Patient Protection and Affordable Care Act includes people who identify as gender diverse,[75,76] insurance claims for gender affirmation, particularly among youth who identify as TGD, are frequently denied.[54,77] In 1 study, it was found that approximately 25% of individuals who identified as transgender were denied insurance coverage because of being transgender.[31] The burden of covering medical expenses that are not covered by insurance can be financially devastating, and even when expenses are covered, families describe high levels of stress in navigating and submitting claims appropriately.[78] In 2012, a large gender center in Boston, Massachusetts, reported that most young patients who identified as transgender and were deemed appropriate candidates for recommended gender care were unable to obtain it because of such denials, which were based on the premise that gender dysphoria was a mental disorder, not a physical one, and that treatment was not medically or surgically necessary.[24] This practice not only contributes to stigma, prolonged gender dysphoria, and poor mental health outcomes,[77] but it may also lead patients to seek nonmedically supervised treatments that are potentially dangerous.[24] Furthermore, insurance denials can reinforce a socioeconomic divide between those who can finance the high costs of uncovered care and those who cannot.[24,77]

The transgender youth group in Seattle likely reflected the larger TGD population when they described how obstacles adversely affect self-esteem and contribute to the perception that they are undervalued by society and the health care system.[74,77] Professional medical associations, including the AAP, are increasingly calling for equity in health care provisions regardless of gender identity or expression.[1,8,23,72] There is a critical need for investments in research on the prevalence, disparities, biological underpinnings, and standards of care relating to gender-diverse populations. Pediatric providers who work with state government and insurance officials can play an essential role in advocating for

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by guest

stronger nondiscrimination policies and improved coverage.

There is a lack of quality research on the experience of youth of color who identify as transgender. One theory suggests that the intersection of racism, transphobia, and sexism may result in the extreme marginalization that is experienced among many women of color who identify as transgender,[79] including rejection from their family and dropping out of school at younger ages (often in the setting of rigid religious beliefs regarding gender),[80] increased levels of violence and body objectification,[81] 3 times the risk of poverty compared with the general population,[31] and the highest prevalence of HIV compared with other risk groups (estimated as high as 56.3% in 1 meta-analysis).[30] One model suggests that pervasive stigma and oppression can be associated with psychological distress (anxiety, depression, and suicide) and adoption of risk behaviors by such youth to obtain a sense of validation toward their complex identities.[79]

## FAMILY ACCEPTANCE

Research increasingly suggests that familial acceptance or rejection ultimately has little influence on the gender identity of youth; however, it may profoundly affect young people's ability to openly discuss or disclose concerns about their identity. Suppressing such concerns can affect mental health.[82] Families often find it hard to understand and accept their child's gender-diverse traits because of personal beliefs, social pressure, and stigma.[49,83] Legitimate fears may exist for their child's welfare, safety, and acceptance that pediatric providers need to appreciate and address. Families can be encouraged to communicate their concerns and questions. Unacknowledged concerns can contribute to shame and hesitation in regard to offering support and understanding,[84]

which is essential for the child's self-esteem, social involvement, and overall health as TGD.[48,85–87] Some caution has been expressed that unquestioning acceptance per se may not best serve questioning youth or their families. Instead, psychological evidence suggests that the most benefit comes when family members and youth are supported and encouraged to engage in reflective perspective taking and validate their own and the other's thoughts and feelings despite divergent views.[49,82]

In this regard, suicide attempt rates among 433 adolescents in Ontario who identified as "trans" were 4% among those with strongly supportive parents and as high as 60% among those whose parents were not supportive.[85] Adolescents who identify as transgender and endorse at least 1 supportive person in their life report significantly less distress than those who only experience rejection. In communities with high levels of support, it was found that nonsupportive families tended to increase their support over time, leading to dramatic improvement in mental health outcomes among their children who identified as transgender.[88]

Pediatric providers can create a safe environment for parents and families to better understand and listen to the needs of their children while receiving reassurance and education.[83] It is often appropriate to assist the child in understanding the parents' concerns as well. Despite expectations by some youth with transgender identity for immediate acceptance after "coming out," family members often proceed through a process of becoming more comfortable and understanding of the youth's gender identity, thoughts, and feelings. One model suggests that the process resembles grieving, wherein the family separates from their expectations for their child to embrace a new reality. This process may proceed through stages of shock,

denial, anger, feelings of betrayal, fear, self-discovery, and pride.[89] The amount of time spent in any of these stages and the overall pace varies widely. Many family members also struggle as they are pushed to reflect on their own gender experience and assumptions throughout this process. In some situations, youth who identify as TGD may be at risk for internalizing the difficult emotions that family members may be experiencing. In these cases, individual and group therapy for the family members may be helpful.[49,78]

Family dynamics can be complex, involving disagreement among legal guardians or between guardians and their children, which may affect the ability to obtain consent for any medical management or interventions. Even in states where minors may access care without parental consent for mental health services, contraception, and sexually transmitted infections, parental or guardian consent is required for hormonal and surgical care of patients who identify as TGD.[72,90] Some families may take issue with providers who address gender concerns or offer gender-affirming care. In rare cases, a family may deny access to care that raises concerns about the youth's welfare and safety; in those cases, additional legal or ethical support may be useful to consider. In such rare situations, pediatric providers may want to familiarize themselves with relevant local consent laws and maintain their primary responsibility for the welfare of the child.

## SAFE SCHOOLS AND COMMUNITIES

Youth who identify as TGD are becoming more visible because gender-diverse expression is increasingly admissible in the media, on social media, and in schools and communities. Regardless of whether a youth with a gender-diverse

8

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf
by guest

identity ultimately identifies as transgender, challenges exist in nearly every social context, from lack of understanding to outright rejection, isolation, discrimination, and victimization. In the US Transgender Survey of nearly 28 000 respondents, it was found that among those who were out as or perceived to be TGD between kindergarten and eighth grade, 54% were verbally harassed, 24% were physically assaulted, and 13% were sexually assaulted; 17% left school because of maltreatment.[31] Education and advocacy from the medical community on the importance of safe schools for youth who identify as TGD can have a significant effect.

At the time of this writing,* only 18 states and the District of Columbia had laws that prohibited discrimination based on gender expression when it comes to employment, housing, public accommodations, and insurance benefits. Over 200 US cities have such legislation. In addition to basic protections, many youth who identify as TGD also have to navigate legal obstacles when it comes to legally changing their name and/or gender marker.[54] In addition to advocating and working with policy makers to promote equal protections for youth who identify as TGD, pediatric providers can play an important role by developing a familiarity with local laws and organizations that provide social work and legal assistance to youth who identify as TGD and their families.

School environments play a significant role in the social and emotional development of children. Every child has a right to feel safe

and respected at school, but for youth who identify as TGD, this can be challenging. Nearly every aspect of school life may present safety concerns and require negotiations regarding their gender expression, including name/pronoun use, use of bathrooms and locker rooms, sports teams, dances and activities, overnight activities, and even peer groups. Conflicts in any of these areas can quickly escalate beyond the school's control to larger debates among the community and even on a national stage.

The formerly known Gay, Lesbian, and Straight Education Network (GLSEN), an advocacy organization for youth who identify as LGBTQ, conducts an annual national survey to measure LGBTQ well-being in US schools. In 2015, students who identified as LGBTQ reported high rates of being discouraged from participation in extracurricular activities. One in 5 students who identified as LGBTQ reported being hindered from forming or participating in a club to support lesbian, gay, bisexual, or transgender students (eg, a gay straight alliance, now often referred to as a genders and sexualities alliance) despite such clubs at schools being associated with decreased reports of negative remarks about sexual orientation or gender expression, increased feelings of safety and connectedness at school, and lower levels of victimization. In addition, >20% of students who identified as LGBTQ reported being blocked from writing about LGBTQ issues in school yearbooks or school newspapers or being prevented or discouraged by coaches and school staff from participating in sports because of their sexual orientation or gender expression.[91]

One strategy to prevent conflict is to proactively support policies and protections that promote inclusion and safety of all students. However, such policies are far from

consistent across districts. In 2015, GLSEN found that 43% of children who identified as LGBTQ reported feeling unsafe at school because of their gender expression, but only 6% reported that their school had official policies to support youth who identified as TGD, and only 11% reported that their school's antibullying policies had specific protections for gender expression.[91] Consequently, more than half of the students who identified as transgender in the study were prevented from using the bathroom, names, or pronouns that aligned with their asserted gender at school. A lack of explicit policies that protected youth who identified as TGD was associated with increased reported victimization, with more than half of students who identified as LGBTQ reporting verbal harassment because of their gender expression. Educators and school administrators play an essential role in advocating for and enforcing such policies. GLSEN found that when students recognized actions to reduce gender-based harassment, both students who identified as transgender and cisgender reported a greater connection to staff and feelings of safety.[91] In another study, schools were open to education regarding gender diversity and were willing to implement policies when they were supported by external agencies, such as medical professionals.[92]

Academic content plays an important role in building a safe school environment as well. The 2015 GLSEN survey revealed that when positive representations of people who identified as LGBTQ were included in the curriculum, students who identified as LGBTQ reported less hostile school environments, less victimization and greater feelings of safety, fewer school absences because of feeling unsafe, greater feelings of connectedness to their school

---

* For more information regarding state-specific laws, please contact the AAP Division of State Government Affairs at stgov@ aap.org.

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by guest

community, and an increased interest in high school graduation and postsecondary education.[91] At the time of this writing,[*] 8 states had laws that explicitly forbade teachers from even discussing LGBTQ issues.[54]

## MEDICAL EDUCATION

One of the most important ways to promote high-quality health care for youth who identify as TGD and their families is increasing the knowledge base and clinical experience of pediatric providers in providing culturally competent care to such populations, as recommended by the recently released guidelines by the Association of American Medical Colleges.[93] This begins with the medical school curriculum in areas such as human development, sexual health, endocrinology, pediatrics, and psychiatry. In a 2009–2010 survey of US medical schools, it was found that the median number of hours dedicated to LGBTQ health was 5, with one-third of US medical schools reporting no LGBTQ curriculum during the clinical years.[94]

During residency training, there is potential for gender diversity to be emphasized in core rotations, especially in pediatrics, psychiatry, family medicine, and obstetrics and gynecology. Awareness could be promoted through the inclusion of topics relevant to caring for children who identify as TGD in the list of core competencies published by the American Board of Pediatrics, certifying examinations, and relevant study materials. Continuing education and maintenance of certification activities can include topics relevant to TGD populations as well.

---

[*] For more information regarding state-specific laws, please contact the AAP Division of State Government Affairs at stgov@ aap.org.

## RECOMMENDATIONS

The AAP works toward all children and adolescents, regardless of gender identity or expression, receiving care to promote optimal physical, mental, and social well-being. Any discrimination based on gender identity or expression, real or perceived, is damaging to the socioemotional health of children, families, and society. In particular, the AAP recommends the following:

1.  that youth who identify as TGD have access to comprehensive, gender-affirming, and developmentally appropriate health care that is provided in a safe and inclusive clinical space;

2.  that family-based therapy and support be available to recognize and respond to the emotional and mental health needs of parents, caregivers, and siblings of youth who identify as TGD;

3.  that electronic health records, billing systems, patient-centered notification systems, and clinical research be designed to respect the asserted gender identity of each patient while maintaining confidentiality and avoiding duplicate charts;

4.  that insurance plans offer coverage for health care that is specific to the needs of youth who identify as TGD, including coverage for medical, psychological, and, when indicated, surgical gender-affirming interventions;

5.  that provider education, including medical school, residency, and continuing education, integrate core competencies on the emotional and physical health needs and best practices for the care of youth who identify as TGD and their families;

6.  that pediatricians have a role in advocating for, educating, and developing liaison relationships with school districts and other community organizations to promote acceptance and inclusion of all children without fear of harassment, exclusion, or bullying because of gender expression;

7.  that pediatricians have a role in advocating for policies and laws that protect youth who identify as TGD from discrimination and violence;

8.  that the health care workforce protects diversity by offering equal employment opportunities and workplace protections, regardless of gender identity or expression; and

9.  that the medical field and federal government prioritize research that is dedicated to improving the quality of evidence-based care for youth who identify as TGD.

### LEAD AUTHOR

Jason Richard Rafferty, MD, MPH, EdM, FAAP

### CONTRIBUTOR

Robert Garofalo, MD, FAAP

### COMMITTEE ON PSYCHOSOCIAL ASPECTS OF CHILD AND FAMILY HEALTH, 2017–2018

Michael Yogman, MD, FAAP, Chairperson
Rebecca Baum, MD, FAAP
Thresia B. Gambon, MD, FAAP
Arthur Lavin, MD, FAAP
Gerri Mattson, MD, FAAP
Lawrence Sagin Wissow, MD, MPH, FAAP

### LIAISONS

Sharon Berry, PhD, LP – *Society of Pediatric Psychology*
Ed Christophersen, PhD, FAAP – *Society of Pediatric Psychology*
Norah Johnson, PhD, RN, CPNP-BC – *National Association of Pediatric Nurse Practitioners*
Amy Starin, PhD, LCSW – *National Association of Social Workers*
Abigail Schlesinger, MD – *American Academy of Child and Adolescent Psychiatry*

### STAFF

Karen S. Smith
James Baumberger

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by guest

## COMMITTEE ON ADOLESCENCE, 2017–2018

Cora Breuner, MD, MPH, FAAP, Chairperson
Elizabeth M. Alderman, MD, FSAHM, FAAP
Laura K. Grubb, MD, MPH, FAAP
Makia E. Powers, MD, MPH, FAAP
Krishna Upadhya, MD, FAAP
Stephenie B. Wallace, MD, FAAP

### LIAISONS

Laurie Hornberger, MD, MPH, FAAP – *Section on Adolescent Health*
Liwei L. Hua, MD, PhD – *American Academy of Child and Adolescent Psychiatry*
Margo A. Lane, MD, FRCPC, FAAP – *Canadian Paediatric Society*
Meredith Loveless, MD, FACOG – *American College of Obstetricians and Gynecologists*
Seema Menon, MD – *North American Society of Pediatric and Adolescent Gynecology*
CDR Lauren B. Zapata, PhD, MSPH – *Centers for Disease Control and Prevention*

### STAFF

Karen Smith

## SECTION ON LESBIAN, GAY, BISEXUAL, AND TRANSGENDER HEALTH AND WELLNESS EXECUTIVE COMMITTEE, 2016–2017

Lynn Hunt, MD, FAAP, Chairperson
Anne Teresa Gearhart, MD, FAAP
Christopher Harris, MD, FAAP
Kathryn Melland Lowe, MD, FAAP
Chadwick Taylor Rodgers, MD, FAAP
Ilana Michelle Sherer, MD, FAAP

### FORMER EXECUTIVE COMMITTEE MEMBERS

Ellen Perrin, MD, MA, FAAP

### LIAISON

Joseph H. Waters, MD – *AAP Section on Pediatric Trainees*

### STAFF

Renee Jarrett, MPH

## ACKNOWLEDGMENTS

We thank Isaac Albanese, MPA, and Jayeson Watts, LICSW, for their thoughtful reviews and contributions.

### ABBREVIATIONS

AAP: American Academy of Pediatrics
GACM: gender-affirmative care model
GLSEN: Gay, Lesbian, and Straight Education Network
LGBTQ: lesbian, gay, bisexual, transgender, or questioning
TGD: transgender and gender diverse

**DOI:** https://doi.org/10.1542/peds.2018-2162

PEDIATRICS (ISSN Numbers: Print, 0031-4005; Online, 1098-4275).

Copyright © 2018 by the American Academy of Pediatrics

**FINANCIAL DISCLOSURE:** The author has indicated he has no financial relationships relevant to this article to disclose.

**FUNDING:** No external funding.

**POTENTIAL CONFLICT OF INTEREST:** The author has indicated he has no potential conflicts of interest to disclose.

## REFERENCES

1. Levine DA; Committee on Adolescence. Office-based care for lesbian, gay, bisexual, transgender, and questioning youth. *Pediatrics*. 2013;132(1). Available at: www.pediatrics.org/cgi/content/full/132/1/e297

2. American Academy of Pediatrics Committee on Adolescence. Homosexuality and adolescence. *Pediatrics*. 1983;72(2):249–250

3. Institute of Medicine; Committee on Lesbian Gay Bisexual, and Transgender Health Issues and Research Gaps and Opportunities. *The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding*. Washington, DC: National Academies Press; 2011. Available at: https://www.ncbi.nlm.nih.gov/books/NBK64806. Accessed May 19, 2017

4. Deutsch MB, Radix A, Reisner S. What's in a guideline? Developing collaborative and sound research designs that substantiate best practice recommendations for transgender health care. *AMA J Ethics*. 2016;18(11):1098–1106

5. Bonifacio HJ, Rosenthal SM. Gender variance and dysphoria in children and adolescents. *Pediatr Clin North Am*. 2015;62(4):1001–1016

6. Vance SR Jr, Ehrensaft D, Rosenthal SM. Psychological and medical care of gender nonconforming youth. *Pediatrics*. 2014;134(6):1184–1192

7. Richards C, Bouman WP, Seal L, Barker MJ, Nieder TO, T'Sjoen G. Non-binary or genderqueer genders. *Int Rev Psychiatry*. 2016;28(1):95–102

8. American Psychological Association. Guidelines for psychological practice with transgender and gender nonconforming people. *Am Psychol*. 2015;70(9):832–864

9. Flores AR, Herman JL, Gates GJ, Brown TNT. *How Many Adults Identify as Transgender in the United States*. Los Angeles, CA: The Williams Institute; 2016

10. Herman JL, Flores AR, Brown TNT, Wilson BDM, Conron KJ. *Age of Individuals Who Identify as Transgender in the United States*. Los Angeles, CA: The Williams Institute; 2017

11. Gates GJ. *How Many People are Lesbian, Gay, Bisexual, and Transgender?* Los Angeles, CA: The Williams Institute; 2011

12. Olson J, Schrager SM, Belzer M, Simons LK, Clark LF. Baseline physiologic and psychosocial characteristics of transgender youth seeking care for gender dysphoria. *J Adolesc Health*. 2015;57(4):374–380

13. Reisner SL, Vetters R, Leclerc M, et al. Mental health of transgender youth in care

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf
by guest

at an adolescent urban community health center: a matched retrospective cohort study. *J Adolesc Health.* 2015;56(3):274–279

14. Clements-Nolle K, Marx R, Katz M. Attempted suicide among transgender persons: the influence of gender-based discrimination and victimization. *J Homosex.* 2006;51(3):53–69

15. Colizzi M, Costa R, Todarello O. Transsexual patients' psychiatric comorbidity and positive effect of cross-sex hormonal treatment on mental health: results from a longitudinal study. *Psychoneuroendocrinology.* 2014;39:65–73

16. Haas AP, Eliason M, Mays VM, et al. Suicide and suicide risk in lesbian, gay, bisexual, and transgender populations: review and recommendations. *J Homosex.* 2011;58(1):10–51

17. Maguen S, Shipherd JC. Suicide risk among transgender individuals. *Psychol Sex.* 2010;1(1):34–43

18. Connolly MD, Zervos MJ, Barone CJ II, Johnson CC, Joseph CL. The mental health of transgender youth: advances in understanding. *J Adolesc Health.* 2016;59(5):489–495

19. Grossman AH, D'Augelli AR. Transgender youth and life-threatening behaviors. *Suicide Life Threat Behav.* 2007;37(5):527–537

20. Spack NP, Edwards-Leeper L, Feldman HA, et al. Children and adolescents with gender identity disorder referred to a pediatric medical center. *Pediatrics.* 2012;129(3):418–425

21. van Schalkwyk GI, Klingensmith K, Volkmar FR. Gender identity and autism spectrum disorders. *Yale J Biol Med.* 2015;88(1):81–83

22. Jacobs LA, Rachlin K, Erickson-Schroth L, Janssen A. Gender dysphoria and co-occurring autism spectrum disorders: review, case examples, and treatment considerations. *LGBT Health.* 2014;1(4):277–282

23. American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders.* 5th ed. Arlington, VA: American Psychiatric Association; 2013

24. Edwards-Leeper L, Spack NP. Psychological evaluation and medical treatment of transgender youth in an interdisciplinary "Gender Management Service" (GeMS) in a major pediatric center. *J Homosex.* 2012;59(3):321–336

25. Anton BS. Proceedings of the American Psychological Association for the legislative year 2008: minutes of the annual meeting of the Council of Representatives, February 22–24, 2008, Washington, DC, and August 13 and 17, 2008, Boston, MA, and minutes of the February, June, August, and December 2008 meetings of the Board of Directors. *Am Psychol.* 2009;64(5):372–453

26. Drescher J, Haller E; American Psychiatric Association Caucus of Lesbian, Gay and Bisexual Psychiatrists. *Position Statement on Discrimination Against Transgender and Gender Variant Individuals.* Washington, DC: American Psychiatric Association; 2012

27. Hidalgo MA, Ehrensaft D, Tishelman AC, et al. The gender affirmative model: what we know and what we aim to learn. *Hum Dev.* 2013;56(5):285–290

28. Tishelman AC, Kaufman R, Edwards-Leeper L, Mandel FH, Shumer DE, Spack NP. Serving transgender youth: challenges, dilemmas and clinical examples. *Prof Psychol Res Pr.* 2015;46(1):37–45

29. Adelson SL; American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Quality Issues (CQI). Practice parameter on gay, lesbian, or bisexual sexual orientation, gender nonconformity, and gender discordance in children and adolescents. *J Am Acad Child Adolesc Psychiatry.* 2012;51(9):957–974

30. Herbst JH, Jacobs ED, Finlayson TJ, McKleroy VS, Neumann MS, Crepaz N; HIV/AIDS Prevention Research Synthesis Team. Estimating HIV prevalence and risk behaviors of transgender persons in the United States: a systematic review. *AIDS Behav.* 2008;12(1):1–17

31. James SE, Herman JL, Rankin S, Keisling M, Mottet L, Anafi M. *The Report of the 2015 U.S. Transgender Survey.* Washington, DC: National Center for Transgender Equality; 2016

32. Centers for Disease Control and Prevention. *CDC-Funded HIV Testing: United States, Puerto Rico, and the U.S. Virgin Islands.* Atlanta, GA: Centers for Disease Control and Prevention; 2015. Available at: https://www.cdc.gov/hiv/pdf/library/reports/cdc-hiv-funded-testing-us-puerto-rico-2015.pdf. Accessed August 2, 2018

33. Substance Abuse and Mental Health Services Administration. *Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth.* Rockville, MD: Substance Abuse and Mental Health Services Administration; 2015

34. Korell SC, Lorah P. An overview of affirmative psychotherapy and counseling with transgender clients. In: Bieschke KJ, Perez RM, DeBord KA, eds. *Handbook of Counseling and Psychotherapy With Lesbian, Gay, Bisexual, and Transgender Clients.* 2nd ed. Washington, DC: American Psychological Association; 2007:271–288

35. World Professional Association for Transgender Health. *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People.* 7th ed. Minneapolis, MN: World Professional Association for Transgender Health; 2011. Available at: https://www.wpath.org/publications/soc. Accessed April 15, 2018

36. Menvielle E. A comprehensive program for children with gender variant behaviors and gender identity disorders. *J Homosex.* 2012;59(3):357–368

37. Hill DB, Menvielle E, Sica KM, Johnson A. An affirmative intervention for families with gender variant children: parental ratings of child mental health and gender. *J Sex Marital Ther.* 2010;36(1):6–23

38. Haldeman DC. The practice and ethics of sexual orientation conversion therapy. *J Consult Clin Psychol.* 1994;62(2):221–227

39. Byne W. Regulations restrict practice of conversion therapy. *LGBT Health.* 2016;3(2):97–99

40. Cohen-Kettenis PT, Delemarre-van de Waal HA, Gooren LJ. The treatment of adolescent transsexuals: changing insights. *J Sex Med.* 2008;5(8):1892–1897

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by guest

41. Bryant K. Making gender identity disorder of childhood: historical lessons for contemporary debates. *Sex Res Soc Policy.* 2006;3(3):23–39

42. World Professional Association for Transgender Health. *WPATH De-Psychopathologisation Statement.* Minneapolis, MN: World Professional Association for Transgender Health; 2010. Available at: https://www.wpath.org/policies. Accessed April 16, 2017

43. American Academy of Pediatrics. AAP support letter conversion therapy ban [letter]. 2015. Available at: https://www.aap.org/en-us/advocacy-and-policy/federal-advocacy/Documents/AAPsupportletterconversiontherapyban.pdf. Accessed August 1, 2018

44. Movement Advancement Project. *LGBT Policy Spotlight: Conversion Therapy Bans.* Boulder, CO: Movement Advancement Project; 2017. Available at: http://www.lgbtmap.org/policy-and-issue-analysis/policy-spotlight-conversion-therapy-bans. Accessed August 6, 2017

45. Ehrensaft D, Giammattei SV, Storck K, Tishelman AC, Keo-Meier C. Prepubertal social gender transitions: what we know; what we can learn—a view from a gender affirmative lens. *Int J Transgend.* 2018;19(2):251–268

46. Olson KR, Key AC, Eaton NR. Gender cognition in transgender children. *Psychol Sci.* 2015;26(4):467–474

47. Olson KR. Prepubescent transgender children: what we do and do not know. *J Am Acad Child Adolesc Psychiatry.* 2016;55(3):155–156.e3

48. Olson KR, Durwood L, DeMeules M, McLaughlin KA. Mental health of transgender children who are supported in their identities. *Pediatrics.* 2016;137(3):e20153223

49. Malpas J. Between pink and blue: a multi-dimensional family approach to gender nonconforming children and their families. *Fam Process.* 2011;50(4):453–470

50. Hagan JF Jr, Shaw JS, Duncan PM, eds. *Bright Futures: Guidelines for Health Supervision of Infants, Children, and Adolescents.* 4th ed. Elk Grove, IL: American Academy of Pediatrics; 2016

51. Minter SP. Supporting transgender children: new legal, social, and medical approaches. *J Homosex.* 2012;59(3):422–433

52. AHIMA Work Group. Improved patient engagement for LGBT populations: addressing factors related to sexual orientation/gender identity for effective health information management. *J AHIMA.* 2017;88(3):34–39

53. Deutsch MB, Green J, Keatley J, Mayer G, Hastings J, Hall AM; World Professional Association for Transgender Health EMR Working Group. Electronic medical records and the transgender patient: recommendations from the World Professional Association for Transgender Health EMR Working Group. *J Am Med Inform Assoc.* 2013;20(4):700–703

54. Dowshen N, Meadows R, Byrnes M, Hawkins L, Eder J, Noonan K. Policy perspective: ensuring comprehensive care and support for gender nonconforming children and adolescents. *Transgend Health.* 2016;1(1):75–85

55. Cahill SR, Baker K, Deutsch MB, Keatley J, Makadon HJ. Inclusion of sexual orientation and gender identity in stage 3 meaningful use guidelines: a huge step forward for LGBT health. *LGBT Health.* 2016;3(2):100–102

56. Mansfield MJ, Beardsworth DE, Loughlin JS, et al. Long-term treatment of central precocious puberty with a long-acting analogue of luteinizing hormone-releasing hormone. Effects on somatic growth and skeletal maturation. *N Engl J Med.* 1983;309(21):1286–1290

57. Olson J, Garofalo R. The peripubertal gender-dysphoric child: puberty suppression and treatment paradigms. *Pediatr Ann.* 2014;43(6):e132–e137

58. de Vries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT. Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study. *J Sex Med.* 2011;8(8):2276–2283

59. Wallien MS, Cohen-Kettenis PT. Psychosexual outcome of gender-dysphoric children. *J Am Acad Child Adolesc Psychiatry.* 2008;47(12):1413–1423

60. Waylen A, Wolke D. Sex 'n' drugs 'n' rock 'n' roll: the meaning and social consequences of pubertal timing. *Eur J Endocrinol.* 2004;151(suppl 3):U151–U159

61. de Vries AL, Klink D, Cohen-Kettenis PT. What the primary care pediatrician needs to know about gender incongruence and gender dysphoria in children and adolescents. *Pediatr Clin North Am.* 2016;63(6):1121–1135

62. Vlot MC, Klink DT, den Heijer M, Blankenstein MA, Rotteveel J, Heijboer AC. Effect of pubertal suppression and cross-sex hormone therapy on bone turnover markers and bone mineral apparent density (BMAD) in transgender adolescents. *Bone.* 2017;95:11–19

63. Finlayson C, Johnson EK, Chen D, et al. Proceedings of the working group session on fertility preservation for individuals with gender and sex diversity. *Transgend Health.* 2016;1(1):99–107

64. Kreukels BP, Cohen-Kettenis PT. Puberty suppression in gender identity disorder: the Amsterdam experience. *Nat Rev Endocrinol.* 2011;7(8):466–472

65. Rosenthal SM. Approach to the patient: transgender youth: endocrine considerations. *J Clin Endocrinol Metab.* 2014;99(12):4379–4389

66. Fenway Health. *Glossary of Gender and Transgender Terms.* Boston, MA: Fenway Health; 2010. Available at: http://fenwayhealth.org/documents/the-fenway-institute/handouts/Handout_7-C_Glossary_of_Gender_and_Transgender_Terms__fi.pdf. Accessed August 16, 2017

67. de Vries AL, McGuire JK, Steensma TD, Wagenaar EC, Doreleijers TA, Cohen-Kettenis PT. Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics.* 2014;134(4):696–704

68. Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: an endocrine society clinical practice guideline. *J Clin Endocrinol Metab.* 2017;102(11):3869–3903

69. Milrod C, Karasic DH. Age is just a number: WPATH-affiliated surgeons' experiences and attitudes toward

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by guest

vaginoplasty in transgender females under 18 years of age in the United States. *J Sex Med.* 2017;14(4):624–634

70. Milrod C. How young is too young: ethical concerns in genital surgery of the transgender MTF adolescent. *J Sex Med.* 2014;11(2):338–346

71. Olson-Kennedy J, Warus J, Okonta V, Belzer M, Clark LF. Chest reconstruction and chest dysphoria in transmasculine minors and young adults: comparisons of nonsurgical and postsurgical cohorts. *JAMA Pediatr.* 2018;172(5):431–436

72. Committee on Adolescent Health Care. Committee opinion no. 685: care for transgender adolescents. *Obstet Gynecol.* 2017;129(1):e11–e16

73. Greydanus DE, Patel DR, Rimsza ME. Contraception in the adolescent: an update. *Pediatrics.* 2001;107(3):562–573

74. Gridley SJ, Crouch JM, Evans Y, et al. Youth and caregiver perspectives on barriers to gender-affirming health care for transgender youth. *J Adolesc Health.* 2016;59(3):254–261

75. Sanchez NF, Sanchez JP, Danoff A. Health care utilization, barriers to care, and hormone usage among male-to-female transgender persons in New York City. *Am J Public Health.* 2009;99(4):713–719

76. Transgender Law Center. *Affordable Care Act Fact Sheet.* Oakland, CA: Transgender Law Center; 2016. Available at: https://transgenderlawcenter.org/resources/health/aca-fact-sheet. Accessed August 8, 2016

77. Nahata L, Quinn GP, Caltabellotta NM, Tishelman AC. Mental health concerns and insurance denials among transgender adolescents. *LGBT Health.* 2017;4(3):188–193

78. Grant JM, Mottet LA, Tanis J, Harrison J, Herman JL, Keisling M. *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* Washington, DC: National Center for Transgender Equality and National Gay and Lesbian Task Force; 2011 Available at: http://www.thetaskforce.org/static_html/downloads/reports/reports/ntds_full.pdf. Accessed August 6, 2018

79. Sevelius JM. Gender affirmation: a framework for conceptualizing risk behavior among transgender women of color. *Sex Roles.* 2013;68(11–12):675–689

80. Koken JA, Bimbi DS, Parsons JT. Experiences of familial acceptance-rejection among transwomen of color. *J Fam Psychol.* 2009;23(6):853–860

81. Lombardi EL, Wilchins RA, Priesing D, Malouf D. Gender violence: transgender experiences with violence and discrimination. *J Homosex.* 2001;42(1):89–101

82. Wren B. 'I can accept my child is transsexual but if I ever see him in a dress I'll hit him': dilemmas in parenting a transgendered adolescent. *Clin Child Psychol Psychiatry.* 2002;7(3):377–397

83. Riley EA, Sitharthan G, Clemson L, Diamond M. The needs of gender-variant children and their parents: a parent survey. *Int J Sex Health.* 2011;23(3):181–195

84. Whitley CT. Trans-kin undoing and redoing gender: negotiating relational identity among friends and family of transgender persons. *Sociol Perspect.* 2013;56(4):597–621

85. Travers R, Bauer G, Pyne J, Bradley K, Gale L, Papadimitriou M; Trans PULSE; Children's Aid Society of Toronto; Delisle Youth Services. *Impacts of Strong Parental Support for Trans Youth: A Report Prepared for Children's Aid Society of Toronto and Delisle Youth Services.* Toronto, ON: Trans PULSE; 2012. Available at: http://transpulseproject.ca/wp-content/uploads/2012/10/Impacts-of-Strong-Parental-Support-for-Trans-Youth-vFINAL.pdf

86. Ryan C, Russell ST, Huebner D, Diaz R, Sanchez J. Family acceptance in adolescence and the health of LGBT young adults. *J Child Adolesc Psychiatr Nurs.* 2010;23(4):205–213

87. Grossman AH, D'augelli AR, Frank JA. Aspects of psychological resilience among transgender youth. *J LGBT Youth.* 2011;8(2):103–115

88. McConnell EA, Birkett M, Mustanski B. Families matter: social support and mental health trajectories among lesbian, gay, bisexual, and transgender youth. *J Adolesc Health.* 2016;59(6):674–680

89. Ellis KM, Eriksen K. Transsexual and transgenderist experiences and treatment options. *Fam J Alex Va.* 2002;10(3):289–299

90. Lamda Legal. *Transgender Rights Toolkit: A Legal Guide for Trans People and Their Advocates.* New York, NY: Lambda Legal; 2016 Available at: https://www.lambdalegal.org/publications/trans-toolkit. Accessed August 6, 2018

91. Kosciw JG, Greytak EA, Giga NM, Villenas C, Danischewski DJ. *The 2015 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools.* New York, NY: GLSEN; 2016. Available at: https://www.glsen.org/article/2015-national-school-climate-survey. Accessed August 8, 2018

92. McGuire JK, Anderson CR, Toomey RB, Russell ST. School climate for transgender youth: a mixed method investigation of student experiences and school responses. *J Youth Adolesc.* 2010;39(10):1175–1188

93. Association of American Medical Colleges Advisory Committee on Sexual Orientation, Gender Identity, and Sex Development. In: Hollenback AD, Eckstrand KL, Dreger A, eds. *Implementing Curricular and Institutional Climate Changes to Improve Health Care for Individuals Who Are LGBT, Gender Nonconforming, or Born With DSD: A Resource for Medical Educators.* Washington, DC: Association of American Medical Colleges; 2014. Available at: https://members.aamc.org/eweb/upload/Executive LGBT FINAL.pdf. Accessed August 8, 2018

94. Obedin-Maliver J, Goldsmith ES, Stewart L, et al. Lesbian, gay, bisexual, and transgender-related content in undergraduate medical education. *JAMA.* 2011;306(9):971–977

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by guest

# EXHIBIT 13

Donate

News Release

## AAP Opposes New HHS Rules Restricting Access to Care for Families

By: Susan J. Kressly, MD, FAAP, President

"Unprecedented actions and harmful rhetoric taking place today  by  U.S. Department of Health and Human Services (HHS) leaders mark a concerning departure from the longstanding principle that health care policy should be grounded in scientific evidence, clinical expertise, and the needs of children and families. These policies and proposals misconstrue the current medical consensus and fail to reflect the realities of pediatric care and the needs of children and families.

"Specifically, HHS issued new proposed rules that create uncertainty for all patients and place new barriers on those seeking treatment, by banning federal funds for health care provided to transgender young people and only allowing hospitals to participate in Medicare and Medicaid if they do not provide care to transgender young people. Allowing the government to determine which patient groups deserve care sets a dangerous precedent, and children and families will bear the consequences.

**For Release:**

12/18/2025

**Media Contact:**

Lisa Robinson

630-626-6084

lrobinson@aap.org

"These rules are a baseless intrusion into the patient-physician relationship. Patients, their families, and their physicians—not politicians or government officials —should be the ones to make decisions together about what care is best for them. The government's actions today make that task harder, if not impossible, for families of gender-diverse and transgender youth.

"At a time when families across the country are facing rising costs and other health challenges, our leading government health care agency opts to introduce regulations that focus disproportionate attention on denying care to a small population of adolescents. These rules help no one, do nothing to address health care costs, and unfairly stigmatize a population of young people.

"The American Academy of Pediatrics remains committed to ensuring that all children — including gender-diverse youth and children covered by Medicaid — receive care that is backed by science, delivered with compassion, and offered without political interference. We call on HHS to immediately reverse course and rescind these harmful proposals."

###

*The American Academy of Pediatrics is an organization of 67,000 primary care pediatricians, pediatric medical subspecialists and pediatric surgical specialists dedicated to the health, safety and well-being of infants, children, adolescents and young adults.*

© Copyright 2026 American Academy of Pediatrics. All rights reserved.

# **EXHIBIT 14**

# Combating Scientific Disinformation on Gender-Affirming Care

Meredithe McNamara, MD, MSc,[a] Hussein Abdul-Latif, MD,[b] Susan D. Boulware, MD,[a] Rebecca Kamody, PhD,[c] Laura E. Kuper, PhD,[d] Christy L. Olezeski, PhD,[e] Nathalie Szilagyi, MD,[a] Anne Alstott, JD[f]

abstract

Scientific disinformation is false and misleading information that is used intentionally by legal and political actors to sway public opinion and oppose facts. In recent years, disinformation has become a tool for authorities to limit gender-affirming health care (GAC) for transgender and gender-expansive youth who experience gender dysphoria. Existing modes of expert intervention in health policy may not be sufficient to match the pace of these quickly unfolding health care bans. A cross-disciplinary team of academics in medicine, psychology, and law assembled to challenge scientific disinformation on GAC with 2 rapid-response rebuttal reports. Reports were produced in 3 to 10 weeks after the passage of GAC bans in Texas, Alabama, and Florida in 2022. They were posted online to facilitate dissemination and engage litigators, judges, policy experts, advocates, parents, and others. The team's efforts complemented public statements by medical societies and lawsuits brought by national LGBTQ litigators. The team's reports were cited in legal challenges to GAC bans in Texas, Alabama, and Florida. The team also filed amicus briefs for direct consideration by the courts and public comments to health care agencies in Florida. The reports received coverage in local and national media outlets in broadcast and print media. This advocacy case study describes the process used to challenge disinformation about GAC with rapid-response rebuttal reports, as well as the impact of this work and associated challenges. In an increasingly polarized political climate, this process may be adapted to other areas of health policy in which scientific disinformation takes root.



[a]Department of Pediatrics, Yale School of Medicine, New Haven, Connecticut; [b]University of Alabama-Birmingham, Birmingham, Alabama; [c]Yale Child Study Center, Yale School of Medicine, New Haven, Connecticut; [d]Childrens' Health Systems of Texas, University of Texas Southwestern Medical Center, Houston, Texas; [e]Department of Psychiatry, Yale School of Medicine, New Haven, Connecticut; and [f]Yale Law School, New Haven, Connecticut

Dr McNamara conceptualized and drafted the initial manuscript and critically reviewed and revised subsequent versions of the manuscript; Drs Abdul-Latif, Boulware, Kamody, Kuper, Olezeski, and Szilagyi critically reviewed and revised the manuscript; Ms Alstott drafted the initial manuscript and critically reviewed and revised subsequent versions of the manuscript; and all authors conceptualized the work described in this Advocacy Case Study, approved the final manuscript as submitted, and agree to be accountable for all aspects of the work.

**DOI:** https://doi.org/10.1542/peds.2022-060943

Accepted for publication Apr 20, 2023

Address correspondence to Meredithe McNamara, MD, MSc, Department of Pediatrics, Yale School of Medicine, 15 York St, New Haven, CT 06512. E-mail: meredithe.mcnamara@yale.edu

PEDIATRICS (ISSN Numbers: Print, 0031-4005; Online, 1098-4275).

Copyright © 2023 by the American Academy of Pediatrics

**FUNDING:** No external funding.

**CONFLICT OF INTEREST DISCLOSURES:** The authors have indicated they have no potential conflicts of interest to disclose.

**To cite:** McNamara M, Abdul-Latif H, Boulware SD, et al. Combating Scientific Disinformation on Gender-Affirming Care. *Pediatrics.* 2023;152(3): e2022060943

Transgender and gender-expansive (TGE) is an umbrella term that describes those whose gender identity is different from their assigned sex at birth and not necessarily binary male or female. In 2021 and 2022, state legislatures and other legal authorities proposed and enacted an unprecedented number of actions that discriminate against TGE youth (Fig 1).[1-4] Some prohibit children and adolescents from participating in sports aligned with their gender and using an appropriate school bathroom. Anti-LGBTQ policy actions also target gender-affirming medical care (GAC) for TGE youth, thus interfering in the physician-patient relationship and overriding private medical decisions.[5] Several of these laws threaten health care providers with prison time, malpractice liability, and loss of licensure, whereas others penalize parents and guardians who consent to this care (Table 1). We refer to these measures collectively as "GAC bans" because all seek to prohibit or limit care for TGE youth or adults. Most of these bans have been blocked temporarily by courts, but litigation is ongoing, and some are currently in force. The intimidation of such actions has disrupted clinical services at children's hospitals throughout the country.[6]

Medical evidence establishes that transgender and gender-diverse identities are valid, that gender dysphoria is real, and that GAC is safe and effective when provided in accordance with guidelines issued by, among others, the World

ADVOCACY CASE STUDY

Downloaded from http://publications.aap.org/pediatrics/article-pdf/152/3/e2022060943/1567424/peds.2022-060943.pdf by guest



**FIGURE 1**
Number of US states with statewide legal measures targeting transgender and gender-expansive youth per year. Legal measures include legislation adopted by US states; proposed but not-yet-adopted measures are excluded. Also excluded are (1) local rules (eg, school district policies) that restrict sports participation or bathroom access and (2) statewide laws (colloquially known as "Don't Say Gay or Trans") that exclude mentions of gender identity and sexual orientation in school curricula.

Professional Association for Transgender Health (WPATH) and the Endocrine Society.[7,8] GAC for youth is supported by every relevant major medical association, including the American Academy of Pediatrics (AAP), American Psychological Association, and the American Academy of Child and Adolescent Psychiatry.[9–11] Although legal authorities have the resources to consult the science and draft health policy that aligns with medical consensus, promoters of GAC bans have ignored or mischaracterized the scientific evidence.[12,13] These legal authorities have erroneously contended that transgender identities are the product of mental illness and social contagion, that gender dysphoria in adolescence resolves spontaneously, that GAC is forced onto patients by physicians, and that it is experimental and dangerous.

Scientific disinformation is distinct from misinformation. Whereas misinformation can be unwittingly spread by those without access to the facts, disinformation is used by those who know, or have the resources to know, that it is false or misleading. Such disinformation has recently been deployed to justify GAC bans in legislation, court filings, and administrative agency actions.[12,13] For example, legislation in Alabama includes the statement that "[s]ome in the medical community are aggressively pushing for interventions on minors."[1] The legislation also states that "[m]inors, and often their parents, are unable to comprehend and fully appreciate the risk and life implications, including permanent sterility, that result from the use of puberty blockers, cross-sex hormones, and surgical procedures."[1] In fact, WPATH Standards of Care and Endocrine Society Clinical Practice Guidelines establish a careful process for psychosocial assessment and interdisciplinary medical counseling, with the expressed goal of providing individualized care guided by informed consent and assent.[7,8]

| | | Patients | |
|---|---|---|---|
| State | Year of Action | Targeted | Type of Action and Consequences |
| Arkansas | 2021 | Youth | Legislation passed over governor's veto<br>Imposes loss of licensure on physicians who provide GAC |
| Texas | 2022 | Youth | Governor's directive based on state attorney general legal opinion that GAC is "child abuse"<br>Texas DFPS directed to investigate parents who consent to GAC |
| Alabama | 2022 | Youth | Legislation<br>Imposes criminal penalties including prison sentences of up to 10 y on physicians and other providers of GAC, as well as those who consent to care |
| Florida | 2022 | All ages | State Medicaid regulations<br>Deny coverage for GAC to patients of any age |
| Florida | 2022 | Youth | Standard of care adopted by Florida Board of Medicine and Board of Osteopathic Medicine<br>Prohibit GAC for youth |

**TABLE 1** GAC Bans Adopted in 2021 and 2022 in US States

Downloaded from http://publications.aap.org/pediatrics/article-pdf/152/3/e2022060943/1567424/peds.2022-060943.pdf
by guest

Disinformation about GAC often includes attacks on medical authority.[1,2,4,12,13] Medical societies that support GAC have become a target for disinformation attacks that reject the societies' expertise and dismiss them as biased. For example, a legal brief filed by the state of Alabama contends that "organizations like the American Medical Association and the American Academy of Pediatrics continue to follow the popular zeitgeist when it comes to unproven gender-affirming interventions," whereas a brief filed by the state of Arkansas urged, in reference to WPATH and the Endocrine Society, that "[n]othing requires the [Food and Drug Administration], Arkansas, or any governmental entity to defer to the policy judgements of an advocacy organization."[1,4,14,15]

Legal documents justifying GAC bans often ignore or mischaracterize clinical practice guidelines and offer cherrypicked criticisms of individual studies without addressing the preponderance of evidence establishing the benefits and risks of GAC for patients with gender dysphoria.[12,13] For example, the state of Florida's Agency for Health Care Administration (AHCA) recommended a GAC ban for Medicaid patients on the basis of an unpublished, non-peer-reviewed literature review by authors with no subject-matter expertise who commented on a truncated sample of available studies.[3] The Florida agency also relied on unpublished, non-peer-reviewed reports by authors whose expertise has been successfully challenged in court (ie, their testimony was questioned or disallowed by judges), as well as some with ties to antitransgender groups.[13]

The authors of this Advocacy Case Study have documented and rebutted this disinformation at length in 2 reports with voluminous citations to published and peerreviewed scientific evidence.[12,13] This piece is focused on the process by which these reports were developed, their impact, lessons learned, and implications for future work.

### RESPONSE TO DISINFORMATION

In response to the growing number of GAC bans, the authors assembled an interdisciplinary group of subject matter experts to craft a written product, a "rapid-response rebuttal report," to document and rebut scientific disinformation about GAC. Our goal was to contribute to the complex ecosystem of legal and scientific information about GAC. National and regional LGBTQ groups, including the American Civil Liberties Union, Lambda Legal, and GLBTQ Legal Advocates and Defenders, have filed lawsuits to protect access to GAC and oppose bans. Medical societies have publicly endorsed GAC and opposed GAC bans.[16] Individual researchers and clinicians have provided information to litigators and the public via expert witness testimony and peer-reviewed scholarship.

Our team's objective was to combine legal and medical expertise to complement these efforts in 2 ways. First, we aimed to craft written reports that would make sound scientific information accessible to lawyers, who typically are not trained to analyze medical research. An important feature of these reports is the inclusion of thorough citations to the scientific literature. Second, the team sought to identify and rebut in detail the false and misleading claims made about GAC by state authorities. As the team's work developed, we found that these reports could support additional efforts to combat disinformation via media engagement and direct participation in legal and policy processes.

### OUR TEAM

We formed a cross-disciplinary team, consisting of a legal scholar and 7 clinicians with academic affiliations from 3 institutions. The legal scholar, who is a lawyer capable of both practice and academic research, organized and helmed the project (AA). Her knowledge helped pinpoint where, among evolving legal controversy, this work would have the greatest impact. She also played a translational role by distilling key questions from legal sources and ensuring that our written work would be accessible to a nonscientific audience. All clinicians treat transgender youth and 2 practice in jurisdictions of GAC bans. Two are pediatric endocrinologists (HAL, SB), 1 is an adolescent medicine physician (MM), 1 is a child and adolescent psychiatrist (NS), and 3 are pediatric psychologists (RK, LK, CO). Many conduct research in this field and provide training that is relevant to this work. Collectively, our group has 57 years of experience in treating >2100 TGE youth.

### COMBATTING DISINFORMATION: EXISTING AND NEW MODES FOR EXPERT INTERVENTION

Existing modes of scientific expert intervention in health policy include published scholarship, testimony in litigation, and media engagement. All of these are critical avenues for communicating scientific information but also have limitations in addressing the rapid spread of disinformation in an evolving legal landscape of GAC bans. Peerreviewed journal publications cannot be quickly produced and are not easily accessible to nonexperts. Expert testimony in litigation provides accurate information to courts but occurs only after enacted bans are challenged and is not easily accessible to the public. Medical society policy statements are impactful and can be quickly responsive, but they are typically concise and provide affirmative portrayals of medical knowledge rather than specific rebuttals of disinformation. Media engagement by experts is also effective but cannot convey the in-depth analysis needed to rebut disinformation claims. After reviewing these options, the team concluded that a comprehensive, evidence-based,

Downloaded from http://publications.aap.org/pediatrics/article-pdf/152/3/e2022060943/1567424/peds.2022-060943.pdf by guest

and quickly produced document could provide a critical resource for legal and public discourse.

### PREPARATION AND PROCESS

Our rapid-response rebuttal reports used the expertise of all team members. Pediatric psychologists and a psychiatrist addressed false and misleading claims that cooccurring mental health disorders and social contagion are responsible for gender dysphoria. Pediatric endocrinologists and the adolescent medicine physician analyzed misinformation about standard practice and the safety of gender-affirming medications. Those with experience in clinical research exposed the mischaracterization of existing data and engaged with misleading claims about the strength of evidence on GAC. The legal scholar clarified technical points and strengthened arguments. Together, the team developed clinically relevant analogies that would clarify issues for judges, litigators, and journalists.

Members of our group contributed as much as they were able, with individuals working from 5 to 25 hours per week. The first report took ~80 hours of combined effort and went through 5 drafts. The second report took 70 hours of combined effort and went through 3 drafts. All authors approved the final versions of each report before public dissemination.

With lead times of 3 to 10 weeks, the team produced 2 freely accessible written products that rebutted disinformation claims in 3 GAC bans. A 28-page report rebutting disinformation in the Texas and Alabama actions was issued on April 28, 2022.[12] This was 2 months after the Texas Attorney General opinion and Governor directive for the Department of Family and Protective Services (DFPS) to investigate parents of TGE youth and 20 days after the enactment of the Alabama GAC ban. A 47-page report was submitted as a formal comment letter to Florida 3 weeks after the state issued its proposed Medicaid ban on GAC.[13,17]

Dissemination of findings was achieved with a multimodal strategy. We made our reports freely available on a Web site hosted by an academic institution and on an open-access research platform (Social Science Research Network). We circulated the reports within our respective professional networks via e-mail list-serves. One institution's communications office issued press releases to relevant local and national outlets. Members of the group also prepared an opinion piece and pitched it to various news outlets. The results of this dissemination strategy are discussed below.

To approximate an element of peer review, we approached medical societies with expertise relevant to GAC. Our first report received formal endorsement from 6 medical societies, including the Endocrine Society, the United States Professional Association of Transgender Health, WPATH, the Society of Adolescent Health and Medicine, the North American Society of Pediatric and Adolescent Gynecology, and Health Professionals Advancing LGBTQ Equality. In each written product, team members clearly stated that we received no financial compensation for this work and had no other conflicts of interest. After the release of each report, 1 institution's communications offices disseminated press releases nationally and to news outlets in the jurisdictions of GAC bans, with subsequent media coverage.

### OUTCOMES IN ENGAGEMENT WITH LEGAL PROCESSES

In litigation challenging GAC bans, defendants are the states whereas plaintiffs are usually doctors, parents, and patients denied care. Plaintiffs first ask a court to preliminarily enjoin, or block, enforcement of the law so that care can proceed until a full trial is conducted. At all stages of litigation, courts consider evidence via briefs presented by the plaintiffs and defendants. Courts also consider amicus briefs, which are submitted by individuals or groups with relevant expertise and a special interest in the outcome of the case. Thus far, our team's reports have been cited in legal briefs in challenges to GAC bans in Texas, Alabama, and Florida (Table 2).[15,18,19] In addition, the team submitted amicus briefs in the court of appeals in the Alabama case and in the trial court in the Florida case.[20,21] These briefs argued that GAC bans in Alabama and Florida did not rest on scientific knowledge and should be enjoined pending litigation.

In Florida, the team also submitted comments to oppose proposed GAC bans. Like many states and the federal government, Florida agencies provide a public comment period before the adoption of any proposed rule. After the Florida AHCA proposed to deny Medicaid coverage for GAC, we submitted a timely formal comment letter and attached our second report.[17] The second report was also cited by other organizations in their own formal comments.[22] Although the Florida Medicaid ban was adopted in September 2022, the team's comments and those of others are part of an official legal record that will be relevant to the plaintiff's lawsuit challenging the rule. When Florida's Board of Medicine shortly thereafter considered a broader ban on GAC for youth, 1 member of our group provided expert testimony in a public hearing, and the team submitted formal written comments which were broadly cited as well.[23,24] The Florida Board of Medicine and Board of Osteopathic Medicine are expected to adopt this rule, but once again, these comments and testimony will serve as relevant information for future litigation.

### OUTCOMES IN PUBLIC ENGAGEMENT

Our work was covered >30 times in at least 19 media outlets. Members of our group were contacted by

Downloaded from http://publications.aap.org/pediatrics/article-pdf/152/3/e2022060943/1567424/peds.2022-060943.pdf
by guest

**TABLE 2** Our Team's Direct Participation and Citation in Addressing GAC Bans by State

| State | Legal Action Interfering With GAC (Corresponding Report) | Legal Challenge to Action; Plaintiffs | Status of Action | Direct Participation by Our Team | Citations of Reports |
|---|---|---|---|---|---|
| Texas | Based on Attorney General Opinion, Governor directed the DFPS to investigate families[a] | PFLAG v Abbott,* families investigated by the DFPS | Enjoined; pending trial | None | Plaintiff's Original Petition, Application for Temporary Restraining Order*[16] |
| Alabama | Vulnerable Child and Compassion Act[a] | Eknes-Tucker v Governor of Alabama,* Minister, doctors, parents, and patients deprived of care | Enjoined; pending trial | Amicus brief*[19] | Reply brief in support of Plaintiff's Motion for Temporary Restraining Order*[13] |
| Florida | AHCA adopted rule that terminated Medicaid coverage of GAC for all ages[3 b] | Dekker v Weida;* Patients denied Medicaid coverage by the AHCA | Rule struck down | Comment letter**[16] Amicus brief*[21] | Comment letter from the AAP and Florida Chapter of the AAP**[22] Complaint and Plaintiff's Motion for Preliminary Injunction, Dekker v Weida*[19] |
|  | Board of Medicine and Board of Osteopathic Medicine proposed rule to ban GAC for youth[23 b] | Doe v Ladapo*; Minor patients and denied GAC and their parents | Enjoined; pending trial | Comment letter**[24] Expert testimony**[23] | Comment letters from the AAP, Florida Chapter of the AAP, Human Rights Campaign, and others**[24] |

[a] A Critical Review of the June 2022 Florida Medicaid Report on the Medical Treatment of Gender Dysphoria.
[b] Biased Science: The Texas and Alabama Measures Criminalizing Medical Treatment of Transgender Children and Adolescents Rely on Inaccurate and Misleading Scientific Claims.
* Litigation.
** Regulatory comments.

journalists for interviews, which allowed key points about scientific disinformation challenges to be distilled and conveyed in print, radio, and televised media. Team members also prepared shorter pieces with clear cross-references to the reports, including an op-ed in a major national newspaper and 3 commentaries in high-impact medical journals.[25–28]

## LESSONS LEARNED

Rapid-response rebuttal reports are 1 way to bring expert knowledge to bear in the legal processes that shape health policy. The team's reports and related materials have been included in the legal record for GAC bans in litigation and regulatory processes that lead to the adoption of GAC bans. In this sense, the team achieved its goals formed at the project's inception in producing documents that were included in the legal, policy, and public discourse on essential health care for TGE youth. We cannot yet know the longer-term impacts of this work, as litigation challenging GAC bans is now proceeding in several states.

Challenges arose in producing and amplifying this work. First, the quick pace of legal actions imposed inflexible deadlines, which can be difficult for clinicians with patient care responsibilities. We were motivated by the looming harm that these bans imposed on our patients and colleagues. We sketched out, in advance, the timeline for each project and kept our group small to ensure participation and accountability. Active leadership and clear assignments of responsibility for specific subtopics helped us work quickly and make the best use of our multidisciplinary expertise. Second, a rapid-response rebuttal report cannot be formally peer-reviewed. We addressed this by convening a diverse group of subject-matter experts from different institutions. Medical organization endorsement afterward enhanced the credibility of this nontraditional work. Third, our work proceeded in a harsh political climate. Some members of our group faced harassment, and some faced legal interference in their clinical practice from bans. We provided support and solidarity to one another, and those receiving threats used institutional safety procedures.

Downloaded from http://publications.aap.org/pediatrics/article-pdf/152/3/e2022060943/1567424/peds.2022-060943.pdf by guest

Rapid response rebuttal reports complement other efforts to address disinformation about GAC. Medical societies have become active participants in litigation challenging GAC bans, and their interventions have had positive effects. In Alabama, for example, a federal judge gave weight to an amicus brief filed by 22 medical societies, including the AAP, the American Medical Association, the Society of Adolescent Health and Medicine, and others.[16] The AAP has submitted public comments opposing Florida GAC bans, and WPATH has used its members' expertise to issue public statements that target disinformation.[22,24,29] Individual researchers have published reviews and commentaries in medical journals challenging GAC misinformation as well.[30,31]

## CONCLUSIONS

Rapid-response rebuttal reports may provide a template for confronting disinformation and misinformation in other areas of health policy. Disinformation is rampant in areas of policy that particularly impact children and adolescents, including vaccinations, climate change, tobacco use, HIV prevention, and reproductive health care, among others. Although it is challenging to assemble cross-disciplinary experts and produce legally relevant written products on a tight time schedule, these reports can be useful in disseminating sound scientific information to litigators, policymakers, journalists, and the public.

---

**ABBREVIATIONS**

AAP: American Academy of Pediatrics
AHCA: Agency for Health Care Administration
DFPS: Department of Family and Protective Services
GAC: gender-affirming care
TGE: transgender and gender-expansive
WPATH: World Professional Association for Transgender Health

---

## REFERENCES

1. US Department of Justice. S.B. 184, Vulnerable Child Compassion and Protection Act, 2022 Ala. Laws 289. Available at: https://www.justice.gov/opa/pr/justice-department-challenges-alabama-law-criminalizes-medically-necessary-care-transgender. Accessed February 2, 2023

2. Paxton K. Re: whether certain medical procedures performed on children constitute child abuse. Feb. 18, 2022, Opinion No. KP-0401. Available at: https://texasattorneygeneral.gov/sites/default/files/global/KP-0401.pdf. Accessed November 15, 2022

3. Florida Department of State. Fl. Dep't of Health Board of Med., notice of proposed rule 64b8-9.019, standards of practice for the treatment of gender dysphoria in minors (Nov. 14, 2022), at 59G-1.050 General Medicaid Policy. Available at: https://www.flrules.org/gateway/RuleNo.asp?id=64B8-9.019. Accessed December 6, 2022

4. Arkansas State Legislature. S H.B. 1570, save adolescents from experimentation (SAFE) Act. A.R. Legis. Assemb. Act 626. Reg. Sess. 2021-2022 (2021). Available at: https://www.arkleg.state.ar.us/Bills/Detail?id=HB1570&ddBienniumSession=2021%2F2021R. Accessed February 2, 2023

5. Conron KJ, O'Neal K, Vasquez L. Prohibiting gender-affirming medical care for youth. Available at: https://williamsinstitute.law.ucla.edu/publications/bans-trans-youth-health-care/. Accessed July 13, 2022

6. Letter from the American Academy of Pediatrics. American Medical Association and Children's Hospital Association to Merrick Garland, Attorney General of the United States, October 3, 2022. Available at: https://downloads.aap.org/DOFA/DOJ%20Letter%20Final.pdf. Accessed January 25, 2023

7. World Professional Association for Transgender Health. Standards of care for the health of transsexual, transgender, and gender nonconforming people. Available at: https://www.wpath.org/publications/soc8. Accessed December 6, 2022

8. Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: an Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab.* 2017;102(11):3869–3903

9. Rafferty J; Committee on Psychosocial Aspects of Child and Family Health; Committee on Adolescence; Section on Lesbian, Gay, Bisexual, and Transgender Health and Wellness. Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. *Pediatrics.* 2018;142(4):e20182162

10. American Psychological Association. Guidelines for psychological practice with transgender and gender nonconforming people. *Am Psychol.* 2015;70(9):832–864

11. Adelson SL; American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Quality Issues (CQI). Practice parameter on gay, lesbian, or bisexual sexual orientation, gender nonconformity, and gender discordance in children and adolescents. *J Am Acad Child Adolesc Psychiatry.* 2012;51(9):957–974

12. Boulware S, Kamody R, Kuper L, et al. Yale University. Biased science: the Texas and Alabama measures criminalizing medical treatment for transgender children and adolescents rely on inaccurate and misleading scientific claims. Available at: https://medicine.yale.edu/lgbtqi/research/gender-affirming-care/report%20on%20the%20science%20of%20gender-affirming%20care%20final%20april%2028%202022_442952_55174_v1.pdf. Accessed December 10, 2022

13. McNamara M, Abdul-Latif H, Boulware S, et al. Yale University. A critical review of the June 2022 Florida Medicaid Report on the medical treatment of gender dysphoria. Available at: https://medicine.yale.edu/lgbtqi/research/gender-affirming-care/florida%20report%20final%20july%208%202022%20accessible_443048_284_55174_v3.pdf. Accessed December 10, 2022

14. US Department of Justice. Reply in support of plaintiffs' motion for temporary restraining order and preliminary injunction, Eknes-Tucker v. Governor of Alabama, May 4, 2022. Available at: https://www.justice.gov/crt/case-document/file/1526016/download. Accessed February 2, 2023

15. ACLU. Defendants' combined brief in opposition to plaintiffs' motion for preliminary injunction; and reply in support of defendants' motion to dismiss, Brandt v. Rutledge, E.D. Ark. July 9, 2021. Available at:

Downloaded from http://publications.aap.org/pediatrics/article-pdf/152/3/e2022060943/1567424/peds.2022-060943.pdf by guest

https://www.aclu.org/legal-document/brandt-et-al-v-rutledge-et-al-defendants-opposition-motion-preliminary-injunction. Accessed December 6, 2022

16. GLAD. Brief of amicus curiae American Academy of Pediatrics and additional national and state medical and mental health organizations in support of plaintiffs' motion for temporary restraining order and preliminary injunction. Eknes-Tucker v. Ivey [later renamed Eknes-Tucker v. Governor of Alabama] May 4, 2022. Available at: https://www.glad.org/wp-content/uploads/2022/05/medical-organizations-amicus-brief.pdf. Accessed December 6, 2022

17. Yale University. Letter from Anne Alstott, et al., to Simone Marstiller, Secretary, Florida Agency for Health Care Administration, July 8, 2022. Available at: https://medicine.yale.edu/lgbtqi/research/gender-affirming-care/alstott%20et%20al%20full%20comment%20proposed%20rule%20re%20gender%20dysphoria_443049_284_55174_v3.pdf. Accessed December 4, 2022

18. Lambda Legal. Plaintiffs' original petition, application for temporary restraining order, temporary and permanent injunction, and request for declaratory relief, PFLAG v. Abbott, June 8, 2022. Available at: https://www.lambdalegal.org/sites/default/files/legal-docs/downloads/pflag_v._abbott_-_filed_petition.pdf. Accessed December 6, 2022

19. National Health Law Program. Complaint for declaratory, injunctive, and other relief, Dekker v. Marstiller, N.D. Fl. Sept. 7, 2022. Available at: https://healthlaw.org/wp-content/uploads/2022/09/FILED-Complaint-against-AHCA.pdf. Accessed December 6, 2022

20. Yale University. Brief of amicus curiae Hussein Abdul-Latif et al. in support of affirmance of the district court's order granting a preliminary injunction, Eknes-Tucker v. Governor, State of Alabama, 11th Cir. (2022). Available at: https://medicine.yale.edu/lgbtqi/research/gender-affirming-care/defending-gender-affirming-care-in-alabama/. Accessed December 6, 2022

21. Justia. Motion for leave to file brief of amici curiae and memorandum in support of the motion by Anne Alstott. Susan D. Boulware, Abdul-Latif Hussein, Rebecca Kamody, Laura Kuper, Meredithe McNamara, Christy Olezeski, Nathalie Szilagyi, Dekker v. Marstiller, N.D. Fl. Nov. 30, 2022. (Not considered solely for reasons of timing). Available at: https://dockets.justia.com/docket/florida/flndce/4:2022cv00325/443916. Accessed December 10, 2022

22. National Health Law Program. Letter from the American Academy of Pediatrics and Florida Chapter of the American Academy of Pediatrics to Tom Wallace. 2022. Available at: https://downloads.aap.org/DOFA/AAP-FCAAP%20Comment%20Letter_Medicaid%20Coverage%20for%20Gender-Affirming%20Care.pdf. Accessed December 10, 2022

23. Florida Board of Medicine and Board of Osteopathic Medicine. Meeting minutes. Available at: https://ww10.doh.state.fl.us/pub/medicine/Agenda_Info/Public_Information/Public_Minutes/2022/October/10282022_RL_Minutes.pdf. Accessed December 10, 2022

24. AAP. Letter to Dr. David Diamond, Chair of the Florida Board of Medicine, from Moira Szilagyi, MD and Teresa Gwynn, DO - July 29, 2022. Available at: https://downloads.aap.org/DOFA/JointAAPFCAAPLettertoFLBoardofMedicine.pdf. Accessed December 10, 2022

25. Lepore C, Alstott A, McNamara M. Scientific misinformation is criminalizing the standard of care for transgender youth. *JAMA Pediatr.* 2022;176(10):965–966

26. McNamara M, Lepore C, Alstott A, et al. Scientific misinformation and gender affirming care: tools for providers on the front lines. *J Adolesc Health.* 2022;71(3):251–253

27. McNamara M, Lepore C, Alstott A. Protecting transgender health and challenging science denialism in policy. *N Engl J Med.* 2022;387(21):1919–1921

28. Olezeski C, McNamara M, Alstott A; Los Angeles Times. Op/Ed: denying trans youth gender affirming care is an affront to science and medical ethics. Available at: https://www.latimes.com/opinion/story/2022-06-13/trans-youth-healthcare-state-bans. Accessed December 10, 2022

29. USPATH, WPATH. USPATH and WPATH respond to NY Times article "They Paused Puberty, But Is There a Cost?". Available at: https://www.wpath.org/media/cms/Documents/Public%20Policies/2022/USPATHWPATH%20Statement%20re%20Nov%2014%202022%20NYT%20Article%20Nov%2022%202022.pdf?_t=1669173834. Accessed December 10, 2022

30. Kraschel KL, Chen A, Turban JL, Cohen IG. Legislation restricting gender-affirming care for transgender youth: politics eclipse healthcare. *Cell Rep Med.* 2022;3(8):100719

31. Gordon CM. Caught in the middle: the care of transgender youth in Texas. *Pediatrics.* 2022;149(6):e2022057475

Downloaded from http://publications.aap.org/pediatrics/article-pdf/152/3/e2022060943/1567424/peds.2022-060943.pdf
by guest

# EXHIBIT 15



**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

For Release

# Andrew N. Ferguson Takes Over as FTC Chairman

January 22, 2025

**Tags:** FTC Operations | Commissioners

Andrew N. Ferguson was officially designated as Chairman of the Federal Trade Commission by President Trump on Monday January 20, 2025.

"I am honored that President Trump chose me to lead the Federal Trade Commission," said Chairman Ferguson. "Under the President's leadership, we will end the previous administration's assault on the American way of life, and we will usher in a new Golden Age for American businesses, workers, and consumers."

The Federal Trade Commission works to promote competition, and protect and educate consumers. The FTC will never demand money make threats, tell you to transfer money or promise you a prize. You can learn more about consumer topics and report scams, fraud, and bad business practices online at ReportFraud.ftc.gov. Follow the FTC on social media, read our blogs and subscribe to press releases for the latest FTC news and resources.

## Contact Information

## Media Contact

Juliana Gruenwald Henderson
Office of Public Affairs
202-326-2924

# **EXHIBIT 16**



**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

For Release

# FTC Chairman Applauds Revocation of Biden-Harris Executive Order on Competition

August 14, 2025

**Tags:** Competition | Commissioners | Bureau of Competition

Federal Trade Commission Chairman Andrew N. Ferguson issued the following statement in response to President Trump's revocation of the Biden-Harris Administration's 2021 Executive Order on competition policy:

"America's markets are the most dynamic on Earth, responsible for enriching the entire world through technological innovations, lifting countless people out of poverty, and inspiring other countries to emulate our economic system.  Our markets thrive when they operate freely and when the Federal government does  not pick winners and losers but allows businesses to grow and innovate.

Today's withdrawal of the Biden-Harris Executive Order on competition marks another break between the last Administration's failed policies and the Trump-Vance Administration's focus on protecting everyday Americans from anticompetitive practices through tailored action, promoting economic growth, and ensuring that American workers benefit from competition for their labor

The now-withdrawn Executive Order encouraged top-down competition regulations, and established a flawed philosophical underpinning for the Biden-Harris Administration's undue hostility toward mergers and acquisitions. Consistent with President Trump's recent Executive Orders, the Trump-Vance FTC is devoting its resources to enforcing the antitrust laws passed by Congress, for the benefit of all American consumers and workers—lowering the cost of living, improving the quality of

goods and services, fostering new innovations, and leading to ever-greater prosperity for our Nation."

The Federal Trade Commission works to [promote competition](), and to protect and educate consumers. The FTC will never demand money, make threats, tell you to transfer money, or promise you a prize. You can learn more about [how competition benefits consumers    ](), [file an antitrust complaint](), or [comment on a proposed merger](). For the latest news and resources, [follow the FTC on social media](), [subscribe to press releases](), and [read our blog]().

## Contact Information

### Media Contact

[Joe Simonson]()
Office of Public Affairs

# **EXHIBIT 17**



## The Dangers of "Gender-Affirming Care" for Minors

July 9, 2025

Jon Schweppe:

Good morning, everyone. Let's go ahead and have a seat if we can. Folks, we're going to get our program started in a minute if everybody could have a seat. Good morning and welcome to the Federal Trade Commission's workshop, the dangers of so-called gender-affirming care for minors. My name is Jon Schweppe. I'm a senior policy advisor in the chairman's office. We have an incredible program for you today with 33 guest speakers plus Chairman Ferguson and Commissioners Holyoak and Meador. Our approach to this workshop is simple. We want to hear from a wide variety of people all over the political spectrum about this issue. Our speakers today include medical, ethicists, physicians, whistleblowers, parents and survivors. We have Republicans, Democrats, conservatives, progressives, even feminists, who are concerned about a profit-seeking industry pushing to medicalize and in some cases sterilize gender dysphoric minors at younger and younger ages. Before we get started today with our substantive program, I need to go over some administrative details.

Please silence any mobile phones or other electronic devices. If you must use them during the workshop, please be respectful of the speakers and your fellow audience members. Please be aware that if you leave the Constitution Center Building for any reason during the workshop, you'll have to go back through security screening again. Please bear this in mind and plan ahead, especially if you're participating on a panel so we can do our best to remain on schedule. Most of you received a lanyard with a plastic FTC event security badge. We reuse these for multiple events, so when you leave for the day, please return your badge to security and we will also have folks collecting them after the event. If an emergency occurs that requires you to leave the Constitution Center but remain in the building, follow the instructions provided over the building PA system. If we are required to evacuate the building, an alarm will sound, we'll exit in an orderly manner through the main seventh street exit, and we'll have further instructions once outside.

If you notice any suspicious activity, see something, say something, please alert FTC staff and building security. Restrooms are located in the hallway just outside of the auditorium. Coffee will be provided throughout the day, and lunch will be served at approximately 12:30 PM outside of the ballrooms. Please do not bring food or drinks into the auditorium. Only water is allowed. Please be respectful of the speakers and panelists, and refrain from interrupting the program. Anyone disrupting the event will be removed by security. Please be advised that this event may be photographed, webcast or recorded. By participating in this event, you're agreeing that your image and anything you say or submit may be posted indefinitely at ftc.gov or on one of the Commission's publicly available social media sites. All

right. So let's get started with the program. Please welcome to the stage the Chairman of the Federal Trade Commission, Andrew Ferguson.

Andrew Ferguson:

Good morning. Welcome to the Federal Trade Commission. Thank you all for being here, and thank you, Jon, for that introduction. Just over a year ago, the New York Times reported that the Biden administration had pressured the World Professional Association for Transgender Health or WPATH to remove age minimum requirements for cross-sex hormones and other sex change surgeries from their forthcoming guidelines on the care of transgender youth. Why did the Biden administration object to age minimum requirements? According to emails provided to the New York Times and the state of Alabama in its suit against the Biden administration, the Biden health agencies worried that including minimum age requirements in the guidelines would "result in devastating legislation for trans care." The Biden administration's concern was not that age minimum requirements were unscientific, unreasonable, or unhelpful to doctors, therapists, parents and children experiencing gender dysphoria. Science was beside the point.

Instead, their concern was political. They worried that age minimum requirements gave too much ammunition to critics of gender-affirming care. The Biden administration didn't care about the parents and kids who might've relied on those requirements when deciding whether to consent to expensive hormone treatments and sex change surgeries. They didn't care about the parents and kids who might've been spared a lifetime of pain and regret if their doctors, therapists and surgeons had observed those requirements. They cared about politics, they didn't care about people. Today, by contrast is not about politics. It's about the parents and kids the Biden administration chose to ignore. It's about our nation's children, who stand most in need of our love, protection and support. It's about their parents, whose selfless and fruitful love is the foundation of our nation and of every nation. It is about caring for the most vulnerable among us and protecting them from manipulation, deception, and abuse.

It is about healing the wounds that proponents of gender-affirming care may have inflicted on our nation's children and parents, and preventing the potential for future harm. Today is about people, not politics. So I want to focus on some of the courageous young people we have with us today. While each person's story is unique and you will hear from them, they do share some features in common, and I want to highlight those features because they speak to recurring patterns of potential deception in gender-affirming care. As chairman of the Federal Trade Commission, Congress has entrusted me with protecting citizens from deceptive acts and practices. And one of the reasons we are here today is examine whether some of the practices in gender-affirming care are deceptive and require greater scrutiny by the FTC. Let's start with Prisha Mosley. You'll hear from Prisha herself at 14 years old was a victim of sexual assault.

By age 16, she suffered depression, obsessive compulsive disorder and anorexia. After a concerning episode of self-harm, a pediatrician was recommended to help Prisha address her eating disorder. After a brief consultation, the pediatrician concluded that Prisha was actually a boy and recommended a therapist specializing in transgender care. Prisha recalls that the therapist assured Prisha that she could cure her depression, obsessive compulsive disorder and anorexia by making her body more masculine through testosterone injections. Just a few months later, Prisha secured a letter from a mental health counselor, stating that the surgical removal of her breasts was a clinical necessity. One month later, Prisha's breasts were removed. What had begun two years earlier as a referral to a pediatrician for treatment of anorexia ended on a surgeon's table and the removal of her breasts. Claire Abernathy will describe her similar experience. After experiencing a traumatic sexual assault, she began identifying as a boy when she was just 11 years old.

A year later, she met with a therapist who specialized in transgender care. Claire explains that this therapist recommended that she realize her male identity through hormone injections and sex change surgeries. Although Claire's mother was not confident in this diagnosis, she was told that affirming Claire's identity as a boy was necessary to prevent Claire from committing suicide. The takeaway for Claire's mother was clear. The only way to heal Claire, the therapist explained, was to take the chemical and surgical steps necessary to make Claire's body more masculine. And so what happened that in the summer following her eighth grade graduation, Claire's breasts were removed. Soren Aldaco too identified as a boy when she was just 11 years old, although she did so at the instigation of an older girl she met online. Four years later, Soren had a severe mental health breakdown that required hospitalization. There she met a psychiatrist, who Soren recalls told her that transitioning to become a boy was a medically legitimate form of treatment for mental health challenges.

After a short appointment, Soren was prescribed testosterone. After a year of testosterone, social isolation brought on by government-mandated COVID lockdowns and a difficult breakup, Soren decided she wanted to remove her breasts. Although Soren's therapist knew Soren had expressed reservations about this, she still wrote a letter recommending the surgical removal of her breasts. $25,000 later, Soren's breasts removed. These are not stories of liberation but of desperation. After years of intense mental health struggles, these girls and their parents were looking for any path that might lead them to genuine healing, and they encountered physicians, therapists and surgeons, who purported to provide them with one. Their pitch was simple. The children's problems were not due to the trauma of sexual assault, depression or anorexia. Instead, the real problem was the fact that they were boys trapped in girls' bodies. Taking chemical and surgical steps necessary to look more like a boy would relieve their symptoms, but they weren't cured.

Indeed, their mental health continuously declined over the course of their treatment. By the time they realized that their medical transition had not solved their mental health issues, permanent and irreversible changes had been made to their bodies. They say they were never informed that testosterone injections would affect permanent changes in their voices, their faces, their hormone levels, and their fertility. Far from making them whole, this gender-affirming care left them in the words of Prisha, "Broken with extreme physical injuries and without their body parts." Unfortunately, these stories are common. The path to puberty blockers, hormone injections, and sex change surgery often begins with a young person struggling with various mental health issues who recently underwent a personal crisis. At a loss for how to help their child helpless parents seek the advice of medical specialists who believe they will provide objective evidence-based guidance. After a brief meeting with the child, the specialist may proclaim that his or her problems can be solved by undergoing a medical transition. Parents may be told they should affirm their children's identity lest they put their child at a greater risk of suicide.

Parents are thus confronted with a terrifying choice. Either consent to gender-affirming care or their child may die. As one of the most public champions of these therapies exclaimed more than a decade ago, "We often ask parents, would you rather have a dead son than a alive daughter?" Confronted with this terrifying choice, parents sometimes are told that puberty blockers will give their child time to think, and make an informed decision about transitioning. What parents often aren't told however is that puberty blockers don't delay puberty, they suppress it entirely, and that most children on puberty blockers move on to sex hormone injections.

In such cases, puberty blockers do not buy a child or his parents' time to think. They are a gateway drug to a lifetime of expensive hormone injections and sex change surgeries. The stories we will hear today paint a troubling picture. Lured by the promise of a fail-safe cure for their mental health problems and kept in the dark about the permanent and irreversible effects of medical transitioning, these young

people and their parents say they were coaxed to open their minds, their hearts and their wallets to the miraculous healing powers of puberty blockers, hormone injections, and sex change surgeries.

There is only one problem. It isn't true. And that isn't me saying it. That is a quote from The Atlantic written by the same reporter who previously accused the Trump administration of carrying out a nasty campaign on this issue. Europeans have a few decades of empirical experience to offer us on this. A 2024 report on gender identity services commissioned by the UK's National Health Service called the CAS report after its author found no evidence to support the claim that puberty blockers improved a child's body image or gender dysphoria, no evidence to support the claim that gender-affirming treatment or sex hormone injections reduced a child's risk of suicide, and no evidence to support the claim that social transition in children led to positive mental health outcomes. Most importantly, the report did not find sufficient evidence to support the claim that gender-affirming care, puberty blockers or sex hormone injections had a positive effect on the psychological well-being of patients.

The report criticized many of the most popular clinical guidelines for recommending medical transition in spite of insufficient evidence about the risks and benefits of medical treatment in adolescents, particularly in relation to long-term outcomes. More specifically, the CAS report notes that the most influential clinical guideline published by WPATH overstates the strength of evidence in recommending medical transition for adolescent children. The shocking disjunction between the science behind these treatments and the claims made about them is hardly limited to Europe. Just last year, the New York Times ran a lengthy expose about how one of the leading advocates of these treatments refused to publish the study, the results of a nearly ten-year study that suggested that "puberty blockers do not lead to mental health improvements in children diagnosed with dysphoria." She refused to publish the studies of her results because she worried they might provide support to state governments who were regulating this care.

You heard me right. She refused to publish the results of her scientific study because of her politics. This disjunction played out before the Supreme Court of the United States just months ago. During oral arguments in United States against Skrmetti, the Biden administration's solicitor general attacked Tennessee's regulation of gender-affirming care for children because it failed to "take into account the significant health benefits that can come from providing gender-affirming care, including reduced suicidal ideation and suicide attempts." But just a few minutes later, the lawyer representing the private plaintiffs attacking the law made a shocking admission in response to Justice Samuel Alito's question about the CAS report. "There is no evidence in the studies that this treatment reduces completed suicide." This had been the whole premise behind the push for gender-affirming care, a choice between hormones and sex change surgery or suicide, but there is no evidence to support that premise.

Indeed, the state of Alabama's brief filed in the same case revealed in gruesome details the length to which the Biden administration went to deny this reality for fear of political consequences. Now, why does all of this matter to the Federal Trade Commission? As chairman, I am not charged with passing moral judgment on anyone's ideology, lifestyle, or medical choices. I am charged, however, with protecting my fellow citizens from unfair or deceptive trade practices. And experience has taught us that the more vulnerable the population, the more likely they are to be targeted with deception. For example, people who suffer from chronic or terminal diseases are more prone to be deceived by healthcare scams. Taking advantage of their desperation, modern snake oil salesmen promise them the moon, an affordable and scientifically proven cure that will succeed where all conventional medical treatments have failed. Of course, the cure is not scientifically proven to be effective. The salesman just presents it as though it were.

The FTC's statutory mandate is to protect vulnerable people from deceptive claims about health and cures. Now, I have heard it argue that the commission ought not to address today's topic at all because

the commission does not regulate the practice of medicine and because the topic is politically controversial. Both arguments are categorically wrong, and I reject them. First, the FTC is the federal government's guardian against false and deceptive health claims. We have brought dozens of enforcement actions against false and misleading health claims from shyster snake oil salesmen to powerful pharmaceutical companies. We have won actions against individuals selling everyday herbs and spices as cures to cancer, organizations overstating the effectiveness of their products in preventing COVID-19, and medical centers making unsubstantiated claims about their efficacy in treating chronic diseases. Time and time again, we have enforced the FTC act against businesses and individuals who have made claims about their health products and services that were not backed by scientific evidence.

Just last year, we won a judgment against a company that "tricked people, who needed real help into buying expensive and unproven stem cell therapy." This was the deceptive medical care aimed at vulnerable people, the elderly and the disabled. We won another judgment against the makers of a popular supplement, who made claims about the mental health effects of the supplement "without competent and reliable scientific evidence." It's taken directly from the district court judgment in that case. The Biden Administration's chief consumer protection enforcer publicly warned after the victory that "companies should take note and remember that health claims need to be backed up by reliable scientific evidence." I agree. The Biden administration FTC also put out 40 pages of guidance on what the FTC Act requires for businesses making health claims, noting that the FTC Act applies to all claims about medical products and cures, and that claims that consumers cannot easily assess on their own must meet an incredibly high standard of scientific substantiation. The issue we address today is no different than the health claims we have addressed for many decades. Second, I acknowledge that many people feel passionately about this issue, but if a medical claim is false or misleading, it is the commission's sworn duty to protect American citizens from that claim no differently than it would for any other false or misleading claim. Refusing to investigate these health claims and the potential consumer harm to parents and children, merely because one political party supports those claims as a matter of its ideology would be the politicized choice. And that is why we are here today, to ensure that parents and children seeking professional help in a period of intense distress do not make potentially life-altering choices under veil of deception, misinformed about the risks and benefits of gender-affirming care. We are not here to pass judgment on anyone. We are here to ensure that those who make claims about gender-affirming care are held to the same standard we apply to everyone else who engages in commerce.

We are here to ensure that everyone can make an informed choice about their own path to healing without fear of being deceived by those who stand to profit from certain medical interventions. Considering our common goal today, I want to outline briefly the FTC's perspective on what counts as a deceptive trade act or practice. For an act of practice to be deceptive, it must satisfy three elements. First, the act of practice must be likely to mislead the consumer. And this can be done either through commission, for example, making a false or misleading claim, or through omission, for example, failing to disclose certain information that would prevent a claim from being misleading to a reasonable consumer. Second, the act of practice must be likely to mislead a reasonable consumer acting in similar circumstances. In the case of acts or practices that target specific groups, for example, children or vulnerable parents, the test is whether the act is likely to mislead a reasonable member of that specific population. And third, the act of practice must be material to the consumer's decision to purchase the service.

For example, if a child or his or her parents would not have chosen puberty blockers had they been aware of the risks associated with those drugs, the omission of this fact by medical practitioners may be considered material. The purpose of today's workshop then is clear. The FTC must understand what sorts of claims are being made about these treatments, what sort of science supports them, what the

risks associated with those treatments are, and whether vulnerable populations may have been subject to deception in the administration of these treatments. They're the same sorts of questions we would ask about any health claim, no matter how politically charged. Americans have a right to health claims substantiated by reliable scientific evidence, they have a right to be informed about information that would be material to their decision to accept hormone therapies or sex change surgeries. The FTC's mandate is to protect those rights in this context as it does in every other healthcare context.

While not everyone who undergoes gender-affirming care will necessarily experience the same painful loss and regret that Prisha, Claire and Soren have experienced. Every young boy and girl, every concerned parent and guardian has the right to be informed of all the material information about the risks of these procedures. I promise that our agency will do everything in its power to achieve that end. Finally, a brief note on what comes next. Following the conclusion of today's workshop, the commission will issue a public request for information on the various topics that we are discussing today. We will issue it sometime next week after we have had time to digest everything we learned today and can tailor our request for information based on what we learn. The public will have 60 days to respond to that request and encourage every single person here to submit a response. We will also provide a mechanism for individual members of the public to submit information they wish the commission to keep confidential. Thank you very much for your attention, and I look forward to today's conversations. So next we have a panel of parents and survivors of these treatments that I will moderate for about a half hour. And while they're coming up here and I'll briefly introduce them, but really the goal of this panel is to let them tell you and the American people their stories. I want to give a quick word of thanks to Jon Schweppe, a policy advisor in my office, who put together today's workshop. Jon has worked on these issues sometimes quietly and subject to great criticism. Before we brought him onto the commission, he has been a tireless advocate for people who have suffered in this industry. And we could not have put on today's event without Jon. So Jon, thank you.

So I'm going to briefly introduce the panel before we begin. We are joined by Simon Amaya Price and his father Gareth, Claire Abernathy of whom I talked in the speech, Elvira Syed and Kayla Lovdahl. Okay, so I don't think anyone here wants to hear from me anymore, so what I'd like to do is go down the panel and we'll start here with you, Simon. Tell us your story about your experience with gender-affirming care. And once we've heard from each of you about your experiences both as patients and as parents, I'm going to then ask what do you wish you had been told early on in the process before treatment began? But why don't we start, Simon, with you and your story?

Simon Amaya Price:

Yeah. First of all, I want to thank you for that amazing presentation. I think that was a very balanced, very apolitical and really great, so thank you for inviting us. Thank you for everybody who's here in the room, and thank you for everybody at home who's watching either live or after the facts. So as mentioned, my name is Simon Amaya Price. And I wrote something ahead of time and then I didn't like it and then I wrote another thing and then I didn't like that either, so I'm just going to speak from the heart here. When I was 14 years old, I was going through a really tough time. I was at a new high school, and I had been ostracized by a group of friends. And shortly after I was sexually assaulted by an older boy at my high school. After this, I sought out a therapist at Boston Children's Hospital at their Waltham location with a combination of what I had been exposed to in school and my conversations with my therapist and obsessive Googling as any kid in my situation would do.

I concluded that I was transgender, that I was really a girl inside. I told my therapist this, and she immediately affirmed me. She said that I'm so brave. She told me not only that I'm brave, but at the same time that she had given instruction to my father to count all the knives in the drawer because I was at risk of self-harm. She encouraged me to go behind my parents' backs to attend transgender

support groups. I was referred to the gender clinic by her, my psychopharmacologist and my pediatrician. Around my 15th birthday, I remember meeting with my pediatrician, sharing with him my transgender identity, and my gender dysphoria diagnosis. I told him that my dad was refusing to take me to the gender clinic. The pediatrician then asked my dad in front of me, would you like a dead son or a living daughter? This isn't just a line used by activists. This is a line used in healthcare settings by the doctors that your kids are seeing in your communities all across this country.

I'm one of the lucky ones. I only socially transitioned. I only lost a couple of years of my life. I didn't lose any body parts. I thank God every day, whether or not he exists, that I'm whole and I'm here today. I was lied to by the medical professionals. I was supposed to trust the same medical professionals who gave me antibiotics, when I had strep. I was told that changing my name, my pronouns, socially transitioning, taking cross-sex hormones, undergoing surgeries would fix me. That was all a lie. And I'm here telling you that today. If I were there again, I really wish that my doctors would've asked me about any history of sexual assault. Maybe if they would've talked about the two years of homophobic bullying I endured in seventh and eighth grade, where kids threatened to kill me and called me the F-slur on a near daily basis.

Maybe that would've helped. Instead of telling me I was really a girl inside and reaffirming my delusions. I wish they told me that I was born in the right body, that I am perfect just the way I was because nobody told me that, nobody I paid attention to at least. Wanted to put that in there for you, dad. And I'm lucky, and look, I could have gotten hormones when I was 16, but COVID happened and I was out in Western Massachusetts for college. And my dad worked as a statistician at Raytheon, so an expert in evaluating methodology and statistical relevance. He read up on all of the science. He is the only reason I am here in front of you today full in one piece, unharmed. Please give him a round of applause. We cannot expect every parent to be a trained statistician, and that's why we are here today. What else do you want to know?

Andrew Ferguson:

That was great, Simon. Thank you.

Simon Amaya Price:

Thank you.

Andrew Ferguson:

Thank you for speaking from the heart. Gareth, tell us what this is like as a parent.

Gareth Amaya Price:

Well, I'm going to stick to my prepared remarks. Hello, I'm the father of a 21-year-old man. He was born male 21 years ago, and he's been male every day since. Even when he and medical professionals told me he wasn't anymore, they were wrong, and the proof is right next to me. In the spring of 2019 when my son was 14 in the ninth grade, he began seeing a therapist and psychopharmacologist at Boston Children's Hospital in Waltham because he was in great distress, suffering from anxiety, depression, confusion, and intrusive thoughts. Our son had already told my wife and me that he believed he was really a girl inside, after which I embarked on weeks of research about the nature and social manifestation of trans ideation in adolescence, all of which validated my instinctive response that it was delusional. Our son did not always have a happy childhood, in part because of the confusion caused by undiagnosed autism, and puberty was traumatic for him.

Page 7 of 84

He cried if a gas station closed. His own body changing, upset him profoundly. He was a target of bullying both by boys physically and by girls socially. The boys threatened him and called him homophobic slurs and the girls shunned him mostly for not acting like they thought a boy was supposed to. The psychiatrist and psychopharmacologist at Boston Children's were supposed to be treating him for anxiety and depression, but when he told them both, he believed he was really a girl in a boy's body. They repeatedly suggested to me that I should take him to Boston Children's Gender Center GeMS. I deflected these suggestions and encouraged them to refocus on his anxiety and depression.

I already knew then what is public knowledge now that GeMS universally agreed kids were the wrong gender and only gave a cursory assessment before recommending medical intervention. The psychiatrist did not like it that I did not take my son to GeMS. I felt I had to walk on eggshells to avoid her recommending to child services that my son be taken away from our family by CPS. She had already suggested he be put in an inpatient facility. I believed that his trans ideation was caused by his anxiety and depression, not vice versa. And that concretizing this delusion through medicalization was a terrible idea. I was right, but I had to keep quiet. At the same time that I was instructed to keep our son under close watch for self-harm, the psychiatrist at Boston Children's was telling him behind my back, to sneak away from home and go to a transgender support group. I was counting knives in the drawers and checking on him every half hour, and she was telling him to lie to me and escape my supervision. That June at his annual pediatric visit, my son told his doctor who had known us for several years that he was really a girl inside. The doctor immediately agreed and offered to refer him to GeMS. I told the doctor I thought that was absurd, as I had known the boy his entire life, and that transgenderism was a phase he would get over, a temporary result of his adolescent misery. I knew then that research supported my view and now hindsight does too. The pediatrician told me he sent every kid who said he was transgender to GeMS.

When I told the pediatrician I didn't intend to take him to GeMS, he asked me in front of my son whether I would like a dead son or a living daughter. That was emotional blackmail and in my opinion malpractice. I chewed the pediatrician out thoroughly for that abuse and we never saw him again. He quit the practice. I think he should have quit the profession, but he just moved one town over and manages a practice there now. I shudder to think how many kids he's medicalized by now.

Later that spring, the Boston Children's psychiatrist and Psychopharmacologist refused to keep treating my son and referred us to a private pay facility. I can't say the name of that facility, because they did a good job treating his anxiety and depression. And treating a child with transgender ideation in any other way than so-called affirmation therapy is illegal in Massachusetts. As I suggested to the several medical professionals who tried to get me to chemically castrate my son, he eventually outgrew the idea that he was really female on the inside and reconciled himself with his sex. Here he is today a happy and healthy man.

Chairman Andrew Ferguson:

Claire, tell us your story.

Claire Abernathy:

[inaudible 00:36:13]. Is this on? Hi friends. First, I want to a little disclaimer, that I wear my heart on my sleeve, so please don't mind my voice shaking while I speak. I want to thank the Federal Trade Commission for inviting me to speak today. I'm grateful for the chance to share my story, because I believe that what happened to me and what's still happening to so many others is an urgent matter of consumer protection and fraud. My name is Claire and I'm a detransitioner. A week after I turned 14 years old, I was put on testosterone by Dr. May Lau at Cook Children's Hospital in Dallas, Texas. Six

months later, Dr. Alan Dulin with the American Institute for Plastic Surgery in Plano, performed a double mastectomy on me.

I was too young... Sorry. I was too young to get a tattoo. I was too young to drive. I hadn't even learned... Thank you. Thank you, Jamie. I hadn't even learned algebra in high school yet, but I was old enough to choose to have healthy parts of my body electively amputated. I was sold a product, medical transition, by professionals and institutions who told me that it would fix my distress and save my life. I was told that if I didn't do this, I would probably end up dead.

But here's what they didn't tell me. They didn't tell me that taking cross-sex hormones and undergoing major surgery at 14 years old could leave me with pelvic floor dysfunction and urinary incontinence, problems I have to manage now as a young adult. I'm only 20 years old. They didn't tell me that these complications are common enough to be known risks, and yet they were hidden from me at an age where I didn't even understand what these terms meant, let alone the impact they would have on my daily life, and it doesn't stop there.

When I tried to warn others by leaving honest reviews on my surgeon's websites, describing my regret, the complications, the lack of real informed consent, my reviews were deleted. Think about that. A surgeon permanently altered my healthy body when I was a middle school student and then erased my negative feedback to protect his reputation. If that doesn't sound like fraud, I don't know what does. In any other context, selling a medical product in this way with half-truths and hidden side effects would be considered fraud. If a pharmaceutical company pushed a drug on children without disclosing the lifelong damage it can cause, they would be sued out of existence. If a cosmetic surgeon buried evidence of complications, they would be shut down. But when it comes to gender medicine, it's not just allowed, it's celebrated. And anyone who asks questions is called hateful.

Every week I hear from more young men and women like me, people who are convinced as kids or as teenagers, that the only way to survive was to become a lifelong medical patient. We now live with the irreversible consequences, the scars, the side effects, the pain and the grief, and we watch helplessly as the same professionals and clinics keep selling the same product to the next generation of vulnerable kids while silencing those of us who speak out. Let me be clear, it is not in my wheelhouse to say that no one should ever transition. I'm here to say that when you sell a product, especially one that removes healthy body parts and alters your life forever, the consumer deserves the whole truth. They deserve honest disclosure of all of the risks, possible outcomes like regret, and alternative treatment options. They deserve the right to share their negative experiences without being censored.

At 14, I trusted the adults who were supposed to protect me. Instead, they sold me a dream that turned out to be a nightmare. That's not healthcare. It's blatant consumer fraud. I want to thank the FTC and those in the audience again for giving people like me a seat at the table. Please hold these providers and pharmaceutical companies to the same standards as any other industry. We need real informed consent. We need oversight, and we need to make sure that no more kids are sold a product they can't return. Thank you for listening.

Chairman Andrew Ferguson:

Thank you for your tremendous courage, Claire. Elvira, let's hear from you.

Elvira Syed:

Good morning everyone. First, I want to thank FTC for having me here and giving me this opportunity to share the tragic story of our family. My name is Elvira Syed, and I lost my... I'm sorry. I lost my 17-year-old daughter, Ilene, to gender ideology and the system that failed her at every step. Ilene was exceptional, despite being on autism spectrum, she spoke four languages, played five instruments, held

two black belts in martial arts and earned a full tuition scholarship to Rider University. But behind all those accomplishments was a young woman silently battling anxiety, depression, trauma, and self-harm, especially after losing her father to cancer at age 12.

During the pandemic, like many other kids, she spent too much time online and after cycling through several LGBTQ labels, she finally declared she was transgender. Before college, she began seeing a therapist who immediately affirmed her identity, no question asks, no effort to understand her trauma or mental health, no curiosity about why this identity emerged so suddenly. When she got to campus, things got worsened. She cut me off and at the age of 17, at that point, she was introduced to a transgender pastor from Metropolitan Community Church in Hartford, someone who barely knew her but filed a complaint against me with the Department of Children and Families. Why? Because I refused to accept my son's identity.

The goal was to remove me so the state could step in and give Ilene all the care she supposedly needed. From that moment, I lost any access to my daughter. I would like to thank Project Veritas for taking a deeper investigation and finding out that that pastor who filed that complaint against me was providing free binders to minors behind their parents' back. In January 2024, Ilene began therapy at the Pride Center referred by Rider University. The therapist there, a transgender man, also affirmed her. And I have to wonder, was this therapist affirming Ilene solely because that's what modern guidelines encourage, or was it also because of her own subjective viewpoint, her personal identity? Was this care or ideology disguised as therapy?

In a therapist's own notes, she documented Ilene's history of self-harm, suicidal ideation, and autism spectrum disorder. On one entry she wrote, "The client stated that most of the time he's feeling blank when he zones out or can't remember, and other times it is like he's watching himself through a screen." To me, this is a massive red flag, dissociation, detachment, instability, but no follow-up was done. No second opinion, no attempt to contact me, her only living parent. Instead, the therapist reinforced Ilene's belief that I was unsafe to be around and referred her to an endocrinologist.

When I finally saw the endocrinologist's notes after Ilene's death, they mentioned only anxiety and depression, nothing about suicidal thoughts, nothing about trauma, nothing about self-harm. Her visit was marked as a well visit. There was no physical exam, no mention of the visible scars on her arms, no signs that her condition was truly assessed and absolutely no indication of an endocrine disorder that would justify a prescription for hormones.

And when talking about side effects, the only side effect discussed was fertility. On that very first visit, Ilene was given a prescription for 40 milligrams of testosterone per week and the referral for double mastectomy on that very first visit. In that referral letter, the doctor or APRN falsely claimed that Ilene had dreamt of being a boy since age eight. That was never true. My insurance was charged for this against my will. When I saw this pharmacy alert, I was horrified. Testosterone can increase aggression, emotional numbness, and suicidal thoughts, especially in a vulnerable unstable teen. But no one stopped to ask if it was safe.

On just her second visit, APRN increased her dose to 60 milligrams per week, even though her chart noted worsening side effects like acne and bleeding, her testosterone level at that point was 289. For reference, the normal female range does not exceed 45. In October 2024, my daughter died by suicide. She overdosed on Benadryl, her body lay in her dorm for four days before anyone found her. The school waited another day to call me. During that time, they were celebrating national coming out day. The autopsy revealed new self-harmed wounds on her thighs. According to the detective report, her friend said Ilene's depression was getting worse. She was struggling and she was having difficulty with transition.

Those entrusted with her care didn't treat her depression. They didn't explore what was underneath the identity. They didn't even tell me what was going on. They treated her ideology, not her illness. What she got instead was a fast-track prescription and an ideology that told her pain was proof she needed to keep going down that path. Ilene deserved better. Every child does. And answering your question, Chairman Ferguson, what would I wish was different? I wish Ilene had met the very true therapist who would really care about her, not about promoting an ideology on a vulnerable teen, because therapy is not identity validation. It's a life-and-death guidance and if done poorly, it leads to the irreversible, sometimes fatal consequences.

Chairman Andrew Ferguson:

Thank you so much, Elvira. Kayla, let's hear from you.

Kayla Lovdahl:

Hello, and good morning to everyone here. My name is Kayla Lovdahl. I go by Layla Jane online, and I am a survivor of gender medicine or a detransitioner. I am someone who has been dosed with Lupron and testosterone starting at 12, I received a bilateral mastectomy just one month after my 13th birthday. I went straight from training bras to binding, straight to the operating table at 13. The reason why, is because I had undiagnosed autism and unaddressed childhood sexual trauma. I was scared to become a woman. I was getting unwanted male attention, which made me fearful of being victimized again. I had sensory issues I didn't know how to cope with when I began menstruating and needing bras.

I learned about transgenderism at 11, and I thought maybe that was the reason I was so uncomfortable. I brought the idea to the therapist I'd been seeing, and she immediately affirmed me, gave me a diagnosis of gender dysphoria. And once I told my parents, she began writing referrals for doctors specializing in pediatric transition care. Never along the way did anyone question why I suddenly wanted to become a boy. They didn't comprehensively screen me for mental health disorders or ask me about any prior trauma.

I saw Susanne Watson in Kaiser Oakland's Pride Clinic, and within 90 minutes she signed off for me to receive testosterone and meet with a surgeon named Winnie Tong. The mastectomy was explained to me at 12 using watered down terms like top surgery. I was told I would never be able to chest feed. I was told I might lose sensation, but to me, at 12, that equated to numbness. But today I deal with nerve pain, extreme slicing sensations, electrical zaps and itchiness. I could scratch my skin until I bleed, but with no relief, because the skin is numb and doesn't register touch, however, the nerves underneath are erratic.

I'm nearing eight years post-op this September. As you can probably all tell, my voice is permanently lowered from the testosterone I took from 12 to 17. I do have a slight Adam's apple. I can't raise my voice for long periods of time. I can't scream if I'm in danger. Mind you, I'm a pretty small person standing at about 4' 11". I still grow facial hair that I have to deal with. I have atrophy and urinary issues. Testosterone also damaged my liver. I've had fatty liver disease since about 14.

The Lupron essentially put my body in menopause. I gained weight. My psychiatric issues flared up. I experienced intense hot flashes, which made it really difficult to focus on my seventh grade homework. Today I live with chronic joint pain. I'm only 20. At no point along the way was I offered an off-ramp. I didn't even know what detransition was until I was almost 18 and began to taper myself off the hormones, scared to go back to the doctors. Even at 18, I called member services and requested my name and gender marker be switched back and to receive a new insurance card to reflect that change. Weeks later, I received one in the mail with my male name. I'm here today to speak out against gender-affirming medical practices for minors. We are letting vulnerable children be irreversibly harmed by a

Page 11 of 84

medical system that affirms without asking why. We need to protect children from these rushed experimental interventions. Let kids grow up whole. Thank you.

Chairman Andrew Ferguson:

I don't think anything could be added to what we just heard. And so I'm going to close with only two comments. First, I'm not sure in my life I've ever seen more courage displayed than what I just witnessed in the last 30 minutes. And second, I want you to know the FTC hears you. We hear all of you. We want to understand what's going on so that if the law is being broken, we can stop it. So thank you for being here for this today.

Jon Schweppe:

Thank you Mr. Chairman, and thank you to the parents, Gareth, Elvira and the survivors, Simon, Claire and Kayla for sharing your personal experiences. So now we're going to shift over to a presentation. So thank you, guys. Dr. Miriam Grossman, MD is board certified in child, adolescent and adult psychiatry. Her current practice focuses on youth who have distress about their sex and their parents. She's a senior fellow at donoharmmedicine.org, the author of five books, including You're Teaching My Child What? and Lost in Trans Nation. Dr. Grossman's work exposing the origin and hazards of the sexuality and gender industry has been translated into 11 languages. In fact, Dr. Grossman of her own volition, brought books here today to share with attendees, and I haven't checked, but I'm pretty sure they're in English. She has testified in Congress and lectured at the British House of Lords and the United Nations. She's featured in The Daily Wire's What is a Woman documentary, Fox Nation's The Miseducation of America, and many other documentaries and popular podcasts. Her expert psychiatric opinion is sought for witness testimony and court reports. Please welcome to the stage Dr. Miriam Grossman.

Dr. Miriam Grossman:

Good morning. Thank you, Chairman Ferguson, John Schweppe, Brandon Scholter. Thank you also to Jackie, Simon, Maria, Laura, Prisha, Kayla, Beth, and Forrest for sharing your medical documents with me. And actually the books that are out there, my Lost in Trans Nation, that's thanks to Do No Harm. So thank you very much, Do No Harm. Section five of the FTC Act says, as you heard, that fraud and deceptive practice means representing as facts, things that are entirely unproven or demonstrably false, thereby misleading the consumer in a material way. When I examine gender-affirming care and the history that led up to it, I see fraud and deceptive practice everywhere. Going back decades, I see it in the landmark experiment on Bruce Reimer when he was a toddler and John Money instructed his parents to socially and medically transition him. This was to be Dr. Money's proof for a concept he'd come up with in 1966 called Gender Identity. Dr. Money announced to the world that the experiment was a resounding success. And for years, the world believed it. But in fact, it was a catastrophe from the start. Decades after Dr. Money, consumers were misled again when gender specialists took the results of one tiny Dutch study, whose subjects were carefully chosen and led parents to believe that every child distressed about their sex could benefit from that model of care.

And now, families are told there's a consensus among clinicians about the best way to help these children, but there is no consensus. What there is, is the silencing of opposition. There are many more examples that you're going to hear about today, but I think it's fair to say that the fraud is wide and it's deep. I decided to focus on three topics, deceptive practice in language, in medical records, and in therapist's letters for support of hormones and surgeries. But first, before discussing fraud and deception, I'll remind you of what's true.

Humanity is divided into two biological categories. Male and female are established at conception. While there are many ways of being male or female, sex does not change and cannot be changed. These are universally acknowledged facts, but gender-affirming care is based on their denial. The premises of gender-affirming care are every person knows best who they are, regardless of their age, development, or mental health. All gender identities should be rubber-stamped by parents, doctors, therapists, and teachers. Medical interventions, including the removal of healthy organs, must be available on demand.

Gender Affirming Care's denial of biological facts is right in front of us. We don't need to make any FOIA requests to see it. All we need to do is examine the language. Look how aggressively the proponents of gender-affirming care compel the language of doctors. This is from a course given by a Doctor Erica Metz, medical director of transgender health for Kaiser Permanente in San Francisco. In this course, doctors learn that there are acceptable and unacceptable terms. For example, sex change operation is not acceptable. Doctors must say gender-affirming surgery. Born male is unacceptable. The proper term is assigned male at birth. Here's another slide from the same course. Always use the pronouns the patient asks you to use, regardless of what they look like to you or what their name is. And the red highlight, I didn't do that. That was from the original.

Why is it so critical to Kaiser to control their doctor's speech? Well, they know what George Orwell taught us. Language is an instrument. It can be shaped for a particular purpose. It can change the way we think. I'm going to go through some of the vocabulary of gender-affirming care and demonstrate how this language is designed to change the way that we think about male and female and to mislead consumers in a material way. So basically, what I'm suggesting today is that all of these terms are Section 5 violations.

Gender identity. We are told that whether we know it or not, we all have an inner sense of being male, female, both or neither. And that's represented by the brain in this slide, which by the way, comes from a sex education course. And we're told that that sense not only is untethered to material reality, but it overrides it, which is the body there. The brain overrides the body. You can have, for example, a girl's brain in a boy's body, and that boy is actually a type of girl, a trans girl. This belief is the cornerstone of gender-affirming care. It's represented as factual. It's not up for discussion.

Now, science studies the material world, the world that can be directly observed, measured and verified. The proponents of gender-affirming care declare that a person's inner sense, something that cannot be directly observed, measured, or verified, is more authentic than the material world. Now, what would you call that? Is that a philosophy? Is that a religion? I'm not sure, but I am sure that the idea is entirely unproven and unprovable in the same way that we can't prove the existence of a soul, even though we might believe in one. There is no objective evidence of being born in the wrong body and saying so misleads and takes advantage of consumers, and it impacts their medical decisions.

I know from my patients and many others, that when young people hear the idea that their feelings are more consequential than their bodies, and when they hear this idea endorsed with great certainty by therapists and doctors, echoed by professional organizations and government agencies, they believe it. They believe that this is bona fide science and that they have a medical condition whose only cure is pharmaceuticals and surgeries. Here's Dr. Gallagher, our favorite Miami surgeon. Girls see the language on her website, female to male procedures, and they genuinely believe that Dr. Gallagher can turn them into boys. And here's Johns Hopkins telling boys they can get female genitals. Boys see this and they think they can get an actual vagina and be a woman just like any other. But Johns Hopkins and Dr. Gallagher cannot do these things. Their claims are demonstrably false. They deceive and exploit vulnerable and misinformed consumers and their families.

Preferred pronouns. If you can pick your pronouns, it means that your feelings determine who you are. And it means, again, that biology is inconsequential. Preferred pronouns are part of social transitioning,

and we know that social transitioning increases the odds that gender dysphoria will persist. Nevertheless, the captured American Association of Child and Adolescent Psychiatry instructs parents, "Use the name and pronouns your child prefers." Chicago Children's Hospital have pronoun stickers for staff, and the pressure is intense. Trust me, I've talked to a lot of people working in hospitals. The pressure is very intense for staff to wear these pronoun stickers. In my opinion, using opposite sex pronouns endorses something that can never be. It supports a patient's false belief and it impacts their medical decisions. So that's fraud right there. Sex assigned at birth. The purpose of that phrase is to lead people to think that male and female are a random designation, a doctor's whim. This is utterly false. I don't have time to discuss intersex. You're going to be hearing about it later. But the sex assigned at birth term, which we hear 24/7 everywhere, is designed to change the way that we think about male and female. Instead of it being a inherent quality of every one of the billions of cells in our body.

Cisgender and non-binary. The word cisgender was invented in 1994 by a graduate student at the University of Minnesota. The inventor explained, "There did not seem to be a way to describe people who were not transgender without inescapably couching them in normalcy and making transgender identity automatically the other." This student was unhappy, in other words, about how the transgender identity was perceived. And the goal of creating the word cisgender was to change that perception. So again, the goal was to change how we think. We are given the impression that cisgender is a scientific classification of people, but it's not.

Non-binary. We are told this is a valid identity for people who are both male and female, neither male and female, or some other combination of male and female. Kaiser Permanente provides this menu of non-binary options. We might think this is silly and it is, but to vulnerable youth, it means that they can have a new identity every day of the month. If identity is based on feelings and you feel different from day to day, then why not? Do you see why so many young people are confused? I once had a 15-year-old patient who identified as non-binary. I asked him to explain what that meant. He thought for a moment, and he gave me hands down the best definition of non-binary I have ever heard. Excuse the language. I would never speak this way, but it's refreshing to hear the truth.

Moving on. Wrong puberty. That's a disturbing one. Puberty is not a disease. You're going to hear more about that from Dr. [inaudible 01:09:01]. Using that phrase is profoundly misleading, as if someone can go through the wrong puberty.

Top and bottom surgery. These are dangerous euphemisms. They're meant to distract you from what they really are. The removal of healthy organs causing disfigurement and a laundry list of serious medical problems, as you've just heard, and you'll hear more about that from Dr. Lappert. Justice Thomas called top and bottom surgery sanitizing language. And he got that right.

Genital reconstruction. Nope. Reconstruction means that particular genitals were once there. That's demonstrably false. A surgical procedure that creates a faux vagina is not reconstruction, it's construction. Same with hormone replacement therapy. You're not replacing anything. It's not the same as giving estrogen to a post-menopausal woman, and it misleads the consumer.

And finally, chestfeed. The CDC until recently, because their site was scrubbed and this page is no longer there, it endorsed the idea that men can lactate. Well, the female body is designed to lactate. The male body is not. Men do not lactate unless they have a medical disorder or they're pumped full of drugs that cause a nipple discharge. This is altogether different from the natural process of lactation that occurs in women. The term chestfeed, aside from erasing women in a most offensive way and dehumanizing all of us, misleads boys and men.

To summarize. The language of gender- affirming care seeks to deny the primacy of biology in determining male and female. It advances the notion that feelings override the objective reality of our sexed bodies. Such beliefs can harm patients and are not consistent with science in the 21st century.

Now, fraudulent language in medical records. I'm going to tell you about this case that was reported in The New England Journal of Medicine. I'm not giving you all the details. This is a very concise review. And this article in The New England Journal called this woman a man and he.him pronouns, so I'm going to go ahead and do that, even though I normally wouldn't. 32-year-old Sam came to the emergency room. He had intermittent lower abdominal pain and high blood pressure. He told the triage nurse that he was a transgender man. His electronic medical record indicated he was male. The nurse noted that Sam was an obese man, and he was comfortable between his bouts of pain. She assessed his condition as non-urgent. Lab tests were ordered, including a pregnancy test. It took several hours for Sam to finally be seen by a physician who took a detailed history, reviewed his lab results, and did a physical exam. He determined that Sam was in labor and had pre-eclampsia, which is an emergency that can be fatal for mother and child. A heartbeat could not be found on the ultrasound. And soon thereafter, Sam delivered a stillborn baby. Though he had obviously not planned or expected the pregnancy, he was heartbroken, and the loss of his baby produced a major depressive episode.

The language of medical records must be accurate. There was once a standard way to indicate a patient's sex in medical records, but no longer. And I want to give a shout-out to Dr. Carrie Mendoza for pioneering the work on safety in electronic health records and writing a model policy. With her help, Texas passed legislation requiring not gender identity, not legal sex, but actually just sex, male or female, on medical records.

So why is it so critical to accurately indicate a patient's sex on medical records? Well, we can see from Sam's story, of course, what happened, but there's much more. The X and Y chromosome have a deep and lifelong impact on each organ system. In fact, on each cell. There are significant differences between male and female in health and disease, and there are thousands of examples of this. For example, women are more likely to develop certain heart arrhythmias. 80% of autoimmune diseases are in women. Certain drugs are more powerful in one sex than in the other. So it's potentially life-saving to have the correct sex identified on medical records. Not gender identity and not legal sex, because that can be changed. But here's what's going on, and this is from NYU Langone Hospital. In 2018, this child was identified as a female, but two years later, this same child was identified as a male. At the Oregon Health and Science University, this is a surgeon's entry for a ma,n Forrest, who you're soon going to meet, who came in for breast implants, and it says the sex is female. And even more, well, equally incredible is that this surgeon's note for purposes of insurance coverage stated that this is a woman with underdeveloped breasts who needed a more feminine shape to her breasts in order to help with her gender dysphoria. Again, this is for the insurance companies to cover the cost of the prosthetic breast insertions. And if someone wasn't careful in reviewing these records, they would've thought that this is a young woman who simply has underdeveloped breasts.

This is back to Kaiser again, Kaiser Permanente in California. This was an admission note for Layla Jane, who you just met. She came in for her bilateral mastectomy. And it's indicated here that she is a 13-year-old male.

Now, more from Kaiser Permanente. This patient is identified as non-binary. A non-binary patient. Now, this is not someone's Facebook page. This is not Instagram. This is a legal document identifying a person as non-binary. Boston Children's has something interesting, and this was given to me by Simon. You'll note it says legal sex up there on the top right. But that means that someone whose legal sex had been changed to a different sex, it would just say that up there. And then... Okay, they have something very interesting there. They have Boston Children. They have an organ inventory. An organ inventory. Now what's that? All right. You see a list of organs, okay? Breasts, cervix, ovaries, penis, testes. And what's supposed to happen here, I guess, is that I don't know if they were indicating that Simon had all these organs, or whether someone forgot to make a check mark next to the ones that he actually has. This is

not medical care. This is dehumanizing. I mean, that's a judgment call, I guess. But as a doctor, okay, this is not medical care.

Now, returning to Forrest, his records... Oh, yeah. Returning to Forrest, his records didn't say anywhere. It didn't indicate that he had gender dysphoria. Oh, I said that already. That the surgeon wrote that he suffers from a... Okay, feminine breast. I already did that. Now, I want to move on to the next thing. And this is the diagnosis endocrine disorder, not otherwise specified, and this is an example of a lab request for estrogen that was written by a Dr. Grace Evins, MD in... Where's this? North Carolina, right? South Carolina?

Audience member:

North Carolina.

Dr. Miriam Grossman:

North Caroline. Now, this is a male patient who's on estrogen, and the doctor, for probably insurance purposes, has indicated diagnosis E34.9. The lawyers in this room, take note. E34.9. I want to explain that to you. It means endocrine disorder, not otherwise specified.

Oh, here's another example. Sorry. Dartmouth College Health Service. Also, you see below that endocrine disorder, unspecified. Dartmouth. Oh, I messed up. Okay. And this is another one for feminizing HRT. But let me just get back to it. Wait, sorry.

Okay. What is diagnosis code E34.9? In the International Classification of Diseases, they have thousands of diagnoses. And so they've categorized all the endocrine, these are medical diagnoses are... Oh, I can see it over there. Okay. The endocrine diagnoses are between E00 and E89. These are endocrine, nutritional and metabolic diseases. So for example, there's hyperthyroidism, type 1 diabetes, polycystic ovaries. These are all medical diagnoses that are between E00 and E89. But then you have E34.9, endocrine disorder, unspecified.

What is that? So it says that this is an acceptable diagnosis when clinical information is unknown or not available for a particular condition. Okay? It's preferable to use a more specific code, but you can use that code when they accurately reflect what is known about a patient's condition. Now, all these people here, these medical records that I showed you, and I'll show you some more, these are physically healthy people. They have no medical diagnosis whatsoever. They have a psychiatric diagnosis. But this E34.9 is being used in a fraudulent way, I would say, in order to get payment for the services.

Now, this is what Planned Parenthood of Southeast Pennsylvania says. "In order to meet the needs of most insurance companies and patients, we typically use the code E34.9. We recognize that much of the language around billing for gender-affirming care is troublesome." What they mean by that is that it's called a disorder. When you say endocrine disorder, they're objecting to the word disorder. "We recognize this is medically necessary care and will work to decrease barriers to get folks the care they need." So they're explaining why they use that diagnosis. So here's... Whoops, I skipped ahead.

Okay, so what I'm going to do now is go into the fraudulent notes that are written for individuals who need letters from therapists in order to get their cross-gender hormones, opposite-sex hormones or surgeries, and how these letters are fraudulent.

So this is actually Prisha's note. You're going to meet her soon. On the first day that she saw this therapist, the therapist indicated that she had a major depressive disorder, recurrent, moderate. That is a serious psychiatric condition. It is a condition that impairs one's functioning and day-to-day life. And she also indicated that Prisha had an eating disorder, doesn't go more than two days without eating. That's a serious eating disorder if she sometimes goes two days and doesn't eat. Yet on the same day

that this therapist indicated this in her chart, she wrote a letter for testosterone saying there is an absence of problems related to mood. What? She just wrote the same day she has a major depression, an eating disorder. Yeah, like Simon's father right here. He's going like, yeah, like what? How can you do that? And she writes later on in the second paragraph, "There is no evidence of psychopathology." What? And the diagnosis, gender dysphoria, anorexia in remission. Nothing about the depression. Nothing about having not that long ago had serious self-injury and cutting, and a whole host of other mental illness diagnoses. So she writes for the testosterone the same day, day one.

She had also, this same therapist. Am I over time? Oh, I am. All right. Anyway, this is another therapist's letter for Prisha to the surgeon. And this therapist wrote, "He presents with no apparent residual psychiatric symptoms and is quite stable." Oh, no, no, no. Wait. This is Laura Becker's. Okay, I'm sorry. This is Laura Becker's, the letter that her therapist wrote to the surgeon. And Laura had been hospitalized for suicidality just two months before this letter to the surgeon for her bilateral mastectomy. Two months. You cannot say that someone that's just two months out of a serious psychiatric hospitalization has no residual psychiatric symptoms and is quite stable. It's misleading. It's misleading to the surgeon. And she also wrote that Laura demonstrated excellent insight into transition. Well, Laura was under the impression at that time, that this is the only thing that would cure her symptoms. This was the only thing that would prevent her from committing suicide. That is not excellent insight. That is not informed consent. So these letters omit critical information about the patient's mental health, information that impacts their ability to provide informed consent, and information that one would hope might make the surgeon think twice before using the scalpel.

So to wrap it up, here's what Admiral Levine said about gender-affirming care. Whoops. Oh. Oh, I messed up the letters. Well, you know what? They're all the same. They're all the same in the same bad way. So Admiral Levine said, "Gender medicine is a medical field like any other. It's all very carefully done." No, Admiral Levine, I don't think so. I don't think it's done carefully at all. I think this WPATH doctor put it more accurately. Dr. Marshall Dahl at a WPATH meeting. No audio? No audio. Okay, I'll talk for him. He said, "Not only are the medications off-label, the whole field is off-label, right? But that's all good." Well, I'm here to say, all of us are here to say that that's not good. It's not good at all. No more misleading the consumer. No more representing facts, things that are entirely unproven or demonstrably false. Families deserve much better, and today is a great start. Thank you for listening.

Jon Schweppe:

Thank you, Dr. Grossman, for that informative presentation. Let's take, I'm going to try to grab a couple of those minutes back. So let's take a quick seven-minute break and we'll be back in seven and then we will have our first panel. All right, everyone. Let's go ahead and get started again. If I can have everybody back to their seats. We're going to get started in the next one to two minutes. All right, everyone. Welcome back. Please have a seat. It is time now for our first panel, the Politicization of Science. And I'd like to introduce our moderator and attorney advisor to Chairman Ferguson here at the Federal Trade Commission, Annie Chiang.

Annie Chang:

Hi, everyone. Good morning. My name is Annie Chang and I'm a current attorney advisor to Chairman Ferguson. We've already heard firsthand this morning the accounts of the harms due to what some refer to as gender-affirming care by those truly on the front lines, the parents and the survivors. We've also heard from Dr. Miriam Grossman, pull back the curtain for us on some of the deceptive language, fraudulent medical records, and misrepresentations in letters used to support the medical and surgical procedures that amount to this type of so-called care.

Though we're speaking publicly about these things today, we should keep in mind how impossible this type of event felt not too long ago. For much of recent history, even asking the questions we are posing today was in many circles, totally forbidden. I hope by now you're thinking to yourself about the elephant in the room, how? And in my mind there's two versions of how. First and possibly most obvious, how did politics and ideology creep into and ultimately capture this area of medicine?

And second, how given the overwhelming success of that political and ideological capture are we discussing these questions today? Before we discuss those questions and hear from our panelists who will shed light, I have the honor of introducing our four panelists, Edmund LaCour, Dr. Eithan Haim, Jordan Campbell and Leor Sapir. And I'll just give a short biography of each.

Edmund LaCour is the current solicitor general of Alabama. In that role, he oversees the state's appellate and constitutional litigation. He has argued three times before the US Supreme Court and dozens of times before other courts. Before joining the Alabama attorney general's office, Edmund was a partner at the DC office of Kirkland & Ellis where he represented numerous clients before the Supreme Court, Courts of Appeals and trial courts. Before joining Kirkland, he practiced at Bancroft PLLC in Washington, DC and Baker-Botts LLP in Houston, Texas. Upon graduating from law school, Edmund clerked for the Honorable William H. Pryor, Jr. of the US Court of Appeals for the 11th Circuit. Edmund earned his bachelor's degree from Birmingham Southern College, his master of philosophy from Trinity College Dublin, and his JD from Yale Law School.

Dr. Eithan Haim is a general and trauma surgeon in a small town outside of Dallas. He attended University of South Florida for his undergraduate degree, followed by Florida Atlantic University, Schmidt College of Medicine, where he was part of the prestigious Alpha Omega Alpha and Gold Humanism Honor Societies. He completed his residency in general surgery at Baylor College of Medicine in Houston, Texas in June 2023.

During his residency, Dr. Haim was an anonymous whistleblower in a May 2023 story released by Christopher Rufo that showed Texas Children's Hospital had been lying about shutting down their transgender program. Instead of shutting down the year before, like they said, TCH continued and expanded the program behind closed wars.

The very next day the Texas Senate passed SB14, a bill to outlaw pediatric gender intervention, which received bipartisan support and in part due to Dr. Haim's anonymous whistleblowing. The Biden administration, however, had a very different response to Dr. Haim's bravery which we will discuss during this panel, and which I'm sure many of you know. Dr. Haim lives with his wife and baby daughter in a small town outside of Dallas, Texas.

Jordan Campbell is the newly appointed deputy assistant attorney general for the consumer protection branch of the civil division at the Department of Justice. Before accepting that position, Mr. Campbell co-founded the first and only law firm exclusively dedicated to representing de-transitioners and victims of radical gender ideology based out of Dallas, Texas. In that capacity, he represented plaintiffs across the country, consulted with state legislatures on proposed legislation, regulating pediatric gender medicalization, coordinated with the state attorney's general's offices, and consulted on policy. He earned his bachelor's degree from Washington and Lee University and JD from Southern Methodist University. He will soon be moving his wife and seven children from Dallas to join him here in DC.

And finally, Leor Sapir. Leor Sapir is a fellow at the Manhattan Institute. He holds a PhD in political science from Boston College and completed a postdoctoral fellowship at the program on constitutional government at Harvard University. Since joining the Manhattan Institute, Leor has become a widely recognized thought leader on topics related to pediatric gender medicine, education, policy, and culture. Leor has offered incisive analysis of the institutional dynamics at play in youth gender medicine, the lack

of incentives for evidence-based practices in this area and the growing divergence between the US and other countries in medical policy.

So I'm really excited today to learn from this group of speakers experienced on this panel's topic. And I want to start with Leor. So you've been writing and studying in this space for years now, and you've been ringing the alarm on the ways that politics have crept into medicine. As just one example, as early as 2022, you published an article on the "affirm or suicide mantra" that you described have become the central strategy of contemporary transgender activism, the empirical basis of which you explained to shoddy at best. So I'd like to hear from your perspective from a 30,000-foot view very generally, how did ideology and politics creep into medicine?

Leor Sapir:

Thank you, Annie. It's really a pleasure and an honor to be here. And I wanted to thank the FTC for organizing this event. A very important event. Before I answer your question, Annie, I do just want to say one thing in light of the context in which this event is being held, and that is that there's growing awareness and acknowledgement among professional class, liberal professional class people that something has gone very wrong in the field of gender medicine, that there is this child-led model where no assessment takes place and kids are rushed into transition.

So that's a good thing that acknowledgement exists. The problem is that that acknowledgement is always accompanied by another claim, which is that there is an alternative, a careful way to do youth gender medicine. They sometimes call it the assessment model. And so I just want to make a few very brief comments about that because I think this is where we're going to see a lot of the battle of ideas over the next couple of years.

So the first thing I want to say is that even this supposedly more conservative approach to youth gender medicine has been evaluated in systematic reviews of evidence and has been found to be based on very low quality, meaning very uncertain evidence. Number two, as the CASS review, I think very helpfully pointed out, even a diagnosis of gender dysphoria is not predictive of adult outcomes. So even if you have a therapist who does a very careful assessment, there's nothing really that assessment can tell you about what would happen to that child if they were not medicalized.

And then the third problem is even if there was good evidence for some mental health benefits in some kids, and even if a gender dysphoria diagnosis was predictive, which it isn't, it would still run into significant ethical problems involving informed consent because no 12-year-old can really understand what it means to give up fertility, sexual function to endure cognitive impairment, if that is indeed one of the consequences of pubertal suppression.

So I just want to flag here that we are moving towards a debate about the careful assessment based model, which itself has significant problems attached to it. Okay, so with that aside to get your question, this is obviously a long and complicated story, but at the heart of it, I want to argue, is a broken chain of trust. So the previous panels I think, explored this idea that medical professionals are misleading patients, misleading parents, and that's true. But I think that another crucial part of this story is that some folks in the medical community are misleading their colleagues and that has to be accounted for.

I cannot tell you how many times I've seen this, how many times I've heard this in my conversations with doctors, with people in positions of authority within the medical field who for understandable reasons say this is not my area of expertise. There are these other people that I call my colleagues who work at my hospital, and they are gender clinicians. This is their specialty. They know what they're doing. I don't want anybody to question what I'm doing. I focus on my particular area of expertise and I expect them to defer to me, so I'm going to defer to them. And modern medicine cannot work without a high level of

trust and deference because modern medicine involves high levels of specialization and compartmentalization.

And so that kind of deference is to be expected, and it's a good thing generally. But it also means that the medical profession, that the trust that makes modern medicine possible can be abused. And pediatric gender medicine is a prime example of what happens when that trust is abused. It is a classic example of a broken chain of trust. So the leading authority on gender medicine in the United States is of course WPATH, the World Professional Association for Transgender Health.

WPATH publishes a document called the standards of care, which are essentially clinical recommendations. The eighth and most recent standards of care were published in 2022, and WPATH has managed to embed its standards of care, and more broadly its approach to understanding human nature, sex, gender, gender identity, and so forth in virtually every relevant aspect of US healthcare. So state Medicaid authorities and commercial insurers incorporate WPATH standards of care in their determinations of covered benefits.

Hospitals conduct WPATH-aligned trainings, also called the Global Education Institute, and operate specialized pediatric gender clinics that rely or claim to rely on WPATH standards. Major US hospitals and medical schools integrate WPATH-aligned standards into their residency fellowship and continuing medical education programs. Around 20 medical associations, including the powerful American Medical Association have repeatedly assured state and federal regulators that WPATH standards are credible and deserving of deference.

And of course, the Biden administration, as we saw, cited WPATH standards of care in its policy memos and had its Department of Justice try to enforce those standards through litigation. In short, in the United States, gender medicine is WPATH and WPATH is gender medicine. In a few minutes, you'll hear from my co-panelist, Solicitor General LaCour about what his team found out about WPATH standards of care during the discovery phase of their litigation Boe vs. Marshall.

Let me give a very brief overview. In evidence-based medicine, systematic reviews of the evidence are the gold standard for evaluating what is known about a medical practice. Clinical practice guidelines are considered trustworthy only if they are based on systematic reviews of evidence. WPATH's previous standards of care version seven, which came out in 2012, was not an evidence-based guideline, and WPATH did not rely on systematic reviews of evidence for that guideline.

When WPATH decided to revise its standards around 2017, it resolved to do so using systematic reviews. The co-chair of the eighth standard of care revision guideline, Dr. Aseratix said at the time that the eighth version would be, "The first to be developed using an evidence-based approach."

So WPATH commissioned dozens of systematic reviews from evidence review experts at Johns Hopkins University. These included reviews of evidence for pediatric outcomes. But when WPATH leaders discovered that the evidence for pediatric transition was extremely weak, it prevented the Johns Hopkins team from publishing their results. WPATH claimed in the final guideline that a systematic review was not possible. It even told the authors of the adolescent chapter of SOC-8 that it was not possible to do a systematic review.

WPATH violated other key requirements of trustworthy guideline development. For example, it failed to manage conflicts of interest stacking the guideline panel with clinicians who are personally, professionally, and financially invested in medical transition. It eliminated age minimums for transition procedures for political reasons, and WPATH leaders privately admitted to including medical necessity statements for the purpose of insurance coverage and for winning legal battles.

In short, WPATH put its activist agenda above any concern for patient health and well-being. And the Alabama documents provide incontrovertible evidence of fraud by the leading authority on transgender

medicine in the United States. Now, the fraud WPATH committed, as I said, is not just against patients and their parents who are the end users of WPATH standards of care, though that is of course their most troubling impact. It's also against the American public, which has absorbed WPATH's messaging about the safety and efficacy of these interventions through WPATH's allies in the media and in the medical profession.

But it's also fraud, as I've been saying, against the rest of the medical community, including unsuspecting insurance companies, state Medicaid authorities, medical association leaders, hospitals, individual clinicians, including I would suspect some clinicians involved in gender medicine itself. Again, the broken chain of trust. But what about the other medical associations?

We often hear that gender-affirming care is supported by most major medical associations. First, it's important to note that US medical groups that endorse the gender-affirming approach are at odds with medical authorities in places like Sweden, Finland, the UK, and Norway, hardly bastions of right-wing conservatism.

In 2023, the director of Belgium's Center for Evidence-Based Medicine said, "If we had to review the WPATH guidelines, we would actually toss them in the bin." Adding what WPATH recommends is, "A pure experiment on children without any scientific evidence for it." Second, even in the United States, not all major, meaning large medical associations support WPATH's approach. Last year, for example, the American Society of Plastic Surgeons effectively sided with the CASS review, acknowledging the weakness of evidence for pediatric outcomes. Among those groups that do support WPATH's approach, the American Academy of Pediatrics or AAP has been one of the most vocal.

In 2018, the AAP allowed a young medical resident by the name of Jason Rafferty to write its policy statement in support of gender transition for minors. The statement asserts that children have indisputable knowledge of their transgender identity and that parents and clinicians should follow their lead. It cites WPATH's standard of care. At that point, it was the seventh edition as authoritative. But as two peer review articles and medical journals have shown the AAP statement contains critical errors including miscitations and misrepresentations of existing research.

A systematic review of guideline quality from the UK commissioned as part of the CASS review found that the AAP guideline is among the worst in the field. The problems with the statement were pointed out to Rafferty and the AAP soon after the statement was published, but the AAP has consistently refused to engage with or even acknowledge these criticisms casting them instead as transphobic.

Indeed, the AAP has gone to great lengths to silence its own members who have raised concerns about the organization's unwillingness to conduct or rely on systematic reviews of evidence. The AAP continues to insist to this day that gender transition for minors is evidence-based, safe and effective.

In a 2023 interview published in the Boston Globe, Jason Rafferty, the author of the AAP statement, said that gender-affirming care is about, "Affirming and validating the child's sense of identity from day one through the end." He explained that when a child declares a gender, "We operate under the assumption that what they're telling us is their truth, that the child's sense of reality and feeling of who they are is the navigational beacon to sort of orient treatment around.

In 2023, after a multi-year campaign from some of its pediatrician members who refused to be silenced, the AAP finally agreed to conduct a systematic review of evidence even though by this point several such reviews had been published and the AAP could easily have relied on them. It's been two years and there is no indication that I'm aware of that the AAP has begun that review or that it intends to adhere to accepted standards of systematic reviews.

So now let me turn to the Endocrine Society. In 2017, the Endocrine Society published a clinical practice guideline on gender medicine. Despite acknowledging the poor quality of evidence, the guideline makes

strong recommendations in favor of puberty blockers and cross-sex hormones, a move that has drawn criticism from some of the world's leading experts in evidence-based medicine. The Endocrine Society explained its decision by invoking the "values and preferences" of pediatric patients wanting endocrine treatments. It said that it places a higher value on "avoiding an unsatisfactory physical outcome when secondary sex characteristics have become manifest and irreversible" than on "avoiding potential harm from early pubertal suppression".

In other words, according to the Endocrine Society, helping a teenager achieve his or her cosmetic goals is more important than preventing harms from the use of off-label drugs. It's important to note that the clinicians who wrote the Endocrine Society's guidelines are themselves gender clinicians with conflicts of interest, and most were WPATH members.

Now, a key element of WPATH strategy has been what I've called credibility laundering. Medical associations with broader scope and larger memberships have specialized subcommittees dealing with LGBTQ issues, which today means primarily gender medicine. And these groups are WPATH-aligned or even affiliated. For example, Dr. Aron Janssen of Lurie Children's Hospital is co-chair of the American Academy of Child and Adolescent Psychiatry's Sexual Orientation and Gender Identity Issues Committee.

Incidentally, he's also a WPATH member and co-author of WPATH's eighth standard of care. It's not just medical associations that produce a broken chain of trust. Medical journals are also responsible. We now have a large body of evidence demonstrating that medical journals have lowered or abandoned their editorial standards when publishing research purporting to show benefits from pediatric transition, and they also suppress or decline to publish critical commentaries on these studies.

Leaders in the medical field may be forgiven for assuming that if a study reports improvement in mental health as a result of cross-sex hormone therapy, that that report is credible because it went through peer review. Again, the broken chain of trust. So to summarize, the medical transition of minors is a good example of medicine's failure to self-regulate. That failure is due not only to the broken chain of trust, which I've highlighted here, but also to the climate of intimidation activists have created within the medical field against any medical professional who would dare question gender medicine or its foundational concepts.

As Dr. Hilary Cass wrote in her important report from last year, "There are few other areas of health care where professionals are so afraid to openly discuss their views where people are vilified on social media and where name-calling echoes the worst bullying behavior." This must stop.

Annie Chang:

Thank you so much, Leor, for that very in depth review of how we got here today. And speaking about kind of the broken trust in the medical field. We're really lucky to have Dr. Haim join us. I want to turn to you next. Your perspective on this panel is especially interesting, both because you are a medical doctor, you're a surgeon, and then also you have personal experiences kind of going up toe to toe with these ideological and political behemoths in medicine. I just want to touch briefly. I know it's a long story about your personal experience here.

Eithan Haim:

Yeah, and thank you all so much for being here and especially to the FTC for hosting us. But yeah, my name is Dr. Haim. I'm a general surgeon in a small town outside of Dallas, and I was the whistleblower who exposed that TCH was lying about the existence of their transgender program. And I'm sure that many of you are wondering, there's so much deception in this field. Where are the doctors? Why are there not other doctors who are speaking up? And all of this happened with me blowing the whistle during my training, and I saw it firsthand myself.

There is a code of silence that exists among physicians in the profession today. If you break that code, then you'll be targeted in the most vicious way possible because when I found out that the hospital, I was working at Texas Children's, which is one of the most amazing hospitals in the country for taking care of kids, but they had this program that was harming these kids that had no basis in scientific or biological reality.

They were doing these children and they were lying about it. So I blew the whistle in May of 2023. There was a law passed the next day. More whistleblowers spoke out, Vanessa Sivich, who you'll hear about later today. And the hospital said that they were shutting down the program. But in response to that, I was targeted by the most powerful federal leviathan in human history. They tried to send me to prison for 10 years. I was charged with more felonies than some of our country's most prolific criminals. And this was for a crime that I had never committed that the DOJ could never even define where no patient had actually been harmed.

They were using HIPAA as a basis for their indictment, even though the victims they said were the hospital and the doctors, not the patients, the hospital.

Annie Chang:

Thank you, Dr. Haim. And moving on, I kind of want to get more into your medical expertise, and you touched on this briefly about this code of silence. Why, in your view has politics and ideology, how has that been allowed to stay in this type of medicine?

Eithan Haim:

It's a decades-long process where the institution of medicine had been taken over by radical left-wing ideologies. And as that creep has taken a hold in these institutions, people who spoke up were increasingly vilified. So people would suffer the traumatic experiences of speaking out and then having their profession, their professional lives damaged. Either they would be fired, they would be held back from promotions. They would be sometimes targeted by governing medical authorities in their state. And in cases like mine, they would be targeted by the federal government.

So you have real consequences to the doctors who speak out against this. And that is happening in conjunction with the professors at medical schools. The clinical doctors who are teaching medical students in residence. All of the people who are promoted, who are hired are not the ones who hold conservative values. Or not even conservative values, just not radical values. Being an average person essentially eliminates your ability from being hired in these prestigious academic centers.

Annie Chang:

I'd like to switch gears a little bit to the second question I pose at the top. We're talking about this cone of silence, how nobody's speaking up. So I want to really get into how we are here today. How are we here today asking these questions and having these discussions? I think we have a lot to thank to some of these panelists, including Dr. Haim. We also have a lot to thank to the work at the state level. We're the FTC, we're at the federal government level.

But state legislators and state enforcement officers we're willing to go to the mat on these disputes. We saw that in United States v. Skrmetti. So let's start with state enforcement. I'm sure it's at the top of all our minds on the Skrmetti Supreme Court decision that upheld Tennessee's Senate Bill 1, which bans healthcare providers from performing or offering to perform on a minor, a medical procedure if the performance or administration of the procedure is for the purpose of enabling a minor to identify with or live as a purported identity, inconsistent with the minor sex under rational basis review.

Many other states, including Alabama, however, also passed similar laws. Today we're joined by General LaCour who was at the forefront of that litigation in Alabama. General LaCour, can you briefly describe what you were seeing at the state level, particularly from Alabama before all the litigation eventually culminated in Skrmetti?

Edmund LaCour:

Absolutely. Thank you, Annie, for having me here today. I think Alabama was seeing, what a lot of states were seeing, which was a rapid rise in children identifying with gender dysphoria and a similarly rapid and unexplained rise in these clinics that were treating them with these untested treatments. So Arkansas was the first state to enact a law in 2021, setting age limits. Then Alabama in 2022, Tennessee other states the year after. And nearly every one of these laws was challenged almost immediately by the ACLU and other activist groups.

And they ran a similar playbook in every state. They would show up, demand immediate preliminary relief from the district court. They would've a carefully curated story sort of along the lines of the assessment model that Leor was talking about a moment ago. And then they would appeal to WPATH. It was their key weapon in their arsenal, which was these are evidence-based guidelines to provide medically necessary care to these children who are in deep distress. "And, judge, if you don't do something, they might kill themselves."

And so many of these district court judges who knew nothing really about this were forced to make judgments very quickly. And in Alabama as well as in other states, preliminary injunctions were entered that prevented us from enforcing our laws. In Alabama's case in particular, the district judge really relied on WPATH in his preliminary injunction order, but we saw that as a great opportunity because the WPATH guidelines had essentially been constitutionalized in the case. And we said, "Well, judge, that makes them the most relevant thing for this litigation. And so we should get discovery into how these things were made. Were these the product of dispassionate science or impassioned advocacy?"

And what we revealed was really a political, medical and legal scandal beyond what we had even imagined at the beginning of the litigation. As Leor referenced, the Biden administration was involved throughout the process in trying to craft these for the purposes of implementing federal policy. So there was this circularity there where the federal government was trying to alter the guidelines and then rely on the guidelines to alter federal policy.

Most shockingly was, again, the instance where in 2022 after years of development, SOC-8, the version eight was finally released on WPATH's website and there were age limits in the guidelines for the hormone treatments and surgeries. Now, many would argue that they were too low, but there were still at least age limits there. And then all of a sudden the guidelines disappeared from the website and a new version came up the next day that had no age limits whatsoever.

And WPATH didn't explain why this was. Well, discovery revealed at least part of the reason why is that Admiral Levine, again, a senior HHS official at the time, had been given an embargoed final copy and then immediately began pressuring WPATH for political reasons to remove all age limits from the guidelines. And then AAP, who Leor referenced as well, joined the party in saying, "We will come out against your guidelines if you don't abolish all the age limits on the surgeries and the hormones."

And we have emails of WPATH authors going back and forth saying, "Well, should we really let US politics govern these international clinical guidelines?" We feel bad about caving, but that caving is exactly what they did. And then we have emails saying, "Let's all get on message and fight misinformation, which they were putting out there into the public." As a result of that, there are some verifiable falsehoods in the guidelines that remain again on their website today.

So WPATH says in the guidelines that all statements went through what's called the Delphi process, which Leor could probably explain far better than I could. But it's essentially a process where you consult different experts, try to reach a sort of consensus, and that consensus is its own sort of evidence. Dr. Coleman, who was the chair of the guidelines said, "It's really the only evidence we have." But because Levine intervened at the end and said, "You need to change this statement and remove all the age limits," that process never went through.

Or that new statement that says, "No age limit is needed," did not go through the process. So that's a verified falsehood that's there in the guidelines. Leor referred to the conflicts of interest problem. WPATH claims that they followed the recommendations of the National Academies of Medicine for developing guidelines free from serious conflicts of interest.

Again, we show that that's not true. The National Academies says that only a minority of people involved in guideline development should be people who have some sort of interest in the procedures. But Dr. Coleman under oath in a deposition in Alabama's case said that most people, so not a minority, but most who were involved in SOC-8 did have a financial or non-financial interest. Indeed, all 119 authors were members of WPATH and Dr. Marcy Bowers, who also oversaw the guidelines' development said that in Bowers view, it was important that every author for the guidelines be an advocate for expansive transgender care in WPATH's view.

So again, we have guidelines now that are based on these undisclosed conflicts of interest, which raises serious problems. And I think that's how you get to a position where they can use the terms evidence-based and medically necessary in such a loose manner as to be almost meaningless. Speaking about the evidence-based, I mean, Leor already touched on a little bit how Dr. Robinson at Johns Hopkins had been contracted to do the systematic evidence review for WPATH to see, to look at all the evidence that might be out there and see if there's strong evidence, weak evidence, or no evidence backing up any of their recommendations.

In 2020, Robinson was already able to confirm to HHS that there is, "Little to no evidence when it comes to children and adolescents." HHS responded, "It's good to know there's little to no evidence." And then years later, "We're telling the Supreme Court that there was overwhelming evidence to support these treatments."

Leor already touched on how the evidence reviews were being suppressed by WPATH. In fact, they required final approval of any article that used any of the data. And anyone who's putting out an article based on the data had to, " Use the data for the benefit of advancing transgender health in a positive manner." But, again, the point of evidence-based medicine is to look at all the evidence that might be for or against your hypothesis, not to just pick the stuff that supports your view and leave the other stuff aside. So I mean, that bias undermines the entire process. But to make it appear neutral, WPATH imposed an additional requirement on their authors saying that in their manuscript, they needed to tell the world that they were, "Solely responsible for the content of the manuscript and the manuscript does not necessarily reflect the view of WPATH." I mean, that's very hard to square with WPATH having final approval of every manuscript.

The last thing I'll touch on medical necessity, as they are referred to, sort of the child-driven model. There are phrases like "embodiment goals" that show up in the emails that we receive from WPATH. I think those emails and even the guidelines themselves made clear that wants are being treated as needs in their view. And so as one author put it, it was in her view, "Clear is a bell that the SOC-A refers to the necessity of treatment in its broadest sense for gender dysphoria because it refers to the symptom of distress, which is a very, very, very," it's three verys, "broad category and one that any good-willing clinician can use for this purpose."

And so when you redefine medical necessity in that light, you can get strange sentences like this in the guidelines, "A key challenge in adolescent transgender care is the quality of evidence evaluating the effectiveness of medically necessary, gender-affirming medical and surgical treatments." But of course, if there's no good evidence out there, calling it medically necessary clearly puts the cart before the horse. But that's what we have in the guidelines today.

Last thing here on medical necessity. SOC-A for the first time has an entire chapter devoted to men who identify with a eunuch gender identity. Associates chairman admitted under oath that even though no diagnostic manual recognizes eunuch as a medical or psychiatric diagnosis, WPATH's official position is that castration may be "medically necessary" for a healthy man with no mental health conditions who presents as eunuch and wants to be castrated.

So when the same guidelines say that it is medically necessary that middle schoolers like the ones we heard from earlier this morning with gender distress need to receive surgeries and hormones, one should to ask what does WPATH really mean by medically necessary?

Annie Chang:

Thank you so much, General LaCour. And you mentioned you got all this information during discovery, so I have two follow-ups on that. One, I've read speculations online that obviously your case didn't make it up to the Supreme Court, Skrmetti did. I've heard online that the Biden administration chose not to petition for cert in the Alabama case because you received all of that discovery. Is it your sense that you were able to uncover that and they wanted to keep that silent?

Edmund LaCour:

That was absolutely our view because after we got the documents, the same lawyers from the Department of Justice under President Biden were suing Alabama and were suing Tennessee. And Tennessee's case was going up on a very truncated six-week record at the preliminary injunction stage and they decided to seek cert even though one reason for the Supreme Court not to take a case is because the record is small and underdeveloped and the United States has argued against the court taking other cases on that very ground.

Meanwhile, we'd been litigating for a year and a half. We had all this record we had developed, we were getting ready to go to trial. And just a few days after, they asked the Supreme Court to take the Tennessee case. They actually filed a motion in the Alabama case to say, "Whoa, whoa, I know we sued Alabama and we need relief really quickly, but let's just hold up on this litigation. Let's press pause." Like they say with the puberty blockers, "and just wait and see if maybe the Supreme Court's interested in taking Tennessee's case because that could resolve a lot of things." And at that time, the discovery was still all under a protective order.

Now, once documents that have been produced under a protective order hit the docket as litigation documents like through trial or through a summary judgment motion, the burden shifts to the party who wants the protective order to be enforced to explain why the public shouldn't see these documents. And so that's what I think they were trying to prevent from happening. Fortunately, we were successful in opposing that stay motion and then another stay motion filed with SPLC. A few months after that, we got the file our summary judgment brief, and that included a lot of all this evidence that I've been talking about today, and that really helped to shift the narrative and sort of expose some of the scandal.

Annie Chang:

And so the Alabama case was stayed. And my second follow follow-up is so that effectively ended when Skrmetti was granted at the Supreme Court. What did you do?

Edmund LaCour:

Well, it actually ended a month before Skrmetti. They came to us and said, "We want to drop our case with prejudice."

Annie Chang:

Of course.

Edmund LaCour:

Which means we lose completely. Even before Skrmetti was decided though, which we took as a sign that if Skrmetti had gone their way, ours was the last case they would want to go forward as the next one up. Because even if heightened scrutiny is applied, when you see that the guidelines they've staked their entire case on are based on this sort of advocacy and not science, that would be sort of a terrible blow for them in terms of pushing this narrative. So they walked away a month before the Supreme Court even issued its decision.

Annie Chang:

And then you filed an amicus brief in this?

Edmund LaCour:

Yes. So in October of last year, we found an amicus brief in Skrmetti, laying all this out, really calling the United States to task for making their representations to the court when they knew what we knew and explaining what we had uncovered about WPATH, which again had been cited multiple times by the private plaintiffs and by the United States in getting the court to take the case and making their case at the court. That brief was cited extensively by Justice Thomas and his excellent concurrence. And so it was an honor to be able to do that work.

Annie Chang:

Thank you so much. I want to turn to private litigation and Jordan. Jordan is now serving in the federal government, but before that time, and I think some of here as former clients of his, you left your position as a partner at a boutique firm in Texas where I'm sure you're doing quite well for yourself, at a firm that was dedicated to representing members of the detrans community who have been harmed by what some have described as gender-affirming care. Before we go into your substantive work here, I just want you to share what motivated you to go into opening up this firm that specialized only in this work?

Jordan Campbell:

Yeah. Thank you first of all for having me. It's an honor to be on this panel. And when I say that, I mean truly it's an honor to be with these three guys because I have no right to be here. They're so much smarter than me. All I can really do is just relay what I have learned from hearing from my clients and literally hundreds of others that we were unable to represent for statute of limitations reasons, which is a whole separate topic. But my background was big law, commercial and antitrust litigation. And so it was a hard right career turn to go into gender litigation.

What got me there was essentially what we heard this morning, and it was just the stories and testimonies of folks I didn't know existed called detransitioners. And the more I read and the more I heard from them, hopefully like others in here, I couldn't turn away and I couldn't do nothing. I saw that there was really nobody that would stand up for them. There was nobody that would speak up for them and there was certainly no lawyers that would represent them. And so I said, "Okay, well I'll be one of those folks and I'll step up and I'll try to represent them the best I could.

So it's not a, I didn't know a ton about the medicine. I've certainly learned from folks like Leor who I've become good friends with. I've known Eddie for a long time and certainly learned a lot from their litigation. And by the way, for nerds who like to read amicus briefs, that is the best amicus brief I've ever read. You should absolutely read it. But it wasn't any of that, it was hearing from my clients, hearing from others and just saying, "Yeah, I feel like I need to do something."

Annie Chang:

Thank you for that. So we heard a little bit from General LaCour about litigation tactics that were used in state litigations to kind of keep this information out of the public view. I was wondering, in private litigation, you were litigating against, I'm sure healthcare institutions and these medical practitioners, sometimes maybe governments. I was just wondering if there's any discovery that you uncovered or facts that you uncovered that you're able to share today. Keeping in mind, I know some of it is subject to protective order.

Jordan Campbell:

Yeah. I would just say there are certainly tactics at the practitioner level that we would see that were very common. I literally cannot tell y'all how many times I've heard folks, clients or potential clients we've interviewed tell us about the suicide myth that they were told, which is the, would you rather have a living son or dead daughter or vice versa? Very, very common tactic. The surgical letters, by the way, that Dr. Grossman highlighted for us this morning as well, very common tactic. I would actually say those are some of the more detailed letters that you'll actually see. It's more common to see even more form letters that are even more fraudulent that just in two quick paragraphs say... We even had one client who had a doctor sign a letter that said they can certify that this patient meets all the WPATH guidelines, which include months of dysphoria, if not years. And the doctor said, "I've been treating this patient since the day that they signed the letter."

So I mean, the most blatant evidence of fraud of, I know this patient and I know they meet all the criteria and I just saw this patient today, but I'm going to sign off on it right here and check the boxes. So the letters are certainly very, very common tactic. The suicide myth is a common tactic.

I would just say that generally speaking, the overall thing that just really blew my mind, the more we would dive into records, the more we'd see from these institutions was just the absolute unquestioned rush to "affirmation" with zero guidelines. I cannot tell y'all how many patients we have spoken to were the absolute very first time they spoke to a clinician, they were prescribed cross-sex hormones or puberty blocker or both, which flies in the face of even the "WPATH Guidelines," which they all purport to follow, but in practice, none of them actually do, which that's the thing that really jumped out to me was they don't even play by the rules that they purport to follow.

Annie Chang:

So there's one last question I want to ask all of our panelists, and Leor touched on this briefly in the beginning. We're here today after Skrmetti, after the state enforcement action, after private individuals have put their livelihoods sometimes at stake to allow us to ask these questions and hear from people

today about what's been happening. So what's next? What's next in undoing the view and the politicization and ideology that's crept into medicine?

Eithan Haim:

If I can start off, I think one of the best strategies, especially for Jordan Campbell moving forward and anyone in the Department of Justice who has the capacity to enforce the law is what Dr. Grossman showed us earlier.

Me as a surgeon, if I use diagnosis codes that were that fraudulent, I would be in prison. That's a real crime, not like the fake crime that they charged me with. And all the Department of Justice has to do is enforce the law. These laws already exist, these people are committing crimes. If the investigations are done and the prosecutions are brought, then these people will be held accountable and there's a very good chance this will stop even in blue states.

Jordan Campbell:

Working on it. Dr. Haim. Obviously, there's certainly a legal angle that I'm sure the FTC may be interested in, obviously the Department of Justice is interested in. But I would also say more broadly, it's a cultural issue and it has been, I'd say the pendulum is swinging right now, and the reason for that is I just think that truth is actually now being brought to bear. That light is actually being shown on what is going on. And ultimately, I would think that truth wins out.

And so just as far as, how does this move forward? How do we progress in this area and recapture it? I think it's stuff panels like this where what is actually happening is being brought to light. I think ultimately that's what moves hearts and minds and that's when people wake up to see this can't be right. And ultimately, that's probably what changes things.

Leor Sapir:

I would say consistent with what I said earlier, I really do think both for intrinsic reasons and also for strategic reasons, we need to have understanding and grace for medical professionals, people in the mental health field who have trusted their colleagues for understandable reasons and have been misled. I think we need to continue forward pressing on with evidence-based medicine, continue insisting on the case for looking at evidence, thinking about the underlying clinical rationales, the concepts of transgender medicine, as Dr. Grossman very helpfully pointed out. But at the same time having some understanding and trying to help create an off-ramp for medical and mental health professionals who have got caught up on this issue.

I don't think it does us any favors to demonize those who don't deserve to be demonized, and I especially think that we need to have understanding and compassion for the kids and their families who have crossed the Rubicon and who have medicalized and who have committed their lives to these procedures. We can't demonize parents above all. I mean, to me, that's always been my red line, never demonize parents. Parents have been misled and lied to constantly. So we need to have understanding and we need to help create off-ramps. That's what I would say.

Edmund LaCour:

Sort of piggyback on something Jordan said, I think getting the word out is so critical. One problem we faced early on was that some of the things that were being done were just so horrible that most people

wouldn't believe it. "No, that can't be true." It's like this move, surgeries aren't happening, and if they are, it's a good thing. But then you hear from the people who've been so damaged by it and that can, I think, hopefully open people's minds up. But then also I agree with Leor that there are some folks in the medical industry who have been tricked and there are some who are doing the tricking. And for those who are in that latter group, I think it's going to be important to continue to investigate.

Annie Chang:

Let's give a round of applause to our panelists. Thank you so much.

Jon Schweppe:

Sorry. I should have put that on. We now have another presentation for you about the medical harms of so-called gender-affirming care for minors. Michael Laidlaw, M.D., is an academically trained board-certified endocrinologist, who has been in private practice in Rocklin, California since 2006.

In 2018, he wrote an influential article for Public Discourse called Gender Dysphoria and Children: An Endocrinologist's Evaluation of I am Jazz, after recognizing a strong push to incorporate gender ideology into his local school system. From there, he went on to publish in medical journals and to speak and educate on the topic of harms from puberty blockers, opposite sex hormones, and surgeries in locations such as California, Washington, D.C., the UK Parliament, and in front of the Florida Medical Board. He has worked and testified on behalf of states, including as an expert witness for important legislation to stop the use of harmful hormones, puberty blockers, and surgeries provided to minors for the purpose of gender transition. Please welcome to the stage Dr. Michael Laidlaw.

Dr. Michael Laidlaw, M.D.:

Okay. Thank you. Thank you for having me here. Thank you Chairman Ferguson, Mr. Schweppe, Brandon Showalter, all the really excellent speakers here today, and thank you guests.

Let's see, next slide. We're waiting on the audiovisual I think so I'll just jump ahead. I'm here in D.C. It's very nice to be here. We're going to be next year our 250th Independence Day, and we just had a great 4th of July in our corner of California, but I couldn't help thinking, what would the founders think about what's happening today? What would they think if someone couldn't define what a woman is or what a man is or that you could give chemicals they didn't know about, hormones, to magically transform someone from a boy into an adult woman or a girl into an adult man. Thank you. All right.

So with that, again, I was first really... Took a deep dive into this when this book, if you've heard of it, I am Jazz, was read to kindergartners in our local school system and a parent urged me to read it as an endocrinologist. This is a propaganda book geared towards very young kids, kindergartners and elementary school. I found at least a couple of things that were untrue claims in there, that a boy could be born with a girl's brain, that a doctor could somehow diagnose a child as being transgender. There was a lot of information missing about types of medical harms that can happen with this treatment.

Today, I'm going to talk about what is gender dysphoria a little bit, how normal human sexual development works, what is gender affirmative therapy, hormones and such, who are the major promoters. You've heard a lot about that. I'll go through that a little bit. Nations and states that have turned away from this care and about suicide deaths and a conclusion.

What does all this hinge upon? I think Dr. Grossman covered this well. Objective biology versus subjective feelings. Gender identity is an internal feeling of being a boy, a girl, or some variation. Gender dysphoria is a legitimate psychological diagnosis found in the DSM-5 with an extreme discomfort with one's sex and perceived gender leading to significant distress and impairment of functioning lasting at

least six months. It's important to know that depending on which study you look at, so long as kids aren't interfered with with hormones, the majority 50 to 98% will desist or grow out of this by adulthood. Also, important to know is that many of these people, as you've heard today, have other coexisting psychological comorbidities such as anxiety, depression or autism, or self-harm.

Now, as an endocrinologist, I provide hormones to people. Hormones are very powerful medications that alter body and mind. So if I'm going to give insulin to a patient, I'm going to make sure I have some objective evidence of diabetes. I want glucose results. If I'm going to refer a patient for a thyroid cancer, I want a biopsy to show me for sure that this person needs this treatment. So we're going to radically alter, as I said, people's bodies, kids' bodies with hormones. How can I prove that this person is transgender? Where do I find the gender identity? Can you do a CAT scan or an MRI or a chromosome testing or other testing? And the answer is you cannot.

Again, there are only two sexes in case you miss that earlier. Sperm comes from your father, an egg from your mother, and there are no other gametes out there. There aren't 14,000 other gametes. There's only two to make you and all of us. You can look in chromosomal evidence that's found in all cells with nuclei in your body. An XX for a female, XY for a male. These cause different processes to occur and sometimes in a sex-specific way within cells.

During normal development, you actually develop your reproductive track and organs around weeks 8 through 12. And so there are primitive tubules. In the beginning, you have some that could become a male and some that could become a female, but what happens is you develop into one or the other and those other tubules are completely eliminated, which means that you can go down one track or the other, but you cannot cross tracks later. We don't have any medical way of doing that.

Again, sex is identified at birth. You can do it as an adult, as a four-year-old. They could look at their little brother or sister and know for sure. It's not assigned at birth. No one flips a coin or pulls out a lotto ball say, "This is a male or a female." It's very easy to identify. There are people with disorders of sexual development, which is outside of the scope of this and really not relevant here, but it doesn't make any difference sex, it's just a disorder of sex development.

I'm going to talk about what I call gender affirmative therapy, which really has four phases, one or more of the social transition, puberty blockers, cross-sex hormones or opposite sex hormones and surgical modifications, which you'll hear more from Dr. Lappert.

Now it's important to note... Is there any water, by the way? It's important to note as we're getting water. Oh, sorry, not observant. So doctors and pediatricians and doctors can examine patients and find out what stage of pubertal development they're in by looking at what we call Tanner Stages. And so Tanner I is the undeveloped prepubertal person, and Tanner V is an adult. Fully adult reproductive organs are present and fully developed. And stages II through IV are various in between stages of development. It's important to know here for our purposes that around Tanner Stage IV, sometimes III, that's when fertility is established.

Now, all of this amazing process is under the control of glands, one being the pituitary, which is a small, pea-sized shape organ in your brain, and that activates the testicles to make testosterone or the ovaries to make estrogen. And that rolls into place all the processes for developing puberty. Now, sometimes persons can develop conditions where they have problems with this communication and it stops puberty or they may not begin puberty. And this is treated by and diagnosed and treated by endocrinologists. But other types of medications such as Lupron, which you may have heard of, can also chemically interfere with this process and stop puberty.

Now, this has legitimate uses in central precocious puberty for very young kids, say they're age three or four who go through puberty early, but there's no FDA approval and there's no good evidence as you've

Page 31 of 84

seen for using this for the purpose of gender transition. And as you might imagine, puberty blocks this normal advancement and normal advancement of fertility.

So different side effects of blockade of normal puberty. In the male, you'll stunt penile and testicular growth, which makes future surgeries problematic. Sexual dysfunction, as you might imagine, impairment of erection, orgasm, ejaculation, prevention of sperm production. In both sexes, you'll have disruption of normal brain development, which occurs under the influence of hormones and disruption of normal bone development.

In the female if you stop puberty at an early stage as recommended by WPATH and Endocrine Society Tanner stage II, you'll develop an early menopause-like state with blockade of normal breast development, decreased blood flow to vagina and vulva, sexual dysfunction with thinning of vaginal epithelium, vaginal atrophy, anorgasmia, problems with orgasm. Of course, interferes with menstruation and infertility. And you'll hear more about infertility from Ms. Lahl later.

You can also read labeling and note that there's many neuropsychiatric effects of puberty blockers right on the labeling. This is ultimately for many a pathway towards sterilization because first, you've impaired or perhaps destroyed sex organs with these medications. And then many, particularly from earlier studies, go on to have their testicles or ovaries removed, which is complete sterilization.

Now, I just want to talk a little bit about bone development. The pubertal phase and up through the 20s is an important time for developing bone and normal bone density. And so you can see at the bottom here, kids and adults ages and years and bone density. And you can see a rapid increase in both males and females from 10-year-old to late 20 years.

What happens with puberty blockers is that relative to their peers, they cannot put down as much bone and end up with a lower bone density than you would otherwise expect. And so there's this flatlining of bone density, which is important because this can lead to risk of osteoporosis and debilitating fractures when a person is older. Now, taking cross-sex hormones after may mitigate some of these effects, but again, as you'll see, that is not a healthy way to go either.

Here is a female who had undergone mastectomy surgery, and you can see evidence of what we call hyperandrogenism or high testosterone levels. You can see the abdominal hair, the facial hair. And I just want to show you, and I think this was covered earlier, but the normal female range of testosterone and females make testosterone as well as 10 to 45, 10 to 50 in blue there. But in the orange is what they're recommending for this gender transition, some 6 to 100 times higher than normal female levels.

This leads to multiple risk. Increased risk of heart attack and death due to cardiovascular disease, high red blood cell counts, potential liver dysfunction, as you heard earlier with Kayla, hypertension, various potential risks for the reproductive tract of ovarian breast, uterine cancer. Some of that's still being worked out. Of course, hirsutism or hair growth, deepening of the voice, sexual dysfunction in fertility.

This is a controlled substance and it's being used off-label. And this is important because this is data from a paper about the Food and Drug Administration Adverse Event Reporting. I want to note the similarities to anabolic steroid abuse in which we've written in a paper actually, a comment. So in the Adverse Event Reporting, they found evidence of aggression, anger reported, euphoria, depressed mood, dissociative identity disorder, affect lability, emotional disorder, antisocial/ self-destructive behavior, homicidal ideation, suicidal ideation.Many of these are similar as to what can be found in anabolic steroid abuse.

Now, let's talk about estrogen. Using estrogen in very high doses, maybe 2 to 40 times higher than the normal estrogen levels of males. This leads to, and Dr. Schwartz has a great paper and company about this, increased risk of, again, heart attack and death due to cardiovascular disease. Thromboembolism risk, two to five times increased risk of blood clots, deadly blood clots. Possible stroke risk, high

triglycerides. The breast cancer risk in males, and males can get breast cancer, has increased some 22 to 46 times, depending where you look. Benign tumors of the brain, prolactinomas. Germ cell neoplasms are other possibilities.

I'm going to skip through some of this because they've done a good job of discussing WPATH. WPATH is an advocacy organization, as you heard earlier. They removed age guidelines primarily as we found out from our great attorneys in Alabama due to Admiral Levine working behind the scenes in American Academy of Pediatrics, trusted since 1930. No longer.

Endocrine Society is an otherwise legitimate medical organization. I have been a member since 2006. They do great work except in gender stuff. They wrote guidelines in 2009 and 2017. And just to emphasize, I think Leor Sapir talked about this, but 9 out of the 10 authors of this 2017 Guideline were WPATH or WPATH affiliated. So I've often been asked, why are medical organizations following this sort of treatment? I think it's because WPATH early on in 2009, got involved and recognize why not use the hormone association to legitimize what we're doing.

I'm going to skip along. Again, systematic reviews of evidence have been done. And common themes in looking at this is that limited high quality evidence for most interventions, primarily low quality problems with methodology, small sample sizes, lack of control groups, lack of long-term follow-up, mental health benefits unproven. And so many nations have turned away from this, including the UK. There's Dr. Hillary Cass you heard about earlier. And we have our own HHS report, which is still under peer review, but in many ways expands on the Cass reports and is very extensive and worth a read. I don't have time to go into it. But I want to talk finally about death in this treatment paradigm, because that's the ultimate thing that physicians are trying to prevent.

And now, if you look at back in 2011, a study was published looking at the entire nation of Sweden general population compared to some 300 plus persons who had gotten hormones and surgeries. And so, you can see time and years across the bottom and survival with 100% at the top. And the top two continuous lines are males and females in the general population. And if you look at the dashed lines that shows what they call trans males and trans females, how their survival dropped off rapidly after 10 years. In fact, there was nearly three times the all-cause mortality rate and 19 times the rate of completed suicide.

Now, what about children and young people? This is Dr. Johanna Olson-Kennedy, who you heard about earlier, gender clinician and researcher at Children's Hospital Los Angeles. And here's a quote you've heard, what she tells parents, "We often ask parents, would you rather have a dead son than a live daughter?" Which is quite a claim in a way. It's a question, but it's also a claim that if your kid receives these hormones, they're going to live though they may be different gender than you had thought. And if not, they will die by suicide.

Which if true would be maybe an important way to discuss this. But if not true, it would be seen as, in my opinion, extreme form of coercion. And Jane Robbins is attorney and author. She alerted me early on to a study from the NIH-funded study and we looked for more information using FOIA requests to NIH. And there's a lot to talk about here, but in Miss Friday we'll cover some of this as well, but this is called, the title of this now ten-year NIH study is The Impact of Early Medical Treatment on Transgender Youth. There's four sites, academic institutions across the country.

And so, they were looking at two arms, a puberty blocker arm, starting puberty blockers at a very early age, say 8 for girls or 9 for boys, and monitoring the effects over two years and also cross-sex hormones starting at age 13 though that was lowered later. And they were studying mental health, psychological well-being, metabolic and physiologic parameters, bone health and so forth.

Page 33 of 84

Now, we found information on that around 2018. And in 2019, one of my colleagues, Dr. Will Malone, who's also an endocrinologist, and my colleague Hacsi Horvath of epidemiology, wrote a letter to the Office of Human Resource Research Protections asking for a moratorium on this study because of all the things I mentioned earlier, which would clearly happen. We stated, "We contend that neither children, nor their parents, can meaningfully consent to permanent infertility or other potentially serious medical harms to treat a non-medical condition. We questioned whether these parents were fully informed of the health risks or the possibility of tragic regret."

We received a reply from NIH basically stating that they would not have a moratorium, that that would only stop the data collection. In any ways, these parents were informed of what would happen and they weren't going to do anything about it. Now, in 2023, a study was published in New English Journal of Medicine with the cross-sex hormone outcomes, or at least some of them, of 315 patients who were given this treatment of the cross-sex hormones.

And the most common adverse event was actually suicidal ideation on 11 participants. And two kids or young people actually died by suicide, which is I thought, "That's what we were trying to prevent with this, weren't we?" Apparently not. Now, in medicine, it's been common practice for centuries to do autopsies of patients, especially people with rare or unusual conditions, and compare that with their clinical course during life to advance what we know about different things. For example, adrenal insufficiency is one thing I know about where they had done that.

So, in The New England Journal, what did you find about these deaths? Well, nothing really. It's just a statistic. Were they males or females? We don't know. What were their ages? We don't know. What were their psychological care leading up to that? What were their diagnoses? Were autopsy performed on the study subjects? If not, why not? What were their testosterone levels or estrogen or progesterone or blood levels? What did the first responders reports say? None of this is known at this time. So, information is being concealed in my opinion.

And so, the first participant was enrolled in this study in 2016. We wrote our letter in 2019 and then The New England Journal published this data in 2023. And I was quite surprised because we had been following yearly progress reports and I never saw that death was mentioned. So, it was concealed. Until our wonderful attorneys in the state of Alabama subpoenaed HHS documents in late 2023 and found out the first death actually occurred way back in 2017, before we had written our letter. And I could not find any information about the second death.

Now, someone we do have information about, and you all here, many of you probably know about Yaeli Martinez, her mom, Abigail Martinez. The only reason we know about her case is because her mom has been very outspoken about it. Yaeli had depression. She was referred to for gender transition at Children's Hospital Los Angeles because of a school psychologist who said that she needed gender transition and she was administered testosterone.

Her mother relates that the daughter was taken away by the county and placed into foster care. She committed suicide by train in Los Angeles County at age 19. The mom says around 9:30 p.m. that night, she walked in front of the train tracks facing a train. She went on her knees, raised her arms up and just laid on the tracks. So, if you want to find out more information of a case report, you could look in your medical journals and find that. No. But you can do a public record request to Los Angeles County Coroner's Office, which is what I did, excuse me, and found the record.

And I don't want to be graphic here. But you can get a picture of it from here. She was identified as a 19-year-old female. Importantly, she had scars on both arms. This was not from a train collision. These were old healed scars from her history of self-harm, I would say. And her body was so badly destroyed that mom wasn't even allowed to see the child afterwards.

So, we'd like to prevent that from happening. We'd like to prevent other deaths from happening. We'd like to prevent all of the stories we've heard today of young people being severely injured or mutilated from this treatment. Just to know this is not standard of care. I skipped over that slide, but endocrine society even said it. We don't have the technology to turn girls into boys, boys into girls, so kids may believe it. Medications are being used off-label at high doses without proper FDA risk assessment. Multi-fold harms are evident or predicted. Proper long-term studies haven't been done. Multiple systematic reviews of evidence have found poor quality of evidence of benefit.

Young people have been permanently maimed and killed during the course of these treatments. And finally, the WPATH Standards of Care 8 is an extreme document, presents a grave danger to minors and should not be followed by any clinician or physician. Thank you.

Jon Schweppe:

Thank you, Dr. Laidlaw, for such an instructive presentation. We now have one more panel before lunch, and I do appreciate you guys being patient. We had a lot to fit in today. So, let's keep going with the focus on the science. What does the science actually say about gender-affirming care? Our moderator is Myles Lynch who serves the Federal Trade Commission as one of our attorney advisors in the Chairman's office.

Myles Lynch:

I guess it's not morning anymore, so good afternoon, everybody. I know we're running a little late right now and you'll probably are looking forward to lunch, so I won't give a long introductory spiel. But this panel is comprised of medical professionals who building off of we just heard from Dr. Laidlaw can help us understand what the science really says about the benefits and the risks of gender-affirming care.

First, I'd like to introduce, I'll let them get seated first, Jennifer Lahl is the founder of the Center of Bioethics and Culture Network. A nonprofit organization educates the public lawmakers and others on bioethics issues. In this role, Lahl couples years of experience as a pediatric critical care nurse and a senior-level nursing manager with passion to speak on behalf of vulnerable populations. Lahl's writings have appeared in various publications including the Cambridge University Press, the San Francisco Chronicle, and the American Journal of Bioethics.

Her newest book, The Detransition Diaries, was published in 2024 and co-authored by Kallie Fell. She's produced 11 documentary films, 3 of which examine gender-affirming care. Her film's Trans Mission: What's the Rush to Reassign Gender?, The Detransition Diaries: Saving Our Sisters, and The Lost Boys: Searching for Manhood were released in June 2021, September 2022 and January 2024, respectively. She's frequently interviewed by the media and has been called upon to speak alongside lawmakers and members of the scientific community addressing issues such as human egg and womb trafficking.

Next is Michelle Cretella. She's a pediatrician, writer, researcher, educator, and speaker. She's the past executive director of the American College of Pediatricians and the current chair of its Adolescent Sexuality Committee. She serves as a pediatric spokesperson educator for the Association of American Physicians and Surgeons and the Catholic Medical Association. Dr. Cretella serves as a peer reviewer for the Journal of American Physicians and Surgeons, Issues in Law and Medicine, and the International Journal of Behavioral and Healthcare Research.

She became a leading physician critic of pediatric transgender interventions following a 2017 interview with Tucker Carlson in which she detailed their harmful effects and called them medical child abuse. Dr. Cretella received her medical degree from the University of Connecticut School of Medicine in 1994. Completed her internship in residency in pediatrics at the Connecticut Children's Medical Center in Hartford, Connecticut in 1997. Completed a fellowship in college health through the University of

Virginia in 1999 and practiced pediatrics with a special interest in behavioral health in 1999 through 2012. At that point, she left clinical pediatric practice to devote more time to leading the American College of Pediatricians. Lauren Schwartz is a psychiatric and psychotherapist in private practice. She's board certified by the American Board of Psychiatry and Neurology, a fellow of the American Psychiatric Association and a senior fellow at Do No Harm. Throughout her career, she's advocated for upholding the highest standards of care and medicine and mental health. Her recent advocacy centers on gender-affirming care, particularly on interventions she believes are unsubstantiated, such as puberty blockers, cross-sex hormones, and surgical procedures from minors and vulnerable adults.

Her efforts have highlighted the critical importance of high-quality medical guidelines, and she asserts that low-quality evidence should never be authoritative as to what constitutes life-saving evidence-based care. In 2024, Dr. Schwartz co-authored an open letter to the APA regarding his Gender-Affirming Psychiatric Care textbook garnering over 7,200 signatures including those of clinicians, educators, and researchers.

She's actively testified against legislation that she understands compromised ethical medical practice and jeopardized vulnerable patients' well-being. Most recently, Dr. Schwartz collaborated with other medical and research professionals to publish an open access review. This review compiles over 50 studies highlighting extensive health risk associated with feminizing hormones in natal males.

And finally, Patrick Lappert is a plastic and reconstructive surgeon who has been in practice for over 30 years. He's board-certified as a general surgeon and has served as the US Navy's chief of Plastic and Reconstructive Surgery at the Portsmouth Naval Hospital. He also served as the reconstructive surgery specialty leader for the Surgeon General of US Navy. He founded the Pediatric Craniofacial Reconstructive Surgery Unit as well as the Wound Care Center for the Portsmouth Naval Hospital, which was then the largest military hospital in the world.

Dr. Lappert retired from the Navy after 24 years of service with the rank of captain. He then worked as a plastic surgeon in private practice for 18 years. Recently retiring from the practice of medicine and surgery. Dr. Lappert has served as an expert witness in numerous legal cases concerning gender-affirmation care in state and federal courts. He was active in the legislative process that produced Alabama's law protecting minors from affirmation care, and he has authored chapters and books about scientific evidence behind gender-affirming care medicine and surgery and about the pastoral care of persons wounded by the gender-affirmation industry.

So, if I can open up by asking Ms. Lahl a question. Can you explain, I know we just heard a little bit from Dr. Laidlaw, what fertility preservation is?

Jennifer Lahl:

Actually, read my remarks just so I can stay on task. Oh, sorry. Thank you. Thank you. Very good. Yeah. Fertility preservation is an assisted reproductive technology that is offered in an attempt to hopefully maybe preserve somebody's fertility so that they can have a biologically-related child in the future. There's several different methods. One is you can freeze your eggs, ova, oocytes, you can freeze sperm, you can freeze embryos, so you actually make embryos with egg and sperm and freeze them. Or often as the case of prepubescent children, you can do ovarian or testicular tissue cryopreservation, and that's an option that's available just to the prepuberty kids because they don't have egg or sperm yet.

Fertility preservation was first tried and used and perfected in the field of species that are at risk of going extinct. So, it was a method that was used to try to preserve different kinds of species. Then it moved into the patient population of adult cancer patients where the therapy treatment they needed for their cancer treatment could negatively impact or harm or destroy their fertility. And then in the

early 2000s, it actually moved into the pediatric cancer patient population so that children who also are afflicted with cancer might have the ability to someday grow up and have a biologically-related child.

But now, we've seen it expand into the scope of gender-affirmation care as something that's offered. I'm probably the only person in the room that when the Cass review came out, the first thing I did was look to see what Dr. Cass said about fertility preservation. And I was saddened and a little bit shocked that she recommended in Section 10 that all children be offered fertility counseling and preservation prior to being put on a medical pathway.

And if I could just put a highlight under some things that Leor said, "If we move to this assessment model, if we move to this model where we can do it better, we can do a good way of treating these children. And also, if we trust the experts, who doesn't want to trust Dr. Hillary Cass?" We have to be mindful of, I think what I'm about to say, that maybe we don't want to offer this to children. As you said in my bio, I was a former pediatric critical care nurse. But for the last 20 years, I've been spending most of my energy in the whole area, fertility, infertility, and assisted reproductive technologies.

I was deeply concerned as a nurse, as a filmmaker when I learned that children who before their puberty was blocked or before they were put on cross-sex hormones or offered surgeries were offered fertility preservation as part of their care. And again, knowing that the younger the child is, they're going to be offered the actual freezing cryopreservation of ovarian or testicular tissue in stage 2 to 3 Tanner stages where they have not yet developed mature gametes.

It's one thing to provide the possibility of having a biological child for a cancer patient, adult or pediatric who needs a treatment to potentially save their life. But it's a whole other thing to offer a person who has healthy fertility who we knowingly are going to damage, but we're going to offer them fertility preservation as part of their care. The research that Dr. Laidlaw cited on one of his slides that we published in March of 2025 in Frontiers and Endocrinology titled Fertility preservation: is there a model for gender-dysphoric youth?

We found only two reported live births in the pediatric patient, female patient where ovarian tissue cryopreservation was done. Only two of those young women that were age 9 and 13 at the time of having their tissue frozen were able to successfully have a live birth. And one other case was reported in a 14-year-old female. It did not say whether or not she had been through puberty or not. But this young girl was able to, after four rounds of IVF, was able to finally give birth, have a live birth, but she did deliver prematurely, which is a risk of IVF pregnancies in general to have premature deliveries.

But in each of these three cases, all of these patients had to have a gonadotoxic therapy to treat their cancers for one of the reasons they were offered for fertility preservation. As far as what we found in the male population, we found zero reported success cases of young men that were offered the freezing of their testicular tissue. An important unknown for both of these categories is we do not know how many attempts were made.

So, of the three young girls that were successful in having live births, did only three young girls attempt this or did 3,000? We don't know. So, you have to take that stat with a grain of salt. For those who that have gone through puberty. So, they were offered to fertility preserve their egg and/or their sperm, this is no longer seen as experimental, but all of the data that we have is all lumped together. So, these young people that as part of their gender-affirmation care offered, accepted the banking of their egg and sperm. They're lumped in with people that are struggling with infertility. They're lumped in with the Silicon Valley women who are just freezing their eggs because they want to have their biological clock protected.

But we do know of all these data points that are lumped together that overwhelmingly per the CDC data that over 50% of all IVF cycles fail. And I don't know what's going to happen with the CDC data because

the group that tracks all this at the CDC was let go, as part of the DOGE, letting go of people. So, we're not sure if we're going to continue to track this or if this is the end of the data that we're going to have.

Embryo freezing actually in the CDC data shows the highest success in live birth. I mean, and the game is to get a live birth out of all this. It's the freezing of embryos. And we know in the gender youth population, they're not freezing embryos because they're not partnered with anybody yet. They just are freezing their own egg or their own sperm. But considering the gender-dysphoric population, if they want to have a child, they also just need to consider the financial costs. I mean, it costs about $1,000 a year to freeze and store and bank your eggs. So, if you're an 8-year-old and you're going to be freezing and banking and storing your eggs for two decades, you have to look at the financial costs.

And we don't know in the medical literature for egg and sperm that have been frozen for that many years, what is the success rate for any of those ending up in either a conception, a creation of an embryo, let alone a live birth. We also have to consider the fact if this is, say for example, a trans woman, a male who froze and banked their sperm, who then grows up and is partnered with a male, there's no egg in the couple, there's no uterus in the couple. So, they're going to double down on the risks and the complications of a third-party conception rate.

So, it's evident to me for all these reasons, that offering fertility preservation to the gender-dysphoric population is deceptive. As the chairman said in his opening remarks, this is a misleading claim. I mean, when you are being offered fertility preservation, you think that you are preserving your fertility, fertility as in having a child, when in fact you're freezing your gametes with no guarantee whatsoever that you'll get a live birth. Thank you.

Myles Lynch:

Thank you for that. Dr. Cretella, could I ask you, as a pediatrician, can you tell us your experience with gender dysphoria and gender-affirming care before it became such a big issue?

Dr. Michelle Cretella:

Right. I think it's important for the public to know how gender dysphoria was treated prior to the explosion in trans identities, the explosion in the diagnosis of gender dysphoria. I would say in America that the 2013 was probably that turning point. 2013 is when the Diagnostic and Statistical Manual 5th Edition came out and altered the diagnosis from gender identity disorder to gender dysphoria.

And one note I want to make is that no genetic or biological trait or condition explodes onto the scene. And across western cultures, western countries, industrialized countries, gender identities, dysphoria has grown at exponential rates. This is a sign. This rate of growth is a sign of a psychosocial condition. Psychosocially constructed predominantly. We have to understand that. That's a scientific principle. And that's been suppressed.

We've heard from Dr. Laidlaw earlier, and I think also Miriam Grossman, it's science fiction to tell parents and children and vulnerable young adults that, "Oh, you just have a brain that's not on the same page as your body. You have a girl brain in a boy's body or a boy brain in a girl's body," science fiction. No one is born with gender dysphoria. Everyone is born either male or female with a sex. So, that has to be ... That concept of, "Oh, you're just born with the wrong brain." That is the foundational fraud right there. I have to get that out.

But prior to 2013, and the best way for me to illustrate this, pediatricians almost never saw this issue. I literally had from my training, which started in 1994 through 2012, so nearly 20 years spanning, I had one case that was very classic of a little boy. I'll just call him Andy. And this one is online, although it was censored. This family brought in their son for his 5-year well-child check and they were concerned

because increasingly from age 3 to 5, he started playing more and more with girls' toys. In preschool, dressing like a princess. And by the time he was 5, he was now saying he was a girl.

At that time, again, pediatrics was not captured by gender ideology. So, I referred him and the family to a family therapist, and they engaged in very traditional child play therapy. And over the course of several visits, well, it came out that he believed mommy and daddy loved girls better than boys. Why? Because when he was 3, after being king of the hill, he had no siblings, but at age 3, a little sister was born and she had profound special needs. Mom and dad had to reallocate. They were all about sissy, all about sissy. Children are not little adults, from ages 3 to 5, especially, they have magical thinking. They can misperceive what's going on. And he honestly thought in one play session, Barbie's here, trucks there, "Mommy, daddy, you don't love me when I'm a boy." So, once that issue was unearthed, oh, my goodness, over time within a year, they were able to change the dynamic. And yeah, he grew to know that, "Yeah. I am a boy and mommy and daddy do love me."

Another time, and this might've been around 2007, 2008, somewhere in there, I received a call from a mother. She was going to be bringing in her twin girls, identical twin girls for their 12-year well-child check. And this mom called me up and said, "Dr. Cretella, I didn't want to say this in front of the girls, but Lee," I'm just going to call them Lee and Ann. "Lee refuses to wear female underwear. She will only wear boxer shorts, and she cuts her hair like a boy and only wears all boy clothing now. Do you think this is a problem?" And I said, "Well, come in. We'll talk and see what's going on." So, Lee and Ann, they were identical twin girls. And again, this was like their 12-year-old child check. From very early years, both girls were very active. Ann was always a girly girl, and she was hardcore ballerina. Lee, from the earliest years, she was always into rough tumble play. She was dad's pal. She loved her dad. And now age 12, she was totally into ice hockey and she was never into dresses.

So, I reassured mom, "Hey, from the beginning, these were personality differences, classic tomboy, what else is going on? How's dad doing?" "Oh, we got divorced. Within the year, we had a divorce." And now, dad he wasn't physically abusive or anything like that. He had the girls every other weekend. And while I was examining Lee by herself, I said, "Hey, saw you see these are your favorite clothes. Hey, tell me why do you wear these?" Just gesturing to the boxers. "They feel so good. They're just so comfy." All right. And she had told her mother the same thing, separately. So, what I ended up doing was making a referral to a family therapist to focus. I didn't focus on Lee or her tomboy qualities, but I explained to them, I said, "When families go through divorce, this is a huge adjustment and this affects us." And I said this to them all together, the two girls and the mom, "It affects everyone differently. And it can be really hard to talk about how we think and feel. We don't want to hurt mom or dad's feelings, but counselors who specialize in this can really help you share your feelings and it can be really healthy. It's really healthy to do this."

And then privately, I said to the mother, "This clothing," the boxers in particular, I said, "It's probably part fashion comfort that psychologically she's probably missing her dad and the whole boy thing and haircut coinciding with the divorce. That could be some of it." And I just encouraged her, "Celebrate the fact that you've got a ballerina and a hockey player at home. Let her make her clothing choices and just focus on the open communication." Also, with her divorced husband as well and the family therapy.

Both girls thrived through high school. Today, poor Lee would've been said, "Oh, you are gender non-confirming," which, sure, okay, she's gender, "And you're 12. Wow. We really should postpone your puberty. We want to pause your puberty," i.e. put you into a disease state. Puberty is not a disease. The absence of normal timed puberty is a disease. So, she would've been put on the medical pathway so that she could have time to really decide, are you male or female or non-binary.

Page 39 of 84

So, in the past, children had a greater chance of having their personality traits, their unique personality traits being affirmed and being shepherded through a critical developmental stage in which they could really come to embrace their true physical and personality identities, if you want to say.

Myles Lynch:

So, Dr. Cretella, what would you say to a responsible pediatrician today should do in those kinds of cases?

Dr. Michelle Cretella:

Yeah. When I'm asked by fellow pediatricians, what can we do? Because if I say these things, I'm going to be fired or my career will end. I will refer them to therapyfirst.org, which has wonderful resources both for clinicians and families. I will tell them because as pediatricians, we can screen for mental health, for anxiety, depression, and underlying traumas. We call them ACEs, adverse childhood events. That is critical as every pediatrician can screen for ACEs for depression and anxiety. Every pediatrician can do that and then refer for treatment for those underlying disorders. You need to know who you can trust within your local mental health area, of course, but therapyfirst.org is phenomenal and I do send many physicians and parents there.

Myles Lynch:

Thank you. Dr. Schwartz, given that we're talking about mental health and all of this as a psychiatrist, can you explain to me where you fit into the gender-affirming care funnel? When are you looped into this process and what's your role?

Dr. Schwartz:

Sure. Absolutely. Well, first I'd like to start out with saying thank you to everyone here and for having us to be able to discuss this, and I know I only have a short period of time, so I don't want to miss being able to say first and foremost as a psychiatrist that is in clinical practice every single day working with patients that from a gender-affirming perspective, repeating a medical fallacy over and over, louder and louder doesn't all of a sudden make it true. What you've already heard today and we'll continue to hear is this is life-saving. It's medically necessary, it's evidence-based. It's widely accepted in medical and mental health arenas as safe and effective, and it absolutely is not. So as a psychiatrist, I work with patients every single day. I prioritize seeing them doing a primary assessment. I look at the biopsychosocial model.

I talk about family issues and developmental challenges. Are they going through things? Are there things in their past or their present or traumas that they've been through that have influenced things? I focus on health and wellness. We work together. I'm looking for a differential diagnosis. I look for medical reasons. Many times in psychiatry diagnostically, I'm ruling out things that may be contributing to symptoms, whether it's depression, it's anxiety, it's distress related to gender or otherwise. We talk about all of those things. Then I talk with a patient about risk versus benefit. I think that's where if you don't take home anything else, realize this is a very exceptionalized approach to treatment from this affirmation perspective. That all of a sudden we ignore everything else. There's diagnostic overshadowing. Don't look at anxiety, don't look at depression, focus only on distress related to gender and then immediately funnel these patients into an extremely harmful, medicalized pathway.

That's not medicine. In no other area of medicine do we permanently alter healthy bodies to better align with a person's current, often underdeveloped, especially when they're kids, sense of self. Our prefrontal cortices, that front part of your brain isn't even fully developed until your mid-twenties,

sometimes 25, 26, 27 years old. So to think that a child can make a decision whether or not they should go through unhindered puberty, that doesn't seem like a medical decision or conversation I should be having with anyone, let alone a child. So when I think about what I do as a psychiatrist and I support mental health and wellness and well-being of my patients throughout their entire lives, not just in that moment, my job is not to affirm quote unquote in that moment what the child thinks that they need or vulnerable young adult thinks they need. My job is to sometimes hold reality when reality is really difficult and really painful and we have to walk through that and walk through it slowly.

We don't rush to medicine. I think that's part of what has really driven this just affirming model is that we have let go of evidence. I rely as a clinical psychiatrist on evidence-based data and guidelines. My own professional association, the American Psychiatric Association, published a book Gender... I'm sorry, Gender Affirming Psychiatric Care in 2023. I with several of my colleagues who are here today, we wrote a letter and said, how can you do this? This book says that puberty blockers are fully reversible and cross-sex hormones, they're generally safe and effective and they're life-saving and they're necessary. And as a psychiatrist, the exceptionalized psychiatry practice is get out of our way, let us provide harmful hormones at doses we've never prescribed before in children and young adults.

It leads them down a path to surgeries and that's not medicine. It's not acceptable. No parent should have to bury their child ever, and we've heard from so many today that have gone through horrible traumas because of what medicine is doing, medicine and mental health. We are failing patients and families and we have to do better and I do hope that with the help of the FTC we can do that.

Myles Lynch:

Just one quick follow up, so you would say that you think it's aberrational how the best practices for healthcare are coming about in gender-affirming care relative to other types of healthcare? Do you think that it's an aberration how the best practices are being developed for gender-affirming care versus other?

Dr. Schwartz:

Absolutely. Yes. It's a remarkably, again, exceptional development of what we are calling best practices, and I think Skirmety was a wonderful example of it. If you want to read amicus briefs, read the one that the American Academy of Pediatrics that included the American Psychiatric Association, the American Medical Association, the American Association of Medical Colleges, 24 organizations, one included WPATH. They were together on an amicus brief calling this critical, medically necessary, and evidence-based care for gender dysphoria. That's false. It's a lie, but they submitted it to the Supreme Court. So yes, I consider it horrific.

Myles Lynch:

And Dr. Lappert, speaking of best practices, is there a diagnostic process that you can use as a surgeon that tells you whether a patient should get gender-affirming surgery with enough confidence to get informed consent?

Dr. Lappert:

Yeah. Thank you and thank you to the Federal Trade Commission. I didn't imagine 11 years ago when I started down this road that I'd ever be speaking to a federal agency about what's going on in the world of medical care in the United States. The transgender treatment industry actually operates in the American medical system through the use of deceptive labeling and deceptive practices. It presents gender-affirmation care as grounded in science. It claims that gender discourse is frequently lethal if not

treated with affirmation care. It claims that gender affirmation is life-saving. It claims that gender affirmation is medically necessary and that it improves the lives of self-identified children. It claims that affirmation care is founded in an accurate process of diagnosis. It claims that affirmation care is the standard of care and that all of this is based in an unassailable body of scientific evidence. All of these claims are deceptive and are made in support of medical and surgical treatments that produce severe and lifelong harms.

It mislabels gender affirmation surgery as reconstructive rather than cosmetic. Using that deceptive labeling to defraud public and private insurance programs as well as defrauding the finances of families while essentially medicalizing these young people for life. Virtually all of the publications of the transgender treatment industry from journal publications to gender clinic websites or legal declarations refer to the WPATH standard of care as the foundational document that serves as a scientific basis for gender affirmation, including surgery.

This document was produced allegedly using the Delphi consensus methodology that was spoken about earlier, but when you look into it, what you find, one of the criteria for a competently done Delphi assessment is that it's done by repeated voting processes that include members in that group outside of the organization that's doing the questioning. That the repeated questioning is happening and the voting is happening anonymously, and none of that is the case in the standards of care.

All of the participants in the Delphi methodology are members of the WPATH and we've also seen that how that Delphi process was further corrupted by the political influence exercised by the government. There is no body of evidence to demonstrate the accuracy of diagnosis. There's no long-term treatment efficacy that could support the labeling of the standard of care. The use the words standard of care is an intentional mislabeling standard of care suggests to us that there's a level of scientific evidence above what we call level three in plastic surgery that is sufficient to guide clinical decision-making and that it is called a standard of care because to do otherwise is to risk harm to the child or to the patient. There's no body of evidence to call it a standard of care. There is no body of evidence even to include gender affirmation care in a treatment guideline as an option.

There isn't sufficient evidence to include it even there. The WPATH document and all the derivative documents falsely label surgeries such as chest masculinization, which is the amputation of two healthy breasts from a young woman, they label that as reconstructive surgery. This is patently false. Speaking as a plastic surgeon, I can tell you that this is no small distinction. Reconstructive surgery is surgery that aims at the restoration of form and function that has been lost due to trauma, surgical care of cancer, infection, or congenital or in utero deforming events. The wounded or the lost part can be objectively defined and those findings guide the surgical planning. The restoration of form and function is the key. Gender affirmation surgery is not based in any loss of form or function. It's based in the emotional life of the patient. The motivation for surgery is emotional and subjective and the success or failure is measured using subjective test instruments like quality of life surveys.

This is the very definition of cosmetic surgery. Gender affirmation surgery is cosmetic surgery. Representing it as reconstructive surgery is an act of deceptive labeling because it suggests evidence of medical necessity where there is no evidence for such a claim. Such mislabeling is employed to mislead patients and parents and to defraud insurance. Proponents of gender affirmation care, including WPATH, make highly exaggerated claims concerning the lethality of gender dysphoria. If it is not treated with affirmation care, the number typically offered is something approaching 40% mortality by suicide. There is no sufficient scientific evidence in the world literature that can be cited to support that claim. The further claim without evidence to support it, that affirmation care including surgery is life-saving. That claim is used coercively, as we've heard earlier, to obtain surgical consent from parents. Gender

affirmation surgery begins with a false claim concerning risk and then mislabels the surgery as having proven efficacy in saving lives.

It obtains consent for surgery by the deliberate deceptive practice of the concealment of existing alternatives of care and their associated benefits. The claim of efficacy itself is based in the intentionally deceptive concealment of high-quality evidence to the contrary. For example, the most commonly performed affirmation surgery at present is chest masculinization in young women.

In a 2019 scoping review of the world literature published by Dr. Tolstrup, a scoping review is level three evidence. It's a systematic review of the literature in that he examined 849 papers in the world literature that examined gender affirmation chest surgery, and that's high-quality evidence. That review reported that the state of the scientific support for gender affirmation breast surgery is low to very low, meaning that there is no basis for offering such surgery as a treatment option for gender discordance. To offer such surgery without offering other therapeutic options to parents and patients is an act of deception by concealment of facts that patients and parents have a right to know if they're going to give consent for surgery.

The WPATH path document in its chapter on surgery further deceives by suggesting that affirmation surgery is effective because such surgeries begin with a proper patient selection. That's in the first paragraph of the chapter on surgery. This is an intentional deception. The transgender treatment industry has no process or test instrument that can be employed to confirm the diagnosis of gender dysphoria. There's no process by which the patients are selected for surgery versus not surgery. There is no testing process that stratifies either risk or benefit. There isn't even a common language of description for either the condition or its treatment. As Dr. Tolstrup demonstrated in his scoping review, there is no patient selection. The patient, typically a distressed child makes the diagnosis. The medical team does nothing to confirm or refute or otherwise characterize the condition. On the other hand, there's a very large and consistent body of scientific evidence showing us that gender affirmation surgery is very harmful to young people.

Chest masculinization surgery that we've been discussing results in the permanent loss of two human capacities, 100% of the time. Young women lose the ability to breastfeed 100% of the time. Young women completely lose erotic sensation from the area due to the severing of the fourth nerve nearly 100% of the time. Neither the capacity for breastfeeding nor erotic sensibility can be restored. In the case of genital surgery, there is the loss of reproductive capacity as well as the degradation if not complete loss of erotic sensibility. In addition to those losses, there's also the additional risk of urinary blockage, urinary leakage, incontinence, the risk of fistula formation resulting in fecal leakage through the counterfeit vagina, chronic wounds, the need for repeated surgery to correct these conditions and the markedly elevated lifetime risk of cancer caused by such chronic conditions in patients receiving high dose sex hormones. When surgical procedures such as gender affirmation surgery are only based in low to very low quality evidence, then by definition those surgeries must be labeled as experimental surgery.

The failure to label it as such is itself an act of deceptive labeling. Furthermore, experimental surgery that involves the high likelihood of loss of function that's described above can only be offered under stringent protocols that govern human experimentation. Such experimentation can never be done on children, given that it has never been proven to be lifesaving. In fact, it has not even proven simple efficacy. Gender advocates will often make the claim that breast and genital surgery on gender-confused minors is rare and should therefore not be a matter of national policy. The best estimate that I can make for you at present is that over the last 15 years, approximately 4,000 minors have undergone gender affirmation surgery in America, the most common procedure being chest masculinization of young women. That number does not account for what may be a considerable number of minors who have

undergone surgery in private fee-for-service clinics and whose records are privately held and therefore unreported.

There's also the added problem of underestimation due to the known practice, and this was discussed earlier, the known practice of mislabeling and miscoding these surgical procedures such as mislabeling bilateral mastectomy in a natal female and calling it gynecomastectomy, an operation commonly done in males to correct for the presence of breast glandular tissue.

They justify this deceptive practice by claiming that these women are actually men. There is deception in the consent process and this to your question, as I alluded to earlier, by misrepresenting both risk and benefit by failing to offer alternatives of care by using the false claim of extreme risk of suicide and obtaining consent under duress by failing to disclose the experimental nature of the surgery and failing to provide ethical oversight in such experimentation, all of that renders consent utterly meaningless. Furthermore, the consent process overlooks the startling fact that a person suffering from suicidal ideation is by definition considered legally incompetent to give consent or in the case of a minor to give assent.

To summarize, gender affirmation surgery is not supported by any high-quality scientific evidence. It is not based in any reliable diagnostic process. There is no test instrument that can be used to stratify risk, to select patients for surgery or to predict the likelihood of any outcome. The harms are very evident in lifelong whereas the benefit has not been demonstrated. It is a product that is deceptively labeled as reconstructive when in fact these are cosmetic operations that in the case of breast and genital surgery begin with the intentional mutilation of the patient. Cosmetic operations that consistently mutilate patients are perhaps the most striking example of malpractice that I can think of. All of these deceptive practices and mislabeling in addition to causing irreversible harm to vulnerable young people ultimately defraud families and insurance providers for financial gain. Thank you.

Myles Lynch:

Thank you, Dr. Lappert. Thank you for all those specific examples demonstrating about how these practices ignore patient harm. Does anybody else in the panel have specific examples of gender-affirming care practices actively ignoring patient harm?

Dr. Schwartz:

If I could jump in really quick, I think one thing that has been pointed out over and over also is that this is a model of care that's overselling benefits and remarkably under-reporting harms. My colleagues and I, we published a paper about a month ago. We looked at over 50 peer-reviewed studies already available to anyone providing gender-affirming care. These practitioners, these providers are fully aware. We looked at all of the harms. This is not something that's hidden. It's peer-reviewed, it's published, it's been available, it still is. We just compiled over 50 studies that looked at harms and this is just in one area of estrogen used in natal males. Please understand that they are asking us to ignore harms. They're asking patients and parents to ignore horrible outcomes at the expense of children's lives.

Jennifer Lahl:

I think just to tag on that, the same thing is in the paper that Dr. Laidlaw and Dr. Thompson and I published. The data's there. I mean, we just went looking for it. We found that there was zero young men that were offered testicular cryopreservation that went on and had a child, so it's not like we discovered something that was new or novel and I think I will just underscore the fact that I don't want

us to take the CAS review and just remember that one little point where she recommends this and I think it's because she's unaware of the data which is out there. Thank you.

Myles Lynch:

Thank you both. And obviously this event is focused on gender-affirming care for minors. I was wondering if anybody could weigh in on what exactly makes it different for minors than it would for agendas for adult. Is there anything particularly about children, the vulnerabilities that they have that make this especially problematic?

Dr. Michelle Cretella:

I think it's their vulnerability, their vulnerabilities. That's why our laws normally protect minors because children are not little adults. Adults have better, higher cognitive development and function, have lived a longer lives, have had greater experiences, can better assess risk and benefit. Even adults, of course, cannot offer informed consent if they're being fed lies, right? So whereas we're focused here on protecting minors and being more maybe paternalistic because we recognize that children and adolescents have underdeveloped judgment centers of their brain and have lived shorter lives. Every adult requires and has a right to the true facts in order to give informed consent. And I think those of us who have spoken and will speak, we are often defamed and, oh, why should we believe you versus the AMA, the AAP. I think it comes down to three things. Follow the science, follow the money, and follow your heart.

Science proved long ago that sex is determined by genes alone and there are only two. No one is born in the wrong body. What we are dealing with in this population of minors who are seeking so-called gender-affirming care. Science has also revealed they are the most vulnerable of the vulnerable. We're dealing with children who have an average one study found an average of five traumas in their childhood. They have untreated psychiatric disease. They may be on the autism spectrum, they may have ADHD. Many are experiencing LGB attractions, so that's follow the science. It's a vulnerable population. Follow the money. AMA, AAP, ACOG, APAs, they are heavily funded by big pharma. This is a cash cow for big pharma and for all those big pharma funds.

Those of us who speak today, we are not getting paid to be here and it's quite the opposite. We put our reputations and our livelihoods on the line. Follow your hearts. You got to ask yourselves, is it loving for big medicine to offer your daughter, your sister, your LGB child, your ADHD child, mutilation, castration, diseaseing, and sterilization? Is that loving? I call it criminal. My profession used to call it eugenics. That's where we are and that's what we have to get out.

Myles Lynch:

Jennifer, do you want to give one last mark to it or did you cover it? All right, well thank you all. I think now it is time for lunch, so thank you. We will return at 1:30.

Jon Schweppe:

Welcome back everyone. If everyone could have a seat as we're coming back from lunch. Just wanted to, from the last panel, thank our medical experts for such an informative panel. Really appreciate all these folks making the trip out to Washington to share with the Federal Trade Commission today. So now we will have remarks by Commissioner Holyoak. Unfortunately, she could not be here today. She's at a family reunion combined with her mother's 80th birthday, so I think that's a pretty good reason, but this is an issue she cares deeply about, and so please watch this video from Commissioner Holyoak.

Commissioner Melissa Holyoak:

The FTC staff who are contributing to today's workshop. [inaudible 04:31:23] for us today are my own. They do not necessarily reflect the views of the commission or any other Commissioner. Right after I gave birth to my second daughter, it became immediately apparent that she was very ill. There had been no indication during my pregnancy that she had any medical problems, so we, like other unfortunate parents, experienced the trauma of having our newborn whisked away unexpectedly to the NICU. My husband and I learned that part of her heart was swollen and she was suffering from persistent pulmonary hypertension. It was one of the most frightening and trying periods we ever experienced. This was not the way it was supposed to be, and this is not what I had envisioned and dreamed of for nine months. I had never felt so helpless in my life as I watched her fight for her life over the coming days. During that time, we relied on the doctors to provide us complete and truthful information as we made medical decisions to treat my daughter. Thankfully, my daughter recovered. She's now a healthy 16-year-old who has blessed our lives in countless ways, and we can't imagine our family without her.

My heart is with those parents who have had similar experiences faced with watching their children suffer from injury, illness, or disease. I empathize in particular with parents whose children experience mental health challenges. Treatments are often complex and may involve a combination of psychotherapy, medication, and other therapies, but whatever health problem a child may be experiencing, it is critical that medical professionals provide parents with complete and truthful information in order for parents to make those difficult medical decisions.

Today, the commission is exploring whether to address unfair and deceptive practices in what is sometimes called gender-affirming care for minors. Recent reports estimate 1. 6 million Americans over the age of 13 identify as transgender. Some transgender individuals suffer from gender dysphoria, a medical condition characterized by persistent clinically significant distress resulting from an incongruence between gender identity and biological sex. Left untreated, gender dysphoria may result in severe physical and psychological harms.

While some have questioned the FTC's role here, there are three principal reasons why the FTC should use its authority to combat unfair or deceptive practices related to gender-affirming care. First, the FTC has a strong history of enforcement actions against unfair and deceptive healthcare related claims. In December 2022, the FTC published a health products compliance guidance, which notes that since 1998, the commission has settled or adjudicated more than 200 cases involving false or misleading advertising claims about the benefits or safety of dietary supplements or other health related products. For enforcement purposes, the advertisement of reported health benefits may be accomplished through a variety of marketing techniques, including by medical practitioners. The guidance further explains that claims about the health benefits or safety of foods, dietary supplements, drugs, and other health related products require substantiation in the form of competent and reliable scientific evidence. Importantly, such substantiation cannot be based solely on a medical practitioner's experience.

A healthcare practitioner's observation about the effect of a health product on patients is anecdotal and doesn't provide evidence of a causal relationship, nor can substantiation be based on advisories from a medical organization because those are based on best currently available evidence rather than a causal link between the recommended course of action and the health benefit. Further, the guidance instructs that a claim may be misleading if it fails to inform about significant safety concerns. Simply put, it is black letter law that misleading and unfair health related claims can violate Section 5. And it is increasingly clear that there are serious questions about the risks and purported benefits of medical transition treatments for children with gender dysphoria. Justice Thomas describes the risks in the US Supreme Court's recent decision, United States v. Skrmetti, which involved a challenge to Tennessee's law restricting sex transition treatments for minors.

For example, there are significant safety risks relating to the use of puberty blockers. Using puberty blockers to suppress normal puberty has multiple organ system effects whose long-term consequences have not been investigated. Such use may lead to decreased bone density and impacts on brain development. It also remains unclear whether patients ever develop normal levels of fertility if puberty blockers are terminated after a prolonged delay of puberty. There are also significant safety risks relating to cross-sex hormone treatments, which involve very high doses of hormones of the opposite sex. For girls, the treatments can cause increased cardiovascular risk, irreversible changes to vocal cords, atrophy of the lining of the uterus and vagina, and ovarian and breast cancer. For boys, cross-sex hormones can cause increased cardiovascular risk, breast cancer, as well as sexual dysfunction. And for girls and boys alike, it is generally accepted even by advocates of transgender hormone therapy that hormonal treatment impairs fertility, which may be irreversible.

The asserted health benefits of treatments for transgender adolescents include the reduction of anxiety, depression, and risk of suicide. Yet just last week, an article in the Atlantic discussed how these benefits have been presented to parents reporting that a physician with Children's Hospital Los Angeles explained, "We often ask parents, 'Would you rather have a dead son than a live daughter?'" Similar reports in The New York Times indicate that parents were presented with this Hobson's choice, which felt like emotional blackmail. But as the Atlantic article reveals, the question medical providers have posed to parents did not present a truthful representation of the consequences of gender-affirming treatment. When Justice Alito asked an oral argument in the Skrmetti case about suicide rates, the ACLU lawyer confirmed that there was no evidence to support the idea that medical transition reduces adolescent suicide rates.

Indeed, in 2024, the United Kingdom's National Health Service commissioned an independent review of the use of puberty blockers and sex hormones to treat children with gender dysphoria. This review found a lack of evidence to support the conclusion that hormone treatment reduces elevated risk of death by suicide. Parents deserve, and the law demands complete and truthful information regarding the grave health risks of transition treatments for minors, as well as complete and truthful information regarding health benefits that are actually substantiated. After weighing the risks and benefits, more than 20 states have enacted laws banning six transition treatments to minors. In affirming the Tennessee law, the US Supreme Court acknowledged the fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments in this evolving field, but that the court's role was not to judge the wisdom, fairness, or logic of the law before it, but only to ensure that it did not violate the equal protection guarantee of the 14th Amendment. Similarly, the FTC plays an important but limited role in this area.

The FTC does not regulate the practice of medicine. The FTC cannot make policy decisions limiting sex transition treatments for minors, but what the FTC can and should do is protect children from deceptive statements regarding such treatments. The FTC has previously enforced and will continue to enforce against deceptive representations made by medical practitioners, including claims in connection with treatments for transgender children. Second, reviewing claims of health benefits for transgender minors is particularly important given the significant and evolving changes in protocols for treating gender dysphoria. In the Skrmetti case, the Supreme Court detailed these evolving changes in clinical guidelines. WPATH, the World Professional Association for Transgender Health published one of the first set of guidelines in 1979 where it advised that hormone and surgical treatments should only be provided to adults. It later changed that recommendation in 1998 to prevent hormone treatments for minors in rare circumstances. WPATH further relaxed its guidelines for minors in 2022 to allow puberty blockers, hormone treatments, and surgical procedures at the onset of puberty, while still recognizing that our understanding of gender identity development in adolescents is continuing to evolve.

Importantly, WPATH's changes do not necessarily reflect widely accepted practices. In fact, recent changes across the world show that there really are no widely accepted practices, but instead drastically evolving standards in this area. After the UK's National Health Service published its 2024 report on the topic, NHS England enacted prohibitions on the administration of puberty blockers to new patients under the age of 18 outside of research settings and instituted a process for reviewing referrals for hormones for adolescents under the age of 16, but England is not alone. Finland, Norway, and Sweden have also raised concerns about using puberty blockers or hormone treatments on juveniles with gender dysphoria and have limited such treatments in some cases by allowing them to go forward only in a research setting. And in Australia, after the state of Queensland placed age restrictions on puberty blockers and hormones, the Australian government began developing new clinical practice guidelines.

Review of these clinical guidelines conclude and as the Atlantic article describes, the fairest thing to say about the evidence surrounding medical transition for adolescents is that it is weak and inconclusive. While relevant legal precedent already recognizes that advisory guidelines cannot serve as the basis for substantiation, what these evolving guidelines emphasize is that the risks and benefits of transition treatments for minors are nowhere settled and any definitive claims or statements should be carefully examined.

Finally, the FTC should prioritize enforcement against unfair and deceptive practices, especially when there's potential for serious harm to children. As previously mentioned, these treatments result in increased risk of cancer, infertility and sexual dysfunction, decreased cognitive development, as well as irreversible physical changes. Given the very serious safety risks, potential for permanent harm and the inconclusive evidence of health benefits, it is appropriate for the commission to ensure that parents are receiving accurate information.

We will continue to prioritize enforcement that protects the most vulnerable among us, especially our children. A recent op-ed in The Washington Post said the quiet part out loud. There, MIT professor Alex Byrne discussed his participation in a review of gender dysphoria treatments published by the United States Department of Health and Human Services. He explained, "I'm hardly a fan of the current administration. I have never voted Republican and as an academic from Cambridge, Massachusetts, I hold many of the liberal beliefs of my tribe. That includes support for the right of transgender people to live free from discrimination and prejudice, but," as he explained, "medicalized treatment for pediatric gender dysphoria needs to be passionately scrutinized like any other area of medicine, no matter which side of the aisle is cheering it on." From the opposite side of the aisle, I agree that we should work together to scrutinize and ensure complete and truthful about the risks and purported benefits of medical transition treatments. We owe this to our children. Thank you.

Jon Schweppe:

Thank you, Commissioner Holyoak. Let's take a moment here to thank the wonderful FTC event staff for putting on an absolutely incredible workshop. We had about 200 people here today and then hundreds more listening online, so really, really a wonderful thing. Also, I want to thank the security staff as well for keeping us safe here today. All right. So now we have Chad Mizelle with the Department of Justice Chief of Staff, and I'd like to now welcome Chad to the stage.

Chad Mizelle:

Thank you all very much. Thanks for being here. Thanks for giving attention to this very, very important issue. I'd like to start by thanking, first of all, President Trump, who has given me the honor of being able to serve you all, being able to serve the American people and especially want to give a shout-out and thanks to my boss, the very tough Pam Bondi, who I think is doing incredible job at DOJ. Thank you. Well

deserved. Well deserved. She's doing such a great job and she's particularly tough on these issues. She was a career prosecutor for 16 years. She was a state attorney general for eight years. This is her passion. This is something she feels very, very strongly about, and I'm very happy to be here to announce some of the things that DOJ is doing on that front.

There's a basic principle of law. You cannot deceive consumers. You cannot lie to them to get them to buy your products, use your services. You cannot commit fraud. This is true in providing medical services, but also more generally. There's no doubt in my mind based not only on what we've heard here today, but just looking around with our own eyes that the industry that is formed around providing gender-affirming care and transitioning services for children has perpetuated one of the greatest frauds on the American public. And that is especially true with respect to our vulnerable children and their parents. One of the most important tasks of government is to prevent this fraud from continuing. And to remedy the consequences of this fraud in recent years, the FTC has a very broad mandate and a consumer protection mandate specifically with powerful investigative tools attached to that. It's very well positioned to tackle this issue, and I would like to thank all the commissioners and particularly my dear friend Chairman Ferguson for the great work that he's doing on this front.

The DOJ also has numerous civil and criminal tools to root out fraud. We are focusing these tools on everyone who's involved in the multi-billion dollar industry of harming our kids, and I want to point out a couple things that we're doing. First, with respect to civil and criminal fraud. Although the details, the exact details of the public of the targets of our investigation are not yet public, we have issued nearly 20 subpoenas against clinics who are engaged in transition related investigations. Thank you.

We're investigating violations such as healthcare fraud, false statements, all of this which could result in either civil or criminal liability for these clinics. We have also investigations into hospitals and other providers related to fraudulent billing, false claims under Medicaid fraud and the False Claims Act. We're going after false and deceptive claims by non-profits and medical associations that have provided false, deceptive or scientifically dubious assertions about transition related medical interventions, allegedly is cover for the clinics and the hospitals to be able to do what they're doing. And finally, we've issued subpoenas to major manufacturers of the drugs used in trans-related medical interventions for possible violations of drug marketing laws and the Food and Drug Cosmetic Act. We've also prepared draft legislation. We're working with Congress on existing criminal laws related to female genital mutilation to more robustly protect children from chemical and surgical mutilation. Thank you.

And we're continuing to work with Congress about enhancing the ability of injured parties to seek remedies, to get recourse because as you all know, that is so important. The way you're going to take down this multi-billion dollar industry is for people to speak out, which is exactly what we're about to hear. We are using all of the tools at the Department of Justice to address this issue. Now, before I introduce, I do want to give a shout-out, if you are somebody who has been harmed in this industry, let us know. If you're a parent, if you're a child, if you were somebody who was lied to, deceived, told that a particular pill might be reversible when we all know it's not actually reversible, we want to know about that. That will help us in all of our investigations, not just on the civil side, but on the criminal side. So please come forward. Come talk to us.

We have DOJ representatives, I think here at the conference. Some of them spoke. Obviously, I'm going to be here. If you guys have any questions about how to get ahold of us, you can reach out to any of the FTC staff who we work very, very closely with, but please continue to reach out to us. Now, we're going to move to a very important conversations with parents and survivors. Earlier, Chairman Ferguson had the opportunity to hear about the harrowing personal experiences from Claire Abernathy, Kayla Lovdahl, Simon Amaya Price, and Gareth Amaya Price, and the truly heartbreaking story of Elvira Syed about the tragic loss of her daughter. There are too many of these stories.

Please join me right now as we welcome to the stage, Prisha Mosley, Soren Aldaco, Beth Bourne, Forrest Smith, Helen Spiegel Lee, and Gwen Turecki. We're going to invite these individuals to the stage. I'm not going to introduce them all beforehand because as part of this, you guys will see they're actually going to be introducing themselves and giving some of their stories as well. Yes, a round of applause. Thank you. Great. To get started, I would just like to jump into it. There's not much I can say that wouldn't detract from the personal experiences that you guys have had, and so to just start off, Prisha, I would love to give you the floor.

Prisha Mosley:

Hello. Okay. Thank you very much for having us here and for listening to our stories. My name is Prisha Mosley. I'm a 27-year-old detransitioner and mother. I am also a victim of medical fraud and abuse. When I was a teenager, my doctors lied to me and as a result, I was medically harmed and defrauded. I was a struggling girl suffering with mental illnesses and with multiple comorbidities including panic attacks, depression, and borderline personality disorder. I experienced a sexual assault as a minor, which made me fear being a woman. I learned about trans online on Tumblr. I felt that I identified with what I read online. I hated myself. I couldn't eat. I struggled to look at my body and I self-harmed. This must mean that I was trans. When I brought this to my nutritionist who was treating me for anorexia, I was immediately introduced to a pediatric endocrinologist who agreed that I had been born in the body and needed medicalization.

I was 16 years old and my body was perfectly healthy. No one cared that I had trauma associated with being female or that I hated my body and had delusions about how it looked. As soon as I said the word trans, all medical ethics went out of the window. I was convinced by the endocrinologist that I had a medical condition. I was led to believe that I had a male brain trapped inside of a female body and that this incongruence would ultimately lead to my death by suicide. I was told that it was a form of intersex. It was under the guise of these lies that I was referred to a woman for a letter of recommendation to begin testosterone injections. After suing her for fraud, I discovered that she was not even licensed as a doctor or a therapist. She was simply a woman who decided that my healthy female body was wrong.

In the letter she wrote for me, she did not mention that I was unable to eat often for days in a row or that I was on a number of psychiatric medications. Instead, she affirmed that I was born in the wrong body and needed to be administered wrong sex hormones in order to stop my mental suffering and continue living. She asked my parents if they would rather have a dead daughter or a living son. I believed that I would die without transition. Medicaid was billed to cover my testosterone injections under endocrine disorder unspecified even though nothing was wrong with my endocrine system. Now, my healthy functioning has been taken away and I cannot regulate my own hormones. Testosterone did not improve my mental state, but worsened it. I was put on more psychiatric medication and given muscle relaxers to deal with the side effects. Cutting episodes worsened.

No one told me that testosterone was the cause of the cysts on my ovaries. I was told when I complained about pain that I was going through male puberty, which is something a teenage girl cannot do. My body was falling apart and my doctors gaslit me and told me that it was good. Testosterone mutilated my genitals before I could legally consent to sex as an adult. I was lied to about the effects it would have, and I suffer with atrophy and disfigurement and pain. I have never had sex as an adult with normal, healthy vagina. I didn't understand what was being taken away from me. When I gave consent, I was too young and I was not being given accurate medical information. My consent was stolen. A year after starting the testosterone injections, I was led to believe by activists and my doctors that I needed to remove my healthy breasts.

I was told that they were causing my continuing mental distress and that I would feel relief when my body was modified. No mental illness can actually be cured by cosmetic surgery. I suffered severe surgical complications as a result of giving birth. The papers I signed said that I may have trouble breastfeeding, concealing the reality that my chest is surgically sealed shut. My nipples were grafted and reattached in the wrong spot, and now they are just decorative. I was unable to breastfeed my baby, the milk that came in. I had no idea that I had breast tissue left inside of me or that this was possible. It was the worst pain and heartbreak I have ever felt. I wanted to die. It is impossible to change sex, but I was led to believe by my doctors not only that I could, but that I needed to do so to live. No mental illness or mental suffering can be relieved by making cosmetic changes to the secondary sex characteristics. But this is the treatment that my doctors offered me and no alternative. I was never given any other option. My doctors never used real medical terminology. They tricked me, using euphemisms like top surgery and with pseudoscience, like the genderbread man. I genuinely believed that I needed drugs and surgery despite the fact that my body was healthy and I just hated myself. My doctors defrauded me. I am not alone. No human changes sex or is benefited by the purposeful disruption of their endocrine system or the removal of their healthy body parts.

Chad Mizelle:

Prisha, thank you so much for that. I don't want to pry too much, but can I ask your child's name?

Prisha Mosley:

Unfortunately, I can't share his name because I actually got threats on my children for the fact that I showed up here today to do this.

Chad Mizelle:

Wow. I'm so sorry, Prisha. Well, thank you for sharing that. Soren.

Dr. Michelle Cretella:

First, I want to say I love Prisha. Thank you for sharing all of that. My name is Soren Aldaco. I am a 23-year-old woman from Texas, born and raised in the suburbs, the urban sprawl between Dallas and Fort Worth. But now I live in Austin where I just graduated with my bachelor's degree and I now study how the internet is influencing identity formation. Thank you. With that, I speak on behalf of myself today as someone who began transitioning socially at age 11, was on the internet, chronically online, like a lot of people my age were and are. And that's where I was first, like I said, exposed to the idea that I could be born in the wrong body and that surgically and medically altering my body might be a good fix for my mental health conditions or my discomfort generally with that body, which was changing, which is pretty normal for puberty.

But that was mostly a role-play identity, something that I used as a framework for developing a sense of self. Until age 15, when I met my biological father for the first time. I went inpatient, I had a little bit of a mental break as I'm sure many people would have meeting their biological father through Facebook for the first time. And while inpatient, the doctor picked up on the fact that I bound my chest and I went by a different name and what was on my record, and he pushed me until I told him, finally, after he had kind of fished for the idea that some people don't identify with their body parts down there and eventually pushed me until I came out as trans to him and then called home and told my family that that was the root cause of all my problem. No credence to the fact that I had just met my biological father, no credence to the fact that I had a strained relationship with my stepfather who helped raise me, but who is pretty profoundly disabled.

And so from there I started to internalize that idea that medical transition might be a path forward for resolving this distress that seemed never ending. And so I began attending a support group in the DFW area. There were several support groups actually in that area run by the same organization, Trans-Cendence International. And it was at that support group that I met a nurse practitioner who had a transgender adult child and was furnishing hormones to pretty much anyone who came and saw him. And after one appointment, at age 17, without ever meeting my real parents or even that the adults who took me were my parents, which they weren't. He prescribed me testosterone, an estrogen blocker, Anastrozole. He facilitated me to lie about my sex on my government documents such as my license, and I could have gotten my birth certificate changed as well if I had wanted to and referred me to a specialist anytime I would have a complication pop up.

If I had vaginal atrophy, it was the gynecologist who was really quick to offer me a hysterectomy, if it was dizziness and headaches and joint pain, it was the rheumatologist or the neurologist or the cardiologist or the orthopedist. I saw all of those at age 16, 17, 18, 19. And so he too also used endocrine disorder not otherwise specified, I believe it was called, to get these covered by my private insurer. But worse than that, that medicalization, which happened right before the onset of COVID in January of 2020, led me to begin to explore in that pandemic lockdown, the idea of amputating my breasts as a form of treatment for the stress and the distress that the hormones didn't actually absolve because they weren't actually treating so much as they were adding onto the list of problems I was already experiencing.

And at that point, I had seen a therapist who had a trans ex spouse and she helped write a totally fraudulent letter. And by fraudulent I mean full of things that were not true, such as my client has lived as a man for the last 12 years, which as someone who was born female and will die female, I had not. But that was especially untrue during COVID, right, when there was no opportunity for me to even go into the public to live life as a normal person or adult, let alone the opposite sex. So she ignored a history of sexual assault that I disclosed to her and after I stopped seeing her, I ghosted her. She did not revoke that letter, but she did terminate my status as her client. From there, I saw the Crane clinic in Austin, which I strongly advise being researched.

They moved from California to Texas because of Texas, at least in my opinion, Texas's tort reform laws, which make it extremely difficult to sue them for medical malpractice. They told me that they could get my surgery covered in-network despite being out of network. So they had a 90% success rate. Told me, alongside listing all the complications I could experience from the surgery, that they had never really had any complications like that. And I would later find out, after experiencing complications, that was because they ghosted clients who had complications. They told me nothing was wrong with me on three separate occasions until I ended up in the hospital. And when I asked just what are you guys going to do to prevent this from happening in the future? They stopped responding to me after trying to get me to sign a non-disparagement agreement and giving me $400, which I did not take because I wasn't going to sign that NDA.

And I'll wrap it up here. I think the main through lines in my story were ideological ties that center, catered specifically to transgender patients, had a lot of really affirming imagery and people laughing and feeling good, kind of like those drug commercials, you guys, I'm sure you've seen. There was no differential diagnosis, no exploration of the root cause or interest into why I was feeling the way I was feeling. And there seemed to be this kind of common thread with supporting the whole person rather than what their expertise was and what their specialty was as doctors, not activists, it was like putting diesel in a gas engine for me. I was never given the insight that I was altering a fundamental process in my body, which is my endocrine system. And although I was on 14 different medications when I de-transitioned in 2022, I'm now on two for Hashimoto's autoimmune thyroid disorder that I think I may have obtained from the testosterone.

Chad Mizelle:

Soren, thank you. If I can ask, you mentioned what you're currently studying, and it does seem as you continue to research on this, the link between access to social media and in a lot of the stories we're hearing and transitioning, are you seeing that as part of your research as well as you're going through that?

Dr. Michelle Cretella:

Yeah, I'm really interested in that. In particular, I think kids use frameworks to understand how to move through the world. That's why it's important they have parents who love them, to show them what kind of adult they could become. And when the internet is doing the parenting, which I don't think often is totally the fault of the parents, you guys didn't grow up with that. You guys didn't see the consequences until our generation had already suffered them. I think it can be really easy to slip into online groups that tell you who you are instead of letting you explore it in an embodied way in the real world through all five of your senses and not just this audio-visual matrix that is social media and the internet.

Chad Mizelle:

Great. Thank you. Thank you so much. Beth.

Beth Bourne:

Hi, my name is Beth. My ex-husband and I, we got a divorce when our children were young. My daughter was an excellent student. She loved gymnastics and math and reading. She was also creative, sensitive and sympathetic. At the end of sixth grade, my daughter suffered trauma and she became withdrawn. In seventh grade, she was placed in an honors class with other gifted students. Some of these students were trans-identified girls. This was 2018, when the teachers and counselors were being trained by the California Teachers Union on ways to support the LGB and transgender students. In eighth grade, my daughter started seeing a private psychiatrist to help with anxiety and some pretty serious self-harming. At 13, my daughter came out in a letter to her father and me as transgender. Within a few days, we received an email from her school counselor saying our daughter had asked the school to change her name and pronouns.

That counselor also put in place a gender support plan that was not disclosed to her father or to me. When my daughter was 14, she began experiencing some dizziness spells. And so we took her to Kaiser Permanente Davis to meet with the pediatrician on duty. This is a pediatrician who had never seen our daughter before. My ex-husband, in the exam room, referred to my daughter with her new male name and male pronouns. And in an excited tone, the doctor asked my daughter if she would like to have her medical records changed to reflect her new name and her male pronouns. This is the first visit. The doctor then recommended that we take our daughter to the Kaiser Proud Clinic, a pediatric gender clinic in Oakland, it was a one-stop shop where she could meet with endocrinologists, an OB-GYN, a gender specialist.

So the next day I called this pediatrician and I said, you had no right to suggest to my daughter that she seek medical interventions at a gender clinic when we were just there for a wellness visit. So I asked the doctor, what would you do with someone my daughter's age if she said she wanted to change into this opposite sex? And she said, well, we refer them to the Kaiser Roseville endocrinologist. So then I spoke to the endocrinologist and I asked him, what would you recommend for someone my daughter's age who wanted to become a trans man? And he said they would go to the Kaiser's gender specialist and talk with them about puberty blockers and hormones. And when I said, would you talk with our private psychiatrist? He said, no, we prefer to keep all treatment within the Kaiser system.

Page 53 of 84

So when I voiced my concerns to the pediatrician and the endocrinologist about what was happening, the endocrinologist said, this is an emerging field. Quote, this is an emerging field, quote, we don't know the long-term medical effects, but with any medical treatments, there are benefits and there are risks. So I asked him what would the benefits be? And he said, quote, it's been shown that youths have a lower risk of suicide and less suicide ideation if they are offered medical treatment. He also said that, quote, youths will feel better when they're on hormones and that they can stop their periods and give them the physical traits of the opposite sex.

And the endocrinologist, of course, referred me to WPATH as the leaders in this field and to the endocrine society. And he also recommended I talk to Gender Spectrum, which is one of these groups that encourages parents and families to transition their kids. Fortunately, my daughter's psychiatrist was willing to have a counseling session with my ex, my daughter and me in the same room. And she explained because I asked her to, the risks of medicalizing with blockers and hormones, this includes brain development, delayed brain development, and loss of bone density. So we agreed, this is when my daughter was 14, that she would not do anything medical until she was 18.

So I realized later how fortunate we were that we were able to send my daughter to a private psychiatrist to seek DBT, Dialectical behavior therapy outside of Kaiser and keep her away from the Kaiser Gender Clinic. My daughter desisted from her trans identity about four years later in her senior year of high school. She's now on her third year of college and she's doing great. I just can't imagine what would've happened when my daughter was 14, if we had taken her to that Kaiser Proud Clinic in Oakland. The doctors in Davis, the endocrinologist, they were all captured by this idea, and they were disingenuous when they were telling us that it would decrease her risk of suicide or suicide ideation.

Chad Mizelle:

Thank you. Thank you, Beth. Forrest.

Forrest Smith:

Yeah, I just want to take a second and thank everybody. So I'm from a little bit of an older generation of transitioner, I think, kind of sit right on the cusp by my transition was from 2015 to 2020. I'm also a male. And so one of the things that I think has been happening in our conversations about Transgenderism in general is we kind of clump the men and the women together. But there's some interesting patterns, I think, between the two different groups. I don't know if anybody's familiar with Ray Blanchard. He's one of the original sexologists who used to talk about this, and I saw him responding to an interview about ROGD, rapid onset gender dysphoria. In girls, we've seen a lot of the ROGD, and when he talked about the boys, he said, with the boys, he tends to see that it doesn't just come about overnight, that it tends to be something that they've been brewing about for a longer amount of time.

And I would certainly say that that's true in my story, which is I'm up here. This is for minors, protecting minors. I transitioned, I began my transition at the age of 20. So I didn't fall into that bracket of minors, but I still believe that young men and young people are vulnerable. A lot of times they're carrying something that they may have been carrying since they were a child. I know in my case, when I've sat down recently and gone to the depths of my soul and my heart about this, writing my memoir, where does the story begin? I go all the way back to the first time. I remember my parents leaving me alone with my sister at my grandma's house, and I just had this kind of thought, this isn't my family. Because I was a child and they left me at my grandparents' child.

But that feeling, I remembered that feeling for the rest of my young adult life. Whenever I would feel like I didn't belong somewhere, those were the words that I would remember. I was still brewing on something that happened when I was a small child, and you mix into that, dysfunction in the home,

sexual abuse, grooming online, pornography, you mix into that and then you've got a pretty tenacious identity by the time somebody is 16 years old or 18 years old. And I think it's good as a culture that we're talking about this the way that we are now. Because when I think about the young man that I was, I seem to have been really set on a track, and if transgenderism wasn't what it is today, I still probably would've had issues. But as the situation is today, I ended up in the same pipeline that everybody... All the other speakers here ended up in. And so we've heard a lot about that. I don't necessarily want to... I can share more about those details, but I'll just stop there if you have any questions.

Chad Mizelle:

If you're comfortable sharing, I'd love to just hear maybe a little bit more about the detransition process. What was kind of going through your mind then and what maybe prodded you to say, I need to make a change?

Forrest Smith:

And this goes back also to the transition. So I was briefly homeless for two months at the beginning of my transition, and during that time, I became enrolled in the Homeless Youth Continuum in Portland. And so my entire lifestyle was supported through this vast network of non-profit organizations. Some of them are private, some of them are very good, admirable, noble organizations. I was able to live a really nice lifestyle, living high on the hog, on the Homeless Youth Continuum as a transgender woman, I kind of became an icon, but that, I aged out at 24. You age out and suddenly all of those opportunities are gone.

And so my transition, I was also putting off the decisions about surgery for those two years that I was totally housed. And then the medical surgeries happened right at the end when I lost my housing, which is kind of the irony and part of the oversight from the medical system, is that the surgeries were solicited by social workers in the HIC. There were around me in some of those housings, I wasn't paying attention, but there were detransitioners kind of dropping like flies, and then it was actually, I went into a crisis as I lost my housing, that I went through those surgeries.

That crisis is part of what ended up bringing me back around at the detransition. I caught COVID and I totally lost my housing in Portland. I went back to live with my parents and that forced me to look at my family dysfunction, to look at my family and realize there's problems, but it's not as bad as I thought it was. My parents aren't evil people. I can live with them. It forced me to confront things from my past, and then there was also a lot of isolation during that period, so I kind of cut off the trans people around me. There was still a lot of difficulty in receiving any kind of care. I had some counselors suggest that I was still feeling dysphoric because I hadn't had a full vaginoplasty.

I had an orchiectomy and I had the breast implants, so I was operated on, and that regret is part of what shocked me out of it because it wasn't what I had intended going into the transition. I hadn't thought that far ahead. It was gradual. I have daily journals from that period, and it took months to unwork. First I acknowledged that I regretted it, and then I acknowledged that I regretted it before I believed that I was a man, I still thought that I was a trans-feminine person and I regretted it.

So I had to unwork layers and layers. I took years of therapy. I found a forensic psychologist that was a specialist in men's sexual issues. That was a smart move. It took years and it took years to get back into the workforce to bond with my family. I mentioned writing the journals, but I had a beautiful moment with my grandparents. I thankfully was able to reconnect with my grandparents in the last year of their life. Both of them passed away within a year, and I had a beautiful moment out on the farm with them where I actually had this very clear thought where, actually, this is my family.

That's my grandpa, that's my grandma. So the detransition, it's been five years now, and it takes a lot to rebuild your whole life when it's not just the medical damage, it's a much deeper social damage. It's a damage to your whole sense of being, right? You build wardrobes, you build a whole life, you build all your papers, everything. You have to change all of that. It's a real deep hole.

Chad Mizelle:

Wow. Thank you. Thank you for sharing. Helen.

Helen Spiegel Lee:

Hello everybody. Thank you very much. So I'm going to read my statement because I am not that great at this. So when my son was three years old, my ex-wife, with the help of medical and school professionals put him firmly on the transgender path. In the fall of 2014, my son's preschool teacher informed me that my son wanted she pronouns. This happened only one month after the traumatic dissolution of my marriage. At that time, I had joint custody and it became a constant battle. I shared with everyone that my son did not express any of these preferences to me. I wondered if he was trying to gain more attention from my ex and if she was using gender to split his loyalties. None of this seemed authentic, but every time I posed reasonable questions and expressed curiosity or doubt, I was looked upon with suspicion. Overnight, I became the dreaded non-supportive parent. At the same time, my ex engaged constantly with school providers and medical professionals, and she demanded that her family and friend support my son's rebirth, as she called it, as a transgender girl.

The gender-affirming model does not welcome questions and inquiry. Repeatedly, I was told by almost everyone that I must accept my daughter, that not accepting the utterances of a three-year-old was tantamount to abuse and would lead to self-harm. It made no sense. I was now in a world where up was down and down was up. It was a time of unrelenting despair. I could not eat, I could not sleep. I barely functioned at work. My unwavering love for my son was all that really kept me from giving up. I was angry back then regarding gender ideology and the medicalization of minors. I was frightened and vulnerable. I needed help. I made an appointment to see gender management services GeMS at Boston Children's Hospital in 2016.

I brought my son to GeMS three times. Initially I went with my ex, but as we became less and less aligned, we attended separately. We saw Dr. Amy Tishelman, a clinical psychologist and the director of research at GeMS once yearly in 2016, 2017. And lastly, in 2019. For four long years, my son lived as a boy with me and as a girl everywhere else. The situation was traumatic for both of us. I was constantly worried about the effects on my son of being torn in two. At one point, I even tried to use the girl's name, but I couldn't do it. I just could not participate in the charade. Over the years, Dr. Tishelman noted time and time again that there was difficulty in parsing out the impact of the parent's conflict on the child's gender presentation in each home. Even with the documented uncertainty of my son's presentation, Dr. Tishelman at one meeting coerced my son to convince me to go along.

Her notes are quoted as thus. Following my meeting with Rosa, I met with Ms. Spiegel and her partner, and again, with Rosa's permission shared that Rosa told me she'd like them to refer to her as Rosa and use female pronouns. Rosa agreed to come to the room, and all four of us met together. At this time, Rosa reiterated to her mother and partner that I want to be called Rosa, and I want to be a girl. My wife and I were stunned, but smiled and the meeting concluded. My son was six years old, and within the gender affirmation model, he and the therapist were in complete control. At the final visit in 2019, Dr. Tishelman had my son fill out a gender worksheet, assigning numbers to how he felt. Tishelman's conclusion was that today she reported that she's not a boy or a girl, but something different. Again,

there was ambiguity, but she dug in deeper. Dr. Tishelman advised us that we should start thinking about puberty blockers for Rosa.

Finally, I sued for full custody. Things were moving at breakneck speed towards medicalization, and I had no other recourse. At the trial, Dr. Tishelman was called to testify. My ex had Dr. Michelle Forcier as her expert witness, and she also testified. Dr. Michelle Forcier is a pediatrician affiliated with Hasbro Children's in Rhode Island. She is possibly better known now as the chicken lady in the film, What is A Woman? It is documented in the court findings that Dr. Tishelman cautioned that failing to strongly support gender diverse children can lead to suicidal ideation and attempts. This, of course, has never been proven. At the same time, Tishelman also testified there is insufficient research around socially transitioning children, and that there are differing opinions. Dr. Forcier also agreed with Tishelman that there was insufficient evidence.

The court findings state in Dr. Forcier's own words, research on gender dysphoria is in its infancy. At my trial in 2019, both these experts in their fields admitted to poor evidence. It is chilling to recount that during our visits to GeMS, Dr. Tishelman repeatedly advised the importance of accepting Rosa and ultimately suggesting the use of puberty blockers while failing completely to admit that evidence around social and medical transition of children was sparse. My son was never gender dysphoric. My son was never transgender. It was all a lie.

Chad Mizelle:

Helen, thank you so much. Thank you for sharing that. Gwen?

Gwen  Turecki:

Sure. Hi, my name is Gwen Turecki, and I'm a mom from Michigan. My son was around 14 when he sent me a text that he was a girl, and at first I thought, hey, he's at theater, and they're just dressing up like girls. The next text was HRT, and I meant that as cross-sex hormones. At that time, I dove into research. He was away, so I was able to jump on the computer. I have a background in Library and Information Science. So I found Dr. Grossman. I found Jennifer Bilek, pro-trans sites, anti-trans sites, and crucially, parents with the inconvenient truth about trans. I connected to other parents and quickly realized this is a cult, and guided my son out using proven cult techniques. Basically what I did is I leveraged stuff that was out there for other cults and tailored it to the needs of my son.

We navigated the depths of the transgender ideology, starting with his pediatrician's office. And the reason why I did this is my son and I have a very close loving relationship, and he would expect me to follow a protocol. So we went to his pediatrician's office, who referred us to the University of Michigan's Mott Children's Hospital gender clinic, notably the pediatrician that we were referred to was not his normal doctor, and this is at a different children's hospital. She was in the process of transing her teenage daughter, and it's like, okay, jump down the rabbit hole. Here we go.

At Mott's Gender Hospital, because I did make an appointment, because according to the protocol, to get someone out of a cult, you slow walk them and bring your kid closer. My kid and I were always very close, but we have a common bond around music. We did more crate diving for albums together, because we're into that stuff. So at the Mott Children's Hospital Center, there's a three-hour session with everybody all together. So his father [inaudible 05:27:31] my son and myself. The therapist explained that the purpose of the session was to help our child connect to what was happening with his mind and align his self-image with his body, citing WPATH as a standard of care. When I asked why there's a 4000% increase in the number of trans-identifying girls in the UK, I was told society's just become more accepting. Amazing. She explained that Western societies have become more accepting

into the ways of thinking. Please note that my son's father immediately affirmed and aligned with the therapist.

I sat in the office and I listened to her weave a narrative, not based on biological reality, opening on the door of possibilities of changing physical appearance without even considering underlying conditions like going through puberty during COVID lockdown. Basically, these kids' social fabric was ripped upside down. The second hour was with my son alone, and I was unable to question the session due to patient confidentiality. The third hour was all four of us together again, the therapist, and she kept on saying to my son, I feel like there's something you need to tell us. She was coercing my son into self-doubt. So I recognized this as, like I said, coercion, and began to steer the conversation away, asking for next steps.

What do we do next? And after a single three-hour session, she said, hey, the next step is let's contact the endocrinologist. That's when I shut it down and I turned to his father and my son and it said, we're going to talk about this at home. I needed to control the situation. Seriously, it was like Alice in Wonderland. It was crazy. The rest is history now. And now I have a thriving, healthy 17-year-old man with an exceptionally bright [inaudible 05:29:44] future. My son was tested for talented and gifted, and had that trajectory. Had we followed the past set by the University of Michigan's Mott Children Hospital, the story could have ended tragically. My son is exceptionally talented, gifted, just like Elvira's daughter. Thank you very much.

Chad Mizelle:

Gwen, thank you for that. If I may ask that subsequent step, that conversation at home with your son, was that a sort of one-time thing that you were able to, was that a months-long process? Is there anything you could share about

Gwen  Turecki:

That? Sure. Okay, so that really didn't happen. I wanted everybody to go into neutral corners and because his dad was affirming, I had to walk that fine line. So anyway, the slow walking, the slow walking, also bringing closer, bringing closer.

About three months after that visit, I walked into my... And I was feeling him feel a stress because I think part of it is that he felt heard. So about three months after I walked into his room, was like, "Hey hun, what are your feelings about cross-sex hormones now?" And he said, "Mom, that's like putting lipstick on a pig." My heart leapt. Okay, but we turned quite out of the woods yet, right? So fast forward, perhaps another four months, he walks into the kitchen, granted, at this point my kid's like six foot, I grow them big, and he says, "I'm thinking about growing a mustache. What do you think, mom?" I'm like, "That's a great idea." Inside my head I'm doing back flips, going, we made it. And so after that I help coach other parents, [inaudible 05:31:42] parents. I have parents in South Africa, Australia, thanks to X. It's easier to do that. There is a way to get your kid out of this.

Chad Mizelle:

Thank you. If we could just do one more round of applause for everybody out there, thank you. As you all have heard, it is certainly not easy emotionally to get up and tell your stories, but as Prisha told us, it's a danger to themselves and to their families to even speak out whenever you're speaking out against a multi-billion dollar industry that is built on lies and deception, whenever you start exposing those lies and deception, they want to come after you. And so thank you guys again for everything that you've done, for what you're doing for sharing your stories. Thank you, thank you, thank you. All right, with that, I think we're going to continue on the program, so I'm going to hand the mic back over to John. Thank you all.

Jon Schweppe:

Thank you, Chad. And what an exciting announcement from the Department of Justice. Now let's shift gears a bit. We've talked with medical professionals, we've talked with parents and survivors and heard their stories. But as the truth emerges, it's important to note that a number of truly courageous people took great personal, professional, and financial risks to themselves to blow the whistle on the gender industry. And I'm pleased to announce that we have six of these whistleblowers at this workshop today. Earlier you heard from Dr. Aton Heim, and now we have a panel with five more. These are individuals who truly paved the way for this moment. So I'd like to introduce our moderator for this panel. He serves the Federal Trade Commission as a special advisor in Chairman Ferguson's office, Ian Mason.

Ian Mason:

Well, as John mentioned, we've heard today the personal stories of young people subject to so-called gender-affirming care and their parents. We've heard doctors and researchers reason conclusions about these practices, but the understanding, especially the popular understanding of what's happening depends on an additional pillar. The accounts of whistleblowers, actual participants in this industry who had the courage to come forward despite potentially devastating consequences for their careers, for their reputations, and for their families. We're grateful to have five of them with us today. Jamie Reid is the executive director and co-founder of the LGBT Courage Coalition, which advocates for cultural and medical approaches that accept and support gender nonconformity without medical intervention. In February, 2023, the Free Press published her explosive first-hand account of her time in a pediatric gender clinic. Jamie holds a master of science in clinical research management from Washington University and a BA in cultural anthropology. She co-hosts the Informed Dissent podcast, has been profiled in the New York Times, advocates for legislation across the country, and addressed a rally on the steps of the US Supreme Court during the US v. Skrmetti oral arguments.

Tamara Pietzke is an independent clinical social worker in Washington state. She earned her master's of social work from University of Washington and after more than a decade as a mental health therapist in community and healthcare settings, she founded her private practice in 2024. In 2023, she gained national attention for speaking out about the mental health field's approach to youth gender transition, raising concerns about blind information without adequate assessment leading to a backlash, including the loss of her job and an ongoing state investigation.

 Leta Boylan is a former psychiatric nurse at a taxpayer-funded facility for teenagers and adolescents. During her time there, she became aware of a series of institutional policies that promote and reinforce social transition of minors while hiding such treatments from their parents. Due to Leda's, unwillingness to lie to parents and engage in dishonest, incomplete documentation, she was targeted by the facility's administrator and fired in December 2024.

Vanessa Sivadge is a pediatric RN who exposed the illegal use of Medicaid to cover sex hormones and transgender treatments for minors at Texas Children's Hospital. After blowing the whistle, Vanessa received a visit from two FBI agents in July of 2023. Despite this and other threats, Vanessa came forward in June of 2024 with journalist Chris Ruffo to expose the Medicare fraud, medical malpractice, and illegal billing in the gender clinic. Two months later, Texas Children Hospitals hospitals fired Vanessa. Vanessa has since launched an advocacy organization committed to fighting for the protection of children in the state of Texas called Protecting Texas Children.

Sara Stockton is a licensed marriage and family therapist, lecturer, researcher, and clinical supervisor with other 15 years of experience specializing in gender dysphoria among youth and families. In 2023, she co-offered one of the US mental health assessments for evaluating youth readiness for medical gender transition. Published in the Journal of Marital and Family Therapy. Growing concern that

prevailing clinical approaches were harming young people, Stockton publicly addressed these issues in the 2022 documentary "What is a Woman?" She testified in state legislatures on bans regarding transgender care for minors and served as an expert witness in family court cases involving child protective services.

So we're here today largely because of your stories raising awareness of these issues. So why don't we start with those stories themselves. We'll just go down the line. Vanessa, if you'd like to start.

Vanessa Sivadge:

Thank you so much. My name is Vanessa Sivadge. I'm honored to be speaking on today's panel on Blowing the Whistle on Gender Medicine to join my voice with the growing number of medical professionals who recognize gender medicine for the farce and the fraud that it is. For 10 years, I've had the privilege of working as a pediatric nurse in Houston, Texas. In 2018, I accepted a job at Texas Children's Hospital, the most prestigious and largest children's hospital in the United States and Houston. And I thought at the time that I had peaked in my career convinced that I would be working here until I retired. A couple of years later, in 2021, I transferred to a multi-specialty outpatient clinic, not knowing that a fully functional and robust gender clinic was active in my workplace. The things I saw over the next few years I will never unsee. Eventually I was asked to do things that went against my nursing ethics, my personal beliefs, and most importantly, my faith in Christ. I had a crisis of conscience one day when a physician, the transgender physician, asked me to do patient teaching, which is not uncommon. Nurses do a lot of patient teaching in the hospital. But on this particular day, I walked into a patient's room and I was asked by the doctor to instruct them on how to administer an intramuscular injection. What I didn't know was that this child, this boy, was going to administer estrogen to himself to affirm the false identity that he had adopted. And realizing that I enabled him to do that was devastating to me.

I considered quitting my job. I could no longer play an indirect role in perpetuating these harms against children. Until one day in May of 2023 when I read an article by an anonymous whistleblower within Texas Children's Hospital who had come forward courageously to expose at the hospital, had been secretly providing transgender treatments to children, had hidden this from parents and from lawmakers in the state of Texas. And I knew this to be true because I was the nurse, one of the nurses working at this clinic that was supposedly non-existent. This person is Dr. Aton Heim without whom I would not be here today.

We did not know each other at the time. We had no knowledge of who the other one was. But what I did know was that someone within the hospital had shared my concerns and was deeply concerned about these children being harmed. And so a couple of days later, I came forward anonymously to corroborate his testimony as a nurse working in the clinic where this was taking place.

And that was supposed to be the end of the story. I was going to go back to work and things were supposed to go back to normal. But two months later, in July of 2023, my husband and I were having dinner on a Monday night and there was a knock on the front door. And lo and behold, we go to open the door and there are two federal agents who are flashing their badges. They say they're from the FBI and they're asking specifically to speak with me by name regarding issues at my work and in a video that has now been viewed over 6 million times, because our ring camera captured this exchange at the front door, these agents informed me that I was a person of interest in an investigation targeting a leaker, not a whistleblower, but a leaker who had allegedly violated patient confidentiality laws by breaking HIPAA, which was of course an utter fabrication and a complete lie. And I knew at that moment that they were lying to me. They were trying to turn me and to use me to eventually testify or speak against Dr. if it ever came to that. Thankfully it did not.

But they informed me that they couldn't protect me if I didn't help them, that I was unsafe, that my career and my safety were at risk, and it was the most terrifying encounter we've ever had at our front door on a Monday night. And so that really set the stage for what happened next. I went back to work, of course, no one knew that this had happened, but I think we saw this a lot during the Biden-Harris Department of Justice era where whistleblowers, people with a medical conscience and a moral spine, pro-life people were targeted because of what they believe or just because they believed they were doing the right thing. And so we were no exception to that.

But I went back to work and I discovered that not only had the hospital lied to the public about the existence of this secret program, but they were also billing Medicaid fraudulently for these cross-sex hormones and puberty blockers, which in Texas is a violation of state law. I saw children that were misdiagnosed intentionally. I saw false diagnoses. I saw all these things that were deeply concerning and deeply and 100% illegal. And I knew that I had to come forward at that point to expose that the hospital was committing fraud against the federal government. And so in June of last year, I came forward publicly with my identity, was promptly placed on leave by the hospital and in August of last year, the hospital fired me. And this was illegal for a number of reasons. I had also submitted a religious accommodation request.

So we retained the Burke Law Group, Marcella Burke, who is an incredible attorney. And I'm so grateful for attorneys all around the country who are really defenders of truth and who are on the right side of this issue. And then Donald Trump was elected president and three months later, the Trump administration under the leadership of Secretary Kennedy at HHS announced a formal investigation into Texas Children's Hospital for illegally terminating my employment. And I'm very, very grateful for that.

And to wrap up, I now have the privilege of serving as the founder of Protecting Texas Children. Our mission is to safeguard the innocence of every child by affirming biological truth. We work towards building a future where children can grow a happy, healthy and whole by not erasing who they are, but by learning to embrace how they've been beautifully created by God. And so I'll end here. What is happening in clinics across the country is not rooted in rigorous science, nor is it grounded in ethical medical practice. It is a marketing campaign masquerading as healthcare. It is a billion-dollar industry that thrives on misleading claims, emotional manipulation, and the systematic erasure of informed consent. The issue of gender medicine has shattered political boundaries and united voices from the right, the left, and the center. Not because of ideology but because of conscience. This is not a partisan battle. This is a battle of good versus evil. And at the end of the day, there are no Democrat children, there are no Republican children, just American children. Thank you.

Ian Mason:

Thank you so much Vanessa. Jamie, if you'd like to go.

Jamie Reed:

Good afternoon. My name is Jamie Reed and I hold a master's of science in Clinical Research Management from Washington University in St. Louis, Missouri. I am also a lifelong Democrat, a mom of five boys, three of whom were adopted out of the foster care system and I'm a lesbian. I am also the public whistleblower from inside a pediatric gender center. I participated in transitioning nearly 1,500 unique patients who ranged in age from 3 to 26 over almost five years, I was once a true believer in pediatric gender medicine. Now I understand. I participated in an industry that was based on fraud, deception, and in layman's terms "we were running a racket". Patients with significant comorbidities were treated using unethical and deceptive informed consent practices. They were never properly assessed, informed of their condition or given a diagnosis. A diagnosis itself is the first required step for

any consent to be valid and not fraudulent. These were also vulnerable patients who required specific special safeguards.

First, they were minor patients and should have been provided all of the safeguarding protections we would want for all children. Second, they had significantly presenting comorbidities, often falling within the definition of a stigmatizing complex medical disease, some even meeting the criteria for a legal medical disability. We were harming disabled children. These comorbidities include but are not limited to autism spectrum disorders, anxiety, depression, borderline personality disorders, eating disorders, self-harming behaviors, somatization disorders, learning disabilities, ADHD, and significant trauma histories. Third, many of the presenting patients before the social contagion cohort, would eventually, if not medically treated, become homosexuals like me. That is they will identify as adults as gay, lesbian or bisexual. The entire diagnosis is based on regressive stereotypes and self-described feelings from minor children and their parents. My clinical experience shows that these quote "biopsychosocial assessments are not consistent, comprehensive, or truly diagnosis diagnostic".

For an assessment to be diagnostic, there is a very simple way to prove if it actually is so. It so simple that so many of us actually forget it. There must be a statistically significant number of patients who will not ever meet the diagnostic criteria. So in lay terms, there has to be a statistically significant number of patients and parents who would've been consistently told no by these centers. That never happens. I might hold a master's of science and clinical research that is not a requirement to understand the basic concept of medical diagnostics. Parents and the public have been deceived into believing that these assessments are diagnostic, that they're consistent, that they're comprehensive, and that no child is ever receiving treatment without one. If the assessment met the criteria of consistent, comprehensive and diagnostic, the diagnostic provider should be able to easily produce their assessment tools, give them to the FTC to be analyzed, and they should also be universally consistent across all of our states. This has never happened and they have not shared any data to show a percentage of those presented are being told no because this is not happening.

But, and this is a huge "but", even if this field was actually doing what it claimed to do, even if it was completing a true biopsychosocial assessment and saying no to a significant percentage of the patient population, please know that those who would be told yes would be homosexuals, like me, and especially the gender-nonconforming homosexuals. Under the Dutch model, we would still be okay to be rendered sterile without sexual function, with destroyed endocrine systems and be allowed to die early simply because we are gender non-conforming homosexuals. And so to some of those not here today to Laura Edwards-Leeper, to Annelou De Vries, we homosexuals are no longer okay to be harmed for straight people's comfort and we are fighting back.

I personally witnessed the consequences of prescribing these treatments without proper informed consent, one of my patients after her radical bilateral mastectomy at 19 called begging for her breasts to be put back on. This harm has not been contained to children or minors. Another patient's intellectual function was so impaired that they could not identify to me where they lived or explained what type of identification they possessed. Multiple staff members expressed concern about their ability to consent to any medical procedure. Despite these and similar red flags with many patients, this patient even stated that they desired to have biological children, yet they were prescribed a treatment that would ultimately render them sterile for life. We as clinicians in the gender industry openly stated, "It does not matter if patients even met the diagnostic criteria". We did not care. If patients even had "gender dysphoria." We did not care if a patient said they were trans, then they were trans. Parents were unaware that patients were self-diagnosing, that clinicians had completely abandoned the diagnostic process entirely. Parents who didn't agree with our lives were isolated, abandoned by our centers. We tore married parents apart and we tore children apart from caring parents who told us no.

Imagine in a different field if children went in self-declaring that they had a malignant cancer, if they went to an oncologist and that oncologist without labs or biopsies, if that child demanded to go through chemotherapy and surgery, that the clinicians would comply and then the clinicians would then bill our insurance for those procedures, medical visits, making money for the hospitals and themselves based on this deception. This is precisely what we were doing in the gender center. And then we expanded this deception into a racket. We created specific lists of affirming therapists who would do exactly what we wanted. A therapist could only get on that list if they would comply. We needed a letter for insurance. So guess what we did? We wrote it. We made it fill in the blank. We pre-drafted it. And I know this because I am the one who not only created this letter, but I emailed it out to all of those same therapists for hundreds of our patients.

 I wish I could say to you that I became a whistleblower the first time I heard the nurse say, "But Dr. Lewis, we are committing insurance fraud." Because that was said, and I wish I spoke up sooner. The final death blow to my ethical medical soul, and what finally led me to speak up, is that we significantly harmed our patients. We didn't just deceive them or their parents. I hurt children. And I said to that same Dr. Chris Lewis, "Chris, we are harming patients." And he said, "I know, but what do you want me to do about it?" I hurt the very children I was employed to protect. St. Louis Children's Hospital. Mission statement is simple. St. Louis Children's Hospital will do what is right for children. We did not. And all of us must now reckon with what we have collectively done.

Ian Mason:

Thank you so much. Tamara, if you'd like to.

Beth Bourne:

So apparently I was supposed to prepare something written and I did not. So here goes nothing. I am Tamara and at the time that my story began, I had been a therapist at MultiCare Hospital in Washington State for about five years. In March of 2023, I had a client come in and say that they identified as a wounded male dog. A female client came in and said that they identified as a wounded male dog. And I did not know what to do with that information. I had heard people come in before and say, "I feel like I'm actually transgender." And I just had kind of treated them the way I treated any other client. We just did therapy on all the different things in their life that were causing them distress. I never felt like I had to have an opinion because I just trusted that people who were working in these gender clinics knew what they were doing. So I felt like, "Okay, whatever, we'll just continue. I'll do what I know how to do. We'll treat anxiety, depression, other issues that are happening in your life."

But at this point, when this client came in and said that, I was like, "Okay, so at what point is someone's identity actually a mental health illness? At what point do we need to press pause and deal with this as if something's going on that needs some mental health attention?" And so I emailed my boss, I emailed my colleagues and I said, "Hey, I had a client come in and say that they identified as a wounded male dog and I don't really know what to do with this. At what point is someone's identity something that we treat as a mental health diagnosis?" And they said, "There's no time that that would happen. If this client is not saying that this identity is causing them any distress, then it's fine. You just basically say, 'Awesome, I'm glad you know who you are,' and you continue to be a therapist."

And my boss was on this email too, and I was like, I don't know how to process this. So I kind of just set it off to the side and kept kind of thinking this stuff through what is going on here with gender identity and the way that we are treating these people and these young children who are just trying to figure out who they are, what is happening here? And then September of 2023, we had a mandatory gender-affirming care training. None of our trainings until this point had been mandatory. And I know I'm going

to sound so naive, I had never heard gender-affirming care, those three words together before. And so I was like, "What is this?" And I just had a bad feeling that because since it was this mandatory training that we were going to go in and be Indoctrinated and threatened, basically have our jobs threatened.

And so it was like the training was supposed to happen after Labor Day weekend. And so I spent every night that weekend, after I put my kids to bed, I sat in bed and I just researched everything I could about gender-affirming care. And I realized it wasn't that easy to do. I would Google "what are the dangers of gender-affirming care" and the result would be "How to be a good friend to your LGBTQ..." And I was like, what is happening? I came into this situation so naive. I truly had no idea, I was processing it all. And any article that I found or any organization that I found that was like, "We're hurting people."

 I had written a letter saying that I would not go to this training. And so I wrote this letter and I said to all the people that I found who were giving a voice to the fact that we're hurting children, I said, "Please read this for me. Tell me that I'm not wrong because I might lose my job over this." And so I sent it to literally strangers on the internet and I was like, "Please tell me that this is the information that I'm putting together here is not wrong." And I got emails back and said, "You're not wrong. You're absolutely right. But you have to go to this training because if you don't, you're going to render yourself irrelevant. They're just going to fire you. And then you lose your influence. So you have to go."

 And so then we talked through some questions that I could potentially ask. I don't know if you can tell I'm not controversial. I do not want to make anybody feel like I'm attacking them. So I went into this meeting and I can tell you with certainty that I was so gentle and so cautious with the way I was presenting these questions. But there were 122 of my colleagues there. And when the opportunity presented itself, I said things like, "Hey, if countries in Europe are pressing pause on this, why are we mandating this of our clinicians now?" It was a virtual training and the chat box blew up and they were like, "You are doing harm to our patients. Keep politics out of this." And again, I'm so stupid. I was like, "Politics? I didn't say anything about the president. I don't understand what you're talking about." And so I just could not believe the hostility. The person that was doing the training was like, "I want you to understand we are not going to... No more of these questions from you. This is not up for debate."

And so I left that training and my boss called me and she was like, "That was not the correct time or place to ask those questions." Like, "Oh, okay. I thought that they had said that we could ask questions. So I just assumed." And so after that, I just kept emailing my boss, emailing the person who I did the training, and I asked them these questions in email so I could keep a record of things that they were saying. And I just wanted to make sure that, am I crazy here? What is happening? And they just kept saying the same response over and over again. No matter what I asked, at no point did anyone say, "Okay, hey, let's look at this. What are you seeing online? Let's look at this research together and figure out whether or not there's anything here that we should reevaluate."

And I just thought that they would, we're here to help people. Why would that not be a conversation that they would want to engage in? Instead, they just decide that I'm a monster. And so they basically just said over and over again, "I want you to understand we are not going to agree on this issue. This is best practice. MultiCare will not tolerate anything less. And there is no reason why a person's mental health would impact their identity. It doesn't matter if they've had a history of trauma. It doesn't matter if there's co-occurring disorders. It doesn't matter because they know who they are and you're not allowed to question that at all." And so again, I didn't really know what to do with that.

And then I had a client come in, a 13-year-old who was a female who was mostly non-verbal. When we would talk, she would just continue to scroll on her phone and rock back and forth. And I kept trying to engage her and it was very challenging. She had a history of trauma, really intense trauma. And shortly after I started seeing her, I saw that she had a gender clinic appointment coming up, her first one. And I asked her how she felt about that. And she said she didn't know she had one. And then she kept

scrolling on her phone and we talked about something else. And then after that initial appointment, I read the note and it said, "Ask your therapist for a letter to start testosterone." And I could tell it was a form letter because I later went back and was like, "Okay, yeah, they're all the same." But it said that she so eloquently said how distressed she was in her body as a female, which I'm like, "There's no way she doesn't talk. That's not a thing that happens."

And so then her dad asked me to write a letter to start testosterone. And so I was like, "Finally, now people will actually listen to me. This is obviously not a good candidate. This is a child who's got so much else going on." And so I emailed my boss and I emailed the person who did the training and I said, "Hey, can we look at this client's chart together? They want me to write this letter for this young child to begin testosterone. And I just feel like there's so many reasons why that's not a good idea." And then I don't think I even got a response back. But my boss came into my office a few days later and was like, "I want you to know this has gone above me. The person who did the training has reported you to risk management." And again, I am so dumb.

I was like, "Finally, risk management and I can have this conversation together. We can look at how we're hurting this client and realize that we are hurting people." And so I met with risk management numerous times. They ultimately determined that I was the risk. They took the child from me, said I was incompetent to work with gender distressed young people, and just gave the client to somebody who would just automatically write that letter, no questions asked. And shortly thereafter, I left MultiCare. I was like, "I can't work for an organization that I don't respect. And I went someplace else. And three weeks after starting that new job, my article in the Free Press came out, that new job, they called me up at 7:00 that night and were like, "You're just not the right fit for this position." Lost my job. Single mom of three little kids. I was like, "This is a nightmare situation". I'm so grateful for the Courage Coalition because I don't know what I would've done had there not been support in place. But I ended up opening my own practice. At the time that I was opening my own practice I got letters from the state saying I was being investigated for not being gender-affirming and first suggesting that gender dysphoria is a mental illness, and so that's where we are today.

Ian Masson:

Thank you so much. Lita, if you'd like to go.

Lita Boylan:

Hi. I am very grateful to the FTC for this forum. My name is Lita Boylan. I'm an LPN and a CHES. I worked as an agency nurse in the psych hospital at North Central Healthcare in Wausau, Wisconsin from 2017 until December of last year. North Central is a taxpayer-funded facility. On the adult unit. In 2017, I had a 19-year- old trans-identified female patient who had already had a double mastectomy and who nearly bled out because testosterone caused her ovaries to become polycystic and then they virtually exploded.

On the adult unit in 2018 I had a trans-identified male patient in his 20s who was abused so brutally as a child that he was legally blind and had an IQ of about 70 related to a permanent traumatic brain injury. He was prescribed four times the amount of estradiol that oral contraceptive contains in spite of the fact that he was unable to live independently or maintain employment. During the pandemic, North Central Healthcare opened a brand new youth psych unit, and by 2023 it had become not just a unit that I worked on, but the primary unit that I worked on.

Many days, every single minor female patient was trans-identified. It was unusual for us to have no trans patients on a given day. Most teenagers experienced suicidal ideation at some point. This is not a great part of the human experience, but it is also not an uncommon one. If a child who is struggling

discloses suicidal ideation at school, it starts an unceasing cascade of interventions which occur without parental input or consent. School staff are legally obligated to report to law enforcement who will remove the child to the emergency room where the child is subjected to medical tests and placed on a 72-hour hold and then delivered to a facility like the one that I worked at.

All of this is done without parental consent. Sometimes it is done without any parental contact. The North Central administration is headed by an individual who is well-known for a previous scandal in the state of Wisconsin at a facility that is state-run that involves children. She had an unwritten but brutally enforced policy that clinical staff were to call the kids whatever they wanted to be called and that we were not to inform the children's parents of their desire to socially transition. The implied threat of suicide is wielded with regard to gender dysphoria in a way that is utterly contrary to the standard, which acknowledges both the suggestibility of people who are actively experiencing suicidal ideation as well as the long-observed phenomenon of suicide clusters, which occur especially often in young people.

In other words, they come in, say that they're suicidal, and we say, "Gosh, we shouldn't discuss that unless you're trans, in which case we have to do whatever you say." Payer sources are billed fraudulently utilizing misused codes. Medicaid fraud was commonplace. It was openly discussed during rounding. Most of the children who came in had insurance via their parent's employer. If they did and the child said, "I don't want my parents to know," they had cottoned on to the fact that if they dropped certain codes for insurance, it was going to trigger a letter that would then get back to the parents. We were on the same campus as county social services, which meant then the social work from the inpatient unit would go talk to social services triggering a CPS investigation. Especially if the parents were not married to each other, what would end up happening is the kid would get on Medicaid, then they could bill Medicaid repeatedly for a 72- hour stay, which was also fraudulent because they were misusing codes.

So I know HHS and DOJ are here. I don't know if this is an FTC thing. Guys, I used to work for an ACO. Codes are my second language, so right now we have CMS who will not let you bill for, I believe it's I-110 for essential hypertension. It won't wait that for an RAF score, but we can bill for, what is it, the E-290 code that is the unspecified endocrine disorder. So we can do that for kids, but we can't do essential hypertension for adults with government payer source healthcare. Make it make sense. My minor patients who are as young as 11-years-old would want to both impress and fit in with their somewhat older peers. They would frequently change their names and pronouns. This was always kept a secret from parents. Clinical, educational, medical, and mental health professionals of perceived authority who had already proven that they could override the wishes of the child's parents were now also in the business of hiding things from parents.

There is no acknowledgement on the part of the administrators who act as accountants, who have no clinical background, who have no scientific degrees, who never interact with patients, who do not do assessments, who have no understanding that science is not an outcome but is in fact a process, that affirming a cross-sex gender identity in children is not a psychologically neutral act. It starts another unstoppable cascade of intervention, but this one ends in permanent sterility, disrupted endocrine systems, sexual dysfunction, mutilated genitalia, and an increased risk of completed suicide by every high-quality study that has been conducted on this issue.

To a person, every single trans-identified minor female patient that I took care of described herself as either neurodivergent, same-sex-attracted, or a survivor of sexual assault. Some girls were all three. Most were on self-harm precautions and presented with significant scarring. The best part of my job was meeting with parents alone and telling them emphatically, "You have to let yourself off the hook. This is bigger than any one family." The trust that parents and families put in us to care for their beloved children is an awesome responsibility. The parents of my community pay a millage to fund a facility that

usurps their rights and engages in iatrogenic harm perpetrated against their children. There is no way for parents to consent to treatments that are neither acknowledged nor explained. How will they ever trust us again?

Ian Masson:

Thank you so much. Sarah, if you'd like to take us home.

Sarah Stockton:

Good afternoon. Thank you to the members of the FTC again for hosting this event. My name is Sarah Stockton and I'm a licensed marriage and family therapist. Since beginning my training at Syracuse University in 2008 with an emphasis on sex and gender issues, I've spent over a decade developing standards for assessing youth with gender dysphoria, signing hundreds letters of affirmation, letters for medical interventions, and training other counselors to do so, but today I'm here as a whistleblower. I have seen children and teens rush into irreversible medical decisions, sometimes after a single session, promised reversible solutions with no chance to learn other ways to manage distress. I've watched families left heartbroken.

At Syracuse I helped develop a comprehensive assessment for gender-questioning youth based on the Dutch protocol, emphasizing thorough evaluations to give time to explore identity before medicalization. We were told to market this option so that a child wouldn't have to experience the wrong puberty. Our 2013 assessment tool was designed to give teens and families space to consider past, present, and future expectations while ensuring interventions like puberty blockers were carefully weighed. But what I witnessed was very different. By 2015, gender clinics started popping up and organizations like Planned Parenthood began prescribing hormones without these thorough evaluations. Families were told puberty blockers were fully reversible, despite emerging evidence of risks like bone density loss and infertility.

Vulnerable teens, including those on the autism spectrum or in foster care were funneled into medicalization for what were often social difficulties or trauma, not necessarily gender dysphoria. In one case, I met a father very similar to Simon's who came into my office because the parents were going through a divorce and the child was requesting puberty blockers. I was very concerned about the implications in basically the story that the father was sharing with me. One of the things that we have not talked about enough and I think we need to talk about is Munchausen by proxy. I asked the courts to give me some time to talk to the father about his reasonable concerns with puberty blockers. The court overruled me and within one month, the father took his own life.

Soon thereafter, a former patient of mine who's seeing me for anxiety issues who was gay, came into my office distraught after he reported that he was harmed by another therapist who rushed him into medical transition. He was so upset with nowhere to turn to for help. I had never heard of the term detransitioner and I had never encountered someone who has been this distraught and harmed by what has happened. I tried to help him with emails and calling his providers. They would not provide any guidance or resources of what we could do, no recommendations but to continue his transgender identity. He did not report gender dysphoria. He wanted help for how difficult dating was due to being a gay man.

We had been assured that regret was rare if it existed at all, and that affirmation was the only path. Almost every professional I encountered validated that I wasn't just treating children but saving them. Yes, saving children. In reality, the system was failing them by prioritizing affirmation over developmentally-informed therapy. Ignoring that in mental health, what we focus on often grows, not diminishes. The pressure to affirm intensified after the pandemic, as I saw spikes in trans-identification,

particularly among youth on the autism spectrum are those isolated and online during lockdowns. It appeared to me that many were adopting a trans identity to cope with other issues, not necessarily from deep persistent dysphoria.

Schools normalized rapid affirmation, leaving no room for gender-nonconforming kids to explore non-medical paths through the natural distress of adolescence. When I raised concerns about a friend group of four teens transitioning altogether in one month, I was silenced and I was told I had no basis to question that. My staff, colleagues, and even courts warned me of professional consequences for questioning the one-size-fits-all approach. Even when I was trained under this protocol and I did deny adults who were suicidal, but when it was children, it didn't matter. Suicidality only meant to affirm quicker. I eventually decided there was nothing I could do, so I just quietly opened my own private practice and stopped helping youth completely.

Many years would pass, and in 2022 I could no longer stay silent. My clients, a lot of them teachers, were bringing in stories of desperation, needing guidance, unable to discuss developmental concerns without risking their careers. Inspired by public discussions, I spoke out in the documentary What is a Woman and at Syracuse University in 2023. The result, the backlash was swift. Petitions with thousands of signatures were made against me, public disavowal by my former mentor and co-author of the publication. I was terminated from the University of 15 years and blacklisted from organizations after I was there with 15 years without any formal complaints against me, and every single evaluation was about being my exemplary service. And then my group practice collapsed.

But I am here because the truth matters. Our children deserve comprehensive, developmentally-informed assessments, not rushed affirmation that they may not fully understand. They need safe open-ended spaces to explore distress without being pushed toward irreversible medicalization. The FTC must continue investigating misleading claims like life-saving, reversible that undermine informed consent. I urge you to reinforce rigorous standards for youth gender care, protect professionals who raise concerns, and ensure gender non-conforming children have the time and support they need to find their path without corrosion.

In retrospect, the promise of saving children often meant recommending interventions that would make sure that they and their legacy would no longer exist. It would mean that I would risk their fertility and their sexual function, bypassing all the safeguards we apply in every other area of therapy. You would find it very strange if I told you that I was playing with dildos with 10-year-old typical children. But in this gender-affirming care, that's not only what was taught to me, it was promoted. We were a part of a drug of an assembly line, taught that gender-affirming care was the only solution.

Today, schools and medical organizations are endorsing the gender affirmation model, medicalizing distress while social media tells children that finding an identity is the most important part of development, even if it means disconnecting from their embodied selves. I continue to work with individuals with gender dysphoria and those who are gender non-conforming, helping families in custody cases and working with legislators to build safeguards for children. We need to rebuild trust in the medical community while caring for a generation of children who now face disorders of sexual development that we, in part, have caused.

When we talk about worrying about suicidality, my biggest fear is that the largest cohort that will end up taking their life are the detransitioners because they do not know and they do not have a way out. If you cannot transition your sex, there is no way to detransition your sex. And these children are also being told that that is a possibility. I already have children coming in and saying, "It doesn't matter if I transition my sex, I can detransition it." You cannot. Our children and their families deserve care, time, and honesty, not promises the medical system cannot keep. Thank you.

Ian Masson:

I want to thank all our panelists today, not just for being here, but also for their courage coming forward in the first place and letting us know all what's happening in their worlds. Thank you so much.

Jon Schweppe:

Thank you, guys. Thank you. Thank you, Ian, and again, thank you to the brave whistleblowers for all they've done to protect kids. Folks, for time purposes, we're going to run past that break and we're going to go straight into our next presentation and we will have one more panel after that, which will be hosted by Commissioner Mark Metter, so stick around for that. Erin Friday is a licensed California attorney and has been a registered Democrat for more than 30 years. She's the President of Our Duty USA, a national nonpartisan organization dedicated to shielding children and vulnerable adults from the influence of gender ideology and a director for Genspect USA. She's heavily involved in legislative advocacy, frequently proposing and opposing bills related to gender interventions.

She has written multiple amicus briefs in cases before the Supreme Court and federal courts of appeal, bringing attention to the perspectives of detransitioners and parents of gender-confused children. Her work and viewpoints have been featured in respected outlets such as The Wall Street Journal, The Economist, The Daily Signal, The Federalist, Daily Wire, The Epoch Times, PragerU, The Sacramento Bee, and Post-Millennial. Erin has been on CBS, Fox News, and NewsNation and has been featured in films both in and beyond the U.S., establishing herself as a significant voice in national discussions on parental rights and child protection. Ladies and gentlemen, please welcome to the stage, Erin Friday.

Erin Friday:

Good afternoon. I am honored to speak today as an awakened Democrat from California. I know, oxymoron. I am offering a roadmap for investigations into the nefarious gender industry. Dismantling the worst medical scandal in human history requires an understanding into the collusion among nonprofits, the medical community, and our government, that has created a new category of humans who were inconceivably born in the wrong body. This has led to an ever-growing billion-dollar industry to fix them. My goal is this, to see the decimation of the deceitful gender industry for both minors and adults. And to see that the individuals who set society on this course are held accountable civilly and criminally, including every medical society that has abandoned ethics and science in fealty to the transgender mafia. In 2007, endocrinologist Norman Spack and his protégé psychologist Laura Edwards-Leeper opened GeMS at Boston Children's, the first pediatric mutilation clinic. Dr. Spack and Leeper abandoned the established treatment of watchful waiting for children who were distressed about their sex. A cohort of children that had a desistance rate of 98%, if not affirmed. They not only adopted the flawed Dutch treatment protocol, but they streamlined it, moving children even faster towards medicalization because according to Leeper, there were staff shortages.

There are now over 400 gender clinics in the United States. There is money to be made and some doctors enjoy playing God. In 2023, I attended a conference in which Dr. Edwards-Leeper proudly recounted that Dr. Spack would tell people, "Everyone needs a Lara," because she claimed that her mental health assessments could distinguish between which child would benefit from sex trait modifications and which would not. When I asked if she followed up with any of her patients to confirm her superpowers, her answer was no.

Notably, she rarely disapproved gender interventions for any of her minor patients. We already heard about Amy Tishelman, we'll hear a little bit more about her. Psychologist Amy Tishelman joined GeMS in 2013. She recently testified that she had only just asked to create a database to track the outcomes of the more than 1,000 children whose bodies the clinic had altered. Boston Children's has been

experimenting on children for 18 years without follow-up, while simultaneously reducing the mental health assessments from 20 to 10 to two hours before prescribing puberty blockers, cross-sex hormones, and surgeries.

Dr. Spack and Edwards-Leeper methodology exemplifies the incestuous nature of gender medicine and the falsification of medical papers that reach predetermined conclusions through data manipulation and circular referencing. They leveraged their prestige to convince other medical providers to adopt their unsubstantiated treatment protocol. In 2009, Dr. Spack contributed to the Endocrine Society's guidelines which declared puberty blockers to be fully reversible. That is untrue. Despite acknowledging that the evidence supporting the safety and efficacy of blockers was low or very low, the guidelines recited in the 2012 WPATH SOC 7 as a basis for recommending blocking children's puberty.

Well, that is likely because Dr. Spack also happened to be on the executive committee for the WPATH SOC 7, so he was citing to himself. In 2012, Edwards-Leeper and Spack published a paper in the American Academy of Pediatrics and again stated that puberty blockers are reversible, citing back to the Endocrine guidelines and WPATH. This circular citation strategy has created a false impression that independent groups supported their conclusions. Another example of manipulation can be found in the $10 million NIH study led by Dr. Olson Kennedy, the head of Children's Hospital LA. That study failed to show that children's mental health improved on blockers. Back in 2021 Olson Kennedy presented the one-year result from her study at a USPATH conference, the U.S. arm of WPATH. But at the two-year Mark Olson Kennedy withheld the disappointing results.

She finally published them in 2025. Well, why the delay? As Lior pointed out, it was because she was afraid that her findings would be weaponized and used in court and used to stop prescribing puberty blockers for children. So this pediatrician placed a political agenda above children's welfare. Since the NIH puberty's blocker study results were not what Olson Kennedy had hoped for, she attempted to temper the failure in the study's abstract. She concluded that children's mental health would have likely worsened if their puberty hadn't been blocked, but her study had no control group, meaning that there's no possible way to support this claim. Her obviously false conclusion is emblematic of the glaring activism at all costs in gender medicine.

As Dr. Laidlaw stated, Olson Kennedy employed the same gamesmanship with the hormone study results, dropping the tracking of suicides, the most stated basis used to justify gender interventions because two out of the 315 children had committed suicide. Under any normal circumstances, this level of harm would have ended that study, but Olson Kennedy buried the lead. This type of manipulation is rampant throughout gender medicine. When the so-called experts are ideologues who stand to benefit from the results, scientific rigor disappears.

Let's spend a little more time on Joanna Olson Kennedy. She's captured on video stating that if girls miss their breasts after top surgery, they can simply get new ones. She is proud that she has performed sex trait modifications on children who are in foster care, homeless, prostituting, and drug-addled. She has said it is no big deal if she transitions kids who ultimately turn out not to be really trans because those kids have no fragility. She has stated it's not the worst thing to be trans, and after all, whose fault is it if she transitions a cis kid? Her answer? The child patient. She was merely providing what the child wanted.

Olson Kennedy opened the soon to be closed, largest pediatric clinic, Children's Hospital LA. It is well-known for the pressure created on families by Olson Kennedy and her wife, a female who identifies as a male. Inside that clinic, they would separate the parents and children into different rooms. They would bring in celebrities and other trans-identified people to talk to the kids and speak persuasively to them, telling them about all the different interventions they could get while others worked on the parents in a separate room, guilting them into accepting their newly-minted son or daughter. Olson Kennedy

partnered with public and private schools through Gender Spectrum, a now largely defunct advocacy group whose mission was to, and I quote, "Get gender ideology into every classroom." She, along with other clinicians, use schools as pathways to create and find her victims. Here is an example. This is a California middle school advertising a Gender Spectrum conference featuring gender surgeons and clinics in its weekly newsletter. Middle school. This slide is from a second gender spectrum conference in which kids in pre-K and older were invited. Those who have read the WPATH files, which I recommend that you all do, may recognize Dr. Satterwhite. He's noted preschool kids. This surgeon performs nullification surgeries. Think Ken doll crotch.

He also performs surgeries that leaves a person's natural genitalia intact while adding fake opposite sex genitalia. Keep this in mind as you hear the phrases life-saving and medically necessary. Then there's Scott Mosser who was caught on video stating that he has no age limit for removing girls' breasts. He also contributed to the adolescent section in WPATH's SOC version eight. What we really need is a crime board showing the connections and reach of each provider because it's quite stunning how a few people can create a whole industry that preys on the vulnerable.

For almost two decades now, gender providers have been placing children on puberty blockers, hormones, and surgeries without knowing the full effects while influential medical societies, major hospitals and providers are assuring parents that these interventions are life-saving and improved mental health. These are not mistakes. These are intentional deception. For example, Jason Rafferty's 2018 AAP Transgender policy is riddled with errors and dramatic statements without any citation. Despite a very public analysis by James Cantor, the AAP did not waiver from its position but doubled and tripled down. It should be of no surprise that Dr. Rafferty makes his living from a gender clinic. The AAP, as Lior stated, promised a systematic review. That was in 2023. Two years later, it appears to not having even started it. I believe that's because the AAP knows and always knew that there is no scientific basis for changing children's sex traits. Investigations must occur into influential medical and mental health societies who publicize false statements knowing that their membership will blindly rely on their protocols. I recommend starting with these societies. Sticking with puberty blockers. The number of kids being placed on puberty blockers is increasing at an unprecedented rate. These figures here don't include Kaiser Permanente. We heard earlier about Kaiser. They are a giant in the trans industry and they seem to make money both as insurer and provider, and that needs to be investigated.

I think a reasonable estimate is that in 2024, the number of kids placed on puberty blockers is close to 4,000 new patients, especially in light of the admission by director of Boston Children's Dr. Jeremi Carswell, that puberty blockers are being handed out like candy, which in her mind is great in some ways. Great. This despite her own acknowledgement that puberty blockers are not reversible.

Puberty blockers are profitable. The drug Lupron by AbbVie costs around $27,000 for six-month supply. A six-month Supprelin implant by Endo Pharmaceuticals can cost $210,000.

UCSF is a leader in altering children's sex traits. Its pediatric clinic was founded and is led by Madeline Deutsch, who also serves as president of USPATH. We really need that crime board showing all of these connections.

The infamous Dr. Diane Ehrensaft, who also works at UCSF, she teaches that 2-year-old boys who unbutton their onesies are communicating that they're really girls, and girls who dislike barrettes in their hair are communicating that they are really boys. She also believes that there are an infinite number of genders, including a Prius gender. I can't make this up.

So this screenshot is from UCSF's website as of June 25th this year. It clearly states that puberty blockers are safe and fully reversible. I wonder why then its consent form states otherwise. This is a consent form from 2021. Let me point out a couple interesting statements. First of all, it says that children with trans identities need to have their puberty postponed, that the medication is not permanent, and that

blockers treat the trauma of unwanted puberty. Puberty is not a choice. It's something humans all go through.

Next, it says that the long-term effects and safety of puberty blockers is not completely understood. Well, I thought it was reversible. Isn't that what it said? Bone density will diminish, but is expected to return to normal. Now, lawyers, we will hone in on that word "expected". Expected? In other words, you think so? Maybe? Then again, we don't know. Oh, and puberty blockers might affect fertility. This consent form directly contradicts UCSF's website. This is purely and simply deceptive practices. In this example, the child's doctor was Stephen Rosenthal who partnered with Johanna Olson-Kennedy in the NIH study that still has not released the results of puberty blockers' effect on a child's physical health. Rosenthal also contributed to the Endocrine Society's and Pediatric Society's guidelines for transgender health, both of which state blockers are safe. Rosenthal and Olson-Kennedy need to be at the center of the crime board.

Dr. Marci Bowers. He is the current president of WPATH. He justifies the eunuch identity for children because the word eunuch appears in the Bible. Again, I can't make this stuff up. As this country's most prolific castrator, having performed over 2000 penile inversion procedures, including on children, he admitted during a Duke symposium that puberty blockers started at Tanner stage 2 plus estrogen result in a life without any sexual pleasure for males. How does one explain to a nine or 10-year-old that he will never experience sexual pleasure in a manner that he can understand and consent to? We all know the answer. It can't be done.

Incidentally, billionaire JB Pritzker, the governor of Illinois, and his trans-identified brother are major contributors to Duke.

A 2024 Mayo Clinic study reports mild to severe gland atrophy and changes in testicular cells in males treated with blockers. It reports that this finding calls into question the reversibility of blockers. Irrespective of this admission, the Mayo Clinic's website as of this June continues to state that puberty blockers are reversible. Almost every major medical clinic or gender clinic advertised on its website that puberty blockers are reversible or merely a pause button with knowing those statements are untrue or at best unknown. Some have been scrubbing their website since the executive order and FBI probes were announced. I watched it in real time.

I want to spotlight one particularly dangerous gender clinic and that is Seattle Children's Hospital. Not only does it state that gender interventions are life-saving and puberty blockers are reversible, but it partners with its autism center. Youth with autistic traits are overly represented in the exploding cohort of children and young adults adopting trans identities. They tend not to conform to rigid sex stereotypes, leaving them vulnerable to believing that there's something wrong with them. Combining the autism and pediatric gender centers provides a steady stream of patients for expensive and lifelong gender treatments. Seattle Children's is not alone in this marketing scheme.

Seattle's gender clinic authored and the AAP published a perspective advancing the notion that refusing to modify a child's sex traits constitutes medical and emotional abuse. Parents who refuse to consent to have their daughter's breasts removed or sexual function destroyed are seen as abusers by the largest pediatric medical society in the United States. And if I recall correctly, Seattle Children's had one of the most prominent booths at the AAP convention this year, where some detransitioners and I were escorted out from our paid-for booth because we dared to try to educate pediatricians. So yes, the AAP knows of the harms, but continues to support gender procedures.

This is a screenshot from Whitman Walker Medical Clinic, a clinic right here in DC, that provides services to patients 10 and older. Excuse the vulgar language. It's not mine, it's theirs. Whitman Walker claims that females can grow a male phallus from testosterone. Of course, that claim is an outright lie, though

prescribing testosterone for females is genital mutilation. That part is true. I want to spotlight one surgeon who deserves immediate investigation.

And this is Dr. Sidhibh Gallagher, a plastic surgeon in Florida. An FTC complaint was filed and ignored under Biden, but I hope this administration will investigate this predator who targets the youth, the overweight, and the vulnerable. She advertises on TikTok, Instagram and YouTube using childlike antics to sell her services while posting pictures of her lavish lifestyle her young victims' bodies provide to her. Here are a few examples. Here she's celebrating her success in a possible fraudulent insurance claim. Here are a couple pictures of her victims. Note that this young girl has scars all over her body from cutting herself. Dr. Gallagher was more than happy to let her pay for her to use her scalpel to make even deeper cuts. The woman on the side, she has no nipples. Humans have nipples.

Turning to cross-sex hormones. There are two major online distributors of cross-sex hormones, Plume and FOLX. Both are supposedly only accessible to adults, but their marketing suggests otherwise. Plume started with seed money from Craft Ventures, one of California's most prestigious VC companies, raising over $38 million. Both of these online cross-sex hormone distributors are capitalizing on the market predictions of substantial growth in the gender industry. In 2022, cross-sex hormone sales were a $1.6 billion business. Planned Parenthood is also reaping the benefits of this market. This is why they want to shut us up.

Let's examine one of Plume's ads. That young woman looks like a minor to me or at suggests that Plume is marketing to minors. It also looks like Plume is getting into the surgery business or perhaps partnering with surgeons who will remove the healthy breasts of young girls. Plume, by the way, is affiliated with Stork, so Plume sterilizes the person and Stork finds them a baby. This slide also shows a snapshot from a newsletter from Plume that a child can sign up to receive. I received it and I faked that I was 16 years old.

Now why would Plume be publishing that runaway minors in New York are able to get hormones in its Stuff We Think You'll Like section? Looking for more clients, enticing children to run away from their parents who won't affirm them. FOLX also markets to children. FOLX had its senior director of audience development, Kai Proschan, speak to kids from Friends for youth at the Chan Zuckerberg Center. The kids there looked to be about 10 to 14. I was actually there. Kai, a male who was wearing an outfit worthy of a red light district, talked about medical transition to a group of at-risk children. These online services are tailor-made to circumvent parents' consent and detection. A website called Gender Mapper directs children to both FOLX and Plume if their parents won't consent. Since both of these online services use telehealth, adults can easily order for minors, the drugs come in unmarked packages, and it's easy to change the delivery addresses. Mental health providers across the country have colluded with the medical-gender complex in their abject failure to safeguard against transgender interventions. Websites like Gender Affirming letter Access Project and Do Something: Identity(ies) facilitate approval letters for gender interventions for free or in an hour with no follow-up, with real assessments for minors and adults. Every medical provider who is just checking a box is not providing mental health care. They are order-takers. The FTC can pursue every last one of them for deceptive advertising.

While this may be out of the FTC's purview. I do want to raise the college transgender connection. Many colleges have transgender clinics right on campus or are affiliated with them, providing an endless stream of paying customers. Parents send their kids to college for an education and their daughters come home with missing breasts and facial hair and their sons on estrogen. I don't know if I can play this. It should work? Okay. I will end with a video that sums up everything that is wrong with gender medicine. This is from a WPATH seminar in which Dr. Dan Metzger admits that talking to a 14-year-old about gender interventions causing infertility is like talking to a blank wall and the regret that comes later is real.

Glenna Goldis:

I think when we're doing informed consent, I know that that's still a big lacuna of that we're just, we do it, we try to talk about it, but most of the kids are nowhere in any kind of a brain space to really, really, really talk about it in a serious way. That's always bothered me. But we still want the kids to be happy, happier in the moment, right?

Erin Friday:

Yeah. Medicine should never be about giving a child what he wants in a moment in time. The whole of gender medicine, even for adults, because we can't forget about the adults. Talk to a parent with a 17-year-old child who thinks that they're the opposite sex, their biggest fear is time because they can hold the line until that child turns 18 and then it's no holds bar. So the whole of gender medicine, it's a complete sham based on false science. Thank you.

Jon Schweppe:

Thank you, Erin. That was a very informative presentation. Before we begin our next panel, I'd like to remind everyone, as the chairman mentioned during his speech this morning, that the FTC will be opening a public request for information related to this workshop in the coming days. Be sure to stay tuned to our website and our social media channels for more on that and how you can submit comments, but go ahead and start preparing them now.

We'd love for the folks here today, especially those who didn't get the opportunity to speak, and especially for those who are watching online, to have the opportunity to share their stories with the FTC.

Now, first of all, I just want to thank you guys. I know this was a really long day. It was a bit of a marathon. We are on our final panel and I'd like to welcome to the stage my friend, newly minted but already off to the races, FTC Commissioner Mark Meador.

Mark Meador:

Thank you everyone. Why don't we have the next set of panelists come on up at this point? While they're coming up, I just want to say thank you to all of you for being here today and to all those in the chairman's office who've invested their time in setting up this workshop. I know it was a big undertaking. These are incredibly important conversations to be having, both here at the commission and as a nation. We also know it can be a difficult conversation sometimes. And let me be clear, every person deserves dignity and respect, and the commission certainly recognizes that.

In my view, treating people with respect and dignity means being honest with them, including about the effects of medical interventions, about the evidentiary basis, about the anticipated outcomes, and this is especially important when we're talking about decisions involving children. That's what today's workshop is about. It's about honesty, the basis for all the work we do here at the Commission to protect consumers.

And that brings me to the topic of our panel, what the FTC can do as an agency about the unfair and deceptive practices that exist in the field of youth gender medicine. Because as this workshop draws to a close, it's become clear that a great deal of work is needed. And so I'd especially like to thank the distinguished members of our panel today, and I'll now go one by one with their introductions. First we have Josh Payne. Josh is a founding partner at Campbell Miller Payne PLLC, a national law firm based in Dallas, Texas, representing detransitioners and others harmed through gender transition procedures. Josh has served as lead counsel on behalf of Detransitioners in medical malpractice litigation in Arizona, Massachusetts, New Hampshire and North Carolina. He also serves as lead counsel in a wrongful death

case in Tennessee on behalf of the parents of a young adult son with autism who committed suicide after being placed on cross-sex hormones.

Next we have Glenn Goldis. Glenn. Glenna Goldis, sorry. Glenna is a consumer protection lawyer in New York City with experience in government and civil legal aid. She's speaking today in her personal capacity, not on behalf of her employer. Glenna has successfully prosecuted deceptive practices in sectors like for-profit education, debt collection, telecom, and bail bonds. A gay rights advocate, she publishes a newsletter about the transgender movement called Bad Facts. Glenna holds a JD from New York University School of Law and a BA in philosophy from the University of North Carolina at Chapel Hill.

Next we have Brandon Showalter. In addition to being a long-time friend of mine and an avid vocalist, Brandon is a journalist with the Christian Post who has reported extensively on the developments of gender ideology around the world and other bioethics issues. He's the creator and host of Christian Post's Generation Indoctrination documentary podcast series, and has been featured in several documentary films on the issue. He holds degrees from Bridgewater College of Virginia and the Catholic University of America.

Next we have Paul Dupont with the American Principles Project. Paul is the policy director for American Principles Project, where he is responsible for helping to build and execute the organization's public policy agenda. He's a 12-year veteran of APP, having served in various roles from communications to operations and research. Paul has been particularly involved in helping support APP's advocacy on transgender issues, from defending North Carolina's HB2 in 2016 to promoting efforts to end taxpayer funding of gender transitions today. He's a graduate of Villanova University where he received a bachelor's degree in political science and humanities.

And last but not least, we have Jay Richards from the Heritage Foundation. Jay is the director of the DeVos Center and the William E. Simon Senior Research Fellow at the Heritage Foundation. He's also a senior fellow at the Discovery Institute. Jay is the author of 14 books, including two New York Times bestsellers. His most recent book is Fight the Good Fight: How an Alliance of Faith and Reason Can Win the Culture War.

Thank you all for being here today and why don't we just jump right into it. So under the FTC Act, an act or practice is deceptive when it, one, misleads or is likely to mislead a consumer, two, a consumer's interpretation of a representation is reasonable under the circumstances, and three, the misleading representation is material. So Josh and Glenna, can you tell us about some of the representations that providers have made in regard to so-called gender-affirming care, both the need for it and its effects?

Glenna Goldis:

Yes. Thank you, Commissioner. Thank you. First, I just want to express gratitude to the FTC for holding this event today and for inviting me to be on this panel. We've heard a lot of deceptive representations all day today. The other speakers have been identifying them accurately, in my opinion, all day. I'd like to drill down on some of the foundational false claims in gender medicine that really show us that the problem goes all the way to the root of this practice.

And this can actually be awkward to focus on because the false claims are not just made by gender doctors. In much of the country that jargon is part of our normal lexicon now. For example, sex assigned at birth, lots of everyday people are using it because they think it's the nice thing to do. But once you realize how harmful gender ideology is, I think that people can maybe start trading in those phrases.

So I'll start with sex assigned at birth. The doctors ably handled this one earlier. Sex is not assigned at birth, so that is a false statement. The words "assigned at birth" imply that sex can change. So for young

patients, especially in a gender clinic, they show up because they want to change sex. And when doctors tell them sex is just an assignment, they get the idea that they'll be getting a sex change. And it's important to note under the FTC Act that it does matter who the target audience is. So even if you are an adult and you think, "Well, that phrase is innocuous. I know what sex assigned to birth means. I know it's just meant to be nice." Well, we must look at it in terms of the patient population that's hearing it, and these are distressed children, so it is deceptive toward them.

Second, this is a big one, gender identity. Doctors claim that consumers, patients have a gender identity that is incongruent with their body, but it's impossible for gender identity to be different from a body or the same as a body because gender identity, the way it is defined by gender doctors, has no definition, it has no properties. So this is an important point. I think a lot of people assume that gender identity means wanting to be one sex or the other, and gender doctors almost make it look like that's what they mean because they say that gender identity can be male, female, or something else. But it's a trick, because, remember, gender doctors think that a male is anybody who says they're a male. So it's a circular definition like gender identity is somebody who has a male gender identity kind of thing.

And then the doctors just double-down on their deception when they try to add more verbiage to make it seem like gender identity does have properties and it's not just a circle. So just to give you some examples, Jack Turban wrote in the New York Times that the most basic part of gender identity is a person's transcendent sense of gender. And this was the New York Times. And he did not define the term "gender" after referring to the transcendent sense of it. Instead, writing that gender, quote, "Goes beyond language."

Another gender doctor, a pediatrician, wrote that gender is a, quote, "Multi-dimensional concept with complex expressions and that it is related and distinct from sex in ways that modern science is still exploring." So she's going to know the definition of gender in the future once science is done. And just a side note on that, I'll try not to go on too many tangents about this, but a lot of times gender doctors will kind of use language to imply that they're going to get the answer to gender questions soon. Science is almost there. And they say, "Look, this is a really new area of study." It is not. All this stuff goes back to the early 1960s. Institutions have been investing in it since then. Major universities. It's had very little change in the theories underlying it since the early 1970s when they coined the term "gender dysphoria". So whenever they try to use that excuse of like, "Oh, we're new," that's not true. They're not new. This stuff is all very old. It is not cutting edge.

And finally, I'll just give you one more example. Daniel Shumer, a pediatric endocrinologist in Michigan, he doesn't have a coherent definition of gender either. And when he was deposed recently, he admitted that when he explains gender to patients, quote, "I have oversimplified." So he's not as complicated as the woman with her complex multi- dimensional concepts. He boils it down to some other not true thing.

So with all that being said, it seems safe to say that patients don't know what their doctors mean by the term "gender". And doctors don't really have any meaning. They seem to be using it as a placeholder to lead the patient to believe that since they have this gender-related problem, they need a gender-related solution, which is gender-affirming care. So that's kind of the function it's serving. I think that whenever you see the term "gender", pretty much in the gender world, the gender medicine world, it's deceptive.

So then I'll just give you one more kind of foundational false statement that they make. And this is from, for example, the American Psychological Association and the American Academy of Pediatrics. They claim that sexual orientation means attraction to a gender. Sexual orientation ... There's no scientific basis for saying that. The studies are about sex, sexual attraction to people based on their sex. And recall, gender doesn't have a definition, so it's not even possible for that claim to be true. And this is really important because it leads consumers to believe that gender-affirming care will allow them to

date and form relationships as though they were members of the opposite sex or non-binary sex, I'll try not to go off on that. So this is playing out in the real world.

In the gay community, we see these young women pursuing gay men, trying to form relationships with them. They think it's viable because they have a male gender identity. Their doctor told them so. And these institutions are telling them that sexual orientation is based on gender. So this just leads to a lot of discomfort and sadness and awkwardness for parties on all sides of this equation. And that's putting it mildly. So again, this is a really material deception that is being imposed on these young people.

Mark Meador:

Thank you. Josh?

Josh Payne:

Thank you, Commissioner. I would like to look at both the problem that's presented by the people making these statements and the solution. And the deception is when viewed in the round, but you can look at it from both angles. They state the problem as your child is going to commit suicide if this intervention is not carried through and if you don't agree to this, and then they come along with a solution that they say is rock solid. So you have a drowning victim and here's the life raft.

And because a deceptive communication is viewed holistically, it is a clearly deceptive message. The message is, "You are dying and here's your life raft." That is the core deceptive message. Another angle of this from an aspect that the FTC is well-versed in is implying that something is FDA-approved. And again, when viewed in the round, you're in a doctor's office, somebody there wearing a white coat, exercising authority over you, presenting a life raft to you, you are assuming this has every conceivable seal of approval out there, and there is no inkling in the parent's mind or the patient's mind that the FDA hasn't vetted this and has not approved this. And so to not have a disclaimer that this is absolutely not FDA approved, not even really reviewed, it's entirely an off-label use and is one of the bits of evidence from earlier today. The whole thing is off-label. That's a disclaimer that's vital and it's not being made aid.

Mark Meador:

Thank you. Switching over to unfairness, under the FTC Act, an act or practice is unfair when it, one, causes or is likely to cause substantial injury to consumers, two, can't be reasonably avoided by consumers, and three, isn't outweighed by countervailing benefits. So I was hoping Brandon, Paul, and Jay could tell us a little bit about some of the injuries that are alleged to have followed from the push to get young people into aggressive gender-related medical interventions.

Brandon Showalter:

I'll go first and I would like to thank you, Commissioner Meador, and the FTC for this event today. The injuries are incredibly brutal. I've seen things that have put gray hair in my black hair, and you'll age pretty fast. You don't want to see the kinds of things that I see in my inbox and I hear from parents about what has happened to their children.

And I'll say when we talk about unfairness and deceptive trade practices, because it is based on an irretrievably flawed premise that it's actually possible to be born in the wrong body, any medical treatment toward that end is going to do damage, guaranteed full stop, because it starts with a lie. That's just it. And it leads to horrors that I'm about to describe. I'll just talk about three injuries that I've seen. I haven't seen fully, but I've seen part of it and heard about it.

One detransitioner man who walked into his appointment, the first he was reportedly told by an intern working in the intake office, "If you think you're trans, you are trans." He went fully down the trans path. His story was featured in Abigail Shrier's book, Irreversible Damage. I also reported on his story. Hormones, wound up getting an orchiectomy, the removal of his testicles. And he was never told even during his appointments, they never used anatomically correct language during his appointments, they castrated him for $1,000. That poor man had severe suicidal ideation in his post-operative regret, severe endocrine complications, and he even, when he tried to have sex, wound up ejaculating blood. And to this day, the weirdest email I've ever had to send was to Dr. Laidlaw asking is it really possible to ejaculate blood? And yes, it is, after you had been castrated.

Another woman on Instagram who was led down this path had a phalloplasty surgery and ended up having to have over two dozen "corrective revision surgeries" because they so badly mangled her down there that she had to urinate out of her anus into an ileostomy bag. And she was posting about this carnage that was done to her body on Instagram. It's gruesome.

Another woman who has got the worst story I have ever heard about, and she's featured in the documentary podcast that I produce and host, I can say her name, her name's Amy Atterbury. I just have to honor her because it's the worst story I've ever heard. She had to be in the next room over where doctors disfigured her daughter's forearm to make a fake penis. Medicaid paid for her to have a double mastectomy and all of her reproductive organs cut out, but her daughter's forearm was cut up to make a fake penis and she had to be in the next room over for 13 hours as the doctors did what they did to her. And reportedly, I've heard that there's some other corrective surgeries going on that are either planned or may have happened. They're currently not speaking as far as I know, where they will have to do some sort of revision where they cut the sex organ in half and reroute her urethra.

You want to talk about... I mean, I totally try to avoid making any comparisons to the Holocaust because I just don't like to. That's a uniquely horrible episode in history. But I will sometimes be emailed by Jewish readers who say we're living in a culture of Mengele's. This industry needs to be dismantled from the top to the bottom because it all begins with deception and a lie that it's actually possible to be born in the wrong body, and there are products and services that are marketed to that end.


Mark Meador:

Thank you.


Jay Richards:

Well, I knew we were coming at the end and probably the harms would be discussed in exquisite detail by other speakers and panels. In fact Erin, Friday,` said almost everything I was planning to say just prior to this, but so let's just briefly summarize the manifest and obvious and documented harms of so-called gender affirming care. We won't even talk about the social transition, just puberty blockers, cross-sex hormones and surgery that have been discussed in this room today. Reduced bone density and bone strength from puberty blockers. The state of Georgia didn't include puberty blockers in its bill restricting these procedures because the sponsor had been told that it was entirely reversible. Puberty blockers are just reversible. We know that's not true. You know it's not logically because you can't reverse time.

And so, if a child has his puberty blocked at 13 and his peers go through puberty and he gets off of them four years later, that part at least is obviously not reversible, and we know there's serious physiological effects of this. It likely harms brain health. This is a topic of continuing research. I happen to have seen a report that will be coming due here very briefly that focuses on the adverse events reporting system. So not the Bayers, not the vaccines, but the other FDA's reporting systems on puberty blockers. Just look at all of the reports. There are very profound and underappreciated effects on mental health and cognitive

development from puberty blockers alone. Remember, we haven't gotten to cross-sex hormones yet. There's psychological distress. There's obviously infertility, at least if these are continued and insofar as they're the beginning of a treatment pathway that leads to infertility, stunted growth, which is at this point quite well known.

Now let's turn to cross-sex hormones. Again, fairly well known already, heart health risk. We don't have long-term data on this, by definition because we're in the beginning of the experiment with doing this with kids, giving girls massive amounts of testosterone. But we can be quite certain that it's going to have a signal in heart health. Infertility, for obvious reasons. Seems to be a serious increase in cancer risk, which is also discussed today. Mental harm. Many detransitioners, especially females, will talk about an initial euphoria from testosterone. Same thing that men that get testosterone supplementation will experience. But this is sort of a honeymoon and a year or two in, many detransitioners report actually quite harmful and distressing mental effects.

Again, the sort of regret and detransition was not supposed to happen, but cross-sex hormones has very specific physiological effects. Some of the detransitioners that spoke today, for instance, commented on the depth of their voice, which in the scheme of things may seem superficial, but it's a reminder of the kind of permanent effects that these drugs have.

And then, almost inevitably when we get to the surgeries, this is sort of obvious, and Brandon's given us a few examples, but these are not one-and-done surgeries. Most of us who've had surgery, I had to have a quadriceps tendon reattached to my knee in 2019. I had one surgery and a few months of recovery. The so-called gender-affirming care in which you create facsimiles of the other sex or of no sex, depending on what the doctor's sort of metaphysical theories on these things are, right? That's not a one-and-done. These usually require maintenance. They very often require follow-up. They may, in some cases, and I know there are detransitioners in this room, involve years just trying to heal the wounds from the initial surgery. That's the reality of this thing.

And then, the one thing that was not discussed quite as explicitly as I think it should be is that there is a iatrogenic harm to the beginning of this procedure. Just puberty blockers alone, even if they were by themselves reversible, we know that if a child is put on the transition pathway and starts taking puberty blockers, he or she is much more likely to continue down the pathway to full transition. In other words, it fast tracks children based upon a really bizarre and almost certainly false diagnosis all the way to the end. The question of whether puberty blockers alone are sterilizing doesn't quite answer the question. Even if they weren't, if it fast tracks kids onto a protocol that leads to sterilization, then yes, they are. These are manifest harms.

Now, any surgical or medical intervention has risks so why would anyone be willing to bear this? It's almost certainly because of the false calculus that parents are presented with. If you're a parent, and I will say I'm someone that works on this issue. I have no personal connection. I don't have a child or family member that has struggled with this. I do know this as a parent, the worst scenario you can possibly imagine for your child to suicide. And so, if you think, "Okay, suicide's the worst," and then you're told by a trusted physician, "I have a way out for you though." It sounds terrible in the abstract, but it will prevent the worst outcome. It's only with that emotional blackmail, I think, that most parents would ever have entertained starting this process in the first place, and it's precisely why the FTC has relevant jurisdiction on this issue.

Mark Meador:

Thank you.

Paul Dupont:

I don't know what else to add about the harms, the obvious harms that this causes. I mean, I think the panels we heard before this, what Brandon and Jay just talked about, I mean, the harms are numerous and obvious. I don't know if I'd be preempting you, Mark, by jumping to the second part of the definition of what makes a practice unfair, that it can't be reasonably avoided by consumers. When Erin was up here earlier, she mentioned Dr. Johanna Olson-Kennedy, how she said that she wouldn't have any issue with transitioning patients who would later regret it because, well, that was what they were asking for at the time. And I feel like that's often used as a cudgel against detransitioners who later regret it of, "Oh, well, you should take responsibility for reactions." And that kind of goes to this question, can this be reasonably avoided?

And I think we have to look at the fact that the system that's been set up, it's really been set up to create a pipeline that's easy to get into and almost impossible to get out of once you're in it. And so, a few things to that point. I mean, obviously, we've heard, again, all the testimony earlier today about the emotional blackmail that's used at the very outset, telling parents, "Would you rather have a dead son or living daughter?", or vice versa. The ways in which at the outset, the... Sorry, the ways in which the patients are really just pushed into this and pressured into it with the fear-mongering and whatnot, and then the fact that they're not fully informed.

This came from a free Press article about Planned Parenthood, which is I think a particularly bad actor in this. Free Press about Planned Parenthood. Planned Parenthood's materials for clinician state atrophy can begin with within just three to six months of exposure. But on the brief patient consent form, it's about three pages long, that both Hineman and Anna signed, this was referred to as only genital dryness. There's a lack of informed consent at the outset.

And then, when patients are in this pipeline, they're encouraged to continue no matter what's happening. And that's again, by design. This is from the WPATH Standards of Care 8. We recommend healthcare professionals maintain existing hormone treatment if a transgender and gender diverse individual required admission to a psychiatric or medical inpatient unit unless contraindicated. That means if they're going through some sort of psychiatric episode, the WPATH standards of care is saying continue to administer hormones anyway.

And again, I think we've heard throughout today examples of that. And again, that's not a mistake, that's by design. That's what their standards of care states. They're in the pipeline. They're continuing to be pushed down this pipeline. And oh, by the way, if they do have regrets, if they do want to detransition, well, insurance will cover the initial cost of transitioning, but a lot of times various detransition care is not covered by insurance. So there's a financial obstacle to getting off the pipeline as well. I think when you throw all that together, you really can't help but conclude this can't be reasonably avoided by consumers.

Mark Meador:

Thank you. Looking ahead, if there are in fact violations of law associated with the youth gender medicine, a critical question is going to be what are the appropriate sets of remedies or solutions that we should be seeking? Josh, Glenna and Paul, what in your views, what does relief realistically look like for American consumers and patients?

Josh Payne:

An important point to make is that, Commissioner of course, as you know, the FTC is able to collect civil penalties in certain circumstances, not necessarily turning that money over directly to individual consumers, but through its consumer protection power, it is controlling conduct, incentivizing conduct,

disincentivizing bad conduct. And once it determines through its investigations who it believes it should enforce the law against, the major players and targets, it can bring administrative cases against those individuals. That can take time. But it's useful because at the end of the process, an order is created that can be enforced through civil penalties, not just against the respondent, the target, but also against what they call non-respondents, non-parties to the proceeding who know about the order, must still follow the order. And if they do not, they subject themselves to those civil penalties.

The FTC, I almost said the FDA, the FTC can engage in rulemaking. Again, that's a process that involves time where it perceives the practices at issue to be what it calls prevalent. I think a lot of what we've been discussing today, I know representing detransitioner clients and medical malpractice cases, as my firm does, these practices are indeed prevalent, which would give rise to the FTC's ability to make rules that limit this conduct.

And then, finally, what I think has historically been an underutilized tool in the FTC's toolkit is it can actually go to the courts and seek injunctive relief. And that's probably the quickest way to stop the bad conduct. If an investigation is ongoing, if an administrative cases in the pipeline or pending, the FTC does all of that part in house, but it can separately go to a federal judge and obtain pretty much immediate injunctive relief off the back of some kind of mini-trial or evidentiary hearing where it's able to lay its case out and say, "This is urgent".

And interestingly, it's not just an ongoing violation, it's also to prohibit anticipated violations. It's not a defense against the FTC's request for injunctive relief for the hospital system or drug company to say, "Well, we're not violating it yet." If there is an imminent threat and they're about to violate it, the FTC is still entitled to seek that injunction from the court to stop the anticipated violations. Those are the key remedies that are out there. And I would draw particular attention to the injunctive relief remedy, which may not be the FTC's immediate thought naturally of that's where we want to go because they can do so much in house, but I think it's a very useful tool that should certainly be considered by the commission.

Mark Meador:

Thank you.

Glenna Goldis:

One of the big social injuries that has come out of this scandal is the decline in medical institutions, especially medical societies and medical journals. You heard about that earlier today. We have these institutions that they're basically healthcare lobbying groups like the American Medical Association, the American Academy of Pediatrics. But the fact is Americans want to have these institutions that give them good information that seems to be objective. Everybody wants that in America. But unfortunately, we've seen that, really, these organizations have become political in the gender scene. They have batted away dissenting views. They've only printed things that supported theirs and even printed errors at some point. And of course, the associations have published endorsements or kind of de facto endorsements of practices that are not evidence-based and that are harmful.

And so, I don't think that the government should go in and force them to be objective. That's not possible. But I think by acting against them, by seeking injunctions, as Josh says, against their deceptive activity, that will pressure them to change. And also just the act of conducting thorough investigations in the course of pursuing a prosecution and making that public will be really helpful in exposing the medical associations to the public and to themselves so that they see the road back because they're at the point where they're going to start losing members. Pediatricians are going to think, "You know what? This is not representing me well, this group. They're actually making me look bad. I don't like what they're doing. I'm not going to pay dues anymore."

They could lose other revenue streams as well. There have already been reports that the American Medical Association has lost traction on Capitol Hill because they're just perceived as being so aligned with the left. And like I said, they are fundamentally a lobbying organization, so this is a big problem for them. They have their own reasons for responding to the action that the FTC takes and reforming themselves.

Mark Meador:

Thank you.

Paul Dupont:

And I'll just add to that, I think obviously both Josh and Glenna here have covered a lot of the different avenues that the FTC can pursue. I think there's also a whole government approach here as well though, right? We had the DOJ represented here earlier, and they certainly have a role to play in this. The memo that was released by Attorney General Bondi earlier this year, laid out a number of different pathways there, which it sounds like they are pursuing enforcing statutes against female genital mutilation, going after violations of the Food and Drug Cosmetic Act, False Claims Act. I mean, we've heard already a bunch of times false billing issues. There's all sorts of avenues to accountability there, I think.

And then, also with the FDA, all of these drugs are being used off label. The FDA is certainly within their authority to commission a review of the off-label drug use of puberty blockers and also warning manufacturers of consequences of promoting that off-label drug use if they are doing that. Which again, I think there's definitely an avenue to investigation of that. Definitely there's a lot that the FTC can do, and I think there's also a lot that other governor agencies can do as well.

Mark Meador:

Thank you all for those comments. Investigating these effects that you all have laid out of youth gender medicine and the representations made about them, it's certainly going to be a priority for the agency going forward, but in doing so, we're going to need the best available information that we can get. As we explore this topic in accordance with the law, Jay and Brandon, who should we at the FTC be talking to as we investigate, and what are some of the key questions that we don't yet have the answers to? And just overall, what does a comprehensive investigation look like?

Brandon Showalter:

Well, one of the things that I've appreciated about today is that names have been named. Erin said a moment ago that some doctors from California should be at the center of the crime board. Start with the people that have been named today and just start digging around, and you'll find a hornet's nest and their associates and their affiliates.

I think the other people that it's just so important to talk to are the parents, because I've been getting messages all day from the hundreds of parents who are watching this, overjoyed, gushing and joyous that a federal agency has put on this day-long seminar because they have felt so unseen and hidden. They've lived in a straight-jacket of silence. And so, the fact that you have federal lawyers that are willing, I mean, they're literally probably dancing in their closets, watching this, in their wardrobes. Some of them, they live inside a cone of silence, even within their own homes and neighborhoods. They have not had a voice. They can tell you firsthand how they were deceived, misled. They haven't been heard. Dr. Grossman has been an excellent advocate for them. But the voices of the families that have been shattered into a thousand little bits, you want to talk about how they were misled and deceived and

Page 82 of 84

ripped apart. Talk to the parents and zero in on the predatory doctors that have been named today. That will get you started.

Mark Meador:

Thank you.

Jay Richards:

Yeah, what Brandon said, essentially ditto. I mean, obviously, everyone that has attended this, everyone that's been on this stage today, start with them, everyone that has attended. But I could tell you, as someone who spent several years working on this in the policy space and others, in some ways I feel like some of us here probably are reaping what others sowed years ago.

This was a very tough issue initially, in which it felt like there was absolutely no way to win. Now, I just happened to be convinced, no, there's no way this can ultimately be maintained because it's contrary to the evidence of the senses and things that everyone knows. This is not really abstract stuff to say, " There's males and females, and we could tell the difference." That's what we were dealing with. Nevertheless, it was first really hard to get people to believe that this was happening.

It was hard to get Republican members of Congress and staffers to think, 'Okay, yeah, this is something maybe, okay, maybe it happens in California or something, but it's not widespread." I mean, this was the idea. I recall a state hearing in Nebraska with Luke Hein, a detransitioner, who had had a double mastectomy, and someone else was testifying and insisting that it never happened in her state. That that didn't happen there, and there was a victim right there in the room. So that level of denial of the reality of it.

And so, as awful as it was sort of initially when detransitioners started deciding, "Okay, we're going to talk about this," that changed the game entirely because you can have 12 people making interesting scientific and philosophical arguments, and one detransitioner just sort of lays them to waste. And so, to have parents and children who are the primary victims of this ideology as it manifests itself in medicine, they got to be in the front in terms of just showing how fundamental and real this is and why it matters.

But then also, the experts themselves, the particular specialists, including many of the medical scientists here mixed with competent generalists and translators. It's sort of hard to describe this, but sometimes a medical specialist for all their specialization can also be subject to confirmation bias and sort of a narrowing of vision. But the generalist is often not likely to have the grasp of the details. And so, a combination of people who've studied this as generalists, who've translated it in what it matters, and the specialists are absolutely crucial.

And then, just to reiterate what Brandon said, you should talk to the members of the committees, of the medical associations that came up with their respective guidelines that the American Academy of Pediatrics, at the Endocrine Society, at the American Psychiatric Association. Ask them not just sort of in general, but specifically how they came up with those guidelines and what the scientific procedures were that they followed in order to do that and find out what they have to say. And then-

Brandon Showalter:

Just tag on one quick thing. Just add to that, I think the biggest stronghold, just to phrase it that way, the medical societies and the courts are the biggest thing that keeps things anchored in insanity here in America. Because if you have ideologically captured court systems, as the FTC takes action and tries to adjudicate these things, if they are deferring to these medical organizations, and it was what was so genius about what the state of Alabama did, was that they went after WPATH's vaunted guidelines, and

they discerned rightly that that was the source of the problem. Because once they blew that apart, they were able to show the judges that all of this was just hogwash. Yeah, put the screws to those who are writing these junk guidelines because they're just based in lies, and that I think will open the floodgates.

Mark Meador:

Thank you. Thank you both. And Jay, one of the things you said reminds me, someone Brandon and I both know is fond of saying that bad ideas can only bear the weight of reality for so long. And it seems like that's what we're coming up to here. And so, I appreciate all of your comments today for the whole panel. It's been incredibly insightful, and I think it gives us a lot to take into consideration as we move forward as a commission.

I'm sure we could discuss it all day long, but unfortunately that does just about conclude the time we have for the panel today. I'd like to take this opportunity to, again, thank our distinguished guests for their time and their thoughtful reflections.

To tie things up for the day, we've had a remarkable and groundbreaking workshop. We repeatedly heard from parents and individuals gravely impacted by youth gender medicine gone wrong, who suffered the harms of misrepresentations about the effects of these medical interventions. We heard from critics of the politicization of scientific debate in this area who explained the various pressures that keep researchers from speaking openly about their findings and how all of this ultimately results in medical decisions that are made without the best available data. Parents and young people deserve better.

We heard from scientific experts and ethicists who spoke to the state of research in this area, experts willing to look at the data rather than merely repeat the slogans of activist organizations and what they had to say was deeply concerning, or it should to anyone concerned with the well-being of American children. We heard from whistleblowers who risked everything to reveal the truth about what's been done in the name of so-called gender-affirming care. All too often we learned medical decisions haven't followed the science. Corners have been cut, ethical lines have been crossed, and young people have suffered the most.

On this most recent panel, we heard from experts who help us to chart a course forward as we continue to engage on this issue as a commission. These conversations have been so important because for too long those in power have only given a voice to one side in this debate. Sadly, it was the side that is perpetrating the very fraud that needs to be uncovered and stopped. That changed today as those of us with the power to change things finally gave a voice to the powerless. I'm very grateful for our panel's thoughts and the contributions of everyone who joined us today. We'll need them in the months and years ahead. No child should suffer from dangerous, unproven, and unwarranted medical interventions, especially if those interventions are unfair and deceptive.

This workshop may be drawing to a close, but the commission's work has only begun. To that end, I'd like to thank the chairman and my colleague, Commissioner Holyoak, for their leadership and engagement on the issue of youth, gender medicine, and the consumer protection issues related to it. Together, we look forward to fighting even harder for the best available science and for the rights of children and families. And I'd like to thank all the distinguished and courageous guests we've heard from throughout the day. Let's please give them another round of applause.

And then, last but not least, I do want to give a special thanks to Johan Schweppe in the chairman's office for all the great work he put into making sure this workshop was a success. Thank you all and Godspeed.

# EXHIBIT 18



▷

app.neverbounce.com

**Email Cleaning - Bulk Email List Cleaning - Verify Billions of Emails**

Over 125,000 Users Trust NeverBounce for Real-Time Email Verification and Email Cleaning. An Email Address is Your First Line of Communication. Make Sure You Reach Your Customer.

Learn more

Sponsored

**N** Newsmax     Follow          3.2K Followers    ⎘

# FTC hires attorney fired for transgender care views

Story by Theodore Bunker• 1w •     3 min read



⌐ FTC Hires Attorney Fired for Transgender Care Views

The Federal Trade Commission hired a former New York state attorney who said she was fired after publicly criticizing transgender

⚬ Feedback

medical treatments for children, assigning her to a senior role expected to focus on potential consumer protection issues tied to that care.

Glenna Goldis will serve as a senior litigator in the FTC's Bureau of Consumer Protection, where she is expected to help lead investigations into possible consumer harm related to medical interventions for minors that supporters often call "gender-affirming care," according to a person familiar with the matter. The Daily Wire first reported the hire.



**Charles Tyrwhitt Shirts - The Finest**

charlestyrwhitt.com · Spon

"Glenna is an extraordinary, brave, and intelligent woman with an impressive history of working on consumer protection matters," said Joe Simonson, the FTC's director of public affairs. "We are so excited to have her aboard."

Goldis previously worked as an assistant attorney general under New York Attorney General Letitia James. Goldis, who has described herself publicly as a "lefty lesbian lawyer," said she was dismissed after speaking out against the use of puberty blockers and cross-sex hormones for minors.

"Today I was fired by NY Attorney General Letitia James for speaking out against pediatric gender medicine (PGM)," Goldis wrote on social media on Jan. 22 in a since-deleted post. "I was an attorney in (the New York attorney general's) consumer frauds bureau, which did not work on anything related to PGM."

Goldis said she raised concerns internally and publicly that providers of such treatments "may be engaged in a dangerous consumer fraud," adding that James' office "treated me like a pest."



**Vince Cici Cross Strap Flat In...**

Nordstrom Rack · Sponsor

A spokesman for James confirmed Goldis' firing and said it stemmed from workplace rules governing employees' outside activities and public conduct.

"The Office of the Attorney General has rules and protocols for employees who engage in activities that can impact the work, operations, or integrity of the office," the spokesman said in a statement.

"This former employee's flagrant and repeated disregard of these rules and protocols disrupts and undermines our efforts to protect the rights of all New Yorkers," the statement continued.

Goldis has disputed that characterization, saying officials told her she could not "take public legal positions that conflict" with James' stance and accusing the office of trying to force her "into silence."

At the FTC, Goldis' work is expected to align with the agency's recent emphasis on examining whether medical providers or marketers violated federal law by failing to disclose risks or by making misleading claims about the benefits of treatments for minors.



**Business Class to Austria - Unbeatabl**

buybusinessclass.com · Spc

The FTC held a workshop on July 9, titled "The Dangers of 'Gender-Affirming Care' for Minors," billed as a discussion of "unfair or deceptive trade practices" in that area.

In closing remarks at the event, FTC Chair Andrew Ferguson said the agency was listening to people who say they were harmed.

"I want you to know the FTC hears you. We hear all of you," Ferguson said. "We want to understand what's going on so that if the law is being broken, we can stop it."

© 2026 Newsmax. All rights reserved.

## Sponsored Content



Montana Knife Company

**Ball Bearing Steel Knife | Free Sharpening For Life | Made Ir The USA | Grey | The...**

Sponsored

Smart Lifestyle Trends

**Cheapest Way To Get A Walk In Tub If You're On Medicare**

Sponsored

## More for You



Newsweek · 1w

Trump rule makes it easier to fire federal workers

236    75



USA TODAY · 17h

**Angie Harmon shares she reunited with ex in Valentine's Day post**

496    26



The Washington Pos! · 1w

**A company that r sites says the Tru administration is**

88    7



**HuffPost · 16h**
### A five-time Olympian finally gets her gold in historic victory
△ 1k  ♡  💬 29

**BBC · 1w**
### Chairman of major US law firm steps down after Epstein files release
△ 2k  ♡  💬 117

**T Time · 19h**
### Marjorie Taylor Greene gives warning to MAGA amid Trump feud
△ 746  ♡  💬 85



△ 1k

♡

💬 333

↪

⋯



**abc ABC News**  [Follow]    1.9M Followers   ↗

# Trump tariffs cost average US household $1K last year: Research

6d



That number is set to increase to $1,300 this year is all the existing tariffs stay in place, research finds.

**Sponsored Content**

More for You

# EXHIBIT 19

 **Jon Schweppe**
@JonSchweppe

"The American Medical Association and @AmerAcadPeds peddled the lie that chemical and surgical sex-rejecting procedures could be good for children. They betrayed their oath to first do no harm… That is not medicine — it's malpractice." - @RobertKennedyJr

## HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures

**WASHINGTON, NOV. 19, 2025** — The U.S. Department of Health and Human Services (HHS) today published *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices*, its peer-reviewed study of the medical dangers posed to children from attempts to change their biological sex.

The report, released through the Office of the Assistant Secretary for Health, finds that the harms from sex-rejecting procedures — including puberty blockers, cross-sex hormones, and surgical operations — are significant, long term, and too often ignored or inadequately tracked. These conclusions confirm President Trump's Make America Healthy Again Commission's findings that unnecessary procedures and long-term health risks such as infertility are the byproduct of the overmedicalization of children.

"The American Medical Association and the American Academy of Pediatrics peddled the lie that chemical and surgical sex-rejecting procedures could be good for children," **said Health and Human Services Secretary Robert F. Kennedy, Jr.** "They betrayed their oath to first do no harm, and their so-called 'gender-affirming care' has inflicted lasting physical and psychological damage on vulnerable young people. That is not medicine — it's malpractice."

"This report marks a turning point for American medicine," said **National Institutes of Health Director Jay Bhattacharya, MD, PhD.** "The evidence in it meticulously documents the risks the profession has imposed on vulnerable children. At the NIH, we are committed to ensuring that science, not ideology, guides America's medical research."

"What are we going to tell the young people who can't have children because the medical profession stole that from them?" said **Assistant Secretary for Health Brian Christine, MD.** "Our report is an urgent wake up call to doctors and parents about the clear dangers of trying to turn girls into boys and vice-versa."

Before submitting its report for peer review, HHS commissioned the most comprehensive study to date of the scientific evidence and clinical practices surrounding the treatment of children and adolescents for "gender dysphoria." The authors were drawn from disciplines and professional backgrounds spanning medicine, bioethics, psychology, and philosophy.

1:18 PM · Nov 19, 2025 · **57.9K** Views

 20     95      314     23

# **EXHIBIT 20**



**Calley Means** ✔
@calleymeans

Happy Easter.

We are fighting against demonic forces but light is shining through.

> The American Academy of Pediatrics, which sets the standard of care for U.S. children, has received major donations from pharmaceutical companies that make puberty blockers and from processed food companies.
>
> In 2023, the AAP reaffirmed its support for puberty blockers as part of gender-affirming care for transgender youth. These drugs, often used around age 9 at the onset of puberty, pause physical development to allow time for gender identity exploration.
>
> The AAP has not taken a formal stance that ultra-processed food is harmful to children and has not identified it as a key driver of chronic disease or called for regulatory action against the food industry.

3:01 PM · Apr 20, 2025 · **153.3K** Views

 89      448      2.8K      84

# **EXHIBIT 21**

# Articles of Incorporation

Certificate Number 2105

S T A T E   O F   I L L I N O I S

OFFICE OF

THE SECRETARY OF STATE

TO ALL TO WHOM THESE PRESENTS SHALL COME, GREETING:

WHEREAS, a CERTIFICATE, duly signed and acknowledged, has been filed in the Office of the Secretary of State, on the 10th day of July, A. D. 1930, for the organization of the

AMERICAN ACADEMY OF PEDIATRICS

under and in accordance with the provisions of "AN ACT CONCERNING CORPORATIONS" approved April 18, 1872, and in force July 1, 1872, and all acts amendatory thereof, a copy of which certificate is hereto attached;

NOW THEREFORE, I, WILLIAM J. STRATTON, Secretary of State of the State of Illinois, by virtue of the powers and duties vested in me by law, do hereby certify that the said AMERICAN ACADEMY OF PEDIATRICS is a legally organized Corporation under the laws of this State.

IN TESTIMONY WHEREOF, I hereto set my hand and cause to be affixed the Great Seal of the State of Illinois.  Done at the City of Springfield this 10th day of July, A. D. 1930, and of the Independence of the United States the one hundred and 55th.

( S E A L )                    WILLIAM J. STRATTON

                                       SECRETARY OF STATE.

Downloaded from http://publications.aap.org/aapbooks/book/chapter-pdf/1596451/aap_9781610025232-articles_of.pdf by guest

27

STATE OF ILLINOIS
DEPARTMENT OF PUBLIC WELFARE
SPRINGFIELD

Rodney H. Brandon, Director          Mrs. Mary L. Silvis, Assistant Director
A. L. Bowen, Superintendent of Charities      Frank D. Whipp, Superintendent of Prisons
Sidney D. Wilgus, M.D., Alienist          Paul L. Schroeder, M.D., Criminologist
E. F. Throgmorton, Fiscal Supervisor      W. C. Jones, Chairman, Pardons and Parole

July 10, 1930

In re - AMERICAN ACADEMY OF PEDIATRICS

Hon. Wm. J. Stratton,
Secretary of State,
B u i l d i n g.

Dear Mr. Stratton:

This department has made
investigation of the above application for
charter and it is found that the work proposed
does not come within our jurisdiction.

Certificate, in duplicate,
is returned herewith.

Very truly yours,

RODNEY H. BRANDON

MLS:J                    Director.
Encl

Downloaded from http://publications.aap.org/aapbooks/book/chapter-pdf/1596451/aap_9781610025232-articles_of.pdf
by guest

28

THIS STATEMENT MUST BE FILED IN DUPLICATE

FEE $10

STATE OF ILLINOIS, )
                   } ss.
Cook County,       )

P A I D
JUL 10 1930
I.F. $10.00
F.T.

To WILLIAM J. STRATTON, Secretary of State:

We, the undersigned Isaac A. Abt, C. Anderson Aldrich, Clifford G. Grulee, citizens of the United States, propose to form a corporation under an Act of the General Assembly of the State of Illinois, entitled, "An Act concerning Corporations," approved April 18, 1872, and all acts amendatory thereof; and for the purpose of such organization we hereby state as follows, to-wit:

1. The name of such corporation is AMERICAN ACADEMY OF PEDIATRICS.

2. The object for which it is formed is to foster and stimulate interest in pediatrics and correlate all aspects of work for the welfare of children which properly comes within the scope of pediatrics; to promote and maintain the highest possible standards for pediatric education in medical schools and hospitals, pediatric practice and research; to perpetuate the history and best traditions of pediatrics and ethics; to maintain the dignity and efficiency of pediatric practice in its relationship to public welfare; to promote publications and encourage contributions to medical and scientific literature pertaining to pediatrics; none of which objects is for pecuniary profit.

3. The management of the aforesaid American Academy of Pediatrics shall be vested in a board of seven Directors, to be known as the Executive Board.

4. The following persons are hereby selected as the Directors to control and manage said corporation for the first year of its corporate existence, viz:

| NAME | ADDRESS | | | |
|------|---------|--|--|--|
| | NUMBER | STREET | CITY | STATE |
| Isaac A. Abt | 4810 Kenwood Avenue, Chicago, Ill. | | | |
| C. Anderson Aldrich | 1189 Oakley Avenue, Winnetka, Ill. | | | |
| Clifford G. Grulee | 1410 Asbury Avenue, Evanston, Ill. | | | |
| Samuel McC. Hamill | 1822 Spruce Street, Philadelphia, Pa. | | | |
| William P. Lucas | 2449 Pacific Avenue, San Francisco, Cal. | | | |
| John L. Morse | 169 Park Street, Newton, Mass. | | | |
| Lawrence T. Royster | University, Va. | | | |

5. The location is in the city of Chicago in the county of Cook in the State of Illinois, and the postoffice address of its business office is at No. 310 S. Michigan Avenue in the said City of Chicago.

(SIGNED,

C. ANDERSON ALDRICH
CLIFFORD G. GRULEE
ISAAC A. ABT.

Downloaded from http://publications.aap.org/aapbooks/book/chapter-pdf/1596451/aap_9781610025232-articles_of.pdf by guest

29

STATE OF ILLINOIS,  }
                    } ss.
Cook County,        }

    I, John Stone, a Notary Public in and for the County and State aforesaid, do hereby certify that on this 7th day of July, A. D. 1930, personally appeared before me Isaac A. Abt, C. Anderson Aldrich, and Clifford G. Grulee, to me personally known to be the same persons who executed the foregoing certificate, and severally acknowledged that they had executed the same for the purposes therein set forth.

    IN WITNESS WHEREOF, I have hereunto set my hand and seal the day and year above written.

                              JOHN STONE

(SEAL)                          Notary Public.


                        F I L E D
                      JUL 10 1930
               William J. Stratton
                Sec'y of State


State of Illinois)
Cook. Co.       ) S.S. No. 10702876

1930-July 11-P.M.-355

and recorded in Book 636, Page 555

              Recorder

              Clayton Smith

Downloaded from http://publications.aap.org/aapbooks/book/chapter-pdf/1596451/aap_9781610025232-articles_of.pdf by guest

# **EXHIBIT 22**

| | |
|---|---|
| **From:** | Kim, Laura |
| **To:** | Ashe, Gregory |
| **Cc:** | Remick, Ali; Chiang, Annie; Hitchcock, Jennie; Clausen, Hans |
| **Subject:** | RE: CID to AAP |
| **Date:** | Saturday, January 31, 2026 11:25:16 AM |
| **Attachments:** | image001.png |

Thank you, Greg.  I was traveling yesterday and appreciate you setting up the meeting for Monday.

Have a good weekend,
Laura

**From:** Ashe, Gregory <GASHE@ftc.gov>
**Sent:** Friday, January 30, 2026 4:04 PM
**To:** Kim, Laura <LKim@cov.com>
**Cc:** Remick, Ali <ARemick@cov.com>; Chiang, Annie <achiang@ftc.gov>; Hitchcock, Jennie <jhitchcock@ftc.gov>; Clausen, Hans <hclausen@ftc.gov>
**Subject:** RE: CID to AAP

<mark>[EXTERNAL]</mark>
Laura,

We didn't hear back, so let's plan on 3:00 on Monday.  I will send a scheduler.

Gregory Ashe
Senior Staff Attorney
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
(202) 326-3719 (o)
(202) 758-5438 (m)

**From:** Ashe, Gregory <GASHE@ftc.gov>
**Sent:** Friday, January 30, 2026 11:18 AM
**To:** Kim, Laura <LKim@cov.com>
**Cc:** Remick, Ali <ARemick@cov.com>; Chiang, Annie <achiang@ftc.gov>; Hitchcock, Jennie <jhitchcock@ftc.gov>; Clausen, Hans <hclausen@ftc.gov>
**Subject:** Re: CID to AAP

Hi Laura,

Would your team be available today at 4:30, 5:30, or 6:30?  Thanks.

Greg

Get Outlook for iOS

---

**From:** Kim, Laura <LKim@cov.com>
**Sent:** Friday, January 30, 2026 12:35:09 AM
**To:** Ashe, Gregory <GASHE@ftc.gov>
**Cc:** Remick, Ali <ARemick@cov.com>
**Subject:** CID to AAP

You don't often get email from lkim@cov.com. Learn why this is important

Dear Greg, I hope you have been well.  I'm reaching out on behalf of the American Academy of Pediatrics to set up time for an initial meet and confer call.  Please let me know if there are some times on Monday that will work for you.  As of now, I could speak 1-2 pm, 3-4 pm, and after 4:30.  I look forward to speaking with you soon.

Best,
Laura

**Laura Kim**
Pronouns: She/Her/Hers

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5333 | lkim@cov.com
www.cov.com

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.

# **<u>EXHIBIT 23</u>**

| | |
|---|---|
| **From:** | Kim, Laura |
| **To:** | Ashe, Gregory; Chiang, Annie; jcohen2@ftc.gov |
| **Cc:** | Remick, Ali |
| **Subject:** | CID to AAP |
| **Date:** | Wednesday, February 4, 2026 11:12:46 PM |
| **Attachments:** | image001.png |

---

Confidential

Jonathan, Greg, and Annie:

Thank you for your time on Monday to discuss our concerns about the CID issued to AAP.  We are reaching out for a status update following that discussion, as the concerns we raised remain outstanding, as well as our request for an extension of our petition to quash deadline.  As we continue to analyze the CID, we remain concerned about the First Amendment implications of the CID, including but not limited to several of the CID's broad requests, such as the requests that seek communications reflecting inter-organizational deliberations about the development of guidance materials like the 2018 Policy Statement, as well as the identities of all entities and individuals involved.  *See, e.g.,* CID A.8, A.13, B.4, B.5.  *Morton Salt,* grounded in the Fourth Amendment, requires that a CID's requests be within the authority of the agency, the demand not be too indefinite and the information sought be reasonably relevant.  And when the First Amendment is implicated, that standard is applied even more strictly.  The overbreadth of these requests, among others, do not meet this standard.

We look forward to hearing from you and continuing to discuss these concerns.

Best,
Laura

**Laura Kim**
Pronouns: She/Her/Hers

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5333 | lkim@cov.com
www.cov.com

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.

# **EXHIBIT 24**

| **From:** | Cohen, Jonathan |
| **To:** | Kim, Laura; Remick, Ali |
| **Cc:** | Chiang, Annie; Hitchcock, Jennie; Clausen, Hans; White, Katherine |
| **Subject:** | CID to AAP |
| **Date:** | Thursday, February 5, 2026 7:28:48 PM |
| **Attachments:** | AAP 020526.pdf |

[EXTERNAL]

Counsel,

Please see the attached correspondence.

Thanks,

**Jonathan Cohen**
Chief Litigation Counsel
Bureau of Consumer Protection | Federal Trade Commission
600 Pennsylvania Avenue, N.W., HQ-462  Washington, D.C.  20580
(202) 326-2551  | jcohen2@ftc.gov



United States of America
**FEDERAL TRADE COMMISSION**
600 PENNSYLVANIA AVE. NW, CC-9528
WASHINGTON, DC 20580

Bureau of Consumer Protection
Chief Litigation Counsel

**Jonathan Cohen**
**(202) 326-2551; jcohen2@ftc.gov**

February 5, 2026

**VIA EMAIL**

Laura M. Kim, Esq. (LKim@Covington.com)
Alexandra Remick (ARemick@Covington.com)
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-5333

Re:    **Civil Investigative Demand to AAP**

Counsel,

Thank you for meeting with us earlier this week (February 2) regarding the Commission's Civil Investigative Demand ("CID") to the American Academy of Pediatrics ("AAP"). During that meet-and-confer, we discussed several matters, including some raised by each side, and we also offered you a proposed production schedule. We also received an email from you this morning (sent very late last night) that raised new issues concerning requests covering "inter-organizational deliberations about the development of guidance materials," and the Supreme Court's 1950 *Morton Salt* decision. *See United States v. Morton Salt*, 338 U.S. 632. Below, we summarize our dialogue earlier this week as well as make some modifications.

**I.    Document Retention and Production**

During our meeting, you confirmed that AAP has imposed a litigation hold, but you were not yet prepared to discuss: (i) how documents responsive to the requests in the Commission's CID are stored or maintained at AAP and what records management systems it has; (ii) the custodians that would have responsive documents within their possession, custody, and control; (iii) your process for reviewing documents to determine responsiveness as well as your privilege review and how and when you will assert protected status claims; or (iv) whether you plan to use certain tools, like AI or Technology Assisted Review (TAR), to review and identify responsive documents.

We explained that if you plan to use any AI-assisted program or tool in connection with your response, then you must disclose this to us. You may not use TAR or AI without our consent, although we would work with you in good faith to attempt to reach an agreement should you propose to use TAR or AI. We further explained that, with respect to privilege logs, AAP must comply with Commission rules, and it must produce logs contemporaneously with the associated production.

## II.     Scope of the CID

During our meeting, we also discussed six issues or sets of issues you raised. In particular:

- You stated that AAP, in your view, is not a "person, partnership, or corporation" under the FTC Act. 15 U.S.C. § 45(a)(2). We indicated that we have not yet determined whether AAP qualifies (indeed, determining this is one of the CID's purposes) and, in any event, whether AAP is ultimately subject to FTC substantive enforcement authority is irrelevant to whether the CID is appropriate (which it is). As we explained, the Commission's authority to issue CIDs is broader than its authority to institute litigation; AAP need only possess information "relevant to" unfair or deceptive acts in or that affect commercial activity. *See* 15 U.S.C. 57b-1(c)(1).

- You asserted that AAP's 2018 Policy Statement, "Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents," is not commercial speech because AAP offers the document for free. However, as we explained, whether AAP charges anyone for the document is immaterial to whether it disseminated it directly or indirectly to consumers (or even whether it qualifies as commercial speech; much advertising is disseminated to consumers for free).

- You questioned whether we had "given any thought" to whether the CID infringes on your client's First Amendment rights. We assured you that we had, and that it does not. We further expressed our willingness to discuss this issue further. To the extent you raise specific arguments with us, or direct us to particular caselaw, we would welcome that.

- You contended that the CID specifications either exceed the Commission's authority under the applicable resolutions or the general subject of the investigation the CID specifies. In short, we disagree with your position, which ignores the appropriate breadth of the language at issue.

- You asked us to consider whether certain specifications that lack a time limit should have one. The CID is appropriate as written because the FTC Act has no statute of limitations. However, in the interest of compromise, we narrow the CID as follows: For Document Request Nos. 1-3 and Interrogatories 8 and 13, we will limit the period from **January 1, 2015, to the present**. This precedes the 2018 Policy Statement—central to the CID—by approximately three years. Notably, Request Nos. 4-5, which seek Communications with Professional Medical Organizations and other organizations, are inherently time limited because they seek documents "related to the 2018 Policy Statement, 2023 Reaffirmation, and SOC 8," which are defined by the CID. Accordingly, we cannot agree to further limit these requests.

- Finally, you argued that various standard CID terms are overbroad:

  - Some requests seek "all" or "any" materials of a certain type. Such requests are commonplace and certainly proportional to this investigation's consequential nature. More important, because you were not yet prepared to

2

address basic issues concerning your client's compliance with the CID – such as document storage and retrieval mechanisms, custodians, and the like – you have left us without any way to evaluate this general objection. We would welcome the opportunity to learn more; if it becomes apparent that we can narrow requests and still obtain the information we need, we will do so.

○    The definition of "documents" comports with that used in CIDs and, more generally, in federal litigation. And other qualifying language limits the type of "documents" that particular specifications request. To the extent that you have particular concerns about the burden some aspect of the definition would raise, either generally or as applied to a particular request, please explain your view to us. As noted already, without basic information regarding how AAP stores information or what responsive documents might exist, you have left us unable to address your concern.

○    The definition of "AAP" includes standard language encompassing "subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, members, employees, agents, consultants, and other persons working for or on behalf of the foregoing." In this context, "members" refers to LLC members; please do not overread the word to support an objection where none exists. In any event, and as we explained yesterday, you should construe "members" in the definition to include only "LLC members," to the extent any exist. This CID does not seek a response on behalf of thousands of individual AAP members, nor is that our intent.

You did not raise any substantive issues with us during the meeting other than those addressed above.

## III.    Production Schedule and Deadlines

At the close of our meeting, we proposed a production schedule, which is reflected below. Assuming AAP agrees to accept service, forgo any petition to quash ("PTQ"), and continue engaging with us in good faith (all standard requirements), we will extend the CID's return date as follows:

- By February 16, you will respond fully to Document Request Nos. 9 and 11;

- By March 16, you will respond fully to five Document Requests of your choosing and five Interrogatories of your choosing (except that you may not select Interrogatory 15 or Request 12 (those logically come last)); and

- By April 16, you will respond fully to all remaining Document Requests and Interrogatories.

For all production deadlines, you will produce the related privilege log simultaneously with your production. This proposed production schedule affords you ninety days to complete your response, which is eminently reasonable. Moreover, it provides AAP extensive discretion over the order in which it produces material.

Relatedly, we made clear that we cannot agree to extend the PTQ deadline – an enormous concession on our part – without a reciprocal commitment from AAP to respond fully to Document Request Nos. 9 and 11 by an agreed date. To that end, we proposed, in the alternative, extending

3

AAP's PTQ deadline in exchange for your agreement that AAP will respond fully to Document Request Nos. 9 and 11 by February 16.

Finally, we expressed our willingness to carefully consider any facts or law AAP provides to us, such as through a White Paper addressing AAP's status under the FTC Act. But we cannot agree to defer your CID response while you prepare one.

## IV.    Yesterday Evening's Email

In yesterday evening's email, you raised two new issues, including an apparent objection to requests encompassing "inter-organizational deliberations about the development of guidance materials," and an opaque reference to the Fourth Amendment and *Morton Salt*. Please explain these objections to us so that we may consider them and respond.

As a formal matter, and in conformance with the applicable rules, we note that Deputy Director Kate White has endorsed the CID modifications this correspondence contains.

We look forward to hearing from you.

Very truly yours,

Chief Litigation Counsel
Bureau of Consumer Protection

CC:    Via Email

Kate White, Deputy Director
Annie Chaing
Jennie Hitchcock
Hans Clausen
Bureau of Consumer Protection
Federal Trade Commission

4

# **EXHIBIT 25**

| | |
|---|---|
| **From:** | Remick, Ali |
| **To:** | Cohen, Jonathan; Kim, Laura |
| **Cc:** | Chiang, Annie; Hitchcock, Jennie; Clausen, Hans; White, Katherine |
| **Subject:** | RE: CID to AAP |
| **Date:** | Friday, February 6, 2026 4:46:04 PM |
| **Attachments:** | 2026.02.06-Letter from AAP to FTC.pdf |
| | image001.png |

Counsel,

Please see the attached correspondence.

Best,

Ali

## Alexandra Remick

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5932 | aremick@cov.com
www.cov.com

---

**From:** Cohen, Jonathan <jcohen2@ftc.gov>
**Sent:** Thursday, February 5, 2026 7:28 PM
**To:** Kim, Laura <LKim@cov.com>; Remick, Ali <ARemick@cov.com>
**Cc:** Chiang, Annie <achiang@ftc.gov>; Hitchcock, Jennie <jhitchcock@ftc.gov>; Clausen, Hans <hclausen@ftc.gov>; White, Katherine <kwhite@ftc.gov>
**Subject:** CID to AAP

**[EXTERNAL]**

Counsel,

Please see the attached correspondence.

Thanks,

**Jonathan Cohen**
Chief Litigation Counsel
Bureau of Consumer Protection | Federal Trade Commission
600 Pennsylvania Avenue, N.W., HQ-462 Washington, D.C. 20580
(202) 326-2551 | jcohen2@ftc.gov

# COVINGTON

BEIJING  BOSTON  BRUSSELS  DUBAI  FRANKFURT
JOHANNESBURG  LONDON  LOS ANGELES  NEW YORK
PALO ALTO  SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

**Laura Kim**

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 5333
lkim@cov.com

**CONFIDENTIAL TREATMENT REQUESTED**

February 6, 2026

**By Email:** jcohen2@ftc.gov

Jonathan Cohen
Chief Litigation Counsel
Federal Trade Commission
600 Pennsylvania Ave. NW
Washington, DC 20580

Re:    Civil Investigative Demand to AAP

Counsel:

We write to respond to your letter dated February 5, 2026 in connection with the Civil Investigative Demand ("CID") issued to the American Academy of Pediatrics ("AAP"). As we stated during our meet and confer call on February 2, we respectfully request the opportunity to have a fuller discussion of AAP's concerns regarding the FTC's authority to issue the CID—but this process would be facilitated without the impending Petition to Quash deadline on Monday, February 9. We understand from your letter, delivered two business days before the deadline, that staff continues to refuse to grant any extension on the Petition to Quash absent AAP responding fully to two specifications a month before the return date. We appreciate your consideration of the points reiterated below, and look forward to your response.

We remain concerned about all of the issues we raised in our first meet and confer conference on Monday, February 2, 2026. During that call, which lasted approximately an hour and fifteen minutes, staff did not resolve any of those concerns. Staff's letter, sent more than three days later and only after my follow-up email, also did not resolve those concerns. To reiterate, those concerns are the following:

- <u>FTC's Authority to Investigate AAP</u>:  AAP remains concerned that the CID seeks to investigate AAP as having allegedly violated the FTC Act. But AAP is not a "person, partnership, or corporation" that could violate the FTC Act. On our call, staff did not provide a satisfactory answer to this concern, and instead simply stated that AAP *may* be a target of the investigation. Staff's letter fails to engage with our concern by simply asserting it has broad investigatory authority.

- <u>FTC's Authority to Investigate AAP's Speech</u>:  We are also concerned that the statements the CID is targeting are not "in commerce." At our meet and confer, we explained that the CID appeared to be targeting guidance intended for clinicians, and offered the 2018 Policy Statement, "Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents" as an example of such speech. Instead of engaging with our concern, staff simply said the meet and confer process was "not the forum or venue for having this discussion" and that whether the speech was in commerce did not "make a difference." Staff's letter does not engage with this concern besides asserting that the fact that the guidance is free to the public is irrelevant (a point with which we disagree).

**CONFIDENTIAL TREATMENT REQUESTED**

**COVINGTON**

Jonathan Cohen
February 6, 2026
Page 2

- <u>First Amendment</u>:  We explicitly asked staff why the CID did not abridge AAP's First Amendment rights and would not chill medical discourse.  We also identified particular categories of requests that implicated these concerns, for instance the requests seeking internal deliberations about the development of AAP's guidance.  In response to the First Amendment concerns, staff stated he was "very reluctant to accept" that AAP would be chilled from doing anything.  Staff claimed this case was not *Media Matters*, that discussing this issue was not "constructive," and that the Commission had considered First Amendment concerns and there were none.  Staff's letter simply repeats that there are no First Amendment issues with the CID, but we remain seriously concerned.  It is well-settled that the First Amendment protects organizations from content-based restrictions and against government retaliation for an organization's speech.  *See, e.g.*, *National Institute of Family and Life Advocates  v. Becerra*, 585 U.S. 755, 756 (2018); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011).  These principles are the core of First Amendment jurisprudence such that AAP should not need to direct the FTC to every Supreme Court case, of which there are many, that reaffirms these constitutional protections.  In particular, as we already explained, the CID could have a significant chilling effect on medical discourse and AAP's ability to freely associate with other organizations.

- <u>Commission Resolutions</u>:  We also raised concerns that the Resolutions attached to the CID did not appear to support the Subject of Investigation identified in the CID.  In response, staff simply asserted that there is a "clear basis" for the investigation.  Staff's letter similarly does not engage with our concerns.

- <u>Burden</u>:  Finally, we raised several specific concerns related to the burden imposed by the CID.  We appreciated staff's clarification about the meaning of "members" in the CID, and in staff's letter.  However, staff's letter otherwise does little to ameliorate AAP's burden concerns and claims that further modifications cannot be made because AAP has not shared detailed information about custodians and document storage mechanisms yet.  As we explained on our call, AAP needs more information from the FTC about the scope of its requests in order to identify appropriate custodians in the first place.  The FTC has not established why it needs "any" and "all" such materials beyond simply asserting that these requests are "certainly proportional to this investigation's consequential nature."  AAP would like to understand more about staff's basis for this assertion of proportionality, as well as to gather additional information about the burden on AAP, all of which would be facilitated with additional time to permit additional analysis of the CID.  To that end, we again request an extension of the Petition to Quash deadline, which as you know expires on Monday, February 9, 2026.

- *Morton Salt* & the Fourth Amendment:  Staff's letter asserts that AAP raised "two new issues" in an email on February 4, 2026.  This is false.  We specifically raised with staff during our lengthy discussion the requirement set forth in *Morton Salt* that a CID must be within the FTC's authority and the information sought must be relevant to a lawful purpose.  Our concern remains the same – the CID does not appear to be within the FTC's authority, and it is not clear how the information sought is relevant to any lawful purpose.  And when First Amendment concerns are implicated, the *Morton Salt* standard is applied even more strictly.

**CONFIDENTIAL TREATMENT REQUESTED**

**COVINGTON**

Jonathan Cohen
February 6, 2026
Page 3

Staff's letter concludes by stating: "You did not raise any substantive issues with us during the meeting other than those addressed above." This is incorrect. We opened the meeting by asking staff *why* the Commission was investigating AAP, given the highly unusual nature of an FTC CID being issued to a non-profit organization that provides scientific and medical information to educate medical professionals. We specifically asked about the genesis of the investigation, and what the Commission's purpose was in conducting it. Staff stated that he could not provide that information, and that AAP could "infer" from the CID that there were concerns about representations made to "consumers" about the safety and efficacy of certain "purported treatments for pediatric gender dysphoria." This response from staff, and the lack of any acknowledgment of this concern in staff's letter, has done little to assure AAP that the Commission's issuance of the CID complies with all requirements of the First Amendment, the FTC Act, and applicable law.

We reiterate that AAP wishes to have the opportunity to continue to discuss these concerns with staff, but the Petition to Quash deadline is just one business day away on February 9, 2026. Staff has refused to extend this deadline unless AAP begins responding to the CID a month before the return date. Many of our concerns go to the question of whether *any* of the requests in the CID were appropriately issued. As such, we once again request that staff extend the Petition to Quash deadline so that the parties may continue to meet and confer in good faith and discuss these concerns.

*      *      *

The responses in this letter are made only on behalf of AAP and only for the purposes of the CID. AAP considers this letter, any accompanying documents, and any information derived therefrom (collectively, the "Confidential Information") to be confidential and exempt from disclosure under the Freedom of Information Act ("FOIA"), the Federal Trade Commission Act ("FTC Act") Sections 6(f) and 21, 16 C.F.R. § 4.10, and any other applicable statute or regulation. Disclosure of the Confidential Information may cause substantial harm to AAP. Accordingly, AAP requests notice and an opportunity to seek protection prior to any disclosure of the Confidential Information by the FTC. AAP is providing the Confidential Information on the basis that all such information will receive the full range of confidentiality protection available under FOIA, the FTC Act, the Commission's Rules of Practice, and any other applicable statutes, regulations, and rules. For that reason, AAP has marked this letter with the header "Confidential Treatment Requested."

This request for confidentiality is not to be construed as a waiver of any protection from disclosure or confidential treatment accorded by law, including, but not limited to, the attorney-client privilege or the work-product doctrine. AAP reserves the right to rely on and invoke any such protection as appropriate.

Sincerely,

*/s/ Laura Kim*

Laura Kim
Alexandra Remick

CC: Via Email
Annie Chiang
Jennie Hitchcock
Hans Clausen
Katherine White

# EXHIBIT 26

| From: | Kim, Laura |
|---|---|
| To: | Cohen, Jonathan |
| Cc: | Chiang, Annie; Hitchcock, Jennie; Clausen, Hans; White, Katherine; Remick, Ali |
| Subject: | RE: CID to AAP |
| Date: | Sunday, February 8, 2026 5:12:19 PM |
| Attachments: | image001.png |

Jonathan,

Thank you for your response to our letter.  We had hoped that AAP's good faith offer to continue to meet and confer to try to understand the nature of the FTC's inquiry, in exchange for a modest extension of the Petition to Quash deadline, would be seriously considered—particularly given the significant jurisdictional and constitutional issues we raised on Monday.  Rather than offering "nothing at all," AAP had specifically offered to share more information about why AAP and the targeted statements fall outside the FTC's enforcement authority.  However, we understand your position to be that AAP has offered nothing and no extension will be granted unless AAP agrees to produce documents 30 days in advance of the CID return date.

The FTC's Rules require that the recipient of a CID meet and confer with staff within 14 days.  AAP reached out to schedule a meet and confer in compliance with this requirement.  On that call, AAP raised several important issues, which included the First Amendment.  We were prepared to discuss these issues in an attempt to try to resolve or at least narrow them, but staff was not willing or able to discuss these issues in a meaningful way.

A modest extension of the deadline would have benefited both parties by providing us additional time to try to resolve or at least narrow the issues of concern, but we understand your position to be that no additional time will be provided.

Best,
Laura

---

**From:** Cohen, Jonathan <jcohen2@ftc.gov>
**Sent:** Saturday, February 7, 2026 3:42 PM
**To:** Kim, Laura <LKim@cov.com>
**Cc:** Chiang, Annie <achiang@ftc.gov>; Hitchcock, Jennie <jhitchcock@ftc.gov>; Clausen, Hans <hclausen@ftc.gov>; White, Katherine <kwhite@ftc.gov>; Remick, Ali <ARemick@cov.com>
**Subject:** RE: CID to AAP

[EXTERNAL]
Laura,

We understand that you maintain your position that we should afford AAP an extension in exchange for nothing at all.   There is no counteroffer here for us to

consider, let alone accept.

Particularly given the absence of a counteroffer, we presume AAP will proceed with a PTQ, so we're not going to respond to your correspondence point-by-point.  But I note that the two of us have disagreed in the past regarding attempts to recount conversations between the FTC and Covington.  Your letter is both overinclusive and underinclusive in important respects.  For instance, the correspondence begins its chronology in the middle, neglecting to mention that AAP received the CID on January 16, yet did not contact us until January 30.  We then spoke on February 2, which was the date you proposed.  As you explained, Covington represents AAP in other matters; we don't know what accounts for this considerable delay (when the parties could have been discussing and negotiating).  You also omit that our February 2 meet-and-confer call occurred during a government shutdown and that we made a point to explain to you that we might need some time to send follow-up correspondence that would convey our oral offer to extend the PTQ deadline in writing, and to confirm modifications to the CID.  To provide another example, we did discuss First Amendment issues, but you did not present specific legal or factual arguments to us as much as probe our views, and you certainly did not assert that the CID was somehow retaliatory or is otherwise a content-based speech restriction (it is neither).

Despite all this, if we misunderstand the absence of a counteroffer or there is another opportunity to avoid a PTQ (without an entirely unilateral concession from us), please let us know.

**Jonathan Cohen**
Chief Litigation Counsel
Bureau of Consumer Protection  |  Federal Trade Commission
600 Pennsylvania Avenue, N.W., HQ-462  Washington, D.C.  20580
(202) 326-2551  |  jcohen2@ftc.gov

---

**From:** Remick, Ali <ARemick@cov.com>
**Sent:** Friday, February 6, 2026 4:46 PM
**To:** Cohen, Jonathan <jcohen2@ftc.gov>; Kim, Laura <LKim@cov.com>
**Cc:** Chiang, Annie <achiang@ftc.gov>; Hitchcock, Jennie <jhitchcock@ftc.gov>; Clausen, Hans

<[hclausen@ftc.gov](mailto:hclausen@ftc.gov)>; White, Katherine <[kwhite@ftc.gov](mailto:kwhite@ftc.gov)>
**Subject:** RE: CID to AAP

Counsel,

Please see the attached correspondence.

Best,
Ali

**Alexandra Remick**

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5932 | [aremick@cov.com](mailto:aremick@cov.com)
[www.cov.com](http://www.cov.com)

---

**From:** Cohen, Jonathan <[jcohen2@ftc.gov](mailto:jcohen2@ftc.gov)>
**Sent:** Thursday, February 5, 2026 7:28 PM
**To:** Kim, Laura <[LKim@cov.com](mailto:LKim@cov.com)>; Remick, Ali <[ARemick@cov.com](mailto:ARemick@cov.com)>
**Cc:** Chiang, Annie <[achiang@ftc.gov](mailto:achiang@ftc.gov)>; Hitchcock, Jennie <[jhitchcock@ftc.gov](mailto:jhitchcock@ftc.gov)>; Clausen, Hans <[hclausen@ftc.gov](mailto:hclausen@ftc.gov)>; White, Katherine <[kwhite@ftc.gov](mailto:kwhite@ftc.gov)>
**Subject:** CID to AAP

[EXTERNAL]
Counsel,

Please see the attached correspondence.

Thanks,

**Jonathan Cohen**
Chief Litigation Counsel
Bureau of Consumer Protection | Federal Trade Commission
600 Pennsylvania Avenue, N.W., HQ-462  Washington, D.C.  20580
(202) 326-2551  | [jcohen2@ftc.gov](mailto:jcohen2@ftc.gov)

# EXHIBIT 27

**PUBLIC**

# COVINGTON

BEIJING  BOSTON  BRUSSELS  DUBAI  FRANKFURT
JOHANNESBURG  LONDON  LOS ANGELES  NEW YORK
PALO ALTO  SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

**Laura Kim**

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 5333
lkim@cov.com

**By Email and Hand Delivery**                    February 9, 2026

April J. Tabor
Secretary
Office of the Secretary
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
atabor@ftc.gov

　　　　Re:  FTC Matter No. P264800

Dear Madam Secretary:

　　　　Pursuant to 16 C.F.R. § 2.10 and § 4.2, enclosed please find American Academy of Pediatrics' Petition to Quash or Limit the United States Federal Trade Commission's Civil Investigative Demand dated January 15, 2026, in the above-referenced matter.

Respectfully submitted,

Laura Kim

Enclosures

cc:　　Via Email

　　　　Office of the Secretary
　　　　Jonathan Cohen
　　　　Gregory Ashe
　　　　Annie Chiang
　　　　Jennie Hitchcock
　　　　Hans Clausen

　　　　Via Hand Delivery

　　　　Office of the Secretary

**PUBLIC**

**BEFORE THE UNITED STATES**
**FEDERAL TRADE COMMISSION**

|  |  |  |
|---|---|---|
| In the Matter of | ) | **PUBLIC** |
|  | ) |  |
| Civil Investigative Demand | ) | File No. P264800 |
| dated January 15, 2026, to American Academy | ) |  |
| of Pediatrics | ) |  |
|  | ) |  |

## PETITION TO QUASH OR LIMIT CIVIL INVESTIGATIVE DEMAND

Pursuant to 16 C.F.R. § 2.10(a), Petitioner American Academy of Pediatrics requests that the Federal Trade Commission ("FTC" or "Commission") quash the Civil Investigative Demand dated January 15, 2026 (the "CID," attached as Exhibit 1). The CID should be quashed in its entirety because it: (1) exceeds the scope of the Commission's authority to investigate; (2) violates the First Amendment; (3) was not issued pursuant to a Commission Resolution; and (4) is overbroad and unduly burdensome.

## BACKGROUND AND PROCEDURAL HISTORY

The American Academy of Pediatrics ("AAP") is an Illinois-based 501(c)(3) non-profit organization. For nearly 100 years, AAP has been dedicated to improving the health of all children. *See* AAP Articles of Incorporation, attached as Exhibit 2. As part of that mission, AAP has issued clinical guidance, such as its 2018 Policy Statement and 2023 Reaffirmation of that Statement (attached as Exhibit 3), to educate medical professionals about gender-affirming care ("GAC") for youth with gender dysphoria.[1] The medical community recognizes GAC as the appropriate treatment for those youth. As with any medical treatment, the decision to begin GAC

---

[1] Gender dysphoria is a condition characterized by clinically significant distress or impairment in social, occupational, or other important areas of functioning due to an incongruence between a patient's gender identity and sex assigned at birth.

1

is an individualized one that should be made in consultation with the patient's family and medical professionals.  AAP's guidance materials are offered for free to the public.[2]  Importantly, AAP does not offer or advertise GAC or any medical products or services to patients.

On January 20, 2025, the President elevated FTC Commissioner Andrew Ferguson to Chairman.[3]  In accepting this role, the Chairman confirmed the agency would be acting "[u]nder the President's leadership."[4]  Eight days later, the President signed Executive Order No. 14187 directing various executive branch agencies to "end" the practice of GAC.[5]  In March 2025, the Chairman voiced his support for the President's firing of Democratic commissioners, stating that the President "is vested with all of the executive power in our government."[6]  In July 2025, the FTC held a workshop entitled, "The Dangers of 'Gender-Affirming Care' For Minors."[7]  Chairman Ferguson asserted that the workshop was about "the parents and kids the Biden Administration chose to ignore" and "healing the wounds that proponents of [GAC] may have inflicted on our nation's children and parents, and preventing the potential for future harm."[8]

On January 15, 2026, the FTC issued the CID to AAP.  The CID identifies the "Subject of Investigation" as:

> Whether the Organization, or any other Person . . . have made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in

---

[2] *See* Exhibit 3.

[3] *See* Press Release, FTC, Andrew N. Ferguson Takes Over as FTC Chairman (Jan. 22, 2025), https://perma.cc/ZSN6-RNAC.

[4] *See id.*

[5] Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025).

[6] Statement of Chairman Andrew N. Ferguson, FTC (Mar. 18, 2025), https://perma.cc/C9G9-WBCT.

[7] FTC, The Dangers of "Gender-Affirming Care" for Minors (July 9, 2025), https://perma.cc/8UEN-AFV8.

[8] Transcript of Chairman Ferguson's Address at the Workshop, FTC (July 9, 2025), https://perma.cc/B6TR-PMUY.

> connection with the marketing and advertising of Pediatric Gender Dysphoria Treatment [("PGDT")] . . . [,] which, according to the Organization, purports to treat gender dysphoric or gender diverse minors, to consumers in violation of Sections 5 and 12 of the FTC Act[.]

The "Organization" is defined as AAP and its subsidiaries, directors, officers, members, employees, agents, consultants, and other persons working for or on behalf of the foregoing. AAP met and conferred with Commission staff on February 2, 2026, and raised the concerns discussed in this petition, as required by 16 C.F.R. § 2.7(k). AAP requested an extension of the Petition to Quash deadline to continue to meet-and-confer about the CID, but staff refused without a commitment from AAP to produce materials by February 16.

## ARGUMENT

The FTC's "[s]ubpoena enforcement power is not limitless." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 586 (D.C. Cir. 2001). Instead, this power is circumscribed by the Fourth Amendment, which permits compulsory process only if the inquiry is within the Commission's authority, the demand is not too indefinite, and the information sought is reasonably relevant to the inquiry. *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950). Furthermore, when the materials sought by an administrative subpoena implicate First Amendment protections, the Fourth Amendment's standards must be met with "scrupulous exactitude." *Zurcher v. Stan. Daily*, 436 U.S. 547, 564 (1978).

The CID fails to satisfy these standards. *First*, the CID targets AAP statements and activities that are beyond the FTC's regulatory authority because they are not "in or affecting commerce." The requests for AAP's statements and deliberations about GAC and its policy-development history have no relevance to any lawful inquiry into possible violations of Sections 5 or 12. *Second*, the CID purports to investigate AAP for violating the FTC Act, but AAP clearly falls outside the FTC's authority to enforce against "persons, partnerships, or corporations."

3

Insofar as the CID targets AAP, it demands information that has no relevance to a possible Section 5 or 12 violation. *Third*, the CID violates the First Amendment by targeting protected scientific, medical, and policy speech, compelling disclosure of AAP's associational materials, and constituting retaliation. *Fourth*, the CID was not issued pursuant to a Commission Resolution. *Finally*, the CID is overbroad and unduly burdensome.

## I.     The CID's Scope Exceeds the Commission's Authority to Investigate.

The Commission may issue a CID whenever it has "reason to believe that any person may . . . have any information, relevant to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title)." 15 U.S.C. § 57b-1(c)(1). This CID fails to meet that requirement because it seeks information that has no relevance to potential FTC Act violations and is thus plainly outside the scope of the FTC's investigatory authority. *First*, the CID targets non-commercial activities and statements, which the FTC Act does not authorize. *Second*, the CID identifies AAP as a potential FTC Act violator, even though it is not a "person, partnership, or corporation" that *could* violate the FTC Act. *Third*, given these points, there is no legitimate purpose for which the CID could have been issued. In fact, the CID violates AAP's First Amendment rights.

### A.     The CID Targets Non-Commercial Activities.

The FTC's authority is limited to acts or practices "in or affecting commerce." *See* 15 U.S.C. § 45(a)(1); *see also In re R.J. Reynolds Tobacco Co.*, 1988 WL 490114, *2 (1988) ("[U]nless the . . . advertisement can be classified as commercial speech, it is not subject to the Commission's jurisdiction."). The CID, however, seeks information about AAP statements and activities that are plainly non-commercial and thus outside the scope of the FTC's jurisdiction.

4

At its core, commercial speech "propose[s] a commercial transaction." *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 64 (1983). The Commission looks to multiple factors to determine if speech is commercial: (1) the speech's content, including whether it promotes demand for a product/service or refers to the attributes of a product/service, such as type, price, quality, or health effects; (2) the means used to publish the speech, including whether it is paid-for; and (3) the speaker's commercial motivation. *See In re R.J. Reynolds Tobacco Co.*, 1988 WL 490114, *3–*5.

AAP's speech and activities satisfy none of these factors. The targeted speech is clinical guidance reflecting scientific research and evidence-based strategies regarding GAC that AAP publishes to help medical professionals support their patients and their families in making informed, individualized health decisions. The guidance emphasizes that decisions about GAC must be made on a case-by-case basis in consultation with family and a qualified medical professional. It discusses potential health effects associated with GAC for the sole purpose of informing clinical judgment—not to shape consumer preferences or steer treatment choices. AAP does not recommend specific providers, nor does it direct, refer, or encourage patients to seek any particular GAC treatments, therapies, clinics or other services. And AAP does not play any role in pricing, prescribing, or providing GAC treatment to patients. In short, AAP's activities are far removed from any effort to generate commercial demand.

Moreover, AAP provides its GAC guidance, and other guidance on a variety of pediatric health conditions, to the public for free, regardless of membership status. Though some practitioners might receive access to AAP guidance statements in connection with paid conferences, workshops, trainings, or compendia, the guidance statements are—and always have been—free to the public. AAP does not pay to advertise its GAC guidance. AAP is a non-profit

5

PUBLIC

organization focused on improving children's health and has no commercial motive in issuing it. The FTC cannot plausibly claim that AAP issued this GAC guidance to generate membership or sales where the guidance is freely available to the non-member public, accessing the guidance in no way impacts membership eligibility or dues, and AAP's GAC policy statement is one of many sets of clinical guidance AAP issues regarding a variety of pediatric health concerns.

The recent decision in *FTC v. Agora Financial, LLC* confirms that AAP's statements are non-commercial speech that falls outside the FTC's jurisdiction. *See* 447 F. Supp. 3d 350 (D. Md. 2020). In *Agora*, the FTC sued the sellers of a medical publication called "The Doctor's Guide" that provided recommendations on how to manage Type 2 diabetes. *Id.* at 355–56. The FTC conceded that it did not seek to regulate the book—only ads for the book—and the court agreed that the book's content was non-commercial speech that "lies outside of the FTC's jurisdiction." *Id.* at 364; *see also id.* at 366 ("The FTC . . . [is] charged with protecting consumers from false or misleading advertising of products being sold, not from being exposed to novel or unproven medical ideas contained in health-related publications."). AAP's GAC guidance is directly analogous; it is medical and scientific speech contained in a health-related publication. AAP does not sell GAC or advertise its GAC guidance. The FTC thus has no basis to assert jurisdiction over AAP's speech or activities.[9] For this reason, the CID should be quashed.

---

[9] For the same reasons, AAP's speech cannot be considered "advertisements" under Section 12. *See In re R.J. Reynolds Tobacco Co.*, 1988 WL 490114, *6 (defining Commission's understanding of "advertisement" as "a notice or announcement that is publicly published or broadcast and is paid-for").

B.    AAP is a Non-Profit and Not a Person, Partnership, or Corporation.

Section 5 prohibits "persons, partnerships, or corporations" from engaging in unfair or deceptive acts or practices "in or affecting commerce." 15 U.S.C. § 45(a)(1)–(2). Section 4 limits "corporation" to an entity "organized to carry on business for its own profit or that of its members." *Id.* § 44. Because AAP was not organized for that purpose, the CID—by purporting to investigate AAP as a potential FTC Act violator—seeks information not relevant to any lawful enforcement purpose. The CID must therefore be quashed, or at a minimum, substantially narrowed.

The Supreme Court decision *California Dental Association v. FTC* confirms that Section 4's definition of "corporation" reaches a non-profit membership association where its activities "plainly fall within the object of enhancing its members' profit"—which AAP's do not. *See* 526 U.S. 756, 767 (1999) (citation omitted). There, the Court held that a trade association of dentists qualified as a "corporation" because it conferred substantial economic benefits on its members through litigation, marketing, lobbying, and public relations for the benefit of members' interests, and by offering members advantageous insurance arrangements and preferential financing for real estate, equipment, cars, or patients' bills—through its own for-profit subsidiaries. *Id.* at 760, 767. That "congeries of activities" conferred "far more than *de minimis*" economic benefits on its members, bringing it within the FTC's jurisdiction. *Id.* at 766–68.

AAP, by contrast, engages in no such "congeries of activities." While AAP's members have access to discounted insurance rates and third-party vendor services such as meal kits, car rentals, office supply purchases, and website hosting,[10] these benefits are incidental to AAP's mission and thus distinguishable from *California Dental*, where the contributions to individual

---

[10] *Member Advantage Programs*, AAP (last accessed Feb. 7, 2026), https://perma.cc/X7R7-FZQX.

members' profits were "proximate and apparent." *Id.* at 766–67. Because AAP's ongoing operations confer no more than *de minimis* economic benefits on its members, AAP is not a "corporation" that can violate the FTC Act. *Id.* at 767 ("the FTC Act does not cover all membership organizations of profit-making corporations *without more*") (emphasis added).

Even where membership in an organization incidentally confers more than *de minimis* economic benefits, the FTC still must show the organization was "organized" to profit itself or its members to assert jurisdiction. In *American Medical Association v. FTC*, the Second Circuit concluded the American Medical Association qualified as a "corporation" in part because its organizing documents included an objective to "safeguard the material interests of the medical profession" (i.e., its members), and the record showed lobbying and business advice benefiting its members. 638 F.2d 443, 448 (2d Cir. 1980). By contrast, AAP's Articles of Incorporation reflect the opposite—an objective to "foster and stimulate interest in pediatrics and correlate all aspects of the work for the welfare of children . . . [and] to promote publications and encourage contributions to medical and scientific literature pertaining to pediatrics . . . *none of which objects is for pecuniary profit.*" *See* Exhibit 2 (emphasis added). *Accord FTC v. Grand Canyon Educ., Inc.,* 745 F. Supp. 3d 803, 819–20, 823–24 (D. Ariz. 2024) (emphasizing Section 4's "organized to" language and rejecting an attempt to substitute how an entity "*has been operated*" for the statute's organizing-purpose requirement).

Accordingly, insofar as the CID investigates AAP as the "Organization" that may have violated the FTC Act, it exceeds the Commission's authority and must be quashed or substantially limited.

8

C.　　The CID Was Issued for An Improper Purpose.

Supreme Court precedent requires that an investigation have a "legitimate purpose." *United States v. Powell*, 379 U.S. 48, 57–58 (1964). Here, where the CID targets activities that patently fall outside the scope of the FTC's authority to regulate, and where the CID raises constitutional concerns, the CID lacks a legitimate investigative purpose.

## II.　　The CID Violates AAP's First Amendment Rights.

The First Amendment prohibits the government from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content." *Nat'l Inst. of Fam. & Life Advocs. v. James*, 160 F.4th 360, 373 (2d Cir. 2025) ("*NIFLA*"). Content-based speech regulations are generally subject to strict scrutiny.

The Commission should quash the CID because it abridges AAP's First Amendment rights in three ways: (1) the CID is a content-based restriction that risks chilling medical discourse, which triggers heightened scrutiny and requires narrow tailoring even at the investigative stage; (2) the CID's demands for the identities of AAP's associates and deliberations about the development of GAC guidance violate AAP's right to freely associate; and (3) the CID constitutes retaliation. Even if AAP's speech were deemed commercial and "subject to a less-exacting standard of judicial scrutiny," *id.* at 373–74, the CID does not pass intermediate scrutiny.

A.　　The CID Will Chill Medical Discourse.

The CID is a content-based restriction on AAP's non-commercial speech. As described in Section I, AAP's statements are non-commercial and thus entitled to the highest level of First Amendment protection. *See id.* at 375 (affirming conclusion that non-profits' statements about abortion pill reversal ("APR") were likely not commercial because non-profits provided free information about APR, did not sell APR, and received no commission, fee, or other renumeration

9

from referrals made to third-party providers).  To conclude otherwise "could potentially subject a sweeping range of non-profits to regulation of their speech . . . [such as] an LGBT rights group in a state with gender-affirming care restrictions that provides free information about out-of-state organizations that will help individuals seeking hormone therapy to obtain it." *Id.* at 376.

Where a CID exceeds constitutional limits or operates as coercive pressure on protected expression, it serves no lawful purpose.  *See Media Matters for Am. v. FTC*, 2025 WL 2988966, at *7 (D.C. Cir. Oct. 23, 2025) (citing cases).  This CID is content-based on its face, targeting a specific category of speech—AAP's statements and guidance concerning PGDT.  Exhibit 1, Subject of Investigation.  The FTC's own public framing of GAC demonstrates that the CID is part of an enforcement initiative shaped by predetermined disfavor for AAP's viewpoint, and thus constitutes viewpoint discrimination.  *See* Background, *supra.*  Government action that singles out speech based on its subject matter and viewpoint is constitutionally suspect, and must be justified and narrowly tailored.  *See NRA of Am. v. Vullo*, 602 U.S. 175, 188 (2024) (government officials may not "use the power of [the State] to punish or suppress disfavored expression").  Where, as here, the content burden is imposed through compulsory process that compels disclosure of materials protected by the First Amendment, the Fourth Amendment imposes an additional constraint:  the request must avoid sweeping intrusions and precisely identify the information sought "with scrupulous exactitude."  *See Zurcher*, 436 U.S. at 564 (citation omitted).  The CID satisfies neither the "narrowly tailored" or "scrupulous exactitude" standard.  It contains sweeping demands for information protected by the First Amendment, including but not limited to:  a catalog of statements about "PGDT," including location, context, purpose, means of communication, and timing of dissemination; materials reflecting AAP's internal deliberative processes; the identities of each person or entity who developed or evaluated substantiation for any Covered Statement;

AAP's financial statements; and "all documents" related to any partnership with certain medical entities or clinicians.  *See* Exhibit 1, Specifications A.6–10, A.12–13, B.1–5, B.10–11.  The CID is plainly unconstitutionally broad.

The Supreme Court has long recognized that investigations and threatened sanctions can violate the First Amendment when they operate as informal censorship and intimidation.  In *Bantam Books, Inc. v. Sullivan*, the Court held unconstitutional a scheme in which a state commission sent notices identifying "objectionable" publications and reminding distributors of possible prosecution because the effect was "clearly to intimidate" and suppress protected expression, even where the commission could not levy formal legal sanctions.  372 U.S. 58, 64 (1963).  The same constitutional principle applies here.  This CID is targeted at a category of medical speech and a viewpoint that the Commission has already deemed problematic, *see* Background, *supra*, and its requests impose coercive pressure that chills protected discourse.

AAP's scientific and medical information is not commercial speech, but even if it were, these requests would fail to satisfy even intermediate scrutiny.  A government restriction on commercial speech is unconstitutional unless it "directly advance[s]" a "substantial" governmental interest, and the means chosen are not "more extensive than is necessary."  *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 564–66 (1980).  The CID's broad requests—in particular, the requests calling for "all Communications" with other professional medical organizations and "all Documents" that reflect "Communications with other organizations or institutions, or individuals" regarding AAP's guidance—are significantly more extensive than necessary for the Commission to investigate AAP's statements about GAC.[11]

---

[11] Even assuming some of AAP's speech were commercial, it is "inextricably intertwined" with protected speech, and entitled to all the same protections. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781, 796 (1988).

PUBLIC

The CID thus violates the First Amendment and should be quashed.[12]

B.    The CID Infringes on AAP's Right to Free Association.

Next, the CID's demands for the identities of all individuals and entities involved in the development of GAC guidance, as well as deliberations about that guidance, infringe on AAP's First Amendment right to free association. The Supreme Court has stated that, "implicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984); *see also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647–48 (2000) (recognizing the right to associate as "crucial" in preventing the majority from imposing views on groups with "perhaps unpopular" ideas). The compelled disclosure of associations and activities can "have a chilling effect on, and therefore infringe, the exercise of fundamental rights." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010). The CID seeks to compel disclosure of precisely that protected information, including (1) the identities of any person or organization involved in the development and issuance of guidance such as the 2018 Policy Statement, 2023 Reaffirmation, and "SOC 8," a publication issued by the World Professional Association for Transgender Health; and (2) communications reflecting discussions around the development of these guidance documents. *See* Exhibit 1, Specifications A.8, A.13, B.4–5. Such requests reach deeply into the deliberative process through which medical guidance is developed and are not narrowly tailored to any legitimate investigative need. Moreover, disclosure would chill AAP's ability to engage in open discussions about GAC and other scientific topics of study and debate, as participants would fear burdensome

---

[12] The CID's request for "testimony, advocacy, or other information" submitted to legislatures infringes on AAP's right to freely petition the government. Exhibit 1, Specification B.7; *see White v. Lee*, 227 F.3d 1214, 1227 (9th Cir. 2000).

investigations or FTC enforcement.  It would likewise deter new members and prompt current members to withdraw, fearing their association with AAP could expose them to FTC scrutiny.

Under *Perry*, once a party makes a prima facie showing that enforcement of a request will result in "(1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights," the burden shifts to the government to demonstrate the request is "rationally related to a compelling governmental interest" and the "least restrictive means of obtaining" the information. 591 F.3d at 1160–61 (citation omitted).  The Commission cannot satisfy that standard here where it seeks overbroad associational information that is not narrowly tailored to a legitimate investigative need.  And because the FTC has no plausible basis to assert jurisdiction here, it has no cognizable interest in the demanded information, let alone a compelling one.

C.    The CID Constitutes Retaliation.

The First Amendment prohibits government agencies from wielding investigatory power to retaliate against protected speech.  A cognizable retaliation claim exists where:  (1) an entity engaged in First Amendment–protected conduct; (2) the government took an adverse action that would deter a person of ordinary firmness from speaking again; and (3) a causal link exists between the protected activity and the adverse action.  *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). AAP satisfies each element.

First, AAP's publication of medical guidance and policy advocacy constitutes protected speech entitled to robust First Amendment protection.  *See NIFLA v. Becerra*, 585 U.S. 755, 756 (2018) (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011)) (recognizing the "danger of content-based regulations 'in the fields of medicine and public health'").  The CID targets precisely this form of protected discourse.  *See* Exhibit 1, Subject of Investigation.

Second, the CID is an adverse action sufficient to deter a person of ordinary firmness from continuing to speak. *Media Matters for America v. FTC* is directly instructive: there, the FTC's "sweeping and burdensome CID calling for sensitive materials" likely constituted retaliatory action that would reasonably deter continued First Amendment activity. 2025 WL 2378009, at *15–*16 (D.D.C. Aug. 15, 2025). The court emphasized that compulsory process seeking "resource materials" (including internal analyses, methodology, communications, and financial information) posed a serious threat to protected activity and could chill future speech. *Id.* at *16 (citing *Shoen v. Shoen*, 48 F.3d 412, 415–16 (9th Cir. 1995)). This CID similarly demands wide-ranging internal "resource materials," including information regarding AAP's policy-development process, underlying substantiation files, communications with other organizations and individuals, and financial records. Exhibit 1, Specifications A.8–9, A.13, B.1–5, B.10–11. Such demands—issued under threat of enforcement—would deter a person of ordinary firmness from engaging further in protected medical and policy speech by imposing the burden and risk of intrusive discovery.

Third, the CID's focus on GAC and the FTC's public statements evidencing hostility to GAC demonstrate a causal link between AAP's protected activity and the FTC's adverse action. The CID seeks expansive internal materials and communications beyond what would be necessary for any neutral inquiry regarding allegedly deceptive advertising—even assuming AAP's statements constituted advertising. That misalignment alone raises retaliation concerns. Because direct evidence of motive rarely exists, retaliation may be proven through circumstantial evidence, including expressions of hostility toward the protected speech. *See Media Matters*, 2025 WL 2988966, at *8. Here, the FTC's statements about GAC for minors demonstrate that the agency has already identified content it deems acceptable and will cast opposing medical viewpoints as

14

PUBLIC

harmful.  For example, an FTC spokesperson described PGDT as "needless mutilation of children" that "no sane person could endorse."[13]  *See also* Chairman Ferguson's Address, *supra* note 8. Coupled with the CID's broad scope and intrusive demands, these contemporaneous statements show that the CID was issued to deter and suppress disfavored speech rather than to pursue neutral fact-finding.

Because the CID retaliates against AAP's protected speech, it should be quashed.

### III.     The CID Was Not Issued Pursuant to a Commission Resolution.

The FTC Act requires that a valid CID be "signed by a Commissioner acting pursuant to a Commission resolution."  15 U.S.C § 57b-1(i).  Here, the FTC failed to satisfy this requirement because the Resolutions do not support the investigation subject matter described in the CID.

First, both Resolutions only authorize investigations into acts or practices "in or affecting commerce" in violation of the FTC Act, which can only be enforced against "persons, partnerships, or corporations."  The statements the CID purports to investigate are not "in commerce" and AAP is not a "corporation" subject to the FTC's enforcement jurisdiction.  *See* Section I, *supra*.

Second, neither Resolution supports the CID's Subject of Investigation.  Specifically, the 2019 Resolution targets the "advertising, marketing, or sale" of health-related products or services, but AAP does not advertise, market, or sell such products or services.  Exhibit 1 at 17.  The 2021 Resolution similarly targets acts or practices related to goods or services marketed "to children under 18."  *Id.* at 18.  AAP does not engage in commercial activities or practices that are marketed to children.  As explained above, AAP offers scientific and medical information about GAC to medical professionals, not patients.  Thus, the Resolutions fail to support the CID.

---

[13] *See* Jody Godoy, *US FTC workshop criticizing medical care for transgender youth draws staff opposition*, Reuters (July 2, 2025), https://perma.cc/E8SU-MF9L.

15

### IV.     The CID is Overbroad and Unduly Burdensome.

In addition to the fatal defects raised above, the CID's requests must be quashed or substantially limited because they are overbroad and unduly burdensome. *See FTC v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C. Cir. 1977) (Commission may not enforce an "unduly burdensome or unreasonably broad" CID where "compliance threatens to unduly disrupt or seriously hinder" normal operations). AAP has only two full-time lawyers, no paralegals, and no dedicated discovery professionals or administrative assistants. AAP has a small team of system administrators who could perform the tasks required by the CID. Much of the requested information related to GAC is not stored in a central repository from which AAP can easily collect responsive information, nor does AAP possess the tools needed to do so without significant burden. AAP's limited staff would have to undertake significant effort just to search for the requested materials related to GAC, let alone collect, review, and produce them. *See* Exhibit 4, Declaration of Robert Katchen. The significant burden imposed by the CID will thus directly disrupt normal operations, and is not proportional to the needs of the investigation.

For example, the time period for the CID is five years, and some requests call for "all Communications" or "all Documents" "regardless of time period." *See* Exhibit 1, Specifications B.4–5. This would require AAP's limited staff to search for documents that are potentially over a decade old. These requests are not proportionate to the FTC's investigative need.

The CID's broad definitions only exacerbate this burden. For example, the definitions of "Document" and "Collaborative Work Environment" capture every possible method of communication that AAP or its employees might use, including chats, texts, social media, as well as any messages sent via any device (including employee-owned devices) as well as any other platform, app, or system to communicate and access information. This definition is incorporated

**PUBLIC**

into nearly every document request, and compounding the burden, most requests use broad language seeking "any" or "all" responsive documents. *See id.*, Specifications B.1–10, B.12.

The CID seeks an overwhelming amount of information that would require an unreasonable diversion of AAP's limited resources. The nature of AAP's speech regarding GAC is plainly non-commercial, the CID raises important constitutional concerns, and thus the CID's overbroad requests are disproportionate to any legitimate investigative need. Accordingly, the requests identified above should be quashed or substantially limited.

## RESERVATION OF RIGHTS

By submitting this Petition to Quash, AAP does not intend to—and does not—waive any rights to make additional arguments against the Commission's investigation of AAP, the CID, or both, including under the U.S. Constitution, the FTC Act, or any other statute or rule.

//

///

//

17

**PUBLIC**

## CONCLUSION

The CID should be quashed in its entirety or limited substantially.

DATED:  February 9, 2026

Respectfully submitted,

COVINGTON & BURLING LLP

By: _____
     LAURA KIM

Alexandra Remick
Carter McCants
Irene Kim

One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
202-662-6000
lkim@cov.com
aremick@cov.com
cmccants@cov.com
ikim@cov.com

Haley Johnson

Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
415-591-6000
hjohnson@cov.com

***Counsel for American Academy of Pediatrics***

**PUBLIC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 9, 2026, the foregoing Petition to Quash or Limit the

Civil Investigative Demand was served by hand delivery or email to the following:

<u>By hand delivery:</u>

Office of the Secretary
Federal Trade Commission
9050 Junction Dr.
Annapolis Junction, MD 20701

<u>By email:</u>

Office of the Secretary
600 Pennsylvania Ave. NW
Washington, D.C. 20580
electronicfilings@ftc.gov

Secretary April Tabor
600 Pennsylvania Ave. NW
Washington, D.C. 20580
atabor@ftc.gov

Jonathan Cohen
600 Pennsylvania Ave. NW
Washington, D.C. 20580
Jcohen2@ftc.gov

Gregory Ashe
600 Pennsylvania Ave. NW
Washington, D.C. 20580
gashe@ftc.gov

Annie Chiang
600 Pennsylvania Ave. NW
Washington, D.C. 20580
achiang@ftc.gov

Jennie Hitchcock
600 Pennsylvania Ave. NW
Washington, D.C. 20580
jhitchcock@ftc.gov

Hans Clausen
233 Peachtree Street, NE
Atlanta, Georgia 30303
hclausen@ftc.gov

_____

Laura Kim

# EXHIBIT 1



Office of the Secretary

UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

January 15, 2026

Via U.S. Mail
American Academy of Pediatrics
c/o Illinois Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703

FTC Matter No. P264800

Dear American Academy of Pediatrics:

The Federal Trade Commission ("FTC") has issued the attached Civil Investigative Demand ("CID") asking for information as part of a non-public investigation. Our purpose is to determine whether the Organization or any other Person, as those terms are defined in the enclosed CID Schedule, have made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of Pediatric Gender Dysphoria Treatment (as defined in the enclosed CID Schedule), which, according to the Organization, purports to treat gender dysphoric or gender diverse minors, to consumers in violation of Sections 5 and 12 of the FTC Act, 15 U.S.C. §§ 45, 52, and whether FTC action to obtain monetary relief would be in the public interest. Please read the attached documents carefully. Here are a few important points we would like to highlight:

1. Contact **FTC counsel Gregory Ashe (202-326-3719/gashe@ftc.gov),** as soon as possible to schedule a telephone call to be held within 14 days. During that telephone call, FTC counsel can address any questions or concerns you have regarding this CID, including whether there are changes to how you comply with the CID that would reduce your cost or burden while still giving the FTC the information it needs. Please read the attached documents for more information about that meeting.

2. **You must preserve, and immediately stop any deletion or destruction of, electronic or paper documents** in your possession, custody, or control that are in any way relevant to this investigation, even if those documents are being retained by

a third party or you believe the documents are protected from discovery by privilege or some other reason. You must also disable auto-delete for, or suspend, restrict, or limit use of, any applications or platforms that automatically delete messages or information that may be relevant to this investigation.

3. **The FTC will use information you provide in response to the CID for the purpose of investigating violations of the laws the FTC enforces.** We will not disclose the information under the Freedom of Information Act, 5 U.S.C. § 552. We may disclose the information in response to a valid request from Congress, or to other civil or criminal law enforcement agencies for their official law enforcement purposes. The FTC or other agencies may use and disclose your response in any civil or criminal proceeding, or if required to do so by law. However, we will not publicly disclose your information without giving you prior notice.

4. **Please read the attached documents closely.** They contain important information about how you should provide your response.

Please contact FTC counsel as soon as possible if you have any questions. We appreciate your cooperation.

Very truly yours,

April J. Tabor
Secretary



United States of America
Federal Trade Commission

**PUBLIC**

## *Civil Investigative Demand*

| 1. TO | 1a. MATTER NUMBER |
|---|---|
| American Academy of Pediatrics<br>c/o Illinois Corporation Service Company<br>801 Adlai Stevenson Drive<br>Springfield, IL 62703 | P264800 |

This demand is issued pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-1, in the course of an investigation to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission by conduct, activities or proposed action as described in Item 3.

**2. ACTION REQUIRED**

☐ You are required to appear and testify.

| LOCATION OF HEARING | YOUR APPEARANCE WILL BE BEFORE |
|---|---|
| | |
| | DATE AND TIME OF HEARING OR DEPOSITION |

☒ You are required to produce all documents described in the attached schedule that are in your possession, custody, or control, and to make them available at your address indicated above for inspection and copying or reproduction at the date and time specified below.

☒ You are required to answer the interrogatories or provide the written report described on the attached schedule. Answer each interrogatory or report separately and fully in writing. Submit your answers or report to the Records Custodian named in Item 4 on or before the date specified below.

☐ You are required to produce the tangible things described on the attached schedule. Produce such things to the Records Custodian named in Item 4 on or before the date specified below.

DATE AND TIME THE DOCUMENTS, ANSWERS TO INTERROGATORIES, REPORTS, AND/OR TANGIBLE THINGS MUST BE AVAILABLE

March 16, 2026 by 5:00pm ET

**3. SUBJECT OF INVESTIGATION**

Whether the Organization or any other Person, as those terms are defined in the enclosed CID Schedule, have made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of Pediatric Gender Dysphoria Treatment (as defined in the enclosed CID Schedule) which, according to the Organization, purports to treat gender dysphoric or gender diverse minors, to consumers in violation of Sections 5 and 12 of the FTC Act, 15 U.S.C. §§ 45, 52, and whether FTC action to obtain monetary relief would be in the public interest. See also attached schedule and attached resolutions.

| 4. RECORDS CUSTODIAN/DEPUTY RECORDS CUSTODIAN | 5. COMMISSION COUNSEL |
|---|---|
| Gregory Ashe<br>Federal Trade Commission<br>600 Pennsylvania Ave., NW<br>Washington, DC 20580<br>202-326-3719 | Gregory Ashe<br>Federal Trade Commission<br>600 Pennsylvania Ave., NW<br>Washington, DC 20580<br>202-326-3719 |

| DATE ISSUED | COMMISSIONER'S SIGNATURE |
|---|---|
| 1/15/26 | *Ah—N. Fyr* |

### INSTRUCTIONS AND NOTICES

The delivery of this demand to you by any method prescribed by the Commission's Rules of Practice is legal service and may subject you to a penalty imposed by law for failure to comply. The production of documents or the submission of answers and report in response to this demand must be made under a sworn certificate, in the form printed on the second page of this demand, by the person to whom this demand is directed or, if not a natural person, by a person or persons having knowledge of the facts and circumstances of such production or responsible for answering each interrogatory or report question. This demand does not require approval by OMB under the Paperwork Reduction Act of 1980.

### PETITION TO LIMIT OR QUASH

The Commission's Rules of Practice require that any petition to limit or quash this demand be filed within 20 days after service, or, if the return date is less than 20 days after service, prior to the return date. The original and twelve copies of the petition must be filed with the Secretary of the Federal Trade Commission, and one copy should be sent to the Commission Counsel named in Item 5.

### YOUR RIGHTS TO REGULATORY ENFORCEMENT FAIRNESS

The FTC has a longstanding commitment to a fair regulatory enforcement environment. If you are a small business (under Small Business Administration standards), you have a right to contact the Small Business Administration's National Ombudsman at 1-888-REGFAIR (1-888-734-3247) or www.sba.gov/ombudsman regarding the fairness of the compliance and enforcement activities of the agency. You should understand, however, that the National Ombudsman cannot change, stop, or delay a federal agency enforcement action.

The FTC strictly forbids retaliatory acts by its employees, and you will not be penalized for expressing a concern about these activities.

### TRAVEL EXPENSES

Use the enclosed travel voucher to claim compensation to which you are entitled as a witness for the Commission. The completed travel voucher and this demand should be presented to Commission Counsel for payment. If you are permanently or temporarily living somewhere other than the address on this demand and it would require excessive travel for you to appear, you must get prior approval from Commission Counsel.

A copy of the Commission's Rules of Practice is available online at http://bit.ly/FTCSRulesofPractice. Paper copies are available upon request.

FTC Form **144** (rev 01/2024)

## FEDERAL TRADE COMMISSION ("FTC")
## CIVIL INVESTIGATIVE DEMAND ("CID") SCHEDULE
### FTC File No. P264800

**Meet and Confer**: You must contact FTC counsel Gregory Ashe (202-326-3719; gashe@ftc.gov), as soon as possible to schedule a telephonic meeting to be held within fourteen (14) days after You receive this CID. At the meeting, You must discuss with FTC counsel any questions You have regarding this CID or any possible CID modifications that could reduce Your cost, burden, or response time yet still provide the FTC with the information it needs to pursue its investigation. The meeting also will address how to assert any claims of protected status (e.g., privilege, work-product, etc.) and the production of electronically stored information. You must make available at the meeting personnel knowledgeable about Your information or records management systems, Your systems for electronically stored information, custodians likely to have information responsive to this CID, and any other issues relevant to compliance with this CID.

**Document Retention**: You must retain all Documents used in preparing responses to this CID. The FTC may require the submission of additional Documents later during this investigation. **Accordingly, You must preserve, and immediately stop any deletion or destruction of, Documents in Your possession, custody, or control** that are in any way relevant to this investigation, even if those Documents are being retained by a third party or You believe those Documents are protected from discovery. *See* 15 U.S.C. § 50; *see also* 18 U.S.C. §§ 1505, 1519. In addition, You must disable auto-delete for, or suspend, restrict, or limit use of, any messaging applications or Collaborative Work Environments that automatically delete messages or information that may be relevant to this investigation.

**Sharing of Information:** The FTC will use information You provide in response to the CID for the purpose of investigating violations of the laws the FTC enforces. We will not disclose such information under the Freedom of Information Act, 5 U.S.C. § 552. We also will not disclose such information, except as allowed under the FTC Act (15 U.S.C. § 57b-2), the Commission's Rules of Practice (16 C.F.R. §§ 4.10 & 4.11), or if required by a legal obligation. Under the FTC Act, we may provide Your information in response to a request from Congress or a proper request from another law enforcement agency. However, we will not publicly disclose such information without giving You prior notice.

**Manner of Production**: Contact **FTC counsel Gregory Ashe (202-326-3719; gashe@ftc.gov)** by email or telephone at least five days before the return date for instructions on how to produce information responsive to this CID.

**Certification of Compliance**: You or any person with knowledge of the facts and circumstances relating to the responses to this CID must certify that such responses are complete by signing the "Certification of Compliance" attached to this CID.

**Certification of Records of Regularly Conducted Activity**: Attached is a Certification of Records of Regularly Conducted Activity. Please execute and return this Certification with Your response. Completing this certification may reduce the need to subpoena You to testify at future proceedings to establish the admissibility of Documents produced in response to this CID.

**Definitions and Instructions**: Please review carefully the Definitions and Instructions that appear after the Specifications and provide important information regarding compliance with this CID.

## I.   SUBJECT OF INVESTIGATION

Whether the Organization or any other Person, as those terms are defined herein, have made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of Pediatric Gender Dysphoria Treatment (as defined herein), which, according to the Organization, purports to treat gender dysphoric or gender diverse minors, to consumers in violation of Sections 5 and 12 of the FTC Act, 15 U.S.C. §§ 45, 52, and whether FTC action to obtain monetary relief would be in the public interest. See also attached resolutions.

## II.   SPECIFICATIONS

**Applicable Time Period:** Unless otherwise directed, the applicable time period for the requests set forth below is from January 1, 2021, **until the date of full and complete compliance with this CID.**

**A.**      **Interrogatories.** Please describe in detail:

1.  All requirements for membership in Your Organization.

2.  The extent to which Your Organization's membership includes members organized for profit, or that provide goods and services for profit.

3.  All benefits and services You offer or provide to Your members, including but not limited to any (a) discounts or advantageous access to any products and services, such as insurance or financing, (b) legal advocacy or litigation, (c) lobbying services, (d) marketing or lead generation of any type, (e) public relations, and (f) education and training.

4.  Each training or certification program offered by You, including but not limited to: (a) the cost of each training or certification program, (b) the requirements (*e.g.*, membership requirements, course titles, hours, testing) for completing the program, (c) the requirements for maintaining the certification, (d) the number of individuals that hold a current certification, and (e) the number of individuals that have completed the training or certification program.

5.  Each workshop, townhall or other formal or informal session, and conference You hosted and that relates to PGDT in any way, including but not limited to the cost to attend and education or trainings offered at those workshops, townhalls or other formal or informal sessions, and conferences.

6. Each type of PGDT You advertised, marketed, promoted, addressed, or referred to in any Document You disseminated. Your response should include but not be limited to descriptions of any pamphlets, posters, or other materials concerning PGDT that You disseminated to healthcare professionals, patients, and their families, to whom those materials were disseminated, for what purpose they were disseminated, and the dates when You disseminated the materials.

7. Any Covered Statements You have made, including but not limited to the exact wording, its location and context, the means of communication, and when dissemination occurred.

8. Regardless of time period, the process for developing and issuing the 2018 Policy Statement and 2023 Reaffirmation, including but not limited to every individual or entity that participated in development and issuance, and any funding sources.

9. Any payments, grants, consulting or financial relationships, or partnerships relating to PGDT between You and any (a) pharmaceutical company, (b) medical device manufacturer, and/or (c) clinic, hospital system, or individual clinician.

10. All formal or informal complaints, questions, or inquiries You received related to concerns that the Covered Statements lack substantiation or do not adequately disclose risks associated with PGDTs.

11. All investigations and lawsuits involving You and either the Covered Statements or PGDTs, including any lawsuit in which You are amicus.

12. Your views regarding whether the Covered Statements are substantiated, and the reasoning therefor.

13. Regardless of time period, identify each person, company, agency, or other entity with responsibility for developing, reviewing, or evaluating substantiation, scientific or otherwise, for each Covered Statement, including the qualifications of each such Person, and describe the functions performed by each.

14. Describe Your record retention policies, including the manner and duration of preservation of email.

15. Identify all persons who participated in preparing responses to this CID.

### B.    Document Requests:

1. Regardless of time period, and whether or not You believe a Covered Statement was made in Your advertising or other promotional materials, all Documents (including tests, reports, studies, scientific literature, and written opinions) upon which You have relied to substantiate each Covered Statement.

2. Regardless of time period, all Documents relating to substantiation for the Covered Statements, that question or disprove any of the Covered Statements or their substantiation.

3. Regardless of time period, all Documents relating to any study You sponsored, conducted, or contributed to that involved PGDT.

4. Regardless of time period, all Communications with Professional Medical Organizations related to the 2018 Policy Statement, 2023 Reaffirmation, and SOC 8.

5. Regardless of time period, all Documents reflecting or constituting Communications with other organizations or institutions, or individuals regarding the development and publication of the 2018 Policy Statement, 2023 Reaffirmation, and SOC 8.

6. All materials used in any education, training, or certification program You offer, or used to promote such programs.

7. All testimony, advocacy, or other information provided to any legislature or regulator related to PGDTs.

8. With respect to any workshop, townhall or other formal or informal session, or conference You hosted or organized related in any way to PGDTs: (a) all recordings and transcripts; (b) all Documents distributed to attendees or participants; and (c) Documents required to be signed by any attendee, participant, or speaker.

9. All Documents You disseminated referencing the Covered Statements.

10. All Documents related to payments, grants, consulting or financial relationships, or partnerships between You and any (a) pharmaceutical company, (b) medical device manufacturer, or (c) clinic, hospital system or individual clinician.

11. Your Financial Statements for each year.

12. All Documents referenced in, or relied upon, in answering any Interrogatory.

## III.    DEFINITIONS

The following definitions apply to this CID:

**D-1.    "Collaborative Work Environment"** means any platform, application, product, or system used to communicate, or to create, edit, review, approve, store, organize, share, and access Documents, Communications, and information by and among users, including Microsoft SharePoint sites, cloud storage systems (*e.g.*, Google Drive, OneDrive, Dropbox), eRooms, document management systems (*e.g.*, iManage), intranets, chat (*e.g.*, Slack), web content

management systems (*e.g.*, Drupal), wikis (*e.g.*, Confluence), work tracking software (*e.g.*, Jira), version control systems (*e.g.*, Github), and blogs.

**D-2.**    "**Communication**" means the transmittal of information by any means.

**D-3.**    "**Covered Statement**" means any representation, whether express or implied, that:
   a. PGDTs are safe, including without limitation the representation that a treatment is safe for muscle, bone, or brain development;
   b. PGDTs are proven effective, including without limitation the representation that PGDTs are supported by evidence-based science;
   c. PGDTs improve mental health;
   d. PGDTs reduce the incidence of suicide, including without limitation the representation that PGDTs are life-saving;
   e. PGDTs are fully or partly reversible, including without limitation the representation that a treatment is only a pause or otherwise do not cause permanent physical changes; and
   f. PGDTs have few side effects.

**D-4.**    "**Document**" means the complete original, including all attachments and copies of all hyperlinked materials (other than hyperlinks to publicly accessible websites), all drafts or prior versions, and any non-identical copy, whether different from the original because of notations on the copy, different metadata, or otherwise, of any item covered by 15 U.S.C. § 57b-1(a)(5), 16 C.F.R. § 2.7(a)(2), or Federal Rule of Civil Procedure 34(a)(1)(A), including chats, instant messages, text messages, direct messages, information stored on or sent through social media accounts or messaging or other applications (*e.g.*, Microsoft Teams, Slack), information contained in, hyperlinked to, or sent through Collaborative Work Environments, and information on all devices (including employee-owned devices) used for Organization-related activity.

**D-5.**    "**Financial Statements**" means balance sheets, statements of financial position, profit and loss statements, income statements, statements of activities, statement of cash flows, and statements of functional expenses.

**D-6.**    "**Organization**," "**You**," or "**Your**" means or refers to the **American Academy of Pediatrics**, its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, members, employees, agents, consultants, and other persons working for or on behalf of the foregoing.

**D-7.**    "**Pediatric Gender Dysphoria Treatment**" or ("**PGDT**") means any medical intervention which, according to the Organization, purports to treat gender dysphoric or gender diverse minors, including but not limited to pubertal suppression, hormone therapy, and surgery (*e.g.*, subcutaneous mastectomy, vaginoplasty, metoidioplasty, and phalloplasty).

**D-8**    "**Person**" means any natural person, an organization or other legal entity, including a corporation, partnership, sole proprietorship, limited liability company, association, cooperative, or any other group or combination acting as an entity.

**D-9.** **"Policy Statement" or "2018 Policy Statement"** means the American Academy of Pediatrics' statement entitled "Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents" published in 2018.

**D-10.** **"Professional Medical Organizations"** means, including, but not limited to, the Endocrine Society, American College of Obstetrics and Gynecology, American Medical Association (AMA), and its Surgical Groups (American Society of Plastic Surgery, American Academy of Cosmetic Surgery, International Society of Aesthetic Plastic Surgery, American Board of Plastic Surgery, American Association of Plastic Surgery, and the American College of Surgeons), World Professional Association for Transgender Health (WPATH), and United States Professional Association for Transgender Health (USPATH).

**D-11.** **"Reaffirmation" or "2023 Reaffirmation"** means Your August 2023 reaffirmation of the 2018 Policy Statement.

**D-12.** **"SOC 8"** means WPATH's 2022 publication entitled "Standards of Care for the Health of Transgender and Gender Diverse People, Version 8."

## IV.    INSTRUCTIONS

**I-1.    Petitions to Limit or Quash**: You must file any petition to limit or quash this CID with the Secretary of the FTC no later than twenty (20) days after service of the CID, or, if the return date is less than twenty (20) days after service, prior to the return date. Such petition must set forth all assertions of protected status or other factual and legal objections to the CID and comply with the requirements set forth in 16 C.F.R. § 2.10(a)(1) – (2). **The FTC will not consider petitions to quash or limit if You have not previously met and conferred with FTC staff and, absent extraordinary circumstances, will consider only issues raised during the meet and confer process.** 16 C.F.R. § 2.7(k); *see also* § 2.11(b). **If You file a petition to limit or quash, You must still timely respond to all requests that You do not seek to modify or set aside in Your petition.** 15 U.S.C. § 57b-1(f); 16 C.F.R. § 2.10(b).

**I-2.    Withholding Requested Material / Privilege Claims**: For specifications requesting production of Documents or answers to written interrogatories, if You withhold from production any material responsive to this CID based on a claim of privilege, work product protection, statutory exemption, or any similar claim, You must assert the claim no later than the return date of this CID, and You must submit a detailed log, in a searchable electronic format, of the items withheld that identifies the basis for withholding the material and meets all the requirements set forth in 16 C.F.R. § 2.11(a) – (c). The information in the log must be of sufficient detail to enable FTC staff to assess the validity of the claim for each Document, including attachments, without disclosing the protected information. If only some portion of any responsive material is privileged, You must submit all non-privileged portions of the material. Otherwise, produce all responsive information and material without redaction. 16 C.F.R. § 2.11(c). The failure to provide information sufficient to support a claim of protected status may result in denial of the claim. 16 C.F.R. § 2.11(a)(1).

**I-3.     Modification of Specifications**:  The Bureau Director, a Deputy Bureau Director, Associate Director, Regional Director, or Assistant Regional Director must agree in writing to any modifications of this CID.  16 C.F.R. § 2.7(l).

**I-4.     Scope of Search**:  This CID covers Documents and information in Your possession or under Your actual or constructive custody or control, including Documents and information in the possession, custody, or control of Your attorneys, accountants, directors, officers, employees, service providers, and other agents and consultants, whether or not such Documents or information were received from or disseminated to any person or entity.

**I-5.     Identification of Responsive Documents**:  For specifications requesting production of Documents, You must identify in writing the Documents that are responsive to the specification. Documents that may be responsive to more than one specification of this CID need not be produced more than once.  If any Documents responsive to this CID have been previously supplied to the FTC, You may identify the Documents previously provided and the date of submission.

**I-6.     Maintain Document Order**:  For specifications requesting production of Documents, You must produce Documents in the order in which they appear in Your files or as electronically stored.  If Documents are removed from their original folders, binders, covers, containers, or electronic source, You must specify the folder, binder, cover, container, or electronic media or file paths from which such Documents came.

**I-7.     Numbering of Documents**:  For specifications requesting production of Documents, You must number all Documents in Your submission with a unique identifier such as a Bates number or a Document ID.

**I-8.     Production of Copies**:  For specifications requesting production of Documents, unless otherwise stated, You may submit copies in lieu of original Documents if they are true, correct, and complete copies of the originals and You preserve and retain the originals in their same state as of the time You received this CID.  Submission of copies constitutes a waiver of any claim as to the authenticity of the copies should the FTC introduce such copies as evidence in any legal proceeding.

**I-9.     Production in Color**:  For specifications requesting production of Documents, You must produce copies of advertisements in color, and You must produce copies of other materials in color if necessary to interpret them or render them intelligible.

**I-10.    Electronically Stored Information**:  For specifications requesting production of Documents, see the attached FTC Bureau of Consumer Protection Production Requirements ("Production Requirements"), which detail all requirements for the production of electronically stored information to the FTC.  You must discuss issues relating to the production of electronically stored information with FTC staff **prior to** production.

**I-11.    Sensitive Personally Identifiable Information ("Sensitive PII") or Sensitive Health Information ("SHI")**:  For specifications requesting production of Documents or answers to

written interrogatories, if any responsive materials contain Sensitive PII or SHI, please contact FTC counsel before producing those materials to discuss whether there are steps You can take to minimize the amount of Sensitive PII or SHI You produce, and how to securely transmit such information to the FTC.

Sensitive PII includes an individual's Social Security number; an individual's biometric data; and an individual's name, address, or phone number in combination with one or more of the following: date of birth, driver's license or state identification number (or foreign country equivalent), military identification number, passport number, financial account number, credit card number, or debit card number. Biometric data includes biometric identifiers, such as fingerprints or retina scans, but does not include photographs (with the exception of photographs and corresponding analyses used or maintained in connection with facial recognition software) or voice recordings and signatures (with the exception of those stored in a database and used to verify a person's identity). SHI includes medical records and other individually identifiable health information relating to the past, present, or future physical or mental health or conditions of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.

**I-12. Interrogatory Responses**: For specifications requesting answers to written interrogatories: (a) answer each interrogatory and each interrogatory subpart separately, fully, and in writing; and (b) verify that Your answers are true and correct by signing Your answers under the following statement: "I verify under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)." The verification must be submitted contemporaneously with Your interrogatory responses.

**I-13. Submission of Documents in Lieu of Interrogatory Answers**: You may answer any written interrogatory by submitting previously existing Documents that contain the information requested in the interrogatory so long as You clearly indicate in each written interrogatory response which Documents contain the responsive information. For any interrogatory that asks You to identify Documents, You may, at Your option, produce the Documents responsive to the interrogatory so long as You clearly indicate the specific interrogatory to which such Documents are responsive.

## CERTIFICATION OF COMPLIANCE
### Pursuant to 28 U.S.C. § 1746

I, _____, certify the following with respect to the Federal Trade Commission's ("FTC") Civil Investigative Demand directed to American Academy of Pediatrics (the "Organization") (FTC File No. P264800) (the "CID"):

1.    The Organization has identified all documents, information, and/or tangible things ("responsive information") in the Organization's possession, custody, or control responsive to the CID and either:

(a) provided such responsive information to the FTC; or

(b) for any responsive information not provided, given the FTC written objections setting forth the basis for withholding the responsive information.

2.    I verify that the responses to the CID are complete and true and correct to my knowledge.

I certify under penalty of perjury that the foregoing is true and correct.

Date: _____          _____
                                        Signature

                                        _____
                                        Printed Name

                                        _____
                                        Title

## CERTIFICATION OF RECORDS OF REGULARLY CONDUCTED ACTIVITY
### Pursuant to 28 U.S.C. § 1746

1.  I, _____, have personal knowledge of the facts set forth below

    and am competent to testify as follows:

2.  I have authority to certify the authenticity of the records produced by American Academy

    of Pediatrics (the "Organization") and attached hereto.

3.  The documents produced and attached hereto by the Organization are originals or true

    copies of records of regularly conducted activity that:

    a)  Were made at or near the time of the occurrence of the matters set forth by, or

        from information transmitted by, a person with knowledge of those matters;

    b)  Were kept in the course of the regularly conducted activity of the Organization;

        and

    c)  Were made by the regularly conducted activity as a regular practice of the

        Organization.

I certify under penalty of perjury that the foregoing is true and correct.


Date: _____          _____
                                       Signature

### Federal Trade Commission - Bureau of Consumer Protection
### Production Requirements
Revised January 2024

In producing information to the FTC, comply with the following requirements, unless the FTC agrees otherwise. If you have questions about these requirements, please contact FTC counsel.

## Production Format

1. **General Format**: Provide load-ready electronic productions with:

   a. A delimited data load file (.DAT) containing a line for every document, unique id number for every document (DocID), metadata fields, and native file links where applicable; and

   b. A document level text file, named for the DocID, containing the text of each produced document.

      Do not produce corresponding image renderings (e.g., TIFF or JPEG) for files in native format unless the FTC requests them. If the FTC requests corresponding image renderings, provide an Opticon image load file (.OPT) containing a line for every image file.

2. **Electronically Stored Information (ESI)**: Documents stored in electronic format in the ordinary course of business must be produced in the following format:

   a. For ESI other than the categories below, submit in native format with all metadata and either document level extracted text or Optical Character Recognition (OCR). Do not produce corresponding image renderings (e.g., TIFF or JPEG) for files in native format unless the FTC requests them. If the FTC requests corresponding image renderings, they should be converted to Group IV, 300 DPI, single-page TIFF (or color JPEG images when necessary to interpret the contents or render them intelligible.)

   b. For Microsoft Excel, Access, or PowerPoint files, submit in native format with extracted text and metadata. Data compilations in Excel spreadsheets or delimited text formats must contain all underlying data, formulas, and algorithms without redaction.

   c. For other spreadsheet, database, presentation, or multimedia formats; messaging applications and platforms (e.g., Microsoft Teams, Slack); or proprietary applications, discuss the production format with FTC counsel.

3. **Hard Copy Documents**: Documents stored in hard copy in the ordinary course of business must be scanned and submitted as either one multi-page pdf per document or as 300 DPI single page TIFFs (or color JPEGs when necessary to interpret the contents or render them intelligible), with corresponding document-level OCR text and logical document determination in an accompanying load file.

4. **Document Identification**: Provide a unique DocID for each hard copy or electronic document, consisting of a prefix and a consistent number of numerals using leading zeros. Do not use a space to separate the prefix from numbers.

-A1-

5. **Attachments**: Preserve the parent/child relationship by producing attachments as separate documents, numbering them consecutively to the parent email, and including a reference to all attachments.

6. **Metadata Production**: For each document submitted electronically, include the standard metadata fields listed below in a standard delimited data load file. The first line of the data load file shall include the field names. <u>Submit date and time data in separate fields</u>. Use these standard Concordance delimiters in delimited data load files:

| Description | Symbol | ASCII Character |
|---|---|---|
| Field Separator | ¶ | 20 |
| Quote Character | þ | 254 |
| Multi Entry delimiter | ® | 174 |
| <Return> Value in data | ~ | 126 |

7. **De-duplication**: Do not use de-duplication or email threading software without FTC approval.

8. **Password-Protected Files**: Remove passwords prior to production. If password removal is not possible, provide the original and production filenames and the passwords, under separate cover.

## Producing Data to the FTC

1. Prior to production, scan all data and media for viruses and confirm they are virus-free.

2. For productions smaller than 50 GB, submit data electronically using the FTC's secure file transfer protocol. Contact FTC counsel for instructions. **The FTC cannot accept files via Dropbox, Google Drive, OneDrive, or other third-party file transfer sites**.

3. If you submit data using physical media:

   a. Use only CDs, DVDs, flash drives, or hard drives. Format the media for use with Windows;

   b. Use data encryption to protect any Sensitive Personally Identifiable Information or Sensitive Health Information (as defined in the instructions), and provide passwords in advance of delivery, under separate cover; and

   c. Use a courier service (e.g., Federal Express, UPS) because heightened security measures delay postal delivery.

4. Provide a transmittal letter with each production that includes:

   a. Production volume name (e.g., Volume 1) and date of production;

   b. Numeric DocID range of all documents in the production, and any gaps in the DocID range; and

   c. List of custodians and the DocID range for each custodian.

## Standard Metadata Fields

| DAT FILE FIELDS | DEFINITIONS | POPULATE FIELD FOR: |
|---|---|---|
| DocID | Unique ID number for each document | All Documents |
| FamilyID | Unique ID for all documents in a family including parent and all child documents | All Documents |
| ParentID | Document ID of the parent document. This field will only be populated on child items | All Documents |
| File Path | Path to produced native file | All Documents |
| TextPath | Path to document level text or OCR file | All Documents |
| Custodian | Name of the record owner/holder | All Documents |
| AllCustodians | Names of all custodians that had copy of this record (populate if data was deduplicated or email threading was used) | All Documents |
| Source | Source of documents: CID, Subpoena, Third Party Data, etc. | All Documents |
| Filename | Original file name | All Documents |
| File Size | Size of documents | All Documents |
| File Extensions | Extension of file type | All Documents |
| MD5 Hash | Unique identifier for electronic data used in de-duplication | All Documents |
| PRODUCTION_VOLUME | Production Volume | All Documents |
| HASREDACTIONS | Redacted document | All Documents |
| Exception Reason | Reason for exception encountered during processing (e.g., empty file, source file, password-protected file, virus) | All Documents |
| PRODBEG | Beginning production bates number | Documents with Produced Images |
| PRODEND | Ending production bates number | Documents with Produced Images |
| PRODBEG_ATTACH | Beginning production family bates number | Documents with Produced Images |
| PRODEND_ATTACH | Ending production family bates number | Documents with Produced Images |
| Page Count | The number of pages the document contains | Documents with Produced Images |
| From | Names retrieved from the FROM field in a message | Emails |
| To | Names retrieved from the TO field in a message; the recipient(s) | Emails |
| CC | Names retrieved from the CC field in a message; the copied recipient(s) | Emails |
| BCC | Names retrieved from the BCC field in a message; the blind copied recipient(s) | Emails |
| EmailSubject | Email subject line | Emails |
| Date Sent | The date an email message was sent | Emails |
| Time Sent | The time an email message was sent | Emails |
| Date Received | The date an email message was received | Emails |
| Time Received | The time an email message was received | Emails |
| Author | File Author | Loose Native Files and Email Attachments |
| Title | File Title | Loose Native Files and Email Attachments |
| Subject | File Subject | Loose Native Files and Email Attachments |
| Date Created | Date a document was created by the file system | Loose Native Files and Email Attachments |
| Time Created | Time a document was created by the file system | Loose Native Files and Email Attachments |
| Date Modified | Last date a document was modified and recorded by the file system | Loose Native Files and Email Attachments |
| Time Modified | Last time a document was modified and recorded by the file system | Loose Native Files and Email Attachments |
| Date Printed | Last date a document was printed and recorded by the file system | Loose Native Files and Email Attachments |
| Time Printed | Last time a document was printed and recorded by the file system | Loose Native Files and Email Attachments |

UNITED STATES OF AMERICA
BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:  Joseph J. Simons, Chairman
Noah Joshua Phillips
Rohit Chopra
Rebecca Kelly Slaughter
Christine S. Wilson

## RESOLUTION DIRECTING USE OF COMPULSORY PROCESS IN A NON-PUBLIC INVESTIGATION OF DIETARY SUPPLEMENTS, FOODS, DRUGS, DEVICES, OR ANY OTHER PRODUCT OR SERVICE INTENDED TO PROVIDE A HEALTH BENEFIT OR TO AFFECT THE STRUCTURE OR FUNCTION OF THE BODY

File No. 002 3191

Nature and Scope of Investigation:

To investigate whether unnamed persons, partnerships, or corporations, or others have engaged or are engaging in deceptive or unfair acts or practices in or affecting commerce in the advertising, marketing, or sale of dietary supplements, foods, drugs, devices, or any other product or service intended to provide a health benefit or to affect the structure or function of the body; have misrepresented or are misrepresenting the safety or efficacy of such products or services; or otherwise have engaged or are engaging in unfair or deceptive acts or practices or in the making of false advertisements, in or affecting commerce, in violation of Sections 5 or 12 of the Federal Trade Commission Act, 15 U.S.C. §§ 45 and 52, as amended. The investigation is also to determine whether Commission action to obtain monetary relief would be in the public interest.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it be used in connection with this investigation for a period not to exceed ten (10) years from the date of issuance of this resolution. The expiration of this ten-year period shall not limit or terminate the investigation or the legal effect of any compulsory process issued during the ten-year period. The Federal Trade Commission specifically authorizes the filing or continuation of actions to enforce any such compulsory process after the expiration of the ten-year period.

Authority to Conduct Investigation:

Sections 6, 9, 10, and 20 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50, and 57b-1, as amended; and FTC Procedures and Rules of Practice, 16 C.F.R. § 1.1 *et seq.*, and supplements thereto.

By direction of the Commission.

APRIL
TABOR

Digitally signed
by APRIL TABOR
Date: 2019.08.12
12:09:40 -04'00'

April J. Tabor
Acting Secretary

Issued: August 9, 2019

## UNITED STATES OF AMERICA
## BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:      **Lina M. Khan, Chair**
                    **Noah Joshua Phillips**
                    **Rohit Chopra**
                    **Rebecca Kelly Slaughter**
                    **Christine S. Wilson**

## RESOLUTION DIRECTING USE OF COMPULSORY PROCESS REGARDING ACTS OR PRACTICES AFFECTING CHILDREN

**File No. 212 3123**

Nature and Scope of Investigation:

To investigate whether any persons, partnerships, corporations, or others have engaged or are engaging in unfair, deceptive, anticompetitive, collusive, coercive, predatory, exploitative, or exclusionary acts or practices, in or affecting commerce, related to goods or services marketed, in whole or in part, to children under 18, in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended or any statutes or rules enforced by the Commission; and to determine the appropriate action or remedy, including whether injunctive and monetary relief would be in the public interest.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it be used in connection with any inquiry within the nature and scope of this resolution for a period not to exceed ten years. The expiration of this ten-year period shall not limit or terminate the investigation or the legal effect of any compulsory process issued during the ten-year period. The Federal Trade Commission specifically authorizes the filing or continuation of actions to enforce any such compulsory process after the expiration of the ten-year period.

Authority to Conduct Investigation:

Sections 6, 9, 10, and 20 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50, and 57b-1, as amended; and FTC Procedures and Rules of Practice, 16 C.F.R. § 1.1 *et seq.*, and supplements thereto.

By direction of the Commission.

April J. Tabor
Secretary

**Issued: September 2, 2021**
**Expires: September 2, 2031**

# EXHIBIT 2

Certificate Number 2105

S T A T E   O F   I L L I N O I S

OFFICE OF

THE SECRETARY OF STATE

TO ALL TO WHOM THESE PRESENTS SHALL COME, GREETING:

WHEREAS, a CERTIFICATE, duly signed and acknowledged, has been filed in the Office of the Secretary of State, on the 10th day of July, A. D. 1930, for the organization of the

AMERICAN ACADEMY OF PEDIATRICS

under and in accordance with the provisions of "AN ACT CONCERNING CORPORATIONS" approved April 18, 1872, and in force July 1, 1872, and all acts amendatory thereof, a copy of which certificate is hereto attached;

NOW THEREFORE, I, WILLIAM J. STRATTON, Secretary of State of the State of Illinois, by virtue of the powers and duties vested in me by law, do hereby certify that the said AMERICAN ACADEMY OF PEDIATRICS is a legally organized Corporation under the laws of this State.

IN TESTIMONY WHEREOF, I hereto set my hand and cause to be affixed the Great Seal of the State of Illinois. Done at the City of Springfield this 10th day of July, A. D. 1930, and of the Independence of the United States the one hundred and 55th.

( S E A L )                    WILLIAM J. STRATTON

                              SECRETARY OF STATE.

THIS STATEMENT MUST BE FILED IN DUPLICATE

FEE $10

STATE OF ILLINOIS, )
                   ) ss.
Cook County,       )

P A I D
JUL 10 1930
I.F. $10.00
F.T.

To WILLIAM J. STRATTON, Secretary of State:

We, the undersigned Isaac A. Abt, C. Anderson Aldrich, Clifford G. Grulee, citizens of the United States, propose to form a corporation under an Act of the General Assembly of the State of Illinois, entitled, "An Act concerning Corporations," approved April 18, 1872, and all acts amendatory thereof; and for the purpose of such organization we hereby state as follows, to-wit:

1.  The name of such corporation is AMERICAN ACADEMY OF PEDIATRICS.

2.  The object for which it is formed is to foster and stimulate interest in pediatrics and correlate all aspects of work for the welfare of children which properly comes within the scope of pediatrics; to promote and maintain the highest possible standards for pediatric education in medical schools and hospitals, pediatric practice and research; to perpetuate the history and best traditions of pediatrics and ethics; to maintain the dignity and efficiency of pediatric practice in its relationship to public welfare; to promote publications and encourage contributions to medical and scientific literature pertaining to pediatrics; none of which objects is for pecuniary profit.

3.  The management of the aforesaid American Academy of Pediatrics shall be vested in a board of seven Directors, to be known as the Executive Board.

4.  The following persons are hereby selected as the Directors to control and manage said corporation for the first year of its corporate existence, viz:

| NAME | ADDRESS | | | |
|------|---------|---|---|---|
|      | NUMBER | STREET | CITY | STATE |
| Isaac A. Abt | 4810 Kenwood Avenue, Chicago, Ill. | | | |
| C. Anderson Aldrich | 1189 Oakley Avenue, Winnetka, Ill. | | | |
| Clifford G. Grulee | 1410 Asbury Avenue, Evanston, Ill. | | | |
| Samuel McC. Hamill | 1822 Spruce Street, Philadelphia, Pa. | | | |
| William P. Lucas | 2449 Pacific Avenue, San Francisco, Cal. | | | |
| John L. Morse | 169 Park Street, Newton, Mass. | | | |
| Lawrence T. Royster | University, Va. | | | |

5.  The location is in the city of Chicago in the county of Cook in the State of Illinois, and the postoffice address of its business office is at No. 310 S. Michigan Avenue in the said City of Chicago.

(SIGNED,

C. ANDERSON ALDRICH
CLIFFORD G. GRULEE
ISAAC A. ABT.

STATE OF ILLINOIS,  }
                    } ss.
Cook County,        }

    I, John Stone, a Notary Public in and for the County and State aforesaid, do hereby certify that on this 7th day of July, A. D. 1930, personally appeared before me Isaac A. Abt, C. Anderson Aldrich, and Clifford G. Grulee, to me personally known to be the same persons who executed the foregoing certificate, and severally acknowledged that they had executed the same for the purposes therein set forth.

    IN WITNESS WHEREOF, I have hereunto set my hand and seal the day and year above written.

(SEAL)

                JOHN STONE
                   Notary Public.


                F I L E D
              JUL 10 1930
          William J. Stratton
          Sec'y of State


State of Illinois)
Cook. Co.        )    S.S. No. 10702876

1930-July 11-F.M.-355

and recorded in Book 636, Page 555

          Recorder

          Clayton Smith

# EXHIBIT 3

## POLICY STATEMENT
Organizational Principles to Guide and Define the Child Health Care System and/or Improve the Health of all Children



American Academy of Pediatrics

DEDICATED TO THE HEALTH OF ALL CHILDREN™

**This Policy Statement was reaffirmed August 2023.**

# Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents

Jason Rafferty, MD, MPH, EdM, FAAP, COMMITTEE ON PSYCHOSOCIAL ASPECTS OF CHILD AND FAMILY HEALTH, COMMITTEE ON ADOLESCENCE, SECTION ON LESBIAN, GAY, BISEXUAL, AND TRANSGENDER HEALTH AND WELLNESS



abstract

As a traditionally underserved population that faces numerous health disparities, youth who identify as transgender and gender diverse (TGD) and their families are increasingly presenting to pediatric providers for education, care, and referrals. The need for more formal training, standardized treatment, and research on safety and medical outcomes often leaves providers feeling ill equipped to support and care for patients that identify as TGD and families. In this policy statement, we review relevant concepts and challenges and provide suggestions for pediatric providers that are focused on promoting the health and positive development of youth that identify as TGD while eliminating discrimination and stigma.

## INTRODUCTION

In its dedication to the health of all children, the American Academy of Pediatrics (AAP) strives to improve health care access and eliminate disparities for children and teenagers who identify as lesbian, gay, bisexual, transgender, or questioning (LGBTQ) of their sexual or gender identity.[1,2] Despite some advances in public awareness and legal protections, youth who identify as LGBTQ continue to face disparities that stem from multiple sources, including inequitable laws and policies, societal discrimination, and a lack of access to quality health care, including mental health care. Such challenges are often more intense for youth who do not conform to social expectations and norms regarding gender. Pediatric providers are increasingly encountering such youth and their families, who seek medical advice and interventions, yet they may lack the formal training to care for youth that identify as transgender and gender diverse (TGD) and their families.[3]

This policy statement is focused specifically on children and youth that identify as TGD rather than the larger LGBTQ population, providing brief, relevant background on the basis of current available research

*Department of Pediatrics, Hasbro Children's Hospital, Providence, Rhode Island; Thundermist Health Centers, Providence, Rhode Island; and Department of Child Psychiatry, Emma Pendleton Bradley Hospital, East Providence, Rhode Island*

*Dr Rafferty conceptualized the statement, drafted the initial manuscript, reviewed and revised the manuscript, approved the final manuscript as submitted, and agrees to be accountable for all aspects of the work.*

*This document is copyrighted and is property of the American Academy of Pediatrics and its Board of Directors. All authors have filed conflict of interest statements with the American Academy of Pediatrics. Any conflicts have been resolved through a process approved by the Board of Directors. The American Academy of Pediatrics has neither solicited nor accepted any commercial involvement in the development of the content of this publication.*

*Policy statements from the American Academy of Pediatrics benefit from expertise and resources of liaisons and internal (AAP) and external reviewers. However, policy statements from the American Academy of Pediatrics may not reflect the views of the liaisons or the organizations or government agencies that they represent.*

*The guidance in this statement does not indicate an exclusive course of treatment or serve as a standard of medical care. Variations, taking into account individual circumstances, may be appropriate.*

*All policy statements from the American Academy of Pediatrics automatically expire 5 years after publication unless reaffirmed, revised, or retired at or before that time.*

**To cite:** Rafferty J, AAP COMMITTEE ON PSYCHOSOCIAL ASPECTS OF CHILD AND FAMILY HEALTH, AAP COMMITTEE ON ADOLESCENCE, AAP SECTION ON LESBIAN, GAY, BISEXUAL, AND TRANSGENDER HEALTH AND WELLNESS. Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents. *Pediatrics.* 2018;142(4): e20182162

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by guest

**TABLE 1** Relevant Terms and Definitions Related to Gender Care

| Term | Definition |
|---|---|
| Sex | An assignment that is made at birth, usually male or female, typically on the basis of external genital anatomy but sometimes on the basis of internal gonads, chromosomes, or hormone levels |
| Gender identity | A person's deep internal sense of being female, male, a combination of both, somewhere in between, or neither, resulting from a multifaceted interaction of biological traits, environmental factors, self-understanding, and cultural expectations |
| Gender expression | The external way a person expresses their gender, such as with clothing, hair, mannerisms, activities, or social roles |
| Gender perception | The way others interpret a person's gender expression |
| Gender diverse | A term that is used to describe people with gender behaviors, appearances, or identities that are incongruent with those culturally assigned to their birth sex; gender-diverse individuals may refer to themselves with many different terms, such as transgender, nonbinary, genderqueer,[7] gender fluid, gender creative, gender independent, or noncisgender. "Gender diverse" is used to acknowledge and include the vast diversity of gender identities that exists. It replaces the former term, "gender nonconforming," which has a negative and exclusionary connotation. |
| Transgender | A subset of gender-diverse youth whose gender identity does not match their assigned sex and generally remains persistent, consistent, and insistent over time; the term "transgender" also encompasses many other labels individuals may use to refer to themselves. |
| Cisgender | A term that is used to describe a person who identifies and expresses a gender that is consistent with the culturally defined norms of the sex they were assigned at birth |
| Agender | A term that is used to describe a person who does not identify as having a particular gender |
| Affirmed gender | When a person's true gender identity, or concern about their gender identity, is communicated to and validated from others as authentic |
| MTF; affirmed female; trans female | Terms that are used to describe individuals who were assigned male sex at birth but who have a gender identity and/or expression that is asserted to be more feminine |
| FTM; affirmed male; trans male | Terms that are used to describe individuals who were assigned female sex at birth but who have a gender identity and/or expression that is asserted to be more masculine |
| Gender dysphoria | A clinical symptom that is characterized by a sense of alienation to some or all of the physical characteristics or social roles of one's assigned gender; also, gender dysphoria is the psychiatric diagnosis in the *DSM-5*, which has focus on the distress that stems from the incongruence between one's expressed or experienced (affirmed) gender and the gender assigned at birth. |
| Gender identity disorder | A psychiatric diagnosis defined previously in the *DSM-IV* (changed to "gender dysphoria" in the *DSM-5*); the primary criteria include a strong, persistent cross-sex identification and significant distress and social impairment. This diagnosis is no longer appropriate for use and may lead to stigma, but the term may be found in older research. |
| Sexual orientation | A person's sexual identity in relation to the gender(s) to which they are attracted; sexual orientation and gender identity develop separately. |

This list is not intended to be all inclusive. The pronouns "they" and "their" are used intentionally to be inclusive rather than the binary pronouns "he" and "she" and "his" and "her." Adapted from Bonifacio HJ, Rosenthal SM. Gender variance and dysphoria in children and adolescents. *Pediatr Clin North Am.* 2015;62(4):1001–1016. Adapted from Vance SR Jr, Ehrensaft D, Rosenthal SM. Psychological and medical care of gender nonconforming youth. *Pediatrics.* 2014;134(6):1184–1192. DSM-5, *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition*; DSM-IV, *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition*; FTM, female to male; MTF, male to female.

and expert opinion from clinical and research leaders, which will serve as the basis for recommendations. It is not a comprehensive review of clinical approaches and nuances to pediatric care for children and youth that identify as TGD. Professional understanding of youth that identify as TGD is a rapidly evolving clinical field in which research on appropriate clinical management is limited by insufficient funding.[3,4]

## DEFINITIONS

To clarify recommendations and discussions in this policy statement, some definitions are provided. However, brief descriptions of human behavior or identities may not capture nuance in this evolving field.

"Sex," or "natal gender," is a label, generally "male" or "female," that is typically assigned at birth on the basis of genetic and anatomic characteristics, such as genital anatomy, chromosomes, and sex hormone levels. Meanwhile, "gender identity" is one's internal sense of who one is, which results from a multifaceted interaction of biological traits, developmental influences, and environmental conditions. It may be male, female, somewhere in between, a combination of both, or neither (ie, not conforming to a binary conceptualization of gender). Self-recognition of gender identity develops over time, much the same way as a child's physical body does. For some people, gender identity can be fluid, shifting in different contexts. "Gender expression" refers to the wide array of ways people display their gender through clothing, hair styles, mannerisms, or social roles. Exploring different ways of expressing gender is common for children and may challenge social expectations. The way others interpret this expression is referred to as "gender perception" (Table 1).[5,6]

These labels may or may not be congruent. The term "cisgender" is used if someone identifies and expresses a gender that is consistent with the culturally defined norms of the sex that was assigned at birth. "Gender diverse" is an umbrella term to describe an ever-evolving array of labels that people may apply when their gender identity, expression, or even perception does not conform

FROM THE AMERICAN ACADEMY OF PEDIATRICS

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by quest

to the norms and stereotypes others expect of their assigned sex. "Transgender" is usually reserved for a subset of such youth whose gender identity does not match their assigned sex and generally remains persistent, consistent, and insistent over time. These terms are not diagnoses; rather, they are personal and often dynamic ways of describing one's own gender experience.

Gender identity is not synonymous with "sexual orientation," which refers to a person's identity in relation to the gender(s) to which they are sexually and romantically attracted. Gender identity and sexual orientation are distinct but interrelated constructs.[8] Therefore, being transgender does not imply a sexual orientation, and people who identify as transgender still identify as straight, gay, bisexual, etc, on the basis of their attractions. (For more information, *The Gender Book*, found at www.thegenderbook.com, is a resource with illustrations that are used to highlight these core terms and concepts.)

### EPIDEMIOLOGY

In population-based surveys, questions related to gender identity are rarely asked, which makes it difficult to assess the size and characteristics of the population that is TGD. In the 2014 Behavioral Risk Factor Surveillance System of the Centers for Disease Control and Prevention, only 19 states elected to include optional questions on gender identity. Extrapolation from these data suggests that the US prevalence of adults who identify as transgender or "gender nonconforming" is 0.6% (1.4 million), ranging from 0.3% in North Dakota to 0.8% in Hawaii.[9] On the basis of these data, it has been estimated that 0.7% of youth ages 13 to 17 years (~150 000) identify as transgender.[10] This number is much higher than previous estimates, which were

extrapolated from individual states or specialty clinics, and is likely an underestimate given the stigma regarding those who openly identify as transgender and the difficulty in defining "transgender" in a way that is inclusive of all gender-diverse identities.[11]

There have been no large-scale prevalence studies among children and adolescents, and there is no evidence that adult statistics reflect young children or adolescents. In the 2014 Behavioral Risk Factor Surveillance System, those 18 to 24 years of age were more likely than older age groups to identify as transgender (0.7%).[9] Children report being aware of gender incongruence at young ages. Children who later identify as TGD report first having recognized their gender as "different" at an average age of 8.5 years; however, they did not disclose such feelings until an average of 10 years later.[12]

### MENTAL HEALTH IMPLICATIONS

Adolescents and adults who identify as transgender have high rates of depression, anxiety, eating disorders, self-harm, and suicide.[13–20] Evidence suggests that an identity of TGD has an increased prevalence among individuals with autism spectrum disorder, but this association is not yet well understood.[21,22] In 1 retrospective cohort study of 180 trans youth and matched cisgender peers, 56 youth who identified as transgender reported previous suicidal ideation, and 31 reported a previous suicide attempt, compared with 20 and 11 among matched youth who identified as cisgender, respectively.[13] Some youth who identify as TGD also experience gender dysphoria, which is a specific diagnosis given to those who experience impairment in peer and/or family relationships, school performance, or other aspects of their life as a consequence of the

incongruence between their assigned sex and their gender identity.[23]

There is no evidence that risk for mental illness is inherently attributable to one's identity of TGD. Rather, it is believed to be multifactorial, stemming from an internal conflict between one's appearance and identity, limited availability of mental health services, low access to health care providers with expertise in caring for youth who identify as TGD, discrimination, stigma, and social rejection.[24] This was affirmed by the American Psychological Association in 2008[25] (with practice guidelines released in 2015[8]) and the American Psychiatric Association, which made the following statement in 2012:

*Being transgender or gender variant implies no impairment in judgment, stability, reliability, or general social or vocational capabilities; however, these individuals often experience discrimination due to a lack of civil rights protections for their gender identity or expression.… [Such] discrimination and lack of equal civil rights is damaging to the mental health of transgender and gender variant individuals.*[26]

Youth who identify as TGD often confront stigma and discrimination, which contribute to feelings of rejection and isolation that can adversely affect physical and emotional well-being. For example, many youth believe that they must hide their gender identity and expression to avoid bullying, harassment, or victimization. Youth who identify as TGD experience disproportionately high rates of homelessness, physical violence (at home and in the community), substance abuse, and high-risk sexual behaviors.[5,6,12,27–31] Among the 3 million HIV testing events that were reported in 2015, the highest percentages of new infections were among women who identified as transgender[32] and were also at particular risk for not knowing their HIV status.[30]

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by quest

## GENDER-AFFIRMATIVE CARE

In a gender-affirmative care model (GACM), pediatric providers offer developmentally appropriate care that is oriented toward understanding and appreciating the youth's gender experience. A strong, nonjudgmental partnership with youth and their families can facilitate exploration of complicated emotions and gender-diverse expressions while allowing questions and concerns to be raised in a supportive environment.[5] In a GACM, the following messages are conveyed:

- transgender identities and diverse gender expressions do not constitute a mental disorder;
- variations in gender identity and expression are normal aspects of human diversity, and binary definitions of gender do not always reflect emerging gender identities;
- gender identity evolves as an interplay of biology, development, socialization, and culture; and
- if a mental health issue exists, it most often stems from stigma and negative experiences rather than being intrinsic to the child.[27,33]

The GACM is best facilitated through the integration of medical, mental health, and social services, including specific resources and supports for parents and families.[24] Providers work together to destigmatize gender variance, promote the child's self-worth, facilitate access to care, educate families, and advocate for safer community spaces where children are free to develop and explore their gender.[5] A specialized gender-affirmative therapist, when available, may be an asset in helping children and their families build skills for dealing with gender-based stigma, address symptoms of anxiety or depression, and reinforce the child's overall resiliency.[34,35] There is a limited but growing body

of evidence that suggests that using an integrated affirmative model results in young people having fewer mental health concerns whether they ultimately identify as transgender.[24,36,37]

In contrast, "conversion" or "reparative" treatment models are used to prevent children and adolescents from identifying as transgender or to dissuade them from exhibiting gender-diverse expressions. The Substance Abuse and Mental Health Services Administration has concluded that any therapeutic intervention with the goal of changing a youth's gender expression or identity is inappropriate.[33] Reparative approaches have been proven to be not only unsuccessful[38] but also deleterious and are considered outside the mainstream of traditional medical practice.[29,39–42] The AAP described reparative approaches as "unfair and deceptive."[43] At the time of this writing,* conversion therapy was banned by executive regulation in New York and by legislative statutes in 9 other states as well as the District of Columbia.[44]

Pediatric providers have an essential role in assessing gender concerns and providing evidence-based information to assist youth and families in medical decision-making. Not doing so can prolong or exacerbate gender dysphoria and contribute to abuse and stigmatization.[35] If a pediatric provider does not feel prepared to address gender concerns when they occur, then referral to a pediatric or mental health provider with more expertise is appropriate. There is little research on communication and efficacy with transfers in care for youth who identify as TGD,

---

* For more information regarding state-specific laws, please contact the AAP Division of State Government Affairs at stgov@ aap.org.

particularly from pediatric to adult providers.

## DEVELOPMENTAL CONSIDERATIONS

Acknowledging that the capacity for emerging abstract thinking in childhood is important to conceptualize and reflect on identity, gender-affirmation guidelines are being focused on individually tailored interventions on the basis of the physical and cognitive development of youth who identify as TGD.[45] Accordingly, research substantiates that children who are prepubertal and assert an identity of TGD know their gender as clearly and as consistently as their developmentally equivalent peers who identify as cisgender and benefit from the same level of social acceptance.[46] This developmental approach to gender affirmation is in contrast to the outdated approach in which a child's gender-diverse assertions are held as "possibly true" until an arbitrary age (often after pubertal onset) when they can be considered valid, an approach that authors of the literature have termed "watchful waiting." This outdated approach does not serve the child because critical support is withheld. Watchful waiting is based on binary notions of gender in which gender diversity and fluidity is pathologized; in watchful waiting, it is also assumed that notions of gender identity become fixed at a certain age. The approach is also influenced by a group of early studies with validity concerns, methodologic flaws, and limited follow-up on children who identified as TGD and, by adolescence, did not seek further treatment ("desisters").[45,47] More robust and current research suggests that, rather than focusing on who a child will become, valuing them for who they are, even at a young age, fosters secure attachment and resilience, not only for the child but also for the whole family.[5,45,48,49]

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by guest

## MEDICAL MANAGEMENT

Pediatric primary care providers are in a unique position to routinely inquire about gender development in children and adolescents as part of recommended well-child visits[50] and to be a reliable source of validation, support, and reassurance. They are often the first provider to be aware that a child may not identify as cisgender or that there may be distress related to a gender-diverse identity. The best way to approach gender with patients is to inquire directly and nonjudgmentally about their experience and feelings before applying any labels.[27,51]

Many medical interventions can be offered to youth who identify as TGD and their families. The decision of whether and when to initiate gender-affirmative treatment is personal and involves careful consideration of risks, benefits, and other factors unique to each patient and family. Many protocols suggest that clinical assessment of youth who identify as TGD is ideally conducted on an ongoing basis in the setting of a collaborative, multidisciplinary approach, which, in addition to the patient and family, may include the pediatric provider, a mental health provider (preferably with expertise in caring for youth who identify as TGD ), social and legal supports, and a pediatric endocrinologist or adolescent-medicine gender specialist, if available.[6,28] There is no prescribed path, sequence, or end point. Providers can make every effort to be aware of the influence of their own biases. The medical options also vary depending on pubertal and developmental progression.

### Clinical Setting

In the past year, 1 in 4 adults who identified as transgender avoided a necessary doctor's visit because of fear of being mistreated.[31] All clinical office staff have a role in affirming a patient's gender identity. Making flyers available or displaying posters related to LGBTQ health issues, including information for children who identify as TGD and families, reveals inclusivity and awareness. Generally, patients who identify as TGD feel most comfortable when they have access to a gender-neutral restroom. Diversity training that encompasses sensitivity when caring for youth who identify as TGD and their families can be helpful in educating clinical and administrative staff. A patient-asserted name and pronouns are used by staff and are ideally reflected in the electronic medical record without creating duplicate charts.[52,53] The US Centers for Medicare and Medicaid Services and the National Coordinator for Health Information Technology require all electronic health record systems certified under the Meaningful Use incentive program to have the capacity to confidentially collect information on gender identity.[54,55] Explaining and maintaining confidentiality procedures promotes openness and trust, particularly with youth who identify as LGBTQ.[1] Maintaining a safe clinical space can provide at least 1 consistent, protective refuge for patients and families, allowing authentic gender expression and exploration that builds resiliency.

### Pubertal Suppression

Gonadotrophin-releasing hormones have been used to delay puberty since the 1980s for central precocious puberty.[56] These reversible treatments can also be used in adolescents who experience gender dysphoria to prevent development of secondary sex characteristics and provide time up until 16 years of age for the individual and the family to explore gender identity, access psychosocial supports, develop coping skills, and further define appropriate treatment goals. If pubertal suppression treatment is suspended, then endogenous puberty will resume.[20,57,58]

Often, pubertal suppression creates an opportunity to reduce distress that may occur with the development of secondary sexual characteristics and allow for gender-affirming care, including mental health support for the adolescent and the family. It reduces the need for later surgery because physical changes that are otherwise irreversible (protrusion of the Adam's apple, male pattern baldness, voice change, breast growth, etc) are prevented. The available data reveal that pubertal suppression in children who identify as TGD generally leads to improved psychological functioning in adolescence and young adulthood.[20,57–59]

Pubertal suppression is not without risks. Delaying puberty beyond one's peers can also be stressful and can lead to lower self-esteem and increased risk taking.[60] Some experts believe that genital underdevelopment may limit some potential reconstructive options.[61] Research on long-term risks, particularly in terms of bone metabolism[62] and fertility,[63] is currently limited and provides varied results.[57,64,65] Families often look to pediatric providers for help in considering whether pubertal suppression is indicated in the context of their child's overall well-being as gender diverse.

### Gender Affirmation

As youth who identify as TGD reflect on and evaluate their gender identity, various interventions may be considered to better align their gender expression with their underlying identity. This process of reflection, acceptance, and, for some, intervention is known as "gender affirmation." It was formerly referred to as "transitioning," but many view the process as an affirmation and acceptance of who they have always been rather than a transition

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf
by guest

**TABLE 2** The Process of Gender Affirmation May Include ≥1 of the Following Components

| Component | Definition | General Age Range[a] | Reversibility[a] |
|---|---|---|---|
| Social affirmation | Adopting gender-affirming hairstyles, clothing, name, gender pronouns, and restrooms and other facilities | Any | Reversible |
| Puberty blockers | Gonadotropin-releasing hormone analogues, such as leuprolide and histrelin | During puberty (Tanner stage 2–5)[b] | Reversible[c] |
| Cross-sex hormone therapy | Testosterone (for those who were assigned female at birth and are masculinizing); estrogen plus androgen inhibitor (for those who were assigned male at birth and are feminizing) | Early adolescence onward | Partially reversible (skin texture, muscle mass, and fat deposition); irreversible once developed (testosterone: Adam's apple protrusion, voice changes, and male pattern baldness; estrogen: breast development); unknown reversibility (effect on fertility) |
| Gender-affirming surgeries | "Top" surgery (to create a male-typical chest shape or enhance breasts); "bottom" surgery (surgery on genitals or reproductive organs); facial feminization and other procedures | Typically adults (adolescents on case-by-case basis[d]) | Not reversible |
| Legal affirmation | Changing gender and name recorded on birth certificate, school records, and other documents | Any | Reversible |

[a] Note that the provided age range and reversibility is based on the little data that are currently available.

[b] There is limited benefit to starting gonadotropin-releasing hormone after Tanner stage 5 for pubertal suppression. However, when cross-sex hormones are initiated with a gradually increasing schedule, the initial levels are often not high enough to suppress endogenous sex hormone secretion. Therefore, gonadotropin-releasing hormone may be continued in accordance with the Endocrine Society Guidelines.[68]

[c] The effect of sustained puberty suppression on fertility is unknown. Pubertal suppression can be, and often is indicated to be, followed by cross-sex hormone treatment. However, when cross-sex hormones are initiated without endogenous hormones, then fertility may be decreased.[68]

[d] Eligibility criteria for gender-affirmative surgical interventions among adolescents are not clearly defined between established protocols and practice. When applicable, eligibility is usually determined on a case-by-case basis with the adolescent and the family along with input from medical, mental health, and surgical providers.[68–71]

from 1 gender identity to another. Accordingly, some people who have gone through the process prefer to call themselves "affirmed females, males, etc" (or just "females, males, etc"), rather than using the prefix "trans-." Gender affirmation is also used to acknowledge that some individuals who identify as TGD may feel affirmed in their gender without pursuing medical or surgical interventions.[7,66]

Supportive involvement of parents and family is associated with better mental and physical health outcomes.[67] Gender affirmation among adolescents with gender dysphoria often reduces the emphasis on gender in their lives, allowing them to attend to other developmental tasks, such as academic success, relationship building, and future-oriented planning.[64] Most protocols for gender-affirming interventions incorporate World Professional Association of Transgender Health[35] and Endocrine Society[68] recommendations and include ≥1 of the following elements (Table 2):

1. Social Affirmation: This is a reversible intervention in which children and adolescents express partially or completely in their asserted gender identity by adapting hairstyle, clothing, pronouns, name, etc. Children who identify as transgender and socially affirm and are supported in their asserted gender show no increase in depression and only minimal (clinically insignificant) increases in anxiety compared with age-matched averages.[48] Social affirmation can be complicated given the wide range of social interactions children have (eg, extended families, peers, school, community, etc). There is little guidance on the best approach (eg, all at once, gradual, creating new social networks, or affirming within existing networks, etc). Pediatric providers can best support families by anticipating and discussing such complexity proactively, either in their own practice or through enlisting a qualified mental health provider.

2. Legal Affirmation: Elements of a social affirmation, such as a name and gender marker, become official on legal documents, such as birth certificates, passports, identification cards, school documents, etc. The processes for making these changes depend on state laws and may require specific documentation from pediatric providers.

3. Medical Affirmation: This is the process of using cross-sex hormones to allow adolescents who have initiated puberty to develop secondary sex characteristics of the opposite biological sex. Some changes are partially reversible if hormones are stopped, but others become

6

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by quest

irreversible once they are fully developed (Table 2).

4. Surgical Affirmation: Surgical approaches may be used to feminize or masculinize features, such as hair distribution, chest, or genitalia, and may include removal of internal organs, such as ovaries or the uterus (affecting fertility). These changes are irreversible. Although current protocols typically reserve surgical interventions for adults,[35,68] they are occasionally pursued during adolescence on a case-by-case basis, considering the necessity and benefit to the adolescent's overall health and often including multidisciplinary input from medical, mental health, and surgical providers as well as from the adolescent and family.[69–71]

For some youth who identify as TGD whose natal gender is female, menstruation, breakthrough bleeding, and dysmenorrhea can lead to significant distress before or during gender affirmation. The American College of Obstetrics and Gynecology suggests that, although limited data are available to outline management, menstruation can be managed without exogenous estrogens by using a progesterone-only pill, a medroxyprogesterone acetate shot, or a progesterone-containing intrauterine or implantable device.[72] If estrogen can be tolerated, oral contraceptives that contain both progesterone and estrogen are more effective at suppressing menses.[73] The Endocrine Society guidelines also suggest that gonadotrophin-releasing hormones can be used for menstrual suppression before the anticipated initiation of testosterone or in combination with testosterone for breakthrough bleeding (enables phenotypic masculinization at a lower dose than if testosterone is used alone).[68] Masculinizing hormones in natal female patients may lead to a cessation of menses,

but unplanned pregnancies have been reported, which emphasizes the need for ongoing contraceptive counseling with youth who identify as TGD.[72]

## HEALTH DISPARITIES

In addition to societal challenges, youth who identify as TGD face several barriers within the health care system, especially regarding access to care. In 2015, a focus group of youth who identified as transgender in Seattle, Washington, revealed 4 problematic areas related to health care:

1. safety issues, including the lack of safe clinical environments and fear of discrimination by providers;

2. poor access to physical health services, including testing for sexually transmitted infections;

3. inadequate resources to address mental health concerns; and

4. lack of continuity with providers.[74]

This study reveals the obstacles many youth who identify as TGD face in accessing essential services, including the limited supply of appropriately trained medical and psychological providers, fertility options, and insurance coverage denials for gender-related treatments.[74]

Insurance denials for services related to the care of patients who identify as TGD are a significant barrier. Although the Office for Civil Rights of the US Department of Health and Human Services explicitly stated in 2012 that the nondiscrimination provision in the Patient Protection and Affordable Care Act includes people who identify as gender diverse,[75,76] insurance claims for gender affirmation, particularly among youth who identify as TGD, are frequently denied.[54,77] In 1 study, it was found that approximately 25% of individuals

who identified as transgender were denied insurance coverage because of being transgender.[31] The burden of covering medical expenses that are not covered by insurance can be financially devastating, and even when expenses are covered, families describe high levels of stress in navigating and submitting claims appropriately.[78] In 2012, a large gender center in Boston, Massachusetts, reported that most young patients who identified as transgender and were deemed appropriate candidates for recommended gender care were unable to obtain it because of such denials, which were based on the premise that gender dysphoria was a mental disorder, not a physical one, and that treatment was not medically or surgically necessary.[24] This practice not only contributes to stigma, prolonged gender dysphoria, and poor mental health outcomes,[77] but it may also lead patients to seek nonmedically supervised treatments that are potentially dangerous.[24] Furthermore, insurance denials can reinforce a socioeconomic divide between those who can finance the high costs of uncovered care and those who cannot.[24,77]

The transgender youth group in Seattle likely reflected the larger TGD population when they described how obstacles adversely affect self-esteem and contribute to the perception that they are undervalued by society and the health care system.[74,77] Professional medical associations, including the AAP, are increasingly calling for equity in health care provisions regardless of gender identity or expression.[1,8,23,72] There is a critical need for investments in research on the prevalence, disparities, biological underpinnings, and standards of care relating to gender-diverse populations. Pediatric providers who work with state government and insurance officials can play an essential role in advocating for

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf
by guest

stronger nondiscrimination policies and improved coverage.

There is a lack of quality research on the experience of youth of color who identify as transgender. One theory suggests that the intersection of racism, transphobia, and sexism may result in the extreme marginalization that is experienced among many women of color who identify as transgender,[79] including rejection from their family and dropping out of school at younger ages (often in the setting of rigid religious beliefs regarding gender),[80] increased levels of violence and body objectification,[81] 3 times the risk of poverty compared with the general population,[31] and the highest prevalence of HIV compared with other risk groups (estimated as high as 56.3% in 1 meta-analysis).[30] One model suggests that pervasive stigma and oppression can be associated with psychological distress (anxiety, depression, and suicide) and adoption of risk behaviors by such youth to obtain a sense of validation toward their complex identities.[79]

### FAMILY ACCEPTANCE

Research increasingly suggests that familial acceptance or rejection ultimately has little influence on the gender identity of youth; however, it may profoundly affect young people's ability to openly discuss or disclose concerns about their identity. Suppressing such concerns can affect mental health.[82] Families often find it hard to understand and accept their child's gender-diverse traits because of personal beliefs, social pressure, and stigma.[49,83] Legitimate fears may exist for their child's welfare, safety, and acceptance that pediatric providers need to appreciate and address. Families can be encouraged to communicate their concerns and questions. Unacknowledged concerns can contribute to shame and hesitation in regard to offering support and understanding,[84]

which is essential for the child's self-esteem, social involvement, and overall health as TGD.[48,85–87] Some caution has been expressed that unquestioning acceptance per se may not best serve questioning youth or their families. Instead, psychological evidence suggests that the most benefit comes when family members and youth are supported and encouraged to engage in reflective perspective taking and validate their own and the other's thoughts and feelings despite divergent views.[49,82]

In this regard, suicide attempt rates among 433 adolescents in Ontario who identified as "trans" were 4% among those with strongly supportive parents and as high as 60% among those whose parents were not supportive.[85] Adolescents who identify as transgender and endorse at least 1 supportive person in their life report significantly less distress than those who only experience rejection. In communities with high levels of support, it was found that nonsupportive families tended to increase their support over time, leading to dramatic improvement in mental health outcomes among their children who identified as transgender.[88]

Pediatric providers can create a safe environment for parents and families to better understand and listen to the needs of their children while receiving reassurance and education.[83] It is often appropriate to assist the child in understanding the parents' concerns as well. Despite expectations by some youth with transgender identity for immediate acceptance after "coming out," family members often proceed through a process of becoming more comfortable and understanding of the youth's gender identity, thoughts, and feelings. One model suggests that the process resembles grieving, wherein the family separates from their expectations for their child to embrace a new reality. This process may proceed through stages of shock,

denial, anger, feelings of betrayal, fear, self-discovery, and pride.[89] The amount of time spent in any of these stages and the overall pace varies widely. Many family members also struggle as they are pushed to reflect on their own gender experience and assumptions throughout this process. In some situations, youth who identify as TGD may be at risk for internalizing the difficult emotions that family members may be experiencing. In these cases, individual and group therapy for the family members may be helpful.[49,78]

Family dynamics can be complex, involving disagreement among legal guardians or between guardians and their children, which may affect the ability to obtain consent for any medical management or interventions. Even in states where minors may access care without parental consent for mental health services, contraception, and sexually transmitted infections, parental or guardian consent is required for hormonal and surgical care of patients who identify as TGD.[72,90] Some families may take issue with providers who address gender concerns or offer gender-affirming care. In rare cases, a family may deny access to care that raises concerns about the youth's welfare and safety; in those cases, additional legal or ethical support may be useful to consider. In such rare situations, pediatric providers may want to familiarize themselves with relevant local consent laws and maintain their primary responsibility for the welfare of the child.

### SAFE SCHOOLS AND COMMUNITIES

Youth who identify as TGD are becoming more visible because gender-diverse expression is increasingly admissible in the media, on social media, and in schools and communities. Regardless of whether a youth with a gender-diverse

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by quest

identity ultimately identifies as transgender, challenges exist in nearly every social context, from lack of understanding to outright rejection, isolation, discrimination, and victimization. In the US Transgender Survey of nearly 28 000 respondents, it was found that among those who were out as or perceived to be TGD between kindergarten and eighth grade, 54% were verbally harassed, 24% were physically assaulted, and 13% were sexually assaulted; 17% left school because of maltreatment.[31] Education and advocacy from the medical community on the importance of safe schools for youth who identify as TGD can have a significant effect.

At the time of this writing,[*] only 18 states and the District of Columbia had laws that prohibited discrimination based on gender expression when it comes to employment, housing, public accommodations, and insurance benefits. Over 200 US cities have such legislation. In addition to basic protections, many youth who identify as TGD also have to navigate legal obstacles when it comes to legally changing their name and/or gender marker.[54] In addition to advocating and working with policy makers to promote equal protections for youth who identify as TGD, pediatric providers can play an important role by developing a familiarity with local laws and organizations that provide social work and legal assistance to youth who identify as TGD and their families.

School environments play a significant role in the social and emotional development of children. Every child has a right to feel safe

* For more information regarding state-specific laws, please contact the AAP Division of State Government Affairs at stgov@ aap.org.

and respected at school, but for youth who identify as TGD, this can be challenging. Nearly every aspect of school life may present safety concerns and require negotiations regarding their gender expression, including name/pronoun use, use of bathrooms and locker rooms, sports teams, dances and activities, overnight activities, and even peer groups. Conflicts in any of these areas can quickly escalate beyond the school's control to larger debates among the community and even on a national stage.

The formerly known Gay, Lesbian, and Straight Education Network (GLSEN), an advocacy organization for youth who identify as LGBTQ, conducts an annual national survey to measure LGBTQ well-being in US schools. In 2015, students who identified as LGBTQ reported high rates of being discouraged from participation in extracurricular activities. One in 5 students who identified as LGBTQ reported being hindered from forming or participating in a club to support lesbian, gay, bisexual, or transgender students (eg, a gay straight alliance, now often referred to as a genders and sexualities alliance) despite such clubs at schools being associated with decreased reports of negative remarks about sexual orientation or gender expression, increased feelings of safety and connectedness at school, and lower levels of victimization. In addition, >20% of students who identified as LGBTQ reported being blocked from writing about LGBTQ issues in school yearbooks or school newspapers or being prevented or discouraged by coaches and school staff from participating in sports because of their sexual orientation or gender expression.[91]

One strategy to prevent conflict is to proactively support policies and protections that promote inclusion and safety of all students. However, such policies are far from

consistent across districts. In 2015, GLSEN found that 43% of children who identified as LGBTQ reported feeling unsafe at school because of their gender expression, but only 6% reported that their school had official policies to support youth who identified as TGD, and only 11% reported that their school's antibullying policies had specific protections for gender expression.[91] Consequently, more than half of the students who identified as transgender in the study were prevented from using the bathroom, names, or pronouns that aligned with their asserted gender at school. A lack of explicit policies that protected youth who identified as TGD was associated with increased reported victimization, with more than half of students who identified as LGBTQ reporting verbal harassment because of their gender expression. Educators and school administrators play an essential role in advocating for and enforcing such policies. GLSEN found that when students recognized actions to reduce gender-based harassment, both students who identified as transgender and cisgender reported a greater connection to staff and feelings of safety.[91] In another study, schools were open to education regarding gender diversity and were willing to implement policies when they were supported by external agencies, such as medical professionals.[92]

Academic content plays an important role in building a safe school environment as well. The 2015 GLSEN survey revealed that when positive representations of people who identified as LGBTQ were included in the curriculum, students who identified as LGBTQ reported less hostile school environments, less victimization and greater feelings of safety, fewer school absences because of feeling unsafe, greater feelings of connectedness to their school

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf
by guest

community, and an increased interest in high school graduation and postsecondary education.[91] At the time of this writing,* 8 states had laws that explicitly forbade teachers from even discussing LGBTQ issues.[54]

## MEDICAL EDUCATION

One of the most important ways to promote high-quality health care for youth who identify as TGD and their families is increasing the knowledge base and clinical experience of pediatric providers in providing culturally competent care to such populations, as recommended by the recently released guidelines by the Association of American Medical Colleges.[93] This begins with the medical school curriculum in areas such as human development, sexual health, endocrinology, pediatrics, and psychiatry. In a 2009–2010 survey of US medical schools, it was found that the median number of hours dedicated to LGBTQ health was 5, with one-third of US medical schools reporting no LGBTQ curriculum during the clinical years.[94]

During residency training, there is potential for gender diversity to be emphasized in core rotations, especially in pediatrics, psychiatry, family medicine, and obstetrics and gynecology. Awareness could be promoted through the inclusion of topics relevant to caring for children who identify as TGD in the list of core competencies published by the American Board of Pediatrics, certifying examinations, and relevant study materials. Continuing education and maintenance of certification activities can include topics relevant to TGD populations as well.

---

* For more information regarding state-specific laws, please contact the AAP Division of State Government Affairs at stgov@ aap.org.

## RECOMMENDATIONS

The AAP works toward all children and adolescents, regardless of gender identity or expression, receiving care to promote optimal physical, mental, and social well-being. Any discrimination based on gender identity or expression, real or perceived, is damaging to the socioemotional health of children, families, and society. In particular, the AAP recommends the following:

1. that youth who identify as TGD have access to comprehensive, gender-affirming, and developmentally appropriate health care that is provided in a safe and inclusive clinical space;

2. that family-based therapy and support be available to recognize and respond to the emotional and mental health needs of parents, caregivers, and siblings of youth who identify as TGD;

3. that electronic health records, billing systems, patient-centered notification systems, and clinical research be designed to respect the asserted gender identity of each patient while maintaining confidentiality and avoiding duplicate charts;

4. that insurance plans offer coverage for health care that is specific to the needs of youth who identify as TGD, including coverage for medical, psychological, and, when indicated, surgical gender-affirming interventions;

5. that provider education, including medical school, residency, and continuing education, integrate core competencies on the emotional and physical health needs and best practices for the care of youth who identify as TGD and their families;

6. that pediatricians have a role in advocating for, educating, and developing liaison relationships

with school districts and other community organizations to promote acceptance and inclusion of all children without fear of harassment, exclusion, or bullying because of gender expression;

7. that pediatricians have a role in advocating for policies and laws that protect youth who identify as TGD from discrimination and violence;

8. that the health care workforce protects diversity by offering equal employment opportunities and workplace protections, regardless of gender identity or expression; and

9. that the medical field and federal government prioritize research that is dedicated to improving the quality of evidence-based care for youth who identify as TGD.

### LEAD AUTHOR

Jason Richard Rafferty, MD, MPH, EdM, FAAP

### CONTRIBUTOR

Robert Garofalo, MD, FAAP

### COMMITTEE ON PSYCHOSOCIAL ASPECTS OF CHILD AND FAMILY HEALTH, 2017–2018

Michael Yogman, MD, FAAP, Chairperson
Rebecca Baum, MD, FAAP
Thresia B. Gambon, MD, FAAP
Arthur Lavin, MD, FAAP
Gerri Mattson, MD, FAAP
Lawrence Sagin Wissow, MD, MPH, FAAP

### LIAISONS

Sharon Berry, PhD, LP — *Society of Pediatric Psychology*
Ed Christophersen, PhD, FAAP — *Society of Pediatric Psychology*
Norah Johnson, PhD, RN, CPNP-BC — *National Association of Pediatric Nurse Practitioners*
Amy Starin, PhD, LCSW — *National Association of Social Workers*
Abigail Schlesinger, MD — *American Academy of Child and Adolescent Psychiatry*

### STAFF

Karen S. Smith
James Baumberger

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf
by guest

## COMMITTEE ON ADOLESCENCE, 2017–2018

Cora Breuner, MD, MPH, FAAP, Chairperson
Elizabeth M. Alderman, MD, FSAHM, FAAP
Laura K. Grubb, MD, MPH, FAAP
Makia E. Powers, MD, MPH, FAAP
Krishna Upadhya, MD, FAAP
Stephenie B. Wallace, MD, FAAP

### LIAISONS

Laurie Hornberger, MD, MPH, FAAP — *Section on Adolescent Health*
Liwei L. Hua, MD, PhD — *American Academy of Child and Adolescent Psychiatry*
Margo A. Lane, MD, FRCPC, FAAP — *Canadian Paediatric Society*
Meredith Loveless, MD, FACOG — *American College of Obstetricians and Gynecologists*
Seema Menon, MD — *North American Society of Pediatric and Adolescent Gynecology*
CDR Lauren B. Zapata, PhD, MSPH — *Centers for Disease Control and Prevention*

## STAFF

Karen Smith

## SECTION ON LESBIAN, GAY, BISEXUAL, AND TRANSGENDER HEALTH AND WELLNESS EXECUTIVE COMMITTEE, 2016–2017

Lynn Hunt, MD, FAAP, Chairperson
Anne Teresa Gearhart, MD, FAAP
Christopher Harris, MD, FAAP
Kathryn Melland Lowe, MD, FAAP
Chadwick Taylor Rodgers, MD, FAAP
Ilana Michelle Sherer, MD, FAAP

### FORMER EXECUTIVE COMMITTEE MEMBERS

Ellen Perrin, MD, MA, FAAP

### LIAISON

Joseph H. Waters, MD — *AAP Section on Pediatric Trainees*

### STAFF

Renee Jarrett, MPH

## ACKNOWLEDGMENTS

We thank Isaac Albanese, MPA, and Jayeson Watts, LICSW, for their thoughtful reviews and contributions.

### ABBREVIATIONS

AAP:  American Academy of Pediatrics
GACM:  gender-affirmative care model
GLSEN:  Gay, Lesbian, and Straight Education Network
LGBTQ:  lesbian, gay, bisexual, transgender, or questioning
TGD:  transgender and gender diverse

**DOI:** https://doi.org/10.1542/peds.2018-2162

PEDIATRICS (ISSN Numbers: Print, 0031-4005; Online, 1098-4275).

Copyright © 2018 by the American Academy of Pediatrics

**FINANCIAL DISCLOSURE:** The author has indicated he has no financial relationships relevant to this article to disclose.

**FUNDING:** No external funding.

**POTENTIAL CONFLICT OF INTEREST:** The author has indicated he has no potential conflicts of interest to disclose.

## REFERENCES

1. Levine DA; Committee on Adolescence. Office-based care for lesbian, gay, bisexual, transgender, and questioning youth. *Pediatrics*. 2013;132(1). Available at: www.pediatrics.org/cgi/content/full/132/1/e297

2. American Academy of Pediatrics Committee on Adolescence. Homosexuality and adolescence. *Pediatrics*. 1983;72(2):249–250

3. Institute of Medicine; Committee on Lesbian Gay Bisexual, and Transgender Health Issues and Research Gaps and Opportunities. *The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding*. Washington, DC: National Academies Press; 2011. Available at: https://www.ncbi.nlm.nih.gov/books/NBK64806. Accessed May 19, 2017

4. Deutsch MB, Radix A, Reisner S. What's in a guideline? Developing collaborative and sound research designs that substantiate best practice recommendations for transgender health care. *AMA J Ethics*. 2016;18(11):1098–1106

5. Bonifacio HJ, Rosenthal SM. Gender variance and dysphoria in children and adolescents. *Pediatr Clin North Am*. 2015;62(4):1001–1016

6. Vance SR Jr, Ehrensaft D, Rosenthal SM. Psychological and medical care of gender nonconforming youth. *Pediatrics*. 2014;134(6):1184–1192

7. Richards C, Bouman WP, Seal L, Barker MJ, Nieder TO, T'Sjoen G. Non-binary or genderqueer genders. *Int Rev Psychiatry*. 2016;28(1):95–102

8. American Psychological Association. Guidelines for psychological practice with transgender and gender nonconforming people. *Am Psychol*. 2015;70(9):832–864

9. Flores AR, Herman JL, Gates GJ, Brown TNT. *How Many Adults Identify as Transgender in the United States*. Los Angeles, CA: The Williams Institute; 2016

10. Herman JL, Flores AR, Brown TNT, Wilson BDM, Conron KJ. *Age of Individuals Who Identify as Transgender in the United States*. Los Angeles, CA: The Williams Institute; 2017

11. Gates GJ. *How Many People are Lesbian, Gay, Bisexual, and Transgender?* Los Angeles, CA: The Williams Institute; 2011

12. Olson J, Schrager SM, Belzer M, Simons LK, Clark LF. Baseline physiologic and psychosocial characteristics of transgender youth seeking care for gender dysphoria. *J Adolesc Health*. 2015;57(4):374–380

13. Reisner SL, Vetters R, Leclerc M, et al. Mental health of transgender youth in care

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by quest

at an adolescent urban community health center: a matched retrospective cohort study. *J Adolesc Health*. 2015;56(3):274–279

14. Clements-Nolle K, Marx R, Katz M. Attempted suicide among transgender persons: the influence of gender-based discrimination and victimization. *J Homosex*. 2006;51(3):53–69

15. Colizzi M, Costa R, Todarello O. Transsexual patients' psychiatric comorbidity and positive effect of cross-sex hormonal treatment on mental health: results from a longitudinal study. *Psychoneuroendocrinology*. 2014;39:65–73

16. Haas AP, Eliason M, Mays VM, et al. Suicide and suicide risk in lesbian, gay, bisexual, and transgender populations: review and recommendations. *J Homosex*. 2011;58(1):10–51

17. Maguen S, Shipherd JC. Suicide risk among transgender individuals. *Psychol Sex*. 2010;1(1):34–43

18. Connolly MD, Zervos MJ, Barone CJ II, Johnson CC, Joseph CL. The mental health of transgender youth: advances in understanding. *J Adolesc Health*. 2016;59(5):489–495

19. Grossman AH, D'Augelli AR. Transgender youth and life-threatening behaviors. *Suicide Life Threat Behav*. 2007;37(5):527–537

20. Spack NP, Edwards-Leeper L, Feldman HA, et al. Children and adolescents with gender identity disorder referred to a pediatric medical center. *Pediatrics*. 2012;129(3):418–425

21. van Schalkwyk GI, Klingensmith K, Volkmar FR. Gender identity and autism spectrum disorders. *Yale J Biol Med*. 2015;88(1):81–83

22. Jacobs LA, Rachlin K, Erickson-Schroth L, Janssen A. Gender dysphoria and co-occurring autism spectrum disorders: review, case examples, and treatment considerations. *LGBT Health*. 2014;1(4):277–282

23. American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders*. 5th ed. Arlington, VA: American Psychiatric Association; 2013

24. Edwards-Leeper L, Spack NP. Psychological evaluation and medical treatment of transgender youth in an interdisciplinary "Gender Management Service" (GeMS) in a major pediatric center. *J Homosex*. 2012;59(3):321–336

25. Anton BS. Proceedings of the American Psychological Association for the legislative year 2008: minutes of the annual meeting of the Council of Representatives, February 22–24, 2008, Washington, DC, and August 13 and 17, 2008, Boston, MA, and minutes of the February, June, August, and December 2008 meetings of the Board of Directors. *Am Psychol*. 2009;64(5):372–453

26. Drescher J, Haller E; American Psychiatric Association Caucus of Lesbian, Gay and Bisexual Psychiatrists. *Position Statement on Discrimination Against Transgender and Gender Variant Individuals*. Washington, DC: American Psychiatric Association; 2012

27. Hidalgo MA, Ehrensaft D, Tishelman AC, et al. The gender affirmative model: what we know and what we aim to learn. *Hum Dev*. 2013;56(5):285–290

28. Tishelman AC, Kaufman R, Edwards-Leeper L, Mandel FH, Shumer DE, Spack NP. Serving transgender youth: challenges, dilemmas and clinical examples. *Prof Psychol Res Pr*. 2015;46(1):37–45

29. Adelson SL; American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Quality Issues (CQI). Practice parameter on gay, lesbian, or bisexual sexual orientation, gender nonconformity, and gender discordance in children and adolescents. *J Am Acad Child Adolesc Psychiatry*. 2012;51(9):957–974

30. Herbst JH, Jacobs ED, Finlayson TJ, McKleroy VS, Neumann MS, Crepaz N; HIV/AIDS Prevention Research Synthesis Team. Estimating HIV prevalence and risk behaviors of transgender persons in the United States: a systematic review. *AIDS Behav*. 2008;12(1):1–17

31. James SE, Herman JL, Rankin S, Keisling M, Mottet L, Anafi M. *The Report of the 2015 U.S. Transgender Survey*. Washington, DC: National Center for Transgender Equality; 2016

32. Centers for Disease Control and Prevention. *CDC-Funded HIV Testing: United States, Puerto Rico, and the U.S. Virgin Islands*. Atlanta, GA: Centers for Disease Control and Prevention; 2015. Available at: https://www.cdc.gov/hiv/pdf/library/reports/cdc-hiv-funded-testing-us-puerto-rico-2015.pdf. Accessed August 2, 2018

33. Substance Abuse and Mental Health Services Administration. *Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth*. Rockville, MD: Substance Abuse and Mental Health Services Administration; 2015

34. Korell SC, Lorah P. An overview of affirmative psychotherapy and counseling with transgender clients. In: Bieschke KJ, Perez RM, DeBord KA, eds. *Handbook of Counseling and Psychotherapy With Lesbian, Gay, Bisexual, and Transgender Clients*. 2nd ed. Washington, DC: American Psychological Association; 2007:271–288

35. World Professional Association for Transgender Health. *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People*. 7th ed. Minneapolis, MN: World Professional Association for Transgender Health; 2011. Available at: https://www.wpath.org/publications/soc. Accessed April 15, 2018

36. Menvielle E. A comprehensive program for children with gender variant behaviors and gender identity disorders. *J Homosex*. 2012;59(3):357–368

37. Hill DB, Menvielle E, Sica KM, Johnson A. An affirmative intervention for families with gender variant children: parental ratings of child mental health and gender. *J Sex Marital Ther*. 2010;36(1):6–23

38. Haldeman DC. The practice and ethics of sexual orientation conversion therapy. *J Consult Clin Psychol*. 1994;62(2):221–227

39. Byne W. Regulations restrict practice of conversion therapy. *LGBT Health*. 2016;3(2):97–99

40. Cohen-Kettenis PT, Delemarre-van de Waal HA, Gooren LJ. The treatment of adolescent transsexuals: changing insights. *J Sex Med*. 2008;5(8):1892–1897

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by guest

41. Bryant K. Making gender identity disorder of childhood: historical lessons for contemporary debates. *Sex Res Soc Policy*. 2006;3(3):23–39

42. World Professional Association for Transgender Health. *WPATH De-Psychopathologisation Statement*. Minneapolis, MN: World Professional Association for Transgender Health; 2010. Available at: https://www.wpath.org/policies. Accessed April 16, 2017

43. American Academy of Pediatrics. AAP support letter conversion therapy ban [letter]. 2015. Available at: https://www.aap.org/en-us/advocacy-and-policy/federal-advocacy/Documents/AAPsupportletterconversiontherapyban.pdf. Accessed August 1, 2018

44. Movement Advancement Project. *LGBT Policy Spotlight: Conversion Therapy Bans*. Boulder, CO: Movement Advancement Project; 2017. Available at: http://www.lgbtmap.org/policy-and-issue-analysis/policy-spotlight-conversion-therapy-bans. Accessed August 6, 2017

45. Ehrensaft D, Giammattei SV, Storck K, Tishelman AC, Keo-Meier C. Prepubertal social gender transitions: what we know; what we can learn—a view from a gender affirmative lens. *Int J Transgend*. 2018;19(2):251–268

46. Olson KR, Key AC, Eaton NR. Gender cognition in transgender children. *Psychol Sci*. 2015;26(4):467–474

47. Olson KR. Prepubescent transgender children: what we do and do not know. *J Am Acad Child Adolesc Psychiatry*. 2016;55(3):155–156.e3

48. Olson KR, Durwood L, DeMeules M, McLaughlin KA. Mental health of transgender children who are supported in their identities. *Pediatrics*. 2016;137(3):e20153223

49. Malpas J. Between pink and blue: a multi-dimensional family approach to gender nonconforming children and their families. *Fam Process*. 2011;50(4):453–470

50. Hagan JF Jr, Shaw JS, Duncan PM, eds. *Bright Futures: Guidelines for Health Supervision of Infants, Children, and Adolescents*. 4th ed. Elk Grove, IL: American Academy of Pediatrics; 2016

51. Minter SP. Supporting transgender children: new legal, social, and medical approaches. *J Homosex*. 2012;59(3):422–433

52. AHIMA Work Group. Improved patient engagement for LGBT populations: addressing factors related to sexual orientation/gender identity for effective health information management. *J AHIMA*. 2017;88(3):34–39

53. Deutsch MB, Green J, Keatley J, Mayer G, Hastings J, Hall AM; World Professional Association for Transgender Health EMR Working Group. Electronic medical records and the transgender patient: recommendations from the World Professional Association for Transgender Health EMR Working Group. *J Am Med Inform Assoc*. 2013;20(4):700–703

54. Dowshen N, Meadows R, Byrnes M, Hawkins L, Eder J, Noonan K. Policy perspective: ensuring comprehensive care and support for gender nonconforming children and adolescents. *Transgend Health*. 2016;1(1):75–85

55. Cahill SR, Baker K, Deutsch MB, Keatley J, Makadon HJ. Inclusion of sexual orientation and gender identity in stage 3 meaningful use guidelines: a huge step forward for LGBT health. *LGBT Health*. 2016;3(2):100–102

56. Mansfield MJ, Beardsworth DE, Loughlin JS, et al. Long-term treatment of central precocious puberty with a long-acting analogue of luteinizing hormone-releasing hormone. Effects on somatic growth and skeletal maturation. *N Engl J Med*. 1983;309(21):1286–1290

57. Olson J, Garofalo R. The peripubertal gender-dysphoric child: puberty suppression and treatment paradigms. *Pediatr Ann*. 2014;43(6):e132–e137

58. de Vries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT. Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study. *J Sex Med*. 2011;8(8):2276–2283

59. Wallien MS, Cohen-Kettenis PT. Psychosexual outcome of gender-dysphoric children. *J Am Acad Child Adolesc Psychiatry*. 2008;47(12):1413–1423

60. Waylen A, Wolke D. Sex 'n' drugs 'n' rock 'n' roll: the meaning and social consequences of pubertal timing. *Eur J Endocrinol*. 2004;151(suppl 3):U151–U159

61. de Vries AL, Klink D, Cohen-Kettenis PT. What the primary care pediatrician needs to know about gender incongruence and gender dysphoria in children and adolescents. *Pediatr Clin North Am*. 2016;63(6):1121–1135

62. Vlot MC, Klink DT, den Heijer M, Blankenstein MA, Rotteveel J, Heijboer AC. Effect of pubertal suppression and cross-sex hormone therapy on bone turnover markers and bone mineral apparent density (BMAD) in transgender adolescents. *Bone*. 2017;95:11–19

63. Finlayson C, Johnson EK, Chen D, et al. Proceedings of the working group session on fertility preservation for individuals with gender and sex diversity. *Transgend Health*. 2016;1(1):99–107

64. Kreukels BP, Cohen-Kettenis PT. Puberty suppression in gender identity disorder: the Amsterdam experience. *Nat Rev Endocrinol*. 2011;7(8):466–472

65. Rosenthal SM. Approach to the patient: transgender youth: endocrine considerations. *J Clin Endocrinol Metab*. 2014;99(12):4379–4389

66. Fenway Health. *Glossary of Gender and Transgender Terms*. Boston, MA: Fenway Health; 2010. Available at: http://fenwayhealth.org/documents/the-fenway-institute/handouts/Handout_7-C_Glossary_of_Gender_and_Transgender_Terms__fi.pdf. Accessed August 16, 2017

67. de Vries AL, McGuire JK, Steensma TD, Wagenaar EC, Doreleijers TA, Cohen-Kettenis PT. Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics*. 2014;134(4):696–704

68. Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: an endocrine society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(11):3869–3903

69. Milrod C, Karasic DH. Age is just a number: WPATH-affiliated surgeons' experiences and attitudes toward

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by guest

vaginoplasty in transgender females under 18 years of age in the United States. *J Sex Med*. 2017;14(4):624–634

70. Milrod C. How young is too young: ethical concerns in genital surgery of the transgender MTF adolescent. *J Sex Med*. 2014;11(2):338–346

71. Olson-Kennedy J, Warus J, Okonta V, Belzer M, Clark LF. Chest reconstruction and chest dysphoria in transmasculine minors and young adults: comparisons of nonsurgical and postsurgical cohorts. *JAMA Pediatr*. 2018;172(5):431–436

72. Committee on Adolescent Health Care. Committee opinion no. 685: care for transgender adolescents. *Obstet Gynecol*. 2017;129(1):e11–e16

73. Greydanus DE, Patel DR, Rimsza ME. Contraception in the adolescent: an update. *Pediatrics*. 2001;107(3):562–573

74. Gridley SJ, Crouch JM, Evans Y, et al. Youth and caregiver perspectives on barriers to gender-affirming health care for transgender youth. *J Adolesc Health*. 2016;59(3):254–261

75. Sanchez NF, Sanchez JP, Danoff A. Health care utilization, barriers to care, and hormone usage among male-to-female transgender persons in New York City. *Am J Public Health*. 2009;99(4):713–719

76. Transgender Law Center. *Affordable Care Act Fact Sheet*. Oakland, CA: Transgender Law Center; 2016. Available at: https://transgenderlawcenter.org/resources/health/aca-fact-sheet. Accessed August 8, 2016

77. Nahata L, Quinn GP, Caltabellotta NM, Tishelman AC. Mental health concerns and insurance denials among transgender adolescents. *LGBT Health*. 2017;4(3):188–193

78. Grant JM, Mottet LA, Tanis J, Harrison J, Herman JL, Keisling M. *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*. Washington, DC: National Center for Transgender Equality and National Gay and Lesbian Task Force; 2011 Available at: http://www.thetaskforce.org/static_html/downloads/reports/reports/ntds_full.pdf. Accessed August 6, 2018

79. Sevelius JM. Gender affirmation: a framework for conceptualizing risk behavior among transgender women of color. *Sex Roles*. 2013;68(11–12):675–689

80. Koken JA, Bimbi DS, Parsons JT. Experiences of familial acceptance-rejection among transwomen of color. *J Fam Psychol*. 2009;23(6):853–860

81. Lombardi EL, Wilchins RA, Priesing D, Malouf D. Gender violence: transgender experiences with violence and discrimination. *J Homosex*. 2001;42(1):89–101

82. Wren B. 'I can accept my child is transsexual but if I ever see him in a dress I'll hit him': dilemmas in parenting a transgendered adolescent. *Clin Child Psychol Psychiatry*. 2002;7(3):377–397

83. Riley EA, Sitharthan G, Clemson L, Diamond M. The needs of gender-variant children and their parents: a parent survey. *Int J Sex Health*. 2011;23(3):181–195

84. Whitley CT. Trans-kin undoing and redoing gender: negotiating relational identity among friends and family of transgender persons. *Sociol Perspect*. 2013;56(4):597–621

85. Travers R, Bauer G, Pyne J, Bradley K, Gale L, Papadimitriou M; Trans PULSE; Children's Aid Society of Toronto; Delisle Youth Services. *Impacts of Strong Parental Support for Trans Youth: A Report Prepared for Children's Aid Society of Toronto and Delisle Youth Services*. Toronto, ON: Trans PULSE; 2012. Available at: http://transpulseproject.ca/wp-content/uploads/2012/10/Impacts-of-Strong-Parental-Support-for-Trans-Youth-vFINAL.pdf

86. Ryan C, Russell ST, Huebner D, Diaz R, Sanchez J. Family acceptance in adolescence and the health of LGBT young adults. *J Child Adolesc Psychiatr Nurs*. 2010;23(4):205–213

87. Grossman AH, D'augelli AR, Frank JA. Aspects of psychological resilience among transgender youth. *J LGBT Youth*. 2011;8(2):103–115

88. McConnell EA, Birkett M, Mustanski B. Families matter: social support and mental health trajectories among lesbian, gay, bisexual, and transgender youth. *J Adolesc Health*. 2016;59(6):674–680

89. Ellis KM, Eriksen K. Transsexual and transgenderist experiences and treatment options. *Fam J Alex Va*. 2002;10(3):289–299

90. Lamda Legal. *Transgender Rights Toolkit: A Legal Guide for Trans People and Their Advocates*. New York, NY: Lambda Legal; 2016 Available at: https://www.lambdalegal.org/publications/trans-toolkit. Accessed August 6, 2018

91. Kosciw JG, Greytak EA, Giga NM, Villenas C, Danischewski DJ. *The 2015 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*. New York, NY: GLSEN; 2016. Available at: https://www.glsen.org/article/2015-national-school-climate-survey. Accessed August 8, 2018

92. McGuire JK, Anderson CR, Toomey RB, Russell ST. School climate for transgender youth: a mixed method investigation of student experiences and school responses. *J Youth Adolesc*. 2010;39(10):1175–1188

93. Association of American Medical Colleges Advisory Committee on Sexual Orientation, Gender Identity, and Sex Development. In: Hollenback AD, Eckstrand KL, Dreger A, eds. *Implementing Curricular and Institutional Climate Changes to Improve Health Care for Individuals Who Are LGBT, Gender Nonconforming, or Born With DSD: A Resource for Medical Educators*. Washington, DC: Association of American Medical Colleges; 2014. Available at: https://members.aamc.org/eweb/upload/Executive LGBT FINAL.pdf. Accessed August 8, 2018

94. Obedin-Maliver J, Goldsmith ES, Stewart L, et al. Lesbian, gay, bisexual, and transgender-related content in undergraduate medical education. *JAMA*. 2011;306(9):971–977

Downloaded from http://publications.aap.org/pediatrics/article-pdf/142/4/e20182162/1529435/peds_20182162.pdf by guest

# EXHIBIT 4

PUBLIC

BEFORE THE UNITED STATES
FEDERAL TRADE COMMISSION

| | |
|---|---|
| In the Matter of | ) PUBLIC |
| | ) |
| Civil Investigative Demand | ) File No. P264800 |
| dated January 15, 2026, to American Academy | ) |
| of Pediatrics | ) |

**DECLARATION OF ROBERT KATCHEN IN SUPPORT OF
PETITION TO QUASH OR LIMIT CIVIL INVESTIGATIVE DEMAND**

I, Robert Katchen, declare the following:

1.  I am Senior Vice President of Information Technology at the American Academy of
    Pediatrics ("AAP"). I have held that position since February 2012.

2.  I have reviewed the January 15, 2026 CID ("CID") served on AAP. I have also reviewed the
    February 5, 2026 letter from FTC staff regarding the January 2026 CID.

3.  The CID contains fifteen interrogatories and twelve document requests. The applicable time
    period is more than five years, and as modified, some of the most burdensome requests seek
    information and documents from over a decade ago to present. Some requests still seek
    documents regardless of time period (Request Nos. B.4-5, seeking Communications with
    Professional Medical Organizations and other organizations).

4.  The interrogatories are extremely broad. They seek information on topics including: (1) all
    information about benefits and services provided to members; (2) training and certification
    programs; (3) various workshops, townhalls, or other sessions and conferences hosted by
    AAP related to statements about gender-affirming care; (4) any disseminated materials
    concerning statements about gender-affirming care; (5) internal processes for developing
    AAP's policy statement about gender-affirming care; (6) financial information; (7) formal

PUBLIC

and informal complaints, including investigations and lawsuits about certain statements; (8) identification of every individual or entity responsible for developing these statements; and (9) record retention policies.

5. The document requests are similarly overinclusive. Among other things, they require production of (1) all documents referenced or relied upon in answering any of the CID interrogatories; (2) all documents relating to substantiation for making statements about gender-affirming care; (3) all communications with professional medical organizations and other institutions or individuals related to those same statements; (4) all materials used for education, training, or certification programs; (5) all testimony or information provided to legislatures or regulators about these statements; (6) all recordings, transcripts, and documents related to any event hosted concerning gender-affirming care; (7) all documents disseminated referencing statements about gender-affirming care; and (8) financial documents.

6. AAP is a 501(c)(3) non-profit organization with limited operational capacity. There are four system administrators who could assist with the task of collecting and reviewing relevant documents. Of the four individuals, two of them would require additional training. These individuals are extremely busy with performing essential information technology, systems maintenance, and cybersecurity and information-security functions to support AAP's mission. AAP also only has two full-time lawyers, no paralegals, and no dedicated discovery professionals or administrative assistants. Because of these limited resources, I expect that compliance with these requests would require significant time and resources from individuals at AAP whose job responsibilities are focused on advancing AAP's mission of improving children's health.

7. The CID calls for documents that are maintained in multiple internal repositories, including network drives and Sharepoint. In addition, the CID requests documents that may be locally stored on individual employee laptops. AAP does not have a dedicated system for collecting electronic communications such as emails and chat messages and lacks efficient search tools beyond Microsoft's native functionality, which would be extremely laborious to use for the volume of documents requested by the CID. In particular, the process of searching individual employee laptops would be extremely laborious as it would require manual, individual searches and assistance from AAP's system administrators, which would divert them from their daily support of AAP staff. Overall, it would require significant time to not only locate where all the relevant materials are stored, but also to manually collect these documents, review them for responsiveness, and prepare them for production.

8. Materials related to publications and education are also stored on several third-party platforms that are only accessible by a few AAP employees, who perform other substantial responsibilities, such as developing educational programming. Responding to these requests would impose a substantial additional burden and require coordination with these service providers, resulting in additional costs for AAP.

9. Staff's proposed production schedule, which requires the first production on February 16 and the next production one month later, fails to account for the burdens associated with all of the CID's requests. I project that complying with these requests will take significantly more time and effort than allowed for by the current schedule.

10. Given the breadth of the interrogatory topics and the volume of documents the CID requests, I predict that complying with these requests would take extraordinary time and effort by AAP

**PUBLIC**

employees even if the production schedule is extended. This will divert attention away from carrying out AAP's mission of promoting the health of children and adolescents.

11. For the reasons above, it is extremely burdensome for AAP to comply with the CID as issued, even with the modification set forth in staff's letter.

I declare that the foregoing is true and correct to the best of my knowledge.

Executed on 2/9 , 2026.

Robert Katchen

## BEFORE THE UNITED STATES
## FEDERAL TRADE COMMISSION

|  |  |  |
|---|---|---|
| | ) | |
| In the Matter of | ) | **PUBLIC** |
| | ) | |
| Civil Investigative Demand | ) | File No. P264800 |
| dated January 15, 2026, to American Academy | ) | |
| of Pediatrics | ) | |
| | ) | |

### STATEMENT OF COUNSEL PURSUANT TO 16 C.F.R. § 2.10(a)(2)

Counsel for petitioners, Covington & Burling LLP ("Covington"), respectfully submits this Statement of Counsel pursuant to 16 C.F.R. § 2.10(a)(2) in support of the Petition to Quash or Limit filed by American Academy of Pediatrics ("AAP") on February 9, 2026.

The CID was served on AAP on January 16, 2026. Covington reached out to FTC staff on January 30, 2026 to schedule a meet-and-confer. Staff agreed to meet on February 2, 2026.

On Monday, February 2, 2026 at 3pm ET, Covington met with staff via videoconference to discuss the CID. Laura Kim and Alexandra Remick attended on behalf of AAP, and Jonathan Cohen, Gregory Ashe, and Annie Chiang attended on behalf of the Commission. During the meeting, Covington raised several concerns with the Commission's authority to issue the CID.

First, Covington asked staff about the genesis of the investigation, and what the Commission's purpose was in conducting it given the highly unusual nature of a CID issued to a non-profit organization focused on non-commercial statements. Staff generally stated he could not share that information, but that a high level, AAP could infer from the CID that there were concerns that representations were being made to "consumers" about the safety and efficacy of "purported treatments for pediatric gender dysphoria."

Second, Covington raised threshold jurisdictional concerns with the CID, noting that AAP is a non-profit organization dedicated to the welfare of children, not the economic interests

of pediatricians, making it not a "person, partnership, or corporation" under the FTC Act. Covington quoted from AAP's Articles of Incorporation, which expressly state this mission. Staff stated that AAP was not "ruled out as a target" of the investigation. Staff did not explain why AAP was an appropriate target for an FTC investigation, and instead justified the CID's scope by asserting the FTC had broad investigatory authority.

Third, Covington asked whether the Commission viewed AAP's medical and scientific guidance material as "commercial" speech that is subject to the Commission's jurisdiction. In particular, Covington explained that the 2018 Policy Statement—a focus of the investigation—is medical guidance provided by physicians and scientists that is free to the public and does not promote the purchase of any product or service. Staff declined to address these questions, stating that the meet-and-confer was not the appropriate venue for such discussion and that it did not "make a difference" whether staff considered the speech to be commercial.

Fourth, Covington also raised First Amendment concerns, asking why the CID would not abridge AAP's constitutional rights, for instance by chilling medical discourse. In response, staff conveyed that the First Amendment had been considered but expressed skepticism that the CID would have a chilling effect, stating that the CID would not have been issued if staff believed it violated the First Amendment. Staff declined to engage in further discussion of AAP's First Amendment concerns by stating that such discussion was not "constructive" during a meet-and-confer.

Fifth, Covington also asked about how the CID aligned with the authorizing resolutions, in particular the resolution on "advertising, marketing, or sale of" health-related products or services and the resolution related to marketing of products and services "to children." Staff stated that the investigation was not limited to AAP and could extend to other entities, and that

PUBLIC

whether certain materials were promotional or advertising materials was subject to debate. Staff concluded that there was a "clear basis" for the investigation.

Finally, Covington objected to the breadth and burden of the CID's requests, including the five-year time period and specifications stating, "Regardless of time period." Covington emphasized that the lack of a time limitation creates an unduly burdensome and potentially irrelevant universe of documents. Staff responded that they would consider time limitations for some of these specifications. Covington also stated that some of the definitions, including "Organization" (Definition 6), "Document" (Definition 4), and "Collaborative Work Environment" (Definition 1), in the context of requests that require "any" and "all," impose a significant burden on AAP to produce a vast amount of information across digital platforms used by individuals affiliated with AAP or working on behalf of AAP. Staff clarified that "members" in the definition of "Organization" referred to LLC members, not AAP's individual members. Staff also responded that the rest of these definitions were standard Commission definitions that would not be modified.

Instead of providing meaningful clarifications about the scope of the investigation or resolving AAP's threshold concerns about the CID, staff set forth a proposal under which AAP would receive a 30-day extension to respond to the CID if it agreed to respond to Document Requests 9 and 11 a full month *before* the return date.[1] While reiterating that the threshold jurisdictional concerns had not been properly addressed, Covington requested an extension of the Petition to Quash deadline to enable both parties to share additional information in an attempt to resolve these important issues and to continue meeting and conferring about the CID. Staff

---

[1] Staff explained that the term "disseminated" as used in RFP 9 referred to documents shared outside of AAP.

stated that the Petition to Quash deadline would not be extended without AAP agreeing to fully respond to two document requests 30 days before the return date indicated on the CID. Staff indicated during the call that they would send a proposal to AAP in writing. Although staff indicated they had been authorized to conduct the meet-and-confer during the partial government shutdown, staff noted that there could be some delay associated with the shutdown.

On the evening of Wednesday, February 4, 2026, Covington reached out to staff via email seeking a status update and restating First Amendment concerns discussed in the first meet-and-confer call, particularly with respect to requests seeking communications for inter-organizational deliberations and identities of individuals involved. Covington stated that when First Amendment concerns are raised, the standards imposed by the Fourth Amendment must be applied even more strictly. Covington also expressed a desire to continue discussing these concerns.

Staff responded with a letter on Thursday, February 5, 2026 at 7:28 PM. The letter set forth the proposal staff had referenced on February 2. Staff confirmed that the Petition to Quash deadline (two business days away) would not be extended unless AAP agreed to respond to two requests 30 days before the CID return date. Staff's letter did not resolve any of the first five concerns Covington raised during the meet-and-confer on February 2 but addressed two points relating to AAP's burden as discussed below.

Staff's letter also purported to summarize the concerns AAP raised on the first meet-and-confer, but omitted several important points. Specifically, staff's letter did not memorialize the first concern Covington raised on the meet-and-confer—specifically, the genesis of the investigation and the Commission's purpose in conducting it. Staff's letter incorrectly claimed that Covington raised "new" issues via email. However, Covington specifically raised the

requirement, set forth in *Morton Salt* and grounded in the Fourth Amendment, that a CID must be within the FTC's authority and the information sought must be relevant to a lawful purpose in the first meet-and-confer call.

As to burden, staff's letter offered to modify the time period for certain requests that previously stated "regardless of time period" to the period from January 1, 2015 to present. However, staff did not agree to modify the time period for Requests 4 and 5, which seek all documents and all communications with professional medical organizations, other organizations, and individuals related to the 2018 Policy Statement, 2023 Reaffirmation, and the "SOC 8." Furthermore, although staff confirmed that the definition of "AAP" does not encompass individual members of AAP, staff did not address concerns about the breadth of the definition of "Document" and the use of words such as "all" or "any" for several requests.

Covington sent a letter responding to staff at 4:46 PM on Friday, February 6. The letter described each of the topics discussed on February 2 and reaffirmed the concerns that Covington had expressed in that meet-and-confer, which remain outstanding. Covington also reiterated that AAP wished to have the opportunity to continue to discuss its concerns with staff, but the Petition to Quash deadline was now only one business day away, and staff had refused to provide any extension unless AAP began responding to the CID a month before the return date. Covington once again requested that staff provide a modest extension of the Petition to Quash deadline to allow the parties to continue to meet and confer in good faith.

FTC staff responded to Covington by email on Saturday, February 7, 2026. The email asserted that AAP had requested an extension of the Petition to Quash deadline in exchange for "nothing at all." Staff reiterated that no extension would be granted absent AAP's agreement to make a document production on February 16, 2026—30 days before the CID return date.

5

**PUBLIC**

Covington replied to staff via email on Sunday, February 8 and emphasized that AAP had hoped to continue to meet and confer with staff in good faith in exchange for a modest extension of the Petition to Quash deadline.  Additional time would have allowed AAP to share more information with staff about its serious concerns with the CID in an attempt to resolve, or at least narrow, the issues contained in the petition.

At this time, the issues identified in the petition remain unresolved.

DATED:  February 9, 2026                    Respectfully submitted,

_____
LAURA KIM
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
202-662-6000
lkim@cov.com

*Counsel for American Academy of Pediatrics*