UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---

AMERICAN ACADEMY OF PEDIATRICS,

*Plaintiff*,

v.                                    No. 1:26-cv-00508-CRC

FEDERAL TRADE COMMISSION, et al.,

*Defendants*.

---

**BRIEF OF ILLINOIS, MASSACHUSETTS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW YORK, OREGON, RHODE ISLAND, VERMONT, VIRGINIA, AND WASHINGTON AS AMICI CURIAE IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts

ALLYSON SLATER
*Director, Reproductive Justice Unit*
ADAM M. CAMBIER
*Assistant Attorney General*
MORGAN CARMEN
*Assistant Attorney General*
1 Ashburton Pl.
Boston, MA 02108
Tel: (617) 727-2200
allyson.slater@mass.gov
adam.cambier@mass.gov
morgan.carmen@mass.gov

KWAME RAOUL
Attorney General
State of Illinois

ALEEZA STRUBEL
*Complex Litigation Counsel*
ELIZABETH B. SCOTT
*Assistant Attorney General*
ELENA S. METH
*Assistant Attorney General*
115 South LaSalle St.
Chicago, IL 60603
Tel: (773) 914-3046
aleeza.strubel@ilag.gov
elizabeth.scott@ilag.gov
elena.meth@ilag.gov

*Additional counsel listed on signature page*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION AND STATEMENT OF INTERESTS ............................................................. 1

ARGUMENT ............................................................................................................. 2

I.     THE FTC'S ACTIONS HAVE THE POTENTIAL TO UNDERMINE THE RELIABILITY OF AAP GUIDANCE ON WHICH AMICI STATES RELY TO FULFILL OUR LONG-RECOGNIZED ROLE AS REGULATORS OF THE PRACTICE OF MEDICINE AND PROTECT THE HEALTH OF OUR RESIDENTS. ........................................................................... 2

    A.     As regulators of the practice of medicine, Amici States employ legal safeguards to ensure high-quality healthcare. .......................................... 3

    B.     Amici States regularly evaluate and rely on medical guidance and policy statements issued by professional medical organizations. .......................... 4

    C.     The FTC's CID to AAP may harm Amici States by undermining our ability to safely and efficiently regulate healthcare. ............................................ 8

II.    THE FTC'S ATTACKS ON AAP SET A DANGEROUS PRECEDENT THAT ENDANGERS FUTURE EFFORTS TO ENSURE THE HEALTH AND WELL-BEING OF ALL AMERICANS. .................................................................................................... 10

CONCLUSION ......................................................................................................... 13

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Acad. of Pediatrics v. Kennedy,*
No. 1:25-cv-11916 (D. Mass. Jan. 19, 2026) .......................................................................... 11

*Arizona v. Kennedy,*
No. 3:26-cv-01609 (N.D. Cal. Feb. 24, 2026) ..................................................................... 6, 8

*Barsky v. Board of Regents of Univ. of N.Y.,*
347 U.S. 442 (1954) .............................................................................................................. 3

*De Buono v. NYSA-ILA Med. & Clinical Servs. Fund,*
520 U.S. 806 (1997) .............................................................................................................. 3

*Gonzales v. Carhart,*
550 U.S. 124 (2007) .............................................................................................................. 3

*Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.,*
471 U.S. 707 (1985) .............................................................................................................. 3

*Linder v. United States,*
268 U.S. 5 (1925) .................................................................................................................. 3

*Massachusetts v. Trump,*
No. 1:25-cv-12162 (D. Mass. Aug. 1, 2025) ......................................................................... 2

*Medina v. Planned Parenthood S. Atl.,*
606 U.S. 357 (2025) .............................................................................................................. 3

*Metro. Life Ins. Co. v. Massachusetts,*
471 U.S. 724 (1985) .............................................................................................................. 3

*Oregon v. Kennedy,*
No. 6:25-cv-02409 (D. OR. Dec. 23, 2025) .......................................................................... 2

*United States v. Skrmetti,*
605 U.S. 495 (2025) .............................................................................................................. 3

*Whalen v. Roe,*
429 U.S. 589 (1977) .............................................................................................................. 3

**Statutes**

105 Ill. Comp. Stat. 5/22-105 .............................................................................................. 7, 8

210 Ill. Comp. Stat 85/11.7 ............................................................................................. 7

210 Ill. Comp. Stat. 3/35 .................................................................................................. 7

215 Ill. Comp. Stat. 5/356s .............................................................................................. 7

225 Ill. Comp. Stat. 10/5.11 ............................................................................................. 7

225 Ill. Comp. Stat. 10/7.01 ............................................................................................. 7

225 Ill. Comp. Stat. 60/3 .................................................................................................. 4

305 Ill. Comp. Stat. 5/5-19 .............................................................................................. 7

410 Ill. Comp. Stat. 210/2 ............................................................................................... 4

755 Ill. Comp. Stat. 5/11-1 .............................................................................................. 4

Conn. Gen. Stat. § 1-1d ................................................................................................... 4

Wash. Admin. Code Title 246 .......................................................................................... 4

