# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN ACADEMY OF PEDIATRICS,

*Plaintiff,*

v.

FEDERAL TRADE COMMISSION; ANDREW N. FERGUSON, in his official capacity as Chair of the Federal Trade Commission; MARK R. MEADOR, in his official capacity as Commissioner of the Federal Trade Commission,

*Defendants.*

Civil Action No. 1:26-cv-00508-CRC

## BRIEF OF LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC. AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

A.D. Sean Lewis*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
800 South Figueroa Street, Suite 1260
Los Angeles, CA 90017
(213) 382-7600

Morgan J. Walker*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX  75219
(214) 219-8585

Karen L. Loewy, D.C. Bar No. 1722185
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
815 16th Street NW, Suite 4140
Washington, DC 20006
(202) 804-6245

Omar Gonzalez-Pagan**
Jessica Polansky*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585

* Motion for admission *pro hac vice* forthcoming
** Application for admission pending.

*Counsel for Amicus Curiae*

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. ii

INTEREST OF *AMICUS CURIAE*...................................................................................... 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ..................................................... 1

ARGUMENT ................................................................................................................. 3

I.  THE CID TO AAP IS PART OF THE TRUMP ADMINISTRATION'S
    TARGETED ATTACKS ON TRANSGENDER PEOPLE
    AND GENDER-AFFIRMING MEDICAL CARE. ...................................................... 5

    A.  The Administration Has Targeted Transgender People
        for Discrimination and Barred Government Acknowledgement
        of Transgender People's Existence. ........................................................ 5

    B.  As Part of Its Discriminatory Campaign, the Administration Seeks to Punish
        Those Who Acknowledge Transgender People's Existence
        and Express Support for Gender-Affirming Medical Care, Including AAP. .............. 9

    C.  The CID to AAP Is Part and Parcel of the FTC's Implementation
        of the Administration's Discriminatory Views Against Transgender People
        and Gender-Affirming Medical Care.......................................................... 13

II. THE FTC'S PROFFERED BASES FOR ITS UNFOUNDED INVESTIGATIONS
    INTO MEDICAL ASSOCIATIONS LIKE AAP
    CANNOT REDEEM THE CIDS' IMPROPER PURPOSE
    OF RETALIATION FOR AND TARGETING OF PROTECTED
    FIRST AMENDMENT ACTIVITY. .................................................................... 15

    A.  Both Because AAP Is a Nonprofit Organization
        and Because AAP's "Covered Statements" Are Non-Commercial Educational
        and Advocacy Speech Excluded From the FTC's Jurisdiction,
        the CID Has No Legitimate Basis.  ......................................................... 16

    B.  The CID's Sprawling Demands for All Things Related
        to Gender-Affirming Medical Care Undercut the Legitimacy
        of the Investigation and Reveal its Targeting and Chilling
        of AAP's First Amendment Rights.......................................................... 22

CONCLUSION............................................................................................................... 25

CERTIFICATE OF SERVICE ............................................................................................ 26

# TABLE OF AUTHORITIES

**Cases**

*A.N.S.W.E.R. Coal. v. Kempthorne,*
537 F. Supp. 2d 183 (D.D.C. 2008) ............................................................................. 3

*Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.,*
No. 25-cv-4505, 2026 WL 80796 (D.D.C. Jan. 11, 2026) ......................................... 11

*Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Insts. of Health,*
795 F. Supp. 3d 678, (D. Md. 2025) ............................................................................ 8

*Aref v. Lynch,*
833 F.3d 242 (D.C. Cir. 2016) ..................................................................................... 4

*Bolger v. Youngs Drug Prods. Corp.,*
463 U.S. 60 (1983) ............................................................................................... 19, 20

*Brookins v. Mote,*
292 P.3d 347 (Mont. 2012) ........................................................................................ 15

*California Dental Ass'n v. F.T.C.,*
526 U.S. 756 (1999) ................................................................................................... 16

*Cent. Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n of N.Y.,*
447 U.S. 557 (1980) ................................................................................................... 18

*Dekker v. Weida,*
679 F. Supp.3d 1271 (N.D. Fla. 2023) ....................................................................... 23

*Doe v. McHenry,*
763 F. Supp. 3d 81 (D.D.C. 2025) ............................................................................... 7

*Exeltis USA Inc. v. First Databank, Inc.,*
520 F. Supp. 3d 1225 (N.D. Cal. 2021) ..................................................................... 20

*Feldstein v. Guinan,*
499 N.E.2d 535 (Ill. App. Ct. 1986) .......................................................................... 15

*FTC v. Agora Fin., LLC,*
447 F. Supp. 3d 350 (D. Md. 2020) ..................................................................... 17, 18

*Goldfarb v. Va. State Bar,*
421 U.S. 773 (1975) ................................................................................................... 15

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*,
721 F.3d 264 (4th Cir. 2013) ................................................................. 19

*Hampton Hosp. v. Bresan*,
672 A.2d 725 (N.J. Super. Ct. App. Div. 1996)..................................... 15

*Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*,
700 F. App'x 251 (4th Cir. 2017) ..................................................... 19, 20

*Haynes v. Yale-New Haven Hosp.*,
699 A.2d 964 (Conn. 1997) .................................................................... 15

*Houston Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022).................................................................................. 3

*In Re 2025 Subpoena to Children's Nat'l Hosp.*,
No. 1:25-cv-03780-JRR, 2026 WL 160792 (D. Md. Jan. 21, 2026),
*appeal docketed*, No. 26-1104 (4th Cir. Feb. 2, 2026) ............................ 12

*In re 2025 UPMC Subpoena*,
No. 2:25-MC-01069-CB, 2025 WL 3724705 (W.D. Pa. Dec. 24, 2025),
*appeal docketed*, No. 26-1401 (3d Cir. Mar. 4, 2026)........................... 9, 13

*In re 2025 UPMC Subpoena*,
No. 2:25-MC-01069-CB, 2026 WL 570419 (W.D. Pa. Mar. 2, 2026) .................. 9, 14

*In re Admin. Subpoena No. 25-1431-019*,
800 F. Supp. 3d 229 (D. Mass. 2025),
*appeal docketed*, No. 25-2092 (1st Cir. Nov. 14, 2025)........................... 13

*In re Dep't of Just. Admin. Subpoena No. 25-1431-030*,
No. 25-MC-00063-SKC-CYC, 2026 WL 33398 (D. Colo. Jan. 5, 2026) .................. 13

*In re Subpoena Duces Tecum No. 25-1431-016*,
No. 2:25-MC-00041-JHC, 2025 WL 3562151 (W.D. Wash. Sept. 3, 2025) ............... 13

*In re Subpoena No. 25-1431-014*,
No. MC 25-39, 2025 WL 3252648 (E.D. Pa. Nov. 21, 2025),
*appeal docketed*, No. 26-1134 (3d Cir. Jan. 26, 2026) ............................ 13

*Jordan v. Jewel Food Stores, Inc.*,
743 F.3d 509 (7th Cir. 2014) ................................................................. 20

*Judge Rotenberg Educ. Ctr., Inc. v. U.S. Food & Drug Admin.*,
3 F.4th 390 (D.C. Cir. 2021)................................................................. 15

*Kadel v. Folwell*,
100 F.4th 122 (4th Cir. 2024) ........................................................................... 1

*Ketonatural Pet Foods, Inc. v. Hill's Pet Nutrition, Inc.*,
756 F. Supp. 3d 1128 (D. Kan. 2024) .............................................................. 22

