IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN ACADEMY OF PEDIATRICS,

*Plaintiff*,

v.                                                            No. 1:26-cv-0508 (CRC)

FEDERAL TRADE COMMISSION, et al.,

*Defendants*.

**DEFENDANTS' OPPOSITION
TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................2

A.    Statutory and Regulatory Framework ................................................................2

B.    Recent Developments Regarding Pediatric Gender Dysphoria Treatment.........5

C.    The Commission's Investigation Into Potential FTC Act Violations Relating to
      Pediatric Gender Dysphoria Treatment ..............................................................8

LEGAL STANDARD.......................................................................................................13

ARGUMENT ...................................................................................................................14

I.    AAP Cannot Show That It is Likely to Prevail on the Merits. ...........................14

      A.    This Court Lacks Authority to Hear AAP's Pre-Enforcement Challenge............ 14

            1.    The Court Lacks Jurisdiction Because Congress Channeled AAP's
                  Claims Into the FTC Act's Exclusive Judicial-Review Scheme. ..............15

                  a.    Congress's preclusive intent is "fairly discernible" in the
                        FTC Act. ....................................................................................16

                  b.    AAP's claims are squarely "of the type" Congress intended
                        to be reviewed through the exclusive statutory mechanism. .........17

            2.    AAP Lacks a Cause of Action. ................................................................20

      B.    AAP Is Not Likely to Prevail on Its First Amendment Retaliation Claim. .......... 21

            1.    AAP Cannot Show Its Speech Caused the CID.........................................22

                  a.    The Commission acted for nonretaliatory reasons.........................22

                  b.    AAP's purported evidence of retaliation fails. .............................24

            2.    AAP Has Not Shown That the CID Had a Sufficient Chilling
                  Effect........................................................................................................36

            3.    AAP Has Not Demonstrated That Its "Retaliatory Investigation"
                  Claim is Cognizable...................................................................................37

            4.    AAP's Reliance on Unrelated District Court Cases Is Misplaced.............38

      C.    AAP Is Not Likely to Prevail on Its First and Fourth Amendment Claim. .......... 40

II.      The Equitable Factors Weigh Heavily Against A Preliminary Injunction. .......................42

III.     The Court Should Require a Bond and Stay Any Injunction..............................................44

CONCLUSION...................................................................................................................................44

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AAP v. HHS*,
— F. Supp. 3d —, 2026 WL 80796 (D.D.C. Jan. 11, 2026)........................................ 29, 38, 39

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*,
840 F. Supp. 2d 327 (D.D.C. 2012) ....................................................................... 43

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .............................................................................................. 20

*Allen v. Napolitano*,
774 F. Supp. 2d 186 (D.D.C. 2011) ................................................................. 29, 30

*Am. Fed'n of Gov't Emps., AFL-CIO v. Loy*,
367 F.3d 932 (D.C. Cir. 2004) .............................................................................. 18

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
929 F.3d 748 (D.C. Cir. 2019) .............................................................................. 18

*Am. Meat Inst. v. USDA*,
968 F. Supp. 2d 38 (D.D.C. 2013) ........................................................................ 43

*Am. Med. Ass'n v. FTC*,
638 F.2d 443 (2d Cir. 1980) ............................................................................ 31, 32

*Am. Motors Corp. v. FTC*,
601 F.2d 1329 (6th Cir. 1979) .............................................................................. 14

*Anheuser-Busch, Inc. v. FTC*,
359 F.2d 487 (8th Cir. 1966) ................................................................................ 14

*Archer v. Chisholm*,
870 F.3d 603 (7th Cir. 2017) ................................................................................ 38

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) ......................................................................... 21, 36

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .............................................................................................. 20

*Ass'n of Nat'l Advertisers, Inc. v. FTC*,
627 F.2d 1151 (D.C. Cir. 1979) ....................................................................... 24, 26

*Atl. Richfield Co. v. FTC*,
    546 F.2d 646 (5th Cir. 1977) ........................................................................ 14, 15

*Axon Enter., Inc. v. FTC*,
    598 U.S. 175 (2023) ........................................................................ 16, 17, 18, 19

*Belle Fourche Pipeline Co. v. United States*,
    751 F.2d 332 (10th Cir. 1984) ............................................................................ 14

*Boe v. Marshall*,
    No. 2:22-cv-0184 (M.D. Ala. Oct. 9, 2025) ........................................................ 7

*Blue Ribbon Quality Meats, Inc. v. FTC*,
    560 F.2d 874 (8th Cir. 1977) ................................................................. 4, 14, 32

*Breaux v. City of Garland*,
    205 F.3d 150 (5th Cir. 2000) ............................................................................. 38

*California Dental Ass'n v. FTC*,
    526 U.S. 756 (1999) ........................................................................... 31, 32, 35

*Camreta v. Greene*,
    563 U.S. 692 (2011) .......................................................................................... 21

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ......................................................................... 43

*Citizens for Resp. & Ethics in Wash. v. FEC*,
    971 F.3d 340 (D.C. Cir. 2020) ......................................................................... 21

*City of Rancho Palos Verdes v. Abrams*,
    544 U.S. 113 (2005) .......................................................................................... 20

*Constantine v. Rectors & Visitors of George Mason Univ.*,
    411 F.3d 474 (4th Cir. 2005) ............................................................................. 29

*Corr. Servs. Corp. v. Malesko*,
    534 U.S. 61 (2001) ............................................................................................ 20

*DeVillier v. Texas*,
    601 U.S. 285 (2024) .......................................................................................... 20

*Disinformation Index, Inc. v. FTC*,
    No. 1:25-cv-4137 (D.D.C. Dec. 16, 2025) ....................................................... 40

*Endocrine Society v. FTC*,
    No. 1:26-cv-0512 (D.D.C. Feb. 17, 2026) ................................................................ 13

*FEC v. Lance*,
    635 F.2d 1132 (5th Cir. 1981) ................................................................................... 4

*Fed. Law Enf't Officers Ass'n v. Ahuja*,
    62 F.4th 551 (D.C. Cir. 2023) ................................................................................ 16

*Fed. Mar. Comm'n v. Port of Seattle*,
    521 F.2d 431 (9th Cir. 1975) ................................................................................. 31

*First Resort, Inc. v. Herrera*,
    860 F.3d 1263 (9th Cir. 2017) ............................................................................... 33

*FTC v. Boehringer Ingelheim Pharms., Inc.*,
    778 F.3d 142 (D.C. Cir. 2015) ................................................................................ 4

*FTC v. Carter*,
    636 F.2d 781 (D.C. Cir. 1980) ............................................................................... 34

*FTC v. Cement Inst.*,
    333 U.S. 683 (1948) ............................................................................................. 26

*FTC v. Church & Dwight Co.*,
    665 F.3d 1312 (D.C. Cir. 2011) ........................................................................ 4, 34

*FTC v. Cinderella Career & Finishing Sch., Inc.*,
    404 F.2d 1308 (D.C. Cir. 1968) ...................................................................... 26, 37

*FTC v. Cigna Group*,
    No. 1:25-mc-0004 (D.D.C. Jan. 15, 2025) ............................................................ 35

*FTC v. Claire Furnace Co.*,
    274 U.S. 160 (1927) .............................................. 1, 4, 14, 16, 19, 20, 21, 40, 43

*FTC v. Ernstthal*,
    607 F.2d 488 (D.C. Cir. 1979) .......................................................................... 31, 32

*FTC v. Facebook, Inc.*,
    581 F. Supp. 3d 34 (D.D.C. 2022) ........................................................................ 27

*FTC v. Invention Submission Corp.*,
    965 F.2d 1086 (D.C. Cir. 1992) .......................................................................... 3, 4

*FTC v. It Media, Inc.*,
No. 2:16-cv-9483 (C.D. Cal. Dec. 12, 2016) ........................................ 35

*FTC v. Ken Roberts Co.*,
276 F.3d 583 (D.C. Cir. 2001) ........................................ 4, 5, 31

*FTC v. Match Grp., Inc.*,
No. 1:22-mc-54, 2023 WL 3181351 (D.D.C. May 1, 2023).......................... 4

*FTC v. Nat'l Comm'n on Egg Nutrition*,
517 F.2d 485 (7th Cir. 1975)........................................ 31

*FTC v. Nat'l Urological Grp., Inc.*,
645 F. Supp. 2d 1167 (N.D. Ga. 2008) ........................................ 9

*FTC v. Owens-Corning Fiberglas Corp.*,
626 F.2d 966 (D.C. Cir. 1980) ........................................ 4

*FTC v. Standard Oil of Cal.*,
449 U.S. 232 (1980) ........................................ 43

*FTC v. Texaco, Inc.*,
555 F.2d 862 (D.C. Cir. 1977) ........................................ 5, 41, 42

*Gen Fin. Corp. v. FTC*,
700 F.2d 366 (7th Cir. 1983)........................................ 4, 14, 16, 40

*Genzyme Corp. v. Shire Hum. Genetic Therapies, Inc.*,
906 F. Supp. 2d 9 (D. Mass. 2012) ........................................ 33

*Gonzalez v. Trevino*,
602 U.S. 653 (2024) ........................................ 22

*Google LLC v. United States*,
2025 WL 778150 (D.D.C. Feb. 25, 2025)........................................ 41

*Gordon & Breach Sci. Publ'rs S.A. v. Am. Inst. of Physics*,
859 F. Supp. 1521 (S.D.N.Y. 1994)........................................ 33

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*,
879 F.3d 101 (4th Cir. 2018)........................................ 33

*Green v. U.S. Dep't of Just.*,
54 F.4th 738 (D.C. Cir. 2022) ........................................ 14

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
 527 U.S. 308 (1999) ................................................................ 20

*Hamilton v. Geithner*,
 666 F.3d 1344 (D.C. Cir. 2012) .............................................. 29

*Harris v. Wackenhut Servs., Inc.*,
 648 F. Supp. 2d 53 (D.D.C. 2009) .......................................... 28

*Hartman v. Moore*,
 547 U.S. 250 (2006) ................................................... 22, 36, 37

*Huisha-Huisha v. Mayorkas*,
 27 F.4th 718 (D.C. Cir. 2022) ................................................ 14

*In re Architect of Capitol Emp. Disp.*,
 2024 WL 3359515 (D.D.C. July 10, 2024) .............................. 28

*In re Aug. 11, 2022 Civ. Investigative Demand Issued to Childhood Leukemia Found., Inc.*,
 No. 222-3073, 2023 WL 8112947 (Nov. 17, 2023) ................. 32

*In re Daniel Chapter One*,
 148 F.T.C. 832 (2009) .............................................................. 9

*In re Feature Films for Families, Inc.*,
 150 F.T.C. 866 (Sept. 23, 2010) ............................................. 32

*In re Formor, Inc.*,
 132 F.T.C. 72 (2001) ................................................................ 9

*In re Grand Jury Procs.*,
 220 F.3d 568 (7th Cir. 2000) .................................................. 41

*In re Grand Jury Procs.*,
 486 F.2d 85 (3d Cir. 1973) ..................................................... 41

*In re Grand Jury Subpoena, Judith Miller*,
 438 F.3d 1141 (D.C. Cir. 2006) .............................................. 41

*In re NBTY, Inc.*,
 151 F.T.C. 201 (2011) .............................................................. 9

*In re Nestle Healthcare Nutrition, Inc.*,
 151 F.T.C. 1 (2011) .................................................................. 9

*In re POM Wonderful LLC*,
   155 F.T.C. 1 (2013) ................................................................................ 9

*J.T.H. v. Mo. Dep't of Soc. Servs. Child.'s Div.*,
   39 F.4th 489 (8th Cir. 2022)................................................................... 38

*John Doe Co. v. CFPB*,
   849 F.3d 1129 (D.C. Cir. 2017) ........................................................... 16

*Johnson v. Interstate Mgmt. Co.*,
   849 F.3d 1093 (D.C. Cir. 2017) ........................................................... 20

*L.W. ex rel. Williams v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2023)............................................................. 6, 38

*LabMD, Inc. v. FTC*,
   776 F.3d 1275 (11th Cir. 2015) ........................................................... 18

*Lakkis v. Lahovski*,
   994 F. Supp. 2d 624 (M.D. Pa. 2014) ................................................. 30

*Maryland v. King*,
   567 U.S. 1301 (2012) .......................................................................... 43

*Media Matters for Am. v. Bailey*,
   2024 WL 3924573 (D.D.C. Aug. 23, 2024)......................................... 22

*Media Matters for Am. v. FTC*,
   805 F. Supp. 3d 105 (D.D.C. 2025) ......................................... 21, 37, 40

*Media Matters for Am. v. FTC*,
   2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) ................................ 27, 40

*Media Matters for Am. v. Paxton*,
   138 F.4th 563 (D.C. Cir. 2025) ..................................................... 18, 37

*Minter v. District of Columbia*,
   809 F.3d 66 (D.C. Cir. 2015) .............................................................. 30

*Moore v. Garnand*,
   83 F.4th 743 (9th Cir. 2023)................................................................ 37

*Nat'l Ass'n of Immigr. Judges v. Owen*,
   139 F.4th 293 (4th Cir. 2025).............................................................. 18

*NewsGuard Techs., Inc. v. FTC*,
   No. 1:26-cv-0353 (D.D.C. Feb. 11, 2026) ................................................................ 40

*Nieves v. Bartlett*,
   587 U.S. 391 (2019) ........................................................................................................ 22

*Nken v. Holder*,
   556 U.S. 418 (2009) ........................................................................................................ 44

*Novartis Corp. v. FTC*,
   223 F.3d 783 (D.C. Cir. 2000) ......................................................................................... 9

*Nuclear Info. & Res. Serv. v. NRC*,
   509 F.3d 562 (D.C. Cir. 2007) ....................................................................................... 26

*Okla. Press Publ'g Co. v. Walling*,
   327 U.S. 186 (1946) ........................................................................................................ 42

*Patten v. District of Columbia*,
   9 F.4th 921 (D.C. Cir. 2021) .......................................................................................... 17

*Perry v. Schwarzenegger*,
   591 F.3d 1147 (9th Cir. 2010) ................................................................................. 41, 42

*Rehberg v. Paulk*,
   611 F.3d 828 (11th Cir. 2010) ....................................................................................... 38

*Reisman v. Caplin*,
   375 U.S. 440 (1964) .................................................................................................. 14, 21

*Reps. Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*,
   593 F.2d 1030 (D.C. Cir. 1978) ..................................................................................... 41

