# EXHIBIT 1

**UNITED STATES OF AMERICA
BEFORE THE FEDERAL TRADE COMMISSION**

COMMISSIONERS:     **Andrew N. Ferguson, Chairman
Mark R. Meador**

| | |
|---|---|
| **In the Matter of** | ) |
| | ) |
| | ) **File No. P264800** |
| **CIVIL INVESTIGATIVE DEMAND TO** | ) **PUBLIC** |
| **AMERICAN ACADEMY OF PEDIATRICS** | ) |
| **DATED JANUARY 15, 2026** | ) |
| | ) |
| | ) |

**ORDER DENYING PETITION TO QUASH
CIVIL INVESTIGATIVE DEMAND**

**<u>By FERGUSON, Chairman</u>:**

The American Academy of Pediatrics (AAP) petitions the Commission to quash in its entirety a Civil Investigative Demand (CID) issued on January 15, 2026, in connection with the Commission's investigation into whether AAP or any other person has made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of Pediatric Gender Dysphoria Treatment (PGDT)—medical interventions for minors with gender dysphoria, including but not limited to pubertal suppression, hormone therapy, and surgery.

AAP requests that the Commission quash the CID because the CID (1) exceeds the scope of the Commission's authority to investigate; (2) violates the First Amendment; (3) was not issued pursuant to a Commission resolution; and (4) is overbroad and unduly burdensome. *Petition*, at 1. For the reasons set forth below, we deny AAP's petition.

## I.     BACKGROUND

AAP describes itself as a 501(c)(3) nonprofit organization "dedicated to improving the health of all children." *Petition*, at 1. AAP notes that, as part of that mission, AAP has issued clinical guidance, such as its policy statement titled "Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents" (2018 Policy Statement) and its August 2023 reaffirmation of that statement (2023 Reaffirmation), "to educate medical professionals about gender-affirming care ('GAC') for youth with gender dysphoria." *Id.* According to AAP, its guidance materials are offered for free to the public, and AAP does not offer or advertise GAC or any medical products or services to patients. *Id.* at 2.

On January 15, 2026, under the authority of two Commission resolutions authorizing the use of compulsory process, the Commission issued a CID to AAP pursuant to Section 20 of the FTC Act, 15 U.S.C. § 57b-1. *Petition* Ex. 1. The AAP CID was issued as part of the Commission's investigation into whether AAP or any other person has made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of PGDT to consumers in violation of Sections 5 and 12 of the FTC Act, and whether FTC action to obtain monetary relief would be in the public interest. *Id.*

The CID to AAP seeks information pertaining to the following: AAP's membership requirements, composition, benefits, and services; AAP's education, training, or certification programs; AAP's PGDT-related workshops, townhalls, and conferences; each type of PGDT advertised, marketed, promoted, addressed, or referred to in documents disseminated by AAP; the dissemination of and substantiation for any Covered Statement, a term defined in the CID to mean six specific representations; the development and issuance of the 2018 Policy Statement, 2023 Reaffirmation, and WPATH's "Standards of Care for the Health of Transgender and Gender Diverse People, Version 8" (SOC-8), including related communications with Professional Medical Organizations or other organizations, institutions, or individuals; AAP's financial relationships or partnerships relating to PGDT with any (a) pharmaceutical company, (b) medical device manufacturer, or (c) clinic, hospital system, or individual clinician; all investigations and lawsuits involving Covered Statements or PGDT, including where AAP is amicus; any studies involving PGDT that AAP sponsored, conducted, or contributed to; PGDT-related information AAP provided to any legislature or regulator; AAP's financial statements; and AAP's records retention policy, among other subjects. *Id.* at 5-7. The relevant time period for AAP's responses is from January 1, 2021, to the date of full and complete compliance with the CID, but certain specifications apply regardless of time period. *Id.* at 5.

The CID attached two resolutions: (1) the Resolution Directing Use of Compulsory Process in a Non-Public Investigation of Dietary Supplements, Foods, Drugs, Devices, or Any Other Product or Service Intended to Provide a Health Benefit or to Affect the Structure or Function of the Body, issued by the Commission on August 9, 2019 [hereinafter 2019 Resolution]; and (2) the Resolution Directing Use of Compulsory Process Regarding Acts or Practices Affecting Children, issued by the Commission on September 2, 2021 [hereinafter 2021 Resolution]. *Id.* at 17-18.

The 2019 Resolution authorized the issuance of CIDs:

> To investigate whether unnamed persons, partnerships, or corporations, or others have engaged or are engaging in deceptive or unfair acts or practices in or affecting commerce in the advertising, marketing, or sale of dietary supplements, foods, drugs, devices, or any other product or service intended to provide a health benefit or to affect the structure or function of the body; have misrepresented or are misrepresenting the safety or efficacy of such products or services; or otherwise have engaged or are engaging in unfair or deceptive acts or practices or in the making of false advertisements, in or affecting commerce, in violation of Sections 5 or 12 of the Federal Trade Commission Act, 15 U.S.C. §§ 45 and 52, as

amended. The investigation is also to determine whether Commission action to obtain monetary relief would be in the public interest.

*Id.* at 17.

The 2021 Resolution authorized the issuance of CIDs:

To investigate whether any persons, partnerships, corporations, or others have engaged or are engaging in unfair, deceptive, anticompetitive, collusive, coercive, predatory, exploitative, or exclusionary acts or practices, in or affecting commerce, related to goods or services marketed, in whole or in part, to children under 18, in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended or any statutes or rules enforced by the Commission; and to determine the appropriate action or remedy, including whether injunctive and monetary relief would be in the public interest.

*Id.* at 18.

AAP was served with the CID on January 16, 2026. *See Petition* Ex. 4, at 5-10 (Statement of Counsel Pursuant to 16 C.F.R. § 2.10(a)(2)). AAP reached out to Commission staff on January 30, 2026, to schedule a meet-and-confer session. *Id.* at 5.[1] That session took place on February 2, 2026. *Id.* During the meet-and-confer, AAP purports to have raised objections to the CID based on the Commission's jurisdiction, the First Amendment, the authorizing resolutions, and the CID's breadth and burden. *Id.* at 5-7. But AAP does not appear to have offered any proposals to modify the CID's specifications in a manner that would address its concerns while providing the Commission the information it needs. *See generally id.* The return date of the CID was March 16, 2026. *Petition* Ex. 1 at 3. Commission staff proposed a production schedule that would have extended the CID's return date, conditional on AAP responding to two document requests by February 16, 2026. *Petition* Ex. 4, at 9.

AAP and Commission staff continued to discuss via email on February 4, 5, 6, 7, and 8, 2026. *Id.* at 8-10. AAP timely filed the instant petition on February 9, 2026.