### Other Authorities

*American Academy of Pediatrics Mission and Strategic Plan*, Am. Acad. of Pediatrics (last visited Mar. 4, 2026), https://www.aap.org/en/about-the-aap/strategic-plan/ ............................ 5

*American College of Cardiology Comments on New Dietary Guidelines for Americans*, Am. Coll. Cardiology (Jan. 7, 2026), https://www.acc.org/about-acc/press-releases/2026/01/07/22/59/american-college-of-cardiology-comments-on-new-dietary-guidelines ................................................................................................................. 12

*As Chair, FTC Commissioner Touts He'd Pull Back on AI and Fight Trans Care*, Punchbowl News (Dec. 6, 2024), https://perma.cc/R2XQ-GXBD ............................................................. 8

Bobby Mukkamala, *Slashing NIH funding imperils the foundation of medical research*, Am. Med. Ass'n (Aug. 1, 2025), https://www.ama-assn.org/about/leadership/slashing-nih-funding-imperils-foundation-medical-research ........................................................................ 12

*Clinical Practice Guideline Manual*, Am. Acad. of Pediatrics (last visited Mar. 3, 2026), https://www.aap.org/en/advocacy/quality/clinical-practice-guideline-manual/ .................. 5, 6

*Clinical Practice Guidelines We Can Trust*, Inst. of Med. (2011) ("IOM Guidelines") ............ 5, 9

*Committees*, Am. Acad. of Pediatrics (last visited Mar. 3, 2026), https://www.aap.org/en/get-involved/aap-committees/ ........................................................................................... 5

David Johnson & Humayun J. Chaudhry, *The History of the Federation of State Medical Boards*, 98 J. Med. Reg. 20 (2012) ............................................................................................. 4

*Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, Policy Statement, Am. Acad. of Pediatrics (last visited Mar. 4, 2026), https://publications.aap.org/pediatrics/article/142/4/e20182162/37381/Ensuring-Comprehensive-Care-and-Support-for ...................................................................................... 7

Evi Arthur, *AAP has been leading voice on childhood vaccine recommendations since 1930s*, Am. Acad. of Pediatrics (July 30, 2025), https://publications.aap.org/aapnews/news/32762/ ................................................................ 11

*From the Member Sections | How Do the 2025-2030 Dietary Guidelines Measure Up for CV Health?*, Am. Coll. Cardiology (Mar. 1, 2026), https://www.acc.org/latest-in-cardiology/articles/2026/03/01/01/from-the-member-sections-dietary-guidelines ................. 12

*FTC Announces Workshop on Exploring Unfair or Deceptive Trade Practices in "Gender-Affirming Care" for Minors,* Fed. Trade Comm'n (June 9, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/06/ftc-announces-workshop-exploring-unfair-or-deceptive-trade-practices-gender-affirming-care-minors ......................................................... 10

*Governor Healey Announces Evidence-Based Childhood Immunization Schedule, Aligning with American Academy of Pediatrics*, Mass.gov (Jan. 14, 2026), https://www.mass.gov/news/governor-healey-announces-evidence-based-childhood-immunization-schedule-aligning-with-american-academy-of-pediatrics ............................ 6, 8

Jeffrey S. Flier, *Publishing Biomedical Research: a rapidly evolving ecosystem*, 66 Perspectives in Bio. & Med. 358 (2023), https://doi.org/10.1353/pbm.2023.a902032 ................................. 8

Jon Cohen, *The Trump administration says some approved childhood vaccines need better studies. Scientists disagree*, Science (Jan. 8, 2026), https://www.science.org/content/article/trump-administration-says-some-approved-childhood-vaccines-need-better-studies ................................................................. 11

M. Hassan Murah, *Clinical Practice Guidelines: A Primer on Development and Dissemination*, 92 Mayo Clinic Proceedings 3 (Mar. 2017) .............................................................................. 5

Megan Messerly, *Trump shares video highlighting discredited theory linking vaccines to autism*, Politico (Sept. 8, 2025), https://www.politico.com/news/2025/09/08/trump-shares-video-highlighting-discredited-theory-linking-vaccines-to-autism-00551311 ................................. 10

*New Dietary Guidelines Underscore Importance of Healthy Eating*, Am. Heart Ass'n (Jan. 7, 2026), https://newsroom.heart.org/news/releases-20260107-6915862 .................................... 12

Patricia J. Zettler, *Toward Coherent Federal Oversight of Medicine*, 52 S.D. L. Rev. 427 (2015), https://perma.cc/GCB5-URVV ...................................................................................... 4

*Perinatal Levels of Care Rewriting the Administrative Rules*, Ill. Dep't of Pub. Health (last visited Mar. 3, 2026), https://dph.illinois.gov/topics-services/life-stages-populations/maternal-child-family-health-services/perinatal-levels-of-care.html ................................................... 7, 8

*Policy Statement Development Process*, Am. Acad. of Pediatrics (last visited Mar. 10, 2026), https://www.aap.org/en/policy/policy-statement-development-process/ ................................. 5

*President's Proposed 26.2% Cut to Department of Health and Human Services Budget Devastating to Fight Against Cancer*, Am. Cancer Society Cancer Action Network (May 2, 2025), https://www.fightcancer.org/releases/president%E2%80%99s-proposed-262-cut-department-health-and-human-services-budget-devastating-fight........................................... 12