*Kingdom v. Trump*,
No. 1:25-CV-691-RCL, 2025 WL 1568238 (D.D.C. June 3, 2025)........................ 7

*McCullen v. Coakley*,
573 U.S. 464 (2014)......................................................................................... 23

*Media Matters for America v. Fed. Trade Comm'n*,
805 F. Supp. 3d 105 (D.D.C. 2025).................................................................... 3

*Media Matters for America v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025).......................................................................... 3

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018)......................................................................................... 18

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024).......................................................................................... 3

*Nelson v. Ho*,
564 N.W.2d 482 (Mich. Ct. App. 1997) ........................................................... 15

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) ........................................................................ 20

*PFLAG, Inc. v. Trump*,
769 F. Supp.3d 405 (D. Md. 2025)................................................................. 1, 7

*POM Wonderful, LLC v. FTC*,
777 F.3d 478 (D.C. Cir. 2015) ......................................................................... 21

*QueerDoc, PLLC v. U.S. Dep't of Justice*,
807 F. Supp. 3d 1295 (W.D. Wash. 2025)....................................................... 13

*Rosenberger v. Rector and Visitors of the Univ. of Va.*,
515 U.S. 819 (1995)..................................................................................... 4, 22

*San Francisco AIDS Found. v. Trump*,
786 F. Supp.3d 1184 (N.D. Cal. 2025) ..................................................... 1, 7, 24

*Schlacter v. United States*,
804 F.Supp.3d 592 (D. Md. 2025) ......................................................... 7

*See v. City of Seattle*,
387 U.S. 541 (1967) ................................................................................ 3

*Simmons v. Stephenson*,
84 S.W.3d 926 (Ky. Ct. App. 2002) ..................................................... 15

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .............................................................................. 21

*Speech First, Inc. v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022) ............................................................ 23

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950) .............................................................................. 16

*United States v. Powell*,
379 U.S. 48 (1964) .................................................................................. 5

*United States v. Skrmetti*,
605 U.S. 495 (2025) ................................................................................ 1

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
485 F. Supp. 3d 1 (D.D.C. 2020) .......................................................... 1

*Wollschlaeger v. Governor of Fla.*,
848 F.3d 1293 (11th Cir. 2017) ...................................................... 21, 23

## Executive Orders

*Defending Women from Gender Ideology Extremism and Restoring Biological
Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan.
20, 2025) ........................................................................................... 2, 5-7, 24

*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Exec.
Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) .................................. 6

*Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec.
Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) .................................. 6

*Ending Radical Indoctrination in K-12 Schooling*, Exec. Order No. 14190, 90 Fed.
Reg. 8853 (Jan 29, 2025) ............................................................................. 6

*Keeping Men Out of Women's Sports*, Exec. Order No. 14201, 90 Fed. Reg. 9279
(Feb. 11, 2025) ................................................................................................ 6, 7

*Prioritizing Military Excellence and Readiness*, Exec. Order No. 14183, 90 Fed.
Reg. 8757 (Jan. 27, 2025) ................................................................................ 6, 7

*Protecting Children From Chemical and Surgical Mutilation*, Exec. Order
No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025) ........................... 2, 6, 7, 10, 13, 23, 24

**Statutes**

15 U.S.C. § 45 .................................................................................................. 16, 17

15 U.S.C. § 52 .................................................................................................. 16, 17

15 U.S.C. § 55(a)(1) ............................................................................................. 17

15 U.S.C. §§ 41-58 .............................................................................................. 15

**Other Authorities**

Am. Civil Liberties Union and Lambda Legal, Comments in Response to Request for Public
Comment Regarding "Gender Affirming Care" for Minors, Docket No. FTC-2025-0264
(Sept. 26, 2025), https://tinyurl.com/m6zmw77j ............................................... 14

Andrew Ferguson, X.com (Nov. 19, 2025), https://tinyurl.com/yc6wx6en ................................. 14

Bureau of Prisons, *Management of Inmates with Gender Dysphoria*, No. 5260.01
(Feb. 19, 2026), https://tinyurl.com/3cwbfxxh ...................................................... 8

Fed. Bureau of Investigation, X.com (June 2, 2025), https://tinyurl.com/5966hpdc .................. 12

Fed. Trade Comm'n, FTC Policy Statement Regarding Advertising Substantiation
(Nov. 23, 1984), https://tinyurl.com/54hn3y73 ..................................................... 17

Fed. Trade Comm'n, *Health Products Compliance Guidance* (Dec. 2022),
https://tinyurl.com/4te7u7sc ............................................................................. 17

Fed. Trade Comm'n, *The Dangers of "Gender-Affirming Care" for Minors*,
https://tinyurl.com/mshfyjc5 ............................................................................. 14

Fed. Trade Comm'n, *FTC Announces Workshop on Exploring Unfair or Deceptive Trade Practices in "Gender-Affirming" Care for Minors* (June 9, 2025), https://tinyurl.com/26td2n2m ...................................................................................................... 13

Fed. Trade Comm'n, *Request for Public Comment Regarding "Gender-Affirming Care" for Minors,* Document No. FTC-2025-0264-001 (Jul. 27, 2025), https://tinyurl.com/5x69775u ...................................................................................................... 14

Ilan H. Meyer & Lauren J. Bouton, The Williams Inst., *Impact of Executive Orders on Access to Federal Data* (Feb. 2025), https://tinyurl.com/2c9a4d4y ................................................ 8

Juliana Kim, *Park Service erases 'transgender' on Stonewall website, uses the term 'LGB' movement*, NPR (Feb. 14, 2025), https://tinyurl.com/3pj27pap ................................. 8

Jo Yurcaba, *DOJ subpoenas more than 20 doctors and clinics that provide trans care to minors*, NBC News (July 10, 2025), https://tinyurl.com/5fa2d853 ............................................... 12

Matthew J. Vaeth, Off. of Mgmt. & Budget, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025), https://tinyurl.com/3zpchy7r ...................................................................................................... 8

Mem. from the Att'y Gen. to Select Component Heads, Subject: Preventing the Mutilation of American Children (Apr. 22, 2025), https://tinyurl.com/y6xcv8jk ........................ 12

Nadia Dowshen, et al., *A Critical Scientific Appraisal of the Health and Human Services Report on Pediatric Gender Dysphoria*, 77 The Journal of Adolescent Health 342-345 (2025), https://doi.org/10.1016/j.jadohealth.2025.06.002 .................................. 10

*Statement of Concern from FTC Employees* (Jul. 2, 2026), https://tinyurl.com/mr3fpn78 ...................................................................................................... 13

Susan J. Kressly, *AAP Statement on HHS Report Treatment for Pediatric Gender Dysphoria*, Am. Academy Pediatrics (May 1, 2025), https://tinyurl.com/478yckca .................. 10

The White House, *National Child Abuse Prevention Month, 2025* (Apr. 3, 2025), https://tinyurl.com/42swzwe5 ...................................................................................................... 9

U.S. Dep't of Health & Hum. Servs., *Declaration of the Secretary of the Department of Health and Human Services re: Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents* (Dec. 18, 2025), https://tinyurl.com/4uyrafyf ...................................................................................................... 11

U.S. Dep't of Health & Hum. Servs., *HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures* (Nov. 19, 2025), https://tinyurl.com/ym3puz6d ................. 10

U.S. Dep't of Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* (May 2025, rev. Nov. 2025, https://tinyurl.com/yxjdbud7 ........................................................................................... 10