*SEC v. McGoff*,
   647 F.2d 185 (D.C. Cir. 1981) ....................................................................................... 41

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020) .......................................................................................................... 4

*Singh v. Berger*,
   56 F.4th 88 (D.C. Cir. 2022) .......................................................................................... 13

*Sivella v. Twp. of Lyndhurst*,
   2021 WL 3356934 (3d Cir. Aug. 3, 2011) .................................................................... 38

*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024) ............................................................................ 13

*Thompson v. Hall*,
    426 F. App'x 855 (11th Cir. 2011) ...................................................... 38

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ............................................................... 15, 18, 19

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ...................................................................... 43, 44

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ............................................................................ 22

*United States v. Fokker Servs. B.V.*,
    818 F.3d 733 (D.C. Cir. 2016) ............................................................ 22

*United States v. Morton Salt Co.*,
    338 U.S. 632 (1950) ........................................................... 3, 5, 24, 41

*United States v. Rundo*,
    108 F.4th 792 (9th Cir. 2024) ............................................................. 30

*United States v. Skrmetti*,
    605 U.S. 495 (2025) .................................................................. 8, 12,  38

*United Steelworkers of Am. v. Marshall*,
    647 F.2d 1189 (D.C. Cir. 1980) .......................................................... 26

*Waggel v. George Wash. Univ.*,
    957 F.3d 1364 (D.C. Cir. 2020) .......................................................... 28

*Wash. Legal Found. v. Friedman*,
    13 F. Supp. 2d 51 (D.D.C. 1988) ....................................................... 33

*Wearly v. FTC*,
    616 F.2d 662 (3d Cir. 1980) ..................................................... 4, 14, 21, 42

*Weinberger v. Hynson, Westcott & Dunning, Inc.*,
    412 U.S. 609 (1973) ............................................................................ 31

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ............................................................ 38

x

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ........................................................................ 43

*WPATH v. FTC*,
    No. 1:26-cv-0532 (D.D.C. Feb. 18, 2026) ...................................................... 13

*Youssef v. Lynch*,
    144 F. Supp. 3d 70 (D.D.C. 2015) .................................................................. 28

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ......................................................................................... 20

*Zurcher v. Stanford Daily*,
    436 U.S. 547 (1978) ......................................................................................... 41

**Statutes**

15 U.S.C. § 44 ............................................................................................... 31, 35

15 U.S.C. § 45 ................................................................................................. 2, 16

15 U.S.C. § 46 ....................................................................................................... 2

15 U.S.C. § 57b-1 ................................................ 1, 3, 4, 5, 13, 16, 17, 23, 32, 34

15 U.S.C. § 57b-2 ............................................................................................... 29

**Rules**

D.C. Cir. R. 36 ................................................................................................... 21

Fed. R. Civ. P. 65 .............................................................................................. 44

**Regulations**

16 C.F.R. § 2.1 ..................................................................................................... 2

16 C.F.R. § 2.4 ........................................................................................... 2, 3, 16

16 C.F.R. § 2.7 ......................................................................................... 3, 16, 40

16 C.F.R. § 2.10 ............................................................................................. 3, 13

16 C.F.R. § 4.10 ................................................................................................. 29

Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025) .......................... 29

Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025)........................................................ 29

**Other Authorities**

Andrew Jacobs, *Doctors' Group Endorses Restrictions on Gender-Related Surgery for Minors*,
N.Y. Times (Feb. 4, 2026),
    https://perma.cc/B2EW-G54H............................................................................................ 7

Azeen Ghorayshi, *U.S. Study on Puberty Blockers Goes Unpublished Because of Politics,
Doctor Says*, N.Y. Times (Oct. 23, 2024),
    https://perma.cc/V4KH-4HTT ........................................................................................... 8

Chloe Cole, *I'm a Detransitioner*, N.Y. Post (Mar. 11, 2025),
    https://perma.cc/3HV7-GN68. .......................................................................................... 8

Ge Bai *Who Paid for Gender-Affirming Care?*, Forbes (Nov. 1, 2024),
    https://perma.cc/7NYQ-29PD ......................................................................................... 12

H. Cass, *Independent Review of Gender Identity Services for Children and Young People*
    (Apr. 2024),
     https://perma.cc/RDN3-WBYR ..................................................................................... 6

Jennifer Block, *How Did Planned Parenthood Become One of the Country's Largest
Suppliers of Testosterone?*, The Free Press (Aug. 7, 2024),
    https://perma.cc/TB9T-27YA ........................................................................................... 8

Kareen M. Matouk & Melina Wald, *Gender-affirming Care Saves Lives*,
    Colum. Univ. Dep't of Psychiatry (Mar. 30, 2022),
    https://perma.cc/6K7N-8PY6........................................................................................... 6

Kate Stringer, *The Benefits of Gender-affirming Care*, Wash. Sch. of Pub. Health
    (Mar. 31, 2023),
    https://perma.cc/FRP8-UMT7.......................................................................................... 6

*Leaked Discussions Reveal Uncertainty About Transgender Care*, The Economist
    (Mar. 5, 2024),
    https://perma.cc/78ZN-7TGV .......................................................................................... 8

Melissa Jenco, *AAP: High Court Ruling Sets Dangerous Precedent*,
    AAP News (June 18, 2025),
    https://perma.cc/Q267-6XTC......................................................................................... 12

*New Estimates Show 300,000 Youth Ages 13-17 Identify as Transgender in the US*,
    UCLA Sch. of Law Williams Inst. (June 10, 2022),
    https://perma.cc/KBZ9-7G86........................................................................................... 5

*NHS Stops Prescribing Cross-sex Hormones to Children*, Daily Mail (Mar. 8, 2026),
 https://perma.cc/Y4JS-AW6P ...................................................................................... 7

*Position Statement on Gender Surgery for Children and Adolescents*, Am. Soc'y of Plastic
 Surgeons (Feb. 3, 2026),
 https://perma.cc/849S-ZJQ2.................................................................................. 6, 7

Press Release, FTC, *FTC Announces Virtual Workshop on Predatory Pricing* (Nov. 18, 2024),
 https://perma.cc/FPS3-ZSPQ ...................................................................................... 9

Press Release, FTC, *FTC Seeks Public Comment on Single-Family Rental Home Mega Investors
 Study* (Jan. 15, 2025), https://perma.cc/LQ5Y-VXXD (Apr. 2024),
 https://perma.cc/RDN3-WBYR .................................................................................. 11

Remarks by Chair Lina M. Khan, *Private Capital, Public Impact Workshop on
 Private Equity in Healthcare* (Mar. 5, 2024),
  https://perma.cc/4FJE-3DPP ...................................................................................... 9

Robin Respaut & Chad Terhune, *Putting Numbers on the Rise in Children Seeking
 Gender Care*, Reuters (Oct. 6, 2022),
 https://perma.cc/QFS9-SYN8 ...................................................................................... 5

*The Future of the COPPA Rule: An FTC Workshop – Session 1* (Oct. 7, 2019),
 https://perma.cc/ZS2Z-4SBN...................................................................................... 9

U.S. Dep't of Health & Hum. Servs., *Treatment for Pediatric Gender
 Dysphoria* (Nov. 19, 2025),
 https://perma.cc/59ZF-L3B5 (HHS Report) ......................................... 5, 6, 7, 8, 23

*WPATH's Standards of Care for the Health of Transgender and Gender Diverse People,
 Version 8*, 23 Int'l J. of Transgender Health S1 (2022),
 https://perma.cc/52JK-PD6D ...................................................................................... 7

## INTRODUCTION

The Federal Trade Commission is charged with protecting the public from unfair and deceptive trade practices. A crucial part of this mission, which the Commission pursues vigorously, is policing false or unsubstantiated representations pertaining to medical services. In recent years, there have been increasing reports of precisely such deceptive representations in regard to Pediatric Gender Dysphoria Treatment (PGDT)—a concept that encompasses a variety of medical interventions that have been used to treat minors diagnosed with gender dysphoria.

The FTC has approached this issue in its ordinary way. Commissioners expressed concerns; the Commission held a fact-gathering workshop that featured testimony from affected individuals; the Commission opened a public comment period, receiving and reviewing thousands of comments; and the Commission issued Civil Investigative Demands (CIDs)—a type of administrative subpoena—to several entities, including the American Academy of Pediatrics.

The FTC's power to issue CIDs is broad. The Commission need only have reason to believe that the recipient *may* have information that is relevant to violations of the laws it administers. 15 U.S.C. § 57b-1. As a large membership organization that has developed a much-cited set of guidelines regarding PGDT and has addressed extensively PGDT in multiple fora, AAP easily qualifies as an appropriate CID recipient. And importantly, CIDs are not self-executing. This means that the CID, in and of itself, did not put AAP under any threat of legal penalty. AAP could incur penalties only as a result of an FTC enforcement action in federal court, where AAP would have an opportunity to present all of its challenges to the CID.

Nevertheless, AAP has brought this pre-enforcement challenge to the CID and now seeks a preliminary injunction against it. AAP's arguments are fundamentally misconceived.

To begin, AAP's claims are not reviewable. It has long been established that FTC CIDs can be reviewed only in an enforcement action brought by the Commission. There is an unbroken, nearly century-long line of appellate decisions denying pre-enforcement review of FTC subpoenas and CIDs. *E.g.*, *FTC v. Claire Furnace Co*., 274 U.S. 160, 174 (1927); *Gen Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983). In fact, the Commission is unaware of a single precedential

decision endorsing a pre-enforcement challenge to *any* federal agency subpoena. AAP's challenge should similarly be rejected.

AAP's claims fare no better on the merits. Its central claim is retaliation, but its purported evidence of retaliation fails as a matter of law, particularly in light of the presumption of regularity that attaches to government action. AAP seeks to brush aside undisputed evidence of the CID's proper purpose in favor of a mishmash of impermissible inferences (such as treating the Commission's ordinary investigative steps as evidence of retaliatory intent). AAP's First Amendment privilege and Fourth Amendment overbreadth claim also lacks merit, including because AAP does not identify a single specific document that is in dispute and has not demonstrated that the CID is unreasonably burdensome or impermissibly broad.

The consequences of adopting AAP's theories would be stark. AAP would open the door to pre-enforcement CID challenges while radically diluting the legal standard governing retaliation claims. This is a recipe for derailing virtually any federal investigation based on unsupported assertions of retaliatory intent. And as for PGDT specifically, the inescapable implication of AAP's arguments is that the executive branch simply is not allowed to investigate potential wrongdoing if it relates to PGDT. That position is not sustainable. The preliminary injunction should be denied.

**BACKGROUND**

**A.    Statutory and Regulatory Framework**

Section 5 of the FTC Act prohibits "persons, partnerships, or corporations" from engaging in "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). Congress "empowered and directed" the Commission "to prevent" these unfair or deceptive acts or practices, *id.* § 45(a)(2), and thus authorized the agency "to investigate … any person, partnership, or corporation engaged in or whose business affects commerce," *id.* § 46(a). *See* 16 C.F.R. § 2.1 (describing how investigations are initiated); *id.* § 2.4 (the Commission "encourages the just and speedy resolution of investigations," and "will … employ compulsory process when in the public

2

interest"). To fulfill this "continuing duty," the Commission "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 639, 642–43 (1950).

To aid the agency in conducting its investigations, the FTC Act authorizes the Commission to issue civil investigative demands (CIDs)—a type of agency subpoena—to "any person" who may have "any information" relevant to potential violations of the laws enforced by the Commission. 15 U.S.C. § 57b-1(c)(1). The issuance of a CID is not a final agency action. *See, e.g.*, *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1089 (D.C. Cir. 1992). Instead, it is simply one step in an ongoing investigation, which initiates a process of discussion and negotiation. This process is "cooperative[]": the Commission expects CID recipients "to engage in meaningful discussions with staff to prevent confusion or misunderstandings regarding the nature and scope of the information and material being sought." 16 C.F.R. § 2.4.

That cooperative process includes negotiations between a CID recipient and FTC staff "to discuss compliance and to address and attempt to resolve all issues," including legal objections to a CID. *Id.* § 2.7(k). The FTC's regulations authorize FTC staff to modify a CID's terms following those meet-and-confer negotiations. *Id.* § 2.7(*l*). CID recipients are required to participate in the meet-and-confer process before filing a petition to quash the CID. *Id.* § 2.7(k).

The petition-to-quash process offers the Commission an opportunity to address any remaining objections to a CID. *Id.* § 2.10; *see* 15 U.S.C. § 57b-1(f)(1). The process builds on the meet-and-confer negotiations. 16 C.F.R. § 2.7(k) (the Commission generally "will consider only issues raised during the meet and confer process."); *id.* § 2.10(a)(2) (requiring a "statement representing that counsel for the petitioner has conferred with Commission staff ... in good faith to resolve by agreement the issues raised by the petition"). FTC staff may reply to the petition, and the Commission generally has 40 days to rule on a petition; the CID compliance deadline is suspended during the pendency of a petition to quash. *Id.* § 2.10(a)(4), (b), (c); *see* 15 U.S.C. § 57b-1(f)(2). Together, these administrative procedures allow the parties to identify and address disputed issues before judicial review of any remaining objections in an enforcement action.

3

If that administrative process fails to resolve any differences between the CID recipient and FTC staff, the Commission may file a petition for enforcement in a federal district court pursuant to 15 U.S.C. § 57b-1(e). *See Invention Submission Corp.*, 965 F.2d at 1088–91. The court hearing a CID enforcement action (and any subsequent appellate court) can address and resolve a wide range of issues, from routine discovery disputes, *see, e.g.*, *FTC v. Match Grp., Inc.*, No. 1:22-mc-54, 2023 WL 3181351 (D.D.C. May 1, 2023), to claims of trade secrets and attorney-client privilege or work-product protection, *see, e.g.*, *FTC v. Boehringer Ingelheim Pharms., Inc.*, 778 F.3d 142 (D.C. Cir. 2015); *FTC v. Owens-Corning Fiberglas Corp.*, 626 F.2d 966 (D.C. Cir. 1980), to issues of statutory construction, *see, e.g.*, *FTC v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2001), and assertions that the scope of the investigation prompting the CID was not properly authorized by a Commission resolution, *see FTC v. Church & Dwight Co.*, 665 F.3d 1312 (D.C. Cir. 2011). Similarly, constitutional challenges and objections to an agency CID may be (and often are) adjudicated in an enforcement action. *E.g.*, *Seila Law LLC v. CFPB*, 591 U.S. 197, 208–09 (2020); *FEC v. Lance*, 635 F.2d 1132, 1140–42 (5th Cir. 1981) (en banc).