---

[1] After service of the CID on January 16, 2026, AAP had 14 days—or until January 30, 2026—to meet and confer with FTC counsel to discuss CID compliance. See 16 C.F.R. § 2.7(k) ("Unless excused in writing or granted an extension . . . , a recipient of Commission compulsory process *shall* meet and confer with Commission staff within 14 days after receipt of process or before the deadline for filing a petition to quash, whichever is first . . . ." (emphasis added)). Instead, AAP waited until January 30 to reach out to Commission staff, and its January 30 email asked if there were "times on Monday" (i.e., February 2) that would work for Commission staff. AAP's meet and confer took place on February 2, 2026, which is outside of the 14-day deadline in 16 C.F.R. § 2.7(k). We remind AAP that we expect full compliance with the agency's rules of practice. If a CID recipient does not raise its concerns in a timely manner, this prevents Commission staff from working constructively with the CID recipient on mutually agreeable solutions that would obviate the need for, or reduce the scope of, any petition to quash. We also remind AAP's counsel that the Commission's Rules require all CID recipients to engage in good faith with Commission staff during the meet-and-confer process to attempt to resolve by agreement any issues or concerns a recipient has with a CID. 16 C.F.R. §§ 2.7(k), 2.10(a)(2); *see also In re Feature Films for Families, Inc.*, 150 F.T.C. 866, 869 (Sep. 23, 2010) (CID recipient's obligation to meet and confer "is neither a pro forma requirement nor one that can or should easily be waived" because it provides a method for "resolving disputes in an efficient manner").

## II.   ANALYSIS

### A.  The CID Is Within the Commission's Authority.

AAP first argues that the CID targets non-commercial activities and statements, which the FTC Act does not authorize; that the CID identifies AAP as a potential FTC Act violator, even though AAP is not a "person, partnership, or corporation" that could violate the FTC Act; and that the CID lacks a legitimate investigative purpose. *Petition*, at 4-9.

### 1.  Non-Commercial Activities and Statements

AAP claims that its speech and activities are non-commercial and thus outside the scope of the FTC's jurisdiction because its GAC guidance does not shape consumer preferences or steer treatment choices, the guidance is available to the public for free, and AAP does not pay to advertise the guidance. *Petition*, at 4-6.

AAP's argument confuses the Commission's enforcement authority with its broader investigatory authority.[2] AAP's citations to 15 U.S.C. § 45(a)(1), *In re R.J. Reynolds Tobacco Co.*, 111 F.T.C. 539 (1988), and *FTC v. Agora Financial, LLC*, 447 F. Supp. 3d 350 (D. Md. 2020), are inapplicable here. These authorities address the analytically separate question of whether the Commission can take *enforcement* action with respect to commercial speech, not whether the Commission can issue a CID to investigate statements about the safety and efficacy of health products and treatments that were made in a commercial context. *Cf. Blue Ribbon Quality Meats, Inc. v. FTC*, 560 F.2d 874, 876 (8th Cir. 1977) ("[I]t is clear that the investigatory power granted the FTC under 15 U.S.C. § 46 reaches further than the regulatory power granted it under 15 U.S.C. § 45.").

AAP's argument fails for another reason as well. The Commission does not dispute that the First Amendment protects noncommercial speech. Misleading commercial speech, however, is "not protected by the First Amendment." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002); *see also Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 638 (1985) (holding that it is "well settled" that "the Federal Government [is] free to prevent the dissemination of commercial speech that is false, deceptive, or misleading"); *FTC v. Trudeau*, 662 F.3d 947, 953 (7th Cir. 2011) ("[M]isleading commercial speech gets no constitutional protection."). Here, the Commission is investigating potential unfair or deceptive practices related to the marketing or advertising of PGDT. *See Petition* Ex. 1. The Commission is not required to accept AAP's assertions that its statements and activities "are plainly non-commercial." *Petition*, at 4. Instead, the Commission can require AAP to produce documents and other information so that the Commission can make that determination itself. *Cf. United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (noting that the Commission "has a power of inquisition ... [that] is more analogous to the Grand Jury, which does not depend on a case or

---

[2] As discussed more fully below, identifying whether the Commission has such enforcement authority is a proper purpose of a CID. Until and unless AAP complies with the CID and produces information and documents sufficient to show the Commission that it lacks enforcement authority over AAP, the Commission cannot concede that it lacks enforcement authority over AAP.

controversy for power to get evidence but can investigate merely on suspicion that the law is being violated or even just because it wants assurance that it is not").

### 2. Non-Profit Status

AAP argues that Section 4 of the FTC Act only allows the Commission to take action against a "corporation" that is "organized to carry on business for its own profit or that of its members," and that AAP was not organized for that purpose. AAP claims that its operations confer no more than *de minimis* economic benefits on its members, and that AAP is therefore not a "corporation" that can violate the FTC Act. *Petition*, at 7-8.

Again, AAP puts the cart before the horse by focusing on *California Dental Ass'n v FTC*, 526 U.S. 756 (1999), *American Medical Ass'n v. FTC*, 638 F.2d 443 (2d Cir. 1980), and other cases involving the Commission's *enforcement* authority under Section 4 of the FTC Act. Prior Commission decisions have recognized that Section 20 authorizes the Commission to obtain information from any "legal entity," irrespective of whether the entity falls within the definition of "corporation" in Section 4. *See In re Aug. 11, 2022 Civ. Investigative Demand Issued to Childhood Leukemia Found., Inc.*, No. 222-3073, 2023 WL 8112947, at *2 (Nov. 17, 2023) ("[T]he plain language of Section 20 permits the Commission to serve a CID on any legal entity, regardless of whether it is a 'corporation' within the meaning of Section 4[.]"); *In re Mar. 19, 2014 Civ. Investigative Demand Issued to Police Protective Fund, Inc.*, 157 F.T.C. 1913, 1915-18 (May 22, 2014); *In re Feature Films for Families, Inc.*, 150 F.T.C. 866, 870 (Sep. 23, 2010) (Commission "can require production of material from an entity that is not subject to the Commission's enforcement authority if that material furthers the investigation of possibly illegal conduct by entities that are subject to the agency's jurisdiction, such as for-profit telefunders making calls on [the CID recipient's] behalf").

More specifically, Section 20 authorizes the Commission to serve a CID on any "person." 15 U.S.C. § 57b-1(c)(1).[3] "Person" for purposes of Section 20 is defined as "any natural person, partnership, corporation, association, or *other legal entity*, including any person acting under color or authority of State law." *Id.* § 57b-1(a)(6) (emphasis added). Given that it is an "Illinois-based 501(c)(3) non-profit organization," *Petition*, at 1, AAP cannot credibly argue that it is not a "legal entity." Therefore, regardless of whether the Commission is ultimately able to enforce Section 5 of the FTC Act against AAP, AAP is a "legal entity" that falls within the definition of "person" under Section 20 of the FTC Act and therefore is subject to the Commission's investigatory jurisdiction and may properly be issued a CID.

Furthermore, the law is clear that an agency has the power to investigate to determine whether an organization is subject to its regulatory jurisdiction. *See, e.g.*, *Weinberger v. Hynson,*

---

[3] Section 20(c)(1) provides: "Whenever the Commission has reason to believe that any person may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title), or to antitrust violations, the Commission may, before the institution of any proceedings under this subchapter, issue in writing, and cause to be served upon such person, a civil investigative demand requiring such person to produce such documentary material for inspection and copying or reproduction, to submit such tangible things, to file written reports or answers to questions, to give oral testimony concerning documentary material or other information, or to furnish any combination of such material, answers, or testimony." 15 U.S.C. § 57b-1(c)(1).