*Red Book Online 2024–2027,* Am. Acad. of Pediatrics (Apr. 2024), https://publications.aap.org/redbook?autologincheck=redirected......................................... 7, 8

Sameer Vohra, *Director Vohra on 2026 Childhood Vaccine Guidance*, Ill. Dep't of Pub. Health (Feb. 6, 2026), https://dph.illinois.gov/resource-center/communications/director-letters/2026/letter-02062026.html ...................................................................................... 6, 8

Steven Middendorp, *AAP Recommends Annual Mental Health Screenings for Children Following Illinois Executive Order*, The Highwire (Aug. 27, 2025), https://thehighwire.com/news/aap-recommends-annual-mental-health-screenings-for-children-following-illinois-executive-order/ ...................................................................... 7, 8

*Understanding the Impact of Federal Cuts to mRNA Vaccine Research*, Am. Lung Ass'n (Sept. 17, 2025), https://www.lung.org/blog/mrna-vaccines-cuts ..................................................... 12

Will Weissert, *Dr. Trump? The president reprises his COVID era, this time sharing unproven medical advice on autism*, Associated Press (Sept. 22, 2025), https://apnews.com/article/trump-doctor-vaccines-autism-tylenol-covid-disinfectants-22f5bcfe2fd3c18fdd412419941541f8 ...................................................................................... 11

**Constitutional Provisions**

U.S. Const. amend. X.................................................................................................................... 3

## INTRODUCTION AND STATEMENT OF INTERESTS

Illinois, Massachusetts, California, Colorado, Connecticut, Delaware, District of Columbia, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New York, Oregon, Rhode Island, Vermont, Virginia, and Washington ("Amici States") submit this brief in support of Plaintiff American Academy of Pediatrics' ("AAP") motion for a preliminary injunction. As an exercise of our well-established police powers, Amici States regulate the practice of medicine within our borders, working to ensure that safe and effective medical care is available to our residents and that practitioners are held to the high standards necessary to provide such care. In developing the standards and guidelines that govern the medical profession, state licensing boards and other regulatory bodies regularly look to recommendations and guidance promulgated by professional organizations like AAP. The reliability of these recommendations and guidance—and the confidence Amici States have that such recommendations are developed based on robust evidence and are grounded in the best interests of patients—is thus a critical part of the states' efforts to ensure that quality healthcare is available to their citizens.

The Federal Trade Commission's ("FTC") targeting of reputable organizations that inform the standard of care simply because the Administration's policy choices run counter to the scientific consensus threatens to undermine Amici States' role as the primary regulators of medicine and hamper our ability to rely on the guidance of organizations like AAP in setting standards of care. In pursuit of the FTC's improper purpose, its Civil Investigative Demand ("CID") to AAP seeks vast troves of information regarding AAP's public statements, deliberative processes, personnel, internal and external communications, political advocacy, educational programs, finances, and more. By bringing the immense pressure of the federal investigative apparatus to bear on AAP, the FTC attempts to coerce AAP into taking considerations other than

1

evidence and patient interests into account in developing medical guidance. This, in turn, would make that guidance less reliable when Amici States look to it to fashion medical standards. In that way, the FTC improperly inserts itself into the process of developing standards of care and upsets the balance between state and federal authority in this area of traditional state police powers.

Moreover, while this particular case is about the provision of transgender youth healthcare, if the FTC is successful in pressuring reputable evidence-driven scientific organizations to change medical recommendations the Administration disfavors, that would have significant downstream effects on patient health and forward-looking research in other medical fields for years to come.

## ARGUMENT

**I.    The FTC's Actions Have the Potential to Undermine the Reliability of AAP Guidance on Which Amici States Rely to Fulfill Our Long-Recognized Role as Regulators of the Practice of Medicine and Protect the Health of Our Residents.**

Amici States have spent the last century developing legal guardrails to ensure medical care is safe, effective, and evidence-based, including by reviewing and relying on recommendations by professional medical organizations like AAP. As part of the Administration's ongoing campaign to curtail transgender youth healthcare, including by usurping states' traditional and longstanding authority to oversee the regulation of the practice of medicine,[1] the FTC has targeted AAP, a reputable and leading professional organization in the field of pediatric medicine, along with other organizations that have informed the standard of care for transgender youth. By challenging the evidence-based guidance and recommendations of the leading reputable professional organizations in transgender youth healthcare, the FTC seeks to intimidate a reliable resource on which the states rely to guide and implement state healthcare policies and promote public health.

---

[1] *See, e.g., Oregon v. Kennedy*, No. 6:25-cv-02409 (D. OR. Dec. 23, 2025) and *Massachusetts v. Trump*, No. 1:25-cv-12162 (D. Mass. Aug. 1, 2025).

This interferes with Amici States' reliance interests and imposes additional costs and burdens to ensure public health and well-being for our citizens.

### A.    As regulators of the practice of medicine, Amici States employ legal safeguards to ensure high-quality healthcare.