U.S. Off. of Pers. Mgmt., *Initial Guidance Regarding President Trump's Executive Order Defending Women* (Jan. 29, 2025), https://tinyurl.com/243c49d6 ...................................... 8

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* **Lambda Legal Defense and Education Fund, Inc.** ("Lambda Legal") is the nation's oldest and largest legal organization dedicated to achieving full recognition of the civil rights of lesbian, gay, bisexual, transgender, and queer (LGBTQ+) people and everyone living with HIV through impact litigation, education, and policy advocacy. Since its founding in 1973, Lambda Legal has sought to eliminate discriminatory barriers to health care for LGBTQ+ people, particularly transgender people, serving as counsel or *amicus* in cases across the country. *See*, *e.g.*, *United States v. Skrmetti*, 605 U.S. 495 (2025); *Kadel v. Folwell*, 100 F.4th 122, 133 (4th Cir. 2024), *cert. granted, judgment vacated*, 145 S. Ct. 2838 (2025); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1 (D.D.C. 2020). This includes cases pushing back against the Trump Administration's defunding of researchers and healthcare entities serving transgender people. *See*, *e.g.*, *San Francisco AIDS Found. v. Trump*, 786 F. Supp. 3d 1184 (N.D. Cal. 2025) ("*SFAF*"); *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405 (D. Md. 2025) ("*PFLAG*").

Having long litigated cases involving barriers to gender-affirming medical care, *Amicus* offers perspectives on the Trump Administration's far-ranging targeting of transgender people and their healthcare providers and on the illegitimacy of investigating medical associations for their clinical guidance and policy statements as the Court considers the improper purpose underlying the administrative subpoenas sent to associations like the American Academy of Pediatrics.

### INTRODUCTION AND SUMMARY OF THE ARGUMENT

In January 2026, the Federal Trade Commission ("FTC") issued substantively identical civil investigative demands ("CID") to medical associations that had stated their support for

---

[1]    No party's counsel authored this brief in whole or in part, and no party or party's counsel contributed money to fund preparing or submitting this brief. No person other than *amicus*, its members, or its counsel made a monetary contribution to its preparation or submission.

affirming the identities of transgender young people and for the use of evidence-based medical care for transgender adolescents who need such health care as treatment for their gender dysphoria (also known as "gender-affirming medical care"). The latest salvo in the Trump Administration's broad-based discriminatory and demeaning campaign against transgender people, the CIDs were issued to punish and intimidate supporters of evidence-based gender-affirming medical care for transgender adolescents into silencing that support and falling in line with the Administration's dogma demonizing such care and those who provide it.

The Administration's attacks on transgender people began on day one of the present term with a mandate to eradicate "gender ideology," the Administration's derogatory term for acknowledging the existence of transgender people. Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) ("Gender EO"). The following week, the President established as "the policy of the United States that it will not fund, sponsor, promote, assist, or support" gender-affirming medical care for minors, and "will rigorously enforce all laws that prohibit or limit" such care, declaring it to be a "stain on our Nation's history," and that "it must end." Exec. Order No. 14187, *Protecting Children From Chemical and Surgical Mutilation*, 90 Fed. Reg. 8771, § 1 (Jan. 28, 2025) ("Denial-of-Care EO"). A series of sweeping implementation efforts followed, including not only by the Departments of Health and Social Services ("HHS") and Justice ("DOJ") but also by the FTC, culminating in the issuance of the CIDs to medical associations, including the one to the American Academy of Pediatrics ("AAP") at issue here.

But the Administration's animus towards transgender people and its rancor towards those who endorse or support the gender-affirming medical care that enables transgender adolescents to live authentically are not lawful bases for any administrative subpoenas or CIDs. "Government

officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024). The CID to AAP is rooted in the Administration's disdainful, inflammatory narrative regarding transgender people broadly and gender-affirming medical care more specifically, retaliating against and targeting AAP for its departure from that narrative. The manufactured statutory bases for the CID serve to illustrate its improper motive rather than serving as a lawful predicate.

AAP is likely to succeed on its claims that the issuance of and information sought by the CID improperly retaliate against AAP for speech and advocacy affirming transgender people's identities and supporting evidence-based gender-affirming medical care for adolescents and that the CID otherwise seeks to regulate and chill AAP's departure from the Administration's narrative regarding that care. Accordingly, this Court should grant the requested preliminary injunction to protect AAP from the imminent and irreparable harm of the violation of their constitutional rights.

## ARGUMENT

The authority of an agency to issue an administrative subpoena like a CID is necessarily constrained by the recipient's rights under the First and Fourth Amendments. *See See v. City of Seattle*, 387 U.S. 541, 544 (1967) (Fourth Amendment); *Media Matters for America v. Fed. Trade Comm'n*, 805 F. Supp. 3d 105, 129 (D.D.C. 2025) (First Amendment). In issuing the CID to AAP, however, the FTC has trampled these core constitutional safeguards. "The First Amendment generally 'prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech.'" *Media Matters for America v. Paxton*, 138 F.4th 563, 570 (D.C. Cir. 2025) (quoting *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022)). It further bars the government from targeting private parties' speech, advocacy, and association solely because they offer a viewpoint disfavored by the government. *See A.N.S.W.E.R. Coal. v.*

*Kempthorne*, 537 F. Supp. 2d 183, 195 (D.D.C. 2008) ("When the government targets particular viewpoints taken by speakers, 'the violation of the First Amendment is all the more blatant.'") (quoting *Rosenberger v. Rector and Visitors of the Univ. of Va.,* 515 U.S. 819, 829 (1995)).

As set forth in AAP's brief, AAP has been engaged in a range of protected First Amendment activities, including publishing guidance documents for supporting transgender youth with gender dysphoria, including through gender-affirming medical care, providing educational programming for pediatricians, and engaging in advocacy through participation in amicus briefs and rulemaking. Mot. for Prelim. Inj. [ECF No. 6] at 5-6. These activities express a viewpoint directly counter to the Trump Administration's mandated narrative vilifying transgender people and gender-affirming medical care.

It is impossible to view the CID in isolation as its issuance is the direct result of the Administration's relentless campaign to erase transgender people from public life and to disavow and disparage the medical care that allows them to live as themselves, *i.e.*, gender-affirming medical care, as well as its providers and supporters. Viewed in this broader context, the causal link between AAP's expressed support and advocacy regarding the need to affirm transgender people's identities and the provision of evidence-based gender-affirming medical care and the FTC's issuance of the CID is inescapable. *See Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) ("causal link between the exercise of a constitutional right and the adverse action taken" is key component of retaliation claim).

Moreover, the CID's alleged statutory aim cannot redeem its improper retaliatory nature or viewpoint discrimination. Rather than offering a legitimate basis for the FTC's investigation, the complete mismatch between the FTC's commerce-focused jurisdiction and the FTC Act's application to marketing and advertising on the one hand and the non-commercial speech of a non-

profit medical association on the other simply underscore the CID's improper purpose. As further illustrated by the astonishingly broad sweep of the CID's requests for effectively anything that touches on gender-affirming medical care in any way, the CID can only be seen as an inquisition to root out, chill, and punish AAP's statements, deliberation, advocacy, and collaborations offering support for a different narrative regarding gender-affirming medical care than that favored by the Administration.

This is precisely the type of improper purpose courts have condemned. *See United States v. Powell*, 379 U.S. 48, 58 (1964) (improper purpose established when subpoena is issued "to harass the [recipient] or to put pressure on [it] to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation.").

## I. THE CID TO AAP IS PART OF THE TRUMP ADMINISTRATION'S TARGETED ATTACKS ON TRANSGENDER PEOPLE AND GENDER-AFFIRMING MEDICAL CARE.