A CID is not self-executing, and a recipient incurs no penalty or other legal detriment for failing to comply with a CID before a court orders enforcement. "[T]here are no sanctions for failing to comply with a subpoena of this type unless and until a district court enters an order ... directing compliance." *Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983); *see e.g.*, *Claire Furnace*, 274 U.S. at 174 (explaining "the defendants cannot suffer" until the government brings an enforcement action); *Wearly v. FTC*, 616 F.2d 662, 665 (3d Cir. 1980) ("[A] subpoena from the FTC is not self-enforcing.").

The scope of the Commission's authority to investigate and to issue CIDs "reaches further than [its] regulatory power." *Blue Ribbon Quality Meats, Inc. v. FTC*, 560 F.2d 874, 876 (8th Cir. 1977). The FTC Act gives the Commission broad authority to seek information from "any person" by issuing a CID if the Commission "has reason to believe" that the recipient "may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C.

§ 57b-1(c)(1). Thus, the Commission is entitled to seek information from entities that are not suspected of any wrongdoing (and indeed might not even be subject to the laws at issue). More generally, this Court has consistently held that administrative agencies are accorded "wide latitude in asserting their power to investigate by subpoena," and that "an individual may not normally resist an administrative subpoena on the ground that the agency lacks regulatory jurisdiction if the subpoena is issued at the investigative stage." *Ken Roberts Co.*, 276 F.3d at 586 (citation omitted).

Moreover, the Commission need not be certain that a CID recipient possesses relevant information: the statutory standard requires only a "reason to believe" that the recipient "may have" relevant information. 15 U.S.C. § 57b-1(c)(1). That undemanding standard accords with the FTC's broad investigative power. The Supreme Court has emphasized the Commission's "power to get information from those who best can give it," analogizing the FTC's authority to that of a grand jury in a criminal investigation. *Morton Salt*, 338 U.S. at 642. And the D.C. Circuit has emphasized "the important governmental interest in the expeditious investigation of possible unlawful activity." *FTC v. Texaco, Inc.*, 555 F.2d 862, 872 (D.C. Cir. 1977) (en banc).

**B.    Recent Developments Regarding Pediatric Gender Dysphoria Treatment**

New diagnoses of gender dysphoria in children are on the rise in the United States. Robin Respaut & Chad Terhune, *Putting Numbers on the Rise in Children Seeking Gender Care*, Reuters (Oct. 6, 2022), https://perma.cc/QFS9-SYN8. About 42,000 children across this country received that diagnosis in 2021 alone—"nearly triple the number" reported only four years prior. *Id.* Other estimates indicate that, as of 2022, at least 300,000 adolescents in the United States between 13 to 17 years old identify as transgender. *New Estimates Show 300,000 Youth Ages 13-17 Identify as Transgender in the US*, UCLA Sch. of L. Williams Inst. (June 10, 2022), https://perma.cc/KBZ9-7G86.

At the same time, there has been a rapid expansion of related medical treatments. *E.g.*, U.S. Dep't of Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria*, at 9 (Nov. 19, 2025), https://perma.cc/59ZF-L3B5 (HHS Report). One category of medical treatments—Pediatric

Gender Dysphoria Treatment (PGDT)—treats gender dysphoric children with medical interventions that at least some consider "experimental." *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 488 (6th Cir. 2023). PGDT "includ[es] but [is] not limited to pubertal suppression, hormone therapy, and surgery (*e.g.*, subcutaneous mastectomy, vaginoplasty, metoidioplasty, and phalloplasty)." Dkt.6-2 at 246. Certain proponents of PGDT insist that pubertal suppression, hormone therapy, and surgical procedures (like mastectomies) lead to improved mental health outcomes, such as lowering suicidality, depression, and anxiety. *See, e.g.*, Kareen M. Matouk & Melina Wald, *Gender-affirming Care Saves Lives*, Colum. Univ. Dep't of Psychiatry (Mar. 30, 2022), https://perma.cc/6K7N-8PY6; Kate Stringer, *The Benefits of Gender-affirming Care*, Wash. Sch. of Pub. Health (Mar. 31, 2023), https://perma.cc/FRP8-UMT7.

There are significant reasons for concern about this proliferation of PGDT procedures. As an initial matter, recent reports have indicated weak scientific evidence and lack of substantiation for PGDT. The Cass Report, a now-famous international government-commissioned review of PGDT, concluded that "[t]his is an area of remarkably weak evidence." H. Cass, *Independent Review of Gender Identity Services for Children and Young People*, at 13 (Apr. 2024), https://perma.cc/RDN3-WBYR. Similarly, a peer-reviewed report from the Department of Health and Human Services found that PGDT's "purported benefits are based on poor quality evidence." HHS Report at 23. On the heels of these and other reports, the American Society of Plastic Surgeons issued a position statement in February 2026, declaring:

> [T]he overall evidence base for gender-related endocrine and surgical interventions is low certainty, and in light of recent publications reporting very low/low certainty of evidence regarding mental health outcomes, along with emerging concerns about potential long-term harms and the irreversible nature of surgical interventions in a developmentally vulnerable population, ASPS concludes there is insufficient evidence demonstrating a favorable risk-benefit ratio for the pathway of gender-related endocrine and surgical interventions in children and adolescents. ASPS recommends that surgeons delay gender-related breast/chest, genital, and facial surgery until a patient is at least 19 years old.

*Position Statement on Gender Surgery for Children and Adolescents*, Am. Soc'y of Plastic Surgeons, at 3 (Feb. 3, 2026), https://perma.cc/849S-ZJQ2. The American Medical Association soon followed suit, stating "[i]n the absence of clear evidence, the AMA agrees with ASPS that surgical interventions in minors should be generally deferred to adulthood." Andrew Jacobs, *Doctors' Group Endorses Restrictions on Gender-Related Surgery for Minors*, N.Y. Times (Feb. 4, 2026), https://perma.cc/B2EW-G54H. Similarly, the United Kingdom's National Health Service announced on March 8, 2026, that it "will stop prescribing powerful cross-sex hormones to [new PGDT patients] under the age of 18" in light of the potentially permanent consequences and the remaining questions regarding the long-term consequences of PGDT, such as "breast cancer, heart disease, stroke and impaired sexual function," as well as potential "long term effects … on teenage brain development." *NHS Stops Prescribing Cross-sex Hormones to Children*, Daily Mail (Mar. 8, 2026), https://perma.cc/Y4JS-AW6P. At least six other countries have recently taken similar steps to restrict use of these treatments, and several others are conducting reviews of their positions on PGDT. *See* HHS Report at 9, 63–65.

Certain statements by PGDT proponents tend to confirm this view. For example, WPATH—an organization that also received a CID in this investigation—continues to depict PGDT as "medically necessary" in its most recent standards of care. *WPATH's Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1, S5, S18 (2022), https://perma.cc/52JK-PD6D. But its internal emails appear to suggest that it made this decision not based on any objective scientific criteria, but for the purpose of securing insurance coverage and to mitigate litigation risk.[1] And a prominent PGDT provider even admitted that she withheld data from a multimillion-dollar federally funded study because the data showed "[p]uberty blockers [as a treatment for gender dysphoria] did not lead to mental health

---

[1] *Boe v. Marshall*, No. 2:22-cv-0184 (M.D. Ala. Oct. 9, 2025), Dkt. 700-10 at 32–34, 42–43 (incorporating "Medical Necessity Statement" into WPATH's standards of care to address concerns over "healthcare 'coverage' [for PGDT] and [as] a tool for our attorneys to use in defending access to [PGDT] care").

improvements." Azeen Ghorayshi, *U.S. Study on Puberty Blockers Goes Unpublished Because of Politics, Doctor Says*, N.Y. Times (Oct. 23, 2024), https://perma.cc/V4KH-4HTT. And during oral argument in *United States v. Skrmetti*, counsel representing a PGDT provider and adolescent PGDT patients conceded that PGDT has not been shown to prevent suicide. Tr. of Oral Arg. 89:3–17, *United States v. Skrmetti*, 605 U.S. 495 (2025).

Moreover, former patients, providers, and others have increasingly come forward with evidence that PGDT may harm teenagers. One young woman, for example, filed a medical malpractice suit alleging that taking testosterone she received after only a "thirty-minute consult" has resulted in "constant vocal pain, joint pain, and frustrating and sometimes painful sexual dysfunction." Jennifer Block, *How Did Planned Parenthood Become One of the Country's Largest Suppliers of Testosterone?*, The Free Press (Aug. 7, 2024), https://perma.cc/TB9T-27YA. Whistleblowers formerly working to provide and support PGDT have similarly alleged that institutions providing PGDT ignored or suppressed concerns that PGDT harmed minors in their care. *E.g.*, HHS Report at 202–09 (collecting whistleblower accounts).

Former patients and their families have also made allegations about false statements and material omissions that were made to them about PGDT's safety and efficacy. *E.g.*, Chloe Cole, *I'm a Detransitioner*, N.Y. Post (Mar. 11, 2025), https://perma.cc/3HV7-GN68. This has raised serious questions regarding whether PGDT patients had been in a position to give informed consent to the procedures. Indeed, certain proponents of PGDT have suggested that children are *incapable* of understanding the often grave and "irreversible" consequences of PGDT, making it "impossibl[e]" to "gain[] their informed consent." *Leaked Discussions Reveal Uncertainty About Transgender Care*, The Economist (Mar. 5, 2024), https://perma.cc/78ZN-7TGV.

### C. The Commission's Investigation Into Potential FTC Act Violations Relating to Pediatric Gender Dysphoria Treatment

Against this backdrop, the FTC began to investigate whether "false or unsubstantiated representations" have been made and "unfair practices" have been committed "in connection with

the marketing and advertising of [PGDT]." Dkt.6-2 at 243. That investigation has followed the FTC's standard practices. Much like in prior investigations into healthcare sector entities,[2] the FTC began by evaluating representations made to consumers about PGDT's purported benefits and the substantiation for those representations.

Consistent with its usual approach,[3] the Commission then held a public, live-streamed workshop on July 9, 2025. The purpose of the workshop was to "help the FTC to understand whether consumers are being or have been exposed to false or unsupported claims about 'gender-affirming care' and to gauge the harms consumers may be experiencing." Dkt.6-2 at 39 (FTC press release). During the workshop, Chairman Andrew Ferguson explained that the FTC is "not charged with passing moral judgment on anyone's ideology, lifestyle, or medical choices." *Id.* at 101. Instead, "the FTC is the federal government's guardian against false and deceptive health claims," and it has a "statutory mandate" "to protect vulnerable people from deceptive claims about health and cures." *Id.* at 101–02; *see also, e.g.*, FTC, Health Products Compliance Guidance at 1 (Dec. 2022), https://perma.cc/58E9-9WPU (providing "guidance from FTC staff on how to ensure that claims about the benefits and safety of health-related products are truthful, not misleading, and supported by science"). Accordingly, the Commission must "ensure that those who make claims

---

[2] *E.g.*, *In re POM Wonderful LLC*, 155 F.T.C. 1, 2 (2013) (addressing claims that products could treat, prevent, or reduce the risk of heart disease and prostate cancer); *In re NBTY, Inc.*, 151 F.T.C. 201, 203–06 (2011) (addressing claims that dietary supplements promote children's eye and brain development); *In re Nestle Healthcare Nutrition, Inc.*, 151 F.T.C. 1, 2 (2011) (addressing claims that product would boost children's immune systems); *In re Daniel Chapter One*, 148 F.T.C. 832, 904–35 (2009) (addressing claims that product prevented, treated, or cured cancer and tumors); *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1190 (N.D. Ga. 2008) (addressing claims that products caused weight loss and sexual enhancement); *In re Formor, Inc.*, 132 F.T.C. 72, 74 (2001) (addressing claims that product could treat HIV); *Novartis Corp. v. FTC*, 223 F.3d 783 (D.C. Cir. 2000) (addressing claims that product was effective at treating back pain).

[3] Many Commission investigations have been preceded with agency workshops, including workshops on predatory pricing, Press Release, FTC, *FTC Announces Virtual Workshop on Predatory Pricing* (Nov. 18, 2024), https://perma.cc/FPS3-ZSPQ, and private equity buyouts of hospitals, Remarks by Chair Lina M. Khan, *Private Capital, Public Impact Workshop on Private Equity in Healthcare* (Mar. 5, 2024), https://perma.cc/4FJE-3DPP. Workshops aimed at evaluating protecting children as consumers are also routine. *E.g.*, *The Future of the COPPA Rule: An FTC Workshop – Session 1* (Oct. 7, 2019), https://perma.cc/ZS2Z-4SBN.

about gender-affirming care are held to the same standard we apply to every other person engaged in commerce." Dkt.6-2 at 102.

To that end, the workshop hosted medical and other professionals, as well as former patients and their families, that the Commission believed could provide relevant information given their extensive personal experience with or expertise on PGDT. The information provided by the workshop's participants reinforced the concerns that had been raised in public reporting.

*First*, participants alleged that PGDT is not evidence-based and lacks substantiation. For example, an experienced endocrinologist noted that "[p]roper long-term studies [of PGDT] haven't been done" and that "[m]ultiple systematic reviews of evidence have found poor quality of evidence of benefit." Dkt.6-2 at 132. Another participant explained that a systematic review of the AAP Policy Statement by the Cass Report showed that AAP was "unwilling[] to conduct or rely on systematic reviews of evidence" for purposes of its Policy Statement. *Id.* at 118–19.

*Second*, participants suggested that PGDT was associated with serious harms to patients, including consequences that are permanent and irreversible. One former patient explained that taking cross-sex hormones caused worsened mental health, vocal cord damage, liver damage, and urinary incontinence, while a mastectomy resulted in persistent "[e]xtreme slicing sensations." *Id.* at 108–09. One mother provided an account of her daughter's experience, which ended with her daughter committing suicide while undergoing PGDT. *Id.* at 106–07. Medical doctors discussed serious potential consequences of testosterone prescribed by PGDT providers, including mental health issues such as "aggression, anger," "dissociative identity disorder," "self-destructive behavior," and "suicidal ideation"—"similar as to what can be found in anabolic steroid abuse." *Id.* at 129. Doctors also explained that cross-sex hormones and puberty blockers can "disrupt[] … normal brain development" or "normal bone development" as well as result in an "early menopause-like state," "sexual dysfunction," "infertility," "hypertension," and "potential risks for the reproductive tract of ovarian, breast, [and] uterine cancer." *Id.*; *see id.* at 139–40.