*Westcott & Dunning, Inc.*, 412 U.S. 609, 627 (1973) (agency's "jurisdiction to determine whether it has jurisdiction is as essential to its effective operation as is a court's like power."); *Fed. Mar. Comm'n v. Port of Seattle*, 521 F.2d 431, 434 (9th Cir. 1975) ("[E]ach independent regulatory administrative agency has the power to obtain the facts requisite to determining whether it has jurisdiction over the matter sought to be investigated."); *FTC v. Monahan*, 832 F.2d 688, 689 (1st Cir. 1987) (Breyer, J.) (reasoning that judges, "like the FTC, must wait to see the results of the investigation before" assessing whether the FTC has jurisdiction). As discussed in prior Commission decisions, the Commission "possesses the authority to investigate whether its jurisdiction extends to" the CID recipient. *Feature Films for Families*, 150 F.T.C. at 871; *see also Childhood Leukemia Found.*, 2023 WL 8112947, at *4; *Police Protective Fund, Inc.*, 157 F.T.C. at 1919-20.

AAP asserts that it provides "no more than *de minimis* economic benefits for its members," and it also points to the fact that AAP's Articles of Incorporation contain language disclaiming any pecuniary profit objective. *Petition*, at 8. But, as we explained in *Police Protective Fund*, "the Commission is not required to take at face value an organization's claim that it is a charitable organization and can require it to produce documents and other information to enable the Commission to make that determination itself." 157 F.T.C. at 1916.

Here, as in *Police Protective Fund*, the Commission will conduct a careful examination to determine whether AAP is in fact carrying on business "for its own profit or that of its members." *Id.* at 1915 (citing 15 U.S.C. § 44). For example, interrogatories 1-3 ask about AAP's membership requirements, composition, benefits, and services; interrogatory 4 and document request 6 ask about AAP's education, training, or certification programs; interrogatory 9 and document request 10 seek information about financial relationships or partnerships between AAP and any (a) pharmaceutical company, (b) medical device manufacturer, or (c) clinic, hospital system, or individual clinician; and document request 11 seeks AAP's financial statements. *Petition* Ex. 1, at 5-7. Information and documents responsive to these specifications will enable the Commission to conduct a fact-intensive inquiry into how AAP actually operates, including examination of "the primary purpose of the organization, the extent to which funds or other benefits may have been conferred on related for-profit companies or individuals, and the extent to which the organization may have been used by individuals or for-profit entities as a device to seek monetary gain." *Police Protective Fund*, 157 F.T.C. at 1917-18. For purposes of this inquiry, "'[t]he extent to which an entity confers benefits on private interests is relevant even if those benefits are not in the form of 'profits' as that term is traditionally understood." *Id.* at 1918.[4]

### 3.  Proper Purpose

AAP argues that the CID lacks a legitimate investigative purpose because it targets activities that patently fall outside the scope of the FTC's authority to regulate and raises constitutional concerns. *Petition*, at 9.

---

[4] *See also FTC v. Gill*, 183 F. Supp. 2d 1171, 1184-85 (C.D. Cal. 2001) (company was "not a legitimate nonprofit organization" where evidence showed individual defendant lived in corporate office, paid personal expenses from corporate account, and otherwise commingled assets); *In re Ohio Christian Coll.*, 80 F.T.C. 815, 848 (1972) ("Profit, for the purpose of Section 4 of the Federal Trade Commission Act, is not limited to dividends, gains or direct reward."); *cf. Liu v. SEC*, 591 U.S. 71, 84 (2020) (expenses such as "extraordinary salaries" may amount to "dividends of profit under another name")

6

We disagree. For the reasons discussed above in Section II.A.1-2, AAP's arguments about the Commission's authority to take *enforcement action* have no bearing on the Commission's authority to *investigate*. And, for the reasons discussed below in Section II.B, AAP's constitutional concerns are also unfounded.

### B. The CID Does Not Violate AAP's First Amendment Rights.

AAP argues that the CID abridges AAP's First Amendment rights in three ways: (1) the CID is a content-based restriction that risks chilling medical discourse; (2) the CID's demands for the identities of AAP's associates and deliberations about the development of GAC guidance violate AAP's right to associate freely; and (3) the CID constitutes retaliation. *Petition*, at 9-15.

### 1. Chilling Medical Discourse

AAP argues that the CID is a content-based restriction on AAP's non-commercial speech, which is entitled to the highest level of First Amendment protection. *Petition*, at 9-11. AAP argues in the alternative that, if its scientific and medical information is deemed commercial speech, the CID fails to satisfy the intermediate scrutiny test. *Id.* at 11.

AAP asserts that "the CID is part of an enforcement initiative shaped by predetermined disfavor for AAP's viewpoint," *Petition*, at 10, but this argument is disproved by the same July 9, 2025 FTC workshop to which AAP points. *Id.* at 2. The workshop occurred amid growing concern about deceptive representations surrounding PGDT. Recent reports have indicated weak scientific evidence and lack of substantiation for PGDT.[5] Patients, providers, and others have increasingly come forward with evidence that PGDT may harm teenagers.[6] Patients and their families have also alleged false statements and material omissions were communicated to them about PGDT's safety and efficacy.[7] Against that backdrop, the FTC began evaluating representations made to consumers about PGDT's purported benefits and the substantiation for those representations. Consistent with this approach, the FTC then held its public, live-streamed workshop. Chairman Ferguson's remarks at the workshop made clear that he had *not* made up his mind regarding the legality of any conduct by proponents of PGDT. *See* Andrew N. Ferguson, Chairman, FTC, *Welcome Keynote at the Dangers of "Gender-Affirming Care" for Minors* 1 (July 9, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-The-Dangers-of-Gender-Affirming-Care-for-Minors-Transcript.pdf ("It is about healing the wounds that proponents of gender-affirming care *may* have inflicted on our nation's children and parents" (emphasis added)); *id.* at 2 ("[O]ne of the reasons we are here today is [to] examine *whether* some of the practices in gender-affirming care are deceptive and require greater scrutiny by the FTC." (emphasis added)). As he explained, "We are not here to pass judgment on anyone. We are here

---

[5] For example, the Cass Report, a now-famous international government-commissioned review of PGDT, concluded that "[t]his is an area of remarkably weak evidence." H. Cass, *Independent Review of Gender Identity Services for Children and Young People*, at 13 (Apr. 2024), https://perma.cc/RDN3-WBYR.

[6] One young woman, for example, filed a medical malpractice suit, alleging that taking testosterone she received after only a "thirty-minute consult" caused "constant vocal pain, joint pain, and frustrating and sometimes painful sexual dysfunction." Jennifer Block, *How Did Planned Parenthood Become One of the Country's Largest Suppliers of Testosterone?*, The Free Press (Aug. 7, 2024), https://perma.cc/TB9T-27YA.

[7] *E.g.*, Chloe Cole, *I'm a Detransitioner*, N.Y. Post (Mar. 11, 2025), https://perma.cc/3HV7-GN68.

to ensure that those who make claims about gender-affirming care are held to the same standard we apply to everyone else who engages in commerce. We are here to ensure that everyone can make an informed choice about their own path to healing without fear of being deceived by those who stand to profit from certain medical interventions." *Id.* at 5. Commissioner Meador expressed similar sentiments. *Id.* at 74 ("In my view, treating people with respect and dignity means being honest with them, including about the effects of medical interventions, about the evidentiary basis, about the anticipated outcomes, and this is especially important when we're talking about decisions involving children. That's what today's workshop is about."). Neither Chairman Ferguson nor Commissioner Meador mentioned AAP. *See generally id.*

Following the workshop, the FTC issued a Request for Public Comment "to better understand how consumers may have been exposed to false or unsupported claims about 'gender-affirming care' (GAC), especially as it relates to minors, and to gauge the harms consumers may be experiencing."[8] By the September 26, 2025, comment deadline, the agency received close to 8,000 responsive comments.[9] Numerous commenters referenced AAP or the 2018 Policy Statement.[10] After considering the perspectives provided at the workshop and in the public comments, the Commission issued the CID to investigate potential deceptive or unfair practices related to the marketing or advertising of PGDT.