It is well-settled that states have the general authority to enact laws and policies aimed at protecting the health and welfare of their residents.[2] Specifically reserved to the states are all rights and powers "not delegated to the United States," commonly referred to as "traditional state police powers."[3] These powers include "primary responsibility over matters of health and safety, including the regulation of the practice of medicine."[4] States therefore have a "legitimate concern for maintaining high standards of professional conduct" in the practice of medicine within their borders.[5] Indeed, the Supreme Court has explained that "[t]here can be no doubt the government 'has an interest in protecting the integrity and ethics of the medical profession.' . . . Under our precedents it is clear the State has a significant role to play in regulating the medical profession."[6] States' role and power to regulate medicine within their borders necessarily extends to the states' ability to make policy judgments about the health and well-being of their residents, a principle most recently recognized by the Supreme Court in *United States v. Skrmetti*.[7]

---

[2] *See Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc*., 471 U.S. 707, 719 (1985) ("[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern.").

[3] U.S. Const. amend. X; *see Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) ("The States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.") (internal quotation marks omitted).

[4] *Medina v. Planned Parenthood S. Atl*., 606 U.S. 357, 364 (2025) (internal quotation marks omitted); *see also De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997) ("[W]e begin by noting that the historic police powers of the State include the regulation of matters of health and safety."); *Whalen v. Roe*, 429 U.S. 589, 603 n.30 (1977); *Linder v. United States*, 268 U.S. 5, 18 (1925).

[5] *Barsky v. Board of Regents of Univ. of N.Y.*, 347 U.S. 442, 451 (1954).

[6] *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) (internal citations omitted).

[7] 605 U.S. 495, 524 (2025) (citing *Gonzales*, 550 U.S. at 163).

As states, we exercise our power to regulate medicine in a variety of ways, starting at the most basic level by defining the scope and contours of medical practice and requiring medical licenses for all practitioners. Fundamental requirements for obtaining a medical license across states include extensive education and residency requirements in addition to passing a licensing exam.[8] And because Amici States have a strong interest in ensuring that our residents receive safe and effective healthcare, we have implemented legal guardrails on the provision of healthcare. All states have had boards that oversee the licensing of medical professionals since the nineteenth century.[9] State boards regulate the medical profession by disciplining licensees who act illegally or unethically and by enacting laws and regulations that circumscribe how licensed practitioners conduct medical practice.[10] Amici States have also passed laws and regulations that ensure patients are appropriately informed of risks and require their voluntary informed consent for all medical care. This is especially true for youth,[11] whose parents or legal guardians retain the authority to provide informed consent with limited exceptions.[12]

**B.    Amici States regularly evaluate and rely on medical guidance and policy statements issued by professional medical organizations.**

In implementing licensing, disciplinary, and other healthcare-related policies and laws, Amici States look to the recommendations of medical and scientific experts and organizations like AAP. Indeed, Amici States recognize AAP for its subject matter expertise on pediatric healthcare.

---

[8] *See, e.g.,* 225 Ill. Comp. Stat. 60/3; Wash. Admin. Code Title 246.

[9] David Johnson & Humayun J. Chaudhry, *The History of the Federation of State Medical Boards*, 98 J. Med. Reg. 20, 23–24 (2012).

[10] Patricia J. Zettler, *Toward Coherent Federal Oversight of Medicine*, 52 S.D. L. Rev. 427, 450–52 (2015), https://perma.cc/GCB5-URVV.

[11] *See, e.g.,* Conn. Gen. Stat. § 1-1d; 755 Ill. Comp. Stat. 5/11-1.

[12] *See, e.g.*, 410 Ill. Comp. Stat. 210/2 ("Any parent . . . may consent to the performance upon his or her child of a health care service by a physician licensed to practice medicine in all its branches, a chiropractic physician, a licensed optometrist, a licensed advanced practice registered nurse, or a licensed physician assistant or a dental procedure by a licensed dentist.").

AAP publishes policy statements, reports, and clinical practice guidelines, backed by rigorous research, that provide up-to-date medical recommendations for children and adolescents.[13] The process for developing such policy statements, reports, and clinical practice guidelines involves AAP committees, comprised of subject matter experts, that review data and studies as they are released and use their expertise to develop and publish these materials.[14]

AAP's clinical practice guidelines in particular are "[c]ritically appraised, synthesized information" and have become necessary tools both for clinicians in their practice of evidence-based medicine as well as for the states as regulators of the practice of medicine.[15] AAP develops such guidelines using a rigorous systematic review of evidence and literature[16] and in consultation with multidisciplinary teams of clinicians, researchers, and stakeholders with expertise on the issue.[17] The guidelines, which go through several rounds of review, are read by dozens of expert reviewers before being published.[18] AAP's guidelines are also transparent about the evidence they rely on and disclose both the quality of the evidence as well as the strength of the guidelines' recommendations.[19] Further, AAP clinical practice guidelines only encourage health providers to

---

[13] *See Clinical Practice Guideline Manual*, Am. Acad. of Pediatrics (last visited Mar. 3, 2026), https://www.aap.org/en/advocacy/quality/clinical-practice-guideline-manual/; *see also American Academy of Pediatrics Mission and Strategic Plan*, Am. Acad. of Pediatrics (last visited Mar. 4, 2026), https://www.aap.org/en/about-the-aap/strategic-plan/.