The FTC's CID to AAP is a direct result of the Trump Administration's relentless targeting of transgender people for unequal treatment, including its multifaceted campaign to eliminate the provision of gender-affirming medical care to adolescents. The CID is inextricably tied to the Administration's broader efforts to exclude transgender people from public life and deny them access to the health care that enables them to live authentically and was unlawfully issued to punish and restrain AAP's departure from the Administration's viewpoint underlying those efforts.

### A. The Administration Has Targeted Transgender People for Discrimination and Barred Government Acknowledgement of Transgender People's Existence.

The Trump Administration set the tone on its first day in office by launching its attack on transgender people via the issuance of the Gender EO, a cross-cutting effort to reverse existing protections and deny recognition of transgender people's existence. *See*, *e.g.*, Gender EO § 2 (declaring "the policy of the United States to recognize two sexes, male and female;" rejecting that

a person might have a gender identity different from their birth-assigned sex as a "false claim"). The Gender EO mandated all agencies to interpret sex-based terms as birth-assigned sex, including with regard to government-issued identification documents and personnel records, § 3(c), (d); rescinded provisions of prior executive orders combating discrimination against LGBTQ people and enabling transgender persons to serve in the military, § 7(b); barred federal funding from being "used to promote gender ideology," § 3(g); mandated housing in accordance with a person's birth-assigned sex in federal prisons and federally-funded shelters, § 4; and directed federal agencies to rescind guidance, forms, and policies acknowledging the existence of transgender people, §§ 3(e), 7(c).

Additional Executive Orders followed, with the Administration using the power of the purse to enforce its erasure of transgender people and its refusal to recognize any form of systemic discrimination; targeting gender-affirming medical care for transgender adolescents through the Denial-of-Care EO; excluding transgender people from military service; threatening federal funding for schools that recognize and affirm transgender students' identities; and barring transgender athletes from competing with their teammates. *See*, *e.g.*, Exec. Order No. 14151, *Ending Radical and Wasteful DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025); Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025); Exec. Order No. 14183, *Prioritizing Military Excellence and Readiness*, 90 Fed. Reg. 8757 (Jan. 27, 2025) ("Military Ban EO"); Exec. Order No. 14190, *Ending Radical Indoctrination in K-12 Schooling*, 90 Fed. Reg. 8853 (Jan 29, 2025); Exec. Order No. 14201, *Keeping Men Out of Women's Sports*, 90 Fed. Reg. 9279 (Feb. 11, 2025) ("Sports Ban EO").

These Executive Orders employ dehumanizing, inaccurate rhetoric to cast transgender people, gender-affirming medical care, and transgender-inclusive policies as an existential threat to "the validity of the entire American system," Gender EO § 1, as antonymic with "an honorable, truthful, and disciplined lifestyle," lacking "humility and selflessness," Military Ban EO § 1, and as a source of "endangerment, humiliation, and silencing of women and girls," Sports Ban EO § 1. Far from mere policy preferences, courts have recognized that these EOs specifically seek to erase transgender people and punish the organizations that provide them necessary services and care. *See*, *e.g.*, *PFLAG*, 769 F. Supp. 3d at 443-44 (The Gender EO "den[ies] the existence of transgender persons altogether;" "[t]he Court cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist."); *SFAF*, 786 F. Supp. 3d at 1215-16 ("[T]he Gender Order necessarily singles out transgender people and excludes them from being able to benefit from federal funds.").

Federal agencies took immediate action to carry out the Gender and Denial-of-Care EOs' campaign against transgender people and their medical providers.  For example, within days of the Gender EO, Secretary of State Rubio ordered State Department staff "to suspend any [passport] application where the applicant is seeking to change their sex marker from the definition provided in [the Gender EO]" or "requesting an 'X' sex marker." *Schlacter v. United States*, 804 F.Supp.3d 592, 598 (D. Md. 2025) (internal quotations omitted). Contemporaneously, the Bureau of Prisons ("BOP") initiated transfers of transgender women to men's prisons, paused access to gender-affirming medical care, and discontinued access to gender-affirming clothing and toiletries. *See Doe v. McHenry*, 763 F. Supp. 3d 81, 84 (D.D.C. 2025) (granting TRO to prohibit imminent transfers); *Kingdom v. Trump*, No. 1:25-CV-691-RCL, 2025 WL 1568238, at *1 (D.D.C. June 3, 2025) (granting PI to protect access to gender-affirming medical care and social accommodations).

*See also* Bureau of Prisons, *Management of Inmates with Gender Dysphoria*, No. 5260.01 (Feb. 19, 2026), https://tinyurl.com/3cwbfxxh (instructing BOP providers to medically de-transition patients, to end access to surgical care, and to treat gender dysphoria symptoms solely with talk therapy and psychotropics).

The Office of Personnel Management instructed federal agencies to "take down all outward facing media (websites, social media accounts, etc.) that inculcate or promote gender ideology." U.S. Off. of Pers. Mgmt., *Initial Guidance Regarding President Trump's Executive Order Defending Women* (Jan. 29, 2025), https://tinyurl.com/243c49d6. The Office of Management and Budget promised to stop the use of federal funds to promote "transgenderism." Matthew J. Vaeth, Off. of Mgmt. & Budget, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs* (Jan. 27, 2025), https://tinyurl.com/3zpchy7r.  Within days, agencies from the National Park Service to the Centers for Disease Control removed references to transgender people from government websites. *See, e.g.*, Juliana Kim, *Park Service erases 'transgender' on Stonewall website, uses the term 'LGB' movement*, NPR (Feb. 14, 2025), https://tinyurl.com/3pj27pap; Ilan H. Meyer & Lauren J. Bouton, The Williams Inst., *Impact of Executive Orders on Access to Federal Data* (Feb. 2025), https://tinyurl.com/2c9a4d4y.

Similarly, the National Institutes of Health terminated hundreds of research grants relating to LGBTQ+ people because the research related to "transgender issues" and, according to the Administration, "research based on gender identity … do[es] nothing to enhance the health of many Americans" and "ignore[s] biological realities." *Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Insts. of Health*, 795 F. Supp. 3d 678, 688, 696-97 (D. Md. 2025).  In this regard, the termination of such research pulls back the curtain on the Administration's discriminatory motives and improper purpose: The Administration is not concerned with the evidence base relating to

gender-affirming medical care (or truth or facts, for that matter), but rather with the ultimate demise of the essential medical care that enables transgender people to live authentically.

The breadth of these executive actions is breathtaking and has a dramatic chilling effect on the speech and activity of organizations and individuals that acknowledge the existence of transgender people and aim to support them.

**B. As Part of Its Discriminatory Campaign, the Administration Seeks to Punish Those Who Acknowledge Transgender People's Existence and Express Support for Gender-Affirming Medical Care, Including AAP.**

The sharpest tip of the Administration's attacks against transgender people is aimed at transgender adolescents, their families and supporters, their medical providers, and the professional associations that express affirming viewpoints about gender-affirming medical care.