*Finally*, workshop participants provided accounts of alleged misrepresentations or significant omissions they personally experienced in relation to PGDT. Some parents, for example,

claimed PGDT providers implied their children would commit suicide if not administered PGDT. *E.g.*, *id.* at 105, 151. As Commissioner Mark Meador summarized at the end of the workshop, the Commission "repeatedly heard from parents and individuals gravely impacted by [PGDT] done wrong, who suffered the harms of misrepresentations about the effects of these medical interventions." *Id.* at 181.

The Commission then issued a Request for Information on PGDT—another common step in FTC investigations[4]—that sought "to better understand how consumers[ may have been exposed to false or unsupported claims about [PGDT], especially as it relates to minors, and to gauge the harms consumers may be experiencing." Dkt.6-2 at 41. In response, the Commission received over 8,000 comments—many critical and some supportive of PGDT. The comments repeatedly referred to medical organizations and their public guidelines or standards of care, including AAP and its Policy Statement. For example, consumers commented that they believed PGDT "is life-saving [and] evidence-based" due to the "endorse[ment]" of PGDT by AAP and its Policy Statement. *Comment from Moran, Crystal* (Aug. 11, 2025), https://perma.cc/VVN9-75XB; *Comment from Montes, Jenifer* (Sept. 9, 2025), https://perma.cc/FR8Z-ASBZ ("Leading medical organizations, including the AMA and AAP, affirm [PGDT's] safety and necessity."); *Comment from Sytsma-Ramos, Rachael* (Aug. 21, 2025), https://perma.cc/ECC3-3Q33. On the other hand, numerous comments expressed serious concern over the lack of evidence supporting the AAP Policy Statement and PGDT. The American Academy of Medical Ethics, for example, explained that the AAP Policy Statement was not credible given its "systematic exclusion and misrepresentation of entire literatures" and evidence that it "deliberate[ly] suppress[es] … opposition" to PGDT. *Comment from Am. Acad. of Med. Ethics* (Sept. 8, 2025), https://perma.cc/C2NZ-V522. FTC staff reviewed all 8,000-plus comments over the following months.

---

[4] *E.g.*, Press Release, FTC, *FTC Seeks Public Comment on Single-Family Rental Home Mega Investors Study* (Jan. 15, 2025), https://perma.cc/LQ5Y-VXXD ("issu[ing] a request for public comment … to understand how large-scale single-family rental owner operators, known as mega investors, have affected home prices and rents across the single-family rental market").

After that, the Commission took another conventional investigatory step: it sought to identify organizations or individuals who it believed may possess relevant information about its investigation into potential deceptive representations or unfair practices related to PGDT.

AAP fit the bill for several reasons. It is a large member organization, with well over $100 million in annual revenue,[5] that is made up of "67,000 pediatric physicians, including primary care pediatricians, pediatric medical subspecialists, and pediatric surgical specialists," Dkt.6-1 ¶ 3, who may have a financial interest in PGDT, *e.g.*, Ge Bai *Who Paid for Gender-Affirming Care?*, Forbes (Nov. 1, 2024), https://perma.cc/7NYQ-29PD. AAP has also publicly taken the position that PGDT "is backed by decades of peer-reviewed research, clinical experience, and scientific consensus." *E.g.*, Melissa Jenco, *AAP: High Court Ruling Sets Dangerous Precedent*, AAP News (June 18, 2025), https://perma.cc/Q267-6XTC. And it has promulgated the Policy Statement, a widely cited set of guidelines regarding PGDT. Though AAP contends that its Policy Statement is "evidence driven, nonpartisan, and rigorously reviewed," Dkt.6-2 at 63, it contains numerous highly contested statements such as the following: puberty blockers are "reversible"; puberty resulting from a child's own hormones and body will "resume" if PGDT patients "suspend[]" use of puberty blockers; and PGDT "generally leads to improved psychological functioning in adolescence and young adulthood." *Id.* at 71–72. AAP has promoted the Policy Statement in a variety of fora, including courts, workshops, conferences, and training programs. *E.g.*, Br. of Amici Curiae Am. Acad. of Pediatrics (Sept. 3, 2024), *United States v. Skrmetti*, 605 U.S. 495 (2025), https://perma.cc/VJ2X-XWR3. Moreover, as Amici States observe, policy statements from entities like AAP are often "incorporate[d] ... directly into state laws and regulations" (thus impacting which services practitioners can offer). Dkt.15 at 14–15. In light of all of these factors, it is unsurprising that (as noted above), AAP's work in this area was discussed at the workshop and was frequently mentioned in the public comments.

---

[5] *See Am. Acad. of Pediatrics, Inc.*, ProPublica, https://perma.cc/2NWX-VVVL.

On January 15, 2026, the Commission issued a Civil Investigative Demand (CID) to AAP.[6] To further the FTC's inquiry, the CID sought information on various issues relevant to the investigation, including representations about PGDT (by AAP and others), as well as questions pertaining to whether AAP's activities are within the scope of the FTC's enforcement jurisdiction under the FTC Act. *See* Dkt.6-2 at 239–54.

After Commission staff met and conferred with AAP concerning the CID, AAP filed a petition to quash. *Id.* at 218. AAP's compliance period is stayed while the petition remains pending. 15 U.S.C. § 57b-1(f)(2). If the Commission denies the petition in whole or in part, it will "specify new terms for compliance, including a new return date." 16 C.F.R. § 2.10(b). Under the Commission's rules, a decision on the petition is due by March 23, 2026. *See id.* § 2.10(c).

Just days after filing its petition—and before the Commission issued an order addressing it—AAP filed this case and now moves for a preliminary injunction.[7]

## LEGAL STANDARD

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (citation omitted). Thus, "a plaintiff seeking a preliminary injunction must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Id*. at 346 (citation omitted). "The balance of the equities and the public interest 'merge when, as here, the Government is the opposing party.'" *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022) (citation omitted). Thus, "[w]hen a private party seeks injunctive relief against the government," the Court

---

[6] On the same day, the Commission also issued similar CIDs to two other medical organizations: the Endocrine Society and WPATH.

[7] The Endocrine Society and WPATH filed separate cases advancing similar claims. *Endocrine Society v. FTC*, No. 1:26-cv-0512 (D.D.C.); *WPATH v. FTC*, No. 1:26-cv-0532 (D.D.C.).

must "weigh[] the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022) (citation omitted).

## ARGUMENT

### I.   AAP CANNOT SHOW THAT IT IS LIKELY TO PREVAIL ON THE MERITS.

AAP cannot satisfy the most important factor in the preliminary injunction analysis: that it is likely to succeed on the merits. *Green v. U.S. Dep't of Just.*, 54 F.4th 738, 745 (D.C. Cir. 2022). AAP's pre-enforcement claims are not reviewable, because the FTC Act channels claims to an enforcement action and because AAP has no cause of action. The claims also fail even on their own terms.

### A.   This Court Lacks Authority to Hear AAP's Pre-Enforcement Challenge.

For nearly a century, the Supreme Court and lower courts have consistently held that disputes about federal CIDs or subpoenas should be resolved in an enforcement action. *See Claire Furnace Co.*, 274 U.S. at 174; *Reisman v. Caplin*, 375 U.S. 440, 443 (1964) (upholding dismissal of pre-enforcement challenge to IRS summons). Relying on *Claire Furnace* and *Reisman*, courts of appeals have repeatedly rejected pre-enforcement challenges to FTC and other federal agency CIDs and subpoenas. *See Gen. Fin. Corp.*, 700 F.2d at 368 (a plaintiff "must wait till the government sues … since that is the method of judicial review of FTC investigations that Congress has prescribed"); *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334–35 (10th Cir. 1984); *Wearly*, 616 F.2d at 668; *Am. Motors Corp. v. FTC*, 601 F.2d 1329, 1335–37 (6th Cir. 1979); *Blue Ribbon Quality Meats*, 560 F.2d at 876–77; *Atl. Richfield Co. v. FTC*, 546 F.2d 646, 651 (5th Cir. 1977); *Anheuser-Busch, Inc. v. FTC*, 359 F.2d 487, 490–91 (8th Cir. 1966) (Blackmun, J.).

The logic of these cases is simple. Recipients of agency CIDs or subpoenas are not entitled to equitable relief in a pre-enforcement posture because they have an adequate remedy at law:

challenging the CID or subpoena in an enforcement action. *E.g.*, *Atl. Richfield*, 546 F.2d at 649. And this doctrine serves important purposes. On the one hand, it protects CID and subpoena recipients by ensuring that they face no legal penalty until they have an opportunity to raise their objections in an enforcement action in federal court. On the other, it ensures that agencies are able to conduct investigations as directed by Congress, allows the parties to narrow and potentially resolve any disputes prior to litigation, and prevents litigants from dragging courts into abstract disagreements without the specific factual context presented in an enforcement action.

A preliminary injunction here would depart from these well-established principles (which, remarkably, AAP's motion entirely ignores). As discussed below, this would be error for two reasons. First, Congress has precluded pre-enforcement review of CIDs under the claim-channeling doctrine of *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). Second, AAP lacks a cause of action.

> **1.    The Court Lacks Jurisdiction Because Congress Channeled AAP's Claims Into the FTC Act's Exclusive Judicial-Review Scheme.**

The Supreme Court has repeatedly confirmed that district courts should not entertain pre-enforcement challenges to FTC CIDs. It is unsurprising, then, that this is precisely the outcome Congress directed in the FTC Act.

In *Thunder Basin*, the Supreme Court explained that Congress may establish a statutory scheme that channels judicial review to an exclusive jurisdictional mechanism, divesting district courts of their ordinary federal-question jurisdiction. 510 U.S. at 218. A statute channels review when (i) a preclusive intent is "fairly discernible in the statutory scheme," and (ii) the claims at issue "are of the type Congress intended to be reviewed within" that scheme. *Id.* at 207, 212 (citation omitted). This framework effectuates Congress's objective of directing certain challenges to agency actions "to a single review process," streamlining investigations and enforcement proceedings. *Id.* at 211. Here, both prongs of the *Thunder Basin* claim-channeling framework are satisfied.

a. **Congress's preclusive intent is "fairly discernible" in the FTC Act.**

The FTC Act and its implementing regulations create an interdependent scheme to protect CID recipients. The scheme allows recipients to discuss and negotiate the CID with FTC staff to resolve or narrow disputes, 16 C.F.R. §§ 2.4, 2.7(k); petition the Commission to quash the CID, 15 U.S.C. § 57b-1(f); and obtain judicial review of the CID, including any objections, when the FTC seeks to enforce it, *id.* § 57b-1(h). Thus, CIDs are not self-executing, and recipients face no penalties for noncompliance until the court rules in an enforcement action. *See Gen. Fin. Corp.*, 700 F.2d at 368–69. This process allows the parties to narrow disputed issues without unnecessarily embroiling district courts in broad legal disputes that lack a well-developed factual record. The FTC's exercise of its "discretion" as to whether to seek enforcement—and if so, as to which specifications—serves a crucial purpose: it crystalizes the issues in dispute, sparing the court "much unnecessary labor and discussion." *Claire Furnace*, 274 U.S. at 174.

Congress's choice to provide an exclusive review mechanism for CIDs is confirmed by the FTC Act's broader structure, which includes several other provisions authorizing judicial review. For example, the Commission's final cease-and-desist orders are subject to review only in the courts of appeals. *See* 15 U.S.C. § 45(b); *see also id.* § 45(*l*) (providing district court review for violations of the FTC's final orders); *id.* § 45(m) (providing district review for violations of certain FTC rules). The "comprehensive nature" of these review provisions confirms Congress's preclusive intent. *Fed. Law Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 558 (D.C. Cir. 2023). To put it simply, it is quite telling that Congress expressly provided for judicial review in a variety of circumstances but pointedly did *not* allow for pre-enforcement review of CIDs.

The fact that the FTC Act does not channel review to a court of appeals, but rather to district court (with subsequent appellate review), only confirms Congress's intent to preclude pre-enforcement review. While Congress "typically chooses" to channel claims to the courts of appeals, *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023), it is free to choose other methods as well, and sometimes does so. *See John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017) (per curiam) (CFPB statute channeled constitutional CID challenge to an enforcement action).

16

*John Doe*, a binding D.C. Circuit decision applying *Thunder Basin* to a functionally equivalent CID scheme involving another agency, dictates the same result here. And in any event, the case for claim channeling here "is even stronger than it was in *Thunder Basin*" precisely because the FTC Act "channels claims into the district court." *Patten v. District of Columbia*, 9 F.4th 921, 927–28 (D.C. Cir. 2021). As illustrated by AAP's First and Fourth Amendment claim, *see* Section I.C, *infra*, challenges to CIDs often involve fact-intensive inquiries that a court of appeals, which "lack[s] the ability to develop the [necessary] factual record," *Patten*, 9 F.4th at 928, is ill-equipped to resolve in the first instance.

> **b. AAP's claims are squarely "of the type" Congress intended to be reviewed through the exclusive statutory mechanism.**

*Thunder Basin* identified three factors that must be considered in evaluating whether a litigant's claims are of the type that Congress intended to be reviewed within the statutory structure: (1) whether precluding district court jurisdiction would "foreclose all meaningful judicial review" of the claim; (2) whether the claim is "wholly collateral to [the] statute's review provisions"; and (3) whether the claim is "outside the agency's expertise." *Axon*, 598 U.S. at 186 (citation omitted). Here, the answer to all three questions is no. Unlike *Axon*'s "structural constitutional claims" that contest an agency's "power to proceed at all," *id.* at 191–92, AAP's claims challenge a discrete agency action and implicate issues on which FTC has considerable expertise.

*First*, precluding this pre-enforcement challenge would not foreclose meaningful judicial review because all objections can be raised and resolved in a CID enforcement action in federal court. *See* 15 U.S.C. § 57b-1(h). Indeed, as discussed above, this is how federal agency subpoenas have always been reviewed, and it is not credible to suggest that this traditional mechanism— endorsed by numerous courts, including the Supreme Court—somehow does not amount to meaningful judicial review.