AAP's concern about content-based restrictions on its non-commercial speech is premature. The Commission has not found that AAP has engaged in unlawful conduct; the Commission has not ordered AAP to do, or refrain from doing, anything; the Commission has not imposed "informal sanctions" such as "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation," *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963); and the Commission has not taken any action, directly or indirectly, to "use the power of the State to punish or suppress disfavored expression," *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). "[T]here are no sanctions for failing to comply with a subpoena of this type unless and until a district court enters an order under section 20(e) of the Act, 15 U.S.C. § 57b-1(e), directing compliance." *Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983).

Although AAP cites *National Institute of Family & Life Advocates v. James (NIFLA)*, 160 F.4th 360 (2d Cir. 2025), this case is inapposite. The *NIFLA* plaintiffs alleged that, because the New York Attorney General had already initiated a civil enforcement action against other entities

---

[8] Press Release, FTC, *FTC Requests Public Comment Regarding "Gender-Affirming Care" for Minors* (July 28, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/07/ftc-requests-public-comment-regarding-gender-affirming-care-minors.

[9] *See Request for Public Comment Regarding "Gender-Affirming Care" for Minors*, regulations.gov, https://www.regulations.gov/docket/FTC-2025-0264.

[10] For example, consumers observed that they believed PGDT "is life-saving [and] evidence-based" due to the "endorse[ment]" of PGDT by AAP and its 2018 Policy Statement. *Comment from Moran, Crystal* (Aug. 11, 2025), https://perma.cc/VVN9-75XB; *Comment from Montes, Jenifer* (Sep. 9, 2025), https://perma.cc/FR8Z-ASBZ ("Leading medical organizations, including the AMA and AAP, affirm [PGDT's] safety and necessity."); *Comment from Sytsma-Ramos, Rachael* (Aug. 21, 2025), https://perma.cc/ECC3-3Q33. On the other hand, numerous commenters expressed serious concern over the lack of evidence supporting the 2018 Policy Statement and PGDT. The American Academy of Medical Ethics, for example, explained that the 2018 Policy Statement was not credible given its "systematic exclusion and misrepresentation of entire literatures" and evidence that it "deliberate[ly] suppress[es] … opposition" to PGDT. *Comment from Am. Acad. of Med. Ethics* (Sep. 8, 2025), https://perma.cc/C2NZ-V522.

for making statements that were identical or substantially similar to statements the NIFLA plaintiffs made or wished to make, the NIFLA plaintiffs faced a threat of sanctions if they continued to engage in this speech and therefore stopped their speech to avoid any liability. *Id.* at 363-64. In contrast, the Commission has taken no comparable enforcement action. The Commission is merely conducting an investigation, one purpose of which is to determine whether AAP or others may have engaged in conduct that lacks protection under the First Amendment. *See Police Protective Fund*, 157 F.T.C. at 1920; *see also Vullo*, 602 U.S. at 190-91 ("When the government threatens no sanction—criminal or otherwise—we very much doubt that the government's criticism or effort to embarrass the intermediary threatens anyone's First Amendment rights." (cleaned up)). In addition, it was undisputed that the *NIFLA* plaintiffs wanted to make their statements based on their moral and religious beliefs, and that they received no remuneration or financial benefit from engaging in their protected speech. 160 F.4th at 376. Here, by contrast, interrogatory 9 and document request 10 seek information needed to assess whether AAP benefits financially from, or has other economic motivations based on, its relationships with pharmaceutical companies, medical device manufacturers, clinics, hospital systems, or individual clinicians. *Petition* Ex. 1, at 6-7.

Additionally, as part of the section of its petition relating to the chilling of medical discourse, AAP includes several apparently unrelated arguments. It makes a fleeting reference to viewpoint discrimination, it invokes the Fourth Amendment, and it argues that the specifications are more extensive than necessary. *Petition*, at 10-11.

To the extent that AAP is claiming that mere issuance of the CID constituted viewpoint discrimination, the Commission notes that AAP has not alleged a "pattern of unlawful favoritism," *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002), or that similarly situated entities received more favorable treatment. Indeed, the CID sent to AAP actually has fewer specifications and seeks less information than other CIDs sent to other nonprofits or purported nonprofits[11] or in other investigations involving healthcare claims.[12]

As to the Fourth Amendment, *Petition*, at 10, there has been no unconstitutional search or seizure here. As courts have recognized, "[a]n administrative subpoena is not self-executing and is therefore technically not a 'search.' It is at most a constructive search, amounting to no more than a simple direction to produce documents, subject to judicial review and enforcement." *United States v. Sturm, Roger & Co.*, 84 F.3d 1, 3 (lst Cir. 1996). AAP's reliance on *Zurcher v.*

---

[11] *See, e.g.*, Pet. to Quash Civil Investigative Demand Ex. B, *Childhood Leukemia Found.*, 2023 WL 8112947, https://www.ftc.gov/system/files/ftc_gov/pdf/2223073-PTQ.pdf (28 interrogatories and 55 document requests, many with subparts), Mot. to Quash Civil Investigative Demand Ex. P, *Police Protective Fund*, 157 F.T.C. 1913, https://www.ftc.gov/system/files/documents/petitions-quash/police-protective-fund-inc./140422policeprotfundquash.pdf (76 interrogatories and 53 document requests, many with subparts).
[12] *See, e.g.*, Pet. to Enforce Civil Investigative Demand Ex. 3, *FTC v. Kushly, LLC*, No. 2:20-mc-00036 (D. Ariz. July 30, 2020), https://www.ftc.gov/system/files/documents/cases/01_petitionexhibitsproposed_order.pdf (22 interrogatories and 15 documents requests, many with subparts); Pet. for an Order Enforcing Civil Investigative Demand Ex.2, *FTC v Redwood Sci. Techs.*, No. 2:17-cv-07921 (C.D. Cal. Oct. 30, 2017), https://www.ftc.gov/system/files/documents/cases/redwood_2017-10-30_enforcement_petition.pdf (22 interrogatories and 16 document requests, many with subparts); Pet. to Limit or Quash Civil Investigative Demand Ex. 1, *In re Cellmark Biopharma LLC*, 162 F.T.C. 1212 (2016), https://www.ftc.gov/system/files/documents/petitions-quash/lexium-international-llc/160613petitiontoquash-lexium.pdf (42 interrogatories and 36 document requests, many with subparts).