[14] *See Clinical Practice Guideline Manual*, Am. Acad. of Pediatrics (last visited Mar. 3, 2026), https://www.aap.org/en/advocacy/quality/clinical-practice-guideline-manual/; *see also Committees*, Am. Acad. of Pediatrics (last visited Mar. 3, 2026), https://www.aap.org/en/get-involved/aap-committees/.

[15] *Clinical Practice Guidelines We Can Trust*, Inst. of Med., at 34 (2011) ("IOM Guidelines").

[16] *See* M. Hassan Murah, *Clinical Practice Guidelines: A Primer on Development and Dissemination*, 92 Mayo Clinic Proceedings 3, 423–33 (Mar. 2017).

[17] *Id*. at 425.

[18] *Policy Statement Development Process*, Am. Acad. of Pediatrics (last visited Mar. 10, 2026), https://www.aap.org/en/policy/policy-statement-development-process/; *Clinical Practice Guideline Manual*, Am. Acad. of Pediatrics (last visited Mar. 3, 2026), https://www.aap.org/en/advocacy/quality/clinical-practice-guideline-manual/.

[19] *Id*.

practice evidence-based medicine, as they are already obligated to do.[20] These guidelines thus ensure that the delivery of all healthcare is safe, individualized, and centered around the patient.

Given the longstanding reliability of AAP's guidance, Amici States frequently consult its policies and guidelines when faced with matters regarding clinical practice and public health for children, when appropriate. For example, in the wake of the Department of Health and Human Services' ("HHS") announcement of a dramatically altered childhood immunization schedule, Amici States Illinois and Massachusetts formally adopted AAP's Child and Adolescent Immunizations Schedule.[21] In doing so, the Illinois Department of Public Health ("IDPH") in particular noted that HHS had not presented new scientific evidence to support the downgrade in vaccine recommendations and had bypassed accepted vaccine recommendation processes.[22] IDPH confirmed that AAP developed the vaccine schedule pursuant to its evidence-based, rigorously developed standards for establishing clinical guidance on pediatric health issues. IDPH specifically determined that AAP's schedule was developed "based on rigorous scientific review and analysis" and filled an essential gap in protecting children from vaccine-preventable illnesses in the absence of reliable guidelines from the federal government.[23] The State of Illinois has also looked to AAP

---

[20] *Id.*

[21] *E.g.*, Sameer Vohra, *Director Vohra on 2026 Childhood Vaccine Guidance*, Ill. Dep't of Pub. Health (Feb. 6, 2026), https://dph.illinois.gov/resource-center/communications/director-letters/2026/letter-02062026.html and *Governor Healey Announces Evidence-Based Childhood Immunization Schedule, Aligning with American Academy of Pediatrics*, Mass.gov (Jan. 14, 2026), https://www.mass.gov/news/governor-healey-announces-evidence-based-childhood-immunization-schedule-aligning-with-american-academy-of-pediatrics.

[22] *Vohra*, *supra* note 21; *see also Arizona v. Kennedy*, No. 3:26-cv-01609 (N.D. Cal. Feb. 24, 2026).

[23] *Vohra*, *supra* note 21.

guidelines to inform its measles treatment protocol,[24] perinatal care hospital standards,[25] child and adolescent mental health screening policy,[26] and other laws relating to the safety, treatment, and insurance coverage of pediatric medical care.[27]

Amici States also consider AAP guidelines, clinical reports, and policy statements to ensure the provision of safe and effective transgender youth healthcare.[28] As with all of its guidance, AAP employs a rigorous process involving experts in their specialty fields who study and review all medical treatment options and available, peer-reviewed scientific studies to make thoroughly vetted recommendations regarding vital transgender youth healthcare. Therefore, with AAP's evidence-based guidance and recommendations as a resource, Amici States and the healthcare providers whose practices we regulate can confidently deliver high-quality transgender healthcare to youth pursuant to stringent guidelines and based on the most current scientific evidence available.

---

[24] *See Red Book Online 2024–2027,* Am. Acad. of Pediatrics (Apr. 2024), https://publications.aap.org/redbook?autologincheck=redirected.

[25] *Perinatal Levels of Care Rewriting the Administrative Rules*, Ill. Dep't of Pub. Health (last visited Mar. 3, 2026), https://dph.illinois.gov/topics-services/life-stages-populations/maternal-child-family-health-services/perinatal-levels-of-care.html.

[26] 105 Ill. Comp. Stat. 5/22-105 (IDPH shall develop social and emotional screening program for youth taking into consideration AAP recommendations); Steven Middendorp, *AAP Recommends Annual Mental Health Screenings for Children Following Illinois Executive Order*, The Highwire (Aug. 27, 2025), https://thehighwire.com/news/aap-recommends-annual-mental-health-screenings-for-children-following-illinois-executive-order/.