The executive's statements about transgender people and gender-affirming medical care providers are "provocative and unabashedly so." *In re 2025 UPMC Subpoena*, No. 2:25-MC-01069-CB, 2025 WL 3724705, at *2 (W.D. Pa. Dec. 24, 2025), *appeal docketed*, No. 26-1401 (3d Cir. Mar. 4, 2026). DOJ has characterized gender-affirming medical care as "a radical ideological agenda"; an "infect[ion visited upon] an entire generation"; the work of "politically captured profiteers"; "barbaric practice[s]" that "maim and steriliz[e] children"; and as "genital mutilation." *Id.* (quoting DOJ statements). The President has characterized gender-affirming medical care for adolescents as child abuse, referring to "the sinister threat of gender ideology" as "one of the most prevalent forms of child abuse facing our country today." The White House, *National Child Abuse Prevention Month, 2025* (Apr. 3, 2025), https://tinyurl.com/42swzwe5. As courts have found, such "rhetoric regarding gender-affirming care reflects callous indifference, if not abject cruelty." *In re 2025 UPMC Subpoena*, No. 2:25-MC-01069-CB, 2026 WL 570419, at *2 (W.D. Pa. Mar. 2, 2026) ("*UPMC Subpoena II*").

As directed by the Denial-of-Care EO, multiple other agencies have taken action to enforce the Administration's singular viewpoint opposing gender-affirming medical care and to punish entities that take an opposing view.  For example, HHS published a report allegedly reviewing "the existing literature on best practices for promoting the health of children" with gender dysphoria. U.S. Dep't of Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* (May 2025, rev. Nov. 2025) ("HHS Report"), https://tinyurl.com/yxjdbud7.   Beyond the other significant flaws in the HHS Report,[2] it specifically took aim at AAP, alleging that its Policy Statement on gender-affirming medical care was "very low quality" and "did not recommend [its guidance] for implementation." HHS Report, at 146. This was no surprise, as the Denial of Care EO had already labeled practice guidelines supporting evidence-based gender affirming medical care for adolescents as "junk science" in calling for the Report's creation. Denial of Care EO § 3.

Concurrently with the Report's release, HHS Secretary Kennedy publicly accused AAP and other medical organizations of "peddl[ing] the lie that chemical and surgical sex-rejecting procedures could be good for children," and alleged that such care "is not medicine—it's malpractice."  *See* U.S. Dep't of Health & Hum. Servs., *HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures* (Nov. 19, 2025), https://tinyurl.com/ym3puz6d. In turn, AAP noted how the HHS Report "misrepresents the current medical consensus and fails to reflect the realities of pediatric care."  Susan J. Kressly, *AAP Statement on HHS Report*

---

[2] *See, e.g.,* Nadia Dowshen, et al., *A Critical Scientific Appraisal of the Health and Human Services Report on Pediatric Gender Dysphoria*, 77 The Journal of Adolescent Health 342-345 (2025), https://doi.org/10.1016/j.jadohealth.2025.06.002 ("The HHS report, with its extensive violations of scientific norms, misrepresentations of science, and wanton disregard of the expert standard of care for TGD youth, is a dangerous incursion of politics into science and medicine.").

*Treatment for Pediatric Gender Dysphoria*, Am. Academy Pediatrics (May 1, 2025), https://tinyurl.com/478yckca.

Subsequently, Secretary Kennedy promulgated a declaration pronouncing by fiat that *any* provision of gender-affirming medical care to minors is *per se* below the standard of care and admonishing AAP and other organizations for supporting such care, alleging that their positions represent the "failure of professional organizations in the United States to protect children."  *See* U.S. Dep't of Health & Hum. Servs., *Declaration of the Secretary of the Department of Health and Human Services re: Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents* (Dec. 18, 2025), https://tinyurl.com/4uyrafyf.  Weeks later, the Administration terminated seven federal grants awarded to AAP, alleging that the awards "no longer effectuate[] agency and [HHS] priorities." *See Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-4505, 2026 WL 80796, at *1–*2 (D.D.C. Jan. 11, 2026) (granting preliminary injunction and finding AAP likely to succeed on First Amendment retaliation claim).  As the court found, this followed AAP "ha[ving] repeatedly drawn attacks and negative critiques impugning its motivations from current high-level HHS officials," with HHS Secretary Kennedy "accus[ing] the organization of lying and 'malpractice,'" and "[a] senior advisor to the HHS Secretary … likewise attack[ing] AAP, using extreme language," such as "describe[ing] AAP as part of 'demonic forces' that 'in many cases, are practicing evil,' and are 'committing war on kids.'" *Id.* at *4-5.  Shortly after HHS's actions against AAP, the FTC issued the instant CID.

To be sure, the retaliatory acts against those who acknowledge transgender people's existence and express support for gender-affirming medical care are not limited to the AAP.  Not only has the FTC issued CIDs to other medical organizations, *see Endocrine Soc'y v. Fed. Trade*

*Comm'n*, No. 1:26-cv-00512-JEB, (D.D.C. filed Feb. 18, 2026); *World Pro. Ass'n for Transgender Health v. Fed. Trade Comm'n*, 1:26-cv-00532-JEB, (D.D.C. filed Feb. 18, 2026), but DOJ has also targeted providers of gender-affirming medical care.  For example, DOJ components have publicly pronounced their intent to target those who provide and support gender-affirming medical care.  *See*, *e.g.*, Fed. Bureau of Investigation, X.com (June 2, 2025), https://tinyurl.com/5966hpdc.  In April 2025, Attorney General Bondi directed "the Civil Division … to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'"  Mem. from the Att'y Gen. to Select Component Heads, Subject: Preventing the Mutilation of American Children (Apr. 22, 2025), https://tinyurl.com/y6xcv8jk.  The Civil Division announced it would do so, issuing a June 2025 memorandum committing to prioritizing these investigations.  Mem. from Brett A. Shumate to All Civil Division Employees, Subject: Civil Division Enforcement Priorities (Jun. 11, 2025), https://www.justice.gov/civil/media/1404046/dl. Immediately thereafter, DOJ issued subpoenas to more than twenty healthcare institutions across the country whose care for their patients includes gender-affirming medical care.  *See* Jo Yurcaba, *DOJ subpoenas more than 20 doctors and clinics that provide trans care to minors*, NBC News (July 10, 2025), https://tinyurl.com/5fa2d853.  Every court that has considered these subpoenas has determined that they were issued for the improper purpose of "fulfill[ing] the Executive's well-publicized policy objective to terminate and block gender affirming healthcare."  *See In Re 2025 Subpoena to Children's Nat'l Hosp.*, No. 1:25-cv-03780-JRR, 2026 WL 160792 at *8 (D. Md. Jan. 21, 2026)*, appeal docketed*, No. 26-1104 (4th Cir. Feb. 2, 2026).[3]

---

[3]     *See also*, *e.g.*, *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, No. 25-MC-00063-

**C. The CID to AAP Is Part and Parcel of the FTC's Implementation of the Administration's Discriminatory Views Against Transgender People and Gender-Affirming Medical Care.**

The FTC has also embraced the Administration's mandated disparagement of transgender people and the medical care that enables them to live authentically, even when, as FTC employees and officials have explained, the FTC's efforts in this regard are "not the FTC's lane." *Statement of Concern from FTC Employees* (Jul. 2, 2026), https://tinyurl.com/mr3fpn78. For instance, in July 2025, the FTC held a workshop on the purported "dangers" of gender-affirming medical care for minors for the express purpose of effectuating the Gender and Denial-of-Care EOs' directive to disavow and undermine support for gender-affirming medical care for adolescents. *FTC Announces Workshop on Exploring Unfair or Deceptive Trade Practices in "Gender-Affirming" Care for Minors*, Fed. Trade Comm'n (June 9, 2025); Fed. Trade Comm'n, *The Dangers of "Gender-Affirming Care" for Minors*, https://tinyurl.com/mshfyjc5. Only one viewpoint was