Moreover, there is no exception to *Thunder Basin* for First Amendment claims, and the D.C. Circuit and other courts have applied *Thunder Basin* to preclude such claims. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755–56 (D.C. Cir. 2019); *Am. Fed'n of Gov't Emps., AFL-CIO v. Loy*, 367 F.3d 932, 936–37 (D.C. Cir. 2004); *see also LabMD, Inc. v. FTC*, 776 F.3d 1275, 1280 (11th Cir. 2015) (explaining, in a case involving allegations of retaliation by the FTC, that "none of our cases suggest that First Amendment retaliation claims must be treated differently than other constitutional claims under *Thunder Basin*"). Nor is there a *Thunder Basin* exception for cases where the plaintiff alleges ongoing harm. *See, e.g.*, *Nat'l Ass'n of Immigr. Judges v. Owen*, 139 F.4th 293, 312 (4th Cir. 2025) ("Plaintiffs cannot avoid" claim channeling under *Thunder Basin* "by merely alleging an irreparable injury."). To the contrary, channeling schemes *presume* that such harm will exist. As the Supreme Court observed in *Axon*, exclusive review mechanisms often "require parties to wait before appealing, even when doing so subjects them to 'significant burdens.'" 598 U.S. at 191–92 (citation omitted). *Thunder Basin* similarly presupposes the possibility of harms from "delayed judicial review," 510 U.S. at 207, even when such harms are irreparable and "onerous," *id.* at 205, 218.[8]

*Second*, there is nothing "wholly collateral" about AAP's claims. A claim is "collateral" only when it involves a challenge to "the structure or very existence of an agency." *Axon*, 598 U.S. at 186, 189. *Axon* contrasted that kind of "fundamental, even existential" claim, *id.* at 180, with party-specific claims that an agency should not have taken a specific action, *id.* at 192—precisely the kind of claim AAP raises here. Unlike in *Axon*, AAP challenges something "particular about

---

[8] *Media Matters for Am. v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025), is not to the contrary. *Paxton* involved a CID issued by a *state* official and did not implicate any federal statutory scheme. The *Thunder Basin* framework—which addresses "challenges to federal agency action," *Axon*, 598 U.S. at 185—simply did not apply. Thus, the question addressed by *Paxton* was simply whether "ongoing" harm suffices to satisfy the Article III standing and ripeness requirements. 138 F.4th at 579–80. This is wholly distinct from the *Thunder Basin/Axon* inquiry, which, as discussed in the main text, presupposes the existence of ongoing harm, and makes an exception only for structural claims of the kind AAP has not asserted here. More broadly, Congress had good reason to channel issues about federal agency CIDs to enforcement proceedings while permitting Section 1983 suits to challenge state CIDs. That approach ensures that in both situations recipients can present their constitutional claims in a federal forum before legal penalties accrue.

how [the FTC's] power was wielded" and objects to a "specific substantive decision"—namely, the issuance of the CID—rather than the Commission's "power generally." *Id.* at 189, 193. AAP's motion also implicates "procedural or evidentiary matters," *id.*, such as the breadth of the CID and the relevance of certain specifications to the investigation's goals. *E.g.*, Pl.'s Mot. for Prelim. Inj., Dkt.6 (Mot.) at 34–38. AAP's challenge, therefore, directly "relate[s] to the subject" of an action to enforce the CID. *Axon*, 598 U.S. at 193. Confirming the point, similar claims are routinely adjudicated in enforcement actions. *See* pp. 14-15, *supra*.

*Third*, questions about the propriety of CIDs fall directly within the FTC's expertise; thus, the agency should be permitted to decide whether to narrow its CID before commencing an enforcement action. Disputes about whether CIDs have been properly issued, or whether they are overbroad or seek privileged information, raise "considerations of agency policy" in which the FTC has "competence and expertise." *Axon*, 598 U.S. at 194 (citations omitted). The FTC routinely issues CIDs and has considerable experience negotiating with recipients over CIDs' scope and in evaluating petitions to quash. And AAP's constitutional claims are "intertwined with or embedded in" the FTC's areas of expertise, *id.* at 195, since, as detailed above, the Commission has authority to consider any objections, including constitutional arguments, in a petition to quash. Likewise, the Commission evaluates such constitutional arguments in determining whether to bring an enforcement action and if so, as to which particular specifications. *See Claire Furnace*, 274 U.S. at 174 (recognizing the significance of the "exercise [of] ... discretion" in "examining" FTC subpoenas, determining which requests are "pertinent and lawful," and "designating the inquiries to enforce" "before asking the court to adjudge forfeitures").

At any rate, the expertise inquiry is not demanding. In *Thunder Basin*, the Court found this factor satisfied after noting that an agency had "addressed constitutional questions in previous enforcement proceedings" and the "statutory and constitutional claims here [could] be meaningfully addressed" in a subsequent federal court proceeding. *Thunder Basin*, 510 U.S. at 215. Both considerations are equally true here.

19

### 2.    AAP Lacks a Cause of Action.

AAP also has no cause of action. AAP does not allege that there is a cause of action under the Administrative Procedure Act and instead relies solely on an implied equitable cause of action, asserting that its claims "arise under the First and Fourth Amendments." Dkt.1 ¶ 10. But "[c]onstitutional rights do not typically come with a built-in cause of action." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024). And the Supreme Court has warned federal courts to hesitate before implying constitutional or statutory causes of action. *E.g.*, *Ziglar v. Abbasi*, 582 U.S. 120, 134–35 (2017); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 75 (2001) (Scalia, J., concurring) ("There is … great[] reason to abandon" the "assumed common-law powers to create causes of action … in the constitutional field"); *Johnson v. Interstate Mgmt. Co.*, 849 F.3d 1093, 1097 (D.C. Cir. 2017) ("[T]he Supreme Court has been very hostile to implied [statutory] causes of action.").

That hostility to implied causes of action stems from the inherent limitations on the "traditional equitable powers" of federal courts. *Ziglar*, 582 U.S. at 133. Those powers are limited to relief that was "traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999), and pre-enforcement injunctions against agency CIDs and subpoenas were not available at equity, *e.g.*, *Claire Furnace*, 274 U.S. at 174.

In addition, the equitable power to "enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). In *Exceptional Child Center*, the Court relied on the Medicaid Act's implicit preclusion of private enforcement in declining to employ federal courts' equitable powers. *Id.* at 327–29. Likewise here, the FTC Act provides no express cause of action, and Congress's choice of an administrative process, followed by an enforcement action, as the sole remedy for CID recipients impliedly restricts equitable collateral attacks. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005) ("The provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy."); *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) (same). Unsurprisingly, the Supreme Court and lower courts have frequently grounded their dismissals of pre-enforcement CID challenges in the

want of equity and the availability of an adequate remedy at law. *See Reisman*, 375 U.S. at 443; *Claire Furnace*, 274 U.S. at 174; *Wearly*, 616 F.2d at 665.

<p style="text-align:center">*     *     *</p>

Although AAP (like other CID recipients) would prefer immediate review, Congress weighed the policy factors and channeled such disputes to enforcement actions. And the scheme Congress adopted takes the interests of CID recipients into account, including through the petition-to-quash process where CID recipients present their challenges to the agency. While AAP awaits judicial review, it is "under no compulsion" to "turn over the documents" and faces no "penalties" for not doing so. *Wearly*, 616 F.2d at 667. By contrast, permitting pre-enforcement challenges would have drastic and unwelcome consequences, potentially allowing any recipient of process to bring law enforcement investigations to a halt simply by claiming retaliation. That is not the law.[9]

## B.    AAP Is Not Likely to Prevail on Its First Amendment Retaliation Claim.

AAP claims that "the FTC issued the CID ... in retaliation for AAP's protected speech." Mot. 23. To prevail on this retaliation claim, AAP must show (1) that it "engaged in conduct protected under the First Amendment," (2) that the FTC "took some retaliatory action sufficient to deter a person of ordinary firmness in [GDI's] position from speaking again," and (3) that there is "a causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). While the Commission does not dispute that AAP engages in some protected First Amendment conduct, AAP fails at each of the other two prongs: it cannot

---

[9] The district court's preliminary injunction ruling in *Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105 (D.D.C. 2025), which disagreed with these threshold arguments against pre-enforcement review, "is not binding." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (citation omitted). The same is true of the divided D.C. Circuit panel's unpublished order declining to stay that decision pending appeal. *Citizens for Resp. & Ethics in Wash. v. FEC*, 971 F.3d 340, 351 (D.C. Cir. 2020); D.C. Cir. R. 36(e)(2) ("a panel's decision to issue an unpublished disposition means that the panel sees no precedential value in that disposition"). Moreover, as the FTC explained in its pending appeal, the *Media Matters* ruling is mistaken in numerous respects, including because it is at odds with nearly a century of Supreme Court and appellate precedent. Appellants' Br. 19–36, *Media Matters*, No. 25-5302 (D.C. Cir. Jan. 5, 2026).

show the necessary causal link between its speech and the CID, and it cannot show that the CID caused a cognizable chilling effect. Additionally, AAP has not demonstrated that chill arising from an allegedly retaliatory investigation is actionable, and none of its cited authority supports that proposition.

### 1.    AAP Cannot Show Its Speech Caused the CID.

To show causation, AAP must demonstrate at a *minimum* that the CID "would not have been [issued] absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019).[10] In making that but-for showing, AAP must overcome the "longstanding presumption of regularity" that attaches to government action. *Hartman v. Moore*, 547 U.S. 250, 263 (2006). That presumption is at its apex in the context of law-enforcement investigations, an area of "executive discretion of such high order" that "judicial intrusion … should be minimal." *Id.* Excessive judicial interference "could 'chill law enforcement,' cause delay, and 'impair the performance of a core executive constitutional function.'" *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (citations omitted); *see Trump v. Hawaii*, 585 U.S. 667, 702 (2018).

To establish a likelihood of success on the merits, then, AAP must put forward enough evidence to displace the presumption and show that the but-for cause of the CID was retaliation for AAP's protected activity. AAP has not come close to carrying that burden.

### a.    The Commission acted for nonretaliatory reasons.

The CID issued to AAP is part of a broad investigation into a high priority issue squarely within the FTC's bailiwick: false or unsubstantiated medical claims regarding the safety and effectiveness of certain treatments for pediatric gender dysphoria.

---

[10] In fact, the requisite showing is more robust: AAP must demonstrate that there was no reasonable basis for the CID. For example, in the similar context of retaliatory arrests, the Supreme Court has held that plaintiffs must show that the government lacked probable cause. *Nieves*, 587 U.S. at 399–400. The logic applies here too. *See Gonzalez v. Trevino*, 602 U.S. 653, 663 (2024) (Alito, J., concurring); *cf. Media Matters for Am. v. Bailey*, 2024 WL 3924573, at *12–13 (D.D.C. Aug. 23, 2024) (considering the issue and ultimately declining to impose an objective basis standard, at least in part for case-specific reasons). However, the Court need not reach that issue because AAP cannot satisfy even the basic but-for standard.

There are compelling reasons for the Commission to investigate this issue, as illustrated both by publicly available reporting and by the Commission's own initial investigatory steps, which have included hosting a workshop and issuing a request for public comment. To begin, significant questions have been raised regarding the scientific basis for various claims that have been made regarding PGDT's safety and effectiveness. As described above, these questions arise from varied sources, including government-sponsored reports (such as the Cass Report), position statements from medical associations (such as the American Medical Association), whistleblower accounts, and statements from PGDT advocates. *See* Background Section B, *supra*. As then-Commissioner Holyoak summarized, "it is increasingly clear that there are serious questions about the risks and purported benefits" of PGDT. Dkt.6-2 at 143.

Furthermore, there is significant reason to believe that children and parents may have been victimized by false or unsubstantiated statements regarding PGDT. Through its investigation, the FTC heard from patients and parents who testified to a significant disconnect between what they were told and what they experienced. *See* Background Section C, *supra*. After reviewing these concerning comments, which reinforced concerns that were already highlighted in public reporting, the Commission decided to seek additional information.

It did so by issuing CIDs to three entities, including AAP, that are prominent in this field. *See, e.g.*, HHS Report at 146 (explaining that the "most influential sources of clinical guidance" on PGDT in the United States are AAP, WPATH, and the Endocrine Society). The FTC had ample "reason to believe" that AAP "may have" information that is "relevant to ... unfair or deceptive acts or practices" 15 U.S.C. § 57b-1(c). After all, AAP is a large membership organization some of whose members may have financial interest in PGDT. It has developed a much-cited set of guidelines regarding PGDT, which is frequently "incorporat[ed]" by "practicing clinicians and state regulators." Dkt.15 at 15. AAP has also addressed PGDT extensively in numerous fora. *See* p. 12, *supra*. And, as noted above, its work in this area was discussed at the FTC's workshop as well as in numerous public comments. At a minimum, AAP is unusually likely to possess

23

information bearing on whether other entities are making false or unsubstantiated claims regarding PGDT.

To be clear, the Commission has not determined whether AAP or anyone else has violated the FTC Act by making false or unsubstantiated statements regarding PGDT. As Chairman Ferguson explained, the purpose of the investigation is to "understand what sorts of claims are being made about these treatments, what sort of science supports them, what the risks associated with those treatments are, and whether vulnerable populations may have been subject to deception in the administration of those treatments." Dkt.6-2 at 102–03. In other words, the Commission is asking "the same sorts of questions [it] would ask about any health claim." *Id.* at 103. And while the "FTC cannot make policy decisions limiting [PGDT] for minors," as then-Commissioner Holyoak put it, "what [it] can and should do is protect children from deceptive statements regarding such treatments." *Id.* at 144.

Entities like AAP may prefer that the FTC not investigate these topics. They may believe that it is unnecessary for the FTC to do so. But the FTC is authorized to investigate "merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Morton Salt*, 338 U.S. at 642–43. Far from demonstrating causation, then, the undisputed evidence disproves it.

### b.   AAP's purported evidence of retaliation fails.

AAP discusses its purported evidence of retaliation at some length, but to no avail: all of it is categorically inadequate as a matter of law. As discussed below, this evidence can be classified into six categories, each of which fails to demonstrate retaliation for its own reasons.

*1. Ordinary Law Enforcement Activity.* AAP begins by criticizing the FTC's reliance on its customary investigatory practices, namely its decision to hold a workshop and to issue a request for public comment. Mot. 15–17. The FTC has taken the same steps in numerous areas. *See* p. 9 & n.3, *supra*. And it is well-established that the Commission may "engage in dialogue with concerned citizens." *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1173 (D.C. Cir. 1979).