*Stanford Daily*, 436 U.S. 547, 564 (1978), is accordingly unavailing. *Zurcher* involved a criminal search warrant, not a CID. 436 U.S. at 551. For administrative subpoenas like the Commission's CIDs, the Fourth Amendment is satisfied so long as "the investigation is authorized by Congress, is for a purpose Congress can order, and the documents sought are relevant to the inquiry." *Okla. Press Publ'g. Co. v. Walling*, 327 U.S. 186, 209 (1946); *see Strum, Ruger & Co.*, 84 F.3d at 4 (describing the "modest," "minimal standards of *Oklahoma Press*" for administrative subpoenas). Section 20 of the FTC Act provides the necessary authorization and lawful purpose, and the information sought in the CID is relevant to the Commission's investigation into potential deceptive or unfair practices related to the marketing or advertising of PGDT. *See FTC v. Invention Submission Corp.*, 965 F. 2d 1086, 1090 (D.C. Cir. 1992) ("The standard for judging relevancy in an investigatory proceeding is more relaxed than in an adjudicatory one. At the investigatory stage, the Commission does not seek information necessary to prove specific charges; it merely has a suspicion that the law is being violated in some way and wants to determine whether or not to file a complaint."); *see also Adams v. FTC*, 296 F.2d 861, 867 (8th Cir. 1961) ("[B]roadness alone is not sufficient justification to refuse enforcement of a subpoena so long as the material sought is relevant.").

And in complaining that the CID specifications are "significantly more extensive than necessary for the Commission to investigate AAP's statements about GAC," *Petition*, at 11, AAP misunderstands the scope of the Commission's investigation. As the CID's "Subject of Investigation" field makes clear, the Commission is investigating both AAP *and* other persons. *Id.* Ex. 1, at 3. Information responsive to the specifications that AAP complains about—documents requests 4 and 5—will help the Commission assess any claims related to the 2018 Policy Statement, 2023 Reaffirmation, or SOC-8, and also assess whether those three documents provided the basis for anyone to make false or unsubstantiated representations or engage in unfair practices related to the marketing or advertising of PGDT. *Id.* at 7. AAP's Communications with Professional Medical Organizations, other organizations or institutions, or individuals related to the 2018 Policy Statement, 2023 Reaffirmation, and SOC-8 are relevant to these concerns.

### 2.  Right to Free Association

AAP argues that the CID's demands for the identities of all individuals and entities involved in the development of GAC guidance, as well as deliberations about that guidance, infringe on AAP's First Amendment right to free association. *Petition*, at 12-13.

AAP's claim is, however, premature. Two of the cases it cites involved situations where the government had ordered a group to accept members it did not desire—an issue that the CID does not raise. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 616, 623 (1984) (state supreme court determined that state law required the Jaycees to admit women as full voting members); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 646-47 (2000) (state supreme court determined that state law required the Boy Scouts to accept a gay man as an adult leader). In the remaining case, the entity was subject to a court order requiring production of the documents in question. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1153-54 (9th Cir. 2010) (court order required production in response to opposing party's requests for production of documents under the Federal Rules of Civil Procedure). Here, by contrast, the Commission has not sought enforcement of the CID. The

Commission has not yet decided whether it will do so at all, and if so, as to which specifications (or even portions of specifications). *See Gen. Fin. Corp.*, 700 F.2d at 368 ("Compliance with the subpoenas could be a hardship but it is one the plaintiffs can prevent by defending successfully against the Commission's [process] enforcement action").

Relatedly, AAP's argument is too underdeveloped for the Commission to evaluate at this juncture. AAP asserts that interrogatories 8 and 13 and documents requests 4-5 "chill AAP's ability to engage in open discussions about GAC and other scientific topics." *Petition*, at 12. But AAP fails to explain how each of these specifications would chill associational rights, whose associational rights would be chilled, what (if any) responsive material it has for each specification, and why disclosure of the responsive material would result in harassment, membership withdrawal, discouragement of new members, or other consequences which objectively suggest an impact on, or chilling of, associational rights. For example, the 2018 Policy Statement lists an author, as well as various contributors, committee members, liaisons, staff, and reviewers. *Petition*, Ex. 3 at 10-11. Without details about whether the responsive material (if any) relates to these publicly known individuals or instead to AAP's members who wish to be anonymous, the Commission cannot evaluate the associational interests at stake.

In addition, without more details about what material AAP claims is protected by the First Amendment, the Commission cannot apply the appropriate balancing test. In a recent case involving compelled disclosure of associational information, three Justices took the view that the applicable standard is "exacting scrutiny." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (plurality opinion as to Part II-B-1).[13] Under that standard, there must be "a substantial relation between the disclosure requirement and a sufficiently important governmental interest," and the disclosure requirement must be "narrowly tailored to the interest it promotes." *Id.* (cleaned up). The Commission's important government interests furthered by this CID include investigating potential deceptive claims about PGDT, protecting children and families from deception, and investigating whether the Commission has enforcement authority over AAP. But, without more information about what responsive material AAP has, the Commission cannot assess whether these important government interests are sufficient to overcome any claimed chilling effect, whether there are other means by which the Commission could obtain the information it needs for its investigation, and whether the claimed injury to AAP's associational rights could be cured by narrowing the specifications, redacting certain information, putting in place use or disclosure restrictions, or taking other measures. *Cf. Dole v. Serv. Emps. Union, AFL-CIO, Loc. 280*, 950 F.2d 1456, 1458 (9th Cir. 1991) (concluding that the DOL could obtain union meeting minutes that recorded "discussions of a highly sensitive and political character" because the DOL had a compelling interest, but upholding various restrictions on the DOL's use and disclosure of the meeting minutes).

AAP is free to assert this claim in the concrete factual context of an enforcement proceeding, if one ever occurs. For the moment, however, its claim is both premature and insufficiently concrete.

---

[13] More specifically, Chief Justice Roberts and Justices Kavanaugh and Barrett applied exacting scrutiny, Justice Thomas would have applied strict scrutiny, and Justices Alito and Gorsuch saw no need to decide between the two standards. 594 U.S. at 619-20 (Thomas, J., concurring in part and concurring in the judgment); 594 U.S. at 622-23 (Alito, J., concurring in part and concurring in the judgment).

11

### 3. Retaliation

AAP argues that the CID retaliates against AAP's protected speech. *Petition*, at 13-15. Specifically, AAP contends that AAP's publication of medical guidance and policy advocacy constitutes protected speech; that the CID demands the same kind of wide-ranging internal "resource materials" at issue in *Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105 (D.D.C. 2025); and that the Commission has evidenced hostility toward GAC. *Id.*

As an initial matter, to the extent that AAP is alleging a retaliatory investigation by the Commission, it appears unlikely that such a claim is even cognizable. The Supreme Court and the U.S. Court of Appeals for the District of Columbia Circuit have declined to resolve the question. *See Hartman v. Moore*, 547 U.S. 250, 262 n.9 (2006); *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584-85 (D.C. Cir. 2025). Several courts of appeals have suggested that such claims should not be recognized. *See Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017); *Breaux v. City of Garland*, 205 F.3d 150, 157-61 (5th Cir. 2000); *see also J.T.H. v. Mo. Dep't of Soc. Servs. Child.'s Div.*, 39 F.4th 489, 493 (8th Cir. 2022) ("[W]e have never recognized a retaliatory-investigation claim of this kind. Nor have other courts around the country. . . ."); *Sivella v. Township of Lyndhurst*, No. 20-2342, 2021 WL 3356934, at *3 (3d Cir. Aug. 3, 2021). And the U.S. Court of Appeals for the Eleventh Circuit has squarely held that "a retaliatory investigation" "does not implicate a federal constitutional right." *Rehberg v. Paulk*, 611 F.3d 828, 850 & n.24 (11th Cir. 2010), *aff'd*, 566 U.S. 356 (2012); *Thompson v. Hall*, 426 F. App'x 855, 858 (11th Cir. 2011) (per curiam) (same).