[27] *See, e.g.*, 210 Ill. Comp. Stat 85/11.7 (requiring hospitals to provide free informational materials regarding sudden infant death syndrome as developed by AAP); 225 Ill. Comp. Stat. 10/7.01 (establishing licensure for newborn and infant childcare employees based on recommendations of AAP); 305 Ill. Comp. Stat. 5/5-19 (Early and Periodic Screening, Diagnosis and Treatment services provided under the Healthy Kids Program shall include anticipatory guidance as recommended by AAP); 225 Ill. Comp. Stat. 10/5.11 (instructing daycare centers to develop plans for anaphylactic shock based on AAP recommendations); 215 Ill. Comp. Stat. 5/356s (setting post-parturition care hospital coverage based on AAP guidelines and protocols); 210 Ill. Comp. Stat. 3/35 (adopting rules for birth centers based on several professional organization recommendations including AAP).

[28] *See Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, Policy Statement, Am. Acad. of Pediatrics (last visited Mar. 4, 2026), https://publications.aap.org/pediatrics/article/142/4/e20182162/37381/Ensuring-Comprehensive-Care-and-Support-for.

**C.    The FTC's CID to AAP may harm Amici States by undermining our ability to safely and efficiently regulate healthcare.**

The FTC's improper inquiry into AAP—based on nothing more than its politically-motivated disapproval of some of the organization's recommendations—threatens to deprive the states of the evidence-based, objective, and reliable resources developed by AAP and deny residents of these states the vital health benefits of AAP's recommendations.[29] Amici States do not undertake our own critical appraisal of all scientific and medical research published each year. Indeed, every year, more than 30,000 scientific journals publish about 2 million biomedical research papers.[30] Instead, Amici States consider and review the recommendations of professional medical organizations that are established, in part, to serve that function. And as noted above in the context of vaccines, when the processes and recommendations of these organizations meet Amici States' own rigorous standards for high-quality healthcare, the states can consider and, when appropriate, adopt them in whole or in part. In many instances incorporate states these recommendations directly into state laws and regulations.[31]

Patients and providers in Amici States also consider policies and recommendations from AAP to engage in evidence-based clinical decision making. Practicing clinicians make complex treatment decisions based on a wide range of factors, including by assessing the strength of the available scientific evidence that supports certain treatments as well as recommendations from subject matter experts. Requiring individual clinicians in Amici States to stay abreast of the

---

[29] FTC Chairman Andrew Ferguson publicly announced his disagreement with the so-called "trans agenda" and promised to use the FTC to "[i]nvestigate the doctors, therapists, hospitals, and others" who "push[] gender confusion." *See As Chair, FTC Commissioner Touts He'd Pull Back on AI and Fight Trans Care*, Punchbowl News (Dec. 6, 2024), https://perma.cc/R2XQ-GXBD.

[30] Jeffrey S. Flier, *Publishing Biomedical Research: a rapidly evolving ecosystem*, 66 Perspectives in Bio. & Med. 358, 363 (2023), https://doi.org/10.1353/pbm.2023.a902032.

[31] *See supra* notes 21-27 (describing IDPH's reliance on AAP's guidelines in both clinical and public health decision making).

countless new developments in scientific and medical research would be a fruitless task: "an internist would have to read 33 articles 365 days a year to stay up to date" in their field.[32] Given the need to also critically analyze each individual article or paper, "[t]he two situations combined [] place clinicians at an increasing risk of drowning in doubtful data."[33]

Clinical guidelines and recommendations, such as those published by AAP, thus play a crucial role in ensuring practicing clinicians and state regulators can evaluate and synthesize the best available evidence for treating a variety of medical conditions, incorporating practical knowledge provided by subject matter experts as well as weighing other relevant factors, all in service of forming clinical recommendations for treatment and public health guidance. Because the guidelines are thoroughly reviewed and standardized, they reduce unnecessary uncertainty in medical decision making and in doing so improve healthcare quality and safety and patient outcomes. The same standardization that makes these guidelines so valuable in treating patients makes them just as valuable in evaluating the performance of healthcare providers and healthcare systems and processes, as well as ensuring public health.

The FTC's decision to target AAP for its policy statement on transgender healthcare for youth risks undermining the accuracy of professional guidance on transgender youth healthcare and the thoroughness of the process that reputable organizations like AAP use to develop their recommendations and guidelines, which may negatively impact the practice of pediatric medicine across the country. Specifically, AAP's ability to create unbiased, evidence-based recommendations on which the Amici States rely would be severely undermined if federal agencies could target and threaten them with investigation for making those recommendations.

---

[32] *Supra* note 15, IOM Guidelines at 34.

[33] *Id.* (internal quotation marks omitted).

Less frequently updated guidance—or no new guidelines at all—would mean less overall guidance for clinicians, potentially leading to decreased public understanding or lower awareness of evidence supporting emerging treatments, poorly informed clinical judgment, worse individual patient outcomes, and a decline of overall public health. Further, Amici States would be less able to trust that any recommendations made by AAP and other professional organizations are reliable when those recommendations are made in the shadow of improper investigations fueled by political pressure and improper influence,[34] as would happen here if the FTC's actions proceed unchecked. In addition to the time and resources Amici States will spend to assure residents and providers that certain healthcare supported by AAP remains clinically recommended as well as safe and effective, Amici States will be hard-pressed to fill the void left by these professional organizations that will be impeded in their efforts to provide reliable guidance.