---

SKC-CYC, 2026 WL 33398, at *7 (D. Colo. Jan. 5, 2026) ("government's aim is not actually to investigate FDCA violations, but to use the FDCA as a smokescreen for its true objective of pressuring pediatric hospitals into ending gender-affirming care through commencing vague, suspicionless 'investigations.'"); *In re 2025 UPMC Subpoena*, 2025 WL 3724705, at *2 (subpoena "carries more than a whiff of ill-intent."); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 237, 239 (D. Mass. 2025) (subpoena's "true purpose" is to interfere with "Massachusetts' right to protect GAC within its borders, to harass and intimidate BCH to stop providing such care, and to dissuade patients from seeking such care."), *appeal docketed*, No. 25-2092 (1st Cir. Nov. 14, 2025); *In re Subpoena No. 25-1431-014*, No. MC 25-39, 2025 WL 3252648, at *10 (E.D. Pa. Nov. 21, 2025) (DOJ's asserted concerns "describe policy disagreements about the propriety of medical care," not a legitimate basis for a subpoena), *appeal docketed*, No. 26-1134 (3d Cir. Jan. 26, 2026); *QueerDoc, PLLC v. U.S. Dep't of Justice*, 807 F. Supp. 3d 1295, 1303 (W.D. Wash. 2025) ("No clearer evidence of improper purpose could exist than the Government's own repeated declarations that it seeks to end the very practice it claims to be merely investigating."), *appeal docketed*, No. 25-7384 (9th Cir. Nov. 24, 2025); *In re Subpoena Duces Tecum No. 25-1431-016*, No. 2:25-MC-00041-JHC, 2025 WL 3562151, at *10-11 (W.D. Wash. Sept. 3, 2025) (finding "threadbare" allegations pretextual; true purpose was "to pressure hospitals into ending gender-related care for minors.").

presented at this workshop, with every single presenter voicing opposition to gender-affirming medical care for transgender young people. *Id*.[4]

The FTC has also sought public comment relating to gender-affirming medical care with the goal of exploring unprecedented enforcement against gender-affirming medical care providers under the guise that the provision of such care constitutes an unfair or deceptive trade practice. Fed. Trade Comm'n, *Request for Public Comment Regarding "Gender-Affirming Care" for Minors*, Document No. FTC-2025-0264-001 (Jul. 27, 2025), https://tinyurl.com/5x69775u. Various FTC officials have also endorsed the Administration's viewpoints in their official capacities, including Commissioner Ferguson's lauding of the HHS Report as "why the FTC is investigating these practices." https://tinyurl.com/yc6wx6en.

Following in the footsteps of other agencies, the CIDs to medical associations like AAP comprise the FTC's move from rhetoric to action, abusing its investigatory authority to retaliate against organizations that have spoken publicly on the importance of evidence-based gender-affirming medical care for transgender adolescents, seeking to chill their speech, advocacy, and association because they express a viewpoint contrary to the Administration's orthodoxy. Viewed in this broader context, the issuance of these broad and burdensome investigative demands targeting AAP's protected First Amendment activity offer "more than a 'whiff' of ill-intent. Arguably, it is closer to a stench." *UPMC Subpoena II*, 2026 WL 570419, at *2.

---

[4]    *See also* Am. Civil Liberties Union and Lambda Legal, Comments in Response to Request for Public Comment Regarding "Gender Affirming Care" for Minors, Docket No. FTC-2025-0264 (Sept. 26, 2025), at 20-24, https://tinyurl.com/m6zmw77j.

## II.    THE FTC'S PROFFERED BASES FOR ITS UNFOUNDED INVESTIGATIONS INTO MEDICAL ASSOCIATIONS LIKE AAP CANNOT REDEEM THE CIDS' IMPROPER PURPOSE OF RETALIATION FOR AND TARGETING OF PROTECTED FIRST AMENDMENT ACTIVITY.

Not only is the issuance of the CID to AAP inextricable from the Administration's targeting of transgender people and its enforced narrative impugning the gender-affirming medical care they need, but the FTC's asserted purpose for the CID and the sheer scope of the CID's demands betray the pretextual nature of the FTC's actions.  Specifically, notwithstanding that AAP is not engaged in commerce and has no commercial interest in gender-affirming medical care, the CID claims to be investigating AAP for potential FTC Act violations related to the "marketing and advertising" of gender-affirming medical care.  *See* Dkt. 1-1 at 4.[5]  This disconnect and the near-limitless scope of "Covered Statements" subject to the CID (*see* Dkt. 1-1 at 9) show that the CID is merely a legally meritless fishing expedition conceived in bad faith to retaliate against AAP and intimidate it into conforming its speech to the Administration's preferred viewpoint regarding gender-affirming medical care.  Having demanded production of the AAP's entire universe of documents

---

[5]     Lest there be any doubt, the FTC has no authority to regulate the practice medicine, which is appropriately left to the states. "States, not the federal government, traditionally have regulated the practice of medicine. Choosing what treatments are or are not appropriate for a particular condition is at the heart of the practice of medicine." *Judge Rotenberg Educ. Ctr., Inc. v. U.S. Food & Drug Admin.*, 3 F.4th 390, 400 (D.C. Cir. 2021) (citations omitted).

Multiple courts have held that consumer protection statutes—statutes modeled after the FTC Act, 15 U.S.C. §§ 41-58—do not regulate the practice of medicine. *See, e.g.*, *Brookins v. Mote*, 292 P.3d 347, 360 (Mont. 2012) (agreeing with "the near unanimous line of authority that has exempted from the [Consumer Protection Act] conduct by health-care providers in the 'actual practice' of the profession."); *Nelson v. Ho*, 564 N.W.2d 482, 486 (Mich. Ct. App. 1997); *Simmons v. Stephenson*, 84 S.W.3d 926, 928 (Ky. Ct. App. 2002); *Haynes v. Yale-New Haven Hosp.*, 699 A.2d 964, 972 (Conn. 1997); *Hampton Hosp. v. Bresan*, 672 A.2d 725, 731 (N.J. Super. Ct. App. Div. 1996); *Feldstein v. Guinan*, 499 N.E.2d 535, 538 (Ill. App. Ct. 1986).

This is consistent with Supreme Court precedent, which has explained that "[i]t would be unrealistic to view the *practice of professions* as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas." *Goldfarb v. Va. State Bar*, 421 U.S. 773, 788 (1975) (emphasis added).

that in any way touch on the topic of gender-affirming medical care, the FTC cannot plausibly assert that the CID is a routine mechanism to collect reasonably relevant information to a genuine investigation under law.  The lack of foundation for these supposed legal violations and the breathtakingly broad nature and scope of the purported investigation undermine any claim by the FTC that this is a legitimate investigation, leaving only the improper purposes of retaliation and targeting of AAP's protected speech, advocacy and association.

**A. Both Because AAP Is a Nonprofit Organization and Because AAP's "Covered Statements" Are Non-Commercial Educational and Advocacy Speech Excluded From the FTC's Jurisdiction, the CID Has No Legitimate Basis.**

An administrative subpoena is only permissible when it "is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *United States v. Morton Salt Co.*, 338 U.S. 632, 652-53 (1950).  The FTC's CID to AAP fails to meet this standard.  First, AAP's status as a non-profit mission-driven organization that in no way engages in activities "in or affecting commerce" places it outside the FTC's jurisdiction and the statute's scope.  15 U.S.C. § 45; *see California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 766 (1999) (for FTC Act to apply to non-profit, "proximate relation to lucre must appear;" it must be organized for its own profit or that of its members: "an organization devoted solely to professional education may lie outside the FTC Act's jurisdictional reach, even though the quality of professional services ultimately affects the profits of those who deliver them.").  AAP does not engage in any commercial activity and is not organized for anyone's profit.  AAP does not sell medical products or provide clinical services and it offers its guidelines and policy statements for free.  Mot. for Prelim. Inj. [ECF No. 6] at 5, citing Grisby Decl. [ECF No. 6-2], Ex. 10.