24

While AAP complains that, in its view, the discussion at the workshop was not conducted "in a neutral" manner, that perspective is far from unusual. One suspects that the representatives of most industries whose practices are examined at an FTC workshop would insist that they were subjected to excessive criticism. In reality, the testimony that was heard at the workshop, which as AAP notes included opposition to the use of puberty blockers, hormones, and surgeries to address pediatric gender dysphoria as well as criticism of AAP and its clinical guidance, Mot. 16, only provides *additional* grounding for the FTC's investigation. Notably, AAP does not claim that any of the information presented at the workshop was false or even misleading. Regardless, the request for public comment opened shortly after the workshop provided ample opportunity for all interested parties to provide their views (which AAP itself did not take advantage of). Dkt.6-2 at 41–45.

AAP also suggests the workshop was improper because some (purported) FTC employees argued in an anonymous letter that the issue was outside of the FTC's jurisdiction and was too much of a "politically charged topic." *Id.* at 49–50. But unnamed agency employees do not have a veto on FTC investigations. And on the merits, their concerns are unfounded. As Chairman Ferguson explained, "the FTC is the federal government's guardian against false and deceptive health claims," and the Commission has brought "dozens of enforcement actions" against "businesses and individuals who have made claims about their health products and services that were not backed by scientific evidence." *Id.* at 102. The fact that "many people feel passionately about this issue" changes nothing; "if a medical claim is false or misleading, it is the commission's sworn duty to protect American citizens from that claim no differently than it would from any other false or misleading claim." *Id.* Similarly, then-Commissioner Holyoak explained that the FTC has authority over "unfair or deceptive practices related to gender-affirming care" and that it "should use" that authority to protect children, who may be particularly vulnerable to deceptive or misleading medical claims. *Id.* at 143–45.

   *2. Statements by law enforcement officials about potential violations of law.* AAP points to statements from Chairman Ferguson and Commissioner Meador and attempts to cast the

comments as expressing hostility to AAP or its advocacy. Mot. 16, 31. This is fundamentally misconceived.

AAP's argument rests on the mistaken premise that it is somehow improper for Chairman Ferguson and Commissioner Meador to publicly identify potential violations of the laws enforced by the Commission. Courts have long rebuffed efforts to treat similar comments as evidence of bias or pre-judgment. *E.g.*, *Nuclear Info. & Res. Serv. v. NRC*, 509 F.3d 562, 571 (D.C. Cir. 2007) ("[A] mere showing that an official has taken a public position, or has expressed strong views, or holds an underlying philosophy with respect to an issue in dispute" is not a basis for disqualification. (citation omitted)); *FTC v. Cement Inst.*, 333 U.S. 683, 700 (1948) (rejecting allegations that the Commission was "prejudiced and biased" due to Commissioners' long-stated view that the practice at issue constituted illegal price fixing).

That makes good sense. "Given the roles that agency officials must play," it is commonplace for them to develop views on how the laws they enforce may apply and to identify conduct that may violate those laws. *Nuclear Info. & Res. Serv.*, 509 F.3d at 571; *see United Steelworkers of Am. v. Marshall*, 647 F.2d 1189, 1208 (D.C. Cir. 1980) ("When Congress creates an agency with an express mission ... the agency officials will almost inevitably form views on the best means of carrying out that mission."). Indeed, agency officials must be able "to formulate policy" and to "engage in dialogue with concerned citizens." *Ass'n of Nat'l Advertisers*, 627 F.2d at 1173–74; *see id.* at 1177 (Leventhal, J., concurring) ("even judges are not disqualified merely because they have previously announced their positions on legal issues"). And the FTC in particular is fully "authorized … to alert the public to suspected violations of the law." *FTC v. Cinderella Career & Finishing Sch., Inc.*, 404 F.2d 1308, 1314 (D.C. Cir. 1968). AAP's notion that agency officials "may [*not*] hold policy views on questions," by contrast, "would eviscerate the proper evolution of policymaking," barring action by any official "who has opinions on the correct course of his agency's future action." *Ass'n of Nat'l Advertisers*, 627 F.2d at 1174. It would also improperly "immunize" from enforcement activity any entity that law enforcement officials had identified as a potential lawbreaker. *Cement Inst.*, 333 U.S. at 701–02 (rejecting this result).

Unsurprisingly, this Court has rejected a theory that is materially identical to the one AAP advances here. Facebook sought to disqualify then-Chairwoman Lina Khan from a proceeding against the company, alleging that she had "an 'axe to grind' against [Facebook] ... given the views articulated in her past work," which included her "views on Facebook's monopoly status." *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 64 (D.D.C. 2022); *see Media Matters for Am. v. FTC*, 2025 WL 2988966, at *15–17 (D.C. Cir. Oct. 23, 2025) (Walker, J., dissenting) (cataloguing Khan's statements about Facebook and other "targets of her investigations"). Judge Boasberg rejected that argument, reasoning that Khan's role as an FTC Commissioner was analogous to "that of a prosecutor," who is "necessarily permitted to be zealous in [her] enforcement of the law." *Facebook*, 581 F. Supp. 3d at 63–64 (citation omitted). And while "Khan [had] undoubtedly expressed views about Facebook's monopoly power," Judge Boasberg found no "personal animosity against Facebook" in those comments "beyond [Khan's] own views about antitrust law." *Id.* at 64.

In short, Khan's "belief in the validity of the allegations" against Facebook was not any cause for concern. *Id.* And there is no reason to believe that Facebook could have changed the outcome simply by styling its argument as a constitutional retaliation claim rather than a disqualification request. The same logic applies here. Just as in *Facebook*, the snippets of comments that AAP relies on demonstrate at most that Chairman Ferguson and Commissioner Meador have expressed opinions about potential violations of the FTC Act.[11]

It is also notable that AAP makes no mention at all of former Commissioner Holyoak. Her support for the Commission's investigation, *see* Dkt.6-2 at 143–45, combined with the absence of *any* allegations that she harbored improper motives, further confirms the investigation's legitimacy.

---

[11] In fact, the showing required here is more demanding than in *Facebook*. Instead of attempting to disqualify a single Commissioner from participating in a matter (like Facebook), AAP is seeking to bar the entire FTC from even beginning an investigation. *See* Dkt.6-3.

AAP then turns to statements by *non*-decisionmakers, including three FTC staffers as well as certain individuals not even employed by the FTC, without alleging that any of them had any role in issuing the CID. Mot. 16–17, 31–32. Remarks from "non-decisionmakers are not generally direct evidence of retaliation." *Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1374 (D.C. Cir. 2020); *accord Youssef v. Lynch*, 144 F. Supp. 3d 70, 101 (D.D.C. 2015). The only way such statements could even conceivably enter the analysis is if the non-decisionmaker was involved in the decisionmaking process. *E.g.*, *Harris v. Wackenhut Servs., Inc.*, 648 F. Supp. 2d 53, 62 (D.D.C. 2009), *aff'd*, 419 F. App'x 1 (D.C. Cir. 2011) (concluding that "comments made by … non-decisionmakers[] are inadmissible" where "plaintiff [had] failed to proffer evidence … that the speakers had any influence, or even had any input, on the [relevant] decision"); *In re Architect of Capitol Emp. Disp.*, 2024 WL 3359515, at *3 (D.D.C. July 10, 2024) (disregarding comments by "non-decisionmakers" who "did not work for the [relevant entity]" and who plaintiffs "never link[ed] to [their] termination"). Here, as noted, AAP has not alleged that any of these individuals had any involvement in the issuance of the CID.

At any rate, the three FTC staffers' comments are innocuous on their face. One quoted a statement from the HHS Secretary, which itself was based on the findings of a peer-reviewed report. Dkt.6-2 at 189. One merely observed that avoiding "needless mutilation of children" should be a point of agreement. *Id.* at 36. And AAP's motion tellingly omits the following sentence, where this employee added that "[e]very American should be troubled by *the possibility* that parents and their children were misled about the use of medical 'therapies' that may have caused serious harm." *Id.* (emphasis added). Finally, the third individual (who was not an FTC employee at the time and was not hired by the FTC until after the CID was issued) suggested that revealing the prevalence of "deceptive activity" to the public through enforcement activity, such as "seeking injunctions," could be a catalyst for potentially beneficial change. *Id.* at 178.[12] Even if these statements from non-decisionmakers were relevant, none of them suggest retaliation against AAP.

---

[12] It would not make sense to suggest that obtaining information via CIDs would create negative publicity for the recipient. The FTC is subject to strict statutory and regulatory requirements

*3. Administration Priorities.* AAP asserts that the "current Administration [has an] ongoing campaign against AAP." Mot. 30. For support, AAP points to two Executive Orders, neither of which mentions AAP or the FTC. *See* Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025); Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025). AAP identifies no legal authority for its implicit assumption that the Orders, or the actions of other government entities, can be attributed to the FTC for purposes of a retaliation claim. The Orders also predate the challenged action by nearly a year, which "negates any inference [of] a causal connection." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005); *see Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (temporal proximity can support causation "only where the two events are very close in time" and even "a three-month period" may "be too lengthy"). The Orders thus have no relevance to this case.

More fundamentally, the Administration is entitled to express its views on what constitutes good medical practice, as the Orders do. And the Administration's position that some practices are not in the public interest cannot serve as a basis to assert that any investigation into those practices is retaliatory. Otherwise, an administration's criticism of Big Tech, pharmaceutical companies, or payday lenders would render those sectors immune from investigation. Indeed, this case is its own reductio ad absurdum. The inescapable implication of AAP's arguments is that the current Executive—in its entirety—is simply powerless to investigate any abusive or deceptive practices relating to PGDT, and ultimately to protect the public from such practices. This cannot be.

*4. Timing of the CID.* AAP claims that "the timing of the FTC's issuance of the CID is suspicious." Mot. 32. Its theory appears to be that the CID was issued in response to a district court ruling four days earlier in a case concerning a different federal agency. Mot. 10, 32–33 (citing *AAP v. HHS*, — F. Supp. 3d —, 2026 WL 80796 (D.D.C. Jan. 11, 2026)).

That theory fails on both the law and the facts. *First*, AAP must show temporal proximity between *its protected conduct* and the CID. *E.g.*, *Allen v. Napolitano*, 774 F. Supp. 2d 186, 201

---

regarding use and disclosure of date produced by CID recipients. *See* 15 U.S.C. § 57b-2; 16 C.F.R. § 4.10.

n.2 (D.D.C. 2011) (measuring timing from "the protected activity"). The *HHS* ruling is not *AAP's* protected conduct, and AAP makes no effort to identify any protected activity that is temporally proximate to the CID's issuance. It is impossible to find a temporal connection to an unknown event. *See Lakkis v. Lahovski*, 994 F. Supp. 2d 624, 634 (M.D. Pa. 2014) (allegations "not anchored in time" cannot "enable a fact-finder to infer a causal link."). Moreover, AAP's principal statements regarding PGDT—its 2018 Policy Statement and the 2023 reaffirmation, Mot. 13–14— are too far removed to support any causal inference. *See, e.g.*, *Allen*, 774 F. Supp. 2d at 201 n.2 ("[A]lleged retaliatory acts must occur within three or four months of the protected activity to establish causation ….").

　　*Second*, any connection to the *HHS* ruling is self-evidently implausible. As AAP recounts, the FTC began investigating this topic long before the *HHS* decision. The FTC's workshop, for instance, was held on July 9, 2025—over five months before AAP even filed the *HHS* case. Dkt.6-2 at 98.[13] It is also public knowledge that, on *the same day* that the FTC issued the CID at issue here, it also issued two substantially similar CIDs to other entities—the Endocrine Society and WPATH. *See* p. 13 n.6, *supra*. And yet neither of those entities had any involvement in AAP's lawsuit against HHS, severing any potential causal link to that case. AAP's eagerness to bolster its retaliation argument with such facially deficient evidence only highlights the weakness of its position.

　　Besides, even if the timing supported AAP's retaliation theory, "temporal proximity" alone is insufficient. *Minter v. District of Columbia*, 809 F.3d 66, 71 (D.C. Cir. 2015); *United States v. Rundo*, 108 F.4th 792, 805 (9th Cir. 2024) ("[T]iming" does not demonstrate "improper motive" because it "can merely be the sign of the government's change in enforcement priorities."). A plaintiff must identify "positive evidence [of retaliation] beyond mere proximity," *Minter*, 809 F.3d at 71–72, which—as discussed throughout this section—AAP has not done.

---

[13] The two cases are also factually unrelated, as explained below. *See* Section I.B.4, *infra*.

**5. *Justification for the CID.*** AAP next points to the supposed "lack of a plausible justification for the FTC's investigation into AAP." Mot. 33. Specifically, AAP raises three jurisdictional arguments, all of which are thoroughly misconceived.

*First*, AAP asserts that the CID is not justified because AAP is a nonprofit that is beyond the FTC's enforcement jurisdiction. Mot. 33, 42–43. This is mistaken in several respects.

To begin, AAP's self-identification is not dispositive. It is well-established that an agency has the power to investigate whether an organization is subject to its regulatory jurisdiction. *See, e.g.*, *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 627 (1973) (agency's "jurisdiction to determine whether it has jurisdiction is as essential to its effective operation as is a court's like power"); *Fed. Mar. Comm'n v. Port of Seattle*, 521 F.2d 431, 434 (9th Cir. 1975) (explaining that regulatory agencies have "the power to obtain the facts requisite to determining whether [they have] jurisdiction over the matter sought to be investigated."). The FTC therefore "is not obliged to prove its jurisdiction" even "in a subpoena enforcement proceeding"—let alone in this pre-enforcement posture. *FTC v. Ernstthal*, 607 F.2d 488, 490 (D.C. Cir. 1979); *accord Ken Roberts Co.*, 276 F.3d at 586 (collecting cases).