Even if a retaliatory investigation claim were theoretically cognizable—which only one federal court of appeals appears to have assumed—it could arise only in extraordinary circumstances. *See Moore v. Garnand*, 83 F.4th 743, 752 (9th Cir. 2023) (recognizing that while no case had "held that a retaliatory investigation by itself was unconstitutional," it was possible that the entire "scope and manner" of a given investigation could violate the First Amendment (cleaned up)). Such extraordinary circumstances might include "campaigns of harassment and humiliation," *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003), threats of arrest, *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 909-10, 917 (9th Cir. 2012), or "other means of coercion, persuasion, and intimidation" such as a substantial fine, *White v. Lee*, 227 F.3d 1214, 1228 & n.8 (9th Cir. 2000) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). None of which are present in the Commission's investigation. AAP faces no threat of fines or arrest. CIDs are not self-executing, and AAP will incur no penalty or other legal detriment for failing to comply unless the Commission first files a petition for enforcement in a federal court and the court, after considering AAP's arguments, rules for the Commission and orders AAP to respond. *See, e.g.*, *Gen. Fin. Corp.*, 700 F.2d at 368; 15 U.S.C. § 57b-1(e) (CID enforcement provision). AAP's statement of counsel acknowledges that, far from harassing or coercing AAP, Commission staff has met and conferred to address AAP's concerns and has modified certain specifications. *See Petition* Ex. 4, at 5-9. And, as discussed in more detail below, none of AAP's asserted harms are sufficient to show a chilling effect, much less rise to the level of extraordinary circumstances.

Even assuming that a retaliatory investigation claim is cognizable, AAP did not provide adequate evidence to support its claim. To prevail on a retaliation claim, a party must show (1)

that it engaged in conduct protected under the First Amendment, (2) that there is "a causal link between the exercise of the constitutional right and the adverse action taken against [the organization]"—*i.e.*, a retaliatory action, and (3) that the Commission's "retaliatory action [was] sufficient to deter a person of ordinary firmness in [the organization's] position from speaking again"—*i.e.*, a chilling effect. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (cleaned up). For purposes of this Order, the Commission assumes without deciding that AAP engages in some protected First Amendment activities. Regardless, AAP's petition fails to establish the other two prongs: it has not shown a causal link between the CID and its First Amendment protected activities, and it has not shown that the CID has caused a sufficient chilling effect.

### a. Retaliatory Action

AAP fails to demonstrate a causal link between its speech and the CID. *Aref*, 833 F.3d at 258. To show causation, AAP must demonstrate at a minimum that the CID "would not have been [issued] absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019).[14] In making that but-for showing, AAP must overcome the "longstanding presumption of regularity" that attaches to government action. *Hartman*, 547 U.S. at 263. That presumption is at its apex in the context of law-enforcement investigations, an area of "executive discretion of such high order." *Id.* For that reason, to meet this prong, AAP must put forward sufficient evidence to displace the presumption of regularity and demonstrate that the but-for cause of the CID was AAP's protected activity. AAP points to the FTC's "public statements evidencing hostility to GAC," as well as the "misalignment" between the CID's "expansive" requests and "any neutral inquiry regarding allegedly deceptive advertising," *Petition*, at 14, but this is insufficient to meet AAP's burden.

As discussed above in section II.B.1, both Chairman Ferguson's and Commissioner Meador's remarks at the July 5, 2025, workshop actually suggest that the Commission acted for *non*-retaliatory reasons when issuing the CID. Both the Chairman and the Commissioner highlighted the need for the Commission to examine whether GAC-related practices are unfair or deceptive. And AAP's reliance on the statement of an FTC spokesperson from July 2, 2025, *Petition*, at 15, is unavailing. Remarks from "non-decisionmakers are not generally direct evidence of discrimination." *Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1374 (D.C. Cir. 2020); *accord Youssef v. Lynch*, 144 F. Supp. 3d 70, 101 (D.D.C. 2015). The only way such statements could even conceivably enter the analysis is if the non-decisionmaker was involved in the decisionmaking process. *E.g.*, *Harris v. Wackenhut Servs., Inc.*, 648 F. Supp. 2d 53, 62 (D.D.C. 2009), *aff'd*, 419 F. App'x 1 (D.C. Cir. 2011) (concluding that "comments made by … non-decisionmakers[] are inadmissible" where "plaintiff [had] failed to proffer evidence … that the speakers had any influence, or even had any input, on the [relevant] decision"). Here, AAP has not alleged that the FTC spokesperson had any involvement in the issuance of the CID. His remarks do not suggest retaliation against AAP in any event. He merely observed that avoiding

---

[14] In fact, the requisite showing is more robust: AAP actually must demonstrate that there was no reasonable basis for the CID. For example, in the similar context of retaliatory arrests, the Supreme Court has held that plaintiffs must show that the government lacked probable cause. *Nieves*, 587 U.S. at 399-400. The same logic applies here too. *See Gonzalez v. Trevino*, 602 U.S. 653, 663 (2024) (Alito, J., concurring); *cf. Media Matters for Am. v. Bailey*, No. 24-cv-147, 2024 WL 3924573, at *1213 (D.D.C. Aug. 23, 2024) (considering the issue and ultimately declining to impose an objective basis standard, at least in part for case-specific reasons). As discussed in the accompanying text, however, AAP has not satisfied even the basic but-for standard.

13

"needless mutilation of children" should be a point of agreement.[15] And AAP's petition tellingly omits the following sentence, where this employee added that "[e]very American should be troubled by the *possibility* that parents and their children were misled about the use of medical 'therapies' that may have caused serious harm."[16] Moreover, as discussed in Section II.B.1, the subsequent responses to the Request for Public Comment reinforced the need for the Commission to investigate potential deceptive or unfair practices related to the marketing or advertising of PGDT.

AAP's argument about a purported "misalignment" is also unconvincing. As previously noted in section II.B.2, the specifications in the AAP CID are actually narrower than other CIDs sent to other nonprofits or in other investigations involving healthcare claims. *See supra* notes 8 and 9. In short, because AAP's Petition fails to demonstrate that its speech was the reason that the Commission issued the CID or that the CID had a chilling effect, AAP has failed to establish a retaliatory investigation claim, to the extent that such a claim is even cognizable.

### b. Chilling Effect

AAP offers no affidavit to support its claims of a chilling effect, and instead merely points to the district court's decision in *Media Matters*, 805 F. Supp. 3d 105. *Media Matters* is, however, a non-precedential decision in a preliminary posture that is currently on appeal. In any event, the reasoning of *Media Matters* is inapplicable here. As the district court explained, the retaliation ruling in *Media Matters* "turned on facts unique to Media Matters" and the "likelihood that" another CID recipient in the same investigation could prevail on a similar claim would "depend[] on entirely different facts." Docket Order, *Disinformation Index, Inc. v. FTC*, No. 1:25-cv-4137 (D.D.C. Dec. 16, 2025). The stay panel majority, too, described *Media Matters* as involving "unique factual circumstances" and expressed skepticism that even other CID recipients in the same investigation "could plausibly … seek similar relief." *Media Matters for Am. v. FTC*, 2025 WL 2988966, at *11 (D.C. Cir. Oct. 23, 2025) (per curiam). *Media Matters* is even less relevant to a CID recipient in a wholly different investigation, such as AAP.