## II.    The FTC's Attacks on AAP Set a Dangerous Precedent That Endangers Future Efforts to Ensure the Health and Well-Being of All Americans.

While the FTC's inappropriate efforts to intimidate AAP arise from its disapproval of transgender youth healthcare, the unprecedented investigative powers it invokes here are not so cabined and—if sanctioned by this Court—could lead to a misuse of authority and threaten the evidence-based development of healthcare guidelines and policies in a broad array of fields. To give several examples as context, the Administration has repeatedly made statements boosting the discredited theory linking vaccines and autism,[35] and, as noted above, earlier this year HHS

---

[34] For example, on July 9, 2025, the FTC convened the workshop titled "The Dangers of 'Gender-Affirming Care' for Minors." In announcing the workshop, the FTC confirmed that its purpose was to "follow[] President Trump's executive order ending the federal government's previous support for gender-affirming care." *FTC Announces Workshop on Exploring Unfair or Deceptive Trade Practices in "Gender-Affirming Care" for Minors,* Fed. Trade Comm'n (June 9, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/06/ftc-announces-workshop-exploring-unfair-or-deceptive-trade-practices-gender-affirming-care-minors.

[35] *See, e.g.*, Megan Messerly, *Trump shares video highlighting discredited theory linking vaccines to autism*, Politico (Sept. 8, 2025), https://www.politico.com/news/2025/09/08/trump-shares-video-highlighting-discredited-theory-linking-vaccines-to-autism-00551311.

reduced the recommended schedule of childhood vaccines from 17 to 11 vaccinations despite widespread scientific consensus that the vaccines in question were effective and had been subjected to rigorous standards.[36] AAP has promulgated evidence-based guidance and recommendations for childhood vaccines for nearly a century,[37] and AAP is in active litigation against HHS challenging the changes to the vaccine schedule and related agency actions as baseless.[38] If the Court were to approve the FTC's far-reaching inquiry into AAP's decision making on transgender youth healthcare—and, as the FTC hopes to accomplish, to use the burden of being under investigation and the threat of enforcement in order to *shape* that decision making— there would be little to stop the FTC from misusing its authority to influence AAP's guidance and recommendations regarding childhood vaccines as well.

Other examples abound of the Administration advancing healthcare policies and positions that sit at odds with leading medical organizations. President Trump has urged pregnant women not to use Tylenol because of unproven links to autism, conflicting with longstanding recommendations from the American College of Obstetricians and Gynecologists stating that the medication is safe during pregnancy.[39] In its updates to dietary guidelines earlier this year, the Administration recommended consumption of high-fat animal products and whole-fat dairy products, such as red meat and whole milk. The Administration did so despite science-based

---

[36] Jon Cohen, *The Trump administration says some approved childhood vaccines need better studies. Scientists disagree*, Science (Jan. 8, 2026), https://www.science.org/content/article/trump-administration-says-some-approved-childhood-vaccines-need-better-studies. *See also supra*, Section I.B (discussing HHS's revised vaccine schedule and Illinois's decision to turn to AAP vaccine guidelines).

[37] Evi Arthur, *AAP has been leading voice on childhood vaccine recommendations since 1930s*, Am. Acad. of Pediatrics (July 30, 2025), https://publications.aap.org/aapnews/news/32762/.

[38] *See Am. Acad. of Pediatrics v. Kennedy*, No. 1:25-cv-11916, Dkt. 180-1 (D. Mass. Jan. 19, 2026) (proposed fourth amended complaint).

[39] Will Weissert, *Dr. Trump? The president reprises his COVID era, this time sharing unproven medical advice on autism*, Associated Press (Sept. 22, 2025), https://apnews.com/article/trump-doctor-vaccines-autism-tylenol-covid-disinfectants-22f5bcfe2fd3c18fdd412419941541f8.

recommendations from the American Heart Association and the American College of Cardiology that encourage limited consumption of these products, which are linked to increased cardiovascular risk.[40] And the president of the American Medical Association issued a statement decrying the Administration's slashing of the research budget of the National Institutes for Health by 40% as "endanger[ing] the health of millions whose illnesses could have been treated had we stayed on course."[41] The head of the American Cancer Society Cancer Action Network made a similar statement regarding budget cuts for HHS and the CDC.[42] So too with the American Lung Association, which warned of "devastating consequences" from the Administration's decision to cancel funding for mRNA vaccine research and development.[43]

As described above, Amici States rely on medical organizations like these to inform statewide standards to ensure that our residents can receive safe, high-quality, effective healthcare. But if the FTC is allowed to use the threat of enforcement action as a cudgel against reputable medical organizations when it disagrees with an organization's recommendations or priorities, everyone would suffer: The organizations would find themselves forced to consider the political ramifications of their guidance, impeding their ability to make recommendations based solely on

---

[40] *American College of Cardiology Comments on New Dietary Guidelines for Americans*, Am. Coll. Cardiology (Jan. 7, 2026), https://www.acc.org/about-acc/press-releases/2026/01/07/22/59/american-college-of-cardiology-comments-on-new-dietary-guidelines; *From the Member Sections | How Do the 2025-2030 Dietary Guidelines Measure Up for CV Health?*, Am. Coll. Cardiology (Mar. 1, 2026), https://www.acc.org/latest-in-cardiology/articles/2026/03/01/01/from-the-member-sections-dietary-guidelines; *New Dietary Guidelines Underscore Importance of Healthy Eating*, Am. Heart Ass'n (Jan. 7, 2026), https://newsroom.heart.org/news/releases-20260107-6915862.