Second, AAP's statements regarding gender-affirming medical care for minors are not "marketing or advertising" as those terms are defined in applicable statutes.  Section 12 of the FTC

Act prohibits the "disseminat[ion]" of "false advertisements [for] … foods, drugs, devices, services, or cosmetics" and establishes that those practices are "an unfair or deceptive act or practice in or affecting commerce."  15 U.S.C. §§ 45, 52(a); *see also* 15 U.S.C. § 55(a)(1) (defining "false advertisement" as "an advertisement, other than labeling, which is misleading in a material respect.").  The FTC has published guidance on these statutory mandates relative to medical claims.  *See* Fed. Trade Comm'n, *Health Products Compliance Guidance* (Dec. 2022) ("*Health Products Guidance*"), https://tinyurl.com/4te7u7sc; Fed. Trade Comm'n, *FTC Policy Statement Regarding Advertising Substantiation* (Nov. 23, 1984), https://tinyurl.com/54hn3y73.  This guidance makes clear that "[p]ublic health recommendations and advisories [from medical organizations] reflect a judgment based on the best currently available evidence" and "aren't equivalent to a finding that there is a causal link between the recommended course of action and the health benefit."  *Health Products Guidance*, *supra*, at 14.  Thus, according to the FTC's own guidance, AAP's "Covered Statements" *are not* marketing or advertising, but professional "*judgment[s]* based on the best currently available evidence."

Moreover, courts have recognized that the FTC has no authority to censor medical opinions and recommendations outside the context of advertising.  For example, in *FTC v. Agora Fin., LLC*, 447 F. Supp. 3d 350 (D. Md. 2020), the court noted that "[t]he FTC, and th[e] Court through adjudication of claims under the FTC Act, are charged with protecting consumers from false or misleading advertising of products being sold, not from being exposed to novel or unproven medical ideas contained in health-related publications."  *Id*. at 366.  "For th[e] Court to prevent dissemination of those ideas on a 'false advertising' theory, or to require specific medical testing before such ideas can be explored in a written publication that is accurately advertised to prospective consumers, could do a grave disservice to current or future medical patients."  *Id.*

But here, the CID is not focused on the truthfulness of AAP's advertising (which of course does not exist), but rather on the truthfulness of AAP's guidance itself, which is impermissible. The only relevant inquiry under the statute is whether advertisements accurately represent the contents of any publication or guidance being advertised, not whether the medical claims themselves are supported. *See* 447 F. Supp. 3d at 364. Limiting the FTC's authority in such circumstances is necessary to prevent "the potential chilling effect on medical discourse" given the strong First Amendment protections for non-commercial speech, including professional speech. *Id*. at 365.

There are only "two circumstances" in which the Supreme Court "has afforded less protection for professional speech," *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 768 (2018) ("*NIFLA*"), and neither applies here. First, "[s]tates may regulate professional *conduct*, even though that conduct *incidentally* involves speech." *Id.* (emphasis added). But the FTC does not regulate the practice of medicine, *see* note 5, *supra*, and the CID does not purport to regulate or investigate AAP's conduct. Indeed, the AAP does not actually *provide* medical treatment (including gender-affirming medical care), services, or products. Rather, the CID requests information about, *inter alia*, "Covered Statements" AAP has made, Policy Statements AAP has authored, studies it has sponsored, legislative testimony and advocacy, and communications with other organizations. *See* CID at 6-8. This is core speech, not conduct.

Second, more deferential review is applied to professionals' "commercial speech." *Id.* But the FTC's targeting of AAP goes far beyond the regulation of commercial speech, meaning "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980). The "core notion of commercial speech" is "speech which does no more than propose a commercial transaction."

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (quotation omitted).  Nothing about AAP's speech falls within this category.  Rather, the FTC's inquiry in this case directly targets AAP's non-commercial speech—its policy statements, publicly-available educational materials, and political and legal advocacy.  *See* Mot. for Prelim. Inj., [ECF No. 6], at 5-6 (describing the types of documents sought by the CID as "Covered Statements").

Even if the Court thought it was a close call, AAP's speech does not meet any of the factors courts analyze to decide whether speech is commercial: "(1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 285 (4th Cir. 2013) (en banc) (cleaned up) (laying out the *Bolger* factors).

One, no advertisements are at issue here.  AAP is neither advertising medical products or services, nor promoting its guidance or policy statements for profit.  The term-of-art "advertising" cannot reasonably be stretched so far as to include AAP's Covered Statements as they are in no way "part of an organized campaign to penetrate the relevant market."  *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 256, 262 (4th Cir. 2017) (quotation omitted). They bear no resemblance to "marketing techniques and promotion methods that marketers engage in to increase consumer interest in, or demand for, their products." Health Products Guidance, *supra*, at 2.  A non-profit professional organization's policy and political statements are fundamentally different from advertising.

Two, the Covered Statements do not relate to products or services, nor does the AAP promote the Covered Statements or guidance at issue here as commercial products or services. *See*, *e.g.*, *Handsome Brook Farm*, 700 F. App'x at 259-60 (email urging retailers to purchase eggs

only from certain producers satisfied second prong).  Because AAP's generalized guidance regarding the treatment of transgender minors with gender dysphoria does not promote any specific products or services, it is not commercial.  On the contrary, as a non-profit medical professional association, AAP's guidance and advocacy related thereto are quintessential professional speech, based on its evaluation of scientific or medical research relating to pediatric health topics.  *See* Decl. of Mark Del Monte, [ECF No. 6-1], at ¶¶ 5-7.

Third, there is no financial motivation here.  AAP is a nonprofit organization.  But even if there were, "[t]he mere fact that a business may earn revenue from its services is 'insufficient by itself' to render its opinions about those services 'commercial.'" *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1120 (9th Cir. 2024) (quoting *Bolger*, 463 U.S. at 67); *see also*, *e.g.*, *Exeltis USA Inc. v. First Databank, Inc.*, 520 F. Supp. 3d 1225, 1230 (N.D. Cal. 2021) (rejecting argument that database compiling information about pharmaceutical products "is nevertheless commercial because it provides a service to payors, who rely on the information it contains" since such an argument would consider any speech that "provides a service . . . on which readers may rely for their own commercial ends" to be commercial speech).  In sum, AAP is not engaged in commercial speech.

Ultimately, even if some component of AAP's policy statements, educational materials, or policy and legal advocacy could be considered commercial speech, it would still be entitled to full First Amendment protection because it is "inextricably intertwined" with protected speech.  The "inextricably intertwined doctrine applies . . . when it is legally or practically impossible for the speaker to separate out the commercial and noncommercial elements of his speech.  In that situation the package as a whole gets the benefit of the higher standard of scrutiny applicable to noncommercial speech." *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 521 (7th Cir. 2014).