Accordingly, the Commission is "not required to take at face value an organization's claim that it is a charitable organization and can require it to produce documents and other information to enable the Commission to make that determination for itself." *In re Mar. 19, 2014 Civ. Investigative Demand Issued to Police Protective Fund, Inc.*, 157 F.T.C. 1913, 1916 (May 22, 2014). To the contrary, the FTC regularly investigates self-described nonprofits, and several of the CID's specifications are tailored to assess whether AAP is a true nonprofit or whether it is carrying on business "for its own profit or that of its members." 15 U.S.C. § 44; *see* Dkt.6-2 at 243–44. In prior cases, the FTC has used such information to establish jurisdiction over professed nonprofits, including in the medical field. *E.g.*, *California Dental Ass'n v. FTC*, 526 U.S. 756, 759 (1999); *Am. Med. Ass'n v. FTC*, 638 F.2d 443, 448 (2d Cir. 1980), *aff'd*, 455 U.S. 676 (1982); *see also FTC v. Nat'l Comm'n on Egg Nutrition*, 517 F.2d 485, 487–88 (7th Cir. 1975). Until the Commission receives the requested information here, it is premature for the Commission (let alone

31

this Court) to reach any conclusion on this issue. *See Ernstthal*, 607 F.2d at 490 (reasoning that courts should await "the close of" agency proceedings to allow the agency to "make the initial determination of its own jurisdiction").[14]

More fundamentally, the FTC is not limited to seeking information from potential wrongdoers. The Commission's authority to investigate is broader than its enforcement authority. *See Blue Ribbon Quality Meats*, 560 F.2d at 875–76. Thus, even if AAP were correct that it is immune from enforcement action (a point the Commission does not concede), it is emphatically *not* immune from CIDs. This is because the FTC can issue a CID to "any person," including a nonprofit, who "the Commission has reason to believe … may … have any information[] relevant to unfair or deceptive acts or practices." 15 U.S.C. § 57b-1(c)(1); *see id.* § 57b-1(a)(6) (defining "person" to include a "partnership, corporation, association, or other legal entity"). Accordingly, the FTC issues CIDs to nonprofits, and those entities may be required to respond even if they are not subject to the FTC's enforcement authority. *E.g.*, *In re Feature Films for Families, Inc.*, 150 F.T.C. 866, 870 (Sept. 23, 2010) (FTC "can require production of material from an entity that is not subject to the Commission's enforcement authority if that material furthers the investigation of possibly illegal conduct by entities that are subject to the agency's jurisdiction"); *In re Aug. 11, 2022 Civ. Investigative Demand Issued to Childhood Leukemia Found., Inc.*, No. 222-3073, 2023 WL 8112947, at *2 (Nov. 17, 2023) (same). And here, the FTC is investigating whether "[AAP] *or any other Person*" has violated the FTC Act. Dkt.6-2 at 220 (emphasis added). As explained above, there is ample reason to believe that AAP may have information relevant to whether entities have violated the FTC Act by making unsubstantiated claims regarding the medical treatments at

---

[14] Even taken at face value, AAP's allegations that it has a nonprofit mission and is "not focused on [its] members' bottom lines," Mot. 42–43, are not sufficient to prove that it falls outside the FTC's jurisdiction. An entity need not "devote itself entirely to its members' profits" to qualify as a corporation under the FTC Act. *California Dental*, 526 U.S. at 766; *Am. Med. Ass'n*, 638 F.2d at 448. Instead, a mere "proximate relation to lucre must appear"—a standard that encompasses numerous factors, such as whether the entity "engages in lobbying, litigation, marketing, and public relations for the benefits of its members' interests." *California Dental*, 526 U.S. at 766–67.

issue. *See* Background Section C, *supra*. If nothing else, as the author of the Policy Statement—a widely discussed set of guidelines regarding PGDT—AAP is quite likely to have information as to whether various statements regarding the safety and efficacy of PGDT can be scientifically substantiated.

*Second*, AAP argues that its speech is "plainly non-commercial and thus outside the scope of the FTC's jurisdiction." Mot. 40. This argument fails for similar reasons. Again, the FTC has authority to assess its jurisdiction. And determining whether a statement is noncommercial is a fact-intensive, statement-by-statement inquiry that cannot be conducted without knowing the statement's precise wording, intended purpose, and audience. *See First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1272 (9th Cir. 2017) (The "commercial speech analysis is fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." (citation omitted)); *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 879 F.3d 101, 108–09 (4th Cir. 2018) (recognizing that the "inquiry is fact-intensive" and remanding for discovery, including on speaker's "economic motivation (or lack thereof)"). One of the CID's objectives is to allow the FTC to make that inquiry. *See* Dkt.6-2 at 243–44.[15]

At any rate, even if some of AAP's statements were non-commercial and did not themselves violate the FTC Act, such statements could still be relevant to determining whether violations of the FTC Act occurred. For example, a researcher's email discussing the risks of a product or the absence of studies showing its benefits would be relevant to a substantiation claim even if the email itself is not commercial speech.

---

[15] Courts have found that scientific research, such as medical textbook and journal reprints, can be commercial speech in some contexts. *E.g.*, *Genzyme Corp. v. Shire Hum. Genetic Therapies, Inc.*, 906 F. Supp. 2d 9 (D. Mass. 2012) (press release containing scientific research comparing drugs qualified as commercial speech); *Wash. Legal Found. v. Friedman*, 13 F. Supp. 2d 51, 62–65 (D.D.C. 1988), *vacated in part on other grounds*, 202 F.3d 331 (D.C. Cir. 2000) (dissemination of medical textbook and journal articles to promote off-label uses of drugs qualified as commercial speech); *Gordon & Breach Sci. Publ'rs S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1544 (S.D.N.Y. 1994) (dissemination of a survey comparing periodicals was commercial speech when targeted to the "core consumers of those products").

*Finally*, AAP argues that the CID "was not" "issued 'pursuant to a Commission resolution' under the FTC Act." Mot. 34 (quoting 15 U.S.C. § 57b-1(i)). But as AAP admits, the CID relied on two separate Commission resolutions, one issued in 2019 and the other in 2021. *Id.* at 43; *see* Dkt.6-2 at 255–56. The CID comfortably falls within the parameters of both of those resolutions.

AAP's contrary argument ignores the plain language of the resolutions. For example, AAP asserts that the 2021 resolution is limited to "goods or services marketed to children," Mot. 43, ignoring that it actually covers "unfair [or] deceptive ... acts or practices" that are "*related to* goods or services marketed ... to children," Dkt.6-2 at 256 (emphasis added). Similarly, AAP says the 2019 resolution applies only to "advertising, marketing, or sale of medical products or services," Mot. 44, but omits the next phrase, which extends the resolution's scope to anyone who "*otherwise* ha[s] engaged or [is] engaging in unfair or deceptive acts or practices" regarding "the safety or efficacy of [medical] products or services." Dkt.6-2 at 255. AAP also asserts that the resolutions are limited to "persons, partnerships, or corporations," Mot. 42, but both resolutions actually apply to "persons, partnerships, corporations, *or others*," Dkt.6-2 at 255–56 (emphasis added).

At any rate, even the portions of the resolutions that AAP quotes would comfortably authorize the CID. This is true for the two fundamental reasons given above: (1) the FTC is entitled to investigate whether in fact AAP is a corporation for purposes of the Act and whether it has engaged in activities like marketing to children; and (2) even if AAP's own activities are not within the scope of the resolutions, the FTC is entitled to seek documents that may shed light on qualifying activities by others. Unsurprisingly, then, the D.C. Circuit has rejected precisely the sort of artificially constrained approach to Commission resolutions that AAP advocates here, asking instead only whether "it is patently clear" that the FTC lacks jurisdiction. *Church & Dwight*, 665 F.3d at 1315–17; *see FTC v. Carter*, 636 F.2d 781, 788 (D.C. Cir. 1980) (enforcing subpoena requests unless "'plainly irrelevant' to the investigatory purpose"). AAP has not come close to satisfying that standard.

**6. Scope of the CID.** Last, AAP asserts that "the scope of the CID" reveals a retaliatory motive. Mot. 34. But the CID is no broader than the typical CID issued in FTC investigations.[16] In fact, the CID sent to AAP actually has *fewer specifications* and seeks *less information* than certain CIDs sent to other nonprofits[17] or in other investigations involving healthcare claims.[18]

Moreover, all of the CID's specifications follow naturally from the Commission's goal of investigating whether AAP or any other persons are making deceptive or unsubstantiated claims about the safety and efficacy of treatments for gender dysphoria in violation of the FTC Act. Indeed, as the specifications identified by AAP reflect, the CID seeks relevant information about the statements AAP has made in support of these treatments, "to whom" they were made, and the scientific backing for the statements. Mot. 34; *see* Dkt.6-2 at 244–45. Similarly, other specifications are plainly relevant to assessing the FTC's jurisdiction. These include specifications regarding any financial incentive AAP may have for its statements, *see e.g.*, Dkt.6-2 at 244 (requesting information on any "financial relationships[] or partnerships relating to PGDT between" AAP and "pharmaceutical compan[ies]" or a "clinic, hospital system, or individual clinician"), and specifications regarding any benefits AAP provides to its members, *see id.* at 243 (such as "discounts," "financing," "legal advocacy," "lobbying," "education and training" programs, or "certifications")—both of which are crucial in determining whether AAP operates "for its own profit or that of its members." 15 U.S.C. § 44; *see California Dental*, 526 U.S. at 760

---

[16] *E.g.*, *FTC v. Cigna Group*, No. 1:25-mc-0004, Dkt.1–2 (D.D.C. Jan. 15, 2025) (43 specifications); *FTC v. It Media, Inc.*, No. 2:16-cv-9483, Dkt.1–2 (C.D. Cal. Dec. 12, 2016).

[17] *E.g.*, Motion to Quash Civil Investigative Demand Ex. P, *Police Protective Fund*, 157 F.T.C. 1913, https://perma.cc/2L5J-PM87.

[18] *E.g.*, Petition to Enforce Civil Investigative Demand Ex. 3, *FTC v. Kushly, LLC*, No. 2:20-mc-0036 (D. Ariz. July 30, 2020) (22 interrogatories and 15 document requests, many with subparts), https://perma.cc/QQJ9-GFXT; Petition for an Order Enforcing Civil Investigative Demand Ex.2, *FTC v Redwood Sci. Techs.*, No. 2:17-cv-07921 (C.D. Cal. Oct. 13, 2017) (22 interrogatories and 16 document requests, many with subparts), https://perma.cc/5BSC-8ATQ; Petition to Limit or Quash Civil Investigative Demand Ex. 1, *In re Lexium Int'l, LLC*, 162 F.T.C. 1212 (2016) (42 interrogatories and 36 document requests, many with subparts), https://perma.cc/Q6PG-D4LA.

(ostensible nonprofit association that "lobbies and litigates in its members' interests" "carries on business for the profit 'of its members'" under the FTC Act).

<p style="text-align:center">*       *       *</p>

In sum, the Commission has proffered undisputed evidence of a nonretaliatory purpose for issuing the CID: advancing its broad investigation into whether AAP or other entities have violated the FTC Act by making deceptive or unsubstantiated claims about the safety and efficacy of certain medical treatments for gender dysphoria. And AAP's purported evidence of retaliation fails as a matter of law.

At bottom, AAP's position is that the federal government is barred by the Constitution from investigating any potential wrongdoing relating to PGDT. This Court would not accept that argument from any other industry and there's no reason to do so here.

### 2. AAP Has Not Shown That the CID Had a Sufficient Chilling Effect.

AAP must also show that the CID is "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking." *Aref*, 833 F.3d at 258. AAP has not made this showing.

As discussed below, if retaliatory investigation claims are cognizable at all, it is only in extraordinary circumstances. *See* Section I.B.3., *infra*. Likewise, asserting a sufficient chilling effect from a retaliatory investigation would also require extraordinary circumstances. The Supreme Court has expressly questioned whether the "adverse consequences of a retaliatory investigation would *ever* justify recognizing such an investigation as a distinct constitutional violation," *Hartman*, 547 U.S. at 262 n.9 (emphasis added), and this counsels skepticism that the adverse consequences of any particular investigation would chill a person of ordinary firmness.

Here, AAP has raised only a generic retaliatory investigation claim. The scope of the CID is standard for FTC investigations, and AAP has not alleged any unusual injury as a result of the CID. Instead, it points to alleged harms common to all CID recipients, such as the concern that third parties will treat it differently due to the CID, the prospect that the CID will result in "complications, delays, and burdens on productivity," and the possibility that being under federal

investigation will challenge its employees' "sense of fulfillment at work." Dkt.6-1 ¶¶ 25, 27. Such routine injuries are inadequate to demonstrate a chilling effect. *See Cinderella Career & Finishing Sch., Inc.*, 404 F.2d at 1316 ("The practical effect of the Commission's initial press release, in this or any other complaint proceeding, is undoubtedly deleterious to the respondents' economic, business, and community status.... Unfortunate though this result may be, we are convinced that this damage does not constitute a transgression of the appellees' legal rights."). AAP's claim of chill is particularly implausible, given the organization's size and substantial resources.

Moreover, some of AAP's alleged harms are either speculative or have no plausible connection to the CID. For example, AAP asserts that the CID will lead to "disruptions and safety threats at its events" or to "anonymous notes and threats in the mail." Dkt.6-1 ¶¶ 18, 26. There's no basis for treating such hypothetical acts by third parties as causally linked to the CID. Finally, AAP's other alleged harms involve mere financial costs or turn on AAP's own voluntary reactions, such as taking steps that it admits will "alienat[e]" its partners. *Id.* ¶¶ 20, 24. In sum, all of these alleged harms are plainly insufficient.

### 3. AAP Has Not Demonstrated That Its "Retaliatory Investigation" Claim is Cognizable.

Because AAP has failed to make out a retaliation claim, this Court need not decide whether retaliatory *investigation* claims, such as the one asserted here, are cognizable at all. If the Court does reach that question, it should hold that AAP is not likely to prevail on it.

The Supreme Court expressly left the question open, and the D.C. Circuit has declined to answer it. *See Hartman*, 547 U.S. at 262 n.9; *Paxton*, 138 F.4th at 584–85.[19] One federal court of appeals appears to have assumed that such a claim could arise in extraordinary circumstances, *see Moore v. Garnand*, 83 F.4th 743, 752 (9th Cir. 2023) (while no case had "held that a retaliatory investigation by itself was unconstitutional," it was possible that the entire "scope and manner" of

---

[19] The *Media Matters* district court found support for a retaliatory investigation claim in *Paxton*, *Media Matters*, 805 F. Supp. 3d at 132–33, but *Paxton* did not address the point because the defendant there forfeited this argument. *Paxton*, 138 F.4th at 584.

a given investigation could violate the First Amendment), but several other courts of appeals have suggested that such claims should *not* be recognized at all, *see Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017); *Breaux v. City of Garland*, 205 F.3d 150, 157–61 (5th Cir. 2000); *see also J.T.H. v. Mo. Dep't of Soc. Servs. Child.'s Div.*, 39 F.4th 489, 493 (8th Cir. 2022) ("[W]e have never recognized a retaliatory-investigation claim of this kind. Nor have other courts around the country."); *Sivella v. Twp. of Lyndhurst*, 2021 WL 3356934, at *3 (3d Cir. Aug. 3, 2011). And the Eleventh Circuit has squarely held that the initiation of a retaliatory investigation "does not implicate a federal constitutional right." *Rehberg v. Paulk*, 611 F.3d 828, 850 & n.24 (11th Cir. 2010), *aff'd*, 566 U.S. 356 (2012); *accord Thompson v. Hall*, 426 F. App'x 855, 858 (11th Cir. 2011) (per curiam).