Even if the Commission were to give credence to AAP's unsupported assertions about discussion participants fearing "burdensome investigations or FTC enforcement" and current or prospective members withdrawing or being deterred because of "expos[ure] to FTC scrutiny," *Petition*, at 12-13, these claimed harms are inadequate. The CID's specifications are typical for CIDs seeking to determine whether an organization has made health and safety claims in advertising and whether those claims are substantiated. *See supra* note 12. The fact that AAP's CID responses may result in the FTC scrutinizing other individuals or entities as part of this same investigation is not sufficient evidence of a chilling effect. *See FTC v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C. Cir. 1977) ("Some burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest."); *cf. FTC v. Standard Oil*, 449 U.S. 232, 244 (1980) ("The expense and annoyance of litigation is part of the social burden of living under government." (cleaned up)).

---

[15] *See* Jody Godoy, *US FTC Workshop Criticizing Medical Care for Transgender Youth Draws Staff Opposition*, Reuters (July 2, 2025), https://perma.cc/E8SU-MF9L.
[16] *Id.* (emphasis added).

PUBLIC

Overall, AAP's Petition fails to establish that the Commission's issuance of the CID has had a sufficient chilling effect on its speech. For that reason, too, AAP has failed to establish its retaliatory investigation claim, to the extent that such a claim exists.

### 4. Right to Petition

AAP argues that document request 7, which seeks "[a]ll testimony, advocacy, or other information provided to any legislature or regulator related to PGDTs," burdens its right to petition. *Petition*, at 12 n.12. Under 16 C.F.R. § 2.10(a)(1), a petition to quash or limit compulsory process "shall set forth all assertions of protected status or other factual and legal objections to the Commission compulsory process, including *all appropriate arguments*, affidavits, and other supporting documentation" (emphasis added). AAP's single sentence in a footnote falls short of this standard, because AAP fails to "offer[] any support, explanation, or reasoned argument." *In re Postal Careers Inst., Inc.*, 125 F.T.C. 1317, 1319 (1998). Despite these deficiencies, however, we explain why AAP's right to petition claim is not a basis to quash the CID.

Document request 7 seeks "[a]ll testimony, advocacy, or other information provided to any legislature or regulator related to PGDTs." *Petition* Ex. 1, at 6. To the extent that AAP contends that disclosure of this information would chill its right to petition legislatures or regulators, that contention is without merit. Although AAP has a First Amendment right to lobby government officials, it has "no First Amendment right to lobby *in secret*." *DoorDash, Inc. v. City of New York*, 754 F. Supp. 3d 556, 577 (S.D.N.Y. 2024); *see also Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, No. A-15-CV-134-RP, 2016 WL 5922315, at *7 (W.D. Tex. Oct. 11, 2016) (rejecting the contention "that there is a First Amendment right not only to lobby the government, but to do so secretly").

AAP's reliance on *White*, 227 F.3d at 1227, is unpersuasive. The government officials there took "extraordinarily intrusive and chilling measures" during the course of their investigation—including advising the plaintiffs' lawyer that the plaintiffs had violated the law, and advising the lawyer that his clients should accept a settlement proposal that would have required the plaintiffs to cease litigation and cease publication of statements and flyers. *Id.* at 1223, 1238. Here, in contrast, the Commission has made no determination about the legality of anyone's conduct and has not proposed to restrict anyone's speech. Document request 7 merely seeks copies of information that AAP has already provided to legislatures or regulators, which will help the Commission assess possible unlawful acts, such as making false or unsubstantiated statements, relating to PGDT. *See also Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1177 (9th Cir. 2022) (distinguishing *White* because Twitter could "raise its First Amendment defense if Paxton moves to enforce the CID").

### C. The CID Was Properly Issued Pursuant to Two Commission Resolutions.

AAP argues that the FTC failed to satisfy 15 U.S.C. § 57b-1(i), because the resolutions do not support the investigation subject matter described in the CID. *Petition*, at 15.

AAP's focus on the "in or affecting commerce" language of the resolutions, *id.*, is unavailing for the reasons discussed above in section II.A. Regardless of whether AAP or its statements are subject to the Commission's enforcement jurisdiction, the Commission properly issued the CID to assess whether law violations have occurred, including whether AAP *or any other persons* are making deceptive claims about the safety and efficacy of PGDT.

AAP disclaims involvement in advertising or marketing directed to children, *id.*, but its argument ignores the broader scope of the resolutions. For example, with respect to the 2019 Resolution, AAP overlooks the part of the resolution describing the Commission's investigation into whether unnamed entities "have misrepresented or are misrepresenting the safety or efficacy of such products or services." *Petition* Ex. 1, at 16. Similarly, with respect to the 2021 Resolution, AAP overlooks the part of the resolution describing the Commission's investigation into unlawful practices "*relating to* goods or services marketed, in whole or in part, to children under 18." *Id.* at 17. Both resolutions thus properly support the CID's Subject of Investigation ("whether the Organization or any other Person . . . have made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of PGDT . . . to consumers in violation of Sections 5 and 12 of the FTC Act"). *Id.* at 1. Although AAP states that its guidance is intended for "medical professionals, not patients," *Petition*, at 15, cases like *Waltham Watch Co. v. FTC*, 318 F.2d 28, 32 (7th Cir. 1963), recognize the availability of means and instrumentalities liability for violations of Sections 5 and 12. [17]

### D.  The CID Is Not Overbroad or Unduly Burdensome.

AAP argues that the CID is overbroad and unduly burdensome, given AAP's limited resources, the time period for the CID, and the CID's broad definitions. AAP also argues that the "significant burden" imposed by the CID is "not proportional to the needs of the investigation." *Petition*, at 16.

AAP fails to provide adequate support for its claim of undue burden. Agency process is not unduly burdensome unless compliance "threatens to unduly disrupt or seriously hinder" the normal operations of the recipient's business. *Texaco*, 555 F.2d at 882. The test is "not easily met" because "[s]ome burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest." *Id.*; *see also FTC v. Shaffner*, 626 F.2d 32, 38 (7th Cir. 1980) ("[A]ny subpoena places a burden on the person to whom it is directed. Time must be taken from normal activities and resources must be committed to gathering the information necessary to comply. Nevertheless, the presumption is that compliance should be enforced to further the agency's legitimate inquiry into matters of public interest.").

A CID recipient bears the burden of showing how a CID interferes with its ability to operate its business. *See FDIC v. Garner*, 126 F.3d 1138, 1146 (9th Cir. 1997) (rejecting claim of undue burden where recipient failed "to enunciate how these subpoenas constitute a 'fishing

---

[17] For further discussion on means and instrumentalities liability, see Dissenting Statement of Comm'r Andrew N. Ferguson, Joined by Comm'r Melissa Holyoak, *In the Matter of Rytr*, Matter No. 2323052, at 3-9 (Sep. 25, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-rytr-statement.pdf.

expedition'"); *see also FTC v. Standard Am., Inc.*, 306 F.2d 231, 235 (3d Cir. 1962) (finding no undue burden where subpoena recipients "did not adduce a single shred of evidence" to support their claim that compliance would result in "the virtual destruction of a successful business").