[41] Bobby Mukkamala, *Slashing NIH funding imperils the foundation of medical research*, Am. Med. Ass'n (Aug. 1, 2025), https://www.ama-assn.org/about/leadership/slashing-nih-funding-imperils-foundation-medical-research.

[42] *President's Proposed 26.2% Cut to Department of Health and Human Services Budget Devastating to Fight Against Cancer*, Am. Cancer Society Cancer Action Network (May 2, 2025), https://www.fightcancer.org/releases/president%E2%80%99s-proposed-262-cut-department-health-and-human-services-budget-devastating-fight.

[43] *Understanding the Impact of Federal Cuts to mRNA Vaccine Research*, Am. Lung Ass'n (Sept. 17, 2025), https://www.lung.org/blog/mrna-vaccines-cuts.

their expert review and understanding of the evidence. States that count on the reliability of that guidance to set medical standards would find their power to regulate medicine in the best interests of their residents interfered with by federal political priorities. And individuals who seek out medically appropriate, critical care may find themselves unable to access it not because it is unsafe or ineffective, but solely because the federal government disfavors it. What's more, these possible consequences could snowball over time; federal efforts to influence or control the recommendations of medical organizations today threaten to restrict the research and scientific developments those organizations shepherd, in turn hampering Amici States' ability to deliver life-saving treatments to our populations tomorrow.

## **CONCLUSION**

Plaintiff's motion for a preliminary injunction should be granted.

Dated: March 10, 2026                    Respectfully submitted,

ANDREA JOY CAMPBELL                KWAME RAOUL
Attorney General                               Attorney General
Commonwealth of Massachusetts        State of Illinois

*/s/ Adam M. Cambier*                       */s/ Aleeza Strubel*
ALLYSON SLATER                             ALEEZA STRUBEL
 *Director, Reproductive Justice Unit*        *Complex Litigation Counsel*
ADAM M. CAMBIER                          ELIZABETH B. SCOTT
 *Assistant Attorney General*                 *Assistant Attorney General*
MORGAN CARMEN                           ELENA S. METH
 *Assistant Attorney General*                 *Assistant Attorney General*
1 Ashburton Pl.                                115 South LaSalle St.
Boston, MA 02108                            Chicago, IL 60603
Tel: (617) 727-2200                           Tel: (773) 914-3046
allyson.slater@mass.gov                     aleeza.strubel@ilag.gov
adam.cambier@mass.gov                   elizabeth.scott@ilag.gov
morgan.carmen@mass.gov               elena.meth@ilag.gov

**ROB BONTA**
Attorney General
State of California
1300 I St.
Sacramento, CA 95814

**PHILIP J. WEISER**
Attorney General, State of Colorado
Office of the Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

**WILLIAM TONG**
Attorney General
State of Connecticut
165 Capitol Avenue
Hartford, CT 06106

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

**BRIAN L. SCHWALB**
Attorney General of the District of Columbia
400 6th St. NW
Washington, D.C. 20001

**AARON M. FREY**
Attorney General of Maine
6 State House Station
Augusta, ME 04333-0006

**ANTHONY G. BROWN**
Attorney General of Maryland
200 Saint Paul Place
Baltimore, Maryland 21202

**DANA NESSEL**
Michigan Attorney General
P.O. Box 30212
Lansing, MI 48909

**KEITH ELLISON**
Attorney General
State of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

**AARON D. FORD**
Attorney General
of Nevada
100 North Carson Street
Carson City, NV 89701

**JENNIFER DAVENPORT**
Attorney General of New Jersey
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

**LETITIA JAMES**
Attorney General
State of New York
28 Liberty Street
New York, NY 10005

**DAN RAYFIELD**
Attorney General of Oregon
1162 Court Street NE
Salem, OR 97301

**PETER F. NERONHA**
Attorney General
State of Rhode Island
150 South Main Street
Providence, RI 02903

14

**CHARITY R. CLARK**
Vermont Attorney General
109 State Street
Montpelier, VT 05609

**NICHOLAS W. BROWN**
Attorney General
State of Washington
P.O. Box 40100
Olympia, WA 98504

**JAY JONES**
Attorney General
Commonwealth of Virginia
202 N. 9th Street
Richmond, VA 23219

## <u>CERTIFICATE OF SERVICE</u>

       I, Elena S. Meth, hereby certify that I have this day, March 10, 2026, served the foregoing document upon all parties of record, by electronically filing to all ECF-registered parties.

*/s/ Elena S. Meth*
ELENA S. METH
*Assistant Attorney General*

115 South LaSalle St.
Chicago, IL 60603
Tel: (773) 914-3046
elena.meth@ilag.gov