Indeed, any attempt to apply FTC advertising guidelines to AAP's non-commercial speech would create an untenable chicken-and-egg paradox because AAP's policy statements are precisely the type of standards the FTC would rely upon to evaluate the truth of advertising about the efficacy of medical products. *See*, *e.g.*, *Health Products Guidance* at 11 ("In making this determination, the FTC gives great weight to accepted norms in the relevant fields of research and consults with experts in those fields. For a health-related claim, the FTC will rely primarily on experts in the particular field of health at issue and may, in addition, consult experts on a particular ingredient or type of product."); *POM Wonderful, LLC v. FTC*, 777 F.3d 478, 490 (D.C. Cir. 2015) (whether statements regarding the efficacy of medical products are misleading turns on whether they are supported by "competent and reliable scientific evidence" "sufficient to satisfy the *relevant scientific community* of the claim's truth."). Here, the relevant scientific community are medical professional organizations like AAP and providers who have experience treating adolescent transgender patients. That FTC is now investigating the entities that create standards—not products—demonstrates that the issuance of this CID is a perversion of the FTC's role.

Moreover, even if, *arguendo*, speech like the Covered Statements could be construed to be providing medical treatment or services, a health professional's recommendations in relation to such treatments or services to a patient is protected by the First Amendment. The Supreme Court "has stressed the danger of content-based regulations 'in the fields of medicine and public health, where information can save lives.'" *NIFLA*, 585 U.S. at 771 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011)). Indeed, "[h]ealth-related information is more important than most topics because it affects matters of life and death." *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1328 (11th Cir. 2017) (en banc) (Pryor, J. concurring). As such, "[i]f anything, the doctor-patient relationship provides more justification for free speech, not less." *Id.* And to be clear, such

speech does not constitute an advertisement for such treatments or services. "Otherwise, any speech can become commercial if eventually relied on by third parties to purchase some good or service." *Ketonatural Pet Foods, Inc. v. Hill's Pet Nutrition, Inc.*, 756 F. Supp. 3d 1128, 1146 (D. Kan. 2024).

FTC's CID raises the absurd specter that the Administration is regulating the expert non-commercial speech of AAP by investigating whether it conforms to the statements of the relevant scientific community, which includes AAP.  This paradox illustrates the Administration's pretextual intent to silence the AAP's voice based solely on its expression of a medical consensus with which the Administration disagrees.

**B. The CID's Sprawling Demands for All Things Related to Gender-Affirming Medical Care Undercut the Legitimacy of the Investigation and Reveal its Targeting and Chilling of AAP's First Amendment Rights.**

Not only does the asserted basis for the CID fail to undercut its illegitimate purpose, but its sweeping demands targeting a broad swath of protected First Amendment activities confirm it. The CID requests information and documents relating to AAP's deliberations on and expressions of its medical views, identification of AAP's collaborators and consultants, and materials relating to AAP's participation in litigation and other advocacy, all because AAP's conclusions support affirming transgender minors' identities and the provision of gender-affirming medical care to adolescents where it is clinically indicated.  But a CID aimed at suppressing AAP's ability to consider, express, and advocate a viewpoint contrary to the Administration's infringes AAP's constitutional rights. Such "[v]iewpoint discrimination is . . . an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829.  Unless an exception applies that would relegate it to a lower standard of scrutiny, speech restrictions "based on viewpoint are prohibited, seemingly

as a *per se* matter." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1126 (11th Cir. 2022) (cleaned up).

Furthermore, the existence of debate, disagreement, or lack of medical consensus does not authorize the government to censor disfavored views because "when the government polices the content of professional speech, it can fail to 'preserve an uninhibited marketplace of ideas in which truth will ultimately prevail.'" *NIFLA*, 585 U.S. at 772 (quoting *McCullen v. Coakley*, 573 U.S. 464, 476 (2014)). "Professionals might have a host of good-faith disagreements, both with each other and with the government, on many topics in their respective fields," but "the people lose when the government is the one deciding which ideas should prevail." *Id.* "The need to prevent the government from picking ideological winners and losers is as important in medicine as it is in any other context." *Wollschlaeger*, 848 F.3d at 1328 (Pryor, J., concurring). "If today the majority can censor so-called 'heresy,' then tomorrow a new majority can censor what was yesterday so-called 'orthodoxy.'" *Id.* at 1329.

On the contrary, it is the government here enforcing an orthodoxy. Any labeling of AAP's position as making "false or unsubstantiated representations" regarding gender-affirming medical care, *see* CID at 2, even assuming *arguendo* that such representations fall within the FTC's purview, flows directly from the Administration's campaign against such care rather than from science or research. Despite that these treatments have long been recognized by the medical establishment as the standard of care in accordance with evidence-based clinical guidelines, *see Dekker v. Weida*, 679 F. Supp. 3d 1271, 1285-86 (N.D. Fla. 2023), the Administration has created an echo chamber within the federal government, including via the HHS Report and Secretary Kennedy's Declaration, in order to implement the Denial-of-Care EO's mandate to undermine longstanding recognition of the medical necessity of these treatments and to use every tool

available to end the provision of gender-affirming medical care and the Administration's directive to not recognize transgender people's very existence. Denial-of-Care EO, §§ 1, 3, 5; Gender EO, § 1.  But, as noted, "content-based regulations in the fields of medicine and public health" presents a unique danger, given that it is a field "where information can save lives.'" *NIFLA*, 585 U.S. at 771 (cleaned up).  As the Supreme Court has observed, repressive "governments have 'manipulat[ed] the content of doctor-patient discourse' to increase state power and suppress minorities . . . ." *Id.*

Here, the FTC's CID is part of an effort to retaliate against AAP and others who deviate from the Administration's dogma regarding transgender people and gender-affirming medical care.  It seeks to chill AAP's expression of its differing viewpoint and. in the process. to manipulate the scientific and medical discourse to increase state power and suppress gender minorities.  Like other components of the Administration's targeting of transgender people and gender-affirming medical care, the CID to AAP is "not directed towards advancing any legitimate objectives," violating the First Amendment due to its "censorious purpose—aiming to suppress the dangerous ideas of . . . 'gender ideology.'" *SFAF*, 786 F. Supp. 3d at 1219-20.

**CONCLUSION**

Because the FTC's CID is inextricably linked to the Administration's mandated narrative regarding the erasure of transgender people and the disavowal and disparagement of gender-affirming medical care, the CID is plainly rooted in retaliatory targeting of AAP's public support for that care in violation of the First Amendment.  The unauthorized and inapplicable asserted purpose for and astonishing breadth of the CID only underscore its improper purpose of seeking to punish and chill AAP's expression of a viewpoint with which the Administration disagrees. This Court should issue the requested preliminary injunction in order to protect AAP from the imminent and irreparable harm from the infringement of its First Amendment rights.

Respectfully submitted,

Dated:  March 10, 2026

/s/ *Karen L. Loewy*
Karen L. Loewy

A.D. Sean Lewis*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
800 South Figueroa Street, Suite 1260
Los Angeles, CA 90017
(213) 382-7600
alewis@lambdalegal.org

Morgan J. Walker*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX  75219
(214) 219-8585
mwalker@lambdalegal.org

Karen L. Loewy, D.C. Bar No. 1722185
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
815 16th Street NW, Suite 4140
Washington, DC 20006
(202) 804-6245
kloewy@lambdalegal.org

Omar Gonzalez-Pagan**
Jessica Polansky*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
Ogonzalez-pagan@lambdalegal.org
jpolansky@lambdalegal.org

* Motion for admission *pro hac vice* forthcoming
** Application for admission pending.

*Counsel for Amicus Curiae*

25

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system on March 10, 2026.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


s/  *Karen L. Loewy*
Karen L. Loewy