If nothing else, the open questions regarding the very existence of retaliatory investigation claims "suggest that the key premise of a preliminary injunction—a showing of a likelihood of success on the merits—is missing." *Skrmetti*, 83 F.4th at 471, *aff'd*, 605 U.S. 495 (2025). And even if this Court ultimately adopts the most sweeping position on the issue—that contemplated by the Ninth Circuit in *Moore*—it would conclude only that *conducting* an investigation in certain unusually abusive ways could give rise to a constitutional claim. No such allegations have been made here. *See White v. Lee*, 227 F.3d 1214, 1220, 1233 (9th Cir. 2000) (addressing a challenge to government conduct during an investigation, which included threatening and defamatory actions not alleged here).

### 4. AAP's Reliance on Unrelated District Court Cases Is Misplaced.

AAP heavily relies on two recent district court decisions that do not support its position.

*First*, AAP points to its lawsuit against the Department of Health and Human Services. There, the issue was whether HHS improperly terminated grants to AAP based on AAP's speech about childhood vaccines and particularly its decision to sue HHS for firing members of the Advisory Committee on Immunization Practices. *HHS*, 2026 WL 80796, at *1, *16, *19. *HHS* is therefore not *factually* related to this case because it had nothing to do with PGDT or the FTC. It

is also not *legally* relevant, because Judge Howell's decision to grant an injunction was motivated by considerations that are not applicable here, such as her view that there was an "almost perfect[]" alignment between the grant terminations and "significant events in [AAP's lawsuit regarding the firings]," as well as her view that "HHS offer[ed] only a pretextual explanation for its adverse actions." *Id.* at *16, *20.

AAP nevertheless insists that the *HHS* case somehow taints the FTC's independent investigation into an entirely different subject. Mot. 17. Specifically, AAP asserts that Chairman Ferguson's reference to a peer-reviewed HHS report about treatments for pediatric gender dysphoria "demonstrat[es] the illegitimate basis" for the Commission's investigation. *Id.* at 32; *see* Dkt.6-2 at 47. That reasoning is unsound. As an initial matter, there's no causal connection; the FTC was investigating these practices months before the HHS report was released in November 2025, as illustrated by the Commission's July 2025 workshop. Moreover, it cannot be the case that a single ruling in an unrelated case makes it improper for the FTC to rely on peer-reviewed materials from the executive department entrusted with protecting Americans' health and well-being. And as explained above, the motives of individuals who are not alleged to have had any role in the decision to issue the CID (such as HHS officials) are irrelevant to the motives of the FTC's decisionmakers here. *See* pp. 29-30, *supra*. Once again, the upshot of AAP's position is that it is categorically protected from any ordinary law enforcement activity by this Administration. That cannot be the law.

*Second*, AAP repeatedly points to *Media Matters*. *E.g.*, Mot. 15. As noted above, *see supra* p. 21 n.9, *supra*, neither the district court's preliminary injunction ruling nor the stay panel ruling in *Media Matters* are binding, and the district court ruling is currently on appeal. As the Commission has explained in its appellate briefing, the district court's analysis of the retaliation claim in that case was flawed in numerous respects. *See* Appellants' Br. 36–54, *Media Matters*, No. 25-5302 (D.C. Cir. Jan. 5, 2026).

In any event, the reasoning of *Media Matters* is inapplicable here. As Judge Sooknanan explained, the retaliation ruling in *Media Matters* "turned on facts unique to Media Matters" and

the "likelihood that" another CID recipient in the same investigation could prevail on a similar claim would "depend[] on entirely different facts." Docket Order, *Disinformation Index, Inc. v. FTC*, No. 1:25-cv-4137 (D.D.C. Dec. 16, 2025). The stay panel majority, too, described *Media Matters* as involving "unique factual circumstances" and expressed skepticism that other CID recipients in the same investigation "could plausibly … seek similar relief." *Media Matters*, 2025 WL 2988966, at *11. *Media Matters* is even less relevant to a CID recipient in a wholly different investigation, such as AAP.

If anything, *Media Matters* further reveals the weakness of AAP's case. In particular, the *Media Matters* district court placed significant reliance on the fact that Media Matters had previously prevailed in litigation where it asserted that certain state subpoenas were issued in retaliation for a specific 2023 article. *Media Matters*, 805 F. Supp. 3d at 113–15. AAP makes no similar allegations.

### C.   AAP Is Not Likely to Prevail on Its First and Fourth Amendment Claim.

AAP also claims that some of the documents implicated by the CID are protected by a First Amendment privilege and, in light of that, the CID is overbroad under the Fourth Amendment. Mot. 35–44. This argument is deeply confused.

To begin, this claim is premature. It is premised on the threat of "*compel[led] disclosure* of information," *id.* at 44 (emphasis added), but that cannot occur here until the Commission seeks enforcement of the CID and a federal court orders production, *Gen. Fin. Corp.*, 700 F.2d at 368. That's important because a CID is not a fixed document; it's subject to change. *See* 16 C.F.R. § 2.7(*l*).[20] Moreover, it is not currently known whether the Commission will attempt to enforce the CID at all, and if so, as to which specifications (or portions of specifications). *See Claire Furnace*, 274 U.S. at 174 (recognizing the "discretion" in "designating the inquiries to enforce").

---

[20] Here, for example, FTC staff agreed to limit the applicable time period for several specifications. *See* Dkt.6-2 at 285. Such changes are far from unusual. *E.g.*, *NewsGuard Techs., Inc. v. FTC*, No. 1:26-cv-0353 (D.D.C. Feb. 11, 2026), Dkt.11-18 at 2 (letter from FTC staff granting "substantial" modifications "to limit" a CID's scope).

Accordingly, whether any documents are in dispute cannot become clear until an enforcement proceeding. Unsurprisingly, *none* of the cases cited by AAP in this section were in a pre-enforcement posture.

Relatedly, it is axiomatic that any claim of privilege must be considered on a "document-by-document basis." *In re Grand Jury Procs.*, 220 F.3d 568, 571 (7th Cir. 2000). Here, however, AAP has not identified *any* specific document or even category of documents that is in dispute (for example, it could have, but did not, utilize the privilege log procedure provided in the CID, *see* Dkt.6-2 at 247).

Regardless, no privilege applies. AAP points to *Perry v. Schwarzenegger*, Mot. 36, but that out-of-circuit case is expressly "limited to ... communications concerning *the formulation of campaign strategy*," 591 F.3d 1147, 1160, 1165 n.12 (9th Cir. 2010). Moreover, the D.C. Circuit has held that there is no special First Amendment privilege in grand jury proceedings, *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1145–49 (D.C. Cir. 2006), and an FTC investigation is "analogous to the Grand Jury," *Morton Salt*, 338 U.S. at 642–43; *see In re Grand Jury Procs.*, 486 F.2d 85, 90 (3d Cir. 1973) ("Grand jury subpoenas … are exactly analogous to subpoenas issued by a federal administrative agency."); *SEC v. McGoff*, 647 F.2d 185, 192 (D.C. Cir. 1981) (same). Similarly, AAP's suggestion that the CID is subject to heightened scrutiny under the Fourth Amendment, *see* Mot. 36, ignores binding precedent: "[T]he existence of First Amendment 'interests' does not give rise to any substantive or procedural protections above and beyond those afforded by the Fourth Amendment." *Reps. Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030, 1056 (D.C. Cir. 1978) (citing *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978)); *see Google LLC v. United States*, 2025 WL 778150, at *8 (D.D.C. Feb. 25, 2025) (*Zurcher* "held that warrants impinging on First Amendment interests raise no special concerns" under the Fourth Amendment).

At the end of the day, then, AAP is left with a run-of-the-mill claim that the CID is overbroad. To prevail on such a claim, AAP must show more than "[b]roadness" or a "burden"; it must show that the CID is "*unduly* burdensome or *unreasonably* broad." *Texaco*, 555 F.2d at 881–

82 (citing *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186 (1946)). AAP has not met that standard, failing even to allege (let alone show) that complying with the CID would "unduly disrupt or seriously hinder normal [business] operations." *Id.* at 882.

AAP's own proposed burden-shifting test (which ignores the governing standard in *Texaco*) underscores the impropriety of addressing its claim at this juncture. Mot. 35–36. As AAP acknowledges, identification of a "state interest" is required only when the government "compel[s] disclosure," *id.* at 44, which has not happened here. Recall that AAP is currently "under no compulsion" to "turn over the documents" and faces no "penalties" for not doing so. *Wearly*, 616 F.2d at 667. And any balancing of the FTC's interests (including assessing its jurisdiction and investigating potentially false or unsubstantiated medical claims) cannot occur absent factual context.[21] In an enforcement proceeding, by contrast, CID recipients like AAP have ample opportunity to assert that a certain document is privileged or that complying with a certain specification poses an undue burden. Moreover, any relevant First Amendment interests can be protected at that time "by entry of a protective order," *Perry*, 591 F.3d at 1160 n.6, 1165; *Texaco*, 555 F.2d at 884 & n.62 (protective orders for FTC subpoenas).

Finally, AAP's claims that the CID is overbroad due to a purported "lack of jurisdiction," Mot. 38–43, are precisely the sort of "substantive" objections to a CID that would be "premature" even "in an enforcement proceeding" and are doubly so here, *Texaco*, 555 F.2d at 879. The objections are also meritless, as explained above. *See* Section I.B.1.b, *supra*.

## II. THE EQUITABLE FACTORS WEIGH HEAVILY AGAINST A PRELIMINARY INJUNCTION.

The equitable prongs of the preliminary injunction analysis also preclude relief.

---

[21] At oral argument, the *Media Matters* district court expressed skepticism regarding a similar claim, observing that it would be "odd" "to apply privilege in the abstract at this stage" and that any privilege argument could be raised "in a more concrete way" in an enforcement action, where it would be clear if the FTC is "going to take issue with [the] assertions of privilege." Transcript of Motion Hearing 14–15, *Media Matters for Am. v. FTC*, No. 1:25-cv-1959, Dkt.43 (D.D.C. Aug. 13, 2025). The court did not rely on the privilege claim in its preliminary injunction decision.

To begin, "the Government is likely to suffer irreparable harm from the District Courts' entry of injunctions that likely exceed the [courts'] authority." *Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025); *see Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). An injunction would also harm the public, which benefits from the robust enforcement of the FTC Act, *see FTC v. Standard Oil of Cal.*, 449 U.S. 232, 242 (1980). This interest is particularly urgent in investigations, like this one, that concern the possibility that parents and children have been harmed by deceptive or unsubstantiated medical claims.

As for AAP, the only potentially irreparable harm it has identified is First Amendment harm, which it has not suffered because there has been no First Amendment violation. The other harms AAP asserts flunk the D.C. Circuit's "high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The Supreme Court has long held that the ordinary burdens associated with responding to an administrative subpoena do not in and of itself constitute irreparable harm. *Claire Furnace*, 274 U.S. at 174; *see Standard Oil*, 449 U.S. at 244. Nor do Plaintiff's claimed reputational injuries show irreparable harm. "The loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms"—and thus recoverable. *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012). Further, the alleged harm must "directly result from the action which the movant seeks to enjoin." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Thus, when a harm is "based on independent market variables such as how [a company's] customers and/or retailer consumers might react," that harm does not flow directly from the challenged action. *Am. Meat Inst. v. USDA*, 968 F. Supp. 2d 38, 81 (D.D.C. 2013), *aff'd*, 746 F.3d 1065 (D.C. Cir. 2014). As for the "concrete financial costs and operational burdens" AAP alleges, Mot. 48, those harms are self-inflicted and result from speculation about the actions of third parties. In any event, such injuries are monetary—the classic example of *reparable* harm. On the other side of the scale, enjoining the FTC's ability to investigate inflicts grievous harm on the public and

on the FTC, which is exacerbated by the likelihood that the injunction will invite a barrage of copycat pre-enforcement challenges.

### III.    THE COURT SHOULD REQUIRE A BOND AND STAY ANY INJUNCTION.

Finally, if the Court grants an injunction, it should require a bond pursuant to Rule 65(c) commensurate with the scope of relief granted.[22] And to the extent the Court issues any injunctive relief, Defendants request that such relief be stayed pending the disposition of any appeal, or at a minimum, administratively stayed for seven days to allow Defendants to consider seeking relief from the Court of Appeals. Defendants have, at a minimum, satisfied the requirements for a stay pending appeal. *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

### CONCLUSION

For the reasons set forth above, the motion for preliminary injunction should be denied.

---

[22] No injunctive relief is appropriate here, as explained. But even if it were otherwise, AAP would be entitled at most to a preliminary injunction against the enforcement of the CID. *See* Order, *Media Matters for Am. v. FTC*, No. 1:25-cv-1959 (Aug. 15, 2025), Dkt. 35 (ordering only that "Defendants are enjoined from implementing or enforcing the Civil Investigative Demand served ... to Media Matters"). While AAP's proposed order requests far more extensive relief, *see* Dkt.6-3, AAP's motion does not even mention these broader forms of relief, let alone mount an argument in favor of them. Regardless, AAP certainly cannot seek to bar actions involving "*other*" organizations, as it proposes. *Id.* at 2 (emphasis added); *see CASA, Inc.*, 606 U.S. at 844.

Dated: March 13, 2026

OF COUNSEL:

LUCAS CROSLOW
*General Counsel*
ALEX POTAPOV
*Deputy General Counsel*
ETHAN D. BECK
*Counsel to the General Counsel*

CHRISTOPHER MUFARRIGE
*Director*, Bureau of Consumer Protection
KATHERINE WHITE
*Deputy Director*, Bureau of Consumer
Protection

Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, DC 20580
(202) 326-2110
ebeck@ftc.gov

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General, Civil
Division*

DANIEL F. MUMMOLO
*Counsel to the Assistant Attorney
General*

*/s/ John Bailey*
JOHN BAILEY
*Counsel to the Assistant Attorney
General*

United States Department of Justice
Civil Division
950 Constitution Ave. NW
Washington, DC 20005
Phone: (202) 514-6993
Email: john.bailey@usdoj.gov

*Attorneys for the Defendants*