Although AAP submitted an affidavit from Robert Katchen, AAP's Senior Vice President of Information Technology, this affidavit fails to specify how compliance will impose an undue burden by seriously disrupting AAP's operations. The affidavit merely claims that responding to the CID "would require significant time and resources from individuals at AAP whose job responsibilities are focused on advancing AAP's mission of improving children's health," that searching electronic communications would be "extremely laborious" and "require significant time," and that collecting materials stored on third-party platforms would result in "additional costs" for AAP. *Petition* Ex. 4, at 2-3. AAP makes no attempt to quantify how much time or employee resources it would take to search for and assemble responsive documents, beyond these conclusory and unsupported statements. The Commission routinely denies petitions to quash that lack an adequate evidentiary basis.[18]

Additionally, AAP's proportionality argument conflates the narrower standard for discovery in the Federal Rules of Civil Procedure with the broader scope for inquiries undertaken by the Commission in investigations. Compare Fed. R. Civ. P. 26(b)(1) (allowing discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case") *with Morton Salt Co.*, 338 U.S. at 652 (enforcing process provided that "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant"). "The standard for judging relevancy in an investigatory proceeding is more relaxed than in an adjudicatory one." *Invention Submission Corp.*, 965 F.2d at 1090; *see also In re Johnson & Johnson*, 168 F.T.C. 796, 799 (Oct. 18, 2019).

AAP also complains about the default five-year time period for the CID, and the fact that some specifications apply "regardless of time period." *Petition*, at 16. Yet the default five-year time period is actually shorter than the default time period in other CIDs investigating healthcare claims. *See supra* note 12. In addition, Commission staff has already agreed to limit several of the "regardless of time period" specifications (interrogatories 8 and 13 and document requests 1-3) so that they only apply from January 1, 2015, to the present. *See Petition* Ex. 4, at 9.

With respect to the specifications relating to the development and substantiation of any Covered Statements and AAP's PGDT-related studies, these time limits (as modified) seek the production of reasonably relevant information that the Commission needs to conduct its investigation. AAP claims that its guidance "reflect[s] scientific research and evidence-based strategies." *Petition*, at 5. Examining the evolution of, and substantiation for, Covered Statements

---

[18] *See, e.g.*, *In re Civ. Investigative Demand to Spread Techs. LLC, Dated May 11, 2022*, No. 222-3050, 2022 WL 2967367, at *8 (July 18, 2022) (rejecting claim of undue burden based on "conclusory contentions regarding [petitioner's] resources, the breadth of its operations, or the burden and expense of responding"); *In re Auto Dealers*, 157 F.T.C. 1880, 1892-93 (Apr. 21, 2014) (noting that the CID recipient must make a factual record to support a claim of undue burden); *In re The College Network, Inc.*, 157 F.T.C. 1894, 1905 (Apr. 21, 2014) (denying petition to quash CID specification where recipient provided "no factual support" for its claimed burden); *In re Nat'l Claims Serv., Inc.*, 125 F.T.C. 1325, 1327-29 (June 2, 1998) (rejecting petitioner's burden argument that as a small company it could not afford the diversion of personnel and financial resources needed for compliance because it failed to substantiate its burden objection with any evidence).

and AAP's PGDT-related studies since January 1, 2015, will help the Commission understand the extent to which this claim is accurate. The mere fact that AAP might have to "search for documents that are potentially over a decade old," *Petition*, at 16, does not render these specifications unreasonably broad. Absent a showing of disruption, the sheer amount of responsive materials does not demonstrate undue burden or overbreadth, since "to define the reasonableness of a subpoena based on the volume of items identified for production would be to require the government to ascertain, before issuing a subpoena, the extent of any wrongdoing. But ascertaining the extent of wrongdoing is itself a primary purpose for the issuance of the subpoena." *In re Subpoena Duces Tecum*, 228 F.3d 341, 350-51 (4th Cir. 2000); *see also Garner*, 126 F.3d at 1145-46 (mere allegation that subpoena called for thousands of financial documents and one million other documents was not sufficient to establish burden). Further, "[b]roadness alone is not sufficient justification to refuse enforcement" of agency process. *Texaco*, 555 at 882 & n.51 (citing *Adams v. FTC*, 296 F.2d 861, 867 (8th Cir. 1961)); *see also Genuine Parts Co. v. FTC*, 445 F.2d 1382, 1391 (5th Cir. 1971) (FTC should be accorded "extreme breadth" in conducting its investigations in order to "'satisfy [itself] that corporate behavior is consistent with the law and the public interest'" (quoting *Morton Salt Co.*, 338 U.S. at 652)). A recipient of process must make "a record . . . of the measure of [its] grievance rather than ask [a reviewing tribunal] to assume it." *Morton Salt*, 338 U.S. at 654.

The two remaining "regardless of time period" specifications—document requests 4 and 5—seek information related to the development of the 2018 Policy Statement, 2023 Reaffirmation, and SOC-8. Information responsive to the specifications is already inherently time limited, depending on when the process for developing these statements began. For example, according to SOC-8 Appendix A, the earliest step in the SOC-8 development process—establishing the Guideline Steering Committee—took place on July 19, 2017.[19] In addition, placing a time limitation that begins on January 1, 2021, on these specifications does not make sense, given that relevant documents and information were generated earlier.

Finally, we are unpersuaded by AAP's arguments about the CID's broad definitions. *Petition*, at 16-17. "The party objecting to discovery as vague or ambiguous has the burden to show such vagueness or ambiguity." *Johnson v. Kraft Foods N. Am., Inc.*, 238 F.R.D. 648, 655 (D. Kan. 2006). In doing so, a party "should exercise reason and common sense to attribute ordinary definitions to terms and phrases," *id.* (quotation omitted), while avoiding "[h]yper-technical, quibbling, or evasive objections," *Avalos v. Carpenter*, No. 15-cv-00369, 2017 WL 387243, at *1 (E.D. Cal. Jan. 27, 2017). Similar definitions of "Document" and "Collaborative Work Environment" can be found in other Commission CIDs, as can the use of specifications seeking "any" or "all" documents.[20] AAP has not met its burden of showing why use of these common definitions and terms renders the CID overbroad or unduly burdensome.

---

[19] E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1, S247 (2022),https://doi.org/10.1080/26895269.2022.2100644.

[20] *See, e.g.,* Petition to Quash or Limit Civil Investigative Demand Ex. 1, *In re Civ. Investigative Demand to MGM Resorts Int'l*, No. 2423028 (Feb. 20, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/2423028mgmpetquashpublic.pdf; Petition to Quash or Limit Civil Investigative Demand to Matthew Thayer Ex. A, *In re IM Mastery Academy*, No. 2123090, 2023 WL 4014246 (F.T.C. June 5, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/2123090ptqthayer.pdf.

### III.    CONCLUSION

For the foregoing reasons, AAP's petition to quash is denied.

**IT IS HEREBY ORDERED THAT** AAP's Petition to Quash the January 15, 2026, Civil Investigative Demand be, and hereby is, **DENIED**.

**IT IS FURTHER ORDERED THAT** AAP shall comply in full with the Commission's Civil Investigative Demand no later than 60 days after the Court's decision on AAP's Motion for Preliminary Injunction in *AAP v. FTC*, No. 1:26-cv-508 (D.D.C. filed Feb. 17, 2026), or at such other date, time, and location as the Commission staff may determine.

By the Commission.

April J. Tabor
Secretary

SEAL:
ISSUED:  March 23, 2026

19